# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

UNILOC USA, INC. and
UNILOC SINGAPORE PRIVATE LIMITED

Plaintiff,

vs. )Civ. A. No. 03-CV-440 (WES)

MICROSOFT CORPORATION,
Defendant.

## DECLARATION OF DAVID KLAUSNER RE: PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

1. My name is David Klausner. I have been retained to provide expert testimony on behalf of Uniloc USA, Inc. and Uniloc Singapore Private Limited (hereinafter "Plaintiffs" or "Uniloc") in connection with this case. I submit this Declaration in support of Plaintiffs' Opening Claim Construction Brief.

2. My background, qualifications and testimonial experience are set forth in my curriculum vitae attached as Exhibit A. As can be seen from my curriculum vitae, I have a Bachelors degree in Mathematics and a Master of Science degree in Electrical Engineering. I have over 37 years of software development, consulting and expert testimony experience in all aspects of the computer field, from micros to mainframes, and in all areas of programming. I have designed and developed, as well as managed and assisted in the design and development of computer hardware and software systems and some of my clients include computer software

companies, including Intel Corp., Hewlett-Packard and IBM. I also have experience as an engineer, developer, supervisor, project manager, department manager, middle manager and company executive as well as experience in forensic investigation and reverse engineering.

3. The '216 Patent relates to the field of registration and licensing of software so as to protect the use of digital data, e.g., software and/or applications, from unauthorized use. It is my understanding based on my experience in the field that a person having ordinary skill in the art ("POSA") at the time of the invention would have a Bachelor's Degree, or equivalent, in either Electrical Engineering or Computer Science, or one to two years of experience in software development or the equivalent work experience. I understand from the deposition of Mr. Richardson (of 03/31/05) that at the time he filed the '216 Patent he did not have a college degree and that he had no more than (approximately) 2 years of programming experience (*Id.*, 9:24-10:10, 10:21-12:9).

4. My opinions in this Declaration are given from a technical point of view, using the perspective of a person of ordinary skill in the art at the time of the invention to which the subject matter of the '216 patent pertains. In reaching these opinions, I have reviewed the '216 patent, its file history, and other documents identified in my previous reports. I understand that Microsoft's expert, Dr. Wallach, has a different opinion of the background of a person of ordinary skill in the art for this patent. To the extent this difference in perspective changes how a POSA would interpret the claim terms, I will note that difference for the specific claim term.

5. I understand that means-plus-function limitations are construed pursuant to 35 U.S.C. § 112, ¶ 6 as covering elements of an accused device that perform the same function, and have a structure identical or equivalent to the structure disclosed in the specification. I also understand the test for a corresponding structure is whether one of ordinary skill in the art would

recognize the specification discloses a structure linked to the function, and not merely whether one of ordinary skill in the art would recognize that a particular structure could perform the claimed function.

**Algorithm**

6. One of ordinary skill in the art would understand the term "algorithm" as used in the context of the patent as having a meaning consistent with Uniloc's proposed construction. Microsoft's proposed construction potentially over-narrows what one of ordinary skill would understand algorithm to mean, and is contradicted by the definition contained in its own dictionary. As an example, algorithms used in computer program often contain many "if/then" statements. The path through an algorithm can depend on whether a certain precedent condition is met. Put simply, one path through an algorithm might involve doing steps 2, 8 and 10 whereas another path, based on a different set of precedent conditions, might involve doing steps 1-10. Microsoft's proposed construction potentially reads out this possibility. For this and other reasons, one of ordinary skill in the art would understand the term algorithm as used in the patent as having a meaning consistent with Uniloc's proposed construction.

**Licensee Unique ID**

7. One of ordinary skill in the art would understand the term "licensee unique ID" as used in the patent as having a meaning consistent with Uniloc's proposed construction. Microsoft's proposed construction adds at least seven different limitations to the claim term. One of ordinary skill in the art would not read the intrinsic record or claim language as supporting these additional limitations. First, the patent uses the term "unique," consistent with

