# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC USA, INC., and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br>Plaintiffs,<br>vs.<br>MICROSOFT CORPORATION,<br>Defendant. | Civ. A. No. 03-CV-440 (WES) |

## DECLARATION OF DEAN G. BOSTOCK IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF INEQUITABLE CONDUCT

I, Dean G. Bostock, hereby declare as follows:

1. I am an attorney for the plaintiffs herein, Uniloc USA, Inc. and Uniloc Singapore Private Limited;

2. Attached hereto as Exhibit A is a true and accurate copy of excerpts from the First Amended Answer and Counterclaim filed herein by defendant, Microsoft Corporation;

3. Attached hereto as Exhibit B is a true and accurate copy of U.S. patent number 5,490,216 ("the '216 patent");

4. Attached hereto as Exhibit C is a true and accurate copy of a letter indicated to be from Greg Grundy to Ric Richardson and dated October 13, 1993;

5. Attached hereto as Exhibit D is a true and accurate copy of a letter from Mark J. Coorey to the Australian Industrial Property Organization dated November 20, 1994, with a copy of the front page of U.S. patent number 5,291,598, appended thereto;

6. Attached hereto as Exhibit E is a true and accurate copy of a letter from Mark J. Coorey to the Australian Industrial Property Organization dated January 11, 1995;

7. Attached hereto as Exhibit F is a true and accurate copy of the specification of German Offenlegungsschrift number DE 40 19 652 A1;

8. Attached hereto as Exhibit G is a true and accurate copy of a letter from Josef Fiener to Peter Maxwell dated January 5, 1996;

9. Attached hereto as Exhibit H is a true and accurate copy of a letter from Peter Maxwell to Steve Cox dated January 17, 1996;

10. attached hereto as Exhibit I is a true and accurate copy of a Notice of Allowability dated August 8, 1995 from the file wrapper of the '216 patent;

11. Attached hereto as Exhibit J is a true and accurate copy of a letter from Jerry T. Sewell to the United States Patent & Trademark Office dated November 6, 1995, transmitting the issue fee for the '216 patent;

12. Attached hereto as Exhibit K is a true and accurate copy of excerpts from the deposition of Peter Lloyd Higgs taken in this case on April 21, 2005;

13. Attached hereto as Exhibit L is a true and accurate copy of the Declaration of Ric Richardson dated on January 27, 1994 regarding the '216 patent; and

14. Attached hereto as Exhibit M is a true and accurate copy of an Information Disclosure Statement filed in connection with the application for the '216 patent and dated December 21, 1994.

Date: September 21, 2006 /s/ Dean Bostock

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic File ("NEF"), and paper copies will be sent to those indicated as non-registered participants on September 21, 2006.

/s/ Dean G. Bostock

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC USA, INC. and<br><br>UNILOC SINGAPORE PRIVATE LIMITED,<br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br>Defendant, | Civ. A. No. 03-CV-440 (WES) |

**DEFENDANT MICROSOFT CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, Defendant Microsoft Corporation ("Microsoft"), by its attorneys Blish & Cavanagh and Fish & Richardson P.C., hereby responds to the Complaint of Plaintiffs Uniloc USA, Inc. and Uniloc Singapore Private Limited (collectively, "Uniloc"), on personal knowledge as to its own activities and on information and belief as to the activities of others, as follows.

Microsoft denies each and every allegation contained in the Complaint that is not expressly admitted below. Any factual allegation admitted below is admitted only as to the specific admitted facts, not as to any purported conclusions, characterizations, implications, or speculations that may arguably follow from the admitted facts. Microsoft denies that Plaintiff Uniloc is entitled to the relief requested or any other.

**JURISDICTION AND VENUE**

1. Microsoft admits that this Complaint purports to state a claim of alleged patent infringement and that this Court has subject matter jurisdiction over patent claims.

**Count II: Declaratory Relief Regarding Invalidity**

28. The allegations of paragraphs 18-27 are incorporated herein by reference. The claims of the '216 patent are invalid because they fail to satisfy the conditions of patentability specified in Title 35 of the United States Code, including, *inter alia*, §§ 101, 102, 103, and 112.

30. In its Complaint, Uniloc alleges that the '216 patent was "duly and legally issued." Given this and Uniloc's filing of this lawsuit, and because Microsoft contends that the claims of the '216 patent are invalid, an actual and justiciable controversy has arisen and now exists between Microsoft and Uniloc as to the validity of the '216 patent.

31. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Microsoft requests the declaration of the Court that the patent-in-suit is invalid.

**Count III: Declaratory Relief Regarding Unenforceability**

32. The allegations of paragraphs 18-31 are incorporated herein by reference. The '216 patent issued on February 6, 1996. Uniloc has unreasonably delayed in filing suit against Microsoft, and is barred from enforcing the '216 patent against Microsoft under the doctrine of laches.

34. Uniloc, including through their predecessors-in-interest in the '216 patent, attorneys and/or agents and/or others owing a duty of candor to the USPTO, committed acts constituting inequitable conduct during the prosecution of the '216 patent application, rendering the '216 patent unenforceable. These acts of inequitable conduct include the failure to make the USPTO aware of highly material information known to, and highly material misrepresentations made to the USPTO by or on behalf of, the sole named inventor, Mr. Richardson, prior to

issuance of the '216 patent. The facts and circumstances surrounding these acts of inequitable conduct include at least the following:

a. U.S. Patent No. 5,291,598 entitled "Method and System for Decentralized Manufacture of Copy-Controlled Software" ("the '598 patent") was filed with the USPTO on April 7, 1992, and issued to Mr. Gregory Grundy on March 1, 1994.

b. The '598 patent is prior art to the '216 patent.

c. The '598 patent renders the claims of the '216 patent invalid.

d. The '598 patent renders one or more claims of the '216 patent invalid by reason of anticipation.

e. Shortly after filing the application for the '216 patent, Mr. Richardson was informed by letter from Mr. Grundy that he owned the allowed U.S. Patent entitled "Method and System for Decentralized Manufacture of Copy-Controlled Software," which "covers exactly the system described in" a press release issued by Uniloc that, on information and belief, described the technology of the '216 patent.

f. Despite this, Mr. Richardson failed to cite this correspondence from Mr. Grundy to the USPTO for review in consideration of the pending claims of the '216 application.

g. This information was not otherwise before the patent examiner.

h. By withholding this information, Mr. Richardson breached his duty of candor and good faith to the USPTO.

i. The withheld information is material to the patentability of the '216 patent, in that it bears on the patentability of the invention, and is inconsistent with express misrepresentations made by Mr. Richardson during prosecution.

j. On information and belief, Mr. Richardson withheld this highly material information with intent to deceive the USPTO into granting an invalid patent.

k. This conduct constitutes inequitable conduct that renders the '216 patent unenforceable.

l. The file history of Mr. Richardson's Australian Patent No. 678,985, which is a foreign counterpart of the '216 patent, contains a November 20, 1994, letter to the Examination Officer of the Australian Patent Registry from solicitor Mark J. Coorey, providing notice that Uniloc's Australian patent application "is in direct conflict" with Mr. Grundy's issued '598 patent, and that the invention concerned is therefore not a patentable invention.

m. Upon information and belief, Mr. Richardson knew about Mr. Coorey's November 30, 1994, letter to the Australian Patent Registry while the application for the '216 patent was pending.

n. The file history of Mr. Richardson's Australian Patent No. 678,985 also contains a January 11, 1995, letter from Mr. Coorey to the Examination Officer of the Australian Patent Registry forwarding a copy of U.S. Patent No. 5,375,240 ("the '240 patent") issued to Mr. Grundy on December 20, 1994, which claimed priority from the application of the '598 patent and which contains an identical disclosure to the '598 patent.

o. Upon information and belief, Mr. Richardson knew about Mr. Coorey's January 11, 1995, letter to the Australian Patent Registry while the application for the '216 patent was pending.

p. Despite knowledge of this prosecution history of Australian Patent No. 678,985 and despite the fact that Australian Patent No. 678,985 is the foreign counterpart to the patent-in-suit, Mr. Richardson failed to inform the United States patent examiner of the application that led to the '216 patent that Mr. Coorey had on two occasions by letter challenged the patentability of the invention of the '216 patent before the Australian Patent Registry in light of the '598 and '240 patents.

q. This information was not otherwise before the patent examiner.

r. By withholding this information, Mr. Richardson breached his duty of candor and good faith to the USPTO.

s. The withheld information is material to the patentability of the '216 patent, in that it bears on the patentability of the invention, and is inconsistent with express misrepresentations made by Mr. Richardson during prosecution

t. On information and belief, Mr. Richardson withheld this highly material information with intent to deceive the USPTO into granting an invalid patent.

u. This conduct constitutes inequitable conduct that renders the '216 patent unenforceable.

v. Mr. Richardson, and those acting on his behalf, did not disclose the '598 patent to the USPTO until after the first substantive office action, in which all of his claims were rejected.

w. The examiner rejected all of the claims of the application that led to the '216 patent in light of the '598 patent.

x. In responding to the rejection of the claims of the application that led to the '216 patent in light of the '598 patent, Mr. Richardson, and those acting on his behalf, narrowed the claims of the application by amendment.

y. In responding to the rejection of the claims of the application that led to the '216 patent in light of the '598 patent, Mr. Richardson, and those acting on his behalf, made numerous highly material misrepresentations concerning the scope and content of the '598 patent.

z. Mr. Richardson, and those acting on his behalf, made the following statement in an effort to distinguish the '598 patent: "It is inherent in the system of the present application, as claimed, that the 'Licensee Unique ID' is entirely the product of data generated locally as distinct from data added ... subsequently from a remote location (thereby distinguishing over Grundy)."

aa. The representation in the quotation in the preceding paragraph is false, including because the '598 patent discloses a value, specifically a checksum value generated from owner data, that "is entirely the product of data generated locally."

bb. On information and belief, this misrepresentation was made with the intent of deceiving the USPTO into granting the '216 patent.

cc. This misrepresentation was highly material, and, on information and belief, was persuasive to the Patent Examiner in his decision to allow the claims of the '216 patent.

dd. This conduct constitutes inequitable conduct that renders the '216 patent unenforceable.

ee. Mr. Richardson, and those acting on his behalf, made the following statement in an effort to distinguish the '598 patent: "Applicant respectfully submits that the uniqueness of the identity upon which Grundy must ultimately rely for operation of its system of registration derives from a unique identifier provided from a remote location."

ff. The representation in the quotation in the preceding paragraph is false, including because the '598 patent discloses a unique identifier provided from a local location, including the name, address, and telephone number of the user.

gg. On information and belief, this misrepresentation was made with the intent of deceiving the USPTO into granting the '216 patent.

hh. This misrepresentation was highly material, and, on information and belief, was persuasive to the Patent Examiner in his decision to allow the claims of the '216 patent.

ii. This conduct constitutes inequitable conduct that renders the '216 patent unenforceable.

jj. Mr. Richardson, and those acting on his behalf, made the following statement in an effort to distinguish the '598 patent: "It is not at all clear from the disclosure of Grundy as to whether the previously derived "Registration Code" is ever utilized to help check the validity of the Authorization code: one is perfectly entitled to infer from the total disclosure of Grundy that any element of uniqueness to be associated with the software to be protected is injected and

derived at the second platform (the remote location) and, furthermore, that whether an Authorization Code is valid or not derives directly from data first arising at the second platform (the remote location). This is the complete reverse of the system of the present invention where the uniqueness derives entirely locally."

kk. The representation in the quotation in the preceding paragraph is false, including because the '598 patent discloses that an "element of uniqueness to be associated with the software to be protected is injected and derived at the" local location.

ll. On information and belief, this misrepresentation was made with the intent of deceiving the USPTO into granting the '216 patent.

mm. This misrepresentation was highly material, and, on information and belief, was persuasive to the Patent Examiner in his decision to allow the claims of the '216 patent.

nn. This conduct constitutes inequitable conduct that renders the '216 patent unenforceable.

oo. Mr. Richardson, and those acting on his behalf, made the following statement in an effort to distinguish the '598 patent: "It is submitted that this local generation of the unique identifying feature for each copy of the software to be protected is one distinguishing feature of the present invention. Grundy does not disclose or suggest this feature or manner of operation."

pp. The representation in the quotation in the preceding paragraph is false, including because the '598 patent discloses "local generation of the unique identifying feature for each copy of the software to be protected."

qq. On information and belief, this misrepresentation was made with the intent of deceiving the USPTO into granting the '216 patent.

rr. This misrepresentation was highly material, and, on information and belief, was persuasive to the Patent Examiner in his decision to allow the claims of the '216 patent.

ss. This conduct constitutes inequitable conduct that renders the '216 patent unenforceable.

tt. Mr. Richardson, and those acting on his behalf, made the following statement in an effort to distinguish the '598 patent: "The fact that the algorithm which generates the unique ID generating means of the present invention is replicated at a remote location permits the following two features of the present invention not to be found in Grundy: (1) A direct comparison for matching purposes of the licensee unique ID data at the local location, and (2) A confirmation that the user details provided to the remote location match identically with the user details provided to the software to be protected and from which the unique ID is generated."

uu. The representation in the quotation in the preceding paragraph is false, including because the '598 patent discloses the use of the same checksum-generation algorithm at both the local and the remote locations, and further discloses (1) a "direct comparison for matching purposes of the [checksum] data

at the local location," and (2) a "confirmation that the user details provided to the remote location match identically with the user details provided to the software to be protected and from which the [checksum] is generated."

vv. On information and belief, this misrepresentation was made with the intent of deceiving the USPTO into granting the '216 patent.

ww. This misrepresentation was highly material, and, on information and belief, was persuasive to the Patent Examiner in his decision to allow the claims of the '216 patent.

xx. This conduct constitutes inequitable conduct that renders the '216 patent unenforceable.

