UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC USA, INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Civil Action No. 03 440 (WES) |

**DECLARATION OF LAURA R. BRADEN**

I, Laura R. Braden, an associate of the law firm Fish & Richardson P.C., counsel for Defendant Microsoft Corporation ("Microsoft") in the above-captioned matter, declare the following to be true, to the best of my knowledge, information, and belief:

1. Attached hereto as Exhibit A is a true and correct copy of the September 1, 2005 Expert Report of Uniloc's expert David Klausner regarding infringement issues, including exhibits and accompanying papers.

2. Attached hereto as Exhibit B is a true and correct copy of the December 8, 2005 Rebuttal Expert Report of Mr. Klausner regarding infringement issues, including exhibits.

3. Attached hereto as Exhibit C is a true and correct copy of the November 7, 2005 Expert Report of Mr. Klausner regarding invalidity issues, including exhibits.

4. Attached hereto as Exhibit D is a true and correct copy of U.S. Patent No. 4,796,220 (the "Wolfe patent").

5. Attached hereto as Exhibit E is a true and correct copy of U.S. Patent No. 5,291,598 (the "Grundy patent").

6. Attached hereto as Exhibit F is a true and correct copy of U.S. Patent No. 5,490,216 (the "patent-in-suit").

7. Attached hereto as Exhibit G is a table summarizing Microsoft's non-infringement positions with respect to each of Uniloc's eight infringement theories.

8. Attached hereto as Exhibit H is a table summarizing the Microsoft products accused of infringement by Uniloc.

9. Attached hereto as Exhibit I is a September 8, 2006 letter Microsoft's counsel sent to counsel for Uniloc.

10. Attached hereto as Exhibit J is Uniloc's counsel's September 12, 2006 response to Microsoft's counsel's September 8 letter.

11. Attached hereto as Exhibit K is a copy of the Microsoft web page found at http://www.microsoft.com/piracy/activation_how.mspx, which was printed on September 21, 2006.

12. Attached hereto as Exhibit L is a copy of the Microsoft web page found at http://www.microsoft.com/piracy/activation_facts.mspx, which was printed on September 21, 2006.

13. Attached hereto as Exhibit M is a copy of the Microsoft web page found at http://www.microsoft.com/piracy/activation_myths.mspx, which was printed on September 21, 2006.

14. Attached hereto as Exhibits N through V are screen captures created at Microsoft's counsel's office during the installation and attempted activations of a retail copy of Microsoft's Office 2003 Standard Edition in January and February of 2005.

- Exhibit N shows a user prompt for entry of the product key;
- Exhibit O shows the prompt in Exhibit N with the product key entered;

- Exhibit P shows a dialogue box providing the End User License Agreement ("EULA") terms and conditions of use of the software;
- Exhibit Q shows a dialogue box providing the EULA with the box checked indicating acceptance of the terms of the EULA;
- Exhibit R shows an "activation wizard" dialogue box that gives the user an opportunity to activate their software by telephone or Internet;
- Exhibits S and T show successive screens shown after a the user elects to activate via the Internet during the grace period and indicating that the activation process is complete;
- Exhibit U shows a dialogue box providing instruction to the user who selects telephone activation; and,
- Exhibit V shows a dialogue box indicating that telephone activation is complete.

15. Attached hereto as Exhibit W is a true and correct copy of excerpts of the transcript from the January 11, 2006 deposition of David Klausner.

16. Attached hereto as Exhibit X is a true and correct copy of excerpts of the transcript from the July 7, 2005 deposition of Susan Cole.

17. Attached hereto as Exhibit Y is a true and correct copy of excerpts of the transcript from the July 12, 2005 deposition of Allen Nieman.

18. Attached hereto as Exhibit Z is a true and correct copy of excerpts of the transcript from the October 5, 2005 deposition of Timothy Cooper.

19. Attached hereto as Exhibit AA is a true and correct copy of excerpts from the September 21, 1993 application for a U.S. Patent which resulted in the issuance of the patent-in-suit on February 6, 1996.

20. Attached hereto as Exhibit BB is a true and correct copy of excerpts from the July 26, 1995 Amendment In Response to March 30, 1995 Office Action.

21. Attached hereto as Exhibit CC are true and correct copies of excerpts from Microsoft's End User License Agreements for the following products: Windows XP Home Edition (MS-U 533509), Windows XP Professional (MS-U 533502-07), Windows Server 2003 (MS-U 533516-533528).

22. Attached hereto as Exhibit DD are true and correct copies of excerpts from Microsoft's End User License Agreements for the following products: Office 2003 Standard (MS-U 533485), Access 2003 (MS-U 533530-36), OneNote 2003 (MS-U 533672-78), InfoPath 2003 (MS-U 533664-670), Visio Professional 2003 (MS-U 533656-62), Word 2003 (MS-U 533547-553), Outlook 2003 (MS-U 533598-604), Office 2003 Professional (MS-U 533476-82), Office 2003 Small Business Edition (MS-U 533494-500), FrontPage 2003 (MS-U 533581-533587), Project Professional 2003 (MS-U 533623-29), Project Standard 2003 (MS-U 533680-86), PowerPoint 2003 (MS-U 533615-21), and Excel 2003 (MS-U 533564-70).

