UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC U.S.A., INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Civil Action No. 03-CV-440 (WES) |

**MICROSOFT'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY**

Pursuant to Fed.R.Civ.P. 56, Defendant Microsoft Corporation ("Microsoft") hereby moves for summary judgment that all of the claims of U.S. Patent No. 5,490,216 are not infringed by Microsoft, and additionally or alternatively that claims 1, 2, 7-13, 17, 19 and 20 are invalid.

This Motion is based on the following supporting materials, filed herewith:

- Memorandum in Support of Microsoft's Motion for Summary Judgment of Non-Infringement and Invalidity;
- Microsoft's Statement of Material Undisputed facts;
- Declaration of Dan Wallach;
- Declaration of Aidan Hughes;
- Declaration of Caglar Guynkati
- Declaration of Sunil Swami; and
- Declaration of Laura R. Braden

For the foregoing reasons and those set forth in the foregoing supporting materials, Microsoft hereby respectfully requests that the Court enter summary judgment on its behalf that all of the claims of U.S. Patent No. 5,490,216 are not infringed by Microsoft, and additionally or alternatively that claims 1, 2, 7-13, 17, 19 and 20 are invalid.

Dated: September 23, 2006

By: _/s/_Joseph V. Cavanagh__________________

Joseph V. Cavanagh, Jr. #1139
BLISH & CAVANAGH
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903
(401) 831-8900 (Telephone)
(401) 751-7542 (Facsimile)
Attorneys for Defendant
MICROSOFT CORPORATION

Frank E. Scherkenbach, Esq.
Kurt L. Glitzenstein, Esq.
Laura R. Braden, Esq.
FISH & RICHARDSON, P.C.
225 Franklin Street
Boston, MA 02110-2804
(617) 542-5070 (Telephone)
(617) 542-8906 (Facsimile)

Isabella Fu, Esq.
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399
(425) 882-8080 (Telephone)
(425) 936-7329 (Facsimile)

**CERTIFICATE OF SERVICE**

I certify that on September 21, 22, and 23, 2006 I caused a true and correct copy of the foregoing (1) Motion for Summary Judgment of Non-Infringement and Invalidity, (2) Memorandum in Support of Microsoft's Motion for Summary Judgment of Non-Infringement and Invalidity, (3) Microsoft's Statement of Material Undisputed Facts, (4) Declaration of Dan Wallach, (5) Declaration of Aidan Hughes, (6) Declaration of Caglar Gunyakti, (7) Declaration of Sunil Swami and (8) Declaration of Laura R. Braden to be served as follows:

| | |
|---|---|
| Francis A. Connor, III<br>Jennifer L. Buckley<br>Taylor Duane Barton & Gilman, LLP<br>10 Dorrance Street, Suite 700<br>Providence, RI 02903 | Attorneys for Plaintiffs<br>UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED |

(HAND DELIVERY)

| | |
|---|---|
| Paul J. Hayes<br>Dean G. Bostock, Esq.<br>Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111 | Counsel for Plaintiffs<br>UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED |

(VIA E-FILE and HAND DELIVERY)

/s/ Joseph V. Cavanagh
Joseph V. Cavanagh

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC U.S.A., INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Civil Action No. 03-CV-440 (WES)<br><br>**[REDACTED]** |

**MEMORANDUM IN SUPPORT OF MICROSOFT'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY**

## TABLE OF CONTENTS

I. Introduction And Summary Of Argument ..... 1

II. Background ..... 5

A. Product Activation ..... 5

1. Overview ..... 5

2. The User Experience ..... 9

3. Product Activation Behind-The-Scenes ..... 17

B. Uniloc's Eight Infringement Theories ..... 19

1. PID (Windows and Office; Telephone and Internet) ..... 19

2. FullPID (Windows and Office; Telephone Only) ..... 20

3. Installation ID (Windows and Office; Telephone Only) ..... 20

4. abConfID/i64ConfID (Windows and Office; Telephone and Internet) ..... 20

5. Digest/hash of license (Windows and Office; Telephone and Internet) ..... 21

6. BPC license/CID in reactivation or subscription renewals (Windows and Office; Telephone and Internet) ..... 22

7. Product Key hash (Windows Only; Telephone and Internet) ..... 23

8. Product Key Authenticator (Office 2003 Only; Telephone and Internet) ..... 24

III. Non-Infringement ..... 25

A. Legal Authority ..... 25

B. There Is No Licensee Unique ID In Product Activation (All Infringement Theories; All Asserted Claims) ..... 29

1. The Alleged Licensee Unique IDs Are Not "Associated With A Licensee" (All Infringement Theories; All Asserted Claims) ..... 29

2. Uniloc Has No Evidence Of Uniqueness For Most Of Its Alleged Licensee Unique IDs (Infringement Theories 4-8; All Asserted Claims) ..... 32

C. Most of Uniloc's Infringement Theories Do not Meet the Requirement of Using The Same Algorithm To Generate the Licensee Unique ID Locally and Remotely (Infringement Theories 1, 3, 4, 7, and 8; All Asserted Claims) ..... 33

1. All Asserted Claims Contain The Same Algorithm Requirement ................ 34

2. Four of Uniloc's Eight Infringement Theories Fail The "Same Algorithm" Requirement (Infringement Theories 1, 3, 4, and 8) .................................... 35

3. There Is No "Same Algorithm" Under the Doctrine of Equivalents ............ 36

D. Product Activation Lacks a Licensee Unique ID Generating Means (All Infringement Theories; Asserted Claims 1, 2, 7-11, and 17-20) .................................................. 38

1. Uniloc Does Not Even Contend That Any Of The Algorithms Used To Generate Its Eight Alleged Licensee Unique IDs is a Summation Algorithm or Summer, Or An Equivalent Thereof (All Infringement Theories; Asserted Claims 1, 2, 7-11, and 17-20) ...................................................................... 38

2. It is Undisputed that Hashing is Not The Same As Or Equivalent to Summation (Infringement Theories 4, 5, and 7; Asserted Claims 1, 2, 7-11, and 17-20) ........................................................................................ 39

E. Product Activation Provides More Than One Way For A User To Get Into a Licensed "Use Mode" or "Fully Enabled Mode," And So Is Not A "Registration System" and Does Not Have A "Mode Switching Means" (All Infringement Theories; All Asserted Claims) ...................................................................... 42

1. Summary And Overview Of Argument ...................................................... 42

2. Relevant Claim Terms ....................................................................... 44

3. Product Activation Is Not A "Registration System" .................................... 45

4. The Grace Period Available After Installation Is A Fully Licensed "Use Mode" ........................................................................................ 46

5. Product Activation Lacks A "Mode Switching Means" ............................... 48

6. Product Activation Does Not Infringe Any of the Asserted Claims Under the Doctrine of Equivalents ..................................................................... 48

F. Further Non-Infringement Arguments ...................................................... 49

1. Product Activation Does Not Meet The Requirement of "Said Registration System is Replicated at the Registration Authority" (All Infringement Theories; Asserted Claims 12-16) ............................................................ 49

2. Product Activation Does Not Use Information Associated With an *Intended* Licensee (All Infringement Theories; Asserted Claims 12-18) .................... 50

3. Product Activation Does Not Have or Use Information or Identifiers "Associated With" A Licensee or Intended Licensee (All Infringement Theories; Asserted Claims 12-18) ............ 51

**a. The HWID is Not "Associated With" a Person............ 52**

**b. The Product Key is Not "Associated With" a Person ............ 54**

4. Product Activation Does Not Include A "First Generated" Local Licensee Unique ID Matched With A "Subsequently Generated" Remote Licensee Unique ID (All Infringement Theories; Asserted Claims 1, 2, 7-11)............ 55

IV. Invalidity............ 57

A. Legal Authority—Anticipation............ 57

B. Under Uniloc's Erroneous And Overbroad Attempt To Distort Its Claims To Cover Product Activation, Claims 12, 13, 19, and 20 of the '216 Patent Are Invalid as Anticipated by U.S. Patent No. 4,796,220 (Wolfe)............ 58

1. Overview of U.S. Patent No. 4,796,220 (Wolfe)............ 58

2. On Uniloc's Attempted Application Of The Claims To Product Activation, Wolfe Invalidates Claims 12, 13, 19, and 20............ 60

As discussed below, Uniloc's attempts to distinguish Wolfe fail based on the proper application of the Court's claim construction and/or the inconsistent positions taken by Uniloc in trying to apply the Court's claim construction to Microsoft's Product Activation. ............ 60

**a. Wolfe Discloses a Registration System for Licensing Execution of Digital Data in a Use Mode ............ 61**

**b. Uniloc's Position That Wolfe Does Not Disclose a Licensee Unique ID is Fundamentally Inconsistent With Its Position That Product Activation Includes a Licensee Unique ID............ 61**

**c. Uniloc's Position That Wolfe Does Not Disclose a Licensee Unique ID Generating Means is Fundamentally Inconsistent With Its Position That Product Activation Includes a Licensee Unique ID Generating Means............ 62**

**d. Wolfe Discloses the Use of the Identical Algorithm to Generate a Licensee Unique ID Locally and Remotely ............ 63**

C. Under Uniloc's Erroneous And Overbroad Attempt To Distort Its Claims To Cover Product Activation, Claims 1, 2, 7-13, 17, 19 and 20 of the '216 Patent Are Invalid as Anticipated by U.S. Patent No. 5,291,598 (Grundy) ............ 64

1. Overview of U.S. Patent No. 5,291,598 (Grundy) ....................................... 64

2. On Uniloc's Attempted Application Of The Claims To Product Activation, Grundy Invalidates Claims 1, 2, 7-13, 17, 19 and 20 .................................... 65

**a. Uniloc's Position That Grundy Does Not Disclose a Licensee Unique ID Generating Means is Fundamentally Inconsistent With Its Position That Product Activation Includes a Licensee Unique ID Generating Means ..................................................................... 66**

**b. Uniloc's Position That Grundy Does Not Disclose a Licensee Unique ID is Fundamentally Inconsistent With Its Position That Product Activation Includes a Licensee Unique ID...................... 67**

**c. Grundy Discloses the Use of the Identical Algorithm to Generate Licensee Unique ID Locally and Remotely .................................. 68**

**TABLE OF AUTHORITIES**

**Cases**

*Alpex Computer Corp. v. Nintendo Co.*,
102 F.3d 1214 (Fed. Cir. 1996) .......... 27

*Al-Site Corp. v. VSI Intern., Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) .......... 41

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F3d. 1343 (Fed.Cir. 2001) .......... 57, 58, 62

*Asyst Techs., Inc. v. Emtrak, Inc.*,
402 F.3d 1188 (Fed.Cir.2005) .......... 48

*Bayer AG v. Elan Pharm. Research Corp.*,
212 F.3d 1241 (Fed. Cir. 2000) .......... 26, 28

*Becton Dickenson and Co. v. C.R. Bard, Inc.*,
922 F.2d 792 (Fed. Cir. 1990) .......... 25

*Bio Med.* 216 F.3d at 1370 .......... 28

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
246 F.3d 1368 (Fed. Cir. 2001) .......... 57

*Canton Bio Med., Inc. v. Integrated Liner Techs, Inc.*,
216 F.3d 1367 (Fed. Cir. 2000) .......... 27, 28

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
145 F.3d 1303 (Fed. Cir. 1998) .......... 41

*Cybor Corp. v. FAS Techs., Inc.*,
138 F.3d 1448 (Fed. Cir. 1998) .......... 28

*Cytologix Corp. v. Ventana Medical Sys., Inc.*,
424 F.3d 1168 (Fed. Cir. 2005) .......... 27, 38

*Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*,
149 F.3d 1309 (Fed. Cir. 1998) .......... 26, 48

*Evans Cooling Systems, Inc. v. General Motors Corp.*,
125 F.3d 1448, 1451 (Fed. Cir. 1997) .......... 58

Fed. R. Civ. P. 56(b) .......... 25

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
535 U.S. 722 (2002).......................................................................................... 28, 37

*IPXL Holdings, Inc. v. Amazon.com L.L.C.*,
430 F.3d 1377, 1381 (Fed. Cir. 2005) ..................................................................... 57

*IPXL*, 430 F.3d at 1381 ........................................................................................... 57

*Kahn v. General Motors Corp.*,
135 F.3d 1472 (Fed. Cir. 1998) ............................................................................. 26

Lan Sys. v. Netscout Serv. Level Corp.,
183 F. Supp. 2d 328 (D. Mass. 2002)...................................................................... 45

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ................................................................................ 53

*Mas-Hamilton Group v. LaGard, Inc.*,
156 F.3d 1206 (Fed. Cir. 1998) ............................................................................. 26

*Moore U.S.A., Inc. v. Standard Register Co.*,
229 F.3d 1091, 1106 (Fed.Cir.2000) ...................................................................... 48

*MOSAID Techs. Inc. v. Samsung Elecs. Co.*,
362 F. Supp. 2d 526 (D.N.J. 2005)......................................................................... 40

Mycogen Plant Science, Inc. and Agrigenetics, Inc. v. Monsanto Co.,
261 F.3d 1345 (Fed. Cir. 2001) ............................................................................. 37

*Netword, LLC v. Cetraal Corp.*,
242 F.3d 1347 (Fed. Cir. 2001) ........................................................................ 26, 27

Novell, Inc. v. Unicom Sales, Inc.,
2004 WL 1839117 (N.D.Cal. 2004) ....................................................................... 45

*Odetics, Inc. v. Storage Tech. Corp.*,
185 F.3d 1259 (Fed. Cir. 1999) ........................................................................ 27, 38

*Prima Tek II, L.L.C. v. Polypap S.A.R.L.*,
412 F.3d 1284, 1287 (Fed. Cir. 2005) ..................................................................... 58

ProCD, Inc. v. Zeidenberg,
86 F.3d 1447 (7th Cir. 1996) ................................................................................. 45

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ........................................................................ 27, 50

*Schoell v. Regal Marine Indus., Inc.*,
247 F.3d 1202 (Fed. Cir. 2001) .................................................................... 26, 30, 38

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed.Cir.2001) ........................................ 48

*Solaia Tech. LLC v. ArvinMeritor, Inc.*,
2005 U.S. Dist. LEXIS 6163, *22-23 (D. Ill. 2005) ........................................ 30

*Southwall Techs.* at 1579 ........................................ 28

*TechSearch, LLC v. Intel Corp.*,
286 F.3d 1360 (Fed. Cir. 2002) ........................................ 26, 33

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed Cir. 2001) ........................................ 25, 57

*Telemac*, 247 F.3d at 1327 ........................................ 57

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
239 F.3d 1225 (Fed. Cir. 2001) ........................................ 54

*Wilson Sporting Goods Co. v. David Geoffrey & Associates,*
904 F.2d 677 (Fed. Cir. 1990) ........................................ 28

*Wolverine World Wide Inc. v. Nike, Inc.*,
38 F.3d 1192 (Fed. Cir. 1994) ........................................ 27

**Statutes**

35 U.S.C. § 102 ........................................ 57

35 U.S.C. § 112(6) ........................................ 27, 44

35 U.S.C. § 282 ........................................ 57

35 U.S.C. 102(b) ........................................ 58

35 U.S.C. 102(e) ........................................ 64

## I. Introduction And Summary Of Argument

The resolution of claim construction in a patent litigation often is case-dispositive. That general rule is true in this case, though Microsoft's (and the Court's) task has been needlessly complicated by Uniloc's refusal to acknowledge the obvious:[1] that many of its 8 separate infringement theories in connection with its 16 asserted claims are not even facially plausible in view of the many claim construction positions Uniloc necessarily advanced and properly lost. While Uniloc may be counting on sheer burden and technical complexity to mask the fact that there is nothing in Microsoft's Product Activation feature that is covered by any of Uniloc's claims, in reality it should succeed only in making the briefing longer than it really needs to be to dispose fully of this case.

