matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.

- Claim 1 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.
- Claim 2 element "wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 7 element "said system further including platform unique ID generating means, wherein said mode switching means will permit

said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed" for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data (e.g., the CIA is hardware-generated).

- Claim 8 element "wherein said platform unique ID generating means comprises part of said digital data when executed on said platform" for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data (e.g., the CIA is hardware-generated).
- Claim 9 for the same reasons as for Claim 7 bulleted above and the independent claim on which it depends.
- Claim 10 for the same reasons as for Claim 1.
- Claim 11 element "said system including local licensee unique ID generating means" for the same reasons as for Claim 10.
- Claim 12 element "said registration system generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed" for lacking a security key. See also the reasons in the bullet points for Claim 1, above.

- Claim 12 element "and wherein said registration system is replicated at a registration authority" for lacking a security key, and for failing to use the identical algorithm to generate a security key locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 13 element "wherein said security key is generated by a registration number algorithm" for lacking a security key. See also the reasons in the bullet points for Claims 1 and 12, above.
- Claim 14 element "wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 15 element "wherein said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 16 element "wherein said environment details comprise at least one element which is not user-configurable on the platform" for the

same reasons as for Claim 15 bulleted above and the independent claim on which it depends.

- Claim 17 element "said method further comprising providing registration key generating means adapted to generate a registration key which is a function of information unique to an intending user of the software" for lacking a licensee unique ID.
- Claim 17 element "said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key" for lacking a licensee unique ID.
- Claim 17 element "and wherein said enabling key is communicated to said intending user at the time of registration of said software" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 18 element "wherein said registration key is also a function of the environment in which said software is installed" for lacking a licensee unique ID. See also the reasons in the bullet points for Claims 1, 12, and 17, above.

- Claim 19 preamble "A remote registration station incorporating remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 20 element "said system including local licensee unique ID generating means and remote licensee unique ID generating means"

for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 20 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 20 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

It is my opinion that the asserted claims of the '216 Patent are not anticipated and are not obvious in view of Kuhn. I also disagree with Dr. Wallach that it would have been obvious to combine this reference with any other reference(s) to make obvious the '216 Patent. (See discussion below in V.i.).

g. Dr. Wallach's Sixth Reference - Medveczky

I disagree with Dr. Wallach that Medveczky anticipates or makes obvious the claims of the '216 Patent. Medveczky is in the class (380/4 and 380/25) that was searched by the Examiner during the prosecution of the '216 Patent and therefore was likely seen by the Examiner and was considered as no more material than the prior art that was already of record. (e.g., Chou) Medveczky teaches away from software means for protecting software such as the '216 patent, relying instead on hardware means. (Medveczky, 2:14-54, including stating, "In general, it can be stated as a mathematical truism that efforts to prevent piracy in software terms alone are defeatable;" and 6:1-3) Also, Medveczky teaches a hardware dongle (Medveczky, Abstract (security device), 3:61-4:14) that is no more material to the '216 Patent than the prior art before the Examiner, and that hardware dongle is not part of the digital data on the platform per the '216 Patent. My knowledge of hardware dongles includes that they tended to be expensive at the time of the filing of the '216 Patent, and Medveczky teaches away from the software means '216 Patent when he mentions that a system that does not rely on a dongle would be impractical. (Medveczky 2:26-42; 6:1-3) To the extent that Dr. Wallach argues that the (ASIC) dongle could store information unique to the user, I disagree that that would have been a workable implementation because each hardware (ASIC)

dongle would have had to be custom "fitted" to each user and that would have been prohibitively expensive. Medveczky generates a password from information preexisting in the software and the hardware configuration, rather than from licensee unique information. (*Id*., 3:35-51) To the extent that the software information used in this process is alleged to be unique, this mechanism would be no different than that of Chou. Medveczky does not teach a unique licensee unique ID generated from information unique to the user. (*Id*., 4:59-5:5, and system identifier at *Id*. 6:18-26). Instead, Medveczky relies on hardware devices for security and for any uniqueness and does not teach user information as part of the functions cited by Dr. Wallach. Also, Medveczky does not teach or motivate to generate an ID that is unique to the user. Medveczky teaches that the dongle/ASIC is hardware and Dr. Wallach considers that the information in this device is part of the platform identifier. Therefore, the dongle's information is not licensee unique information because it belongs to the hardware, much like the hard drive and the associated ID in the '216 patent. Medveczky does not appear to teach a platform unique ID that uses platform information, or that is part of the digital data. Also, Dr. Wallach 's alleged platform unique ID is not generated by the digital data. Medveczky does not teach performing a check for mode switching at a subsequent boot. Medveczky's VAL PASS deliberately slows down execution of the software and would not be used by a POSA. (*Id*., 7:20-34) Also,