its use in the art, to refer to a low probability for duplication. For example, the patent discusses making a number more unique which is consistent with its use as a relative term (low probability) as opposed to an absolute term (one-of-a-kind). Therefore, one of ordinary skill in the art would not read licensee unique ID as being one-of-a-kind. Second, one of ordinary skill in the art would not read the intrinsic record as requiring the licensee unique ID be "entirely the product of data about the user, not the platform." One of ordinary skill in the art would readily recognize the patent clearly contemplates the use of environment information (*e.g.*, serial number) as an input into the licensee unique ID generating means. Next, one of ordinary skill in the art would not read the file history as requiring the two enumerated limitations added by Microsoft. These limitations come from a superficial reading of the file history, and failing to read the file history in the context of the asserted prior art. The file history underscores a distinguishing limitation that the Licensee Unique ID is a value generated locally by an algorithm on the local side. Ex. A, UNILOC 0128 (Response to First Office Action at 3); Ex. A, UNILOC 0143 (Second Office Action at 6) In Chou, the only unique identifiers are inputs into the algorithm, and result in a non-unique output. *See* Ex. C. In Grundy, the Licensee Unique ID is not created at the local location, rather it is created at the remote location by adding information on the remote side to create an ID. *See* Ex. D. The Applicant's remarks do not limit the identity of the information. The Applicant then reiterated that point with the following discussion:

> The fundamental principles underlying the operation of the present invention are simple yet highly effective. The uniqueness of identity by which each copy of the software to be protected is distinguished from any other copy is provided by each and only each new user: to reiterate the system does not require the introduction of any unique identifiers from any other source, either before delivery of the software for use by the intending user or subsequent to delivery thereof.
> Ex. A, UNILOC 144 (Response to Second Office Action at 7).

Again, contrary to Microsoft's interpretation, these statements by the Applicant only reiterate that the local licensee unique ID must be generated locally. The uniqueness is provided by running the algorithm on the local location rather than being delivered to the user and rendered non-unique by the algorithm (as in Chou) or taking the output of the algorithm on the local side and then modifying it on the remote location to create the ID (as in Grundy). This reading is also supported by the subsequent paragraphs of the response. Those subsequent paragraphs on page seven of the response are summarized in the topic sentence on page eight when the Applicant states "[i]t is submitted that this local generation of the unique identifying feature for each copy of the software to be protected is one of the distinguishing features of the present invention." Ex. A, UNILOC 0145 (Response to Second Office Action at 8). Finally, the Applicant explicitly and successfully argued that the claims encompass, and that Grundy does not anticipate or render obvious, a system where the information is provided by a remote location or party to the local location for the creation of the local licensee unique ID. Ex. A, UNILOC 0146 (Response to Second Office Action at 9) ("In the Examiner's last paragraph relating to Grundy, the Examiner argues that Grundy does not preclude providing additional information to the local user. The fact, if true, that Grundy does not teach away from providing the information does not therefore mean that Grundy teaches the information is provided or that doing so would be obvious.") In short, one of ordinary skill in the art would not read the file history as clearly and unambiguously disclaiming the subject matter asserted by Microsoft. Therefore, one of ordinary skill in the art would interpret the term "licensee unique ID" as having a meaning consistent with Uniloc's proposed construction.

**Registration System**

8. One of ordinary skill in the art would understand the term "registration system," as used in the '216 patent, as having a meaning consistent with Uniloc's proposed construction. Microsoft adds the limitation that the registration system must be one where "users register themselves with the software vendor by providing data that enables the vendor to contact the user." This limitation is inconsistent with how one of ordinary skill in the art would understand the term for several reasons. First, one of ordinary skill in the art would recognize the patent discusses prior art registration systems that would not fall under Microsoft's construction. Second, one of ordinary skill in the art would find Microsoft's interpretation inconsistent with the disclosure in the specification, which describes one of the defining features of the registration system as permitting or preventing digital data to operate in use mode. '216 Patent at 2:52-55 ("In broad terms, the system according to the invention is designed and adapted to allow digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed.") One of ordinary skill in the art would recognize that a registration system as construed by Microsoft would not necessarily contemplate this functionality. Third, one of ordinary skill in the art would understand that a registration system as defined by Microsoft would only require software logic to receive, store and recall user information. Such a system is inconsistent with the registration system disclosed in the patent and disclosed by the prior art registration systems. Moreover, one of ordinary skill in the art would find Microsoft's construction of "registration system" inconsistent with its construction of "wherein said registration system is replicated…" If, as Microsoft proposes, a registration system requires users register themselves by providing data enabling the user to contact the vendor, one of ordinary skill in the art would recognize it would make no sense to replicate such

a system at the remote location. Thus, one of ordinary skill in the art would understand the term "registration system" consistent with Uniloc's proposed construction based on the background knowledge of one of ordinary skill in the art and the disclosure in the '216 patent.