35. Because Uniloc has attempted to enforce the '216 patent against Microsoft, an actual and justiciable controversy has arisen and now exists between Microsoft and Uniloc as to the enforceability of the '216 patent against Microsoft.

36. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Microsoft requests the declaration of the Court that the patent-in-suit is unenforceable against Microsoft.

**Prayer for Relief**

Microsoft respectfully requests a judgment against Uniloc as follows:

A. A declaration that Microsoft does not infringe and has not infringed United States Patent No. 5,490,216;

B. A declaration that United States Patent No. 5,490,216 is invalid;

# EXHIBIT B

US005490216A

# United States Patent [19]

Richardson, III

[11] Patent Number: 5,490,216

[45] Date of Patent: Feb. 6, 1996

[54] SYSTEM FOR SOFTWARE REGISTRATION

[75] Inventor: Frederic B. Richardson, III, Brookvale, Australia

[73] Assignee: Uniloc Private Limited, Singapore

[21] Appl. No.: 124,718

[22] Filed: Sep. 21, 1993

[30] Foreign Application Priority Data

Sep. 21, 1992 [AU] Australia .................... PL4842
Oct. 26, 1992 [AU] Australia .................... PL5524

[51] Int. Cl.[6] .................... H04L 9/00
[52] U.S. Cl. .................... 380/4; 380/23
[58] Field of Search .................... 380/3, 4, 23, 24, 380/25

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,654,799 | 3/1987 | Ogaki et al. . | |
| 4,688,169 | 8/1987 | Joshi . | |
| 4,796,220 | 1/1989 | Wolfe . | |
| 4,982,430 | 1/1991 | Frezza et al. . | |
| 4,999,806 | 3/1991 | Chernow et al. | 380/4 |
| 5,191,611 | 3/1993 | Lang | 380/4 |
| 5,199,066 | 3/1993 | Logan | 380/4 |
| 5,222,133 | 6/1993 | Chou et al. | 380/4 |
| 5,239,166 | 8/1993 | Graves . | |
| 5,239,648 | 8/1993 | Nukui | 380/4 |
| 5,287,408 | 2/1994 | Samson | 380/4 |
| 5,291,598 | 3/1994 | Grundy . | |
| 5,313,637 | 5/1994 | Rose | 380/4 |
| 5,319,705 | 7/1994 | Halter et al. | 380/4 |
| 5,337,357 | 8/1994 | Chou et al. | 380/4 |
| 5,343,526 | 8/1994 | Lassers | 380/4 |
| 5,349,643 | 9/1994 | Cox et al. | 380/4 |
| 5,371,792 | 12/1994 | Asai et al. | 380/4 |
| 5,379,433 | 1/1995 | Yamagishi | 380/4 |
| 5,386,468 | 1/1995 | Akiyama et al. | 380/4 |
| 5,388,211 | 2/1995 | Hornbuckle | 380/4 |
| 5,390,297 | 2/1995 | Barber et al. | 380/4 |

FOREIGN PATENT DOCUMENTS

WO9209160 5/1992 WIPO .

*Primary Examiner*—David C. Cain
*Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear

[57] ABSTRACT

A registration system allows digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed. Preferably, the system detects when part of the platform on which the digital data has been loaded has changed in part or in entirety, as compared with the platform parameters, when the software or digital data to be protected was last booted or run. The system relies on a portion of digital data or code which is integral to the digital data to be protected by the system. This integral portion is termed the code portion and may include an algorithm that generates a registration number unique to an intending licensee of the digital data based on information supplied by the licensee which characterizes the licensee. The algorithm in the code portion is duplicated at a remote location on a platform under the control of the licensor or its agents, and communication between the intending licensee and the licensor or its agent is required so that a matching registration number can be generated at the remote location for subsequent communication to the intending licensee as a permit to licensed operation of the digital data in a use mode. The code portion can be identical for all copies of the digital data. The algorithm provides a registration number which can be "unique" if the details provided by the intending licenses upon which the algorithm relies when executed upon the platform are themselves "unique".

20 Claims, 12 Drawing Sheets




REGISTRATION NUMBER
ALGORITHM
14
15
16
REGISTRATION NUMBER
ALGORITHM
14
13
12
10
11

FIG. 1


BOOT
IS THIS A NEW COPY ? (INTERNAL CHECKING BY APPLICATION)
NO
GO TO FIG. 3a OR 3b
YES
A
DIALOG BOX: "DEMO OR REGISTER" ?
DEMO
REGISTER
B
DISPLAY PRODUCT INFORMATION BOX: e.g.. SOFTWARE PUBLISHER DETAILS
DEMO MODE OF APPLICATION: NO SAVE OR PRINT CAPABILITY
CANCEL
CANCEL OR AGREE ?
AGREE
B1
LICENSE INFO. DIALOG BOX: DETAILS OF NEW LICENSING AGREEMENT
CANCEL
CANCEL OR CONTINUE ?
CONTINUE
GO TO FIG. 2b

*FIG. 2a*

FIG. 2b


FROM FIG. 2a
A SERIAL NO. IS GENERATED BY THE APPLICATION USING INFORMATION FROM THE USER ENVIRONMENT (E.G. TIME, MACHINE TYPE, LAST MODIFICATION DATE)
SERIAL NO. IS ENCRYPTED, REARRANGED AND PRESENTED AS A NUMBER IN THE SERIAL NO. FIELD OF THE REGISTRATION DIALOG BOX.
C
REGISTRATION DIALOG BOX: USER MUST ENTER DETAILS IN THE SPECIFIED FIELDS IN ORDER TO REGISTER THE PRODUCT INCLUDING: NAME, COMPANY, ADDRESS, CONTACT NUMBER (PHONE AND CREDIT CARD DETAILS OR CORPORATE ACCOUNT NO.)
USER CALLS THE NEAREST ADMINISTRATION CENTER (FROM CONTACT DIALOG BOX) AND COMMUNICATES THE REGISTRATION DETAILS AS WELL AS THE SERIAL NO. GENERATED BY APPLICATION
PAYMENT DETAILS CONFIRMED (E.G. CREDIT CARD)
PUBLISHER USES REGISTRATION DETAILS IN UNLOCKING APPLICATION
REGISTRATION NO. GENERATED FROM USER DETAILS ADDED TO SERIAL NO. IS ENCRYPTED AND RE-ARRANGED
USER GIVEN REGISTRATION NO.
GO TO FIG. 2c

FIG. 2c


FROM FIG. 2b
USER TYPES IN REGISTRATION NUMBER
APPLICATION USES UNLOCKING ALGORITHM TO CHECK VALIDITY
VALID ?
NO
YES
ALERT DIALOG BOX: USER TOLD THE REGISTRATION NO. IS INCORRECT AND ASKED TO CALL THE OPERATOR FOR ASSISTANCE IN CHECKING REGISTRATION DETAILS. USER GIVEN 3 ATTEMPTS TO REGISTER AFTER WHICH THE PROGRAM AUTOMATICALLY REVERTS TO DEMO VERSION
RUN FULL VERSION
RUN DEMO VERSION

FIG. 3


BOOT
DO REGISTRATION (KEY) DETAILS EXIST IN APPLICATION ?
NO
YES
LOOK FOR DUPLICATE KEY FILE STORED ELSEWHERE ON MACHINE
NO
DO REGISTRATION (KEY) DETAILS MATCH ENVIRONMENT ?
YES
DOES DUPLICATE KEY FILE EXIST ?
YES
NO
COPY DUPLICATE KEY FILE INFORMATION TO APPLICATION
REMOVE KEY INFORMATION IF IT EXISTS
NO
DO REGISTRATION (KEY) DETAILS MATCH ENVIRONMENT ?
YES
RUN FULL VERSION
RUN DEMO VERSION


220
NAME:
ORGANIZATION
ADDRESS
CITY
ZIP/POST CODE
COUNTRY
CREDIT CARD/ORDER#
EXPIRE DATE
LAST USER NO.
SERIAL NO.
PRODUCT NO.
YOUR USER NO.
REGISTRATION NO.
22
50
21

FIG. 4




FIG. 5




FIG. 6


PLAY
FIRST PIECE OF ENCODED INFORMATION IS BROUGHT INTO CONTROLLER INCLUDING A PRODUCT IDENTIFIER.
IS THE CURRENT PRODUCT REGISTERED FOR USE ?
YES
NO
DEMO OR BUY ?
DEMO
ALLOWS ACCESS TO DEMONSTRATION RECORDINGS THAT ARE NOT ENCRYPTED.
BUY
REGISTRATION DATA ENTRY eg: PAYMENT DETAILS AND PERSONAL DATA
COMMUNICATION WITH REGISTRATION SERVICE PROVIDOR
SUPPLY OF REGISTRATION NUMBER TO CUSTOMER
STORE REGISTRATION NUMBER IN WRITABLE MEMORY OF LOCAL CONTROLLER AND WRITABLE STORAGE AREA OF SMART CARD.
ALLOWS ACCESS TO DAC AND DECRYPTION ENGINE

FIG. 7


LOCAL LICENSEE LOCATION
INTERNAL BOND
39
38
USER PROGRAM
ALG
31
EXECUTE ON PLATFORM
LOCAL LICENSEE UNIQUE I.D. GENERATOR
66
REG. NO.
68
PROGRAM SUBSET (DEMO)
MODE SWITCHER
FULL PROGRAM
69
PLAT. I.D
70
PLATFORM UNIQUE I.D GENERATOR
REMOTE REGISTRATION DATABASE LOCATION
61
62
ALG
REGISTRATION DATABASE PROGRAM
63
EXECUTE ON PLATFORM
67
REMOTE LICENSEE UNIQUE I.D. GENERATOR
66
REG. NO.

FIG. 8


VARIABLE KEY PORTION
72
SYSTEM INFORMATION
71
50
SERIAL NO.
61
PRODUCT NAME
65
CUSTOMER INFORMATION
22
PREVIOUS USER IDENTIFICATION
66
REGISTRATION NUMBER

FIG. 9




FIG. 10

# SYSTEM FOR SOFTWARE REGISTRATION

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to improvements in systems for software registration and, more particularly, to improvements in arrangements where software is transferable by media such as magnetic disks, CD ROMS and the like.

2. Description of the Related Art

Much commercially available software is provided at time of purchase (or license) on a magnetic media, typically a floppy disk. Frequently the only security feature attached to the software is a simple registration number stored on the media. This registration number identifies that particular copy of the software and it is often required at the time of installation of the software onto any given computer that the installer must provide the registration number independently to the installation routines.

However, such simple security arrangements for the distribution of software on media suffer from at lest two disadvantages: (1) each copy of the software made on any given media at the time of manufacture must include an individual, unique number, programmed into the media, and (2) this arrangement does not prevent copying of the software, once installed on any given computer, to another computer by means of file transfer (as opposed to reinstallation).

WO 92/09,160 to Tan Systems Corporation discloses a registration system which is relatively sophisticated which relies for its security on a requirement that an intending software licensee must obtain from a remote location by file transfer significant and essential portions of the program which the licensee desires to execute. The arrangement disclosed in WO 92/09,160 suffers from a number of deficiencies including:

a. the shell program which the intending licensee initially executes requires a unique identity embodied within the shell prior to distribution of the shell program;

b. the shell program is not, itself, a functional program—that is, it does not include all of the code which the intending licensee wishes to execute. That program must be obtained remotely with all the delays, inconveniences and possibilities of corruption during transit that that entails;

c. the prior art system appears to require and indeed, rely on, encryption to ensure that the program material which is communicated from a remote location is not intercepted for utilization in an unauthorized manner; and

d. it is unclear whether the system can accommodate and react appropriately to the situation where the program, once registered, is transferred in its entirety from one platform to another so as to avoid the requirement for payment of a further registration fee.

U.S. Pat. No. 4,796,220, assigned to Pride Software Development Corporation, discloses a system for unique recognition of a platform on which licensed software is to be executed. However, U.S. Pat. No. 4,796,220 does not contemplate or disclose utilization of information which is unique to the user or intended licensee as part of the registration process which is to be distinguished from identification of the platform upon which the software is proposed to be run.

U.S. Pat. No. 4,688,169 to Joshi broadly discloses the same principles as U.S. Pat. No. 4,796,220 in that it discloses a computer software security system which relies for its security on a "machine identification code unique to the machine" upon which the software to be protected is to be run. Again, the disclosure is limited to identification of the platform and there is no suggestion or contemplation of linking platform identification with unique user identification.



Also this arrangement does not allow the flexibility of transfer of copies of the program from platform to platform which can be run in a demonstration mode.

It is an object of the present invention to address or reduce the above-mentioned disadvantages.

Definitions

Throughout this specification the term "software" is to be interpreted broadly so as to include all forms of digital data which are executable on a platform (as to be later defined). The digital data comprising the software can, for example, be code comprising a word processing program adapted to run on a PC or the like. The software can also, for example, be digital data stored on a CD ROM adapted for playback as music on a CD ROM audio drive. The digital data can be displayable information or information which is otherwise usable by a licensed user.