23. Attached hereto as Exhibit EE are true and correct copies of excerpts from the Microsoft End User License Agreements for the following products: Office XP Standard (MS-U 533450), Project 2002 Professional (MS-U 533757-63), Project 2002 Standard (MS-U 533862-68), Visio Standard 2002 (MS-U 533640-46), Visio Enterprise Network Tools (MS-U 533698-704), Word 2002 (MS-U 533538-45), Outlook 2002 (MS-U 533589-96), FrontPage 2002 (MS-U 533572-79), PowerPoint 2002 (MS-U 533606-13), Publisher 2002 (MS-U 533631-38), Excel 2002 (533555-62), Office XP Professional (MS-U 533458-65), Office XP Developer Edition (MS-U 533467-74), and Visio 2003 Office 2003 (MS-U 533648-54).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: September 21, 2006

/s/

Laura R. Braden

# UNILOC et al. v. MICROSOFT CORPORATION

# EXHIBIT A

September 1, 2005 Expert Report of Uniloc's expert David Klausner regarding infringement issues, including exhibits and accompanying papers

## FILED UNDER SEAL

# UNILOC et al. v. MICROSOFT CORPORATION

# EXHIBIT B

December 8, 2005 Rebuttal Expert Report of Mr. Klausner regarding infringement issues, including exhibits

## FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNILOC USA, INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED<br><br>Plaintiff,<br><br>vs.<br><br>MICROSOFT CORPORATION,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)Civ. A. No. 03-CV-440 (WES)<br>)<br>)<br>)<br>) |

**EXPERT REPORT OF DAVID KLAUSNER**
**RE VALIDITY OF U.S. PATENT NO. 5,490,216**

## I. Experience and Qualifications

My background, qualifications and testimonial experience are set forth in my curriculum vitae attached as Exhibit A. As can be seen from my curriculum vitae, I have a Bachelors degree in Mathematics and a Master of Science degree in Electrical Engineering and over 37 years of development and consulting experience in the computer and software industry. I have testified as a computer expert in prior lawsuits. I have designed and developed, as well as managed and assisted in the design and development of computer hardware and software

systems and some of my clients are computer software companies, including Intel Corp., Hewlett-Packard and IBM.

I have over 37 years of software development, consulting and expert testimony experience in all aspects of the computer field, from micros to mainframes, and in all areas of programming. I also have experience as an engineer, developer, supervisor, project manager, department manager, middle manager and company executive as well as experience in forensic investigation and reverse engineering.

I am being paid at the rate of $350 per hour for my time in preparing my opinion. I expect to be compensated at the same rate for any time spent testifying at deposition or at trial.

## II. Scope of Study and Opinions

### A. Questions Presented

I have been retained by the plaintiff, Frederic B. Richardson ("Richardson") as a technical expert in this case. I have been asked to review the Defendant's Expert Reports and to opine as to the validity of the asserted claims 1, 2, and 7-20 of U.S. Patent No. 5,490,216 ("the '216 Patent"). The '216 Patent is attached hereto as Exhibit B.

### B. Materials

In the process of forming my opinions, I have reviewed and considered numerous documents including the Expert Report of Dan Wallach, Ph.D. (the "Wallach Report"), the Expert Witness Report of Larry S. Nixon (the "Nixon Report"), asserted patent and the alleged prior art documents provided by the defendants.

### C. Summary of Opinions

It is my opinion that the asserted claims of the '216 Patent are not anticipated and are not obvious in view of the alleged prior art identified by the Defendant. It is also my opinion that Mr. Nixon has failed to provide evidence of inequitable conduct on the part of the '216 Patent applicant.

A detailed explanation of the bases of my opinions is set forth below and in the exhibits attached to this Report.

## III. Background of the Invention

Generally the'216 Patent protects digital data from unauthorized execution by reliance on an identifier (one or more pieces of information that alone, or in

combination, can be used to form an identifier that relates uniquely only to the user) that is unique to the licensee and/or to the environment of the licensee. Examples of pieces of information used to form an identifier include the serial numbers of present hardware, the fact of the presence of certain hardware components, some personal information of the user, some information unique to the licensee.

The '216 Patent is directed generally to systems and methods for (1) licensing execution of digital data in a use mode; (2) a registration system attachable to software to be protected; (3) a method of control of distribution of software; and (4) a method of registration of digital data so as to enable its execution in a use mode. (See the '216 Patent, claims 1, 12, 17, 20).

I note that Dr. Wallach has not described the problem solved by the inventor. See Wallach Report, III. A. 6. and VI. D.

The problem solved by the inventor is that of ensuring that an application loaded on a user computer is able to execute in a fully enabled mode (also called a "use mode") only if a licensing procedure has been successfully performed. See '216 Patent Abstract, Figures 2a, 2b, 2c, 2:52-55, 4:30-43, 5:47-51, 13:42-48. See also *Id.* 2:40:47, that states "In this specification, 'use mode' refers to use of the digital data or software by its execution on a platform so as to fulfill the seller's licensor's obligations in relation to the sale or license of the right to execute the

digital data or software in the use mode. The use mode is to be distinguished from what might generally be termed unlicensed modes of operation (which is not to say unauthorized modes of operation) …"

## IV. Level of Ordinary Skill in the Art

The '216 Patent relates to the field of registration and licensing of software so as to protect the use of digital data, e.g., software and/or applications, from unauthorized use.