Uniloc's patent and Product Activation have very different goals and very different approaches to meet those goals. As a consequence, there are fundamental contrasts between the two at nearly every level, from overall philosophy and architecture to implementation specifics:[2]

- **Privacy**: It is difficult to open a newspaper today without seeing an article on identity theft, "spyware," and other digital invasions of privacy. These are substantial public concerns, and Microsoft designed Product Activation to respect them by ensuring that the activation process is completely anonymous. By contrast, Uniloc's claims all require the use of information, called "licensee unique IDs," which is "associated with" the person who licensed the software. Indeed, this information is central to the operation of Uniloc's claimed

[1] In light of the Court's claim construction, Microsoft's counsel asked Uniloc's counsel whether Uniloc intended to drop any of these eight theories, or any of its asserted claims. Uniloc refused to do so. (*See* Declaration of Laura R. Braden ("Braden Decl."), Exs. I and J.)

[2] Exhibit A to this memorandum a chart that summarizes the different non-infringement bases, and the theories to which they are applicable.

registration system. While it may have been acceptable in 1992 when Uniloc filed its patent to collect and use such information, consumers today are not generally willing to trade their privacy for the use of a software program. Despite having itself proposed the "associated with" construction for its claims, which the Court adopted, Uniloc's case fails for lack of proof on this very issue: Uniloc has not identified any evidence showing the requisite association for any of its eight infringement theories.

- **Symmetry**: From an architectural perspective, Uniloc's system relies critically on symmetry. Information is provided to an algorithm—specifically, a summer or its equivalent—on the user's computer, to generate a local licensee unique ID. The same information is provided to the same algorithm on a remote computer, to generate a remote licensee unique ID. If a comparison of the two licensee unique IDs shows that they are the same, then the software becomes licensed for use. Uniloc repeatedly emphasized the importance of this symmetric structure in its patent, as well as during prosecution where it was forced to amend its claims to expressly require symmetry. Despite this history, Uniloc pressed for much broader claim constructions on these symmetry issues—and lost on virtually all of them. With regard to most of Uniloc's eight infringement theories, Product Activation simply does not generate the same alleged licensee unique ID on both the local and remote sides, let alone use the same information or the same algorithm to do so. Given the complexity of Product Activation and the ubiquity generally of "algorithms" in any complex piece of computer software, it should not be surprising that Uniloc has been able to scour the minutia of Microsoft's

source code to locate a few fringe instances of the same algorithms being used on both the local and remote sides, and has then tried to build a case around that. One of the algorithms on which Uniloc tries to rely relates to "hashing." However, Uniloc has not identified any evidence to show that the hashing algorithms in question are summers or equivalent to summers, as required by the Court's claim construction. To the contrary, Uniloc's own Rule 30(b)(6) corporate representative unequivocally conceded that the hashing algorithms used by Microsoft are ***not*** summers or their equivalents.

- **Security**: The symmetric structure required by all of Uniloc's claims produces a pair of keys. If a comparison of the two licensee unique IDs shows that they are the same, then the software is unlocked, i.e., it switches from an unlicensed mode to a licensed mode. This is an important security feature to Uniloc's implementations, which contemplate payment for the software at the time the licensee unique IDs are generated and matched. Consequently, all of Uniloc's claims require a gatekeeper of sorts, an element that switches the software from the unlicensed mode to the licensed mode only if the local and remote licensee unique IDs are the same. In short, the only way that the user can unlock the software, and thereby switch from the unlicensed mode to the licensed mode, is by performing the claimed method. Were it otherwise, users could become licensees without paying for the software. By contrast, Product Activation and the licensing of Microsoft products are distinct. There is no dispute on this. Uniloc's technical expert, Mr. David Klausner, agrees as he must that the licensing procedure occurs during installation, which is generally after the user

> has paid for the product. Microsoft's Product Activation does not enter the picture until after the user becomes licensed. At that point, Product Activation helps identify non-*bona fide* software installations that exceed the terms of the license; it is not itself a gatekeeper that switches the software from an unlicensed mode of operation to a licensed mode of operation. Microsoft's customers are licensed before they activate their software, and they remain licensed under the exact same license agreement afterwards.

This motion is principally a non-infringement motion. There are multiple reasons why no reasonable jury could find infringement by Product Activation for each asserted claim of Uniloc's patent. However, the final section of the present memorandum also addresses invalidity issues, in particular the anticipation of Uniloc's claims by two references that have featured prominently in prior briefing, namely, the Wolfe and Grundy patents.

To be clear, Microsoft does not believe that the Wolfe and Grundy patents anticipate ***any*** claims of the Uniloc patent. On the proper application of the Court's claim constructions, there is ***neither*** infringement by Product Activation ***nor*** anticipation by Wolfe and Grundy. That is because the same scope and application of the claims used for non-infringement must also be used for invalidity. However, it has become apparent that Uniloc intends to press theories of infringement that simply do not square with its efforts to save its patent from invalidity. For instance, while Uniloc says that Wolfe's unlocking key is not a "licensee unique ID" because it is based on hardware information rather than information about the licensee as a person, Uniloc takes the opposite position with regard to Product Activation. And while Uniloc says that Wolfe's and Grundy's respective algorithms for calculating the unlocking keys are not the same as or equivalent to the summer disclosed in Uniloc's patent, Uniloc again takes the opposite

position with regard to Product Activation. Uniloc of course cannot have it both ways. Uniloc should be held to its admissions with regard to the narrowness of its patent, further warranting summary judgment of non-infringement for Microsoft.

## II. Background

### A. Product Activation

To break down the issues presented on this motion, we consider Product Activation from several different perspectives. After first providing an overview of Product Activation, we describe the details of its operation from three perspectives: the user's experience, what is happening "behind-the-scenes," and Uniloc's eight separate infringement theories.

#### 1. Overview

The accused Product Activation feature is found in Microsoft's Windows and Office software, along with individual Office applications.[3]

Microsoft developed Product Activation with three basic goals in mind.

First, Microsoft wanted to educate its customers about their license rights—and the limitations of those rights—in using Microsoft products. In particular, Microsoft wanted to let its users know that most retail versions of its software are licensed with rights to install on only one or a limited number of computers. (Braden Decl., Ex. X, Deposition Transcript of Susan Cole, 18:15-18.)

[3] *See* Exhibit H to the declaration of Laura R. Braden ("Braden Decl."), which is a chart of all of the accused products showing which fall into the Windows "family," which fall into the Office XP "family," and which fall into the Office 2003 "family" for the purposes of this motion. For two of the accused products identified by Uniloc, Microsoft Office 2000 SR-1 and Microsoft Project 2000 SR-1, Uniloc has not provided any evidence that the products infringe any of its patent claims. Accordingly, Microsoft is entitled for this reason alone to summary judgment of non-infringement for these products. *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001) ("Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") ((internal citations omitted).

Second, and relatedly, Microsoft wanted to reduce so-called "casual copying," a loosely defined term used to describe the situation where, for example, two friends or relatives share a single box of software product by installing it on their respective computers. (Braden Decl., Ex. Y, Deposition Transcript of Allen Nieman, 157:11-13.) Casual copying is distinct from organized, concerted, or professional software pirating.

Third, and paramount, Microsoft wanted to achieve these goals while at the same time respecting and protecting its customers' privacy. Towards that end, Product Activation is completely anonymous. Indeed, Microsoft expressly and formally promises anonymity in the familiar End-User License Agreement ("EULA"), the agreement that licenses the customer to use the software, and that is displayed to users upon installation of every copy of Microsoft's Office 2003 software:

> 2.1 Mandatory Activation. THERE ARE TECHNOLOGICAL MEASURES IN THIS SOFTWARE THAT ARE DESIGNED TO PREVENT UNLICENSED USE OF THE SOFTWARE. You may not be able to exercise your rights to the Software under this EULA after a finite number of product launches unless you activate your copy of the Software in the manner described during the launch sequence. You may also need to reactivate the Software if you modify your computer hardware or alter the Software. Microsoft will use those measures to confirm you have a legally licensed copy of the Software. If you are not using a licensed copy of the Software, you are not allowed to install the Software or future Software updates. ***Microsoft will not collect any personally identifiable information from your device during this process.***

(Braden Decl., Ex. DD, Office 2003 EULA, at 2.1; emphasis added.)[4]

Microsoft reiterates this commitment to privacy over and over again in the promises it makes to any customer who seeks to learn more about Product Activation. In a section of its website entitled "How Activation Works," Microsoft is unequivocal:

> Product Activation is a simple, straightforward and ***anonymous*** process. In most cases, the only information required to activate is an Installation ID created by the software. ***No personally identifiable information is required.***

[4] The "unlicensed use" that Product Activation is designed to prevent is, e.g., the use of the software on a greater number of computers than is permissible under the terms of the EULA.

(Braden Decl., Ex. K; emphasis added. See also Braden Decl., Ex. L "Product Activation Facts" ("Activation is completely anonymous and requires no personally identifiable information from the end user.") and Ex. M "Myths of Product Activation" ("Microsoft absolutely respects the privacy of its customers and does not ask for any personally identifiable information to activate a product. Product Activation is completely anonymous.")

Product Activation is described in detail below, but at a high level, it is triggered after the software is purchased by the user, and after the user accepts the terms and conditions of the EULA during the installation and licensing process. Once the software has been installed (and licensed) and the user elects to activate it, the software communicates, among other things, two pieces of information to a "Clearinghouse" at Microsoft: (1) a Product Identifier, or "PID," that identifies the particular unit of software, and (2) a Hardware Identifier, or "HWID," generated from information about the user's computer but which does not identify that computer. (Declaration of Caglar Gunyakti ("Gunyakti Decl.") ¶ 4; Declaration of Aidan Hughes ("Hughes Decl.") ¶ 5.)

The collection of the HWID information is carefully managed to prevent any invasion of privacy, for example, by making it impossible to determine whether a particular computer is associated with any particular HWID. As also explained on Microsoft's website, Product Activation uses a special one-way hashing function to ensure anonymity:

> ***To ensure the end user's privacy***, Microsoft uses a one-way mathematical algorithm to create the hardware hash used by Product Activation to create the Installation ID. Once created, the hash information cannot be calculated back to its original values. Hardware information is sent through the algorithm in the software on the PC-not at Microsoft-to create the hash. The raw hardware information is not known or sent to Microsoft. ***Ensuring end user privacy is a No. 1 design goal for Microsoft with Product Activation.***

(Braden Decl., Ex. M; emphasis added.)

The Clearinghouse loads the PID and HWID information into a computer database, and then takes steps to enable activation of the software on the user's computer, as explained in detail below.

With the initial activation of a particular boxed copy of genuine software, there is no way for Microsoft to determine if the licensee is *bona fide*. For instance, if the software was stolen from the customer, the thief could activate it on his computer without detection by Product Activation. Rather, Product Activation is targeted more to the situation where there are multiple attempts to activate the same boxed copy of software on different computers, beyond the number of installations permitted by the EULA. Specifically, if the Clearinghouse later receives another request to activate the same PID, it uses logic to decide whether the request is coming from the original computer, or from a different one. (Declaration of Sunil Swami ("Swami Decl.") ¶ 6.) It generally does so by evaluating the HWID previously stored for that PID. If the HWID sent with the new request is close enough to the stored HWID, a determination that Microsoft calls being "in tolerance," it assumes the request is *bona fide*, and issues an activation command.[5] (*Id.*) If not, it denies the activation request. (*Id.*)

The following figure depicts the general operation of Product Activation. (Swami Decl., ¶ 27 and Ex. A.) The relevant details of the structure and operation of Product Activation will be explained in the following sections.

[5] Microsoft was awarded its own patent for the technology that determines whether the new HWID is close enough to the old HWID: U.S. Patent No. 6,243,468 entitled "Software anti-piracy system that adapts to hardware upgrades", filed April 29, 1998, issued June 5, 2001.




### 2. The User Experience

In purchasing a retail copy of one of the accused Microsoft software products, a Microsoft customer receives a CD, contained in the product box. A sticker on the back of the CD case lists a 25-character "Product Key." (Gunyakti Decl. ¶ 5, Hughes Decl. ¶ 6.)

To install the software, the user inserts the CD into the computer drive, and follows the instructions. At the outset of the installation process, illustrated below using Office 2003, the user is prompted to enter the Product Key, (Gunyakti Decl. ¶ 6, Hughes Decl. ¶ 7) as follows:


My Computer
Shortcut to PRINTKEY
Shot 1
Microsoft Office 2003 Setup
Microsoft Office Standard Edition 2003
Product Key
In the boxes below, type your 25-character Product Key. You will find this number on the sticker on the back of the CD case or on your Certificate of Authenticity.
Product Key:
Help
< Back
Next >
Cancel
Recycle Bin
start
Microsoft Office 2003...
3:30 PM


My Computer
Shortcut to PRINTKEY
Microsoft Office 2003 Setup
Microsoft Office Standard Edition 2003
Product Key
In the boxes below, type your 25-character Product Key. You will find this number on the sticker on the back of the CD case or on your Certificate of Authenticity.
Product Key: xd6kb - h3vqw - dvym6 - 2hxy3 - 9vqwd
Help
< Back
Next >
Cancel
Recycle Bin
start
Microsoft Office 2003...
3:33 PM

(Braden Decl., ¶ 14 Exs. N-V.)

The user is then shown the EULA that dictates the terms and conditions of use of the software. For instance, the EULA below is for Office 2003, and items 1.1 (a) and (b) specify that the software can be installed on two computers, one a personal computer and the other a "second, portable device:"




In order to become a licensee and install the software, the user must affirmatively indicate acceptance of the terms of the EULA, by clicking the box labeled "I accept the terms in the License Agreement:" (Gunyakti Decl. ¶ 6, Hughes Decl. ¶ 7.)




Once the license has been agreed to and the installation process is complete, the licensed software is available for use. Even though it is not yet activated, the full functionality of the software is available for use. (Microsoft's Statement of Material Undisputed Facts ("MUF") ¶ 2, Hughes Decl. ¶ 8, Gunyakti Decl. ¶ 7.)

At this point, the user is in the "grace period," a defined period between installation and activation.[6] Specifically, in the case of Office XP and Office 2003, the user may run the software a total of 50 times. (MUF ¶ 3, Hughes Decl. ¶ 8.) In the case of Windows XP, the user may use the software for a set duration, e.g., 30 days. (MUF ¶ 4, Gunyakti Decl. ¶ 7). If the user fails to activate before the end of the grace period, many features of the software become unavailable. (MUF ¶ 39, Braden Decl. Ex. A, Exhibit D to the September 1, 2005 Expert Report

[6] With one exception, all of the accused products have a grace period. The exception is Microsoft Plus! Digital Media Edition, which requires activation before allowing use of the software. (MUF ¶ 2; Hughes Decl. ¶ 8, Gunyakti Decl. ¶ 7.)

of David Klausner ("Klausner 9-1-05 Report"), p. 51; Braden Decl., Ex. B, December 8, 2005 Rebuttal Report of David Klausner ("Klausner 12-8-05 Report"), p. 41.)