Medveczky fails to teach, and Dr. Wallach has failed to show, that the generic symbol "*f*" for a function means the identical function at the local and remote locations. Also, Medveczky 's "installation identification code" is not computed from within the digital data and is also not a licensee unique ID. Also, Medveczky is not enabled because it does not define the "installation type" used in the calculations. I disagree with Dr. Wallach that "… it would have been obvious to one of ordinary skill in the art at the time of the invention that L1 and L2 could be generated entirely from local information about the user, including the user identification (6:3-26, 8:22, 8:29, Fig. 3 item 310) or billing/invoice information (6:44-45, Fig. 3 items 430, 435)" because use of the secret information in the hardware dongle is essential to the embodiments of Medveczky and there is no benefit to using user information for the same security purposes Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would consider user information in place of or in addition to hardware information, or that such a system was possible.

In addition, Medveczky is not enabled because it fails to teach how to create the L2. I disagree with Dr. Wallach that "To one of ordinary skill, at the time of the invention, it' s obvious that the computation could occur in either order, so long as the L1 computation is not dependent on any information provided by the server. In Medveczky, there is no such dependence (7:1-12, 8:28-32, see also, Fig.

4 item 590: 'Calculate L1')." Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this. Also, as I have previously stated Medveczky is not enabled because it fails to teach how to create the L2. Medveczky also fails to teach that L1 and L2 are unique.

I disagree with Dr. Wallach to the extent that he argues for Claim 12 of the '216 Patent that a Medveczky "checksum" is unique. Medveczky would operate, to the extent it does operate, with a non-unique checksum. Medveczky uses a non-unique checksum only to find transmission errors between and among the user's hardware components, including the dongle, and Medveczky does not use the non-unique checksum as a licensee unique ID. (*Id.*, 8:60-64) Calculating a checksum is distinguished from the format check cited by Dr. Wallach. I disagree with Dr. Wallach that "… the use of this user information in its registration algorithm … would have been obvious to one of ordinary skill in the art at the time of the invention ..." Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, would be motivated to do this, or that such a modification would be likely to work. Also, I disagree with Dr. Wallach that "It would have also been obvious to one of skill in the art at the time of the Richardson invention to add a [partly enabled] demonstration mode such as those disclosed in Grundy and Hellman to Medveczky' s invention (e.g., by changing the 'disable system' step (Fig. 5C item 1200) or the 'system crash' step

(Fig. 4 step 620) to instead enter the demonstration mode) or to activate the new user registration procedure." Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, would be motivated to do this, or that such a modification would be likely to work. For example, unlike systems that employ a demonstration or limited use mode, such as the '216 patent, Medveczky requires the user have a special hardware device for operation, and that requirement would be impractical for use with a software demonstration distribution process.

With respect to the Wallach Report, Exhibit D that references Medveczky, Medveczky is missing the following elements of the claims of the '216 Patent for at least the following reasons:

- Claim 1 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID. In addition, there is no corresponding element in Medveczky's that is the same as the Richardson "summer" ("Seventh Embodiment") because the Richardson "summer" explicitly creates a '216 patent licensee unique ID.
- Claim 1 element "and remote licensee unique ID generating means" for lacking a licensee unique ID.

- Claim 1 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.
- Claim 1 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.
- Claim 2 element "wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode" for lacking a licensee unique ID, and for failing to use the

identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 7 element "said system further including platform unique ID generating means, wherein said mode switching means will permit said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed" for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data.
- Claim 8 element "wherein said platform unique ID generating means comprises part of said digital data when executed on said platform" for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data.
- Claim 9 for the same reasons as for Claim 7 bulleted above and the independent claim on which it depends.
- Claim 10 for the same reasons as for Claim 1.
- Claim 11 element "said system including local licensee unique ID generating means" for the same reasons as for Claim 10.
- Claim 12 element "said registration system generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said

software is to be installed" for lacking a licensee unique ID. See also the reasons in the bullet points for Claim 1, above.