**Licensee Unique ID Generating Means / Registration Key Generating Means**

9. Some claims of the '216 patent include the terms "local licensee unique ID generating means," "remote licensee unique ID generating means," or "registration key generating means." As an initial matter, the terms "licensee unique ID" and "registration key" are used synonymously in the '216 patent. For example, the specification provides "[t]he code portion 38 includes an algorithm adapted to generate a registration number 66 or local licensee unique ID or registration key which characterizes the licensee." '216 Patent at col. 5, ll. 61-64.[1]

10. One of ordinary skill in the art would recognize the '216 patent discloses two different structures -- one software (*e.g.*, an algorithm) and one hardware (*e.g.*, a summer) -- that can perform the function of generating licensee unique IDs. First, one of ordinary skill in the art would readily recognize the '216 patent discloses software logic, including an algorithm, as structure capable of generating licensee unique IDs. '216 Patent at col. 5, ll. 61-67; col. 6, ll. 16-19; col. 7, ll. 14-18; col. 10, ll. 2-4; col. 10, ll. 49-52; col. 11, ll. 46-48; col. 11, ll. 53-56. Moreover, one of ordinary skill in the art would recognize there are a variety of algorithms capable of accomplishing the claimed invention, and would understand the specification's use of the term "algorithm" encompasses those possibilities. Second, one of ordinary skill in the art

[1] As used throughout the remainder of this Declaration, the term "licensee unique ID" includes "local licensee unique ID," "remote licensee unique ID," and "registration key." Moreover, one of ordinary skill in the art recognizes that the structure discussed for the "local licensee unique ID generating means" is also the structure for the "remote licensee unique ID generating means" and "registration key generating means." For convenience, I will refer to all of these means as "licensee unique ID generating means."

would also readily recognize the patent discloses hardware, *e.g.*, a summer, as structure capable of generating licensee unique IDs. '216 Patent at col. 12, ll. 62-65. Therefore, one of ordinary skill in the art would read the '216 patent as disclosing both software and hardware as structures capable of performing the function of generating licensee unique IDs. Moreover, one of ordinary skill in the art would find no suggestion in the specification, or within the art, to limit the invention as claimed only to a hardware implementation

**Mode-Switching Means**

11. One of ordinary skill in the art would recognize the structure disclosed by the '216 patent for performing the function of the mode-switching means can be software or hardware. First, one of ordinary skill in the art would readily recognize the '216 patent discloses software logic capable of acting as a mode switching means. *See, e.g.*, '216 Patent at col. 6, ll. 12-14; col. 7, ll. 36-50; col. 8, ll. 15-28; col. 10, ll. 35-44; col. 11, ll. 5-13; col. 11, l. 58 - col. 12, l. 2. Second, one of ordinary skill in the art would also readily recognize the patent discloses hardware, *e.g.*, a comparator, as structure capable of generating licensee unique IDs. *See, e.g.*, '216 Patent at col. 13, ll. 37-40. Therefore, one of ordinary skill in the art would read the '216 patent as disclosing both software and hardware as structures capable of performing the function of mode-switching means.

**Use Mode**

12. One of ordinary skill in the art would understand the term "use mode" as used in the context of the patent as having a meaning consistent with Uniloc's proposed construction. Microsoft's proposed construction reads in an additional specification passage into the term.

One problem with this approach, from the perspective of one of ordinary skill in the art, is Microsoft's definition makes "use mode" a foil for "demonstration mode." A demonstration mode is one example of a non-use mode, but it is not the only example as indicated by the use of the word "typified" in the specification passage. This description only applies to some of the embodiments disclosed in the specification, and overly narrows the concepts disclosed and claimed in the '216 patent as would be understood by a POSA. More specifically, the '216 patent relates to a registration system that allows digital data to operate in a use mode. See, e.g., '216 Patent at Abstract ("A registration system allows digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed."); '216 Patent at 2:52-55 ("In broad terms, the system according to the invention is designed and adapted to allow digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed."). A "use mode" is broadly defined in the specification, and is explicitly distinguished from "unlicensed modes of operation." '216 Patent at 2:44-48. The demonstration mode referred to by Microsoft is only one example of an unlicensed mode of operation. *See, e.g.*, '216 Patent at 2:44-48 ("The use mode is to be distinguished from what might generally be termed unlicensed modes of operation (which is not to say unauthorized modes of operation) as typified by the demonstration modes later described in the specification."). Additionally, one of ordinary skill in the art would recognize that a demonstration mode simply restricts the rights of an end user and can include temporal or functional limitations on the execution of the software. For all of these reasons, one of ordinary in the art would understand the term "use mode" as used in the patent as having a meaning consistent with Uniloc's proposed construction.