Throughout this specification the term "platform" denotes an environment to be associated with a computing device such as a microprocessor or other data processing device which permits execution of the digital data (to which reference has previously been made in relation to the term "software") whereby the computer can perform functions on input and output devices associated therewith.

In some circumstances, the "software" or digital data may itself be the operating system environment. Typically, but by no means exclusively, examples of operating system environments include the MicroSoft DOS operating system, the IBM OS/2 operating system or the Macintosh System 7 environment. In the degenerate case of microcontrollers operating from ROM, the operating system environment may be the microcode of the microcontroller which enables the microcontroller to execute machine code.

In this specification, "use mode" refers to use of the digital data or software by its execution on a platform so as to fulfill the seller's/licensor's obligations in relation to the sale or license of the right to execute the digital data or software in the use mode. The use mode is to be distinguished from what might generally be termed unlicensed modes of operation (which is not to say unauthorized modes of operation) as typified by the demonstration modes later described in this specification.

## SUMMARY OF THE INVENTION

In broad terms, the system according to the invention is designed and adapted to allow digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed. In particular forms, the system includes means for detecting when parts of the platform on which the digital data has been loaded has changed in part or in entirety as compared with the platform parameters when the software or digital data to be protected was for example last booted or run or validly registered.

The system relies on digital data or code which forms part of the digital data to be protected by the system. This portion of the digital data which preferably is integral to the digital data to be protected has been termed the "code portion" elsewhere in this specification. The code portion includes an algorithm adapted to generate a registration number which is unique to an intending licensee of the digital data based on

information supplied by the licensee which characterizes the licensee.

The algorithm in the code portion is duplicated at a remote location on a platform under the control of the licensor or its agents and communication between the intending licensee and the licensor or its agent is required so that a matching registration number can be generated at the remote location for subsequent communication to the intending licensee as a permit to licensed operation of the digital data in a use mode.

Preferably, the code portion is integral with the digital data and can be identical for all copies of the digital data. It is the algorithm embedded within the code portion (and which is duplicated at the remote location) which provides a registration number which can be "unique" if the information provided by the intending licensee upon which the algorithm relies when executed upon the platform is itself "unique."

In any event, in particular preferred forms, a serial number (see further on) is included in the registration number generation algorithm which introduces an additional level of uniqueness into the registration number calculation process.

Accordingly, in one broad form of the invention there is provided a system for licensing use of digital data in a use mode, the digital data executable on a platform, the system including local licensee unique ID generating means and remote licensee unique ID generating means, the system further including mode switching means operable on the platform which permits use of the digital data in the use mode on the platform only if a licensee unique ID generated by the local licensee unique ID generating means has matched a licensee unique ID generated by the remote licensee unique ID generating means.

Preferably, the system further includes platform unique ID generating means, wherein the mode switching means will permit the digital data to run in the use mode in subsequent execution of the digital data on the platform only if the platform unique ID has not changed.

Preferably, the mode switching means permits operation of the digital data in the use mode in subsequent execution of the digital data only if the licensee unique ID generated by the local licensee unique ID generating means has not changed.

Preferably, the mode switching means includes part of the digital data.

Preferably, the remote licensee unique ID generating means comprises software which includes the algorithm utilized by the local licensee unique ID generating means to produce the licensee unique ID.

Preferably, the information utilized by the local licensee unique ID generating means to produce the licensee unique ID comprises prospective licensee credit card number, date of birth and full name and address.

Preferably, the platform unique ID generating means forms part of the digital data.

Preferably, the platform unique ID generating means utilizes hard disk information and/or other computer hardware or firmware information to determine the platform unique ID.

Preferably, the platform comprises a computer operating system environment.

Preferably, the digital data comprises a software program adapted to run under the operating system environment.

In a further broad form of the invention, there is provided a security routine or registration means attachable to software to be protected, the registration means generating a



security key from information input to the software which uniquely identifies an intended registered user of the software on a computer on which the software is to be installed.

Preferably, the security key is generated by a registration number algorithm.

Preferably, the registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run (e.g., system clock, last modify date, user name).

Preferably, the registration means is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration means.

Preferably, the registration means checks at the time of boot of the software as to whether it is a first boot of the software to be protected or a subsequent boot. If a subsequent boot is detected, then environment and user details are compared to determine whether the program reverts to a demonstration mode and a new user registration procedure is to commence, or a full version run.

Preferably, the environment details comprise one or more of disc volume name, user name or computer, initialization date of hard disk, hardware identifier (e.g., ROM checksum) or other elements which are generally not user-configurable on the platform.

In a further broad form of the invention, there is provided a method of control of distribution of software, the method comprising providing mode-switching means associated with the software adapted to switch the software between a fully enabled mode and a partly enabled or demonstration mode; the method further comprising providing registration key generating means adapted to generate an enabling key which is a function of information unique to an intending user of the software; the mode-switching means switching the software into fully enabled mode only if an enabling key provided to the mode-switching means by the intending user at the time of registration of the software has matched identically with the registration key generated by the registration key generating means.

Preferably, the enabling key is communicated to the intending user at the time of registration of the software by a third party operating a duplicate copy of the registration key generating means.

In yet a further broad form of the invention, there is provided digital data incorporating registration code, the digital data executable on a platform; the registration code comprising a portion of the digital data executable on the platform so as to switch the digital data between a demonstration mode and a use mode.

Preferably, the registration code when executed on the platform provides local licensee unique ID generating means whereby the digital data can be switched from the demonstration mode to the use mode by execution of the registration code only if a licensee unique ID generated by the local licensee unique ID generating means has matched a licensee unique ID generated by remote licensee unique ID generating means.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention will now be described with reference to the accompanying drawings wherein:

FIG. 1 is a schematic diagram of the relationship and interaction between an intending registered user and a registration authority of software on media secured according to a first embodiment of the invention;

FIGS. 2*a*, 2*b* and 2*c* are segments of a flow chart of the procedure to be followed during registration of software by a user according to a first embodiment of the invention;

FIG. 3 is a flow chart of alternative boot processes according to a second embodiment of the invention;

FIG. 4 is a personal information dialogue box relating to the procedure of FIGS. 2*a*, 2*b*, 2*c* in accordance with a third embodiment;

FIG. 5 is a schematic diagram of a system according to a fourth embodiment of the invention;

FIG. 6 is an implementation of the fourth embodiment of FIG. 5 in relation to a CD ROM drive;

FIG. 7 is a logic flow chart in relation to the decoder box of FIG. 6;

FIG. 8 is a block diagram of a generalized system according to a fifth embodiment of the invention;

FIG. 9 is a block diagram indicating one particular example of generation of a registration number for the system of FIG. 8; and

FIG. 10 is a schematic diagram of a sixth embodiment comprising a particular example of the generalized system of FIG. 8.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

It is to be understood that, in its various embodiments, the present invention is for the protection of digital code/software by control of permission to use the digital code/software. A hardware platform and a remote registration station implemented at least partially by means of electronic hardware are required by the various embodiments.

The code/software to be protected requires at least some adaption to be usable with the invention in its various embodiments. The adaptation can be universal for all copies of the code/software to be protected.

### First Embodiment

With reference to FIGS. 1 and 8, the system according to embodiments of the invention is designed and adapted to allow digital data 39 or software to run in a use mode on a platform 31 if and only if an appropriate licensing procedure has been followed. In particular forms, the system includes means for detecting when parts of the platform 31 on which the digital data 39 has been loaded has changed in part or in entirety as compared with the platform parameters when the software or digital data to be protected was, for example, last booted or run or validly registered.

The system relies on digital data or code 38 which forms part of the digital data to be protected by the system. This portion of the digital data, which preferably is integral to the digital data to be protected, has been termed the code portion 38 elsewhere in this specification. The code portion 38 includes an algorithm adapted to generate a registration number 66 or local licensee unique ID or registration key which characterizes the licensee. In this instance, the local licensee unique ID generator which generates the registration number comprises the execution of code 38 on platform 31.



The algorithm in the code portion is duplicated at a remote location on a platform 67 under the control of the licensor or its agents, and communication between the intending licensee and the licensor or its agent is required so that a matching registration number or enabling key can be generated at the remote location for subsequent communication to the intending licensee as a permit to licensed operation of the digital data 39 in a use mode.

Execution of the duplicated code portion on platform 67 comprises, in this instance, the remote licensee unique ID generating means.

Mode switching means can comprise execution of the code portion which additionally performs a comparison of the locally and remotely generated registration numbers.

Preferably, the code portion 38 is integral with the digital data and can be identical for all copies of the digital data. It is the algorithm embedded within the code portion (and which is duplicated at the remote location) which provides a registration number which can be "unique" if the information provided by the intending licensee upon which the algorithm relies when executed upon the platform is itself "unique".

In any event, in particular preferred forms, a serial number (see further on) is included in the registration number generation algorithm which introduces an additional level of uniqueness into the registration number calculation process.

With particular reference to FIG. 1, a program comprising digital data protected according to a first embodiment of the invention is supplied recorded on a magnetic disk 10.

Included as part of the software on that disk 10 is a registration and re-registration routine which executes whenever the program protected by the arrangement of the first embodiment "boots".

With reference to FIG. 1 and FIGS. 2*a*, 2*b* and 2*c*, the operation of the security routine will be described on the assumption that the program on the disk 10 protected by the registration routine has not been registered on the platform or is otherwise being loaded for the first time.

The prospective new user 11 inserts disk 10 into the user PC 12 so as to be read by PC 12.

As part of the software installation procedure, the registration routine is activated causing a series of dialogue boxes to appear on the display 13 of the user PC 12. Having checked to ensure that the software has not previously been registered on the PC 12, a dialogue box A (in FIG. 2*a*) is displayed which provides the user with a choice of either seeing a demonstration of the software (which typically has features such as save and/or print disabled) or alternatively an invitation to register ownership/licensee of the software (after which all features of the software are made available to the user).

If the register option is selected or if the user cancels the demonstration in favor of registration, then a contact dialogue box B (in FIG. 2*a*) is presented on the display 13 which provides a list (stored on disk 10 as part of the registration routine) which provides for example, names and contact numbers of the software publishing company together with other general product information.

Following the user's indication of agreement during display of license details (box B1) to proceed to register, the user can contact the registration center after filling out the registration dialogue box C as detailed below. After selecting "continue", the registration routine begins the first step in the generation of a security key which will be unique to the current copy of the software and to certain features of the environment in which it runs.

As shown in FIG. 2*b*, the first step in the generation of the security key comprises the generation of a serial number generated from the current time on the system and, in this example, the last modify date of the software and other information from the computer environment. The serial number is encrypted and rearranged and then presented as a number in the registration dialogue box on the display **13**.

The registration dialogue box C (in FIG. 2*b*) prompts the user for details unique to that user (including, for example, name, company, address, state, contact number) together with financial details for payment for the purpose of becoming a registered user of the software protected by the registration routine (for example Mastercard or corporate account number details). This information, unique to the user, is passed through a registration number algorithm **14** (represented symbolically in FIG. **1**) which generates a registration number or security key from the information unique to the user together with the serial number previously generated. The registration number or security key is not made available to the user of the PC **12** by the PC **12**.

An identical registration number algorithm **14** resides on the registration authority PC **15**. As an integral part of the registration procedure, the prospective new user **11** communicates the information unique to the user which was entered by the user on the user PC **12**, along with the serial number generated by the user's algorithm, to the registration authority **16**. The registration authority feeds this information into the registration authority PC **15** wherein the registration number algorithm **14** should produce an identical registration number or security key to that produced by the user PC **12** if the details communicated to the registration authority by the prospective new user **11** match with the details that have been entered on the user PC **12**. Optionally, the user can communicate the information to the registration authority electronically, e.g., by fax or modem or tone phone.

As a final stage in registration (refer to FIG. 2*d*), the registration authority **16** provides the registration number generated by the registration authority PC **15** to the user **11**. The user **11** enters the registration number into the user PC **12** where the registration routine checks to see whether the entered registration number matches the calculated registration number. If the two match, then a valid registration has taken place and access is provided by the registration routine to a full operating version of the software protected by the registration routine. If there is no match and a preference file (which stores the user details) does not exist then a dialogue box D (FIG. 2*c*) appears on the display **13** of user PC **12** providing the prospective new user **11** with the opportunity to check his/her details or switch to the demonstration version of the software protected by the registration routine.

Again, the registration authority PC **15** can provide to PC **12** the registration number which it generates by electronic means such as modem communication.

It will be evident that it is not obvious to the prospective new user **11** that the registration number which unlocks the full version of the software protected by the registration routine is, in fact, generated from an algorithm residing on the magnetic disk **10** and that it forms part of the software to which access is desired.

In this manner, the registration procedure outlined above ensures that exactly the same details entered by the prospective new user on his/her user PC **12** are those details recorded by the registration authority **16**. It will also be evident that the procedure does not require each magnetic disk **10** containing a copy of the software to be protected to have a unique registration number recorded on the disk at the time of distribution of the disk. Each copy has exactly the same registration number algorithm located upon it. A unique registration number or "security key" is generated only at the time of registration from the details supplied by the prospective new user **11**.