It is my understanding based on my experience in the field that a person having ordinary skill in the art ("POSA") at the time of the invention would have a Bachelor's Degree, or equivalent, in either Electrical Engineering or Computer Science, or one to two years of experience in software development or the equivalent work experience. I understand from the deposition of Mr. Richardson (of 03/31/05) that at the time he filed the '216 Patent he did not have a college degree and that he had no more than (approximately) 2 years of programming experience (*Id.*, 9:24-10:10, 10:21-12:9).

I disagree with Dr. Wallach's opinion that (a) the art is the field of computer security because the '216 Patent does not require, discuss, or even mention such a field, and (b) Richardson does not require, discuss, or even mention such a field in

his depositions. I also disagree with Dr. Wallach that a person having ordinary skill in the art would have a clear understanding of the operations and limitations of common cryptographic techniques, including the use of hash functions, including "1. the operation and limitations of common cryptographic techniques, including the use of hash functions. 2. the ease with which traditional copy protection technologies can be circumvented by rewriting a program to remove its internal copy protection checks. 3. the general difficulty of engineering software to be robust against attack versus the general ease with which attackers can find and exploit security flaws in computer software. 4. the nature of writing computer programs that use computer networks for communication between computers." A clear understanding of the four items enumerated by Dr. Wallach is not necessary for a POSA. Dr Wallach has not given a reason for why "a clear understanding" of his enumerated items is necessary for a POSA. I find that what is necessary for a POSA to possess is merely a working knowledge of the items enumerated by Dr. Wallach in order to implement the Patent without undue experimentation.

## V. Validity Analysis

I am informed that a patent is presumed valid by law and that a relatively high standard of proof (clear and convincing evidence) is required to prove a

patent invalid. I am also informed that each claim must be considered separately and that a dependent claim can be valid even if the claim from which it depends has been declared invalid.

I have reviewed Dr. Wallach's Report and the alleged prior art produced by the defendants in this case. I disagree with the opinions expressed by Dr. Wallach in the Wallach Report and I also disagree with his application of the prior art cited therein to the claims of the '216 Patent. It is my opinion that the prior art does not teach each and every element of the claims of the '216 Patent. In addition, because the prior art teaches away from the '216 Patent, it is my opinion that the '216 Patent is not obvious in view of this prior art.

a. Dr. Wallach's Discussion Of The Prosecution History

According to Dr. Wallach (Wallach Report, V. B. 1.), the '216 Patent describes a "try before you buy" demonstration mode. In fact, "try before you buy" is never mentioned in the '216 Patent or in the Prosecution History. Instead, the '216 Patent describes a "use mode" (*Id.*, 2:40) as part of the embodiments. The methods and systems of the '216 Patent apply to either "try before you buy" usage or to "buy and activate" usage and there is nothing in the '216 Patent or in the Prosecution History to limit the inventions to "try before you buy" usage. (Microsoft's Accused Products use "buy and activate" methods and systems.) In

any event, any differences between the two usages are insubstantial, as I have shown below:

"Try before you buy" and "buy and activate" are illustrated as follows:







According to Dr. Wallach (Wallach Report, V. B. 2.), in the '216 Patent "[T]he local machine also generates the licensee unique id locally, based solely upon the same information that is sent to the remote registration system and using the identical licensee unique ID algorithm as is used at the remote registration system." I disagree. There is no limitation in the '216 Patent as to the licensee unique ID being based "solely" on anything in particular. In addition, the information on which the '216 Patent's licensee unique ID is based is not limited to "the same information that is sent to the remote registration system …"

According to Dr. Wallach (Wallach Report, V. B. 3.), the '216 Patent "technique provides negligible protection against unlicensed use of software because all the necessary information to impersonate the remote registration system is already available on the client computer. It would be a straightforward exercise for one of skill in the art to run a Richardson-protected program under appropriate debugging tools and to observe the comparison of the local and remote licensee unique IDs. This section of the program could then be trivially modified to eliminate the check. Alternatively, the local licensee unique ID generating means could be identified and extracted to produce a standalone 'cracking' tool. Only one 'cracker' would need to accomplish this task, after which the cracked software program, with the Richardson invention disabled, could be widely distributed and used in its fully functional mode without any need for users to purchase licenses." In fact, the Microsoft products have been successfully cracked in the same manner. (See "Inside Windows Product Activation, A Fully Licensed Paper, 2001", at http://www.licenturion.com/xp/fully-licensed-wpa.txt, and other Web sites) Nevertheless, the level of knowledge required to accomplish the cracking described by Dr. Wallach is beyond that possessed by a POSA of the '216 Patent and is irrelevant to evaluating the scope of the claims, particularly because the claims do not require that the registration system be impervious to every

imaginable form of attack. Dr. Wallach and a POSA will appreciate that no registration system will ever be completely undefeatable.