Whenever the user launches the software during the grace period, an "activation wizard" gives him the opportunity to activate the software, and tells him how much remains of the grace period. If the user decides not to activate, he clicks on the "Cancel" button. During the grace period, he may continue to use the software normally. (MUF ¶2; Hughes Decl. ¶ 8; Gunyakti Decl. ¶ 7.)




To activate over the Internet, the user simply clicks the "Next" button, and activation is completed without any further action on the part of the user, as shown in the following two screen captures (Hughes Decl. ¶ 9; Gunyakti Decl., ¶ 8):


Document1 - Microsoft Word
File Edit View Insert Format Tools Table Window Help
Type a question for help
Times New Roman 12
Getting Started
Microsoft Office 2003 Activation Wizard
Microsoft Office Standard Edition 2003
Activation Wizard
Connecting...
If you experience trouble connecting or if nothing seems to be happening for more than a minute, please check that your Internet connection is working properly.
Privacy Statement
Help
Back
Next
Cancel
Second use of Microsoft Word 2003 on this machine
More...
Page 1 Sec 1 1/1 At 1" Ln 1 Col 1 REC TRK EXT OVR
start
Document1 - Microsof...
1:08 PM


Document1 - Microsoft Word
File Edit View Insert Format Tools Table Window Help
Type a question for help
Times New Roman 12
Getting Started
Microsoft Office 2003 Activation Wizard
Microsoft Office Standard Edition 2003
Activation Wizard
Thank You. Your copy of Microsoft Office Standard Edition 2003 is activated. Close and restart open applications to enable any unavailable features.
Click Register Now if you would like to register your copy of the software. Registration is voluntary and not part of activation.
Register Now...
Privacy Statement
Help
Back
Next
Close
Second use of Microsoft Word 2003 on this machine
More...
Page 1 Sec 1 1/1 At 1" Ln 1 Col 1 REC TRK EXT OVR
start
Document1 - Microsof...
1:09 PM

To activate by telephone, the user selects that option from the dialog box shown above, and selects the "Next" button. The user is presented with the dialog box below, which provides him with telephone numbers to call and a 54-digit Installation ID (IID). (Gunyakti Decl. ¶ 9; Hughes Decl. ¶ 10.) The user dials the number ("Step 1" in the screen capture below) and provides the IID to either an automated telephone service or a live customer service representative ("Step 2" below). (*Id.*) In return, the user receives a Confirmation ID (CID) which he types into the dialog box ("Step 3" below) (*Id.*):




Once the user enters the CID and selects the "Next" button, telephone activation is complete.




If the EULA permits installation on more than one computer, the activation process will be the same for each computer. (Hughes Decl. ¶ 11.)

Once the software is activated, the user will have to repeat the activation process if he changes enough of the hardware on the computer on which the software is installed. (MUF ¶ 5; Hughes Decl. ¶ 12; Gunyakti Decl. ¶ 10.) Specifically, changing computer hardware (for instance, increasing the amount of RAM memory, changing a video card or a hard drive, etc.) can also change the HWID hash value. If the difference between the original HWID and the new HWID becomes large enough, the HWID's said to be out of tolerances and the software must be reactivated. Thus, the "tolerance" built into Product Activation contemplates that users will want to make changes to their computer. (Hughes Decl. ¶ 18; Gunyakti Decl. ¶ 16.) Product

Activation tolerates a certain level of change before requiring reactivation. (*Id.*) If reactivation is necessary, the Clearinghouse will evaluate whether it thinks the request is *bona fide*, or if it is an attempt at piracy (e.g., an attempt to install the software on a different computer, rather than on a computer that merely appears different because of the extent of hardware changes). (Swami Decl. ¶ 6.)

### 3. Product Activation Behind-The-Scenes

In order to accomplish the foregoing, Product Activation performs a number of steps, which we will refer to by the step numbers provided in the overview graphic on page 9:

Step 3: The PID (Product ID) is generated from the Product Key typed in during installation. In addition to information in the Product Key, the PID is derived from information about the software version (information found on the CD used to install the software), as well as a random number generated by the software. (Hughes Decl. ¶ 13; Gunyakti Decl. ¶ 11.)

Step 7: The HWID (Hardware ID) is generated by first quantifying various hardware components of the computer on which the software is installed, and then running this information through a one-way mathematical transformation called a hash function. Hash functions are discussed in more detail below. (Gunyakti Decl. ¶ 12; Hughes Decl. ¶ 14.)

Step 8: In internet activation, the PID and HWID are sent to the Microsoft Clearinghouse as part of a license request. (Hughes Decl. ¶ 15; Gunyakti Decl. ¶ 13.) In telephone activation, portions of the PID and the HWID are used to generate the IID (Installation ID). (Hughes Decl. ¶ 16; Gunyakti Decl. ¶ 14.)

Step 9: At the Clearinghouse, a check is performed to determine if the PID that is received is already stored in the Clearinghouse database. (Swami Decl. ¶ 3.) If the

PID is not yet in the database, the HWID is stored along with the PID in the database, and the activation process continues. (*Id.*) If the PID is already in the database, the Clearinghouse checks the HWID that is stored with the PID in the database against the HWID that was sent with the PID from the user's computer. (*Id.*) If the HWIDs match, or if they are close enough ("in tolerance"), the activation process continues. (*Id.*)

Step 10: If the activation process continues after the previous step, the Clearinghouse generates a license in the case of internet activation. (Swami Decl. 4.) The license consists of information provided by the Clearinghouse, as well as the PID and HWID sent to the Clearinghouse from the user's computer. *Id.* In the case of telephone activation, the Clearinghouse generates a CID (Confirmation ID). (Swami Decl. ¶ 5) The CID consists of information provided by the Clearinghouse, and is encrypted with a key derived from the PID and HWID sent to the Clearinghouse. (*Id.*)

Step 11: The Clearinghouse then sends the license (internet) or CID (telephone) back to the user's computer. (Gunyakti Decl. ¶¶ 15 & 17; Hughes Decl. ¶¶ 17 & 19.)

Steps 12 and 13: The user's computer then unpacks the license or CID. (Gunyakti Decl. ¶¶ 15 & 17; Hughes Decl. ¶¶ 17 & 19.) If the PID in the license is the same as the PID created in Step 3 above, <u>and</u> if the HWID in the license is "within tolerance" of the HWID created in Step 7 above, the software is considered to be activated, and so is allowed to run. (*Id.*) Every time the software is subsequently run, the PID and HWID are regenerated and this same check is performed. (*Id.*) If at any time the

PIDs do not match or the HWIDs are not in tolerance, the user is advised that he needs to reactivate the software. (*Id.*)

In summary, the Clearinghouse does not generate or recreate the PID, HWID and/or IID generated by the user's computer. (MUF ¶ 8; Swami Decl. ¶ 7.) In fact, because the Clearinghouse never separately receives all of the information used to form the PID (i.e., the information found on the CD and the random number) and the HWID (i.e., the raw information about the user's computer hardware), the Clearinghouse cannot generate or recreate the PID, HWID, or IID. (Gunyakti Decl. ¶¶ 13, 14, 27, 28; Hughes Decl. ¶¶ 15, 16, 28, 29.) The Clearinghouse simply records the PID, HWID, and/or IID information provided by the user's computer, and then sends the PID and HWID that it received from the user back to the user. (Swami Decl. ¶ 7.)

**B. Uniloc's Eight Infringement Theories**

All of the claims of Uniloc's patent require that the same "licensee unique IDs"[7] must be generated on both the user's computer and a remote computer, using the identical algorithm on both sides.

Rather than point to one thing in Product Activation that it contends constitutes a "licensee unique ID," Uniloc points to eight. Seven of Uniloc's eight theories are directed to Windows (theories 1-7 below), and seven are directed to Office (theories 1-6 and 8 below).

**1. PID (Windows and Office; Telephone and Internet)**

Uniloc asserts that the PID constitutes a licensee unique ID. The PID is generated on the user's computer, both during installation and whenever the software is run after it has been

[7]This term is synonymous with "security key," "enabling key," and "registration key," and so the group will collectively be referred to as "licensee unique IDs."

activated. (Hughes Decl. ¶¶ 13, 17, 19; Gunyakti Decl. ¶¶ 11, 15, 17.) However, the PID is never generated on the Clearinghouse server. (MUF ¶ 8; Swami Decl. ¶ 7.)

**2. FullPID (Windows and Office; Telephone Only)**

Uniloc asserts that something it calls the "FullPID" is a licensee unique ID. While the PID is a human-readable string, the FullPID is a binary-encoded machine-readable data structure derived from the PID. (Hughes Decl. ¶ 21; Gunyakti Decl. ¶ 19; Swami Decl. ¶ 8.) The PID is converted into FullPID format only during telephone activation. (*Id.*) The "algorithm" that Uniloc identifies as generating the FullPID is called PIDStringtoPIDStruct. This algorithm has not been used on the Clearinghouse since March 2003, long prior to the filing of this lawsuit.[8] (MUF ¶ 9; Swami Decl. ¶ 8.) Moreover, at no time has Product Activation compared the FullPID generated on the user's computer with a FullPID generated on the Clearinghouse to determine if the two are the same. (MUF 10; Hughes Decl. ¶ 21; Gunyakti Decl. ¶ 19; Swami Decl. ¶ 8.)

**3. Installation ID (Windows and Office; Telephone Only)**

Uniloc asserts that the IID constitutes a licensee unique ID. The IID is generated on the user's computer when a user chooses to activate by telephone. (Gunyakti Decl. ¶ 14; Hughes Decl. ¶ 16.) However, an IID is never generated on the Clearinghouse server. (MUF ¶ 8; Swami Decl. ¶ 7.)

**4. abConfID/i64ConfID (Windows and Office; Telephone and Internet)**

This infringement theory is also based on code that has not been used since March 2003. (MUF ¶ 11; Swawmi Decl. ¶ 9.) Prior to that time, when a CID was generated, temporary values called the i64ConfID and abConfID were used to hold the data used to generate the CID as it went through various mathematical transformations. (Swami Decl. ¶ 10.) These temporary

[8] Because it failed to mark its products in compliance with 35 U.S.C. §287, Uniloc is barred from recovering damages for any alleged infringement prior to the filing date of this lawsuit, September 26, 2003. (Dkt. 109)

values also appeared during the decryption of the CID by the software on the user's computer. (Hughes Decl. ¶ 22; Gunyakti Decl. ¶ 20.) Uniloc has asserted that one of those values, the output of a particular algorithm called FEncryptDecryptUsingPIDHWID, is a licensee unique ID. Not only has this algorithm not been used on the Clearinghouse side since March 2003, but at no time has Product Activation compared the output of this algorithm on the user's computer with the output of this algorithm on the Clearinghouse. (MUF 14; Hughes Decl. ¶ 24; Gunyakti Decl. ¶ 22; Swami Decl. ¶ 12.)

#### 5. Digest/hash of license (Windows and Office; Telephone and Internet)

When the Clearinghouse decides to activate the user's software, it generates a license. (Swami Decl. ¶¶ 4, 5.) It also "signs" the license.[9] (Swami Decl. ¶¶ 13-16.) "Signing" the license is to allow the user's computer to confirm that the license is genuine. The signature is created by running the license through a mathematical hash operation.[10] (Swami Decl. ¶¶ 13-16.) For instance, in the Office context for internet activation, the license is hashed [redacted]. (MUF 15; Swami Decl. ¶ 13.) The result of the hash operation is then encrypted with a private key known only to Microsoft. (Swami Decl. ¶ 13.) The encrypted entity is called a signature. (*Id.*) Both the license and the signature are sent back to the user's computer. (*Id.*)

The software at the user's computer has a public key that it uses to decrypt the signature. (Hughes Decl. ¶ 25.) The software also runs the license data through [redacted] hash. (MUF ¶ 16; Hughes Decl. ¶ 25.) If the result of the [redacted] hashing operation on the user's computer is not the

[9] This description pertains to Product Activation in Microsoft Office products. Microsoft Windows products use a somewhat different protocol to generate licenses, but this description is accurate for Windows in material respects for the purposes of this motion. (MUF ¶¶ 18-20; Swami Decl. ¶¶ 15-16; Gunyakti Decl. ¶¶ 23-24.)

[10] "Generally, a hash function transforms a string of characters into a (usually shorter) value of fixed length, commonly referred to as the hash value. Hash functions may be employed in symmetric and asymmetric encryption systems. When hashing a message, the message is converted into the hash value, and it is difficult to recreate the original message from the hash value." (Wallach Decl., ¶ 3.)

same as the decrypted signature received from the Clearinghouse, the software will not execute. (Hughes Decl. ¶ 25.)

Telephone activation is similar, except that it uses a different hashing function, called [redacted], to generate the signature for the CID. (MUF 17; Hughes Decl. ¶ 26; Swami Decl. ¶ 14.)

Uniloc contends that the results of the hashing operation in these scenarios is a licensee unique ID. However, as discussed in detail below, the particular hashing algorithms used by Product Activation are old and commonplace; it is beyond dispute that the particular algorithms, and their manner of usage in Product Activation, long predate Uniloc's patent. Even more significantly, Uniloc's Rule 30(b)(6) corporate representative conceded that they are not the same as or equivalent to Uniloc's claimed summation algorithm.

#### 6. BPC license/CID in reactivation or subscription renewals (Windows and Office; Telephone and Internet)

When Microsoft Office products are reactivated over the internet, the license (which Uniloc refers to as the "BPC license") or CID that was sent to the user's computer from the Clearinghouse is sent back to the Clearinghouse along with the PID and HWID as part of the license request.[11] (Swami Decl. ¶ 17.) However, the user's computer does not generate the license or CID; it merely sends back to the Clearinghouse the license or CID that it originally received from the Clearinghouse. (*Id.*)

In the case of most reactivation requests, the Clearinghouse does not do anything with the license or CID that is sent back. (*Id.*) However, for certain versions of Office XP that were formerly sold on a subscription basis, where there was a request to reactivate such Office XP software due to a subscription renewal, the license or CID that was sent to the Clearinghouse with the request was compared against the license or CID originally generated by the

[11] Uniloc's expert contends that this also occurs with Microsoft Windows software, but it does not. (MUF ¶ 21; Gunyakti Decl. ¶ 25.)

Clearinghouse. (*Id.*) Uniloc contends that, in the reactivation context, either the BPC license or the CID is a licensee unique ID.

**7. Product Key hash (Windows Only; Telephone and Internet)**

Beginning with Microsoft Windows Service Pack 1,[12] and in all subsequently released accused Windows products, Microsoft introduced the feature of Product Key Hash. (Gunyakti Decl. ¶ 26; Swami Decl. ¶ 18.) This feature is only present in Windows products. (MUF ¶ 22; Hughes Decl. 27.) Uniloc contends that the Product Key hash is a licensee unique ID. However, Uniloc's expert, Mr. Klausner, conceded at his deposition that the Product Key hash, standing alone, is not unique. (Braden Decl. ¶ W; January 11, 2006 Deposition Transcript of Mr. Klausner ("Klausner Tr."), 130:1-18.)