- Claim 12 element "and wherein said registration system is replicated at a registration authority" for lacking a security key, and for failing to use the identical algorithm to generate a security key locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 13 element "wherein said security key is generated by a registration number algorithm" for lacking a security key. See also the reasons in the bullet points for Claims 1 and 12, above.
- Claim 14 element "wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 15 element "wherein said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.

- Claim 16 element "wherein said environment details comprise at least one element which is not user-configurable on the platform" for the same reasons as for Claim 15 bulleted above and the independent claim on which it depends.
- Claim 17 element "said method further comprising providing registration key generating means adapted to generate a registration key which is a function of information unique to an intending user of the software" for lacking a licensee unique ID.
- Claim 17 element "said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key" for lacking a licensee unique ID.
- Claim 17 element "and wherein said enabling key is communicated to said intending user at the time of registration of said software" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 18 element "wherein said registration key is also a function of the environment in which said software is installed" for lacking a

licensee unique ID. See also the reasons in the bullet points for Claims 1, 12, and 17, above.

- Claim 19 preamble "A remote registration station incorporating remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 20 element "said system including local licensee unique ID generating means and remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 20 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 20 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

Also, Dr. Wallach does not explain why claim 7 and its dependent claims are indefinite. To the extent that Dr. Wallach argues indefiniteness of Claim 7 on

the basis that "Richardson does not disclose a corresponding structure for performing this function [of generating a platform unique ID]," I disagree. Richardson teaches generating a platform unique ID ('216 Patent, Figure 8, 11:66-12:2) and Grundy (Grundy, 17:10-12) corroborates that such a function is known in the art and is thereby merely a routine implementation detail for a POSA. It is my opinion that the asserted claims of the '216 Patent are not anticipated and are not obvious in view of Medveczky. I also disagree with Dr. Wallach that it would have been obvious to combine this reference with any other reference(s) to make obvious the '216 Patent. (See discussion below in V.i.).

h. Dr. Wallach's Seventh Reference – Tau

I disagree with Dr. Wallach that Tau anticipates or makes obvious the claims of the '216 Patent. Tau (1) includes source code that Dr. Wallach has not shown has ever been made public, (2) includes source code that Dr. Wallach has not shown was ever used to produce any executable programs that have been made public, (3) includes an executable program from which a POSA would not know the source code cited by Dr. Wallach and would not know how that source code operates to the detail described in the source code modules referenced by Dr. Wallach, (4) includes two references ( a manual and the software), and (5) is not analogous art to the '216 Patent because it involves measuring circadian rhythms.

In addition, Tau lacks a licensee unique ID because the so-called "user info" of Tau's software Version Number is not unique and is also present in the data on the floppy disk delivered by the manufacturer, as in Chou. The Tau platform ID is not unique because two machines similarly configured would have the same Tau "computerID" calculated for each. This is because the calculation of the Tau "checksum" is based on the identification of the hardware that is, at best, either (1) identified as being present, or (2) perhaps by model number as reported by the BIOS (although there is no proof of the latter), and the calculation of the Tau "checksum" is not based on the serial numbers of the computer hardware. Serial numbers were generally reported by computer hardware sub-components only years after Tau was written and when Plug and Play was implemented years after Tau. Tau does not teach what software or hardware is present at a location remote to the user. I also note that the alleged Tau licensee unique ID is generated the first time the software is run without waiting for the user to supply any of his unique information. (JS 0000356) In the Tau source code module ..\JS573\R3_Disk3dot3\PAS1001_ZIP\Getuseid[eschull0000306].pas, the User Information is not input to an algorithm to generate a licensee unique ID, and instead is intended to be sent to Jonathan Schull and not to the software distributor, Mini-Mitter, contrary to what Dr. Wallach states. (Wallach Report, L. 2. a.) Also, in the Tau source code module

..\JS573\R3_Disk3dot3\PAS1001_ZIP\Getuseid[eschull0000306].pas, the computer ID and software version is sent to Jonathan Schull and not to the software distributor, Mini-Mitter, contrary to what Dr. Wallach states. (Wallach Report, L. 2. d.) Also, the source code cited by Dr. Wallach is from at least two different versions of Tau and is therefore at least two different references.

With respect to the Wallach Report sections that reference Tau, Tau is missing the following elements of the claims of the '216 Patent for at least the following reasons:

- Claim 1 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 1 element "and remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 1 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.