**Information Uniquely Descriptive of the Intended Licensee**

13. One of ordinary skill in the art would understand this term as having a meaning consistent with Uniloc's proposed construction. Microsoft's proposed construction adds several limitations that one of ordinary skill in the art would understand is inconsistent with the intrinsic evidence. First, as previously discussed, the patent uses the term "unique" in a manner consistent with its use in the field to mean a low probability of duplication, and expressly contemplates information that is not one-of-a-kind but that is nonetheless unique. Second, Microsoft appears to be limiting its definition to the specification's disclosure of information such as credit card information and name. As an initial matter, even this type of information is often not "one-of-a-kind." People have the same name, and people can share credit card numbers. More importantly, the specification discloses other types of information that can be uniquely descriptive of an intending licensee such as Product IDs. Therefore, one of ordinary skill in the art would understand this term as having a meaning consistent with Uniloc's proposed definition.

**Checking by the Registration Authority that Information Unique to the User is Correctly Entered**

14. One of ordinary skill in the art would understand this term, as used in the '216 patent, as having a meaning consistent with Uniloc's proposed construction. Microsoft's proposed construction is inconsistent with how one of ordinary skill in the art would understand the disclosure in the specification, and with how one of ordinary skill in the art would understand the ways to implement the disclosed invention. First, there is no requirement in the claim or in the other intrinsic evidence that the remote side check "at the point in time when the security key is generated on the local side." In fact, some of the embodiments disclose exactly the opposite of

what Microsoft requires of the claim -- the remote authority checks at some point after the security key is generated on the local side. Moreover, from an implementation perspective, one of ordinary skill in the art would find little value in the simultaneity required by Microsoft. Therefore, one of ordinary skill in the art would not read the claim language to include the limitation added by Microsoft. Second, one of ordinary skill in the art would not read the term at issue to require, as Microsoft does, that the "remote side checks to ensure that information unique to the user was entered by the user without errors or mis-entry, with respect to how the user intended to enter it." As an initial matter, this form of checking required by Microsoft is found nowhere in the intrinsic evidence. Rather, the intrinsic evidence makes clear that the system verifies that the information is correctly entered by comparing the outputs of the algorithm on each side. That is, the remote side checks the information by inputting the information into the algorithm on the remote side. One of ordinary skill in the art would read the file history as supporting this interpretation. UNILOC 0128 (Response to First Office Action at 3) ("The uniqueness is ultimately provided by the end users of the software in the course of supplying their own identification details, which are subsequently checked by use of a <u>matching</u> algorithm at a remote location."); UNILOC 0143 (Response to Second Office Action at 6) ("The algorithm used to generate locally the "Licensee Unique ID" is replicated remotely for the purposes of remote generation of a separate "Licensee Unique ID" for matching purposes.") Finally, the requirement Microsoft seeks to add is <u>impossible</u> in many circumstances. Aside from circumstances such as spell-check, Microsoft's reading of the claim term would require the computer to understand the subjective intent of the user. For all of these reasons, one of ordinary skill in the art would interpret this term consistent with Uniloc's proposed construction.

**Platform Unique ID Generating Means**

15. The specification discloses the use of software logic as the structure of the platform unique ID generating means. '216 Patent at col.3, ll. 54-55. The platform unique ID is preferably a function of computer environment details such as hard disk volume name. '216 Patent at col. 3, ll. 56-59; col. 8, ll. 15-39. The serial number is also a function of these same details. '216 Patent at col. 7, ll. 1-5; col. 12, ll. 3-19. Therefore, one of ordinary skill in the art would appreciate that the same software logic can create the platform unique ID and serial number. Moreover, as discussed in ¶ 10, the patent more broadly discloses various structures, *e.g.*, the software or hardware acting as the generating means, for generating identification numbers. The platform unique ID is a form of an identification number, therefore, one of ordinary skill in the art would read the specification as disclosing structure, *e.g.*, software logic including an algorithm, capable of acting as the platform unique ID generating means.

**[An Enabling Key] Provided to Said Mode-Switching Means by Said Intended User**

16. One of ordinary skill in the art would understand this term as used in the patent as having a meaning consistent with Uniloc's proposed construction. There is nothing ambiguous about this term when read in light of the specification and from the understanding of one of ordinary skill. Microsoft's proposed definition changes the term from "provided to said mode-switching means by said intending user" to "a person who is not presently a licensee, but who intends in the future to license the digital data provides the enabling key to the mode-switching means." One of ordinary skill in the art would recognize that Microsoft's proposed construction changes the meaning of the term at issue without any basis in the intrinsic record. Therefore,

one of ordinary skill in the art would understand this term as having a meaning consistent with Uniloc's proposed construction.