The registration routine behaves generally as follows where any copy of the protected software boots. In this situation, the registration routine checks at the time of boot to see what registration details are present for that particular copy of the software. If no details are present, then it is assumed that the PC is booting from a newly distributed magnetic disk and registration is to occur for the first time. The registration procedure in that case is that followed in respect of FIGS. 2*a*, 2*b* and 2*c*.

In the event that registration details are present, then the registration routine checks a number of parameters which are expected to be unique to the environment in which the software to be protected operates. In this embodiment, the parameters checked are hard disk volume name, user name, and computer name and user password and hard disc initialization date (not generally user configurable on the Apple Macintosh computer). The registration routine then checks these parameters against the corresponding details that it finds from the operating environment of the computer on which the software is running. If a designated combination of these details matches then it is assumed that a properly authorized and registered copy of the software is running and full access to the software is allowed.

In this manner, it is quite in order for users to provide other users with copies of the software protected by the security routine. The security routine attached to the software to be protected determines from the environment in which it operates whether an additional registration fee is required. If it is determined by the registration routine that this is the case, then the registration routine has the capability to provide a fresh registration number as part of an authorized registration procedure pending which the protected software reverts to demonstration mode.

## Second Embodiment

(Auto re-registration)

According to a second embodiment, a more sophisticated procedure suitable for checking at first boot and at subsequent boot is shown in flowchart form in FIG. **3**.

This procedure incorporates redundancy to cope with situations where the key file containing the information from which the current use has been authorized may have been deleted or does not exist on a subsequent boot.

The distinction as against the first embodiment is that a "key file" is created at the time of registration of the software and a duplicate key file is also created at the same time. The duplicate key file is arranged to be stored on the computer at a location separate from the program to be protected. In the case of the Apple Macintosh computer the duplicate key file can be stored in the "system" folder.

Both the key file (stored with the software) and the duplicate key file are encrypted and both contain identical information. The information contained comprises:

1. The user registration details including the serial number,
2. The environment details of the computer, and
3. Details of the application protected by the security routine for which registration is to be or has been obtained.

With reference to FIG. **3**, whenever the protected application boots, a check is made by the registration routine to

determine whether registration details exist in the key file of the protected application. If they do, a comparison is made by the registration routine between what is stored in the key file and the environment to determine whether a change has taken place to the environment as compared with what is stored in the key file. If no change is detected, then the protected application is permitted to run normally.

If there are no registration details present in the key file or if the above-referenced comparison between the key file contents and the application does not show a match, then the re-registration routine of FIG. 3 looks for the existence of a duplicate key file within the environment. If a duplicate key file exists, then the information contained within that duplicate key file is copied to the application key file and comparisons as previously described as between the key file details and the environment and application are made. If the comparison is positive, then the protected application is allowed to run normally. If the comparison proves negative, then the protected application is permitted to run by the registration routine in demonstration mode only. If a duplicate key file is found not to exist at all and the internal key file, if present, brings a negative result, then the protected application is allowed to run in demonstration mode only.

This arrangement provides improved durability for the registration routine in the sense that it is less likely that the protected application will be caused to run in demonstration mode for incorrect reasons.

## Third Embodiment

### Tracking System

With reference to FIG. **4**, a modified form of the dialogue box C of FIG. **2***b* is shown which includes provision for entry of "your user number" in box **21**.

At the time a prospective new user enters his/her details into the other boxes comprising the dialogue box C, there is an option for the user to enter a user number into box **21**. The user number is provided by the registration authority **16** as a number unique to that particular registered user. If the box **21** has the user number details inserted into it, then the registration routine, When the next copy of the protected application is made, will transfer the user number details from box **21** to the "last user number" box **22**. A similar transfer will take place when next a copy is made of the protected application if and only if the person wishing to register the next copy enters their user number details in box **21**. If they do not, then the last user number details in box **22** remain as before. In this manner, a tracking system is available to the registration authority in the form of a tree where any given copy is identified by its ancestry based on current and previous user number as entered into boxes **21** and **22**.

### Self-Serialization

In a particular embodiment, a process termed "self-serialization" can be utilized to produce the serial number **50** which is displayable to the user/licensee as illustrated in FIG. **4**.

The serial number **50** is disguised by use of a random or pseudorandom number input to the algorithm which generates the serial number at the time of first boot of the software as part of the initial registration procedure. For example, the serial number, when generated by the self-serialization process, can be generated by a random number routine forming part of the registration software or it can be generated by the registration software with reference to data which is available in a widely varying fashion on the platform on which the software is located—for example, a time reference on the



platform. The serial number **50** generated by the self-serialization process can be a required input to the registration algorithm from which the registration number is generated. Clearly, the serial number **50**, as determined and displayed to the user, will then be required to be communicated to the registration authority for input to the registration authority's registration number generating algorithm.

It will be observed that a serial number **50** generated in this manner is likely to be displayed as a different number on each platform on which the software to be protected is to be run and comprises a randomized input to the registration algorithm which is determined and determinable only at the time of registration.

## Fifth Embodiment

With reference to FIG. **5**, there is shown in schematic form a microprocessor **30** adapted to operate under an operating system or upon a platform **31** such as, for example, MicroSoft DOS or Macintosh System **7**. The platform **31** allows relatively high level commands to be used to cause the microprocessor **30** to interact with input/output devices such as keyboard **32**, monitor **33**, loudspeaker **34**, memory **35** and magnetic or CD ROM disk **36**.

By way of example a word processing program comprising a length of code or digital data **37** has been copied onto disk **36**.

The digital data **37** includes registration code portion **38** and use code portion **39**.

The digital data **37** is arranged in such a way that when microprocessor **30** seeks to first execute the digital data **37** by way of operating system or platform **31** the digital data comprising the registration code portion **38** is caused to execute first in a manner previously described in reference to the first embodiment of the invention. The execution of the digital data comprising the registration code portion **38** in conjunction with the operating system or platform **31** comprises a mode switcher which will permit the microprocessor **30** to execute the use code portion **39** of digital data **37** only in a demonstration mode unless and until registration involving reference to an external registration authority is first completed successfully. This registration procedure is as previously described with reference to the first embodiment.

The digital data **37** can comprise, for example, a word processing program such as Wordperfect 6.0 available from Wordperfect Corporation. The registration code portion **38** is integral with the digital data **37** comprising the word processing program. The registration code portion **38** includes the algorithm for calculation of the registration number as previously described in respect of other embodiments of the invention.

It will be appreciated that the registration code portion **38** effectively forms simply a part of the software or digital data **37** to be protected/registered and that the digital data **37** will be or can be identical for all copies of the word processing program produced. The registration code portion **38** allows a unique link to be made between the digital data **37** and an individual authorized or licensed to use the digital data **37** by way of initial execution of a copy of the digital data comprising registration code portion **38**.

With reference to FIGS. **6** and **7**, a specific realization of the fifth embodiment will be described.

With particular reference to FIG. **6**, a decoder **51** is interposed in the datapath from the CD in CD player **52** and a digital-to-analog converter **53**. The digital-to-analog con-

verter **53** is the device by which digitally encoded musical or video information residing on CD ROM **54** is converted to analog form suitable for playback on current mass produced television sets (video) or hi-fi sets (audio).

The decoder **51** comprises part of the platform upon which the digital data **37** is executed and includes means to interpret the code portion **38** of the digital data **37** whereby the registration system is implemented such that the digital data **37** and, more particularly, the use code portion **39** of that digital data **37** can be executed on the platform in a use mode only if the registration procedure to which reference has been made in respect of previous embodiments has been performed.

The registration code portion **38** can include a preview or demonstration related to a subset of the balance of the digital data on the CD **54** which can be executed by the platform without license.

The decoder **61** includes LCD display **55** and keypad **56** whereby the licensee can enter information via keypad **56** and receive information via the LCD display **55** for the purpose of the registration procedure.

In addition a smart card (SRAM) **57** is receivable by the decoder **81** for the purpose of customizing or amending operation of the decoder **51**.

With reference to FIG. **7**, the registration procedure following insertion of CD **54** into CD player **52** is as follows. The user operates the play control and decoder **51** reads from CD **54** code portion **38** of digital data **37** located thereon and executes this code so as to determine whether the digital data is already licensed for the platform. If not, a demonstration is communicated via digital-to-analog converter **63** whilst the user determines whether to register as a licensee of the digital data **37** in the manner indicated in the flowchart of FIG. **7**.

Sixth Embodiment

With reference to FIG. **8**, there is shown a block diagram of a system according to a further embodiment of the invention which is to be read in the context of the earlier generalized description in respect of FIG. **1**.

The system illustrated in FIG. **8** operates in the manner generally described in respect of previous embodiments and as generally outlined in the diagram. In the context of the block C illustrated in FIG. **4**, and with reference to FIG. **9**, the algorithm, which generates the unique user identification and which is resident both as the registration code portion **38** in digital data **37** integrally bound to use code portion **39** for execution on local platform **31** and also as remote algorithm **61**, is attached to registration database program **62** for execution on the remote platform **63**.

The algorithm, in this embodiment, combines by addition the serial number **50** with the software product name **64** and customer information **65** and previous user identification **22** to provide registration number **66**.

As discussed earlier, all of the items to be summed, namely items **50**, **64**, **65** and **22** must be communicated to the remote licensee unique ID generator **67** by the intending licensee whereby algorithm **51** causes the production of a registration number **66** which matches identically with the locally produced registration number. When mode switcher **68** verifies the match, then the mode switcher **68** allows execution on platform **31** of the full user program **39**.

Prior to allowing execution of the full program, mode switcher **68** will also check whether platform ID **69** has



changed as provided to it by platform unique ID generator **70**.

In this embodiment, serial number **50** is comprised of two components, namely system information **71** and a variable key portion **72**. The variable key portion **72** provides the characteristic of self serialization described earlier in the specification and, in this embodiment, is generated at the time of registration on platform **31** by reference to a variable platform parameter, in this case reference to system time information, although other parameters which are variable can be utilized in other embodiments.

System information **71** can include information which identifies the hardware comprising the platform **31** on which the user program **39** is to be executed such as, for example, CPU number (where available), or unique parameters associated with the firmware in use. The system information, optionally, can further include system configuration information such as amount of memory, type of processor etc.

It will be noted, therefore, that serial number **50** will appear to an intending licensee when it appears on screen as per box C in FIG. **4** as an apparently random variable having no obvious link to the platform **31** or the user program **39**.

However, when the serial number **50** is communicated to the remote licensee unique ID generator **67** a secondary algorithm complementary to the algorithm which generated the serial number including variable key portion **72** and system information **71** is able to "decode" or otherwise strip away the variable key portion **72** so as to make use of the system information **71** if allowable and desirable in the circumstances.

Whether the system information **71** is utilized or not, the serial number **50** generated in this manner provides an input to the algorithm which generates registration number **66** which presents as an apparently variable parameter thereby rendering "cracking" of the software registration system more difficult and unlikely.

Seventh Embodiment

The schematic diagram of FIG. **10** illustrates a substantially hardware implementation of the invention applicable, for example, for implementation of the CD arrangement of FIG. **6** or the more generalized arrangement of FIGS. **8** and **9**.

In this embodiment, a prospective user **80** of digital code **81** on media **82** by its execution on platform **83** firstly inserts the media **82** into an appropriate digital code reading device within platform **83** (e.g., a floppy disk drive or a CD ROM drive).

Customer information C is provided by user **80** both direct to local encoder/decoder **84** and also to local adder or summer **85**.

Additionally, product information P derived from media **82** (typically via platform **83**) or else via the intermediary of the user (signified by the small man symbol) is provided to encoder/decoder **84** and to summer **85**.

Finally, a serial number S derived from platform **83** is supplied either directly or via the intermediary of user **80** to encoder/decoder **84** and to summer **85**.

Summer **85** acts as a local licensee unique ID generating means by combining, by addition, customer information C, product information P and serial number S in order to provide a local licensee unique ID here designated Y.

Encoder/decoder **84** transmits the serial number S, the customer information C and the product information P via

modems **86, 87** over the public switched telephone network to a remote encoder/decoder **88** which, in turn, supplies signals S, C and P to the inputs of remote summer **89**. Remote summer **89** combines these signals by addition (thereby acting as a remote license unique ID generating means) so as to provide a summed output, here termed X, which represents a licensee unique ID or enabling key which should match identically with the local licensee unique ID or registration key or registration number Y if inputs S, C and P to summers **85** and **89** are identical.

The licensee unique ID termed X is transmitted back via encoder/decoders and modems **84, 86, 87, 88** to comparator **90** which outputs a high signal if X equals Y. This condition corresponds to the local licensee unique ID matching with the licensee unique ID generated at the remote location by the remote licensee unique ID generating means generally comprising summer **89**.

Digital code **81** on media **82** comprises code identified as a demonstration portion D together with code identified as a use portion U. There may be other kinds of code designated O as well.

Code **81** is executed on platform **83** (for example, a microprocessor or a substantially hardware based, dedicated playback device such as a CD drive) with the code being passed through a mode switcher comprising first gate **91** and second gate **92** together with relay **93**.

First gate **91** energizes relay **93** so as to permit execution of code of type D but not code of any other type such as of type U.

Second gate **92** permits execution of any kind of code by closure of relay **93** provided only that the output of comparator **90** is high (which is to say that X equals Y or that the local licensee unique ID matches with the licensee unique ID generated by the remote licensee unique ID generating means comprising summer **89**).

Comparator **90** together with gates **91, 92** and relay **93** comprise one particular form of mode switcher or switching platform **83** of various kinds of code such as the code of types D and U.