According to Dr. Wallach (Wallach Report, V. D. 1-3.), the Chou reference was distinguished from the '216 Patent because Chou "does not need unique identifying numbers prestored in each copy of the software." In fact, the Applicant distinguished the '216 Patent from Chou because Chou (1) "is not particularly relevant to the claims ... [because it] covers a hardware lock ..." (Response of 12/27/94, page 3); and (2) only teaches a <u>local</u> licensee unique ID generating means and does not teach a remote licensee unique ID generating means (*Id.*); and (3) "[Chou does not teach that] The uniqueness is ultimately provided by the end users of the software in the course of supplying their own identification details, which details are subsequently checked by use of a matching algorithm at a remote location." (*Id.*).

According to Dr. Wallach (Wallach Report, V. D. 6. and V. E. 1.) "a 'licensee unique ID' must be entirely the product of local information about a user, such as their name, address, telephone number, and so forth." Dr. Wallach's opinion is based on his reading of the '216 Patent File History (Response of 07/05/95, page 6-7) where the Applicant distinguished the claims over Grundy that "It is inherent in the system of the present application, as claimed, that the 'licensee unique ID' is entirely the product of data generated locally as distinct

from data added before delivery of the software to the local location for use … or [generated from data added] subsequently from a remote location". I disagree with Dr. Wallach. The Applicant did not argue that the "data generated locally" be limited to "…local information about a user, such as their name, address, telephone number, and so forth …" as Dr. Wallach asserts. The Applicant merely argued in the Response of 6/30/95, page 6-7, that regardless of the data that is used to generate the "licensee unique ID", that the "licensee unique ID" itself may be generated locally. Such data can be other than the data to which Dr. Wallach wants to limit the claims. The Applicant's argument to the Examiner was about where the "licensee unique ID" is generated, but the Applicant's argument did not limit the inputs or limit the contents of the "licensee unique ID" that could be formed from data or formed from metadata that was in the possession of the user. In fact, neither the claims, the Specifications, nor the File History limit the data that can be used to generate the "licensee unique ID" to what Dr. Wallach asserts; e.g., the word "packaging," does not appear in the Specifications or in the claims as limiting the inputs to the generator of a "licensee unique ID." In addition, the Applicant's reference to data from a remote location was made to distinguish data generated locally from data generated remotely, and was not made to distinguish from a user's telephone number or from a user's product serial number as that product serial number may appear on packaging provided by a manufacturer.

Either of the latter are "information unique" to the user ('216 Patent, 3:65, 4:12:17, 4:30-43, 7:8-35, 9:58, 12:32). Also, "vendor information" (e.g., product serial numbers) was recognized by the Examiner during prosecution as potentially being part of the authorization process of Grundy (Office Action, 12/27/94, page 3) and of the '216 Patent (without limitation, and at least by acquiescence) and therefore as potentially being part of the information unique to the user for the '216 Patent. Finally, it is a fact that everything that identifies a person comes from a source outside of the person; e.g., social security number given by the Government, name provided by parents, etc. Finally, there is no requirement in the '216 Patent that the information unique to the user also has to be unique at the time it is input by the user. The information entered by the user can become unique to the user by virtue of the user having supplied the information that no other user had yet supplied.

To the extent that Dr. Wallach argues indefiniteness of Claim 7 on the basis that "Richardson does not disclose a corresponding structure for performing this function [of generating a platform unique ID]," I disagree. Richardson teaches generating a platform unique ID ('216 Patent, Figure 8, 11:66-12:2) and Grundy (Grundy, 17:10-12) corroborates that such a function is known in the art and is thereby merely a routine implementation detail for a POSA.

b. Dr. Wallach's First Reference – Chou

See V. a. above. Also, Chou teaches away from using software methods to protect software (7:59-66). It is my opinion that the asserted claims of the '216 Patent are not anticipated and are not obvious in view of Chou.

c. Dr. Wallach's Second Reference - Grundy

I disagree with Dr. Wallach that Grundy anticipates or makes obvious the claims of the '216 Patent. One embodiment of the '216 Patent requires that there be generated a licensee unique ID created with the same algorithm on both the local and remote, and not just that the same algorithm be present on both the local and remote. ('216 Patent generally, and the 12/21/94 Response to Office Action.) This made it possible to perform a simple match between the licensee unique ID generated on both sides. Grundy does not generate a licensee unique ID on both local and remote with the same algorithm. For example, although a "user data cross-reference" checksum is generated at a local location and provided to a Manufacture Control Agency that calculates its match, that "user data cross-reference" checksum is not unique and it does not "… uniquely identify[ies] an intended registered user ..." ('216 Patent, 4:2, 6:63-67, 14:42-43, 15:10-13) and is not "… information uniquely descriptive of an intending licensee …" (*Id.*, 14:6-7) Grundy never requires that the "user data cross-reference" checksum be unique (or