In internet activation, the Product Key input by the user during installation is sent to the Clearinghouse. (Gunyakti Decl. ¶ 27.) The Clearinghouse processes the Product Key with a [redacted] hashing algorithm to generate a Product Key hash. (MUF 23; Swami Decl. ¶ 19.) As noted above, Uniloc has conceded that this particular hashing algorithm is not the same as or equivalent to Uniloc's claimed summation algorithm.

The Product Key hash is compared against a table of valid Product Key hashes that has been provided to the Clearinghouse by Microsoft. (*Id.*) If the Product Key hash generated by the Clearinghouse does not match one of the Product Key hashes in the table, activation will not proceed. If activation proceeds, the Product Key hash from the table is sent back to the user's computer. (*Id.*) Upon receiving the license and during subsequent boots of the activated software, the software on the user's computer will run the Product Key originally entered by the user during installation through a [redacted] hashing algorithm to generate a Product Key hash.

---

[12] Microsoft periodically makes Service Packs available for its software. These packages include updates to its software and are released to customers of the software.

(MUF ¶ 24; Gunyakti Decl. ¶ 27.) This Product Key hash is then compared against the Product Key hash returned from the Clearinghouse. (*Id.*)

In telephone activation, the software on the user's computer uses the [redacted] hashing algorithm to generate a shorter version of a Product Key hash, which is then sent to the Clearinghouse as part of the IID. (MUF ¶ 25; Gunyakti Decl. ¶ 28.) The Clearinghouse compares this Product Key hash against the table of valid Product Key hashes. (MUF ¶ 25; Swami Decl. ¶ 20.) If a match is found, the Clearinghouse sends the Product Key hash found in the table back to the user as part of the CID. (*Id.*) On the user's computer, the Product Key originally entered by the user during installation is hashed using a [redacted] hashing algorithm, and the result is compared with the Product Key hash returned as part of the CID. (MUF 27; Swami Decl. ¶ 21.)

In sum, with the Product Key hash, there is never a comparison between a value generated on the user's computer and a value generated at the Clearinghouse. (MUF ¶ 27; Swami Decl. ¶ 21.)

#### 8. Product Key Authenticator (Office 2003 Only; Telephone and Internet)

In Microsoft's Office 2003 products only, the 25-character Product Key entered by the user during installation includes a Product Key authenticator. (MUF ¶ 28; Braden Decl., Ex. W, Klausner Tr., 135:15-21; Hughes Decl. ¶ 28.)

When a user chooses to activate Office 2003 products over the internet, the 25-character Product Key is sent to the Clearinghouse along with the PID and HWID as part of the license request. (Hughes Decl. ¶ 28.) The Product Key authenticator is embedded within the Product Key. (*Id.*) The Clearinghouse extracts the Product Key authenticator from the Product Key and validates it using a secret known only to the Clearinghouse. (*Id.*) Activation will only proceed if

the Product Key authenticator is successfully validated. (*Id.*) The Product Key authenticator is ***not*** sent back to the user's computer as part of the license. (*Id.*) The Product Key authenticator is never extracted on the user's computer when the user activates over the internet. (MUF 29; Hughes Decl. ¶ 28.)

When a user chooses to activate Office 2003 products over the telephone, the software on the user's computer extracts the Product Key authenticator from the 25-character Product Key and used to generate the IID. (Hughes Decl. ¶ 28.) The Clearinghouse then validates the Product Key authenticator as described in the preceding paragraph. (*Id.*) The Clearinghouse never extracts the Product Key authenticator from the Product Key when the user activates over the telephone. (MUF ¶ 30; Hughes Decl. ¶ 29; Braden Decl., Ex. W, Klausner Tr., 138:1-4; 139:3-6.) The Product Key authenticator is ***not*** sent back to the user's computer as part of the CID. (Hughes Decl. ¶ 29.)

Uniloc nevertheless asserts that the Product Key authenticator is a licensee unique ID.

## III. Non-Infringement

### A. Legal Authority

Summary judgment shall be granted where the moving party "shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(b). This rule applies equally to patent cases as to any other case. *Becton Dickenson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed. Cir. 1990); *see also, Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316 (Fed Cir. 2001) (affirming grant of summary judgment of invalidity and non-infringement).

"Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001) (internal citations omitted).

A determination of infringement requires a two-step analysis. The court first construes each asserted patent claim as a matter of law, as this Court has done, and then determines whether each and every limitation of each such claim is found in the accused product. *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998). The first step, claim construction, is a matter of law, while the second step is a question of fact. *TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002). The plaintiff bears the burden of proving infringement by a preponderance of the evidence. *Kahn*, 135 F.3d at 1476-77.

In the context of a motion for summary judgment, "infringement must be shown literally or equivalently for each limitation; general assertions of fact, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden." *TechSearch*, 286 F.3d at 1372. The absence of a single limitation is fatal to the plaintiff's case. *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998). The Court should grant summary judgment where no reasonable fact-finder could find infringement. *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998).

A patent claim may be "literally" infringed, or it may be infringed under the "doctrine of equivalents." "To establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused system." *Netword, LLC v. Cetraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Where an independent patent claim is not infringed, it follows as a

matter of law that any claims depending from that claim are also not infringed. *Wolverine World Wide Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994).

Literal infringement of a limitation written in the means-plus-function format described in 35 U.S.C. § 112(6), "requires that the relevant structure in the accused device … be identical or equivalent to the corresponding structure in the specification." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). The patentee must perform a comparison of the structure in the accused device and the structure in the specification. *Cytologix Corp. v. Ventana Medical Sys., Inc.*, 424 F.3d 1168, 1178 (Fed. Cir. 2005) (reversing jury finding of infringement of claims containing means-plus-function limitations because the patentee "failed to identify the structure in the specification that is the 'temperature controlling means' and compare it to the structure of the accused device."); *see also Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222 (Fed. Cir. 1996) (To establish infringement under § 112, ¶ 6, it is insufficient for the patent holder to present testimony "based only on a functional, not a structural, analysis.").

In the absence of literal infringement, a patentee can in some limited circumstances resort to the doctrine of equivalents. "For infringement by equivalency, all of the elements of the claimed invention or an equivalent thereof must be present in the accused system." *Netword*, 242 F.3d at 1354. If a patentee's theory of equivalents would "vitiate a particular claim element, partial or complete summary judgment should be rendered by the court." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1429 (Fed. Cir. 1997). As with literal infringement, summary judgment on a question of infringement under the doctrine of equivalents is appropriate "when no material fact is in dispute, or when no reasonable trier of fact could find facts whereby the nonmoving party could prevail." *Canton Bio Med., Inc. v. Integrated Liner Techs, Inc.*, 216 F.3d 1367, 1369 (Fed. Cir. 2000).

"The doctrine of equivalents … is not a tool for expanding the protection of a patent after examination has been completed. Thus, prosecution history estoppel limits the range of equivalents available to a patentee by preventing recapture of subject matter surrendered during prosecution of a patent." *Southwall Techs.* at 1579 (internal citations omitted). "Prosecution history estoppel is one limitation on the scope of equivalents that a patentee can claim under the doctrine of equivalents, and it is a question of law." *Bayer AG*, 212 F.3d at 1251 (internal citations omitted). "[E]ven when technological equivalency is present, the patentee is estopped from enforcing the patent against an equivalent process if the inventor surrendered, during the prosecution of the patent application, claim scope which included the now-asserted element or its equivalent." *Canton Bio Med.* 216 F.3d at 1370. "Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002). In addition to estoppel arising from amendment to the patent claims, surrender of subject matter may also arise as a result of argument to secure allowance of a claim. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc).

Even if the accused product would otherwise infringe the patent under the doctrine of equivalents, "there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art." *Wilson Sporting Goods Co. v. David Geoffrey & Associates*, 904 F.2d 677, 683 (Fed. Cir. 1990).

### B. There Is No Licensee Unique ID In Product Activation (All Infringement Theories; All Asserted Claims)[13]

As construed, all asserted claims require a licensee unique ID that is a "unique identifier associated with a licensee." Thus, not only must the licensee unique ID be associated with a licensee, it must also be unique as construed by the Court.

Although Uniloc proposed this construction, it has completely failed in its burden of showing that any of its eight infringement theories meets the requirements of the term. First, Uniloc has identified no evidence that any of the eight alleged licensee unique IDs is in any way "associated with" the licensee of the software. Second, with regard to uniqueness, Uniloc only has evidence with regard to three of its eight theories, namely, the PID (theories 1 and 2) and the IID (theory 3). However, those theories fail in the larger context, since as discussed in Section C below, neither the PID nor the IID is generated on the Clearinghouse side.

We turn first below to the requirement of "associated with," and then to the requirement of uniqueness.

#### 1. The Alleged Licensee Unique IDs Are Not "Associated With A Licensee" (All Infringement Theories; All Asserted Claims)

As noted above, "[e]nsuring end user privacy is a No. 1 design goal for Microsoft with Product Activation." (Braden Decl., Ex. M.) There is absolutely no evidence to show that any one of the eight things that Uniloc says is a licensee unique ID is "associated with" a licensee. To the contrary, any such "association" would be an anathema to Microsoft's repeated commitment to its customers that "Microsoft absolutely respects the privacy of its customers and does not ask for any personally identifiable information to activate a product. Product Activation is completely anonymous." (*Id*.)

[13] Given the array of different claims and infringement theories, we will indicate in each section heading the claims and theories to which the non-infringement arguments discussed in that section pertain.

That Product Activation is in no way "associated with" a licensee is illustrated by two simple hypotheticals. A licensee is free to sell his computer to another party, and thereby transfer his license under Microsoft's software to another party. Although the licensee has changed, Product Activation has no way of knowing that this has occurred, and there is no need to reactivate the software. (MUF ¶ 44; Swami Decl. ¶ 25.) Conversely, if the licensee upgrades his computer hardware to the point where the HWID goes "out of tolerance," then he will have to reactivate the software, even though the licensee in fact remains unchanged. (MUF ¶ 45; Swami Decl. ¶ 26.) These two simple hypotheticals clearly show that the information used by Product Activation depends only on information about the computer, not about the licensee.

Uniloc cannot seriously dispute any of this. Uniloc's expert, Mr. Klausner, does not even attempt to identify any "association" between the licensee and the alleged licensee unique IDs in any of Uniloc's eight theories of infringement, either literally or under the doctrine of equivalents. (*See generally*, Braden Decl. Exs. A and B.) Uniloc's complete failure of proof on this issue in and of itself entitles Microsoft to summary judgment of non-infringement of all of Uniloc's asserted claims. *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001).

Moreover, Microsoft submits that the term "associated with" requires a predetermined relationship between the alleged unique identifier and the licensee, and that there is also no such predetermined relationship with regard to the licensee and the licensee unique IDs in any of Uniloc's eight infringement theories. That was the conclusion of the court in *Solaia Tech. LLC v. ArvinMeritor, Inc.*, 2005 U.S. Dist. LEXIS 6163, *22-23 (D. Ill. 2005), in construing "associated with" in the context of the patent in that case. The court there began by noting that "[t]he plain meaning of 'associated' is 'connected with something else.' The New Oxford

American Dictionary 97 (Elizabeth J. Jewell and Frank Abate eds., 2001); see also *id*. (definition of 'associate' includes '(usu. be associated) connect (something) with something else because they occur together or one produces another')." *Id*. at *22. The court further reasoned that, absent a predetermined relationship, the phrase "associated with" was meaningless:

> Without some kind of pre-defined connection between each PLC and one or more message registers, the phrase "associated with" is doing no work in the claimed function. "All the limitations of a claim must be considered meaningful," *Unique Concepts*, 939 F.3d at 1562, and a construction which reads out a limitation is improper. Thus, the Court construes the claim limitation "a plurality of message registers, of which at least one of said message registers is associated with each of said programmable logic controllers" to mean "at least one, but not less than two message registers, of which at least one of said message registers has a predetermined connection with each PLC.

Id. at *23-24.

The requirement of a predetermined relationship between the licensee and the licensee unique ID is wholly consistent with, and supported by, the intrinsic record. (*See, e.g.,* Braden Decl. Ex. F, '216 patent, 7:8-27; FIG. 2b, box C; 9:35-37; and FIG. 4 (describing use of personally identifying information to generate a security key locally and remotely).)

Moreover, as discussed in more detail below in the invalidity section, a broader interpretation of this phrase would render many of the asserted claims invalid, based on prior art that was cited and argued during prosecution of the patent. To distinguish the prior art Wolfe patent, Uniloc took the position that the unlocking key used in Wolfe is not a "licensee unique ID" because it is based on hardware information (information about the user's computer), rather than information about the user as a person. This is what Uniloc's expert, Mr. Klausner, had to say about Wolfe, and why it does not disclose a licensee unique ID:

> Also, Wolfe does not generate a local and remote licensee unique ID because the user's information (such as a telephone number, Wolfe 8:34-35, 9:15-23) is never input into an identical algorithm local and remote for generating a licensee unique ID. (Wolfe, 8:32-35) I also note that Wolfe was properly characterized by the '216 patent specification that stated that Wolfe discloses "recognition of a

> platform on which licensed software is to be executed" ('216 Patent, 1:59-60) and that Wolfe "does not contemplate or disclose utilization of information which is unique to the user," (*Id*., 1:60-62) because ***Wolfe merely calculates a value based on hardware information.*** ***Therefore, like the "hardware identification code" of Grundy, Wolfe's "permission code" is roughly akin to a "platform unique ID," and is not a licensee unique ID or a security key as required by the claims of the '216 patent. Wolfe does not generate a local or remote licensee unique ID because the user's information (such as a telephone number, Wolfe 8:34-35, 9:15-23) is never input to an identical algorithm local and remote for generating a licensee unique ID.***

(Braden Decl. Ex. C, November 7, 2005 Expert Report of David Klausner ("Klausner 11-7-05 Report" at 34-35; emphasis added.) There thus is no dispute on this core issue. Like Wolfe, Product Activation also "does not generate a local or remote licensee unique ID because the user's information (such as a telephone number, Wolfe 8:34-35, 9:15-23) is never input to an identical algorithm local and remote for generating a licensee unique ID."

**2. Uniloc Has No Evidence Of Uniqueness For Most Of Its Alleged Licensee Unique IDs (Infringement Theories 4-8; All Asserted Claims)**

Uniloc has likewise failed to meet its burden of identifying evidence to show the alleged uniqueness of the licensee unique ID for five of its eight infringement theories. In his expert report on infringement issues, Mr. Klausner, only purports to identify evidence in support of the uniqueness of the PID (theories 1 and 2) and the IID (theory 3). Mr. Klausner identifies no evidence of uniqueness with regard to the abConfID/i64ConfID (theory 4), product key hash (theory 7), or product key authenticator (theory 8). (Braden Decl. Ex. A, Klausner 9-1-05 Report.)

In fact, at his deposition, Mr. Klausner conceded that the Product Key hash is not unique on its own, but rather has to be combined with other information in order to achieve what Mr. Klausner considers to be uniqueness:

> Q: What is it that needs to be combined with the product key hash, in your view, in order for the product key hash to be unique?

> A. Well, for example, there's the hardware ID.
>
> Q. Okay. I don't want examples, actually. I want a complete listing of everything that, in your view, needs to be combined with the product key hash in order for the product key hash to be considered unique, using your definition.
>
> A. So you don't want my example?
>
> Q. No. I want a complete list, actually?
>
> A. Well, I started to give you the list. It's the hardware ID and also the license ID and the issue date. And you don't want examples and you want a complete list, and that's what I remember at this point.