- Claim 1 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely.
- Claim 2 element "wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 7 element "said system further including platform unique ID generating means, wherein said mode switching means will permit said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed" for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data.

- Claim 8 element "wherein said platform unique ID generating means comprises part of said digital data when executed on said platform" for lacking a licensee unique ID, and for lacking a platform unique ID generating means that is part of the digital data.
- Claim 9 for the same reasons as for Claim 7 bulleted above and the independent claim on which it depends.
- Claim 10 for the same reasons as for Claim 1.
- Claim 11 element "said system including local licensee unique ID generating means" for the same reasons as for Claim 10.
- Claim 12 element "said registration system generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed" for lacking a security key. See also the reasons in the bullet points for Claim 1, above.
- Claim 12 element "and wherein said registration system is replicated at a registration authority" for lacking a security key, and for failing to use the identical algorithm to generate a security key locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 13 element "wherein said security key is generated by a registration number algorithm" for lacking a security key. See also the reasons in the bullet points for Claims 1 and 12, above.
- Claim 14 element "wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 15 element "wherein said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot" for the same reasons as for Claim 13 bulleted above and the independent claim on which it depends.
- Claim 16 element "wherein said environment details comprise at least one element which is not user-configurable on the platform" for the same reasons as for Claim 15 bulleted above and the independent claim on which it depends.
- Claim 17 element "said method further comprising providing registration key generating means adapted to generate a registration

key which is a function of information unique to an intending user of the software" for lacking a licensee unique ID.

- Claim 17 element "said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key" for lacking a licensee unique ID.
- Claim 17 element "and wherein said enabling key is communicated to said intending user at the time of registration of said software" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 18 element "wherein said registration key is also a function of the environment in which said software is installed" for lacking a licensee unique ID. See also the reasons in the bullet points for Claims 1, 12, and 17, above.
- Claim 19 preamble "A remote registration station incorporating remote licensee unique ID generating means" for lacking a licensee unique ID.

- Claim 19 element "said system including local licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 19 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.
- Claim 20 element "said system including local licensee unique ID generating means and remote licensee unique ID generating means" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

- Claim 20 element "said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means" for lacking a licensee unique ID.
- Claim 20 element "and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID" for lacking a licensee unique ID, and for failing to use the identical algorithm to generate a licensee unique ID locally and remotely. See also the reasons in the bullet points for Claim 1, above.

Also, Dr. Wallach does not explain why claim 7 and its dependent claims are indefinite. To the extent that Dr. Wallach argues indefiniteness of Claim 7 on the basis that "Richardson does not disclose a corresponding structure for performing this function [of generating a platform unique ID]," I disagree. Richardson teaches generating a platform unique ID ('216 Patent, Figure 8, 11:66-12:2) and Grundy (Grundy, 17:10-12) corroborates that such a function is known in the art and is thereby merely a routine implementation detail for a POSA. It is

my opinion that the asserted claims of the '216 Patent are not anticipated and are not obvious in view of Tau. I also disagree with Dr. Wallach that it would have been obvious to combine this reference with any other reference(s) to make obvious the '216 Patent. (See discussion below in V.i.).

i. Dr. Wallach's Combinations Alleging Obviousness of the '216 Patent

Dr. Wallach argues that a POSA would be motivated to combine certain of Dr. Wallach's references to meet the limitations of claims of the '216 Patent. I disagree. I have reviewed Dr. Wallach's arguments and I do not find them persuasive. There is no teaching in any of Dr. Wallach's references to combine with any other reference asserted by Dr. Wallach. In addition, Dr. Wallach does not explain how any of his combinations of references would operate to perform all of the elements of the claims of the '216 Patent.

There is no teaching in Hellman to combine with any other reference asserted by Dr. Wallach. Dr. Wallach argues to combine Hellman and Grundy to use the Hellman "cryptographic function generator" instead of the Grundy "checksum." Such a combination benefits from hindsight and also would make no sense in light of the Hellman disclosure and the Grundy disclosure. For example, Dr. Wallach does not explain how the "Manufacturing Modules" of Grundy could