**[Enabling Key is] Communicated to Said Intending User**

17. One of ordinary skill in the art would understand this term as used in the patent as having a meaning consistent with Uniloc's proposed construction. There is nothing ambiguous about this term when read in light of the specification and from the understanding of one of ordinary skill. Microsoft's proposed definition changes the term from "communicated to said intending user" to "communicated to the person who is not presently a licensee, but who intends in the future to license the digital data." One of ordinary skill in the art would recognize that Microsoft's proposed construction changes the meaning of the term at issue without any basis in the intrinsic record. Therefore, one of ordinary skill in the art would understand this term as having a meaning consistent with Uniloc's proposed construction.

**Fully Enabled Mode / Full Version Run**

18. One of ordinary skill in the art would understand this term as used in the patent as having a meaning consistent with the construction proposed by Uniloc. One of ordinary skill in the art recognizes the patent relates to the use of software or digital data in a restricted or unrestricted mode (use mode/non-use mode). The terms "fully-enabled mode" and "full version run" are used similar to "use mode" to mean allowing unrestricted use in accordance with the license. Therefore, one of ordinary skill in the art would understand these terms as used in the patent as having a meaning consistent with Uniloc's proposed construction.

**Partly Enabled Mode or Demonstration Mode**

19. One of ordinary skill in the art would understand this term as used in the patent as having a meaning consistent with the construction proposed by Uniloc. Microsoft improperly characterizes the patent as solely relating to a demonstration mode in which consumers can try software before buying it, but with key features of the software (e.g., saving or printing files) disabled. This description only applies to some of the embodiments disclosed in the specification, and overly narrows the concepts disclosed and claimed in the '216 patent as would be understood by a POSA. More specifically, the '216 patent relates to a registration system that allows digital data to operate in a use mode. See, e.g., '216 Patent at Abstract ("A registration system allows digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed."); '216 Patent at 2:52-55 ("In broad terms, the system according to the invention is designed and adapted to allow digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed."). A "use mode" is broadly defined in the specification, and is explicitly distinguished from "unlicensed modes of operation." '216 Patent at 2:44-48. The demonstration mode referred to in this part of the specification is only one example of an unlicensed mode of operation. *See, e.g.*, '216 Patent at 2:44-48 ("The use mode is to be distinguished from what might generally be termed unlicensed modes of operation (which is not to say unauthorized modes of operation) as typified by the demonstration modes later described in the specification."). Additionally, one of ordinary skill in the art would recognize that a demonstration mode simply restricts the rights of an end user and can include temporal or functional limitations on the execution of the software. Therefore, one of ordinary skill in the art

would understand these terms as having a meaning consistent with the construction proposed by Uniloc.

**Serial Number**

20. One of ordinary skill in the art would understand the term "serial number," as used in the '216 patent, as having a meaning consistent with Uniloc's proposed construction. Microsoft adds two limitations inconsistent with this understanding: (1) that the serial number be generated in series; and (2) that the serial number be one-of-a-kind. First, one of ordinary skill in the art would readily recognize that the serial number need not be generated in series because it is a function of the computer environment. See, e.g., '216 Patent at 12:3 - 19 ("In this embodiment, serial number 50 is comprised of two component, namely system information 71 and a variable key portion 72....System information 71 can include information which identifies the hardware comprising the platform 31 on which the user program 39 is to be executed such as, for example, CPU number (where available), or unique parameters associated with the firmware in use. The system information, optionally, can further include system configuration information such as amount of memory, type of processor etc.") Second, one of ordinary skill in the art would recognize the specification contemplates the serial number as not always being one-of-a-kind, and certainly does not require the serial number be one-of-a-kind. For example, the third embodiment discloses a self-serialization process that creates a serial number with greater uniqueness, *i.e.*, higher probability of being one-of-a-kind. Finally, Microsoft's expert previously conceded that the patent discloses serial numbers that are not one-of-a-kind.

**Includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID**

21. One of ordinary skill in the art would understand the term as used in the context of the '216 patent as having a meaning consistent with Uniloc's proposed construction. First, there is no requirement in the plain language of the claim, nor within the remainder of the intrinsic record, for the identical algorithm. Second, one of ordinary skill in the art would not read the intrinsic record as disclaiming the use of encryption or decryption technology. One of ordinary skill in the art would realize Microsoft is misreading statements in the file history as disclaiming subject matter, when it in fact did not. Uniloc stated to the USPTO that the invention "does not require that an encryption key" be used and "does not require any decryption key" to be used. UNILOC 0146 (Response to Second Office Action at 9). One of ordinary skill in the art would understand that these statements were underscoring that the licensee unique ID is unique, so encryption/decryption is optional, *i.e.*, the system does not require encryption/decryption. Put simply, if the system did not use licensee unique IDs that were in fact unique, someone could obtain all of the IDs and use them to unlock all of the copies of software. In this circumstance, which is the circumstance disclosed in the prior art that Uniloc was traversing, encryption/decryption would be required to keep the IDs more secret. In the case of the Uniloc invention, the licensee unique IDs are unique so there is no requirement for encryption, but a system can and should still use encryption. Thereofore, one of ordinary skill in the art would realize Uniloc was not disclaiming the use of encryption rather it was merely restating the uniqueness of the licensee unique ID as one of the inventive aspects, and pointing out that one of the results is making encryption optional. Therefore, one of ordinary skill in the art would read this term in the context of the patent as having a meaning consistent with Uniloc's proposed construction.

**Wherein said registration system is replicated at the registration authority**

22. One of ordinary skill in the art would understand this phrase as used in the patent as having a meaning consistent with the construction proposed by Uniloc. Microsoft first requires all of the features present on the local side be present on the remote side. This makes no sense. First, all the embodiments relate to replicating the licensee unique ID generating means on the remote side. Second, one of ordinary skill in the art would understand there would be no reason at all to include functionality such as the mode-switching means on the remote side. Finally, one of ordinary skill in the art would understand Microsoft's reading of the claim as covering no embodiments of the patent. Moreover, one of ordinary skill in the art would recognize Microsoft is seeking to import its misreading of "checking" into this claim term. As previously discussed, this is wrong. Finally, as discussed elsewhere, Microsoft is misreading the file history as clearly and unambiguously disclaiming the use of encryption/decryption when one of ordinary skill in the art would clearly recognize it does not. For all of these reasons, one of ordinary skill in the art would understand this phrase as used in the patent as having a meaning consistent with Uniloc's construction.

**Has matched**

23. One of ordinary skill in the art would understand the term "has matched" as used in the context of the '216 patent as having a meaning consistent with Uniloc's proposed construction. First, one of ordinary skill in the art would not require something to match as a result of a "direct comparison." Particularly in the art, matching can involve an indirect comparison. For example, two groups can match after an indirect comparison shows an association between the two groups. As a simple example, there are two sets of numbers below:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 1 | 4 | 9 | 16 | 25 | 36 | 49 | 64 |

A direct comparison of the top set of numbers with the bottom set of numbers would lead one to conclude these sets of numbers do not match. However, when the square of the top numbers are compared with the bottom number they do match -- as a result of an <u>indirect</u> comparison. Similarly, one of ordinary skill in the art would also understand that two values can match even though the are not the same. As another simple example, consider the following two numbers:

1st Number: 123456789

2nd Number: 929496989

Obviously, these numbers are not the same, and would not match under Microsoft's construction. However, if the test is whether the numbers in the even numbered-position, *i.e.*, the second, fourth, sixth and eighth place, are the same then these numbers do match. Thus, one of ordinary skill in the art recognizes two values may not be the same but can still match. Finally, combining the two scenarios, consider the following two numbers:

1st Number: 123456789

2nd Number: 949169369649

Obviously, these two numbers are not the same. However, the values between each "9" in the 2nd number is the square of the values in the even-numbered position of the 1st number, and the 2nd number matches the 1st number based on this correspondence. These types of relationships and correspondences are an important part of computer programming, and one of ordinary skill in the art would understand the term "has matched" to include these concepts.

Thus, Uniloc's construction is consistent with how one of ordinary skill in the art would understand the term "has matched" in the context of the patent.

**Mode switching means will permit said data to run in said use mode in subsequent execution only if said platform unique ID has not changed**

24. One of ordinary skill in the art would understand this phrase as used in the context of the patent as having a meaning consistent with Uniloc's proposed construction. Microsoft proposes a construction of this phrase that changes the language to include the concept of identity. The term "identical" does not appear in the claim, and as previously discussed, has a very precise meaning within the art. Therefore, one of ordinary skill in the art would understand this phrase as used in the patent as having a meaning consistent with Uniloc's proposed construction.

Dated February 24, 2006

David Klausner