Industrial Applicability

The aforementioned may be applied either in dedicated electronic hardware or by means of more generalized digital computation devices such as microprocessors and the like whereby digital code or software (which may incorporate at least part of the code which, when executed, acts as a licensee unique ID generator) is fully enabled only after following a specified licensing procedure.

The above describes only some embodiments of the present invention and modifications, obvious to those skilled in the art, can be made thereto without departing from the scope and spirit of the present invention.

What is claimed is:

**1.** A registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.



**2.** The system of claim **1**, wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode.

**3.** The system of claim **2**, wherein said mode switching means permits operation of said digital data in said use mode in subsequent execution of said digital data only if said licensee unique ID generated by said local licensee unique ID generating means has not changed.

**4.** The system of claim **3**, wherein said local licensee unique ID generating means comprises part of said digital data when executed on said platform.

**5.** The system of claim **4**, wherein said mode switching means comprises part of said digital data when executed on said platform.

**6.** The system of claim **5**, wherein the information utilized by said local licensee unique ID generating means to produce said licensee unique ID comprises prospective licensee details including at least one of payment details, contact details and name.

**7.** The system of claim **1**, said system further including platform unique ID generating means, wherein said mode switching means will permit said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed.

**8.** The system of claim **7**, wherein said platform unique ID generating means comprises part of said digital data when executed on said platform.

**9.** The system of claim **8**, wherein said platform unique ID generating means utilizes hard disc or other platform information to determine said platform unique ID.

**10.** The system of claim **1**, wherein said platform comprises a computer operating system environment.

**11.** The system of claim **10**, wherein said digital data comprises a software program adapted to run under said operating system environment.

**12.** A registration system attachable to software to be protected, said registration system generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed; and wherein said registration system is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration system.

**13.** The registration system of claim **12**, wherein said security key is generated by a registration number algorithm.

**14.** The registration system of claim **13**, wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run.

**15.** The registration system of claim **12**, wherein said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot, and, if a subsequent boot is detected, then environment and user details are compared to determine whether the program reverts to a demonstration mode and a new user registration procedure is to commence or a full version run.

**16.** The registration system of claim **15**, wherein said environment details comprise at least one element which is not user-configurable on the platform.

17. A method of control of distribution of software, said method comprising providing mode-switching means associated with said software adapted to switch said software between a fully enabled mode and a partly enabled or demonstration mode, said method further comprising providing registration key generating means adapted to generate a registration key which is a function of information unique to an intending user of the software; said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key; and wherein said enabling key is communicated to said intending user at the time of registration of said software; said enabling key generated by a third party means of operation of a duplicate copy of said registration key generating means.

18. The method of claim 17, wherein said registration key is also a function of the environment in which said software is installed.

19. A remote registration station incorporating remote licensee unique ID generating means, said station forming part of a registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform



only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

20. A method of registration of digital data so as to enable execution of said digital data in a use mode, said method comprising an intending licensee operating a registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

* * * * *

# EXHIBIT C

PHONEWARE

13 October 1993

Mr Ric Richardson,
Managing Director
Uniloc Corp
32 Brookvale Ave.
Brookvale NSW 2100

Dear Ric,

I note with interest the publicity that you have received with regard to the "try before you buy" technology. Please be aware that the United States Patent Office has recently allowed my patent "Method and System for Decentralized Manufacture of Copy-Controlled Software" which covers exactly the system described in your press release.

As the patent has only recently been allowed I have not as yet made any progress in the marketing of the process myself. However, it appears that you may have made some real progress in the commercialisation of the technology. As I have better protection of the process itself, it would appear that there may be advantages in a pooling of resources. I will be contacting you in the near future to discuss this possibility.

I look forward to speaking with you and hope to formulate an arrangement which is to our mutual benefit.

Yours Sincerely,

G Grundy

Greg Grundy
Managing Director

OZIMOSIS
INTERNATIONAL
PTY LTD
ACN 050 404 218

1/21 Hewitt Street
Wilston Q 4051
Tel: (07) 856 4813
Fax: (07) 856 4861

ATTORNEYS'
EYES ONLY
UNILOC 14902

# EXHIBIT D

5

**Mark J Coorey - Solicitor**
108 The Promenade, Camp Hill, Queensland, Australia
P.O. Box 1463, Coorparoo D.C., Qld, Australia 4151
Tel: (018) 728 733 (International: +61 18 728 733)
Fax: (07) 843 0924 (International: +61 7 843 0924)

November 20th, 1994

The Examination Officer - Patent Registry
**Australian Industrial Property Organisation**
P.O. Box 200,
Woden ACT 2606

Dear Sir

**Uniloc Corporation Pty. Ltd. - Patent Application**
**Australian Allocation No. 48113/93**

I refer to the above matter and to my telephone conversation with your office (Mr. Dominic Stinziani - Patent Registry Section). I confirm that I am both a director of and the solicitor for Tryware P/L (ACN 010 965 367). As mentioned, Tryware P/L has entered an exclusive license agreement over US Patent Number 5,291,598 issued March 1, 1994 (Application filed April 7, 1994).

It has come to our attention that Uniloc Corporation has filed an application for a Patent in September, 1992. The Australian Allocation Number is 48113/93. As you would be aware, Uniloc Corporation has since issued PCTs (Int. Application No: PCT/AU93/00483) in the various Designated States as noted on the PCT. We note that the Uniloc Corporation Patent Application has not yet been examined by your branch and that the said Application has not been granted.

The aforementioned patent application by Uniloc Corporation, entitled "System for Software Registration", is in direct conflict with our issued Patent. The application for our Patent was filed almost 6 months prior to Uniloc Corporation's application as noted in the PCT Priority Data (September 21, 1992). Accordingly, pursuant to Section 27 of the Patents Act, we hereby notify the Commissioner that the invention concerned is not a patentable invention because it does not comply with Section 18 Paragraph 1. Pursuant to Regulation 2.7, we enclose herewith a copy of US Patent Number 5,291,598.

If the said Patent Application has actually been examined and granted, please advise same by return facsimile so that we may file a Notice of Opposition pursuant to Chapter 5 of the Patents Act and Regulations.

If you require any further information, please do not hesitate in contacting me.

Yours Faithfully,

Mark Coorey

AUSTRALIAN INDUSTRIAL
RECEIVED
24 NOV 1994
PROPERTY ORGANISATION

UNILOC 10735
ATTORNEY'S
EYES ONLY

US005291598A

**United States Patent** [19]

**Grundy**

[11] **Patent Number: 5,291,598**

[45] **Date of Patent: Mar. 1, 1994**

[54] **METHOD AND SYSTEM FOR DECENTRALIZED MANUFACTURE OF COPY-CONTROLLED SOFTWARE**

[76] Inventor: Gregory Grundy, 1/21 Hewitt Street, Wilston 4051, Queensland, Australia

[21] Appl. No.: 864,836

[22] Filed: Apr. 7, 1992

[51] Int. Cl.[5] ........................ G06F 9/00; G06F 12/14

[52] U.S. Cl. ........................ 395/650; 364/DIG. 1; 364/286.4; 364/286.5; 364/286.6

[58] Field of Search ........................ 395/650; 364/286.4, 364/286.5, 286.6

[56] **References Cited**

U.S. PATENT DOCUMENTS



| | | | |
|---|---|---|---|
| 4,652,990 | 3/1987 | Pailen et al. | 364/200 |
| 4,685,055 | 8/1987 | Thomas | 364/200 |
| 5,034,980 | 7/1991 | Kubota | 380/4 |
| 5,113,518 | 5/1992 | Durst et al. | 395/550 |



*Primary Examiner*—Gareth D. Shaw
*Assistant Examiner*—A. Katbab
*Attorney, Agent, or Firm*—Kenyon & Kenyon

[57] **ABSTRACT**

A system to control the use of an informational product is disclosed. The informational product is stored on a storage medium and executed by a first processor. The informational product is operatable in a plurality of modes. The system comprises three manufacture modules. The first manufacture module, executed by the first processor, generates a registration code for a user of the informational product, the registration code being a function of the identity of the first processor, the identity of the user and the identity of the informational product. The second manufacture module, executed by the first processor, accepts as input an authorization code, verifies the authorization code and, if the verification is successful, changes the operational mode of the informational product. The second manufacture module also stores a user record in the informational product. The third manufacture module examines the user record each time the informational product is activated. The third module determines the operational mode of the informational product as a function of the operational mode stored in the user record and the identity of the processor on which the third module is executed. The third module returns to the informational product the user record.

**43 Claims, 11 Drawing Sheets**




UNILOC 10736
ATTORNEY'S
EYES ONLY

# EXHIBIT E

**Mark J Coorey - Solicitor**
108 The Promenade, Camp Hill, Queensland, Australia
P.O. Box 1463, Coorparoo D.C., Qld, Australia 4151
Tel: (018) 728 733 (International: +61 18 728 733)
Fax: (07) 843 0924 (International: +61 7 843 0924)

January 11th, 1995

The Examination Officer - Patent Registry
**Australian Industrial Property Organisation**
P.O. Box 200,
Woden ACT 2606

Dear Sir,

**Re: Uniloc Corporation Pty. Ltd. - Patent Application**
**Australian Allocation No. 48113/93**

I refer to the abovementioned patent application and to the Notice under Section 27 of the Patents Act forwarded with my letter dated November 20, 1994.

I confirm the contents of the said Notice and, pursuant to regulation 2.7, enclose herewith a copy of Tryware Pty Ltd's second US patent (No: 5,375,240). I apologise that same could not be provided with the original notice. The U.S. Patents Office only issued same on December 20, 1994.

Please attach the additional patent to the original notice.

Thank you for your assistance. If you require any further information, please do not hesitate in contacting me.

Yours Faithfully,

Mark Coorey

1 6 JAN 1995

UNILOC 10798
ATTORNEY'S
EYES ONLY

# EXHIBIT F

|4S|

(19) BUNDESREPUBLIK DEUTSCHLAND

DEUTSCHES PATENTAMT

(12) **Offenlegungsschrift**

(10) **DE 40 19 652 A1**

(51) Int. Cl.[5]: **G 06 F 12/14**

G06F1/00N7R2

(21) Aktenzeichen: P 40 19 652.6
(22) Anmeldetag: 20. 6. 90
(43) Offenlegungstag: 2. 1. 92

DE 40 19 652 A1

(71) Anmelder:
Kuhn, Alois, 8939 Waal, DE

(74) Vertreter:
Herrmann-Trentepohl, W., Dipl.-Ing., 4690 Herne; Kirschner, K., Dipl.-Phys.; Grosse, W., Dipl.-Ing.; Bockhorni, J., Dipl.-Ing., Pat.-Anwälte, 8000 München

(72) Erfinder:
gleich Anmelder

(56) Für die Beurteilung der Patentfähigkeit in Betracht zu ziehende Druckschriften:

| | |
|---|---|
| US | 46 85 055 |
| EP | 03 02 710 A2 |
| EP | 01 19 886 A1 |
| EP | 01 05 242 A2 |

DE-Z: ZELTWANGER, Holger: Kopierschutz für Programme und Zugangsschutz für Daten. In: Elektronik 17/22.8.1986, S.48-51;
- US-Z: IBM Technical Disclosure Bulletin, Vol.32, No.6A, November 1989, S.264;

DOC

# (54) Verfahren zum Schutz von Software gegen unzulässiges Kopieren

(57) Zum wirksamen Schutz von Software gegen unzulässiges Kopieren wird softwareseitig ein in jedem Zielrechner anzuordnendes Rechner-Identifikations-Merkmal zur Begrenzung der Lauffähigkeit der Software auf dem jeweiligen Zielrechner genutzt. Dabei kann das Rechner-Identifikations-Merkmal mit einer Software-Lizenznummer ergänzt werden. Das um die Software-Lizenznummer ergänzte Rechner-Identifikations-Merkmal kann weiterhin mit einem Komplement komplettiert werden, so daß sich stets ein generelles softwareseitiges Paßwort ergibt.

DE 40 19 652 A1

UNILOC 990

## Beschreibung

Die Erfindung betrifft ein Verfahren zum Schutz von Software gegen unzulässiges Kopieren, wenn die Software in einem entsprechenden Computer installiert ist.

Das unzulässige Kopieren von auf einem Computer installierter Software, sogenannter Originalsoftware, wird Raubkopieren genannt. Unter Raubkopieren lassen sich die unterschiedlichsten Formen der sogenannten Computer-Kriminalität zusammenfassen. Darunter fällt beispielsweise das Kopieren von Originalsoftware und Weiterverkauf auf eigene Rechnung, der Einsatz einer mit Einzellizenz erworbenen Originalsoftware auf gleichzeitig mehreren Anlagen oder das unberechtigte Kopieren von Software von Mitarbeiter und der Einsatz auf privaten Anlagen. Insgesamt sind die Erscheinungsformen des Raubkopierens unüberschaubar.

Lt. Schätzung der VSI (Vereinigung zur Förderung der Deutschen Software-Industrie) entsteht der Software-Industrie durch Raubkopieren ein Umsatzschaden von jährlich mindestens 500 Mill. DM.

Nach herrschender Meinung ist für jeden Rechner ein Originalprogramm oder eine Mehrfachlizenz für alle Computer eines Betriebes bzw. Netzes zu beziehen.