that the input to it's calculation be unique), and there is no need in Grundy for the "user data cross-reference" checksum to be unique. To the extent that Grundy functions, it does so without the "user data cross-reference" checksum being, or needing to be, unique. The Grundy "user data cross-reference" checksum that is not a licensee unique ID is used to check the typing of the Manufacture Control Agency operator for typographical errors rather than for uniquely identifying a user or a copy of the software and is not used in the process of mode switching. (*Id.*, 14:49-59, 15:10-13, 15:17-26). This error checking via checksum is tangential to the Grundy authorization code calculation that is essentially an encrypted resending of the registration number information from the Manufacture Control Agency to the user. Checksums were well known long before the filing of the '216 Patent, were ubiquitous in the prior art, and were commonly used for data transfers and error checking as opposed to uniquely identifying a licensee or copy of the software. A POSA would know that a "user data cross-reference" checksum is not unique, and the Examiner of the '216 Patent likely knew that as well because he did not cite checksums and he allowed the claims of the '216 Patent over Grundy. According to the Grundy specification, an "owner data" checksum that is not a '216 Patent licensee unique ID is calculated on the local location and is sent to the Manufacture Control Agency that returns it to the local location. Unlike the "data cross-reference" checksum, Grundy does not teach a re-calculation of the

"owner data" checksum at the Manufacture Control Agency nor does Grundy teach that a checksum of the user data that is calculated by Manufacture Control Agency is returned to the user. (Grundy 15:10-13, 15:52-54, 19:53-55, 20:3-5) Checksums were well known to a POSA, and Grundy does not add anything to that art. Also, Grundy changes the executable code of the installed product itself, "After the user enters the authorization code, a Save Ownership Module modifies the executable code of the software product." (Grundy 5:22-23, 10:13-16, 13:14-54, 19:27-30, 20:28-34, 21:41-51) Also, modifying the executable code is not a workable solution for protecting software for several reasons: (1) the executable code must therefore be unprotected and unprotectable thereby weakening software protection; (2) the method will not work on CD ROMs and other read-only media ('216 Patent, 2:19-21); (3) the method can be defeated with debugging tools per Dr. Wallach's comments in the Wallach Report V. B. 3. Also, I disagree with Dr. Wallach that "...it would have been obvious to one of ordinary skill in the art at the time of the invention that, as with the hardware identification code, the user data cross-reference code could be compared on subsequent boots." Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this because, at least, (1) Grundy is not concerned with subsequent boots or the problem of subsequent boots, (2) Dr. Wallach does not explain where Grundy motivates a POSA to increase security protection for

subsequent boots beyond what is taught in Grundy, (3) Dr. Wallach does not explain why or where Grundy motivates a POSA to help users move software to new computers to implement checking on subsequent boots.

With respect to the Wallach Report, Exhibit B that references Grundy, Grundy is missing the following elements of the claims of the '216 Patent for at least the following reasons:

- Claim 1 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID. In addition, Grundy's "checksum" is not the same as the Richardson "summer" ("Seventh Embodiment") because the Richardson "summer" explicitly creates a '216 patent licensee unique ID.
- Claim 1 element "and remote licensee unique ID generating means" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.
- Claim 1 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means" for lacking a licensee unique

ID, for not including mode switching means on the local platform, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.

- Claim 1 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.
- Claim 2 element "wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 7 element "said system further including platform unique ID generating means, wherein said mode switching means will permit said digital data to run in said use mode in subsequent execution of

said digital data on said platform only if said platform unique ID has not changed" for lacking a licensee unique ID.

- Claim 8 element "wherein said platform unique ID generating means comprises part of said digital data when executed on said platform" for lacking a licensee unique ID.
- Claim 9 for the same reasons as for Claim 7 bulleted above and the independent claim on which it depends.
- Claim 10 for the same reasons as for Claim 1.
- Claim 11 element "said system including local licensee unique ID generating means" for the same reasons as for Claim 10.
- Claim 12 element "said registration system generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed" for lacking a security key and generation means. See also the reasons in the bullet points for Claim 1, above.
- Claim 12 element "and wherein said registration system is replicated at a registration authority" for lacking a security key and generation means, and for failing to use the identical algorithm to generate a security key locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 13 element "wherein said security key is generated by a registration number algorithm" for lacking a security key. See also the reasons in the bullet points for Claims 1 and 12, above.
- Claim 14 element "wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 15 element "wherein said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 16 element "wherein said environment details comprise at least one element which is not user-configurable on the platform" for the same reasons as for Claim 15 bulleted above and the independent claim on which it depends.
- Claim 17 element "said method further comprising providing registration key generating means adapted to generate a registration

key which is a function of information unique to an intending user of the software" for lacking a licensee unique ID.

- Claim 17 element "said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.
- Claim 17 element "and wherein said enabling key is communicated to said intending user at the time of registration of said software" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 18 element "wherein said registration key is also a function of the environment in which said software is installed" for lacking a licensee unique ID. See also the reasons in the bullet points for Claims 1, 12, and 17, above.
- Claim 19 preamble "A remote registration station incorporating remote licensee unique ID generating means" for lacking a licensee unique ID.