(Braden Decl. Ex. W, Klausner Tr., 130:1-18.)

With respect to the digest/hash of license (theory 5) and BPC license (theory 6), Mr. Klausner's sole basis for concluding that they are unique is the conclusory and unsupported statement that they allegedly "include[] licensee unique information, including the PID and the HWID." (Braden Decl. Ex. A, Exhibit D to Klausner 9-1-05 Report, p. 21; *see also id.*, p. 25.) This speaks only to the inputs to the functions that create the hashes and licenses, not to the outputs of those functions. This statement is thus wholly conclusory, and is insufficient to meet Uniloc's burden of showing that this limitation is met either literally or under the doctrine of equivalents. *TechSearch*, 286 F.3d at 1372 ("general assertions of fact, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden.").

### C. Most of Uniloc's Infringement Theories Do not Meet the Requirement of Using The Same Algorithm To Generate the Licensee Unique ID Locally and Remotely (Infringement Theories 1, 3, 4, 7, and 8; All Asserted Claims)

The Court's claim construction Order confirmed what has been clear since the prosecution of the '216 patent over ten years ago: All of the patent claims unequivocally require that the same algorithm be used to generate the licensee unique ID both locally and remotely. Despite this, Uniloc continues to press four infringement theories that clearly do not meet this "same algorithm" requirement.

### 1. All Asserted Claims Contain The Same Algorithm Requirement

All of the patent claims require generation of a licensee unique ID. All of the claims also require that the licensee unique ID be generated both locally (where the user's computer is located) and remotely (generally, where the software vendor is), and that they be compared for matching purposes. All of the claims also require that the identical algorithm be used both locally and remotely to generate the licensee unique ID. The relevant claim terms containing this requirement are:

- Asserted claims 1, 2, 7-11, 19 and 20 all require "includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID." The Court construed this term to mean "**includes the identical algorithm used by local licensee unique ID generating means to produce the licensee unique ID**." (Dkt. 145, Order re Claim Construction, p. 30.)
- Asserted claims 17 and 18 all require "generated by a third party means of operation of a duplicate copy of said registration key generating means." The Court construed to this term to mean "**generated by a third party's use of a duplicate copy of the registration key generating means.**" (Dkt. 145, Order re Claim Construction, p. 33.)
- Asserted claims 12-16 all require "wherein said registration system is replicated at the registration authority." The Court construed this term to mean "**wherein the registration system attachable to software to be protected is reproduced exactly at the registration authority**." (Dkt. 145, Order re Claim Construction, p. 55.)[14]

[14] As discussed below, the Court construed this term to require more than just that the particular algorithm used to generate the licensee unique ID be identical at both the local and remote locations. The entirety of the registration system must be reproduced, giving rise to an additional dispositive non-infringement argument unique to claim 12.

### 2. Four of Uniloc's Eight Infringement Theories Fail The "Same Algorithm" Requirement (Infringement Theories 1, 3, 4, and 8)

Uniloc's infringement theory numbers 1 (PID) and 3 (IID), do not meet the same algorithm requirement because neither the PID nor the IID is ever generated by the Clearinghouse. (MUF ¶ 8; Swami Decl. ¶ 7.) They are only generated on the user's computer. There is no algorithm, let alone a duplicate or identical algorithm, that is used to generate a PID or Installation ID on the Clearinghouse. (*Id.*)

Uniloc's theory number 4 (abConfID/i64ConfID) does not meet this requirement because the current algorithm Uniloc identifies as supposedly generating the licensee unique ID (FEncryptDecryptUsingPIDHWID) is not identical at the Clearinghouse and on the user's computer. At the Clearinghouse, this algorithm ***encrypts*** data, while on the user's computer, it ***decrypts*** data. (MUF ¶ 12; Swami Decl. ¶ 11; Hughes Decl. ¶ 23; Gunyakti Decl. ¶ 21.) Thus, the encryption algorithm on the remote side takes certain data D, and encrypts it into E. On the local side, the decryption algorithm starts with the encrypted data E, and decrypts it to D. The algorithms are thus the exact ***opposite*** of one another. They also do not have the same outputs: the output of the encryption algorithm is the encrypted value E, and the output of the decryption algorithm is the decrypted value D. E and D are not the same, and are not compared for matching purposes. (MUF ¶ 14; Hughes Decl. ¶ 24; Gunyakti Decl. ¶ 22; Swami Decl. ¶ 12.)

Uniloc's theory number 8 (Product Key authenticator) also does not meet this requirement. During internet activation, the algorithm used to extract the Product Key authenticator from the Product Key is used ***only*** by the Clearinghouse, not by the software on the user's computer. (MUF ¶ 29; Hughes Decl. ¶ 28.) During telephone activation, the algorithm is used ***only*** by the software on the user's computer, not by the Clearinghouse. (MUF 30; Hughes Decl. ¶ 29; Braden Decl. Ex. W, Klausner Tr, 138:1-4; 139:3-6.) Since internet activation and

telephone activation are mutually exclusive, for a given activation, the algorithm will not be executed on both sides to generate licensee unique IDs that must match for activation to occur. (MUF ¶ 31; Hughes Decl. ¶ 30.)

**3. There Is No "Same Algorithm" Under the Doctrine of Equivalents**

During the prosecution of the '216 patent, Uniloc was unequivocal in requiring the use of the same algorithms at both the local and remote computers. As a consequence, Uniloc is now estopped from premising an infringement theory on aspects of Product Activation that do not use the same algorithm on both the local and the remote locations to generate a licensee unique ID.

Specifically, during prosecution in response to a rejection by the patent examiner of all of its then-pending claims over the Grundy prior art patent, Uniloc redrafted the claims such that each independent claim included the requirement that the algorithm used locally (i.e., on the user's computer) to generate a licensee unique ID is replicated remotely for the purposes of remote generation of a licensee unique ID. The amendment of claim 1 is illustrative. Claim 1 as originally filed stated:

> A registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means.

(Braden Decl., Ex. AA, Application, p. 26.)

In its July 26, 1995, Amendment in Response to a March 30, 1995, Office Action, Uniloc canceled pending claim 1 (and the other pending claims) and replaced it with the following claim, which ultimately issued as claim 1. The language of original claim 1 is in plain text; the new language added in the amendment is underlined:

> A registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said local licensee unique ID.

(Braden Decl., Ex. BB, July 26, 1999 Amendment, pp. 1-2.) The remaining independent claims were amended in the same manner to require the same algorithm feature.

In its accompanying argument, Uniloc explained that this change was made to distinguish its claims from the prior art Grundy patent:

> In response [to the examiner's rejection], the Applicant submits herewith redrafted claims, the main claims of which include, broadly, the following two distinguishing limitations:
>
> …
>
> (b) ***The algorithm used to generate locally the "Licensee Unique ID" is replicated remotely for the purposes of remote generation of a separate "Licensee Unique ID" for matching purposes.***

(*Id.*, p. 6; emphasis added.)

Having amended its claims during prosecution to require the same algorithm feature in order to overcome the Grundy rejection and secure allowance of its patent, Uniloc is now estopped from invoking the doctrine of equivalents in a manner that would erase that feature from the claims. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002); *see also Mycogen Plant Science, Inc. and Agrigenetics, Inc. v. Monsanto Co.*, 261 F.3d 1345, 1349 (Fed. Cir. 2001) (finding that that cancellation of a claim and replacement with another claim having an added limitation had the effect of narrowing the scope of the original

claim and therefore should be treated as a claim amendment that created a bar to the doctrine of equivalents with respect to the limitation that was added to the original claim).

### D. Product Activation Lacks a Licensee Unique ID Generating Means (All Infringement Theories; Asserted Claims 1, 2, 7-11, and 17-20)

Other than claims 12-16, all of the patent claims also require a "licensee unique ID generating means" or a "registration key generating means." This Court construed those terms synonymously to mean "**Function: to generate a local or remote licensee unique ID/registration key. Structure: a summation algorithm or a summer and equivalents thereof.**" (Dkt. 145, Order re Claim Construction, p. 25.)

#### 1. Uniloc Does Not Even Contend That Any Of The Algorithms Used To Generate Its Eight Alleged Licensee Unique IDs is a Summation Algorithm or Summer, Or An Equivalent Thereof (All Infringement Theories; Asserted Claims 1, 2, 7-11, and 17-20)

Uniloc has not even attempted to prove that any of the eight things it alleges are licensee unique IDs are generated using either a summation algorithm, or a summer, or an equivalent thereof. In order to prove that a "licensee unique ID generating means" is present in Product Activation, Uniloc must show that the relevant structure in the accused device is identical or equivalent to the corresponding structure in the specification. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). This requires that Uniloc perform a comparison of the structure in the accused device and the structure in the specification. *Cytologix Corp. v. Ventana Medical Sys., Inc.*, 424 F.3d 1168, 1178 (Fed. Cir. 2005). Uniloc's expert performed no such analysis in any of his expert reports. Uniloc thus cannot meet its burden of showing that each and every element of the claims that contain this limitation is met either literally or under the doctrine of equivalents, and Microsoft is entitled to summary judgment of non-infringement of these claims for all of its accused products. *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001) ("Summary judgment must be entered against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (internal citations omitted).

Given that Uniloc has completely failed in its burden, summary judgment of non-infringement of claims 1, 2, 7-11 and 17-20 is warranted on this basis as well.

**2. It is Undisputed that Hashing is Not The Same As Or Equivalent to Summation (Infringement Theories 4, 5, and 7; Asserted Claims 1, 2, 7-11, and 17-20)**

Moreover, with respect to the hashing algorithms used to generate the alleged licensee unique IDs for Uniloc's infringement theory number 4 (digest/hash of license), 5 (BPC license / CID in reactivation), and 7 (product key hash), the undisputed record in this case establishes that these algorithms are not the same as or equivalent to a summation algorithm or summer.

Mr. Timothy Cooper was Uniloc's corporate designee under Fed.R.Civ.P 30(b)(6) on the topic of "the design, development, structure, function, configuration, architecture and operation of any product or technology that practices, employs, implements or embodies, or was capable of practicing, employing, implementing or embodying any claim of the patent in suit." (Braden Decl., Ex. Z, October 5, 2005 Deposition Transcript of Timothy Cooper ("Cooper Tr.", pp. 15-16.)

Mr. Cooper unequivocally testified that an [redacted] is not equivalent to a summing operation. (*Id.*, pp. 107-108) ("Q. So do you consider the [redacted] to be equivalent to a summing operation. A. No."). Mr. Cooper explained that the [redacted] is more complex than a simple summation algorithm:

> Q. What's the mechanism that it [redacted] uses to create the hash?
> A. I don't really know. It's a little cryptography.
> Q. Is it a summing operation that's used to create the hash?
> A. It's not simple. It's like have you heard of check sums? A check sum can be as simple as adding up all the bytes and coming up with a total, but, obviously, if you do that – if byte 10 is an eight and byte 12 is a nine you can change byte nine to an eight and

byte eight to a nine. You will get the same check sum, so it's trivial to circumvent that, [redacted]
**Q. So do you consider** [redacted] **to be equivalent to a summing operation.**
**A. No**.
Q. Why not?
A. Because a summing operation is, to me, means adding things up.
Q. And the [redacted] is more sophisticated?
A. Yes.

*Id.* (emphasis added).

Mr. Cooper likewise testified that [redacted] is not equivalent to summing because, [redacted] (*Id.*, pp. 108-109) ("Q. [redacted] A. It's another hash. Q. Is that like summing? A. No, [redacted]. Q. So [redacted] is not equivalent to summing? A. No.").

Thus, separate and apart from Uniloc's complete lack of evidence of equivalence, Uniloc's corporate representative has admitted ***non-equivalence***. This is an independent basis warranting entry of summary judgment for Microsoft on this issue. *MOSAID Techs. Inc. v. Samsung Elecs. Co.*, 362 F. Supp. 2d 526, 542 (D.N.J. 2005) (summary judgment of no infringement of means-plus-function limitation either literally or under the doctrine of equivalents, where the plaintiff's Rule 30(b)(6) designee admitted that the structure required by the limitation (a PMOS transistor) and the structure embodied in defendant's accused products (an NMOS transistor) were not equivalent; "[t]hus, by MOSAID's own admission, there are more than insubstantial differences between the two types of transistors.").

Further support for non-equivalence is found in the prior art, which had disclosed hashing [redacted] prior to the issuance of the '216 patent. This is relevant because a technology developed before the patent issued but not disclosed in the patent, cannot

infringe a means-plus-function term under the doctrine of equivalence, as a matter of law. *Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1320 n. 2 (Fed. Cir. 1999) ("A proposed equivalent must have arisen at a definite period in time, i.e., either before or after patent issuance. If before, a § 112, ¶ 6 structural equivalents analysis applies and any analysis for equivalent structure under the doctrine of equivalents collapses into the § 112, ¶ 6 analysis."); *see also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1310-11 (Fed. Cir. 1998).

Well before the '216 patent issued, hashing was known in the art as a mechanism for signature validation. (MUF ¶ 33; Wallach Decl. ¶ 4 and Ex. B, [redacted] In addition, as discussed in further detail below, the Grundy patent discloses the use of hashing functions—in the product registration context—to generate values on both the local and remote sides.

Thus, Microsoft's affirmative evidence of non-equivalence provides separate and independent bases warranting entry of summary judgment of non-infringement on Uniloc's infringement theory numbers 5 (digest/hash of license), 6 (BPC license / CID in reactivation), and 7 (product key hash) with regard to claims 1, 2, 7-11, or 17-20, both literally and under the doctrine of equivalents.

### E. Product Activation Provides More Than One Way For A User To Get Into a Licensed "Use Mode" or "Fully Enabled Mode," And So Is Not A "Registration System" and Does Not Have A "Mode Switching Means" (All Infringement Theories; All Asserted Claims)

#### 1. Summary And Overview Of Argument

Uniloc's patent contemplates two modes of operation: an unlicensed mode and a licensed mode. The unlicensed mode is not an unauthorized mode, but is "typified" by demonstration modes. (Braden Decl., Ex. F, '216 Patent, 2:40-48.) For example, a user might freely obtain a copy of software protected by Uniloc's invention. The user can install the software on his computer, but his use of it is limited to a demonstration mode in which features such as print and save are disabled. Although not unauthorized, this initial mode is ***unlicensed***. If the user decides after sampling the software to pay for it, he becomes a ***licensee*** by going through the registration process and agreeing to the software license:

> [A] dialogue box A (in FIG. 2a) is displayed which provides the user with a choice of either seeing a demonstration of the software (which typically has features such as save and/or print disabled) or alternatively an invitation to register ownership/licensee of the software (after which all features of the software are made available to the user).
>
> If the register option is selected or if the user cancels the demonstration in favor of registration, then a contact dialogue box B (in FIG. 2a) is presented on the display 13 which provides a list (stored on disk 10 as part of the registration routine) which provides for example, names and contact numbers of the software publishing company together with other general product information.
>
> Following the user's indication of agreement during display of license details (box B1) to proceed to register, the user can contact the registration center after filling out the registration dialogue box C as detailed below. After selecting "continue", the registration routine begins the first step in the generation of a security key which will be unique to the current copy of the software and to certain features of the environment in which it runs.

(*Id*. at 6:45-68.)