possibly work with Hellman, nor does he explain how or why the complex computations for the Hellman check value C and authorization A can substitute for the simple Grundy "checksum" that is used merely to avoid typographical errors in a human operator's keyed input. In any event, since none of the Hellman or Grundy elements is a licensee unique ID, Hellman is no more material than Grundy for the '216 Patent. Also, Dr. Wallach argues to combine Hellman and Grundy to generate a local licensee unique ID. I disagree with Dr. Wallach. Neither of these references teaches generating a licensee unique ID, or using an identical algorithm on a remote and local for generating a licensee unique ID. Also, I disagree with Dr. Wallach that "… one of skill in the art at the time of the Richardson invention would have been motivated to combine such a feature ['try before they buy'] with Hellman' s invention (e.g., by using the switch to change the software from a full version to a demonstration mode, rather than preventing the user from using the software)." Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, been motivated to do this, or would expect this modification to work successfully. Also, I disagree with Dr. Wallach that "… one of skill in the art would have been motivated to combine Hellman and Grundy to create a registration key [or an enabling key] [generating means] based on input that uniquely identifies a user." Dr. Wallach provides no proof that a POSA at the time of the filing of the '216

Patent would have known to do this, been motivated to do this, or that such a modification would be likely to work. Also, I disagree with Dr. Wallach that "… one of skill in the art would have been motivated to combine Hellman and Grundy to create a third party means." Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, been motivated to do this, or that such a modification would be likely to work. Also, I disagree with Dr. Wallach that "… one of skill in the art would have been motivated to combine Hellman and Grundy to create a remote [or a local] licensee unique ID [or enabling key, or generating means]." Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, been motivated to do this, or that such a modification would be likely to work. In addition, just as the PTO Examiner found nothing interesting about Grundy's use of checksums, a POSA reading Hellman would also not care about Grundy. Because these references teach conflicting (cryptographic versus checksum) strategies, there is no easy way to combine them.

There is no teaching in Wolfe to combine with any other reference asserted by Dr. Wallach. Dr. Wallach argues to combine Wolfe and Grundy to use information local to the user (such as a telephone number) to create local and remote licensee unique IDs. I disagree. Also, the Examiner had these references

before him during prosecution and did not make Dr. Wallach's suggested combination. It would not be obvious to combine Wolfe with Grundy. Such a combination is not obvious because, at least, the only user information disclosed in Wolfe is sent only to the central authority for some purpose, such as tracking, unrelated to matching with a licensee unique ID locally, and such information is never returned locally because doing so would serve no obvious purpose in Wolfe. Therefore, combining Wolfe with checksums from Grundy is non-obvious and would serve no useful purpose related to the '216 patent. Also, as discussed above, Grundy does not disclose a licensee unique ID or related generation means, so even if these references were combined the combination would still lack several elements of the claims of the '216 patent. Also, I disagree with Dr. Wallach that "... one of skill in the art at the time of the Richardson invention would have been motivated to combine the disclosure of a demonstration mode (see, e.g., Grundy, Hellman, and Tau) with Wolfe's invention (e.g., by using the switch to change the software from a full version to a demonstration mode, rather than preventing the user from using the software)." There is no teaching in Wolfe to combine with any other reference asserted by Dr. Wallach. Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, been motivated to do this, or that such a modification would be likely to work. Also, I disagree with Dr. Wallach that "... one of skill in the art would have been

motivated to combine Wolfe and Grundy to create a remote [or a local] licensee unique ID [or enabling key, or generating means]." I disagree. Also, the Examiner had these references before him during prosecution and did not make Dr. Wallach's suggested combination. Also, I disagree with Dr. Wallach that "... one of skill in the art would have been motivated to combine Wolfe and Grundy to create a third party means." I disagree. Also, the Examiner had these references before him during prosecution and did not make Dr. Wallach's suggested combination.

There is no teaching in Kuhn to combine with any other reference asserted by Dr. Wallach. Dr. Wallach alleges that it would be obvious and advantageous to use Grundy's checksums. Dr. Wallach is wrong at least because Kuhn does not disclose sending licensee unique information that was obtained from the licensee back from an authority. Specifically, the manufacturer in Kuhn returns a CP that is otherwise not available to the licensee and is not licensee information. Therefore, there would not be a way to combine Kuhn with Grundy without extensive modification to both systems, and requiring undue experimentation to achieve a dubious result. Also, as explained above, Grundy's checksums are not licensee unique IDs and therefore no combination with Grundy would resolve the elements missing from Kuhn. Dr. Wallach also argues to combine Kuhn and Grundy to use