Die bisher bekannten Verfahren zum Schutz vor Raubkopieren sind zum Teil reine softwareseitige Kopierschutzmaßnahmen, die durch entsprechende Kopierprogramme übergangen werden können.

Weiterhin werden in großer Zahl kombinierte Hardware/Software-Kopierschutzmaßnahmen ergriffen. Beispielsweise ist es bekannt, auf einer Originaldiskette eine versteckte Fehlerspur anzuordnen, die bei normalem Kopieren nicht mit übertragen wird. Es wird dadurch eine sogenannte Systemdiskette gebildet, die jeweils beim Start des Programmes eingelegt werden muß.

Eine andere Art des Softwareschutzes liegt in der Festlegung und Abfragung eines Paßwortes.

Weiterhin ist eine Möglichkeit bekannt, bei der mit der Software ein sogenanntes Hardlock, also ein hardwareseitiges Schloß, mitgeliefert wird. Dieses wird an einer entsprechenden Schnittstelle des Computers angeordnet und enthält einen Speicher- oder Prozessorbaustein. Entweder wird dem Speicherbaustein eine entsprechende Kombination durch die Software entnommen oder es wird mittels eines besonderen Algorithmusses eine eingegebene Zahlenkombination modifiziert und durch die Software wieder abgefragt. Damit kann die Originalsoftware jeweils erkennen, ob der Rechner, auf dem sie gestapelt wurde, für ihren Ablauf legitimiert ist.

Alle genannten Maßnahmen haben den Nachteil gemeinsam, daß sie umgangen werden können. Weiterhin sind sie im einzelnen nicht zur Vermeidung aller Erscheinungsformen des Raubkopierens geeignet.

So kann ein Paßwortschutz nicht verhindern, daß die gleiche Software auf beliebig vielen Rechner installiert und betrieben wird, sofern der Nutzer das Paßwort kennt. Mitarbeiter eines Betriebes können somit ohne weiteres die im Dienst zur Verfügung gestellte Software auch zu Hause betreiben.

Das Anordnen von Fehlerspuren auf Originaldisketten hat sich als unsinnig erwiesen, da inzwischen gute Kopierprogramme diese Fehlerspur identisch mitübertragen.

Der Einsatz von sogenannten Hardlocks ist ebenfalls umgehbar, indem entweder durch eine entsprechende Software die Existenz des Hardlocks simuliert oder einfach das Hardlock durch Auslesen und Nachbau kopiert wird.



Weiterhin haben die bekannten Maßnahmen den Nachteil gemeinsam, daß sie auf die Software bezogen sind. Eine andere Software macht eine andere Maßnahme erforderlich.

Unter Berücksichtigung bestimmter Randbedingungen besteht also seitens der softwareproduzierenden Industrie Bedarf nach einem echten Softwareschutz für ihre Originalsoftware.

Eine Randbedingung ist dabei, daß der rechtmäßige Benutzer jederzeit die Möglichkeit haben muß, beliebig viele Sicherheitskopien seiner Originalsoftware zu erstellen. Weiterhin muß die Verwendung dieser Software auf mehreren Betriebs- oder Netzrechnern möglich sein. Möglicher organisatorischer oder verwaltungsseitiger Aufwand muß auf ein vertretbares Maß reduziert sein.

Unter Berücksichtigung der Randbedingung liegt der Erfindung die Aufgabe zugrunde, ein Verfahren zum Schutz von Software gegen Raubkopieren anzugeben, bei welchem gewährleistet ist, daß die Software nicht unberechtigterweise auf einem anderen als dem vom Software-Hersteller lizensierten Rechner ablaufen kann.

Diese Aufgabe wird durch die kennzeichnende Merkmale des Patentanspruches 1 gelöst. Vorteilhafte Ausgestaltungen der Erfindung sind in den Unteransprüchen gekennzeichnet.

Dabei ist nach Maßgabe der Erfindung vorgesehen, durch Anordnen und Nutzen eines speziellen Paßwortverfahrens mit einem hardwareseitig erzeugtem Rechneridentifikations-Merkmal (RID), gleichsam einem Fingerabdruck des Rechners, die Lauffähigkeit von Software auf jedem individuellen Zielrechner zu begrenzen.

Der Lösungsvorschlag erfüllt alle in der Zielvorstellung formulierten Bedingungen. Durch Verknüpfung eines Paßwortverfahrens mit einem neu einzurichtenden Rechneridentifikationsmerkmals läßt sich ein nahezu perfekter Sortwareschutz aufbauen.

Die Rechner/Prozessoren können von den Herstellern mit einem individuellen, unzerstörbaren, unveränderbaren Identifikations-Merkmal, das über Software gelesen werden kann, ausgestattet weden. Bei diesem könnte es sich z. B. um eine mehrstellige Kombination aus Hersteller, Rechnertyp, -serie, Herstellungsdatum und laufende Nummer handeln. Sie sollte jeden produzierten Rechner eindeutig, gleich einem Fingerabdruck, identifizieren.

In Verbindung mit dieser RID kann der Software-Hersteller einen rechnerindividuellen Paßwortschutz aufbauen. Die Abarbeitung eines Programmes kann von der Eingabe eines rechnerindivuellen, vom Softwarehersteller ausgegebenen und registrierten Paßwortes abhängig gemacht werden.

Im folgenden wird die Erfindung anhand von Beispielen und Ausführungsvorschlägen sowie der Beschreibung eines möglichen organisatorischen Ablaufs erläutert.

Gemäß einem Ausführungsbeispiel kann die RID und eine Software-Lizenz-Nr. vom Softwarehersteller durch ein registriertes Rechnerpaßwort zu einem generellen Softwarepaßwort komplementiert werden.

Bei diesem Paßwortverfahren wird die mit jeder Originalsoftware ausgelieferten Softwareregistrier-Nr. (SRN) mit dem RID durch ein rechnerindividuelles Paßwort (RP) zu einem generellen Softwarepaßwort kom-

plementiert. Bei den genannten Paßwörtern sollte es sich um mehrstellige, verschlüsselte Wertekombinationen handeln, um das Erkennen von Strukturen und Gesetzmäßigkeiten soweit wie möglich zu erschweren.

Beispiel:

Software-Register-Nr. (SRN)
+ Rechneridentifikations-Merkmal
+ Rechnerindividuelles Paßwort (RP) → Komplement
= Generelles Softwarepaßwort

Das generelle Softwarepaßwort wäre somit das Schlüsselwort, durch das der Zugang zur Software eröffnet wird.

Bei dem genannten Ausführungsbeispiel handelt es sich um ein sehr stark vereinfachtes Anschauungsmodell, das von jedem Softwarehersteller beliebig erweiterbar und variierbar ist. Das generelle Softwarepaßwort kann beispielsweise, um das Erscheinungsmuster unterschiedlich zu halten, mit variablen Daten, wie Datum, Seriennummern und verschiedenen Algorithmen verschleiert werden.

Wesentlich ist bei diesem Verfahren:
Ein eindeutiges Rechneridentifikationsmerkmal, das einem rechnerindividuellen "Fingerabdruck" gleicht und hardwareseitig erzeugt wird, wird mit einem Rechnerpaßwort nach den Vorstellungen des Softwareherstellers kombiniert. Durch dieses Rechnerpaßwort kann die Lauffähigkeit von Software auf jeden einzelnen Rechner begrenzt werden. Softwarekopien wären nur noch auf dem registrierten Rechner einsetzbar.

Die Software wäre nun selbst in der Lage, vor Ausführen der eigentlichen Anwenderfunktionen die Berechtigung der Softwarebenutzung durch eine Prüfroutine wirksam zu kontrollieren und gegebenenfalls die Ausführung zu unterbinden.

Bei diesem Ausführungsbeispiel gestaltet sich die technische und organisatorische Handhabung beispielsweise wie folgt: Beim Kauf eines Software-Paketes erhält der Käufer die entsprechenden Originaldisketten mit der Angabe der Software-Registrier-Nr. (SRN). Als erster Schritt installiert der Käufer die Software mit der Installationsdiskette (SETUP-Programm). Dieses löst nach Eingabe aller Parameter das Rechner-Identifikationsmerkmal (RID) und gibt es auf den Drucker/Bildschirm aus. Der Käufer teilt dem Softwarehersteller die RID und die Software-Registrier-Nr. (SRN) mit und erhält von diesem das rechnerindividuelle Paßwort (RP) zugeteilt. Nach Eingabe dieses RP wird dieses beiden Konfigurationsdaten oder in einer speziellen Paßwortdatei gespeichert. Damit erhält dieser Rechner eine überprüfbare Nutzungsberechtigung, die erst wieder bei einer Neuinstallation durch Eingabe des RP erneuert werden müßte.

Die Originalsoftware kann zu Sicherungszwecken beliebig oft kopiert werden, kann jedoch ohne RP auf keinem anderen Rechner eingesetzt werden.

Bei Mehrfachlizenzen ist der geschilderte Vorgang für jeden Rechner zu wiederholen. Bei Netzwerklizenzen sind entsprechend alle RP von allen Netzteilnehmern abzuspeichern.

Voraussetzung ist dabei eine hardwareseitige Rechneridentifikations-Einrichtung (RIE). Bei dieser Rechner-Identifikations-Einrichtung handelt es sich um ein hardwareseitig installiertes rechnerindividuelles Merkmal — gleich einem Fingerabdruck — das unveränderbar, nicht überlagerbar und eindeutig jeden Rechner zu einem unverwechselbaren "Individuum" macht. Dieses Identifikationsmerkmal muß über Programmbefehl lesbar sein und darf nur über eine Konstante ausgegeben werden.

Das Rechner-Identifikationsmerkmal (RID) könnte ein mehrstelliger Wert mit folgendem beispielhaftem Aufbau sein.
Herstellername; -code; -kürzel
Rechnertyp;
Seriennummer;
Herstellungsdatum;
Laufende Nummer.

Daß der Rechner selbst diese Funktion integriert hat, kann natürlich erst mit neuen Herstellungsbatches realisiert werden. Dieses Verfahren könnte somit erst in Jahrzehnten zum Einsatz kommen. Dieses Rechner-Identifikations-Merkmal sollte in einem ROM oder PROM abgelegt sein, also nicht mehr veränderbar sein und über eine Programmanfrage als Konstante ausgegeben werden.

Zur Zeit kann nur eine externe oder zusätzliche Einheit vorgesehen werden. Dieses Verfahren kann schon mit der Auslieferung einer neuen Software-Version realisiert werden. Die neue Software-Version kann das Vorhandensein einer Ein-/Ausgabe(E/A)-Einheit RIE als Hardwarestecker an einer Schnittstelle oder als E/A-Einheit in einem freien Steckplatz erzwingen. Diese Zusatzeinrichtung würde sozusagen als "Pseudoeingabegerät" die RID liefern.

Die Rechner-Identifikations-Einrichtungen (RIE) können zudem nach Änderung der Kommunikations-Software (Protokolle) für mehr Netzsicherheit sorgen. Unerwünschte, unberechtigte Eindringlinge könnten somit sicher identifiziert und abgewiesen werden.

Patentansprüche

1. Verfahren zum Schutz vom Software gegen unzulässiges Kopieren, **dadurch gekennzeichnet,** daß softwareseitig ein in jedem Zielrechner anzuordnendes Rechner-Identifikations-Merkmal zur Begrenzung der Lauffähigkeit der Software auf jedem individuellen Zielrechner abgefragt und genutzt wird.

2. Verfahren nach Anspruch 1, dadurch gekennzeichnet, daß ein unzerstörbar und unveränderbar in der Rechnerhardware angeordnetes Rechner-Identifikations-Merkmal genutzt wird.

3. Verfahren nach wenigstens einem der Ansprüche 1 oder 2, dadurch gekennzeichnet, daß das Rechner-Identifikations-Merkmal mit einer Software-Lizenznummer ergänzt wird.

4. Verfahren nach Anspruch 3, dadurch gekennzeichnet, daß das um die Softlizenznummer ergänzte Rechner-Identifikations-Merkmal softwareseitig mit einem Komplement ergänzt wird, so daß sich ein softwareseitig feststehendes generelles Paßwort ergibt.

5. Verfahren nach einem der vorhergehenden Ansprüche, dadurch gekennzeichnet, daß softwareseitig vor Ausführen der eigentlichen Anwenderfunktionen die Berechtigung der Softwarebenutzung kontrolliert wird.