- Claim 19 element "said station forming part of a registration system for licensing execution of digital data in a use mode" for requiring that the software on the manufacturer's media be modified.
- Claim 19 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.
- Claim 19 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 20 element "said system including local licensee unique ID generating means and remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 20 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.
- Claim 20 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

It is my opinion that the asserted claims of the '216 Patent are not anticipated and are not obvious in view of Grundy. I also disagree with Dr. Wallach that it would have been obvious to combine this reference with any other reference(s) to make obvious the '216 Patent. (See discussion below in V.i.).

d. Dr. Wallach's Third Reference - Hellman

I disagree with Dr. Wallach that Hellman anticipates or makes obvious the claims of the '216 Patent. Hellman does not teach the generation of a licensee unique ID using information unique to the user. For example, no forms of the word "unique" are taught by Hellman with respect to his invention. In addition, Dr. Wallach references the Hellman teaching to alter the distributed software when enabling its use. (Hellman 2:44-53) Modifying the executable code is not a workable solution for protecting software for several reasons: (1) the executable code must therefore be unprotected and unprotectable thereby weakening software protection; (2) the method will not work on CD ROMs and other read-only media ('216 Patent, 2:19-21); (3) the method can be defeated with debugging tools per Dr. Wallach's comments in the Wallach Report V. B. 3. [Hellman's one-way hash function generator 22 always generates the same H when provided the same "software package" of the manufacturer. (*Id.*, 6:43-45)] Hellman does not teach identical algorithms on the local and remote as required by the '216 Patent.

Hellman's "cryptographic function generators" 38 and 23 are merely "functionally identical" and so they can differ in their sequence and steps. (*Id.*, 10:27-30) Dr. Wallach also argues that Hellman (*Id.*, 5:63-65) discloses a serial number, but that number is not generated locally, and that number is hidden inside the user's hardware (*Id.*, 9:7-10) like a platform ID and that number is not licensee unique information. Also, Dr. Wallach provides no basis for his argument that it would have been obvious to a POSA to generate Hellman's check value C and authorization A entirely from local information about the user. Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this. In fact, such generation would not work since the only asserted "licensee unique information" (that I disagree is within the scope of the '216 Patent) is permanent, secret memory. (*Id.*, 9:7-10) A username or other user information is not an obvious or trivial substitution for this permanent memory. (*Id.*, 9:29-40) I disagree with Dr. Wallach's conclusory arguments. Also, there is no teaching in Hellman that the check value C and authorization A are licensee unique IDs, unlike the "summer" of the '216 Patent. Also, I disagree with Dr. Wallach that "… it would have been obvious to one of ordinary skill in the art at the time of the invention that the registration number algorithm could use information entered by a prospective registered user unique to that user including the user name (5:63-65) and/or billing information (5:61)." Dr. Wallach provides

no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, no proof that a POSA would be motivated to do this in light of the disclosure in Hellman, and no proof that such a deviation from the mechanism of Hellman would be likely to succeed. Also, I disagree with Dr. Wallach that "…it would have been obvious to one of ordinary skill in the art at the time of the invention that, as with the non-volatile memory, the user details could be compared on subsequent boots." Dr. Wallach does not provide a credible reason for why this would have been obvious to a POSA at the time of the filing of the '216 Patent, no reason that a POSA would be motivated to do this in light of the disclosure in Hellman, and no reason that such a deviation from the mechanism of Hellman would be likely to succeed. I also disagree with Dr. Wallach's argument to replace the cryptographic function with a summer because these are very different functions -- Hellman relies on a secret key.

Also, there is a fundamental flaw with Dr. Wallach's assertions regarding Hellman. As I understand his interpretation of the Hellman patent, Dr. Wallach concludes that C is the locally-generated licensee unique ID. Dr. Wallach is wrong because C is never based on user information, nor is there a disclosure that C is unique to the licensee. Instead, C is the output of a cryptographic function that uses a "secret key" stored permanently on the licensee's computer (Hellman, Figure 7) While I disagree that Hellman's C is a platform unique ID in accordance

with the '216 patent, it is much more like a '216 Patent platform unique ID than a licensee-unique ID. This secret key is not user information. In addition, Dr. Wallach alleges that the secret key can be found on the server using user information (Hellman, item 18 in Figure 2) However, a POSA would appreciate that the table used for this process is not resident on the user's platform, nor would anyone consider placing this information on the user's platform because of insurmountable security problems. Therefore, the cryptographic function discussed by Dr. Wallach as the licensee unique generation means does not anticipate the '216 claims because it does not process licensee-unique information. Also, there is no teaching or obvious way to modify the cryptographic function of the Hellman patent to generate an ID that is unique to a licensee. Therefore, no licensee-unique ID or generation means is disclosed in, or obviously compatible with, the Hellman patent.

With respect to the Wallach Report, Exhibit C that references Hellman, Hellman is missing the following elements of the claims of the '216 Patent for at least the following reasons:

- Claim 1 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID and generating means. In addition, Hellman's "cryptographic function generator" is not the same as the Richardson "summer" ("Seventh Embodiment")

because the Richardson "summer" explicitly creates a '216 patent licensee unique ID.

- Claim 1 element "and remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 1 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.
- Claim 1 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.
- Claim 2 element "wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a

registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 7 element "said system further including platform unique ID generating means, wherein said mode switching means will permit said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed" for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data.
- Claim 8 element "wherein said platform unique ID generating means comprises part of said digital data when executed on said platform" for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data.
- Claim 9 for the same reasons as for Claim 7 bulleted above and the independent claim on which it depends.
- Claim 10 for the same reasons as for Claim 1.