As the patent claims make clear, the ***only*** way to make the transition from the unlicensed mode to the licensed mode is by following the procedure set forth in the claims, i.e., by generating licensee unique IDs locally and remotely using the same algorithm, and comparing

them to determine if they are the same. In short, the registration procedure serves as the gatekeeper, the process by which the user becomes licensed under the software. All of this makes perfect sense in a try-before-you buy implementation such as contemplated in Uniloc's embodiments. (*Id*. at Fig. 7 "demo or buy?"; 7:8-14; "[t]he registration dialogue box C (in FIG. 2b) prompts the user for details unique to that user (including, for example, name, company, address, state, contact number) together with financial details for payment for the purpose of becoming a registered user of the software protected by the registration routine (for example Mastercard or corporate account number details).") If there were instead a way to make the transition from an unlicensed mode of operation to a licensed mode of operation without going through the registration process, then users could become licensees without paying for the software.

Product Activation works in a fundamentally different way. Microsoft's retail customers generally pay for Microsoft's software before installing it, let alone using it. More importantly, as discussed in further detail below, the user becomes a licensee before making any use of the software whatsoever, and also before activating the software. In short, Product Activation has absolutely nothing to do with whether, when, or how a user becomes a licensee. With the accused Microsoft products, the licensing procedure is completed when the user accepts the terms of the EULA, and all use of the product after that is fully licensed. Product Activation is simply done to confirm that the license that already exists is *bona fide*.

This fundamental difference in operation provides yet another independent reason why Microsoft's accused products do not infringe any of the asserted claims either literally or under the doctrine of equivalents.

### 2. Relevant Claim Terms

All of the patent claims include a requirement that software be allowed to run in a "use mode" or a "fully enabled mode" ***only if*** the procedure set forth in the claims is followed.

Claims 1, 2, 7-16, 19 and 20 require a "registration system," which has been construed to mean "a system that allows digital data or software to run in a use mode ***if and only if an appropriate licensing procedure has been followed***." (Dkt. 145, Order re Claim Construction, p. 49; emphasis added.)

Claims 1, 2, 7-11, and 17-20 likewise require a "mode switching means," which was construed under 35 U.S.C. § 112(6) to require: "Function: to permit the digital data or software to run in a use mode / fully enabled mode if the locally generated licensee unique ID / registration key matches with the remotely generated licensee unique ID / enabling key. Structure: program code which performs a comparison of two numbers or a comparator and equivalents thereof." (Dkt. 145, Order re Claim Construction, p. 41.)[15]

Thus, both the "registration system" and the "mode switching means" requirements of the claims are the gatekeepers that determine whether the software is able to run in the "use mode" or the "fully enabled mode," which the Court has construed synonymously to mean "a mode that allows full use of the digital data or software in accordance with the license." (Dkt. 145, Order re Claim Construction, p. 36.)

[15] Each of the claims in which the "mode switching means" term appears include an express requirement that the digital data or software be permitted to run in a use mode / fully enabled mode ***only if*** the locally generated licensee unique ID / registration key matches with the remotely generated licensee unique ID / enabling key. The Court's claim construction did not reflect the "only if" requirement expressly present in all of the claims, and as found in Microsoft's proposed construction. Since nothing in the Court's analysis of this claim term suggests that it intended to read the "only if" requirement out of the claims, Microsoft requests that the Court clarify its construction in this respect; i.e., "Function: to permit the digital data or software to run in a use mode / fully enabled mode only if the locally generated licensee unique ID / registration key matches with the remotely generated licensee unique ID / enabling key. Structure: program code which performs a comparison of two numbers or a comparator and equivalents thereof."

### 3. Product Activation Is Not A "Registration System"

Uniloc's infringement theories attempt to equate Microsoft's Product Activation process with a licensing procedure. Not so. Product Activation is not the procedure by which users become licensed to use Microsoft's products. Microsoft's products are licensed when a user clicks on the box on his screen during installation, assenting to the terms of the product's EULA. (MUF ¶ 36.) *Lan Sys. v. Netscout Serv. Level Corp.*, 183 F. Supp. 2d 328, 339 (D. Mass. 2002) ("click-wrap" license are an appropriate way to form a software license contract; "i.LAN explicitly accepted the clickwrap license agreement when it clicked on the box stating 'I agree.'"); *see also ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1450, 1452-53 (7th Cir. 1996); *Novell, Inc. v. Unicom Sales, Inc.*, 2004 WL 1839117, *11 (N.D.Cal. 2004) (shrink wrap licenses "are no less enforceable than any other type of contract.")

There is no dispute on this. Uniloc's expert, Mr. Klausner, agrees that licensing is separate from, and precedes, activation:

> Microsoft Windows is a software product that is licensed to Microsoft Customers according to the Microsoft End User License Agreement ('EULA') that is presented to the user during installation of Windows. … During installation, the Microsoft Customer is asked to accept the Microsoft EULA License.
>
> * * *
>
> After installation and during or after the Activation Period [Mr. Klausner's misnomer for the grace period], the Customer can choose to Activate Windows.

(Braden Decl. Ex. A, Klausner 9-1-05 Report, at 5-6. *See, e.g.*, *id*. at 8-10 (same for Office installation and activation).)

Product Activation thus indisputably takes place independent of and after the licensing procedure. Product Activation is thus not a "registration system" as required by claims 1, 2, 7-16, 19 and 20.

### 4. The Grace Period Available After Installation Is A Fully Licensed "Use Mode"

Once licensed, the user is allowed to use the software in its fully functional mode during the specified grace period, without going through Product Activation. (MUF ¶2; Hughes Decl. ¶ 8; Gunyakti Decl. ¶ 7.) The grace period is thus "a mode that allows full use of the digital data or software in accordance with the license," and thus is a "use mode"/"fully enabled mode."

It is true that the grace period is limited, either in time (30 days for Windows), or in number of product launches (50 for Office). (MUF ¶¶ 3-4; Gunyakti Decl. ¶ 7; Hughes Decl. ¶ 8.) But that does not mean that the user is not fully licensed prior to activation. For example, the EULA for Windows XP Home makes clear that the user is only granted a license for 30 days, with any use after that being contingent upon activation:

> Mandatory Activation. The license rights granted under this EULA are limited to the first thirty (30) days after you first install the Software unless you supply information required to activate your licensed copy in the manner described during the setup sequence of the Software.

(Braden Decl., Ex. CC, MS-U 533509.) (emphasis in original.) [16]

That a license is conditioned, and may terminate after a set period, does not change the fact that the user is fully licensed prior to termination. The duration of the license is simply one of many terms and conditions of the license. In the case of the license quoted above, if the user elects not to activate, his license terminates in 30 days. That is all that the license entitles him to, i.e., that use for 30 days is "full use … ***in accordance with the license.***" The user would not at that point have any basis to demand that Microsoft supply him with a copy of the software with the Product Activation feature disabled, on the theory that he "bought" the right to use the

[16] Identical or near identical language is found in the EULAs for the accused products identified in ¶ 21 of the Braden Declaration. *See* Braden Decl. Ex. CC. EULAS for the products identified in ¶ 22 of the Braden Declaration contain similar language. *See* Braden Decl. Ex. DD. EULAS for the products identified in ¶ 23 of the Braden Declaration contain similar language. *See* Braden Decl. Ex. EE. Aside from Plus! Digital Media Edition, which does not have a grace period, the EULAs for only three accused products – Visual Studio.Net, Office 2000 SR-1 and Office 2000 SR-2 – do not contain this type of language.

software forever and so it is improper to restrict the duration of his license for failure to satisfy a condition imposed by the license. He got exactly—and fully—what the EULA provided. Conversely, if the user elects to activate, there is no need for him to assent to an additional or different EULA. The user's use both before and after activation constitutes full enjoyment of his license rights as provided by the EULA.

Moreover, even after activation, the user's rights under the EULA remain conditioned, just as his rights before activation are conditioned.[17] If after an initial activation the hardware on the user's computer is changed to a sufficient degree that it goes "out of tolerance," the software will have to be reactivated. (MUF ¶ 5; Hughes Decl. ¶ 12; Gunyakti Decl. ¶ 10.) If it is not, the user will no longer be able to make full use of the software. If Uniloc's theory that the period before initial activation is not a "use mode" because the license is conditioned were accepted, then it would follow that the period prior to reactivation is also not a "use mode," because the licensed is conditioned during that period as well. Indeed, on Uniloc's theory, the software would never enter the "use mode" (which would be a different, but just as dispositive, basis for summary judgment of non-infringement). With Product Activation, the user's rights under the license are ***always*** conditioned; there is no point in time where he is granted the right to use the software forever. This underscores that the periods before and after activation, and before and after any subsequent reactivation, are all "use modes," because all are under the auspices of the EULA that was agreed-to at the outset, during installation.

[17] The only difference between the two is that the condition imposed before activation (passage of time in the case of Windows) is perhaps more likely to occur than the condition imposed after activation (changing the hardware to a degree that it goes out of tolerance). But there is no basis in the patent, or elsewhere in the intrinsic record, for parsing "use mode" on that basis. In both instances, the EULA imposes conditions that if not met will preclude the licensee from making further use of the software.

### 5. Product Activation Lacks A "Mode Switching Means"

Like the "registration system," the "mode switching means" serves as a gatekeeper. It permits use of the software in the use mode ***only if*** the licensee unique ID generated on the local side is the same as the licensee unique ID generated on the remote side using the same algorithm. Since the grace period is a "use mode," and since there is absolutely no need to go through Product Activation to enter the use mode, Product Activation lacks the required mode switching means.

### 6. Product Activation Does Not Infringe Any of the Asserted Claims Under the Doctrine of Equivalents

By requiring that digital data or software be executable in a use mode "only if" the Uniloc licensing procedure is followed, Uniloc specifically excluded systems that allow use of the software in a use mode without going through such a procedure. The Federal Circuit has held that "by defining the claim in a way that clearly excluded certain subject matter, the patent implicitly disclaimed the subject matter that was excluded and thereby barred the patentee from asserting infringement under the doctrine of equivalents." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346 (Fed.Cir.2001); *see also Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed.Cir.2005) (affirming summary judgment of non-infringement and stating that "To hold that 'unmounted' is equivalent to 'mounted' would effectively read the 'mounted on' limitation out of the patent."); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed.Cir.2000) (affirming summary judgment of non-infringement and stating "it would defy logic to conclude that a minority--the very antithesis of a majority--could be insubstantially different from a claim limitation requiring a majority, and no reasonable juror could find otherwise."); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149

F.3d 1309, 1317 (Fed.Cir.1998) (subject matter is "specifically excluded" from coverage under the doctrine of equivalents if its inclusion is "inconsistent with the language of the claim").

### F. Further Non-Infringement Arguments

#### 1. Product Activation Does Not Meet The Requirement of "Said Registration System is Replicated at the Registration Authority" (All Infringement Theories; Asserted Claims 12-16)

Asserted claims 12-16 include the requirement that "said registration system is replicated at the registration authority." The Court construed this requirement to mean "wherein the registration system attachable to software to be protected is reproduced exactly at the registration authority." (Dkt. 145, Order re Claim Construction, at 55.) In doing so, the Court specifically rejected Uniloc's broad construction that the registration authority merely "also has a system that generates a security key." (*Id.*)

Uniloc has adduced no evidence that the alleged registration system is reproduced exactly at the registration authority.

In fact, it is undisputed that many functions performed by what Uniloc contends is the registration system are not reproduced at the registration authority. Specifically, Uniloc alleges that Microsoft's Product Activation is the "registration system attachable to the software to be protected" of these claims. (Braden Decl. Ex. A, Ex. D to Klausner 9-1-05 Report, at 63.) It is undisputed that, on the user's computer, Microsoft's Product Activation has a mechanism that (1) allows the software to continue to operate in its fully functional mode after the expiration of the grace period if the software has been activated and the HWID remains within tolerance, and (2) restricts use of the software if these requirements are not met. (MUF ¶ 40; Braden Decl. Ex. A, Ex. D. to Klausner 9-1-05 Report, p. 45.) It is also undisputable that this same mechanism is ***not*** reproduced at the registration authority. (MUF ¶ 41; Swami Decl. ¶ 23.)

It is likewise undisputed that Microsoft's Product Activation provides a user interface on the user's computer that offers options for activating over the internet or over the telephone. (MUF ¶ 42; Klausner 9-1-05 Report, at 6 and 9-10.) This too is not reproduced at the registration authority. (MUF ¶ 43, Swami Decl. ¶ 24.)

In short, what Uniloc alleges to be the "registration system attachable to the software to be protected" is not reproduced exactly at the registration authority. Microsoft's accused products therefore do not infringe asserted claims 12-16 for this reason as well.

Microsoft's accused products also do not infringe asserted claims 12-16 under the doctrine of equivalents, as a matter of law. The doctrine of equivalents may not be used to "vitiate a particular claim element". *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1429 (Fed. Cir. 1997). If a patentee's theory of equivalence would do so, "partial or complete summary judgment should be rendered by the court." *Id.* Here, given the consensus that multiple steps performed by Product Activation on the user's computer are not performed at the Clearinghouse, any theory that Microsoft's accused products meet this limitation would vitiate the "replicated" requirement of these claims. Accordingly, there can be no infringement under the doctrine of equivalents.

### 2. Product Activation Does Not Use Information Associated With an *Intended* Licensee (All Infringement Theories; Asserted Claims 12-18)

Asserted claims 12-18 require that that the licensee unique ID be generated from "information … which uniquely identifies an intended registered user" or "information unique to an intending user." The Court construed the former term to mean "information that is uniquely

associated with a person who intends to become a licensee so as to access full functionality of the digital data." (*Id.*, p. 22.)[18]

As noted above, there is no dispute that a user is licensed *before* activation takes place. (MUF ¶ 36.) Thus, no information associated with a person who ***intends to become a licensee*** is used in Microsoft's Product Activation. Thus, even accepting *arguendo* Uniloc's erroneous contention that information associated with the person activating the software is used in Product Activation—a point that Microsoft disputes in the following section—this would still not be information associated with a person who ***intends*** to become a licensee. Rather, it would be information associated with a person who is ***already*** a licensee. This required feature of claims 12-18 is thus also absent from Product Activation.

#### 3. Product Activation Does Not Have or Use Information or Identifiers "Associated With" A Licensee or Intended Licensee (All Infringement Theories; Asserted Claims 12-18)

On the Court's constructions, discussed in the preceding section, the inputs to the algorithm must include "information that is uniquely associated with a person who intends to become a licensee so as to access full functionality of the digital data."

With regard to all eight infringement theories, Uniloc's expert maintains that only the Hardware ID and the Product Key constitute information unique to the user:

> Q. Other than product key and hardware ID, are there any other pieces of information unique to the user that are used in the accused product activation technology?
>
> A. I don't think so.

(Braden Decl. Ex. W, Klausner Tr., 116:21-117:1.)

---

[18] Although the Court did not expressly construe the latter term, given the similarity of the language and the Court's rationale in reaching its construction, Microsoft submits that the same construction should apply.