the Kuhn CIA and CP to generate a local licensee unique ID [or a security key or a registration key] by using user information. I disagree with Dr. Wallach. Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, been motivated to do this, or that such a modification would be likely to work. There is no teaching in Kuhn to combine with any other reference asserted by Dr. Wallach. There is no teaching in Kuhn to use a generating means either locally or remotely to generate licensee unique IDs. Also, the CIA and CP are implemented in hardware and are also not part of the digital data per the '216 Patent. Also, I disagree with Dr. Wallach that "One of skill in the art attempting to implement a system like Kuhn would need a method for comparing the remote licensee unique IDs with the local licensee unique IDs. This provides the motivation to combine Kuhn with Grundy, Hellman, or Wolfe." I disagree. A POSA would need a Kuhn "check routine" that is not defined. Also, there is no teaching to combine any other references with Kuhn to perform any mode switching. None of Dr. Wallach's references teaches generating a licensee unique ID, or using an identical algorithm on a remote and local for generating a licensee unique ID. Also, I disagree with Dr. Wallach that "It would have been obvious to one of skill in the art at the time of the invention that the registration system, replicated at a registration authority, could be used for the purposes of checking by the registration authority that the information unique to the user is

correctly entered at the time that the security key is generated by the registration system. For example, as described in other exhibits, Grundy, Hellman, and Wolfe disclose this feature. One of skill in the art attempting to implement a system like Kuhn would need a method for the registration authority to check user information. This provides the motivation to combine Kuhn with Grundy, Hellman, or Wolfe." By this quote, Dr. Wallach requires that the combination teach, at least, (1) replication at a registration authority of the registration system of the '216 Patent, (2) information unique to the user be input, (3) validated for its having been entered properly, (4) used to create licensee unique IDs with (4) identical algorithms locally and remotely. Dr. Wallach fails to show how these could all be accomplished, and in fact, there is no teaching to create any such combinations or permutations from Dr. Wallach's asserted prior art. Also, I disagree with Dr. Wallach that "It would have been obvious to one of skill in the art at the time of the invention that a security check could be used to switch said software between a fully enabled mode and a partly enabled or demonstration mode. For example, as described in other exhibits, Grundy and Hellman disclose this feature. It would be desirable to widely distribute software with a demonstration mode, allowing prospective users to try before they buy (see, e.g., Grundy). Therefore, one of skill in the art at the time of the Richardson invention would have been motivated to combine such a feature with Kuhn' s invention (e.g., by using the switch to change

the software from a full version to a demonstration mode, rather than preventing the user from using the software)." There is no teaching in Kuhn to combine with any other reference asserted by Dr. Wallach. Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, been motivated to do this, or that such a modification would be likely to work. Also, I disagree with Dr. Wallach that "It would have been obvious to one of skill in the art at the time of the invention that algorithms are necessary to generate the enabling key and the registration key, and that the algorithms used could be the same. For example, Grundy, Hellman, and Wolfe disclose such algorithms, and disclose the possibility that the algorithms used are the same. One of skill in the art attempting to implement a system like Kuhn would need algorithms to generate the keys and would thus be motivated to combine Kuhn with the algorithms disclosed in Grundy, Hellman, or Wolfe." There is no teaching in Kuhn to combine with any other reference asserted by Dr. Wallach. Dr. Wallach provides no proof that a POSA at the time of the filing of the '216 Patent would have known to do this, been motivated to do this, or that such a modification would be likely to work.

There is no teaching in Medveczky to combine with any other reference asserted by Dr. Wallach. In his discussion of Medveczky, Dr. Wallach references

Grundy and Hellman. I do not see that Dr. Wallach has made an argument to combine Medveczky with any other reference(s), but if he has, I reserve my right to examine and to report on his opinions after he clarifies them.

There is no teaching in Tau to combine with any other reference asserted by Dr. Wallach. I do not see that Dr. Wallach has made an argument to combine Tau with any other reference(s), but if he has, I reserve my right to examine and to report on his opinions after he clarifies them.

As I have stated, it is my opinion that none of the alleged prior art references of Dr. Wallach anticipate or render obvious the claims of the '216 Patent. I also understand that commercial success of systems practicing the patent can be a secondary consideration of non-obviousness. As I have stated previously, I believe that the accused Microsoft products practice the '216 patent. To the extent that these products have been commercially successful, I believe this to be persuasive evidence that the invention of the '216 patent is non-obvious over the prior art.