# EXHIBIT G

PATENTANWÄLTE **KAHLER KÄCK FIENER STURM** EUROPEAN PATENT ATTORNEYS
DIPL.-ING. KURT KAHLER
ASSESSOR JOSEF FIENER
PATENTANWÄLTE, MINDELHEIM

DIPL.-WIRTSCH.-INGENIEUR
DIPL.-ING. JÜRGEN KÄCK
DR.PHIL. DIPL.-CHEM.
HANS-GEORG STURM
PATENTANWÄLTE, LANDSBERG

Kahler Käck Fiener Sturm, PO Box 1249 D-87712 Mindelheim

**Mailing Address:**
Maximilianstrasse 57
P. O. Box 1249
D-87712 Mindelheim

Telephone: +49-8261-3027
Facsimile 1: +49-8261-6563
Facsimile 2: +49-8191-59209

Peter Maxwell and Associates
Patent and Trade Mark Attorneys
P.O. Box 2309

North Parramatta
New South Wales 2151
Australia

ADVANCE FAX
+8 Pages

**European Patent Application No. 93920609.0**
**UNILOC (SINGAPORE) PRIVATE LIMITED**
**"System For Software Registration"**
**YOUR REF.: 93 1 168**
**OUR REF.: UL 25043EP.K2 L/em**

Confirmation

**5. Januar 1996**

**Dear Mr. Maxwell:**

This is to inform you of the receipt of the supplementary European search report in respect of the above-identified patent application. According to Art. 157(2) EPC, a supplementary European search report has to be drawn up in respect of all international applications. As you may gather from the European search report, the Examiner cites one reference, copy of which is enclosed. The Search Examiner considers this document as being "particularly relevant" concerning Applicant's claims 1 and 8 to 14 indicated by the letter X, but merely as "technological background" concerning Applicant's claims 4 to 6 and 15 to 30 indicated by category A. As you may also gather from the search report, claim 30 is cited twice, one time in category X and one time in category A. After reviewing the prior art document we consider the quoting of Applicant's claim 30 in category X as not justified. We would like to comment this reference (available in German language only) as follows:

DE 40 19 652 A1 (published on January 2, 1992) describes a method whereby a computer-ID-feature to be arranged in every objective-computer is used to limit the operation of the software to the corresponding objective-computer in order to have an effective protection against unauthorized copying. This method is characterized in that a computer or processor is provided with an individual, undestroyable and unchangeable

computer-ID-feature, such as a type code, serial number, date of production, etc., which may be read via software. Firstly, this computer-ID-feature may be supplemented with a software-license-number and, furthermore, the computer-ID-software-feature supplemented with the software-license-number may be supplemented with a complement, such that a general software-based password results.

The technical and organizational handling is disclosed in column 3, lines 39 to 51 of this reference: "In buying a software-product, the buyer gets the corresponding master disks together with a software-recording-number (SRN). In a first step, the buyer installs the software by means of a setup-disk (setup-programme). After the input of all parameters, a computer-ID-feature (RID) is solved and outputted on the printer/screen. The buyer communicates the RID and the software-recording-number (SRN) to the software-producer and receives an individual computer-password (RP). After inputting this RP, it is stored in both configuration files or in a special password file."

A basic requirement is, thereby, a hardware-ID-means which is not yet available in conventional computers or microprocessors and which should be, according to the reference cited, integrated in a ROM or PROM in order to be unchangeable.

According to Applicant's claim 1 for which the reference is quoted category X, Applicant's invention requires a remote licensee unique ID generator for generating a registration number independently from a local licensee unique ID generator. Only if the registration numbers from both local and remote licensee unique ID generators match, a mode switching means will allow a full operation mode. Thus, such a structure is not disclosed in the reference cited, which just discloses that the licensee gets a special password, the so-called complement, from the producer of the software. Therefore, there exists no reference to a special remote registration station including a remote licensee unique ID generator. Thus, in our opinion, the reference fails to fully disclose the subject-matter of the present invention as defined in claim 1, such that we consider this reference as not relevant.

Furthermore, the reference cited is quoted category X concerning Applicant's claims 8 to 14. But Applicant's claims 8 to 12 concern a specification of a registration system according to Applicant's claim 1 providing a platform unique ID generator comprising part of digital data necessary to run the software in a fully enabled mode in a subsequent execution. There exist no passages in the reference that indicate a structure such as this, such that we consider the reference as not relevant concerning Applicant's claims 8 to 12.

However, Applicant's claims 13 and 14 disclose a security routine or registration means attachable to software to be protected, said registration means generating a security key by registration number algorithm. Likewise, the reference discloses in column 3, lines 32 to 36, that "the software is, by means of a checking-routine, able to effectively check the authorization of the software-utilization before the execution of the actual user-programme and is able to prevent execution, if necessary", which seems to anticipate Applicant's claims 13 and 14, such that we consider the reference as relevant concerning Applicant's claims 13 and 14.

Furthermore, the reference cited is quoted category A concerning Applicant's claims 4 to 6 and 15 to 30. As the reference does not provide a mode switching means switching software into fully enabled mode, if an enabling key has matched identically with the registration key provided from a remote registration station or a digital data incorporating registration code with the digital data executable on a platform so as to switch the digital data between a demonstration mode and a use mode etc., we agree with the Examiner to consider this reference as not relevant concerning Applicant's claims 4 to 6 and 15 to 30.

Thus, in our opinion, the application should be allowable as European patent, as Applicant's claims 1 and 8 to 12 are not anticipated by the reference cited, due to the above-mentioned reasons. Concerning Applicant's claims 13 and 14 which seem to be anticipated, we suggest to await the Examiner's statement in a first Office Action and to make the necessary amendments, if required.

Furthermore, we enclose two EPO Communications dated November 22 and November 24, 1995, informing of the publication number 0 689 697 and requesting us to indicate within two months of notification, whether Applicant desires to proceed further. Since the International and the enclosed supplementary European search report are rather favourable, we will file an appropriate request in due time, if we do not receive your instruction to the contrary until

**January 22, 1996.**

If there are any questions left, please do not hesitate to contact us. Enclosed please find our debit note for the services rendered.

Encl.:
Supplementary European Search Report
1 Reference (by advance fax)
2 EPO Communications
Debit Note

Yours very truly,

KAHLER, KÄCK, FIENER & STURM

Josef Fiener

Josef Fiener

CLIENT

P.B.5818 - Patentlaan 2
2280 HV Rijswijk (ZH)
☎ (070) 3 40 20 40
TX 31651 epo nl
FAX (070) 3 40 30 16

Europäisches Patentamt
Zweigstelle in Den Haag
Recherchen-abteilung

European Patent Office
Branch at The Hague
Search division

Office européen des brevets
Département à La Haye
Division de la recherche

Fiener, Josef
Patentanwälte Kahler, Käck, Fiener & Sturm
P.O. Box 12 49
D-87712 Mindelheim
ALLEMAGNE

EINGANG/RECEIPT
31. OKT. 1995
KAHLER, KÄCK, FIENER & STURM

30.11.95 BERI.

Datum/Date 27.10.95

| Zeichen/Ref./Réf. | Anmeldung Nr./Application No./Demande n°./Patent Nr./Patent No./Brevet n°. |
|---|---|
| UL 25043EP.e0 F | 93920609.0 |
| Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire: UNILOC (SINGAPORE) PRIVATE LIMITED | |

# COMMUNICATION

The European Patent Office herewith transmits

- ☐ the European search report
- ☐ the declaration under Rule 45 EPC
- ☐ the partial European search report under Rule 45 EPC
- ☒ the supplementary European search report concerning the international application under Article 157(2) EPC

relating to the above-mentioned European patent application. Copies of the documents cited in the search report are enclosed.

The following specifications given by the applicant have been approved by the Search Division :

☑ Abstract ☑ Title ☐ Figure

- ☐ The abstract was modified by the Search Division and the definitive text is attached to this communication.
- ☐ The following figure will be published with the abstract, since the Search Division considers that it better characterises the invention than the one indicated by the applicant.

Figure:

- ☐ Additional copy(copies) of the documents cited in the European search report.

EUROPÄISCHES PATENTAMT DEN HAAG · EUROPEAN PATENT OFFICE THE HAGUE · OFFICE EUROPEEN DES BREVETS LA HAYE

## REFUND OF THE SEARCH FEE

If applicable under Article 10 Rules relating to fees, a separate communication from the Receiving Section on the refund of the search fee will be sent later.

EPO Form 1507 02.93

European Patent Office

# SUPPLEMENTARY EUROPEAN SEARCH REPORT

Application Number
EP 93 92 0609

## DOCUMENTS CONSIDERED TO BE RELEVANT

| Category | Citation of document with indication, where appropriate, of relevant passages | Relevant to claim | CLASSIFICATION OF THE APPLICATION (Int.Cl.5) |
|---|---|---|---|
| X | DE-A-40 19 652 (KUHN ALOIS) 2 January 1992 | 1,8-14, 30 | G06F15/21<br>G06F9/44<br>G06F1/00 |
| A | * abstract; claims * | 4-6, 15-30 | |
| | ----- | | |
| | | | TECHNICAL FIELDS SEARCHED (Int.Cl.5) |
| | | | G06F |

The supplementary search report has been drawn up for the claims attached hereto.

1

| Place of search | Date of completion of the search | Examiner |
|---|---|---|
| THE HAGUE | 17 October 1995 | Fournier, C |

CATEGORY OF CITED DOCUMENTS

X : particularly relevant if taken alone
Y : particularly relevant if combined with another document of the same category
A : technological background
O : non-written disclosure
P : intermediate document

T : theory or principle underlying the invention
E : earlier patent document, but published on, or after the filing date
D : document cited in the application
L : document cited for other reasons

& : member of the same patent family, corresponding document

EPO FORM 1503 03.82 (P04C09)

# ANNEX TO THE EUROPEAN SEARCH REPORT ON EUROPEAN PATENT APPLICATION NO.

EP 93 92 0609

This annex lists the patent family members relating to the patent documents cited in the above-mentioned European search report.
The members are as contained in the European Patent Office EDP file on
The European Patent Office is in no way liable for these particulars which are merely given for the purpose of information.

17-10-1995

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
|---|---|---|---|
| DE-A-4019652 | 02-01-92 | NONE | |

EPO FORM P0459

For more details about this annex : see Official Journal of the European Patent Office, No. 12/82

# EXHIBIT H

**Peter Maxwell**
and associates
patent and trade mark attorneys

**Peter F. Maxwell B.Sc., F.I.P.A.A..**
James V. Maxwell Dip. Law (SAB)
George Grizlotis B.Sc. (Hons)
Peter R. Vaughan B.Agr.Sc.
Charles V. Maxwell
Denise M. Sylvester (Accountant)

Blaxland House
5 Ross Street
North Parramatta
Sydney
New South Wales
Australia

P.O. Box 2309
North Parramatta
New South Wales 2151 Australia
**Telephone** (02) 683 3411
International +61 2 683 3411
**Facsimile** +612 683 5795

17 January 1996

Mr Steve Cox
Uniloc Corporation Pty Limited
PO Box 919
BROOKVALE NSW 2100

Dear Steve

RE: European Patent Application No 93 920 609.0
SYSTEM FOR SOFTWARE REGISTRATION
Our Reference: 93 1 168 PFM:gb

I refer to my letter of 7 July 1995 and enclose a copy of our associate's report of 5 January 1996 regarding the Supplementary Search Report.

Our associate has reviewed the additional citation raised by the European Patent Office (German specification 40 19 652 A1) and concluded that it should not cause any real problems.

In accordance with the practice of the European Patent Office, our associate will indicate that you wish to proceed with the application.

In the ordinary course of events, I doubt if the application will be examined before 1997.

Our account in respect of the Supplementary Search Report and the disbursement to our associate in that regard is enclosed.

Kind regards

P.F. Maxwell

Peter Maxwell

/us6/pat/3-l

# EXHIBIT I

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/124,18 | 09/21/93 | RICHARDSON | F CLAUTZ1.001A |

EXAMINER
CAIN,D

22M2/0808

JERRY T. SEWELL
KNOBBE, MARTENS, OLSON & BEAR
620 NEWPORT CENTER DRIVE
16TH FLOOR
NEWPORT BEACH, CA 92660-8016

| ART UNIT | PAPER NUMBER |
|---|---|
| 2202 | 12 |

DATE MAILED: 08/08/95

## NOTICE OF ALLOWABILITY

**PART I.**

1. [X] This communication is responsive to amendment of 7/5/95
2. [X] All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.
3. [X] The allowed claims are 31-50
4. [X] The drawings filed on 9/21/93 are acceptable.
5. [X] Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has [X] been received. [ ] not been received [ ] been filed in parent application Serial No ______, filed on ______.
6. [ ] Note the attached Examiner's Amendment
7. [ ] Note the attached Examiner Interview Summary Record, PTOL-413
8. [ ] Note the attached Examiner's Statement of Reasons for Allowance.
9. [ ] Note the attached NOTICE OF REFERENCES CITED, PTO-892
10. [ ] Note the attached INFORMATION DISCLOSURE CITATION, PTO-1449.

**PART II.**

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" indicated on this form. Failure to timely comply will result in the ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

1. [ ] Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.
2. [ ] APPLICANT MUST MAKE THE DRAWING CHANGES INDICATED BELOW IN THE MANNER SET FORTH ON THE REVERSE SIDE OF THIS PAPER.
   a. [ ] Drawing informalities are indicated on the NOTICE RE PATENT DRAWINGS, PTO-948, attached hereto or to Paper No. ______ CORRECTION IS REQUIRED.
   b. [ ] The proposed drawing correction filed on ______ has been approved by the examiner. CORRECTION IS REQUIRED.
   c. [ ] Approved drawing corrections are described by the examiner in the attached EXAMINER'S AMENDMENT. CORRECTION IS REQUIRED.
   d. [ ] Formal drawings are now REQUIRED.

---

Any response to this letter should include in the upper right hand corner, the following information from the NOTICE OF ALLOWANCE AND ISSUE FEE DUE: ISSUE BATCH NUMBER, DATE OF THE NOTICE OF ALLOWANCE, AND SERIAL NUMBER.