- Claim 11 element "said system including local licensee unique ID generating means" for the same reasons as for Claim 10.
- Claim 12 element "wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode" for lacking a security key. See also the reasons in the bullet points for Claim 1, above.
- Claim 12 element "and wherein said registration system is replicated at a registration authority" for lacking a security key, and for failing to use the identical algorithm to generate a security key locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 13 element "wherein said security key is generated by a registration number algorithm" for lacking a licensee unique ID. See also the reasons in the bullet points for Claims 1 and 12, above.
- Claim 14 element "wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run"

for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.

- Claim 15 element "wherein said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 16 element "wherein said environment details comprise at least one element which is not user-configurable on the platform" for the same reasons as for Claim 15 bulleted above and the independent claim on which it depends.
- Claim 17 element "said method further comprising providing registration key generating means adapted to generate a registration key which is a function of information unique to an intending user of the software" for lacking a licensee unique ID.
- Claim 17 element "said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said

registration key" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.

- Claim 17 element "and wherein said enabling key is communicated to said intending user at the time of registration of said software" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 18 element "wherein said registration key is also a function of the environment in which said software is installed" for lacking a licensee unique ID. See also the reasons in the bullet points for Claims 1, 12, and 17, above.
- Claim 19 preamble "A remote registration station incorporating remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "said station forming part of a registration system for licensing execution of digital data in a use mode" for requiring that the software on the manufacturer's media be modified.
- Claim 19 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID.

- Claim 19 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.
- Claim 19 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 20 element "said system including local licensee unique ID generating means and remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 20 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.
- Claim 20 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

It is my opinion that the asserted claims of the '216 Patent are not anticipated and are not obvious in view of Hellman. I also disagree with Dr. Wallach that it would have been obvious to combine this reference with any other reference(s) to make obvious the '216 Patent. (See discussion below in V.i.).

e. Dr. Wallach's Fourth Reference - Wolfe

I disagree with Dr. Wallach that Wolfe anticipates or makes obvious the claims of the '216 Patent. Wolfe is not analogous art because Wolfe (1) is a copy control scheme (Wolfe, 2:33-36), (2) does not provide for a demonstration mode, (3) is not a registration system, and (2) does not activate/register anything (Title, Abstract, description, and 7:42-44). Also, although Wolfe was mentioned in the '216 Patent Specifications ('216 Patent, 1:57-65), and was before the Examiner during the '216 Patent prosecution, Wolfe likely was not argued by the Examiner because it is no more material to the '216 Patent than the other art that was argued; (1) there is no remote licensee unique ID generating means (Wolfe, 3:15-16); and (2) Wolfe uses a "footprint" of the hardware on the local machine (also not unique) (*Id.*, 3:11-14, 4:23-28) and was no more material to the '216 Patent than Grundy's "hardware identification code" (Grundy, 17:9-23). Also, Wolfe does not generate a local and remote licensee unique ID because the user's information (such as a telephone number 8:34-35, 9:15-23) is never input to an identical algorithm local and remote for generating a licensee unique ID. (Wolfe, 8:32-35) I also note that Wolfe was properly characterized by the '216 patent specification that stated that Wolfe discloses "recognition of a platform on which licensed software is to be executed" ('216 Patent, 1:59-60) and that Wolfe "does not contemplate or disclose utilization of information which is unique to the user," (*Id.*, 1:60-62) because

Wolfe merely calculates a value based on hardware information. Therefore, like the "hardware identification code" of Grundy, Wolfe's "permission code" is roughly akin to a "platform unique ID," and is not a licensee unique ID or a security key as required by the claims of the '216 patent. Wolfe does not generate a local and remote licensee unique ID because the user's information (such as a telephone number, Wolfe 8:34-35, 9:15-23) is never input to an identical algorithm local and remote for generating a licensee unique ID. Wolfe changes the executable code of the installed product itself (*Id.*, 4:23-28) by storing the "footprint" in the first control program. Modifying the executable code is not a workable solution for protecting software for several reasons: (1) the executable code must therefore be unprotected and unprotectable thereby weakening software protection; (2) the method will not work on CD ROMs and other read-only media ('216 Patent, 2:19-21); (3) the method can be defeated with debugging tools per Dr. Wallach's comments in the Wallach Report V. B. 3. In addition, Wolfe stores the serial number on the media as did the prior art of the '216 Patent. ('216 Patent, 1:11-15).

With respect to the Wallach Report, Exhibit D that references Wolfe, Wolfe is missing the following elements of the claims of the '216 Patent for at least the following reasons:

- Claim 1 preamble for not being a registration system for licensing execution of digital data in a use mode.
- Claim 1 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID and generating means. In addition, there is no corresponding element in Wolfe's that is the same as the Richardson "summer" ("Seventh Embodiment") because the Richardson "summer" explicitly creates a '216 patent licensee unique ID.
- Claim 1 element "and remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 1 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.
- Claim 1 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which

includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.

- Claim 2 element "wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 7 element "said system further including platform unique ID generating means, wherein said mode switching means will permit said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed" for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data.
- Claim 8 element "wherein said platform unique ID generating means comprises part of said digital data when executed on said platform"

for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data.