Neither theory is correct. No association exists between the product key and the user at any time. No association exists or is created between the user and the HWID when the HWID is generated. (MUF ¶ 7; Gunyakti Decl. ¶ 12; Hughes Decl. ¶ 14.) Similarly, when the Clearinghouse receives the PID (derived from the Product Key) and HWID from the user's computer during activation, there is no way for the Clearinghouse to "associate" those pieces of information with the user. For example, there is no database that the Clearinghouse can consult, based on the PID, the HWID, or both, to determine who is making the request for activation. The PID and HWID are not like a credit card number, or a social security number, in which there is a predetermined relationship that associates them with a particular person. (Braden Decl., Exs. K, L, and M.) The information that the Clearinghouse receives from the user's computer during activation is completely anonymous, and is not tied to the user in any way known to the Clearinghouse. (*Id.*)

It is undisputed that the HWID is derived from information about the computer on which software is installed, while the Product Key is information provided by the software vendor, Microsoft. (MUF ¶¶ 6 and 1; Hughes Decl. ¶ 14; Gunyakti Decl. ¶ 12; Braden Decl. Ex. W, Klausner Tr., 50:1-13.) As Uniloc's claim construction briefing and presentation made clear, both parties agree that (1) hardware information, (2) vendor information, and (3) user information are three separate and distinct categories of information. That distinction is also found in the patent claims, through claim differentiation, as well as in the distinctions that Uniloc made over the prior art. Uniloc's infringement contentions seek to erase that careful distinction. We address the HWID and the Product Key in detail separately below.

**a. The HWID is Not "Associated With" a Person**

The Hardware ID is a non-reversible hash function based on information about various hardware components of the computer on which the Microsoft software is installed:

> ***To ensure the end user's privacy***, Microsoft uses a one-way mathematical algorithm to create the hardware hash used by Product Activation to create the Installation ID. Once created, the hash information cannot be calculated back to its original values. Hardware information is sent through the algorithm in the software on the PC-not at Microsoft-to create the hash. The raw hardware information is not known or sent to Microsoft. ***Ensuring end user privacy is a No. 1 design goal for Microsoft with Product Activation.***

(Braden Decl., Ex. M; emphasis added.)

Thus, it is not even possible to identify a particular computer using the HWID hash.

Moreover, even if it were, a computer does not uniquely identify a person. A computer can be used by multiple people. It is thus beyond dispute that an identifier based on hardware components of a computer is not "information that is ***uniquely*** associated with a ***person*** who intends to become a licensee so as to access full functionality of the digital data."

Claims 14 and 18 further underscore that information derived from computer hardware is not information associated with a person. Those claims depend respectively from claims 12 and 17 (the two independent claims that impose the requirement of "information that is uniquely associated with a person who intends to become a licensee so as to access full functionality of the digital data"), and add the further requirement that, in addition to information unique to the intended user, the licensee unique ID is *also* generated from information provided by "the environment in which the software to be protected is to run," i.e., Hardware ID. ('216 Patent, claims 14 and 18.) In short, the dependent claims make clear that HWID information is different than information uniquely associated with a person. Under the doctrine of claim differentiation, "information that is uniquely associated with a person who intends to become a licensee so as to access full functionality of the digital data" should thus not be construed so broadly as to encompass HWID information. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) citing *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir.

2001) ("the presumption that an independent claim does not have a limitation that is introduced for the first time in a dependent claim 'is *especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim*, and one party is urging that the limitation in the dependent claim should be read into the independent claim'") (emphasis added).

The background of Uniloc's patent also draws this distinction. For example, in distinguishing the Wolfe patent, U.S. Patent No. 4,796,220, the Uniloc patent states:

> U.S. Patent No. 4,796,220 does not contemplate or disclose utilization of information which is unique to the user or intended licensee as part of the registration process ***which is to be distinguished from identification of the platform on which the software is proposed to be run***.

(Braden Decl. Ex. F, '216 Patent, 1:60-65) (emphasis added.)

There thus cannot be any genuine dispute that the HWID of Microsoft's accused products is not "information … which uniquely identifies an intended registered user" or "information unique to an intending user."

**b. The Product Key is Not "Associated With" a Person**

The Product Key is also not "associated with a person who intends to become a licensee so as to access full functionality of the digital data." As described above, the Product Key is a 25-character number found on the back of the CD case. The product key is attached to individual copies of Microsoft software products by Microsoft or an authorized Microsoft replicator. (MUF ¶ 1.) At the time of manufacture, of course, neither Microsoft nor the replicator has any idea who will ultimately buy a given copy of software. After a sale, the fact that the customer has paid for something that has a particular number on it does not mean that the number is associated with that customer. If this were the case, any product serial number would immediately become "associated with" the product purchaser, and the "associated with"

limitation would cease to have any meaning. *Solaia Tech*, 2005 U.S. Dist. LEXIS 6163, *22-23 ("Without some kind of pre-defined connection between each PLC and one or more message registers, the phrase 'associated with' is doing no work in the claimed function."). Purchasing a retail copy of Microsoft's software does not give Microsoft any information about which person has purchased software with a particular Product Key printed on the back of the CD case, so there is no association of the Product Key with anyone.

Moreover, Microsoft's accused products are licensed for use on a certain number of computers, not by a certain number of users, so there is no expectation that there will be a one-to-one correspondence between Product Keys provided with individual copies of software and users. Multiple users can legitimately use the same software, so that software's Product Key cannot be said to be associated with any one of them.

The Product Key of Microsoft's accused products is therefore not "information … which uniquely identifies an intended registered user" or "information unique to an intending user," and so for this separate reason there is no infringement of any of claims 12-18 by Product Activation.

#### 4. Product Activation Does Not Include A "First Generated" Local Licensee Unique ID Matched With A "Subsequently Generated" Remote Licensee Unique ID (All Infringement Theories; Asserted Claims 1, 2, 7-11)

Independent claim 1 of the '216 patent contains a sequencing requirement, namely, that the "licensee unique ID ***first generated*** by said local licensee unique ID generating means has matched a licensee unique ID ***subsequently generated*** by said remote licensee unique ID generating means." It also contains a matching requirement, construed to mean that "a comparison between the locally generated licensee unique ID/registration key and the remotely generated licensee unique ID/enabling key shows that the two are the same." (Dkt. 145, Order re Claim Construction, at 44.)

Of Uniloc's eight infringement theories, only one (theory 2) arguably meets the requirement that the locally generated licensee unique ID be generated before the remotely generated licensee unique ID. However, the alleged licensee unique IDs are never matched in that theory, so this claim term is not met.

For Uniloc's theory numbers 1 (PID) and 3 (IID), the sequencing requirement is not met for the simple reason that the alleged licensee unique ID is never generated by the Clearinghouse server. (MUF ¶ 8; Swami Decl. ¶ 7.) Similarly, for Uniloc's theory number 8 (Product Key Authenticator), there is never an activation in which the alleged licensee unique ID is generated on both the Clearinghouse server and on the user's computer, so it is never the case that a remotely generated licensee unique ID is generated subsequent to a locally generated licensee unique ID. (MUF ¶ 31; Hughes Decl. ¶ 30.)

For Uniloc's theory number 7 (Product Key hash), the comparison is always made between the Product Key hash and the values in a table. The table is generated long before the Product Key hash is calculated, the opposite of what is required by the claims. (MUF ¶¶ 23-27.)

For Uniloc's theory numbers 4 (abConfID/i64ConfID), 5 (digest/hash of license) and 6 (BPC license/CID in reactivation), the alleged licensee unique ID is first generated by the Clearinghouse then by the user's computer, the opposite of what is required by the claims. (MUF ¶ 13; Hughes Decl. ¶¶ 23, 25-26; Swami Decl. ¶¶ 13-17; Gunyakti Decl. ¶¶ 23-24.)

Finally, for Uniloc's theory number 2 (FullPID), the alleged licensee unique ID prior to March 2003 was generated first on the user's computer as part of the process of generating the IID for telephone activation. However, the "FullPID" generated on the user's computer was never matched with a "FullPID" generated on the Clearinghouse, so the requirement of these claims is not met. (MUF ¶ 10; Hughes Decl. ¶ 21; Gunyakti Decl. ¶ 19; Swami Decl., ¶ 8.)

There is thus no literal infringement of claims 1, 2, and 7-11. Product Activation also does not infringe claims 1, 2 and 7-11 under the doctrine of equivalents. The sequencing requirements of "first" and "subsequent" were added to the claims during prosecution in response to a claim rejection, and so on the basis of the same prosecution history estoppel arguments outlined in connection with the "same algorithm" feature (which was added to the claims at the same time), there is no infringement under the doctrine of equivalents, as a matter of law.

## IV. Invalidity

### A. Legal Authority—Anticipation

Anticipation under 35 U.S.C. § 102 is a question of fact, which a court may resolve on summary judgment if the record reveals no genuine dispute of material fact. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001). Summary judgment is proper if no reasonable jury could find that the patent is not anticipated. *Id.* Microsoft bears the burden of proving anticipation by clear and convincing evidence. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).

To anticipate, a single prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently. *Telemac*, 247 F.3d at 1327; *IPXL Holdings, Inc. v. Amazon.com L.L.C.*, 430 F.3d 1377, 1381 (Fed. Cir. 2005). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." *Telemac*, 247 F.3d at 1327. Although a patent is presumed to be valid under 35 U.S.C. § 282, "a patent may be found to be anticipated on the basis of a reference that had properly been before the patent examiner in the United States Patent and Trademark Office ('PTO') at the time of issuance." *See, e.g., IPXL*, 430 F.3d at 1381 (affirming grant of summary judgment of invalidity for anticipation by reference considered by examiner where district court

held that there could be no genuine dispute that the reference disclosed each limitation of the asserted claims of the patent-in-suit); *Prima Tek II, L.L.C. v. Polypap S.A.R.L.*, 412 F.3d 1284, 1287 (Fed. Cir. 2005).

Microsoft denies infringement and disagrees with Uniloc's strained application of the Court's claim construction against Microsoft's Product Activation. Moreover, Uniloc's flawed attempt to apply the Court's claim construction to Microsoft's Product Activation renders the asserted claims invalid over the prior art. Uniloc cannot have it both ways. Uniloc cannot take inconsistent infringement and invalidity positions with respect to the Court's claim construction. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F3d. 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of was,' be twisted one way to avoid anticipation and another to find infringement."). *See Evans Cooling Systems, Inc. v. General Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997) (patentee's infringement allegation provides basis for invalidating patent).

### B. Under Uniloc's Erroneous Attempt To Distort Its Claims To Cover Product Activation, Claims 12, 13, 19, and 20 of the '216 Patent Are Invalid as Anticipated by U.S. Patent No. 4,796,220 (Wolfe)

Uniloc's attempted application of the claims of its patent to Product Activation is so overbroad that, if accepted, at least claims 12, 13, 19, and 20 of the Uniloc patent would be invalid for anticipation by U.S. Patent No. 4,796,220 (Wolfe).

#### 1. Overview of U.S. Patent No. 4,796,220 (Wolfe)

The Wolfe patent is entitled "Method of Controlling the Copying of Software," was filed on December 15, 1986, and issued on January 3, 1989. Wolfe issued more than one year before September 21, 1992, the earliest possible priority date of Uniloc's patent, and so Wolfe is prior art to Uniloc's patent under 35 U.S.C. 102(b).

Generally, Wolfe's "method of controlling the copying of software" addresses the need of software publishers to collect billing information, register and track copies of software, and

control the authorization and distribution of software to potentially unauthorized users and computers. (*See, e.g.*, Braden Decl. Ex. 4 (hereinafter "Wolfe") Abstract; 1:7-12; 3:7-11; 4:40-68; 8:13-65.) In Wolfe's system, a user must proceed through a software authorization process before being allowed to use a piece of newly installed software. (*Id.*) To begin the process, the software computes a substantially unique "configuration code" derived from the user's computer hardware configuration (*e.g.*, the amount of RAM, the size of the hard disk). (*See, e.g.*, Fig. 2; 6:4-32.) The configuration code and a software serial number are transmitted to a central computer system 12. (*See, e.g.*, Fig. 3; 7:24-26.)

If the software serial number has not yet been registered, it is stored by the central computer system 12, and a "permission code" is generated using the configuration code. The permission code is sent back to the user's computer. (7:29-43; 8:13-68.) The user's computer receives the permission code, and recalculates the permission code based on the hardware in the user's computer. (*See, e.g.*, 5:38-54; "At that point, the user enters the permission code. The control program portion of the software then recreates the generation of the permission code based on the hardware and can compare the internally generated code to the entered permission code.").

The received permission code and the recalculated permission code are then compared. If the permission codes match, the software on the user's computer is authorized for use and allowed to run; if the permission codes do not match, the user is prompted with an error and the software is not allowed to run. (*Id.; see also, e.g.*, 8:50-68.) After a successful authorization, each time the user runs the software, the hardware is checked and the permission code is recalculated using the same algorithm as used on the central computer system 12. (Fig. 3; 5:42-46; 7:43-48.) If the recalculated permission code is the same as the permission code transmitted

by the central computer system 12, then execution of the software is allowed to continue. Otherwise, execution stops. (Fig. 3; 5:45-51; 7:48-52; 8:60-65.)

Although Wolfe is cited on the face of the '216 patent, it was not discussed with the patent examiner during prosecution. The '216 patent, however, refers to Wolfe in its specification, claiming that Wolfe "discloses a system for unique recognition of a platform on which licensed software is to be executed." (Braden Decl. Ex. F, '216 patent, 1:58-60.) The '216 patent attempts to distinguish Wolfe by asserting that Wolfe "does not contemplate or disclose utilization of information which is unique to the user or intended licensee as part of the registration process which is to be distinguished from identification of the platform upon which the software is proposed to be run." (*Id.*, 1:60-65.)

### 2. On Uniloc's Attempted Application Of The Claims To Product Activation, Wolfe Invalidates Claims 12, 13, 19, and 20

Through its technical expert, Mr. Klausner, Uniloc makes essentially the following arguments to distinguish Wolfe: (1) Wolfe is not a registration system for licensing execution of digital data in a use mode; (2) Wolfe lacks a licensee unique ID; (3) Wolfe fails to disclose structure the same as or equivalent to the summer used in the Uniloc patent for creating the licensee unique ID; and (4) Wolfe fails to use the identical algorithm to generate a licensee unique ID locally and remotely.[19] *See generally*, Klausner Expert Report at 34-43.

As indicated above and as discussed in detail below, Uniloc's attempts to distinguish Wolfe fail based on the proper application of the Court's claim construction and/or are inconsistent with the positions taken by Uniloc in trying to apply the Court's claim construction to Microsoft's Product Activation.

[19] Uniloc also tried to distinguish Wolfe by arguing that it requires "that the software on the manufacturer's media be modified." Klausner Expert Report at 35, 41. This is irrelevant; there is no claim limitation in Uniloc's patent that bears on this alleged distinction.

Claim charts applying Wolfe to claims 12, 13, 19, and 20 are set forth in Ex. D of Dr. Wallach's Declaration. (*See also* MUF ¶¶ 46-48 and 91-108.)

**a. Wolfe Discloses a Registration System for Licensing Execution of Digital Data in a Use Mode**

The Court construed "registration system" as a "system that allows digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed." (Dkt. 145, Claim Construction Order at 49.) Wolfe clearly discloses this feature. For example, Wolfe states:

> This invention relates to a method of controlling the copying of computer software and more particularly, to such a method which allows an unlimited number of backup copies of a program to be made for the same machine, but selectively prevents the execution of such backup copies or the original on other unauthorized machines. (1:7-12).
>
> In practice, the manner in which the invention is to be implemented is that the first time the application program is used, a prompt appears on the screen requiring the user to register the program for use on a defined user computer 10 with the owner or the authorizing agent of the owner. (4:40-45)

(*See also* MUF ¶¶ 92 and 93; Wallach Decl., Ex. D at Claim 12[a]; Wolfe, 8:60-68.)