## VI. Inequitable Conduct Analysis

I have reviewed Mr. Nixon's Report and his arguments that the '216 Patent Applicant engaged in inequitable conduct. I disagree with the opinions expressed by Mr. Nixon in the Nixon Report and I also disagree with his reading and understanding of the '216, the Grundy, and the Kuhn Patents. It is my opinion that Mr. Nixon has failed to provide evidence of inequitable conduct on the part of the '216 Patent Applicant.

### a. Mr. Nixon's Discussion Of The '216 Patent And Prosecution History

Mr. Nixon has mischaracterized both the '216 Patent and the Grundy Patent. According to Mr. Nixon (Nixon Report, I. b. (i)) the "… '216 Patent is directed to … registering … plural identical copies of digital content …" I disagree. There is no requirement for a "plurality" in the '216 Patent. I also disagree with Mr. Nixon that there is only one invention in the '216 Patent (*Id.*) I also disagree with Mr. Nixon that in the '216 Patent "… executable computer software is … configured … based on the customer['s] … own unique identification …" (*Id.*) There is no requirement in the '216 Patent that the information provided by the "customer" be their "own unique identification," only that the information input by the customer be useful to uniquely identify that customer. There is no requirement in the '216 Patent that the customer's personal data, such as name, address, telephone number,

etc. be input by the customer. I disagree with Mr. Nixon that the "principal focus" of the '216 Patent "… is on use of truly personal 'licensee unique ID' data …" (*Id.*) Mr. Nixon has no basis for his statement limiting the '216 Patent.

Mr. Nixon argues that '216 Patent Applicant engaged in inequitable conduct with respect to Grundy. (Nixon Report I. e. (i)) I disagree. Mr. Nixon mischaracterizes Grundy in Mr. Nixon's attempt to prove inequitable conduct. I find that the description of Grundy supplied by the Applicant to the Examiner during prosecution of the '216 Patent was correct, and that Mr. Nixon's description of Grundy is misleading, at best. For example, Mr. Nixon argues that Grundy calculates the same checksum locally and remotely and compares the results, while ignoring the fact that the Grundy checksum is not a licensee unique ID of the '216 Patent. (See my discussion above with respect to Grundy and this issue.) Mr. Nixon bases his arguments on confusing a checksum with a licensee unique ID; a mistake that the Examiner did not make during the '216 Patent prosecution. Mr. Nixon merely turns on its head the fact that the Examiner properly ignored the checksum as a Licensee Unique ID and instead Mr. Nixon accuses the Applicant, and by implication, the Examiner, of misconduct because they failed to make the mistake made by Mr. Nixon. Also, Mr. Nixon mischaracterizes the Applicant's arguments in the Applicant's 12/20/94 Response to the Patent Office as saying that "… Gru[n]dy was not relevant <u>merely</u> because it required validity/authorization

checking steps in addition to merely one single match-comparison check between a locally generated and a centrally generated licensee unique ID registration code." A glance at the Response of the Applicant shows a broader argument distinguishing Grundy that is consistent with both Grundy and with the '216 Patent. (e.g., '216 Patent File History ("FH"), Response of 12/21/94 pages 4-5, and Grundy 15:49-58; e.g., also FH, Response of 06/30/95 pages 7-9, and Grundy Claim 1 "second processor", 4:54-57, 5:5-7) This also shows that Mr. Nixon has chosen to ignore the parts of the Applicant's Response that do not fit Mr. Nixon's theories. (See my discussion above with respect to Grundy.) Also, Mr. Nixon mischaracterizes the Applicant's arguments in the Applicant's 6/30/95 Response to the Patent Office. (*Id.*, page 30) Mr. Nixon alleges without basis that (1) the Applicant [improperly] "focused" on Grundy's Owner Identification Number, (2) there was something "unnatural" about the Applicant's argument distinguishing Grundy, (3) it is logical in the '216 Patent to generate a sequential serial number at the licensor cite, and (4) Grundy's Owner Identification Number is not checked at the user location because it is not known to be authentic [the word "authentic" does not even appear in Grundy]. Mr. Nixon is wrong on all of these counts, and has no basis for arguing any of them. In addition, the argument presented by the Applicant and quoted by Mr. Nixon (*Id.*) was not erroneous. In fact, the Applicant was correct that in Grundy

"... any element of uniqueness to be associated with the software to be protected is injected and derived at the second platform (the remote location) and, furthermore, that whether an Authorization Code is valid or not derives directly from data first arising at the second platform (the remote location). [See, e.g., Grundy 15:46-50]

This is the complete reverse of the system of the present invention where the uniqueness derives entirely locally,

It is submitted that this local generation of the identifying feature for each copy of the software to be protected is one distinguishing feature of the present invention. Grundy does not disclose or suggest this feature or manner or operation ..." [See, e.g., Grundy Claim 1 "second processor", and discussions above)

The '216 Patent does not teach merely comparing generated data as Mr. Nixon is apparently arguing, but the '216 Patent requires generating a Licensee Unique ID.