**Attachments:**

- Examiner's Amendment
- Examiner Interview Summary Record, PTOL-413
- Reasons for Allowance
- Notice of References Cited, PTO-892
- Information Disclosure Citation, PTO-1449
- Notice of Informal Application, PTO-152
- Notice re Patent Drawings, PTO-948
- Listing of Bonded Draftsmen
- Other

David Cain
DAVID C. CAIN
PRIMARY EXAMINER
GROUP 2200

PTOL-37 (REV. 4-89)

USCOMM-DC 89-3789

# EXHIBIT J

MAIL ROOM NOV 13 1995 PAT. & TRADEMARK

**PATENT**

Case Docket No. CLAUTZ1.001AUS
Date: November 6, 1995

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant(s) | : | Frederic B. Richardson, III |
| Appl. No. | : | 08/124,718 |
| Filed | : | September 21, 1993 |
| For | : | SYSTEM FOR SOFTWARE REGISTRATION |
| Group Art Unit | : | 2202 |
| Batch No. | : | 0624 |
| Examiner | : | David C. Cain |

I hereby certify that this correspondence and all marked attachments are being deposited with the United States Postal Service as first class mail in an envelope addressed to: Assistant Commissioner for Patents, Washington, D.C. 20231, on

November 6, 1995
(Date)

Jerry T. Sewell, Reg. No. 31,567

TRANSMITTAL LETTER

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

ATTENTION: BOX ISSUE FEE

Dear Sir:

Enclosed for filing in the above-identified application are:

(X) Issue Fee Transmittal.

(X) A check in the amount of $1280.00 to cover the above fees is enclosed.

(X) The Commissioner is hereby authorized to charge any additional fees which may be required, or credit any overpayment, to Account No. 11-1410. A duplicate copy of this sheet is enclosed.

(X) Return prepaid postcard.

Jerry T. Sewell
Registration No. 31,567
Attorney of Record

JTS-1943:rb
110395

# EXHIBIT K

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

UNILOC USA, INC. and

UNILOC SINGAPORE PRIVATE LIMITED

Plaintiffs

v.

Civ.A. No. 03-CV-440(WES)

MICROSOFT CORPORATION,

Defendant

# DEPOSITION OF PETER LLOYD HIGGS

BRISBANE, AUSTRALIA

THURSDAY, 21 APRIL 2005

AUSCRIPT PTY LTD

Level 10, 15 Adelaide Street, Brisbane

Brisbane, Queensland, Thursday, 21 April 2005

MR GLITZENSTEIN: It is April 21, 2005. We're here at the deposition of Peter Higgs. This deposition is being taken pursuant to notice at the offices of Mallesons Stephens Jaques, 1 Eagle Street, Brisbane, Queensland, Australia, and the deposition is being taken in the matter of Uniloc USA Inc and Uniloc Singapore, plaintiffs, versus Microsoft Corporation, defendant. The case is pending in the United States District Court in the District of Rhode Island and, pursuant to the Court's order in this matter, which is civil action number 03-CV-440 dated April 13, 2005, I'll now swear in the witness.

10.23 a.m.

**PETER LLOYD HIGGS**

called as a witness, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR GLITZENSTEIN:

Q. If you could please state your full name, sir.

A. Peter Lloyd Higgs.

Q. Where do you live, sir?

A. Kangaroo Point, Queensland.

Q. And are you aware that you've been asked to provide some testimony here today in a matter pending between Uniloc and Microsoft?

A. I am.

Q. And I've forgotten one thing. I am Kurt Glitzenstein, counsel for Microsoft, defendants, Fish and Richardson of Boston, Massechusetts.

A. Yes. It says, "All done by a control panel with a password". Correct. So, effectively, dual layers of security, user name and password and hardware identification.

Q. And did you - is it fair to say that your notes in exhibit 7 are the result of your collaboration with Mr Richardson?

MR WODARSKI: Objection.

A. This is me communicating to Ric my requirements based on all the previous documentation and the conversation I'd had with him about his functionality. So there was - I had a very basic idea of what his core functionality was at that stage. So this is not saying what was missing from him. This is saying more, "Okay, this is what we have to meet" and we - he specifically spoke about the hardware side that I can remember. The name - user name and password to all of us was so effectively trivial that it hasn't stuck it my mind whether he had it in there or not. But what I haven't got then is an audit back of his check list against this, but - yes.

BY MR GLITZENSTEIN:

Q. But this was - sorry.

A. Yes. But I do know that those were the market requirements and it was getting fairly close, confident enough for me to go and talk to Apple and the other staff about what could be available in - to be in the market within a year.

Q. About how much time cumulatively had you spent talking with Mr Richardson prior to the creation of exhibit 7?

A. Three hours maybe.

Q. And - - -

A. A million miles a minute. Yes, probably about three hours.

Q. Do you know who Allan Bell is?

A. Sure. He was the Apple developer manager at that time, so he was - he had the role with developers at the developer stage that I had with developers at the distribution stage. So his role was to get their apps built and help them with the tools on that.

Q. Did he work with Ric Richardson, to your knowledge?

A. He would certainly be aware of him. I don't know how particularly he would have been aware of him, but it's quite possible. I don't remember explicitly discussing it with Allan.

Q. Did you and Mr Bell talk about software unlocking?

A. Not that it's in my mind as such. Not that I know of. Not that I can remember specifically. I could go through and see if I have notes of meetings with Allan after leaving Apple to see if it's on this topic. There may have been a meeting there, but I can't remember. But certainly in all the period of time I was working at Apple, Allan Bell never came up to me and said, "Hey, we have a developer who is working on this.", because otherwise I would have gone and talked to him before. So I can definitely remember my surprise at that party having been introduced to Ric and finding out what he was on.

Q. Was Mr Bell at that party?

A. I don't think so. There was no other Apple people. It was just me - ex.

Q. And just going back to exhibit 3.

A. Yes.

Q. Do you recall who you sent these materials to?

A. Certainly would have sent this to David Smith in the UK; probably would have sent it to connections in the States, but I can't be certain on that one; and probably would have discussed it with someone like Sarah Hatcher and Graham Barr at Apple in Australia.

Q. Do you - - -

A. But I doubt it they would - they certainly wouldn't have copies. I doubt they would even remember it.

Q. Do you recall discussing any of the - do you recall discussing the ideas of exhibit 3 with anybody in the United States?

A. Certainly would have at the - the little network of Dan Cochoran and Dave Smith, who is now located in the States exclusively.

Q. Who is Dan Cochoran?

A. Dan Cochoran used to work for Apple Developer Services in the States, and he left and joined - worked with us at Xpand, but he was not as focused on this technical side of it as Dave and I were.

Q. Did you have meetings in the United States about this idea?

A. After this, in October, November, I had - took a paper that I had written, which is basically fleshing out all of the previous stuff, and put it to my connections at Apple Developer and other areas. We had a presentation with Dave Smith, Dave Fox, myself, probably Dan Cochoran, where we presented what is now a next wave distribution white paper, and a slide show, and I can't find the slide show but I've got the frame-over document. That was effectively to try and get a commitment from Apple US in late October, early November '92 to run - to adopt a bundling and software distribution strategy around this.

Q. Now, this exhibit, exhibit 3, is 1991.

A. Correct.

Q. Do you recall any meetings about the substance of exhibit 3 in the United States prior to the October, November 1992 meeting that you have just mentioned?

A. Not - there would have been a World Wide Web Developer Group meeting in January of '92. I would have taken that paper with me, but who I discussed it with there would have been limited, probably, to Rebecca and others. I don't have a specific advice on that. I probably wouldn't have sent that document as is. You saw some of the other emails which I've sent to Piet Vonk and others where I flesh this out and put narrative in between it, but I would have sent this document as is to Dave Smith because he would have had the application to open it, and that sort of stuff, but other than that, no, it's pretty much an internal one.

Q. The meeting that you have referred to, that's a meeting in Cupertino?

A. San Jose.

Q. San Jose, California.

A. San Jose or Cupertino.

Q. Apple's headquarters?

A. Yes.

Q. All right.

A. But there were very few people who would actually have understood what it was.

Q. All right. I'd like to show you a document that I am marking as Higgs exhibit 12. It's got production numbers Higgs 69 and 70.

A. Yes.

Q. And can you find this document on exhibit 2 and determine what the date is?

A. Yes. Unlocking - on that one it says 19 November '92, and - yes.

Q. All right.

A. So that was written after discussions, just effectively teasing our the functionality required for a specific unlocking centre, and that was after I'd met Arthur D. Lytell through friends, and we were trying to effectively build that into a concept of an enterprise that could run an unlocking centre on a world scale, or for Asia.

Q. If you could turn to the second page of exhibit 12.

A. Yes.

Q. There is a bullet point at the bottom third of the page, "Technologies". Do you see that?

A. Yes.

Q. And you list out five different technologies there.

A. Yes.

Q. Do you recall discussing any of these technologies with Ric Richardson?

A. Not specifically. They're certainly the ones I was aware of at the moment and, by that stage, Ric and I were having difficulties in communication so - which is why his technology wasn't on there.

Q. You answered my next question.

A. Mm?

Q. You've just answered my next question. All right. Let me show you a document that I'm marking as Higgs exhibit 13, a two-page document Higgs 22 and 23, and if I could ask you to locate this document on your exhibit 2 sheet, and tell me the date, if you can.

A. Okay. So this is a link to Elliott, 26 February 1992, and this is 13.

# EXHIBIT L

MAIL ROOM FEB 22 1994 PAT. & TRADEMARK

#3

Page 1

Attorney's Docket No. CLAUTZ1.001AUS

## DECLARATION - USA PATENT APPLICATION

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name;

I believe I am the original, first and sole inventor of the subject matter which is claimed and for which a patent is sought on the invention entitled SYSTEM FOR SOFTWARE REGISTRATION; the specification of which was filed on **September 21, 1993** as Application Serial No. **08/124,718.**

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above;

I acknowledge the duty to disclose to the U.S. Patent and Trademark Office all information known to me to be material to patentability as defined in Title 37, Code of Federal Regulations, § 1.56;

I hereby claim foreign priority benefits under Title 35, United States Code, § 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

| PRIOR FOREIGN APPLICATION(S) | | | Priority Claimed |
|---|---|---|---|
| No.: **PL 4842** | Country: **Australia** | Date Filed: **09/21/92** | **Yes** |
| No.: **PL 5524** | Country: **Australia** | Date Filed: **10/26/92** | **Yes** |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful, false statements may jeopardize the validity of the application or any patent issued thereon.

---

1-00 Full name of sole inventor: **Frederic Bailier Richardson, III** ✓

Inventor's signature [signature]

Date 27-1-94

Residence: **32 Brookvale Avenue, Brookvale, New South Wales, 2100, Australia** AUX

Citizenship: **Australia**

Post Office Address: **Same As Above**

---

Send Correspondence To:
KNOBBE, MARTENS, OLSON & BEAR
620 Newport Center Drive
Sixteenth Floor
Newport Beach, CA 92660-8016

Direct Telephone Calls To:
Jerry T. Sewell

(714) 760-0404

FTS-5864:sb
031108/1

# EXHIBIT M

200 – 126 GP 2202
#8 Prior Art
w/ Att
PATENT

DEC 27 1994

CLAUTZ1.001AUS

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant | : | Frederic B. Richardson, III | Group Art Unit 2202 |
| Serial No. | : | 08/124,718 | |
| Filed | : | September 21, 1993 | |
| For | : | SYSTEM FOR SOFTWARE REGISTRATION | |
| Examiner | : | David C. Cain | |

## INFORMATION DISCLOSURE STATEMENT

Hon. Commissioner
of Patents and Trademarks
Washington, D.C. 20231

Dear Sir:

Enclosed is form PTO-1449 listing references that are also enclosed. This Information Disclosure Statement is being filed before the mailing date of a final action under 37 C.F.R. § 1.113 and before the mailing date of a notice of allowance under Section 1.311 in accordance with 37 C.F.R. § 1.97(c). This statement is accompanied by the fee of $200.00 set forth in 37 C.F.R. § 1.17(p). Please charge our deposit account 11-1410 for any additional fees that may be incurred. A duplicate copy of this Statement is enclosed.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR

Dated: December 21, 1994

By: Jerry T. Sewell

Jerry T. Sewell
Registration No. 31,567
Attorney of Record
620 Newport Center Drive
Sixteenth Floor
Newport Beach, CA 92660
(714) 760-0404

JTS-8717
941221/1

020 AA 01/18/95 08124718 1 126 200.00 CK

#8

DEC 1994 PAT. & TRADEMARK OFF.

SHEET 1 OF 1

FORM PTO-1449 U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT

(USE SEVERAL SHEETS IF NECESSARY)

| ATTY. DOCKET NO. | SERIAL NO. |
|---|---|
| CLAUTZ1.001AUS | 08/124,718 |
| APPLICANT | |
| Frederic B. Richardson, III | |
| FILING DATE | GROUP |
| September 21, 1993 | 2202 |

U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| dc | | 5 2 9 1 5 9 8 | 3/1/91 | Grundy | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | TRANSLATION NO |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

OTHER DOCUMENTS (INCLUDING AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC.)

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| David Cain | 3/27/95 |

*EXAMINER: INITIAL IF REFERENCE CONSIDERED, WHETHER OR NOT CITATION IS IN CONFORMANCE WITH MPEP 609; DRAW LINE THROUGH CITATION IF NOT IN CONFORMANCE AND NOT CONSIDERED. INCLUDE COPY OF THIS FORM WITH NEXT COMMUNICATION TO APPLICANT.

JTS-8722

941221/1