- Claim 9 for the same reasons as for Claim 7 bulleted above and the independent claim on which it depends.
- Claim 10 for the same reasons as for Claim 1.
- Claim 11 element "said system including local licensee unique ID generating means" for the same reasons as for Claim 10.
- Claim 12 element "said registration system generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed" for lacking a security key. See also the reasons in the bullet points for Claim 1, above.
- Claim 12 element "and wherein said registration system is replicated at a registration authority" for lacking a security key, and for failing to use the identical algorithm to generate a security key locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 13 element "wherein said security key is generated by a registration number algorithm" for lacking a security key. See also the reasons in the bullet points for Claims 1 and 12, above.

- Claim 14 element "wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 15 element "wherein said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 16 element "wherein said environment details comprise at least one element which is not user-configurable on the platform" for the same reasons as for Claim 15 bulleted above and the independent claim on which it depends.
- Claim 17 element "said method further comprising providing registration key generating means adapted to generate a registration key which is a function of information unique to an intending user of the software" for lacking a licensee unique ID.

- Claim 17 element "said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.
- Claim 17 element "and wherein said enabling key is communicated to said intending user at the time of registration of said software" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 18 element "wherein said registration key is also a function of the environment in which said software is installed" for lacking a licensee unique ID. See also the reasons in the bullet points for Claims 1, 12, and 17, above.
- Claim 19 preamble "A remote registration station incorporating remote licensee unique ID generating means" for lacking a licensee unique ID.

- Claim 19 element "said station forming part of a registration system for licensing execution of digital data in a use mode" for requiring that the software on the manufacturer's media be modified.
- Claim 19 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.
- Claim 19 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 20 element "said system including local licensee unique ID generating means and remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 20 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for requiring that the software on the manufacturer's media be modified.
- Claim 20 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

Also, Dr. Wallach does not explain why claim 7 and its dependent claims are indefinite. To the extent that Dr. Wallach argues indefiniteness of Claim 7 on the basis that "Richardson does not disclose a corresponding structure for performing this function [of generating a platform unique ID]," I disagree. Richardson teaches generating a platform unique ID ('216 Patent, Figure 8, 11:66-12:2) and Grundy (Grundy, 17:10-12) corroborates that such a function is known in the art and is thereby merely a routine implementation detail for a POSA. It is my opinion that the asserted claims of the '216 Patent are not anticipated and are not obvious in view of Wolfe. I also disagree with Dr. Wallach that it would have been obvious to combine this reference with any other reference(s) to make obvious the '216 Patent. (See discussion below in V.i.).

f. Dr. Wallach's Fifth Reference - Kuhn

I disagree with Dr. Wallach that Kuhn anticipates or makes obvious the claims of the '216 Patent. Kuhn does not teach a user unique identifier (I have some knowledge of the German language, and my examination of Kuhn in German shows that the German word for "unique" that is "einmalig" does not appear in Kuhn). Also, Kuhn teaches away from using software methods, "... the known methods have the same disadvantage in that they are software-based." UNILOC 991b. Also, Kuhn does not teach a remote algorithm to generate a remote licensee

unique ID identical to the local algorithm and the local licensee unique ID. Dr. Wallach alleges that Kuhn discloses a local licensee unique ID called a CIA. However, Kuhn plainly teaches that the CIA is entirely based on hardware information and is therefore more akin to a platform identifier of the '216 patent rather than to a licensee unique ID as Dr. Wallach alleges. Dr. Wallach also alleges that Kuhn discloses a remote licensee unique ID called a CP. However, Kuhn plainly teaches that the CP is only generated by the software manufacturer and is not generated by the user's platform. The user's platform instead appears to use the CP to find a general software password that is the same for all copies of the software, and the CP is therefore not a licensee unique ID. Also, there is no disclosure that the CIA or CP is unique, or why it might be useful for the CIA or CP to be unique, especially in light of their role as components of a general software password that is the same for all instances and copies of the manufactured software. I also note that because a CIA and a CP are completely different, there is no switching means disclosed in Kuhn that matches these two values, which are neither licensee unique IDs. Dr. Wallach also incorrectly states that the CP could be entirely generated from local user information. Kuhn also discloses a hardware device called a CID. However, Kuhn fails to describe how the CID is created or calculated, and is therefore indefinite. Kuhn also does not identify a structure for the mode-switching means and for the "check routine." Also, Kuhn essentially

requires a hardware dongle (a ROM/PROM/IOU/CID) to store the CIA and is therefore no more material to the '216 Patent than the prior art before the Examiner. (e.g., Chou) Also, Dr. Wallach does not explain why claim 7 and its dependent claims are indefinite. It is my opinion that the asserted claims of the '216 Patent are not anticipated and are not obvious in view of Kuhn.

With respect to the Wallach Report, Exhibit D that references Kuhn, Kuhn is missing the following elements of the claims of the '216 Patent for at least the following reasons:

- Claim 1 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID. In addition, there is no corresponding element in Kuhn's that is the same as the Richardson "summer" ("Seventh Embodiment") because the Richardson "summer" explicitly creates a '216 patent licensee unique ID.
- Claim 1 element "and remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 1 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has