**b. Uniloc's Position That Wolfe Does Not Disclose a Licensee Unique ID is Fundamentally Inconsistent With Its Position That Product Activation Includes a Licensee Unique ID**

The Court construed "licensee unique ID" as "a unique identifier associated with a licensee." In arguing that Wolfe fails to disclose a "licensee unique ID," Uniloc took the position that Wolfe's "permission code" is not a licensee unique ID since it is generated using information about the computer, rather than information about the person:

> ***Wolfe merely calculates a value based on hardware information.*** Therefore, like the "hardware identification code" of Grundy, ***Wolfe's "permission code" is*** roughly akin to a "platform unique ID," and is ***not a licensee unique ID or a security key as required by the claims of the '216 patent***. Wolfe does not generate a local or remote licensee unique ID because the user's information (such as a telephone number, Wolfe 8:34-35, 9:15-23) is never input to an identical algorithm local and remote for generating a licensee unique ID.

(Braden Decl. Ex. C, Klausner 11-7-05 Report at 35; emphasis added.)

Uniloc cannot have it both ways. A patentee cannot read the claims differently for purposes of infringement and validity. *Amazon.com*, 239 F3d. at 1351 ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement."). Uniloc should be held to its admission that hardware information cannot form the basis for a "licensee unique ID," which Microsoft agrees with and which compels summary judgment of non-infringement for Microsoft. Conversely, to the extent Uniloc is permitted to contend that Microsoft's Product Activation has a "licensee unique ID" based on product serial number and hardware information, Uniloc cannot argue that Wolfe's permission code, which is also based on hardware information, is not a "licensee unique ID." (*See* MUF ¶¶ 46, 47, and 94; Braden Decl., Ex. C; Klausner 11-7-05 Report at 34-35; Wallach Decl., Ex. D at Claim 12[b]; Wolfe, 5:1-10; 5:33-42; 8:30-49.)

#### c. Uniloc's Position That Wolfe Does Not Disclose a Licensee Unique ID Generating Means is Fundamentally Inconsistent With Its Position That Product Activation Includes a Licensee Unique ID Generating Means

Uniloc also contends that Wolfe does not disclose structure that is the same as or equivalent to the summer used in the Uniloc patent for creating the licensee unique ID. (Klausner Expert Report at 36 ("there is no corresponding element in Wolfe's that is the same as the Richardson 'summer' ('Seventh Embodiment') because the Richardson 'summer' explicitly creates a '216 patent licensee unique ID.") In fact, the algorithm disclosed in Wolfe is nearly the same as Uniloc's summation algorithm:

> Central computer 12 has many different algorithms it can use to calculate the permission code and the particular one selected relates to the unique Mode Number portion of the configuration code. For example, if the Mode Number is 75, then ***the algorithm to calculate the permission code may be the sum of the RAM size plus the hard disk size, times the percent of free space***. For a different

> Mode Number, a different algorithm using different portions of the configuration code information is used to calculate the permission code.

(Wolfe, 7:31-41; emphasis added.)

Uniloc cannot credibly maintain that Wolfe's algorithm (the sum of the RAM plus the hard disk size times the percent of free space) is not the same or equivalent to a summation algorithm, while at the same time contending that Microsoft's hashing algorithms (which its own 30(b)(6) designee admits are far more complicated than summing) are. (*See* MUF ¶¶ 95, 99 and 100; Wallach Decl., Ex. D at Claim 12[b]; Wallach Decl., Ex. D at Claim 19[a]; Wolfe, 5:38-54; 7:29-56; 8:50-68.) As with the previous subsection, Uniloc should be held to the admission it made in attempting to save its patent from invalidity over Wolfe, and summary judgment of non-infringement entered for Microsoft.

#### d. Wolfe Discloses the Use of the Identical Algorithm to Generate a Licensee Unique ID Locally and Remotely

Contrary to Uniloc's assertions, Wolfe plainly discloses the use of the identical algorithm to generate a licensee unique ID locally and remotely. For example, Wolfe states:

> After the permission code generated by computer 12 is returned to and entered in user computer 10, user computer 10 is able to duplicate, with the appropriate additional information that may be contained in the permission code (or previously included in the control program) **the recalculation of a permission code based on retesting the hardware configuration**. (7:42-48) (emphasis added).
>
> Once the permission code is generated, it is transmitted to the user machine, either directly through modem 16, or to the operator of user machine 10 over the telephone 18. At that point, the user enters the permission code. **The control program portion of the software then recreates the generation of the permission code based on the hardware and can compare the internally generated code to the entered permission code.** (5:38-47) (emphasis added).
>
> The subsequent use, as indicated at block 54, is the recalculation of a permission code by user's computer 10 under the control of the software and, as indicated at block 56, a comparison between the originally entered permission code and the recalculated permission code occurs. (8:52-58).

(*See also* MUF ¶ 96; Wallach Decl., Ex. D at Claim 12[c].)

Thus, in the face of clear evidence to the contrary, Uniloc fails to provide any support for its bald assertion that Wolfe fails to "use the identical algorithm to generate a license unique ID locally and remotely." (Braden Decl. Ex. C, Klausner 11-7-05 Report at 34-43.)

**C. Under Uniloc's Erroneous Attempt To Distort Its Claims To Cover Product Activation, Claims 1, 2, 7-13, 17, 19 and 20 of the '216 Patent Are Invalid as Anticipated by U.S. Patent No. 5,291,598 (Grundy)**

Uniloc's attempted application of the claims of its patent to Product Activation is so overbroad that, if accepted, at least claims 1, 2, 7-13, 17, 19 and 20 of the Uniloc patent would be invalid for anticipation by U.S. Patent No. 5,291,598 (Grundy).

**1. Overview of U.S. Patent No. 5,291,598 (Grundy)**

The Grundy patent is entitled "Method and System for Decentralized Manufacture of Copy-Controlled Software," was filed on April 7, 1992, and issued on March 1, 1994. The Grundy patent is therefore prior art to Uniloc's patent under 35 U.S.C. 102(e).

Generally, Grundy's "method and system for decentralized manufacture of copy-controlled software" describes a system where users can try a software product before they buy it and register the software after they have evaluated it favorably. (*See, e.g.*, Braden Decl. Ex. E (hereinafter "Grundy") 4:27-42.) When a user is ready to buy, he enters his personal information, such as name, address and telephone number, into the software. He also provides this information to the registration system. (*See, e.g.*, 12:36-38.) Also sent to the registration system is a registration code, which includes, among other pieces of information, a checksum of this user information (i.e., "user data cross-reference code") and a hardware identification code, both generated by the user's computer. (*See, e.g.*, 15:3-9.) When it receives the registration code, the remote registration system repeats the checksum calculation on the user information using the same algorithm to create a "user data checksum." (*See, e.g.*, 15:13-16.) If and only if

the locally calculated checksum (i.e., user data cross-reference code) matches the remotely calculated checksum (i.e., user data checksum) will the central authority generate and transmit an authorization code to the user to enable the full functionality of the software product. (*See, e.g.*, 15:17-27.)

When the user's computer receives the authorization code, it extracts the remotely calculated user data checksum from it. (19:53-55.) The user's computer checks that the remotely calculated user data checksum matches the locally calculated checksum (now called an "owner data cross-reference code" because it is being applied at this point to a licensee or software owner) before the full functionality of this software can be used. (19:60-20:5.) The software product on the user's computer also extracts the hardware identification code from the authorization code. (19:53-57.) The software product checks that the current hardware identification code of the user's computer matches the hardware identification code received from the central registration authority. (19:60-65.)

Grundy is cited on the face of the '216 patent and was the subject of rejections during prosecution that led to extensive claim amendments and arguments. Specifically, Uniloc amended all of its claims to require the same algorithm feature, on the false representation that Grundy lacked this feature. Uniloc also emphasized that "the 'Licensee Unique ID' is entirely the product of data generated locally as distinct from data added before delivery of the software to the local location for use (thereby distinguishing over Chou) or subsequently from a remote location (thereby distinguishing over Grundy)." (Braden Decl. Ex. AA, Amendment, at 6-7.)

### 2. On Uniloc's Attempted Application Of The Claims To Product Activation, Grundy Invalidates Claims 1, 2, 7-13, 17, 19 and 20

Through its technical expert, Mr. Klausner, Uniloc makes essentially the following arguments to distinguish Grundy: (1) Grundy lacks a "licensee unique ID;" (2) Grundy's

"checksum" is not the same as or equivalent to the summer disclosed in the Uniloc patent for creating the licensee unique ID; and (3) Grundy fails to use the identical algorithm to generate the licensee unique ID.[20] (See Braden Decl. Ex. C, Klausner 11-7-05 Report, at 13-23.)

As discussed below, and as with Wolfe, Uniloc's attempts to distinguish Grundy fail based on the proper application of the Court's claim construction and/or the inconsistent positions taken by Uniloc in trying to apply the Court's claim construction to Microsoft's Product Activation.

Claim charts applying Grundy to claims 1, 2, 7-13, 17, 19 and 20 are set forth in Ex. C of Dr. Wallach's Declaration. (*See also* MUF ¶¶ 48-90.)

**a. Uniloc's Position That Grundy Does Not Disclose a Licensee Unique ID Generating Means is Fundamentally Inconsistent With Its Position That Product Activation Includes a Licensee Unique ID Generating Means**

Uniloc argues that Grundy's "checksum" is not the same as or equivalent to the summer disclosed in the Uniloc patent for creating the licensee unique ID. (Klausner Expert Report at 16 ("Grundy's "checksum" is not the same as the Richardson "summer" ("Seventh Embodiment") because the Richardson "summer" explicitly creates a '216 patent licensee unique ID.") As with Uniloc's effort to distinguish Wolfe, this position is wholly inconsistent with its infringement contentions.

Grundy discloses that the checksum algorithm that produces the user data cross-reference can be a hashing algorithm. In particular, Grundy states:

> If the user data validity check 502 passes, a checksum of the user data is created 505. This checksum will be used during the Authorization process as a cross-reference to validate the user data as communicated to the Manufacture Control Agency 310 FIG. 3. ***The cross-reference can be a hash value based on only the alphanumeric characters in***

[20] Uniloc also tries to distinguish Grundy by arguing that it requires "that the software on the manufacturer's media be modified." Klausner Expert Report at 15, 21. This argument is irrelevant, as it does not bear on any of the claim limitations, none of which preclude software modification.

> ***the user data.*** (All lower-case letters are converted to upper-case and white space is ignored before the hash value is calculated.) (18:25-34; emphasis added.)

(*See also* MUF ¶¶ 53-57; Wallach Decl., Ex. C at Claim 1[c]; Grundy 12:26-38; 15:13-27; 17:64-18:34.)

Uniloc cannot credibly maintain that Grundy's hashing algorithm is not a licensee unique ID generating means, but the hashing algorithms used in Product Activation are. As with its effort to distinguish the Wolfe reference on this basis, Uniloc should be held to its admission, and summary judgment of non-infringement entered for Microsoft.

**b. Uniloc's Position That Grundy Does Not Disclose a Licensee Unique ID is Fundamentally Inconsistent With Its Position That Product Activation Includes a Licensee Unique ID**

As noted above, the Court construed "licensee unique ID" as "a unique identifier associated with a licensee," adopting Uniloc's proposed claim construction. In arguing that Grundy fails to disclose a "licensee unique ID" Uniloc takes the position that Grundy's "user data cross-reference" checksum is not unique. Without providing any support, Uniloc argues that Grundy never requires that the "user data cross-reference" checksum be unique (or that the input to its algorithm be unique), and that there is no need in Grundy for the "user data cross-reference" checksum to be unique. (*See, e.g.*, Klausner Expert Report at 13-14; "To the extent that Grundy functions, it does so without the "user data cross-reference" checksum being, or needing to be, unique.")

However, Grundy discloses using a hashing function to generate the checksum. Uniloc has never explained how it can be that Grundy's hashing function does not produce a unique output, but the hashing functions it accuses in Product Activation do. Moreover, unlike Product Activation, Grundy uses information descriptive of a licensee similar to that disclosed in the '216 patent as an input to its algorithm. (*See* MUF ¶ 56; Wallach Decl., Ex. C at Claim 1[c]; Grundy

12:26-38.) Uniloc thus inexplicably argues that the hash value in Grundy derived from personal information is not a "licensee unique ID," but hash values in Product Activation that are demonstrably not associated with users in any sense are somehow "licensee unique IDs." Again, Uniloc's inconsistencies warrant a narrow application of "licensee unique ID" that compels summary judgment of non-infringement for Microsoft.

**c. Grundy Discloses the Use of the Identical Algorithm to Generate Licensee Unique ID Locally and Remotely**

Contrary to Uniloc's assertions, Grundy discloses the use of the identical algorithm to generate a licensee unique ID or security key locally and remotely. In particular, Grundy states:

> "The user data cross-reference code as extracted 309 is the checksum originally calculated (505 FIG. 5) from the owner data as entered by the user during the registration process (212 FIG. 2). **A second checksum based on the user data as entered via the input/output device 16 by the Manufacture Control Agency operator is also calculated 309.**
>
> **The user data cross-reference code and the second checksum 309 are compared 310. If these do not match it is an indication that the User Data as entered by the Manufacture Control Agency operator 301 does not match the User Details as originally entered by the new user at step 212.** There is also a possibility that the mismatch could have resulted from a mis-entry of the Registration Code 302. In the event of a mismatch, an error message is displayed 311 and the operator given the opportunity to correct the data entry problems." (15:10-26) (emphasis added).
>
> "If the user data validity check 502 passes, a checksum of the user data is created 505. This checksum will be used during the Authorization process as a cross-reference to validate the user data as communicated to the Manufacture Control Agency 310 FIG. 3. The cross-reference can be a hash value based on only the alphanumeric characters in the user data. (All lower-case letters are converted to upper-case and white space is ignored before the hash value is calculated.)" (18:25-34).

(*See also* MUF ¶ 55; Wallach Decl., Ex. C at Claim 1[c].)

Uniloc fails to provide any support for its bald assertion that Grundy fails to "use the identical algorithm to generate a licensee unique ID locally and remotely." (Klausner Expert Report at 13-23.)

## V. Conclusion

For the foregoing reasons, Microsoft hereby respectfully requests that the Court enter summary judgment on its behalf that all of the claims of U.S. Patent No. 5,490,216 are not infringed by Microsoft, and additionally or alternatively that claims 1, 2, 7-13, 17, 19 and 20 are invalid.

Dated: September 23, 2006 By: ____/s/__Joseph V. Cavanagh_____________

Joseph V. Cavanagh, Jr. #1139
BLISH & CAVANAGH
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903
(401) 831-8900 (Telephone)
(401) 751-7542 (Facsimile)
Attorneys for Defendant
MICROSOFT CORPORATION

Frank E. Scherkenbach, Esq.
Kurt L. Glitzenstein, Esq.
Laura R. Braden, Esq.
FISH & RICHARDSON, P.C.
225 Franklin Street
Boston, MA 02110-2804
(617) 542-5070 (Telephone)
(617) 542-8906 (Facsimile)

Isabella Fu, Esq.
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399
(425) 882-8080 (Telephone)
(425) 936-7329 (Facsimile)