I disagree with Mr. Nixon that the Kuhn reference is invalidating prior art to the '216 Patent. (See, e.g., paragraphs in V.f. above) Kuhn is no more material to the patentability of the '216 Patent than the art that was before the PTO Examiner (e.g., Chou). In addition, I disagree that the European Patent Office examiner properly held Kuhn to be invalidating art for the Richardson Application, based on the arguments I have already made in V.f., above.

I disagree with Mr. Nixon that Mr. Higgs or Mr. Bell were inventors of the '216 Patent, or that the inventions of the '216 Patent were derived from those of Mr. Higgs or Mr. Bell. (See Richardson Deposition, 07/20/05, page 245:15-24) It is my understanding that in order to be an inventor of a patent, the person must have contributed to the conception of the invention of at least one claim of the patent.

I find no evidence of record that Mr. Higgs collaborated in any way with Mr. Richardson during the conception of Mr. Richardson's invention. Mr. Higgs testified that at his first meeting with Mr. Richardson (which was at Mr. Higgs birthday party), Mr. Richardson informed him that a patent application was filed or about to be filed. (Higgs Dep. p. 62.) Presumably, if Mr. Richardson had filed or was about to file the application, he would have had to have met with his patent attorney prior to meeting Mr. Higgs. Also, Mr. Richardson testified that he conceived of his idea at least 20 days before he filed his patent application on

September 21, 1992. (See Richardson, 3/31/05 p. 180.) Thus, it would appear that Mr. Richardson was working with Mr. Higgs to reduce Mr. Richardson's invention to practice and/or as a business partner to commercialize Mr. Richardson's invention. This is consistent with Mr. Higgs testimony and with Mr. Richardson's notebook entry "contract work" above Mr. Higgs' name. (See Uniloc 11775) Further, I disagree with Mr. Nixon, this entry does not attribute "a way to create demonstration mode software with disabled 'save' and 'print' functions," because it appears that Mr. Richardson was considering Mr. Higgs as someone who could provide some contract work to reduce Mr. Richardson's invention to practice. My understanding is consistent with the other document Mr. Nixon relies on, Uniloc 15870, with respect to Mr. Bell. That latter document is a letter to Mr. Cary Dreelan, and apparently from the letter, Mr. Dreelan was a software developer and Mr. Richardson, in the Uniloc 15870 letter, was asking Mr. Dreelan to provide a quote for software development work (as reduction to practice) after the Uniloc provisional application was filed. (See Uniloc 15870-15871).

I also note that Mr. Nixon has not identified any elements of any claims of the '216 Patent that were conceived by either Mr. Higgs or by Mr. Bell. I note that the mock up screen shots allegedly produced by Mr. Higgs (and disputed by Mr. Richardson), do not disclose or even suggest the concept of a licensee unique ID or an algorithm for generating a licensee unique ID. (See Higgs 44-49) Accordingly,

it is my opinion that none of the evidence relates to any of the claims of the '216 Patent and that neither Mr. Higgs nor Mr. Bell contributed to the conception of the claimed inventions of the '216 Patent.

## VII. Exhibits To Be Used As A Summary Of Or In Support Of My Opinions

To summarize and support my testimony at trial, I may use this Report (or a revised/updated version of this Report), and any of the various documents to which I have referred, or excerpts from them. I may also use charts or other demonstrative exhibits prepared from my Report.

## VIII. Reservation of Right to Supplement This Report and Opinions

This report presents my opinions to date regarding the matter set forth above. As additional data, information, testimony, or Defendant's experts' reports become available to me or is provided to me, I may consider this information and I may find it appropriate to revise or supplement my analysis, opinions, and conclusions. I reserve the right to modify or supplement this Report and the opinions contained herein.

Dated November 7, 2005

David Klausner

**Exhibit A – David Klausner's Resume and**
**Exhibit B – U.S. Patent 5,490,216 are NOT attached to this report.**