UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC U.S.A., INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Civil Action No. 03-CV-440 (WES) |

**MICROSOFT'S OBJECTION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF INEQUITABLE CONDUCT**

Defendant Microsoft Corporation ("Microsoft") objects to the motion of Plaintiffs Uniloc U.S.A., Inc. and Uniloc Singapore Private Ltd. (collectively, "Uniloc") for partial summary judgment on the issue of inequitable conduct. For the reasons in the attached memorandum of law, numerous genuinely disputed issues of material fact foreclose summary judgment on this issue. Microsoft respectfully requests the Court to deny Plaintiffs' motion.

Dated: October 16, 2006

By: /s/ Joseph V. Cavanagh, Jr.

Joseph V. Cavanagh, Jr. #1139
**BLISH & CAVANAGH**
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903
(401) 831-8900 (Telephone)
(401) 751-7542 (Facsimile)

Frank E. Scherkenbach
Kurt L. Glitzenstein
Laura R. Braden
**FISH & RICHARDSON P.C.**
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Isabella Fu, Esq.
**MICROSOFT CORPORATION**
One Microsoft Way
Redmond, WA 98052-6399
Telephone: (415) 882-8080
Facsimile: (415) 936-7329

Attorneys for Defendant
MICROSOFT CORPORATION

**CERTIFICATE OF SERVICE**

I certify that on October 16, 2006, I caused a true and correct copy of the foregoing MEMORANDUM IN SUPPORT OF MICROSOFT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF INEQUITABLE CONDUCT to be served as follows:

| | |
|---|---|
| Francis A. Connor, III<br>Sheri L. Pizzi<br>Taylor Duane Barton & Gilman, LLP<br>10 Dorrance Street, Suite 700<br>Providence, RI 02903 | Attorneys for Plaintiffs<br>UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED |

(Served via e-file)

| | |
|---|---|
| Paul J. Hayes<br>Dean Bostock<br>Paul J. Cronin<br>Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111 | Counsel for Plaintiffs<br>UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED |

(Served via e-file)

______/s/ Joseph V. Cavanagh, Jr.__________

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC U.S.A., INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Civil Action No. 03-CV-440 (WES)<br><br>**[REDACTED]** |

**MICROSOFT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF INEQUITABLE CONDUCT**

# TABLE OF CONTENTS


I. INTRODUCTION .....1

II. BACKGROUND .....3

A. Best Mode .....3

B. Inventorship .....6

C. The Grundy Patent and Letters .....10

1. The Grundy Patent Disclosure .....10

2. Uniloc's Knowledge of the High Materiality of the Grundy Patent .....11

3. Uniloc's Mischaracterizations of the Grundy Patent .....12

D. The Kuhn Reference .....14

III. APPLICABLE LAW .....17

A. Summary Judgment .....17

B. Inequitable Conduct .....18

IV. ARGUMENT .....19

A. Richardson Intentionally Concealed the Best Mode .....19

B. Richardson Withheld Material Information Regarding Inventorship .....21

C. Richardson Made Material Misrepresentations and Withheld Material Information Regarding the Grundy Patent .....23

1. Richardson's Material Misrepresentations Regarding the Grundy Patent Constitute Inequitable Conduct, Even Though the Examiner Could Have Determined That Richardson's Statements Were False Upon Further Analysis of the Grundy Patent .....24

2. Richardson Withheld Material Information Regarding the Grundy Patent .....26

3. Richardson Misrepresented and Withheld Material Information Regarding the Grundy Patent with an Intent to Deceive the PTO .....28

D. Richardson Intentionally Withheld the Kuhn Reference .....29

V. CONCLUSION .....32

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)....17

*Akron Polymer Container Corp. v. Exxel Container, Inc.*,
148 F.3d 1380 (Fed. Cir. 1998)....27

*Akzo N.V. v. U.S. Int'l Trade Comm'n*,
808 F.2d 1471 (Fed. Cir. 1986)....24, 25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....17

*Braintree Labs., Inc. v. Nephro-Tech, Inc.*,
81 F.Supp.2d 1122 (D. Kan. 2000)....25

*Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*,
394 F.3d 1348 (Fed. Cir. 2005)....18, 19, 29

*CIVIX-DDI, L.L.C. v. Cellco P'ship*,
387 F. Supp. 2d 869 (D. Ill. 2005)....28

*Consolidated Aluminum Corp. v. Foseco Int'l, Ltd.*,
910 F.2d 804 (Fed. Cir. 1990)....20

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
120 F.3d 1253 (Fed. Cir. 1997)....27

*D.O.C.C. Inc. v. Spintech Inc*,
36 U.S.P.Q.2d 1145 (SDNY 1994)....31

*Dana Corp. v. IPC Ltd. Partnership*,
860 F.2d 415 (Fed. Cir. 1988)....20

*Frank's Casing Crew & Rental Tool, Inc. v. PMR Tech. Ltd.*,
292 F.3d 1363 (Fed. Cir. 2002)....22

*GFI, Inc. v. Franklin Corp.*,
265 F.3d 1268 (Fed. Cir. 2001)....18, 19, 27

*Hebert v. Lisle Corp.*,
99 F.3d 1109 (Fed. Cir. 1996)....17, 26

*Hoffmann-La Roche, Inc. v. Promega Corp.*,
323 F.3d 1354 (Fed. Cir. 2003)....19

*Kimberly-Clark Corp. v. Procter & Gamble Distributing Co., Inc.*,
973 F.2d 911 (Fed. Cir. 1992)....31

*LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066 (Fed. Cir. 1992)....19

*Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320 (Fed. Cir. 2000)....24, 25

*Lipman v. Dickinson*, 174 F.3d 1363 (Fed. Cir. 1999)....28

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365 (Fed. Cir. 2001)....26

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed. Cir. 1995)....18, 19

*Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931 (Fed. Cir. 1990)....25

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182 (Fed. Cir. 1993)....17

*PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315 (Fed. Cir. 2000)....21, 23

*Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 204 F.3d 1368 (Fed. Cir. 2000)....18, 25

*Transocean Offshore Deepwater Drilling v. GlobalSantaFe Corp.*, 2006 U.S. Dist. LEXIS 57967 slip-op at 29 (D. Tex. 2006)....28

*Wanlass v. Fedders Corp.*, 145 F.3d 1461 (Fed. Cir. 1998)....17

*Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368 (Fed. Cir. 1998)....22

**<u>Statutes</u>**

35 U.S.C. § 112....20

35 U.S.C. 102(e)....10

Fed. R. Civ. P. 56(e)....17

Defendant Microsoft Corporation ("Microsoft") submits this opposition to the motion of Plaintiffs Uniloc U.S.A., Inc. and Uniloc Singapore Private Ltd. (collectively, "Uniloc") for partial summary judgment on the issue of inequitable conduct. For the reasons set forth below, numerous genuinely disputed issues of material fact foreclose summary judgment on this issue. Microsoft respectfully requests the Court to deny Plaintiffs' motion.

## I. INTRODUCTION

Summary judgment is rarely appropriate on the issue of inequitable conduct, turning as it does on fact-intensive issues of intent and materiality that cannot be fully evaluated on the cold written record. Taking all inferences in Microsoft's favor, the record clearly demonstrates that Uniloc engaged in a pattern of deliberate omission and misrepresentation throughout the prosecution of the asserted patent, U.S. Patent No. 5,490,216 ("the '216 patent," *see* Declaration of Kurt L. Gliztenstein ("Gliztenstein Decl.") Ex.1), warranting a finding of unenforceability based on inequitable conduct.

Every applicant for a United States patent owes a "duty of candor" to the United States Patent and Trademark Office ("PTO"). If an applicant makes material misrepresentations to, or withholds material information from, the PTO with an intent to deceive, the patent is rendered unenforceable for reasons of inequitable conduct. In this case, the evidence shows that the named inventor of the '216 patent, Frederic "Ric" Richardson, as well as those substantively involved in the prosecution of the '216 patent, including Uniloc's patent attorneys and Ric Richardson's assistant and "right hand man," Gregory Steven "Steve" Cox (collectively, "Richardson") violated their duty of candor and committed inequitable conduct.

There are four separate and independent bases for Microsoft's inequitable conduct claim. The first is Richardson's failure to disclose the best mode to the PTO. Uniloc's motion does not even address this issue. U.S. patent law requires patent applicants to disclose the best mode that

they know of for carrying out the invention. That is an important *quid pro quo* for getting a patent, since it teaches the world how best to use the invention after the patent expires. Here, the evidence shows that Richardson intentionally concealed the best mode for carrying out the licensee unique ID generating means of the ‘216 patent. Specifically, critical to the alleged invention is the use of the same algorithm on both the local and remote sides of the transaction. As the Court concluded on claim construction, the only structure disclosed in the ‘216 patent corresponding to the licensee unique ID generating means is a summation algorithm or summer. However, this was a sham; Uniloc’s own witnesses admitted that summation was not the best mode. Far from it. Summation is in fact an inferior and impractical approach. Richardson kept the real algorithm secret, out of fear that disclosing it would allow others to circumvent it. Richardson’s efforts to have his cake and eat it too on this issue is in direct contravention of the best mode requirement, and his intentional concealment constitutes inequitable conduct.

Second, Richardson intentionally withheld material information regarding the true inventorship of the ‘216 patent. Richardson failed to disclose the inventive contributions of two individuals, Allan Bell and Peter Higgs, who provided him with important contributions to what ultimately became the claimed invention. Bell contributed the idea, pervasive throughout the claims of the ‘216 patent, of using user information and software information to calculate an unlocking number on both the local and remote sides of the transaction. The evidence also shows that Higgs discussed the use of user information with Richardson and made recommendations to Richardson regarding the nature and structure of a demonstration mode available to the user to evaluate the software during the “try before you buy” period. Richardson’s intentional failure to disclose the contribution of others to the invention and to name them as inventors was also inequitable conduct.

Third, Richardson intentionally misrepresented the scope and content of a prior art patent (U.S. Patent No. 5,291,598, invented by Gregory Grundy) and [redacted] Remarkably, Uniloc does not dispute the fact that Richardson directed the Examiner to less relevant portions of the Grundy patent, misrepresented the Grundy patent, and withheld conflicting statements made by Grundy regarding the relevance of his own patent. Rather, Uniloc's motion is premised on the view that such gross lack of candor is permissible. The law is clear that it is not.

Finally, Richardson intentionally withheld a material prior art reference (German patent application DE 40 19 652 A1 to Kuhn, the "Kuhn reference") that had been identified during the prosecution of the European/PCT counterpart application of the '216 patent. Uniloc's German patent attorney opined that the Kuhn reference anticipated claims in Uniloc's European/PCT counterpart application that were similar to those pending in the U.S. application. Despite Richardson's knowledge of the Kuhn reference and the German patent attorney's opinion regarding its materiality, the evidence shows that Richardson intentionally withheld it from the PTO.

Not only do numerous factual disputes on materiality and intent foreclose summary judgment on this issue, but Richardson's actions display a clear pattern of intentionally misleading and withholding information from the PTO in an effort to deceive the PTO into granting the '216 patent. These actions amply support a finding of inequitable conduct.

## II. BACKGROUND

The material facts underlying Microsoft's inequitable conduct claim are set forth below:

### A. Best Mode

The '216 patent is directed to a "try before you buy" system for registering computer software. The system of the '216 patent involves unlocking computer software using the same

algorithm on both a local and remote computer to generate an "unlocking" key. This algorithm—the "the licensee unique ID generating means"—is essential to the invention of the '216 patent, and Richardson intentionally concealed the preferred embodiment of that algorithm.

The licensee unique ID generating means was a hotly contested term during the claim construction proceedings. While Uniloc took the claim construction position that any software or hardware was the disclosed structure for the licensee unique ID generating means, the Court concluded that the patent discloses only a summing algorithm or summer as the structure corresponding to the licensee unique ID generating means. *See* Court's Markman Order, Dkt. 145 at 25; *see also* Glitzenstein Decl., Ex.1, '216 patent, Col. 12:62-65 & 13:3-10; Fig. 10. The licensee unique ID generating means also plays a critical role in Microsoft's noninfringement case. As set forth in Microsoft's Motion for Summary Judgment of Non-Infringement and Invalidity, Microsoft's accused products do not use a summation algorithm or summer for any sort of "licensee unique ID generating means." Microsoft's Mem., Dkt. 172 at 38-41.

Despite the disclosure of a summer as the only embodiment of the licensee unique ID generating means in the '216 patent, Uniloc never used a summation algorithm or summer as a licensee unique ID generating means in its actual products embodying the '216 patent. Uniloc never used a summation algorithm because Uniloc knew that better algorithms were commercially necessary. [redacted]

While disclosing only the simplistic and inferior summation algorithm/summer in the '216 patent, Uniloc kept the real algorithm for generating a licensee unique ID secret. (MUF ¶ 6.)

[redacted]

[redacted]

The evidence shows that Richardson and his patent counsel were aware of this "secret algorithm" and intentionally withheld it from the PTO. (MUF ¶¶ 7-9; Microsoft's Statement of Material Facts as to Which There is a Genuine Issue Precluding Partial Summary Judgment ("MF") ¶ 1.) [redacted]

---

1 [redacted]

[redacted]

**B. Inventorship**

Richardson never disclosed to the PTO the contributions made by Allan Bell and Peter Higgs to the conception of the invention of the '216 patent. (MUF ¶ 23.)

[redacted]

[redacted]

[redacted]

[redacted]

Richardson's assertion not only lacks credibly on its face, but it is flatly contradicted by the '216 patent itself, which clearly discloses preferred embodiments in which the last modified date (of the software) is combined with unique user data (as typed into a start up screen) to produce a modification date number that can be hidden from the user and then used to unlock the software for full use:

> Preferably, ***the registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from*** information provided by the environment in which the software to be protected is to run (e.g., system clock, ***last modify date***, user name).

(MUF ¶ 14; Glitzenstein Decl., Ex. 1, '216 patent, 4:6-11; emphasis added.)

Thus, Bell contributed to all the asserted claims and in particular, the licensee unique ID and its generation on the local and remote sides. The Court construed "licensee unique ID" and synonymous terms as a "unique identifier associated with a licensee." *See* Court's Markman Order, Dkt. 145 at 9.

The evidence further shows that Peter Higgs also suggested the use of user information to Richardson, and contributed to the conception of the "demonstration mode" in the '216 patent.

[redacted]

[redacted]

[redacted]

[redacted] As with Bell, Higgs also contributed to the use of user information, which is relevant to all the asserted claims. As noted above, the Court construed "licensee unique ID" and synonymous terms as a "unique identifier associated with a licensee." *See* Court's Markman Order, Dkt. 145 at 9.

Claim 17 of the '216 patent requires a "mode switching means . . . adapted to switch said software between a fully enabled mode and a partly enabled or demonstration mode." The Court construed "partly enabled or demonstration mode" as a "mode that allows partial use of the digital data or software." Court's Markman Order, Dkt. 145 at 36. [redacted]

[redacted]

[redacted]

[2] [redacted]

[redacted]

### C. The Grundy Patent and Letters

#### 1. The Grundy Patent Disclosure[4]

The '216 patent was filed on September 21, 1993 and claims priority from two Australian patent applications, filed on September 21 and October 26, 1992. Ric Richardson was not the first person to invent such a system. Gregory Grundy developed his system before Richardson and was awarded U.S. Patent No. 5,291,598 ("Grundy patent," Glitzenstein Decl., Ex. 16). The Grundy patent, entitled "Method and System for Decentralized Manufacture of Copy-Controlled Software," was filed on April 7, 1992, and issued on March 1, 1994. The Grundy patent is therefore prior art to the '216 patent. (MUF ¶ 24.)

Generally, Grundy's "method and system for decentralized manufacture of copy-controlled software" describes a system where users can try a software product before they buy it and register the software after they have evaluated it favorably. (*See, e.g.*, 4:27-42.) When a user is ready to buy, he enters his personal information, such as name, address and telephone number, into the software. He also provides this information to the registration system. (*See, e.g.*, 12:36-38.) Also sent to the registration system is a registration code, which includes, among other pieces of information, a checksum of this user information (i.e., "user data cross-reference code") and a hardware identification code, both generated by the user's computer.

---

[3] Uniloc did not produce a final executed copy of the settlement agreement.

(*See, e.g.*, 15:3-9.) When it receives the registration code, the remote registration system repeats the checksum calculation on the user information, using the same algorithm, to create a "user data checksum." (*See, e.g.*, 15:13-16.) If and only if the locally calculated checksum (i.e., user data cross-reference code) matches the remotely calculated checksum (i.e., user data checksum) will the central authority generate and transmit an authorization code to the user to enable the full functionality of the software product. (*See, e.g.*, 15:17-27.)

When the user's computer receives the authorization code, it extracts the remotely calculated user data checksum from it. (19:53-55.) The user's computer checks that the remotely calculated user data checksum matches the locally calculated checksum (now called an "owner data cross-reference code" because it is being applied at this point to a licensee or software owner) before the full functionality of the software can be used. (19:60-20:5.) The software product on the user's computer also extracts the hardware identification code from the authorization code. (19:53-57.) The software product checks that the current hardware identification code of the user's computer matches the hardware identification code received from the central registration authority. (19:60-65.)

### 2. Uniloc's Knowledge of the High Materiality of the Grundy Patent

Richardson was aware of the Grundy patent, as well as its high materiality, long before issuance of the '216 patent. [redacted]

[4] *See generally* Ex. C to the September 20, 2005 Declaration of Dan S. Wallach in Support of Microsoft's Motion for Summary Judgment ("Wallach Decl."), Dkt. 161, at 3-10 & 19-22.

[redacted]

### 3. Uniloc's Mischaracterizations of the Grundy Patent

Despite his repeated contacts with Grundy and knowledge of the high materiality of the Grundy patent, Richardson did not disclose the Grundy patent to the PTO until December 21, 1994, after the letter from Grundy's counsel to the Australian Patent Office. Although there was no requirement to discuss the relevancy of prior art when submitting it to the PTO, Richardson nonetheless included a preemptive discussion of the Grundy patent. Through this discussion Richardson sought to dissuade the PTO Examiner from the true importance of Grundy, as evidenced by his directing the PTO Examiner to less relevant portions of the Grundy patent dealing with "registration" and "authorization" codes, and never identifying (let alone addressing or attempting to distinguish) those portions of the Grundy patent dealing with the highly relevant "user data cross-reference code," i.e., a checksum derived from the user's personal information that corresponds to the "licensee unique ID" of the '216 patent. (MUF ¶ 29, Glitzenstein Decl., Ex. 20, Response to PTO 12/21/94.)

On March 30, 1995, the Examiner rejected a majority of the pending claims of the '216 application based on the Grundy patent. As a result of having been directed to the "registration" and "authorization" codes by Richardson, the Examiner based the rejection on those codes, rather than the "user data cross-reference code." (MUF ¶ 30; MF ¶ 3; Glitzenstein Decl., Ex. 21,

Office Action 3/30/95.) In response to the Examiner's rejection of the claims, Richardson identified two "distinguishing limitations" of his invention: (a) the algorithm used to generate the "licensee unique ID" must be the same on both the local computer and the remote computer, and (b) only local information is provided to, and then processed by, that algorithm to generate the "licensee unique ID" that must match on both the local and the remote side of the system in order for the software to "unlock." (Glitzenstein Decl., Ex. 22, Response 6/30/95 at 6.) Richardson amended all of his claims to require the same algorithm feature, on the false representation that Grundy lacked this feature. Uniloc also emphasized that "the 'Licensee Unique ID' is entirely the product of data generated locally as distinct from data added before delivery of the software to the local location for use (thereby distinguishing over Chou) or subsequently from a remote location (thereby distinguishing over Grundy)." (*Id.*)

Specifically, Richardson argued that, unlike in his invention, Grundy lacked the same algorithm used locally and remotely to generate a unique ID:

> The fact that the algorithm which generates the unique ID generating means of the present invention is replicated at a remote location permits the following two features of the present invention not to be found in Grundy:
>
> (1) A direct comparison for matching purposes of the licensee unique ID data at the local location, and
> (2) A confirmation that the user details provided to the remote location match identically with the user details provided to the software to be protected and from which the unique ID is generated.

(MUF ¶ 31; Glitzenstein Decl., Ex. 22, Response 6/30/95 at 7.) These statements plainly and seriously misrepresent Grundy. Grundy discloses a checksum – called a "user data checksum" – that is a unique ID which is generated from the same algorithm locally and remotely, compared for matching purposes at the local location, and used to confirm user details. (MUF ¶ 32; *See, e.g.*, Glitzenstein Decl., Ex. 16, Grundy, 15:10-27; 17:64-18:34, 19:23-20:25; Ex. C to the

September 20, 2006 Declaration of Dan S. Wallach in Support of Microsoft's Motion for Summary Judgment ("Wallach Decl."), Dkt. 161, at 3-10 & 19-22.)

Richardson also misrepresented the use of data to generate the unique ID in Grundy. Richardson argued that Grundy required the use of remotely generated data to generate the unique ID:

> It is inherent in the system of the present application (as claimed), that the "Licensee Unique ID" is entirely the product of data generated locally as distinct from data added before delivery of the software to the local location for use (thereby distinguishing over Chou) or subsequently from a remote location (thereby distinguishing over Grundy).

(MUF ¶ 33; Glitzenstein Decl., Ex. 22, Response 6/30/95 at 6-7.) However, Grundy clearly discloses that the user data checksum is a unique ID that is generated entirely from local data, i.e., user data. (MUF ¶ 34; *See, e.g.,* Glitzenstein Decl., Ex. 16, Grundy, 12:26-38; 15:13-27; Ex. C to the Wallach Decl., Dkt. 161, at 6.)

Thus, it is untrue that the Grundy patent is the "complete reverse" of the '216 patent. Grundy does in fact disclose a system in which locally generated data is used as the input for the same algorithm on both the local and the remote sides of the system. Richardson blatantly misrepresented Grundy with respect to both of the bases he relied on to overcome the Examiner's rejection of his claims under Grundy. (MUF ¶¶ 31-34.)

**D. The Kuhn Reference**

In addition to filing a patent application in the United States, Uniloc filed an international PCT application also claiming priority under its two Australian patent applications. (Glitzenstein Decl., Ex. 23, European/PCT counterpart application.) As filed, original claims 1-26 of the European/PCT counterpart application were identical to original claims 1-26 of the United States application, and claims 27-30 are also essentially the same although written in dependent format. An international search report, dated December 30, 1993, cited five references (Frezza, Wolfe,

Joshi, Ogaki and Tau Systems) as category "A" prior art references (defining the general state of the art which is not considered to be of particular relevance). (MUF ¶ 35; Glitzenstein Decl., Ex. 24, International Search Report.) Six weeks later, on February 16, 1994, Richardson disclosed the international search report and the prior art cited therein to the PTO. (MUF ¶ 36; Glitzenstein Decl., Ex. 25, IDS 2/16/94.)

During the prosecution of the European/PCT counterpart application, the European examiner issued a supplemental European search report, dated October 27, 1995, designating a published German patent application DE 40 19 652 A1 (the "Kuhn reference") as being of the highest "X" category of relevance ("particularly relevant if taken alone") to Uniloc's claims 1, 8-14 and 30. (MUF ¶ 37; Glitzenstein Decl., Ex. 26, Supplemental European Search Report at UNILOC 987 – 989.) The Kuhn reference was published on January 2, 1992 and is prior art to the '216 patent. (MUF ¶ 38; Glitzenstein Decl., Ex. 27, Kuhn reference and translation.) Despite his established practice of promptly disclosing the earlier search report and less relevant "A" prior art, Richardson never informed the PTO about either this later search report, or its highly relevant "X" prior art—Kuhn.

The Kuhn reference, entitled "Procedure to Protect Software Against Unauthorized Copying," describes a system to limit execution of software by tying it to a particular computer. When a user installs a software program that has the Kuhn invention, the user must first communicate with the software manufacturer (p. 4). The user sends the manufacturer a "software registration number" delivered with the original software (p. 4) and "computer identification attribute" derived from the particular configuration of the user's computer, such as its serial number (p. 4-5). In return, the manufacturer sends the user a "computer password" (p. 4), which is then stored in a special file. Kuhn discloses that the software will only execute if the password has been entered. (p. 3-4)

Uniloc's German patent attorney, Josef Fiener, received the supplemental European search report identifying the Kuhn reference as highly relevant prior art on October 31, 1995. On January 5, 1996, Fiener sent Peter Maxwell, Uniloc’s Australian patent attorney, the supplemental European search report, the Kuhn reference, and a letter explaining the materiality of the Kuhn reference. (MUF ¶ 39; Glitzenstein Decl., Ex. 26, Fiener Letter at UNILOC 984 - 986.) Maxwell was substantively involved in the prosecution of the ‘216 patent. (MUF ¶ 40; Glitzenstein Decl., Ex. 5, Richardson 3/31/05 Tr. at 20:5-20:24; Glitzenstein Decl., Ex. 7, Cox Tr. at 12-16.) Fiener wrote to Maxwell that the Kuhn reference anticipated claims 13 and 14 of Uniloc’s European/PCT counterpart application. (MUF ¶ 39; Glitzenstein Decl., Ex. 26, Fiener Letter at UNILOC 984 - 986.) On January 17, 1996, Maxwell forwarded the information to Steve Cox, who was also substantively involved in the prosecution of the ‘216 patent. (MUF ¶ 41; Glitzenstein Decl., Ex. 5, Richardson 3/31/05 Tr. at 197:18-200:4; Glitzenstein Decl., Ex. 7, Cox Tr. at 12-16.) Completely ignoring Fiener’s statements regarding claims 13 and 14, Maxwell stated that Fiener had concluded that the Kuhn reference should not cause any real problems. (MUF ¶ 42; Glitzenstein Decl., Ex. 26, Maxwell Letter at UNILOC 983.)

The ‘216 patent issued on February 6, 1996. Richardson never disclosed the supplemental European search report and the Kuhn reference to the PTO, despite the fact that the European search report issued on October 27, 1995, fourteen weeks before the issuance of the ‘216 patent on February 6, 1996. (MUF ¶ 43.) Subsequently in the European prosecution, the European examiner rejected a majority of the pending claims in the European/PCT counterpart application as lacking novelty and/or an inventive step over the Kuhn reference. (MUF ¶ 44; Glitzenstein Decl., Ex. 28, European Office Action.) Uniloc acquiesced in this rejection, amending the claims as suggested by the European examiner to overcome the Kuhn reference. (MUF ¶ 45; Glitzenstein Decl., Ex. 29, Uniloc response.)

## III. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is not appropriate where there is a genuine issue as to any material fact. *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993) ("If the facts of materiality or intent are reasonably disputed, the issue is not amendable to summary judgment."). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). To defeat a summary judgment motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Paragon*, 984 F.2d at 1190. In evaluating the record to determine whether there is a genuine issue as to any material fact, the "evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed. Cir. 1998) ("In determining the propriety of summary judgment, credibility determinations may not be made, and the evidence must be viewed favorably to the non-movant, with doubts resolved and reasonable inferences drawn in the non-movant's favor.").

Even though inequitable conduct is an equitable issue committed to the discretion of the district court, summary judgment is nevertheless improper if there are genuine issues of material fact. *Paragon,* 984 F.2d at 1190 ("disputed finding of intent to mislead or to deceive is one for the judge to resolve, not the jury, albeit not on summary judgment if there is a genuine dispute"). During a jury trial, district courts have discretion to handle the inequitable conduct issue in a variety of ways:

> Some courts have reserved the entire issue of inequitable conduct unto themselves; some have submitted special interrogatories to the jury on the facts of materiality and intent; and some have instructed the jury to find and weigh the facts of materiality and intent and decide the ultimate question of inequitable conduct.

*Hebert v. Lisle Corp.,* 99 F.3d 1109, 1114 (Fed. Cir. 1996).

**B. Inequitable Conduct**

Patent applicants and those substantively involved in the preparation or prosecution of a patent application are required to prosecute patent applications with candor, good faith, and honesty. *Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 204 F.3d 1368, 1373 (Fed. Cir. 2000); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995). "[I]nequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Semiconductor*, 204 F.3d at 1373. Materiality and intent must be established by clear and convincing evidence and then weighed to determine whether the equities warrant a conclusion that inequitable conduct occurred. *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1351 (Fed. Cir. 2005). The more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa. *Semiconductor*, 204 F.3d at 1375; *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001). Proof of high materiality and that the applicant knew or should have known of that materiality makes it difficult to show good faith to overcome an inference of intent to mislead. *Semiconductor*, 204 F.3d at 1375.

37 C.F.R. § 1.56 is the starting point for determining materiality. Information is material to patentability when:

> [I]t is not cumulative to information already of record or being made of record in the application, and
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
> (2) It refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56. Materiality is not limited to prior art but instead embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to

allow an application to issue as a patent. *GFI,* 265 F.3d at 1274.

Turning to the intent to deceive, it is well established that "[i]ntent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequence of which are presumably intended by the actor. *Semiconductor*, 204 F.3d at 1374-75; *Bruno,* 394 F.3d at 1354 ("Intent need not, and rarely can, be proven by direct evidence."); *Molins,* 48 F.3d at 1180. Intent to deceive is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially where there is no good faith explanation for a nondisclosure. *Bruno,* 394 F.3d at 1354; *see also LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed. Cir. 1992) (inference of deceptive intent was supported by evidence of applicant making patentability arguments that could not have been made had the withheld prior art been disclosed); *GFI,* 265 F.3d at 1275. There is no requirement that the evidence to establish intent to deceive must come directly from the inventor or prosecuting attorney. *Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354 (Fed. Cir. 2003) ("Intent, however, is typically proved inferentially, and a finding of intent does not required a confession from the stand by the inventor or prosecuting attorney").

## IV. ARGUMENT

### A. Richardson Intentionally Concealed the Best Mode

Richardson committed inequitable conduct by failing to disclose the best mode for his invention with an intent to deceive the PTO. Although the law is clear that intent need not, and rarely can, be proven by direct evidence, this is the rare case where intent to conceal is reflected by both the direct and indirect evidence. As discussed above in Section I.A., there is direct evidence that Richardson knew about the best mode (i.e., "secret algorithm") for carrying out the invention of the '216 patent and intentionally concealed it. (MUF ¶¶ 3-9.) Instead of the best mode, Richardson disclosed an inferior mode (i.e., a summer) that did not accomplish the intended purpose of the invention. (MUF ¶¶ 1-2, 6.) Uniloc does not even attempt to seek

summary judgment on this issue, but rather ignores it.[5]

"The purpose of the best mode requirement is to ensure that the public, in exchange for the rights given the inventor under the patent laws, obtains from the inventor a full disclosure of the preferred embodiment of the invention." *Dana Corp. v. IPC Ltd. Partnership,* 860 F.2d 415, 418 (Fed. Cir. 1988). 35 U.S.C. § 112 expressly requires that the "specification . . . shall set forth the best mode contemplated by the inventor of carrying out his invention." Thus, it is particularly egregious that Richardson deceived the PTO into granting a patent while Richardson never intended to give the public the preferred embodiment of the '216 patent invention.

The failure to disclose best mode is material. *Consolidated Aluminum Corp. v. Foseco Int'l, Ltd.,* 910 F.2d 804, 808 (Fed. Cir. 1990) ("Because disclosure of the best mode is statutorily required, *see* 35 U.S.C. § 112, failure to disclose the best mode is inherently material and, we believe, reaches the minimum level of materiality necessary for a finding of inequitable conduct."). The Federal Circuit in *Consolidated* affirmed the district court's ruling of inequitable conduct based on the intentional concealment of the best mode and disclosure of a fictitious, inoperable mode. *Consolidated,* 910 F.2d at 807-810. Here, Richardson intentionally concealed the best mode (i.e., "secret algorithm") for carrying out the invention of the '216 patent and instead, disclosed an inferior mode (i.e., a summer) that did not accomplish the intended purpose of the invention because it was "too obvious" and "too easy for someone to break."

Given the high materiality of the information regarding best mode, a lower level of intent is required to establish inequitable conduct. *See Semiconductor,* 204 F.3d at 1375. The intent to deceive is based on Richardson's concealment of the best mode (i.e., "secret algorithm") and disclosure of an inferior mode (i.e., summer). Richardson's motive is also apparent: If the secret

[5] Microsoft disclosed this defense on December 22, 2005. (*See* Glitzenstein Decl. Ex. 2, Microsoft's Supplemental Response to Plaintiffs' Interrogatory No. 13 dated December 22, 2005

algorithm were revealed, his unlocking mechanism would not work to prevent unlicensed use of software, thereby diminishing his chances to attract business from software publishers. The evidence thus shows Richardson deliberately concealed the "secret algorithm" from his patent disclosure, knowing that anyone armed with this knowledge would be able to unlock the software, thereby putting his entire software unlocking scheme in jeopardy. (MF ¶ 1.) Richardson also has not provided any explanation why the '216 patent discloses a "summer" that does not accomplish the intended purpose of the invention, instead of the "secret algorithm" that was actually used by Uniloc. (MUF ¶ 46.)

Thus, there is clear and convincing evidence that Richardson concealed material information regarding best mode with intent to deceive the PTO.

**B. Richardson Withheld Material Information Regarding Inventorship**

Richardson committed inequitable conduct by withholding material information regarding inventorship, with intent to deceive the PTO. Specifically, Richardson failed disclose that Allan Bell and Peter Higgs contributed to the invention of the '216 patent and thus, should have been named as co-inventors. Uniloc makes two arguments: "(1) there is a lack of evidence that either Mr. Higgs or Mr. Bell invented anything in the Uniloc '216 patent, and (2) there is a lack of evidence that Mr. Richardson or his attorneys attempted to deceive anybody." (Uniloc Brief at 13.)

Uniloc does not dispute, as it cannot, that information regarding inventorship is material. Incorrectly named inventorship (or evidence of derivation from another) would have prevented issuance of the '216 patent and thus serves as grounds for invalidity. In *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000), the Federal Circuit determined that inventorship is material in the context of inequitable conduct:

As a critical requirement for obtaining a patent, inventorship is material. *See, e.g.,*

---

(incorporating by reference responses to Interrogatory No. 11).)

> 35 U.S.C. § 102(f) (1994) ("A person shall be entitled to a patent unless ... he himself did not invent the subject matter sought to be patented."); 35 U.S.C. § 116 ("When an invention is made by two or more persons jointly, they shall apply for a patent jointly."). Examiners are required to reject applications under 35 U.S.C. § 102(f) on the basis of improper inventorship. *See* Manual of Patent Examining Procedure § 2137.01 (hereinafter "MPEP"). Accordingly, the Manual of Patent Examining Procedure details the "rules" of inventorship to be used by examiners, *see id.*, and specifically notes that information about inventorship is material under 37 C.F.R. § 1.56, *see* MPEP § 2001.06(c) (inventorship disputes are material information); MPEP § 2004 (suggesting that applicants carefully consider inventorship in the duty to disclose context).

The failure to disclose information regarding inventorship is also material under 37 C.F.R. § 1.56(b)(2) ("[I]nformation is material to patentability when . . . [i]t refutes, or is inconsistent with, a position the applicant takes in [a]sserting an argument of patentability."). *Id.* at 1321-22.

Uniloc argues that Microsoft did not ask Higgs or Bell if they invented anything in the '216 patent and that neither Higgs nor Bell has ever made any claim in any forum that they invented anything in the '216 patent. (Uniloc Brief at 13.) However, inventorship is a question of law. *Frank's Casing Crew & Rental Tool, Inc. v. PMR Tech. Ltd.*, 292 F.3d 1363, 1371 (Fed. Cir. 2002). Testimony from Higgs or Bell regarding their respective opinions on the ultimate legal conclusion of inventorship is irrelevant—a point that Uniloc would no doubt press if either gentleman had made such an assertion. What is relevant is that Higgs and Bell testified to their respective contributions, and their testimony is corroborated by the testimony of others and contemporaneous documents evidencing their contributions (see discussion above in Section I.B.), which under the patent law establish that they should have been named as inventors. *See Frank's Casing*, 292 F.3d at 1373; *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1373 (Fed. Cir. 1998) (documentary evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated). Moreover, regardless of whether Higgs and Bell are ultimately determined to be inventors, the

issue with respect to inequitable conduct is whether a disclosure of the contributions of Higgs and Bell would have been material to a reasonable examiner's consideration of the inventorship issue. *See PerSeptive*, 225 F.3d at 1322 ("whether the inventorship of the patents as issued is correct does not determine the materiality of the statements in this case, just as whether concealed prior art would actually invalidate the patent is irrelevant to materiality").

Given the high materiality of the omissions regarding inventorship, a lower level of intent is required to establish inequitable conduct. *See Semiconductor*, 204 F.3d at 1375. The evidence is more than enough to show that Richardson's failure to disclose the contributions of Higgs and Bell was driven by Richardson's desire to deprive Higgs and Bell of any entitlement to credit for their work. [redacted]

Thus, there is clear and convincing evidence that Richardson withheld material information regarding inventorship, with an intent to deceive the PTO.

### C. Richardson Made Material Misrepresentations and Withheld Material Information Regarding the Grundy Patent

Richardson committed inequitable conduct by making material misrepresentations and withholding material information regarding the Grundy patent, with an intent to deceive the PTO. To this day, Uniloc has never disputed the facts that Richardson directed the Examiner to less relevant portions of the Grundy patent, misrepresented the Grundy patent, and withheld conflicting statements made by Grundy regarding the relevance of his own patent.[6] Nor does Uniloc offer any explanation to justify its pattern of calculated misrepresentations and omissions,

[6] Tellingly, Uniloc's counsel ignored Grundy's offer to explain how the Grundy patent discloses the same algorithm during his deposition. Glitzenstein Decl., Ex. 31, Grundy Tr. at 47-48.

which Microsoft contends were designed to deceive and mislead the PTO into granting a patent for what Richardson knew was not an invention.

In response to Microsoft's allegations, Uniloc simply rehashes many of the same arguments it raised, and that were rejected, in its Motion to Dismiss: (1) Richardson argued its view of the prior art to the Examiner, which the Examiner was free to accept or reject; (2) the Grundy letters are not prior art and are less material than the Grundy patent; and (3) there is no evidence of intent to deceive the PTO. Uniloc Brief at 5-10. Uniloc is mistaken on each of these points.

**1. Richardson's Material Misrepresentations Regarding the Grundy Patent Constitute Inequitable Conduct, Even Though the Examiner Could Have Determined That Richardson's Statements Were False Upon Further Analysis of the Grundy Patent**

Regarding Richardson's misrepresentations of the Grundy patent, Uniloc essentially takes the position that it is somehow acceptable to make material misrepresentations to the Examiner and withhold material information from the Examiner, so long as the Examiner is given the underlying prior art reference. This is plainly incorrect under established Federal Circuit law, and if true would turn the duty of candor on its head and render it largely meaningless.

Citing *Akzo N.V. v. U.S. Int'l Trade Comm'n,* 808 F.2d 1471 (Fed. Cir. 1986) and *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000), Uniloc argues that the repeated material misrepresentations regarding the Grundy patent do not give rise to inequitable conduct because arguments to the PTO regarding a prior art reference cannot amount to a material misrepresentation. (Uniloc Brief at 9.) Uniloc asserts that the Examiner is presumed to have understood the Grundy patent and thus, could have accepted or rejected Uniloc's arguments. (Uniloc Brief at 9-10.) That presumption, however, is one that can be overcome, especially here, where Richardson directed the Examiner to less relevant portions of the Grundy patent and made additional misrepresentations of the Grundy patent.

Contrary to Uniloc's assertions, a patent applicant cannot willfully and intentionally mislead the Examiner when distinguishing cited prior art. In *Akzo*, the district court concluded, ***after full discovery and trial***, that there was no inequitable conduct because there was neither "a proved material misrepresentation [n]or a proved intent to mislead." *Akzo,* 808 F.2d at 1482. *Akzo* "does not stand for the proposition, that as a matter of law, arguments made to the PTO cannot constitute inequitable conduct." *Semiconductor Energy Lab., Co., Ltd. v. Samsung Elecs. Co., Ltd.* 24 F.Supp. 2d 537, 542 (E.D. Va. 1998), *aff'd on other grounds,* 204 F.3d 1368 (Fed. Cir. 2000); *see also Braintree Labs., Inc. v. Nephro-Tech, Inc.*, 81 F.Supp.2d 1122, 1134 (D. Kan. 2000) ("that the prior art is independently considered by the PTO does not alleviate the applicant's duty of candor to the PTO, and, therefore, a deliberate misrepresentation of the prior art's teachings, if sufficiently material, may justify a finding of inequitable conduct") (citing *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 938 (Fed. Cir. 1990) ("lapse on the part of an examiner does not exculpate an applicant whose acts are intentionally deceptive")).

Uniloc's reliance on *Life Techs.* is likewise misplaced. Unlike in the *Life Techs.* case, Richardson made several factual assertions regarding the Grundy patent that were plainly incorrect and could give rise to a finding of misrepresentation. Uniloc's quotation from *Life Techs.* (Uniloc Brief at 9) leaves out this critical distinction:

> First, in making the argument, the inventors merely advocated a particular interpretation of the teachings of the Johnson article and the level of skill in the art, which the Examiner was free to accept or reject. **This argument did not contain any factual assertions that could give rise to a finding of misrepresentation.**

*Id.* at 1326 (emphasis added).

There can be no dispute that the Grundy patent is material under 37 C.F.R. § 1.56 and establishes a prima facie case of unpatentability either alone or in combination with other references, because the Examiner himself rejected the '216 patent claims based on the Grundy

patent. Moreover, as discussed above in Section I.C., Richardson directed the Examiner to less relevant portions of the Grundy patent and misrepresented the Grundy patent. Because Richardson's misrepresentations were the sole basis on which the '216 patent claims were ultimately distinguished from the Grundy patent, the misrepresentations were highly material.

### 2. Richardson Withheld Material Information Regarding the Grundy Patent

Further aggravating Richardson's misrepresentations is the fact that Richardson also withheld material information regarding the Grundy patent that conflicted with those misrepresentations. [redacted]

Uniloc's argument that the Grundy letters post-dated the filing date of the '216 and thus, are not prior art, misses the point. Microsoft is not taking the position that the Grundy letters themselves constitute prior art. Rather, the Grundy letters contain material information regarding the Grundy patent, which is undisputed prior art to the '216 patent. Thus, Uniloc's discussion regarding the *Hebert* case on page 8 of its brief is irrelevant.

Uniloc's reliance on *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365 (Fed. Cir. 2001) is likewise misplaced. Unlike in the *Mentor* case, in this case Richardson not only directed the Examiner to less relevant portions of the Grundy patent, but also misrepresented the Grundy patent to the Examiner. Again, Uniloc's quotation from the *Mentor* case (Uniloc Brief at 7) leaves out this critical distinction:

> An inventor's opinions regarding a prior art device known to the examiner are not within the domain of material that must be submitted to the PTO. An article describing the device was before the examiner and **the record does not demonstrate that Parisi misrepresented the device**.

*Id.* at 1378 (emphasis added).

Contrary to Uniloc's assertions, any information may be material, and require disclosure, even if it is not itself prior art. *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148

F.3d 1380, 1382 (Fed. Cir. 1998) ("With regard to the issue of inequitable conduct, we noted that '[b]oth the parties and the district court appear to have assumed, quite incorrectly, that only prior art can be a material reference.' Materiality instead embraces 'any information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent.'"); *GFI*, 265 F.3d at 1274 ("Materiality is not limited to prior art but instead embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent."); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1258 (Fed. Cir. 1997) ("A patent applicant's duty to disclose is not limited to disclosing prior art. A patent applicant must disclose any material information to the PTO."). The Manual of Patent Examining Procedure specifically contemplates "communications from or with competitors" as a source of information to be disclosed to the PTO. *See* MPEP § 2001.06.

The information in the Grundy letters is not merely cumulative to or less material than the Grundy patent. [redacted] Richardson's obligation to disclose Grundy's statements was even more compelling considering Richardson's extensive and repeated misrepresentations to the PTO that the Grundy patent discloses the "complete reverse" of his system. Thus, the information in the Grundy letters satisfies 37 C.F.R. § 1.56 because it refutes or is inconsistent with a position Richardson took in opposing an argument of unpatentability. Particularly when considered in the context of Richardson's misrepresentation, the information in these letters constitutes material information, and by withholding that information Richardson clearly violated the duty of candor.

### 3. Richardson Misrepresented and Withheld Material Information Regarding the Grundy Patent with an Intent to Deceive the PTO

Given the high materiality of the misrepresentations and withheld information regarding the Grundy patent, a lower level of intent is required to establish inequitable conduct. *See Semiconductor*, 204 F.3d at 1375. Here, intent to deceive is shown by the fact that Richardson knew full well of the high materiality of the Grundy patent, and yet deliberately chose to direct the Examiner to less relevant portions of the Grundy patent, misrepresented the Grundy patent in opposing the Examiner's rejection, and concealed Grundy's conflicting statements regarding the relevance of his patent to the '216 patent. *See Lipman v. Dickinson*, 174 F.3d 1363 (Fed. Cir. 1999) ("The fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent.").

Richardson's actions clearly fail to satisfy the duty of candor. Although there was no requirement to discuss the relevancy of the Grundy patent when submitting it to the PTO, the duty of candor certainly required Richardson to refrain from providing explanations that diverted the Examiner's attention from the Grundy patent's relevant teachings and to refrain from misrepresenting the Grundy patent. *See, e.g.*, *Semiconductor*, 204 F.3d at 1376-77 (intent to mislead based on submission of partial translation of foreign reference and concise statement not addressing its key teachings); *CIVIX-DDI, L.L.C. v. Cellco P'ship*, 387 F. Supp. 2d 869, 907 (D. Ill. 2005) (denying a motion for summary judgment of no inequitable conduct where the patentee's affirmative misrepresentations regarding the prior art before the examiner raised a genuine issue of material fact); *Transocean Offshore Deepwater Drilling v. GlobalSantaFe Corp.*, 2006 U.S. Dist. LEXIS 57967 slip-op at 29 (D. Tex. 2006) (denying a motion for summary judgment of no inequitable conduct where the patentee's representations regarding the prior art before the examiner conflicted with other evidence on the record, raising a genuine issue of material fact). By submitting the Grundy patent along with a preemptive discussion focusing

on less relevant portions of the Grundy patent, and by misrepresenting the Grundy patent, Richardson left the Examiner with the impression that the Examiner did not need to conduct any further investigation of the Grundy patent. (MF ¶ 3.) The natural consequence of these acts was to lead the Examiner to believe that the Grundy patent was not relevant and that Richardson had pointed out the most relevant portions of the Grundy patent. (*Id.*) Uniloc's actions effectively led the Examiner away from investigating and analyzing the facts before him.

Finally, it is telling that Uniloc has nowhere provided any explanation as to why Richardson made preemptive statements directing the Examiner to less relevant portions of the Grundy patent, misrepresented the Grundy patent, and withheld information that conflicted with his misrepresentation of the Grundy patent. *See Bruno,* 394 F.3d at 1351 (intent to deceive is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially where there is no good faith explanation for nondisclosure).

In sum, there is clear and convincing evidence that Richardson misrepresented the Grundy patent and withheld material information regarding the Grundy patent with intent to deceive the PTO.

**D. Richardson Intentionally Withheld the Kuhn Reference**

Richardson committed inequitable conduct by withholding the Kuhn reference from the PTO. In its brief, Uniloc makes the following arguments: (1) Kuhn was merely cumulative of the prior art that was before the Examiner; and (2) there is no evidence of intent to deceive the PTO. (Uniloc Brief at 10-13.)

As the sole support for its argument that the Kuhn reference is cumulative, Uniloc points to Maxwell's statement that Fiener, Uniloc's German patent attorney, had concluded that the Kuhn reference "should not cause any real problems." (Uniloc Brief at 13.) Uniloc overlooks the fact that Fiener actually opined that the Kuhn reference anticipated certain claims in the

European/PCT counterpart application. (MUF ¶ 39; Glitzenstein Decl., Ex. 26, Fiener letter at UNILOC 984 - 986.) Thus, there is a genuine dispute as to the materiality of the Kuhn reference based solely on Fiener's analysis relied upon by Uniloc.

Moreover, as set forth in Section I.D., the European examiner, as well as Fiener, regarded the Kuhn reference as not cumulative, and in fact, more material than the other prior art references (i.e., Frezza, Wolfe, Joshi, Ogaki, and Tau) cited in the international search report, which were disclosed by Richardson to the PTO. The high materiality of the Kuhn reference is further evidenced by the fact that during the European prosecution, the Examiner subsequently rejected the pending claims in the European/PCT counterpart application as lacking novelty and/or an inventive step over the Kuhn reference. (MUF ¶ 44; Glitzenstein Decl., Ex. 28, European Office Action.) Richardson's knowledge that the Kuhn reference was highly material is shown by the fact that Richardson acquiesced in this rejection, amending the claims as suggested by the European examiner to overcome the Kuhn reference. (MUF ¶ 45, Glitzenstein Decl., Ex. 29, Uniloc Response.)

Given the high materiality of the Kuhn reference, a lower level of intent is required to establish inequitable conduct. *See Semiconductor*, 204 F.3d at 1375. Here, intent to deceive is based on the facts that Richardson had sufficient time to disclose the Kuhn reference before the issuance of the '216 patent and Richardson knew about Fiener's opinion that the Kuhn reference anticipated certain claims in the European/PCT counterpart application (and later amended his claims in response to a rejection over Kuhn). (*See* MUF ¶¶ 39-45.) Richardson has not identified any further analysis of the Kuhn reference that called into question Fiener's analysis or provided any other explanation why the Kuhn reference was not disclosed to the PTO. (MUF ¶ 48.)

Moreover, contrary to Uniloc's assertions, it is irrelevant that Uniloc paid the issuance

fee for the ‘216 patent on November 6, 1995. It is well established that the duty of disclosure exists throughout the entire course of the application process up through the date of issuance of the patent. MPEP § 2001.04 (“The duty to disclose information, however, does not end when an application becomes allowed but extends until a patent is granted on that application.”); *see also D.O.C.C. Inc. v. Spintech Inc*, 36 U.S.P.Q.2d 1145, 1153 (SDNY 1994). Uniloc’s reliance on *Kimberly-Clark Corp. v. Procter & Gamble Distributing Co., Inc.*, 973 F.2d 911 (Fed. Cir. 1992) is also misplaced. There, the patent attorney explained that he did not have time to study the prior art patent by the time the Enloe patent issued. After completing his study, however, the patent attorney disclosed the prior art patent to the PTO in connection with the examination of a sibling application to the Enloe patent. *Id.* at 918.

Unlike *Kimberly-Clark*, Richardson never disclosed the Kuhn reference to the PTO and provided no explanation for why it had not been disclosed. Both Maxwell and Cox, who were substantively involved in the prosecution of the ‘216 patent, were aware that Fiener had opined that the Kuhn reference anticipated certain claims in the European/PCT counterpart application. (MUF ¶¶ 40-41.) There was also sufficient time to disclose the Kuhn reference to the PTO. While Richardson took only six weeks to cite the five less-relevant prior art references from the international search report to the PTO, Richardson failed to cite the single highly relevant Kuhn reference in the fourteen weeks between the issuance of the supplemental search report and the issuance of the ‘216 patent. (MUF ¶ 43.) It is reasonable to infer that Richardson did not disclose the Kuhn reference because he did not want to affect the issuance of the ‘216 patent, especially given the fact that Uniloc’s German patent attorney opined that the Kuhn reference anticipated certain claims in the European/PCT counterpart application. (MF ¶ 7.)

Thus, there is clear and convincing evidence that Richardson withheld the material Kuhn reference, with an intent to deceive the PTO.

## V. CONCLUSION

For the foregoing reasons, Microsoft respectfully requests that the Court deny Plaintiffs' Motion for Partial Summary Judgment.

Dated: October 16, 2006

By: /s/ Joseph V. Cavanagh, Jr.
Joseph V. Cavanagh, Jr. #1139
**BLISH & CAVANAGH**
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903
(401) 831-8900 (Telephone)
(401) 751-7542 (Facsimile)

Frank E. Scherkenbach
Kurt L. Glitzenstein
Laura R. Braden
**FISH & RICHARDSON P.C.**
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Isabella Fu, Esq.
**MICROSOFT CORPORATION**
One Microsoft Way
Redmond, WA 98052-6399
Telephone: (415) 882-8080
Facsimile: (415) 936-7329

Attorneys for Defendant
MICROSOFT CORPORATION

**CERTIFICATE OF SERVICE**

I certify that on October 16, 2006, I caused a true and correct copy of the foregoing MEMORANDUM IN SUPPORT OF MICROSOFT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF INEQUITABLE CONDUCT to be served as follows:

| | |
|---|---|
| Francis A. Connor, III<br>Sheri L. Pizzi<br>Taylor Duane Barton & Gilman, LLP<br>10 Dorrance Street, Suite 700<br>Providence, RI 02903 | Attorneys for Plaintiffs<br>UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED |

(Served via e-file)

| | |
|---|---|
| Paul J. Hayes<br>Dean Bostock<br>Paul J. Cronin<br>Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111 | Counsel for Plaintiffs<br>UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED |

(Served via e-file)

/s/ Joseph V. Cavanagh, Jr.
Joseph V. Cavanagh, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNILOC USA, INC. and
UNILOC SINGAPORE PRIVATE LIMITED,

Plaintiffs,

v.

MICROSOFT CORPORATION,

Defendant.

Civil Action No. 03 440 (WES)

**DECLARATION OF KURT L. GLITZENSTEIN**

I, Kurt L. Glitzenstein, a principal of the law firm Fish & Richardson P.C., counsel for Defendant Microsoft Corporation ("Microsoft") in the above-captioned matter, declare the following to be true, to the best of my knowledge, information, and belief:

1. Attached hereto as Exhibit 1 is a true and correct copy of the U.S. Patent No. 5,490,216 ("the patent-in-suit").

2. Attached hereto as Exhibit 2 is a true and correct copy of Microsoft's Supplemental Response to Plaintiffs' Interrogatory No. 13, dated December 22, 2005.

3. Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the transcript from the October 5, 2005 deposition of Timothy Cooper. **[FILED UNDER SEAL]**

4. Attached hereto as Exhibit 4 is a true and correct copy of excerpts of the transcript from the October 6, 2005 deposition of Cary Michael Stephen Dreelan. **[FILED UNDER SEAL]**

5. Attached hereto as Exhibit 5 is a true and correct copy of excerpts of the transcript from the March 31, 2005 deposition of Fredric Bailer Richardson III. **[FILED UNDER SEAL]**

6. Attached hereto as Exhibit 6 is a true and correct copy of the letter to Cary Dreelan from Ric Richardson, dated August 1, 1992 (UNILOC 15870 – 15871). **[FILED UNDER SEAL]**

7. Attached hereto as Exhibit 7 is a true and correct copy of excerpts of the transcript from the April 28, 2005 deposition of Gregory Stephen Cox.

8. Attached hereto as Exhibit 8 is a true and correct copy of Plaintiffs' Second Supplemental Answers to Defendant's Interrogatory No. 6, dated February 22, 2005.

9. Attached hereto as Exhibit 9 is a true and correct copy of excerpts of the transcript from the October 3, 2005 deposition of Allan Bruce Bell.

10. Attached hereto as Exhibit 10 is a true and correct copy of excerpts of the transcript from the July 10, 2005 deposition of Fredric Bailer Richardson III. **[FILED UNDER SEAL]**

11. Attached hereto as Exhibit 11 is a true and correct copy of excerpts of the transcript from the April 21, 2005 deposition of Peter Lloyd Higgs. **[FILED UNDER SEAL]**

12. Attached hereto as Exhibit 12 is a true and correct copy of Peter Lloyd Higgs deposition exhibit No. 8. **[FILED UNDER SEAL]**

13. Attached hereto as Exhibit 13 is a true and correct copy of Peter Lloyd Higgs deposition exhibit No. 6. **[FILED UNDER SEAL]**

14. Attached hereto as Exhibit 14 is a true and correct copy of Ric Richardson's notebook, with a cover dated October 1, 1992 (UNILOC 11772; 11775; 11778; 11833). **[FILED UNDER SEAL]**

15. Attached hereto as Exhibit 15 is a true and correct copy of Tania Clubb deposition exhibit No. 2. **[FILED UNDER SEAL]**

16. Attached hereto as Exhibit 16 is a true and correct copy of the U.S. Patent No. 5,291,598 (the "Grundy patent").

17. Attached hereto as Exhibit 17 is a true and correct copy of the letter to Ric Richardson from Greg Grundy dated October 13, 1993 (UNILOC 10739). **[FILED UNDER SEAL]**

18. Attached hereto as Exhibit 18 is a true and correct copy of the letter to the Managing Principal of Uniloc Corporation from John Swinson, Esq., dated June 24, 1994 (UNILOC 10561-10562). **[FILED UNDER SEAL]**

19. Attached hereto as Exhibit 19 is a true and correct copy of the letter to Examination Officer, Australian Industrial Property Organization from Mark J. Coorey, dated November 20, 1994 (UNILOC 10735). **[FILED UNDER SEAL]**

20. Attached hereto as Exhibit 20 is a true and correct copy of excerpts from the prosecution history of U.S. Patent 5,490,216, Amendment in Response to June 24, 1994 Office Action (MS-U 467218- 467222).

21. Attached hereto as Exhibit 21 is a true and correct copy of excerpts from the prosecution history of U.S. Patent 5,490,216, Office Action, dated March 30, 1995 (MS-U 467225- 467228).

22. Attached hereto as Exhibit 22 is a true and correct copy of excerpts from the prosecution history of U.S. Patent 5,490,216, Amendment in Response to March 30, 1995 Office Action, dated June 30, 1995 (MS-U 467230- 467239).

23. Attached hereto as Exhibit 23 is a true and correct copy of Uniloc's European/PCT Patent Application (MS-U 969919 - 969970).

24. Attached hereto as Exhibit 24 is a true and correct copy of the European/PCT Patent Application International Search Report (MS-U 970086 - 970089).

25. Attached hereto as Exhibit 25 is a true and correct copy of excerpts from the prosecution history of U.S. Patent 5,490,216, Information Disclosure Statement, dated February 16, 1994 (MS-U 467209-467210).

26. Attached hereto as Exhibit 26 is a true and correct copy of the letter to Steve Cox from Peter Maxwell, dated January 17, 2006, enclosing Josef Fiener letter, dated January 5, 1996,

Supplementary European Search Report and German patent application DE 40 19 652 A1 (the "Kuhn reference") (UNILOC 983 - 992).

27. Attached hereto as Exhibit 27 is a true and correct copy of published German patent application DE 40 19 652 A1 (the "Kuhn reference") and the German to English translation with certificate (MS-U 954410-954415 and UNILOC 990-992).

28. Attached hereto as Exhibit 28 is a true and correct copy of the European/PCT Application Office Action, dated February 2, 1999 (MS-U 969989-969995).

29. Attached hereto as Exhibit 29 is a true and correct copy of the European/PCT Application Response, dated November 18, 1999 (MS-U 969977-969984).

30. Attached hereto as Exhibit 30 is a true and correct copy of Uniloc Q & A, dated August 24, 1993 (UNILOC 2400-2424). **[FILED UNDER SEAL]**

31. Attached hereto as Exhibit 31 is a true and correct copy of excerpts of the transcript from the April 28, 2005 deposition of Gregory Lawrence Grundy.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: October 16, 2006

Kurt L. Glitzenstein

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC USA, INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br>Defendant. | Civ. A. No. 03-CV-440 (WES) |

**MICROSOFT'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORY NOS. 9-13, 15 & 16**

Microsoft Corporation ("Microsoft") responds to Plaintiff's First Set of Interrogatories (Nos. 1-17) as follows:

## GENERAL OBJECTIONS

Microsoft incorporates by reference its General Objections and Objections to Instructions and Definitions stated in its Response to Plaintiffs' First Set of Interrogatories (Nos. 1-17) and its General Objections and Objections to Instructions and Definitions stated in its Response to Plaintiffs' Second Set of Interrogatories (Nos. 18-25).

## INDIVIDUAL RESPONSES

INTERROGATORY NO. 9

Identify all prior art known to Defendant that supports its contention in its Answer, Affirmative Defenses and Counterclaims that the patent-in-suit is invalid.

RESPONSE TO INTERROGATORY NO. 9 (FEBRUARY 5, 2004)

Microsoft objects to this interrogatory as premature because this action has just begun, 35 U.S.C. § 282 establishes a statutory for disclosure of prior art references to an adverse party, and a date for expert disclosure has not yet been set in this case. Microsoft has proposed a schedule for identifying infringement and invalidity contentions in this

6th SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10 (DECEMBER 22, 2005)

Subject to and without waiving the foregoing general and specific objections, Microsoft further responds as follows. Microsoft incorporates by reference its responses to Interrogatory No. 9 and the Third Expert Report of Dan S. Wallach, Ph.D.

Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory.

INTERROGATORY NO. 11

Separately for each claim of the '216 patent that Defendant asserts is invalid under 35 U. S. C. §§ 101, 102, 103 and/or 112, as is set forth in Defendant's answer, affirmative defenses and/or counterclaims, identify, set forth in detail and describe with particularity the factual and legal basis supporting Defendant's contentions that the '216 patent is invalid; and identify all of the facts, actions, events, witnesses, testimony and documents which you contend support Defendant's assertions of invalidity, including, but not limited to: all prior art which Defendant asserts anticipates the claim and/or renders the claim obvious; all prior art which Defendant asserts was not properly disclosed to the U. S. Patent and Trademark Office during prosecution of the patents-in-suit; all language which Defendant asserts is indefinite and/or is not enabled; all information which Defendant asserts suggests that the best mode is not disclosed in the specification; and all subject matter which is not patentable, and explain why Defendant asserts the subject matter is not patentable; and identify the level of ordinary skill in the art; identify all persons and entities who Defendant will call as a witness in support of its invalidity contentions; and provide the facts and substance of the expected testimony of each witness.

RESPONSE TO INTERROGATORY NO. 11 (FEBRUARY 5, 2004)

Microsoft objects to this interrogatory as premature because this action has just begun, 35 U.S.C. § 282 establishes a statutory for disclosure of prior art references to an adverse party, and a date for expert disclosure has not yet been set in this case. Microsoft has proposed a schedule for identifying infringement and invalidity contentions in this case, including through expert reports, and Plaintiffs have not yet responded to this proposal. Microsoft objects to this interrogatory to the extent it seeks information

protected against disclosure by the attorney-client privilege and/or the work product doctrine. Microsoft also objects to disclosing confidential information until a suitable protective order is entered. Microsoft further objects to this interrogatory as unduly burdensome in that it seeks to impose obligations on Microsoft that exceed those set forth in the Federal Rules of Civil Procedure, the Local Rules or any order of the Court. Microsoft will provide its witness disclosure in accordance with the Federal Rules of Civil Procedure and the pretrial order set by the Court.

1st SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (OCTOBER 29, 2004)

In view of the fact that the Court entered a Protective Order in this case on April 30, 2004, Microsoft is not withholding information responsive to this interrogatory on the basis of its earlier objection concerning confidentiality.

Subject to and without waiving the foregoing general and specific objections, Microsoft hereby incorporates its responses to Plaintiffs' Interrogatories Nos. 8, 9, 10, 13, and 14. Microsoft further identifies the following: the '216 patent, the '216 patent file history, Microsoft's technical expert(s), and Frederic B. Richardson III.

As fact discovery is ongoing, including that the named inventor of the '216 patent, Frederic B. Richardson III, has not yet been deposed, and expert discovery has not yet commenced, Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory after the deadline for expert reports on invalidity.

2nd SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (DECEMBER 23, 2004)

Subject to and without waiving the foregoing general and specific objections, Microsoft hereby incorporates its supplemental response to Plaintiffs' Interrogatory No. 10.

As fact discovery is ongoing, including that the named inventor of the '216 patent, Frederic B. Richardson III, has not yet been deposed, and expert discovery has not yet commenced, Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory after the deadline for expert reports on invalidity. Microsoft further reserves the right to amend, supplement, or clarify its response to this interrogatory after the deadline for expert reports on invalidity.

3rd SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (JUNE 24, 2005)

Subject to and without waiving the foregoing general and specific objections, Microsoft hereby incorporates its supplemental responses to Plaintiffs' Interrogatory Nos. 9, 10, and 13. Microsoft further identifies the deposition testimony of the following individuals as relevant to the invalidity of the '216 patent: Frederic B. Richardson III, Tania Clubb, Peter Higgs, Gregory Steven Cox, Tim Cooper, and Gregory Grundy.

All claims of the '216 patent are invalid as they do not meet the standards for patentability set out by 35 U.S.C. § 112 ¶¶1, 2, including because the following phrases are ambiguous: "subsequent execution" (claim 7); "said platform unique ID generating means comprises part of said digital data when executed on said platform" (claim 8); "said platform unique ID generating means utilizes hard disc or other platform information to determine said platform unique ID" (claim 9); "attachable to" (claim 12);

"checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration system" (claim 12); and "not user configurable" (claim 16). Furthermore, the '216 patent does not enable at least the following: "local licensee unique ID generating means;" "remote licensee unique ID generating means;" "the algorithm;" "a registration algorithm;" "generating a security key;" "registration system is replicated at a registration authority;" "registration number algorithm;" and "registration key generating means."

As fact discovery is ongoing, including that the named inventor of the '216 patent, Frederic B. Richardson III's deposition has not yet concluded, and expert discovery has not yet commenced, Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory. Microsoft further reserves the right to amend, supplement, or clarify its response to this interrogatory after the deadline for expert reports on invalidity.

4th SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (JULY 29, 2005)

Subject to and without waiving the foregoing general and specific objections, Microsoft hereby incorporates its supplemental responses to Plaintiffs' Interrogatory Nos. 9, 10, and 13.

All claims of the '216 patent are invalid as they do not meet the standards for patentability set out by 35 U.S.C. § 102(f). The alleged invention of the '216 patent claims was derived from at least the work of Allan Bell and Peter Higgs. Microsoft incorporates herein the deposition testimony of Ric Richardson and Peter Higgs on this issue.

Furthermore, and although the Interrogatory does not call for invalidity defenses premised on 35 U.S.C. § 116, all claims of the '216 patent are invalid under 35 U.S.C. § 116 for failure to name Allan Bell and/or Peter Higgs as co-inventors.

Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory after completion of fact discovery, including without limitation after the depositions of Allan Bell, Cary Dreelan, and Martin Hellman. Microsoft further reserves the right to amend, supplement, or clarify its response to this interrogatory after the deadline for expert reports on invalidity.

5th SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (AUGUST 26, 2005)

Subject to and without waiving the foregoing general and specific objections, Microsoft hereby incorporates the deposition of Ric Richardson, (i.e., July 20, 2005 Richardson Tr. 324:11-236:8; 238:7-246:4; 246:10-247:21; 248:1-257:12) and Peter Higgs (i.e., Higgs Tr. 8-12, 17-19, 22-28, 32-42, 44, 46-50).

Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory after the completion of fact discovery, including without limitation after the depositions of Allan Bell and Cary Dreelan. Microsoft further reserves the right to amend, supplement, or clarify its response to this interrogatory after the deadline for expert reports on invalidity.

6th SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (DECEMBER 2, 2005)

Subject to and without waiving the foregoing general and specific objections, Microsoft hereby incorporates its responses to Plaintiffs' Interrogatory Nos. 9, 10, and 13. Microsoft further incorporates the First and First Supplemental reports of Dan S.

Wallach, Ph.D., the Expert Witness Report of Larry D. Nixon, the deposition of Cary Michael Stephen Dreelan (e.g., Dreelan Tr. 18-19, 25-27, 31-32, 37-39, 50-51), and the deposition of Allan Bruce Bell (e.g., Bell Tr. 10-23), along with the exhibits thereto.

All claims of the '216 patent are invalid as they do not meet the standards for patentability set out by 35 U.S.C. § 112 ¶1, including because the phrase "platform unique ID generating means" is ambiguous (claim 7 and its dependent claims) and because the '216 patent specification fails to set forth the best mode contemplated by Mr. Richardson of carrying out his invention. In particular, the '216 patent specification does not set forth the best mode for the local and remote licensee unique ID generating means.

Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory.

7th SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (DECEMBER 22, 2005)

Subject to and without waiving the foregoing general and specific objections, Microsoft hereby incorporates its responses to Plaintiffs' Interrogatory Nos. 9, 10, and 13. Microsoft further incorporates the Third Expert Report of Dan S. Wallach, Ph.D. and the Rebuttal Expert Witness Report of Larry S. Nixon

Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory.

INTERROGATORY NO. 12

Separately for each accused product tested, conceived, designed, developed, manufactured, purchased, acquired, licensed, imported, exported, distributed, used, offered for sale and/or sold by Defendant in the United States after 1998, which Defendant asserts does not infringe any of the claims of the '216 patent literally, under the doctrine of equivalents, contributorily and/or by inducement, as set forth in Defendant's answer, affirmative defenses and/or counterclaims, Defendant is requested to

INTERROGATORY NO. 13

Separately for each claim of the '216 patent that defendant asserts is unenforceable, as is set forth in defendant's answer, affirmative defenses and/or counterclaims, identify, set forth in detail and describe with particularity the factual and legal basis of its unenforceability contentions, including, but not limited to, the facts, actions, events, witnesses, testimony and documents on which defendant will rely in supports its assertions of unenforceability; identification of all persons and entities who defendant will call as a witness in support of its unenforceability contentions; and identification of the facts and substance of the expected testimony of each witness.

RESPONSE TO INTERROGATORY NO. 13 (FEBRUARY 5, 2004)

Microsoft objects to this interrogatory as premature because this action has just begun, and a date for expert disclosure has not yet been set in this case. Microsoft objects to this interrogatory to the extent it seeks information protected against disclosure by the attorney-client privilege and/or the work product doctrine. Microsoft further objects to this interrogatory as unduly burdensome in that it seeks to impose obligations on Microsoft that exceed those set forth in the Federal Rules of Civil Procedure, the Local Rules or any order of the Court. Microsoft will provide its witness disclosure in accordance with the Federal Rules of Civil Procedure and the pretrial order set by the Court.

1st SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13 (OCTOBER 29, 2004)

In view of the fact that the Court entered a Protective Order in this case on April 30, 2004, Microsoft is not withholding information responsive to this interrogatory on the basis of its earlier objection concerning confidentiality.

Subject to and without waiving the foregoing general and specific objections, Microsoft hereby incorporates by reference Defendant's Motion for Leave to File an Amended Answer, Memorandum in Support of Defendant's Motion for Leave to File an

Amended Answer and Proposed Amended Answer, to be filed with the Court on November 1, 2004. Microsoft also incorporates by reference its responses to Plaintiffs' Interrogatory No. 14.

As fact discovery is ongoing, Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory as that discovery dictates.

2nd SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13 (DECEMBER 23, 2004)

Subject to and without waiving the foregoing general and specific objections, Microsoft hereby incorporates by reference Defendant's Motion for Leave to File an Amended Answer, Memorandum in Support of Defendant's Motion for Leave to File an Amended Answer and Proposed Amended Answer, which were filed with the Court on November 1, 2004, Defendant's First Amended Answer, Affirmative Defenses and Counterclaims, which were filed with the Court on November 19, 2004, Defendant's Opposition to Plaintiffs' Motion to Dismiss Defendant's Counterclaim Alleging Inequitable Conduct Pursuant to Fed. R. Civ. P. 12(b)(6) and Memorandum in Support of Defendant's Opposition to Plaintiffs' Motion to Dismiss Defendant's Counterclaim Alleging Inequitable Conduct Pursuant to Fed. R. Civ. P. 12(b)(6), which were filed with the Court on December 13, 2004.

As fact discovery is ongoing, Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory as that discovery dictates.

3rd SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13 (JUNE 24, 2005)

Subject to and without waiving the foregoing general and specific objections, Microsoft incorporates by reference its First Amended Answer, Affirmative Defenses and Counterclaims.

Furthermore, the '216 patent is also unenforceable by reasons of inequitable conduct for the failure to cite DE 40 19 652 A, which is entitled "Procedure to protect software against unauthorized copying" ("Kuhn") and which was published on January 2, 1992. Kuhn is prior art to the '216 patent. Based on Microsoft's understanding of Plaintiffs' view of the scope and application of the claims, as demonstrated in Plaintiffs' Response to Microsoft's Interrogatory No. 1., and without the benefit of the Court's claim construction, Kuhn renders one or more claims of the '216 patent invalid by reason of anticipation and/or obviousness as shown in Exhibit D.

Various individuals owing a duty of candor and full disclosure were well aware of Kuhn, and its high degree of materiality, during the pendency of the patent application that issued as the '216 patent. For instance, during the prosecution of EP 93 92 0609, which claims priority to the same patent applications that the '216 patent claims priority to, the European Examiner conducted a Supplementary European Search Report. That Supplementary European Search Report identified Kuhn as a "category X" prior art reference with respect to certain claims of the European application and as a "category A" prior art reference with respect to other claims. A category X reference is one which is "particularly relevant if taken alone", and a category Y reference is one which is "particularly relevant when combined with another document of the same category".

Mr. Richardson's and Uniloc's European counsel, Josef Fiener, received the Supplemental European Search Report identifying Kuhn as highly relevant prior art on October 31, 1995. On January 5, 1996, Josef Fiener sent Peter Maxwell of Peter Maxwell & Associates the Supplemental European Search Report, a copy of Kuhn, and a letter explaining the materiality of the Kuhn reference. Mr. Maxwell was Mr. Richardson's and Uniloc's Australian counsel. Mr. Maxwell worked with and assisted Mr. Richardson's and Uniloc's U.S. counsel in the prosecution of the application that led to the '216 patent. Mr. Maxwell owed a duty of candor and good faith to the USPTO.

On January 17, 1996, Mr. Maxwell sent Gregory Steven Cox of Uniloc Corporation Private Limited a letter notifying him that the Supplemental European Patent Search identified Kuhn as prior art. Mr. Cox was substantively involved in the patent prosecution of the application that led to the '216 patent. Mr. Cox owed a duty of candor and good faith to the USPTO.

Despite being aware of Kuhn and the Supplemental European Search Report prior to the issuance of the '216 patent, neither Mr. Maxwell nor Mr. Cox, nor anyone else owing a duty of candor and good faith to the USPTO in connection with the prosecution of the application that led to the '216 patent, cited either Kuhn or the Supplemental European Search Report to the USPTO in connection with the application that led to the issuance of the '216 patent. This information was not otherwise before the USPTO Examiner. By withholding this information, Mr. Maxwell and Mr. Cox breached their duties of candor and good faith to the USPTO.

The withheld information is material to the patentability of the '216 patent in that it bears on the patentability of the alleged invention as shown in Exhibit D. Furthermore,

the European Examiner rejected PCT claims paralleling one or more of those of the '216 patent as lacking novelty and/or an inventive step over Kuhn. Uniloc acquiesced in this rejection, amending the claims as suggested by the European Examiner to overcome Kuhn.

On information and belief, Mr. Maxwell withheld this highly material information with the intent to deceive the USPTO into granting an invalid patent. On information and belief, Mr. Cox withheld this highly material information with the intent to deceive the USPTO into granting an invalid patent.

This conduct constitutes inequitable conduct that renders the '216 unenforceable.

As fact discovery is on-going, Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory as that discovery dictates.

4th SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13 (JULY 29, 2005)

Subject to and without waiving the foregoing general and specific objections, in addition to the foregoing, Microsoft hereby incorporates by reference its responses to Plaintiffs' Interrogatory No. 11. Microsoft further identifies the deposition testimony of the following individuals as relevant to the unenforceability of the '216 patent: Frederic B. Richardson III, Peter Higgs, Gregory Steven Cox, and Gregory Grundy.

Furthermore, the '216 patent is also unenforceable by reason of inequitable conduct for failure to identify Allan Bell and Peter Higgs as inventors, and for failure to disclose to the Patent and Trademark Office that the alleged invention of the '216 patent was derived and copied from Allan Bell and Peter Higgs. Deposition testimony from Mr. Ric Richardson and Mr. Higgs establishes that subject matter claim of the '216 patent

was invented or co-invented by Mr. Higgs, Mr. Bell, or both combined. (*See also*, Higgs 50-53).

As the sole named inventor of the '216 patent, Frederic B. Richardson III owed a duty of candor and good faith to the United States Patent and Trademark Office. Mr. Richardson was well aware that Mr. Bell and/or Mr. Higgs made substantial and inventive contributions to the claimed subject matter of the '216 patent. Mr. Richardson, however, never informed the USPTO of these facts, and this information was not otherwise before the USPTO Examiner. Microsoft contends that Mr. Richardson withheld this information with intent to deceive the Patent and Trademark Office into granting the '216 patent, as well as to deprive Mr. Higgs and Mr. Bell of any entitlement to credit for their work. By withholding this information, Mr. Richardson breached his duty of candor and good faith to the USPTO.

This conduct constitutes inequitable conduct that renders the '216 unenforceable.

Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory after completion of fact discovery, including without limitation after the depositions of Allan Bell.

5th SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13 (DECEMBER 2, 2005)

Subject to and without waiving the foregoing general and specific objections, Microsoft, in addition to the foregoing, incorporates by reference its responses to Interrogatory No. 11, the First and First Supplemental reports of Dan S. Wallach, Ph.D., and the Expert Witness Report of Larry S. Nixon. Microsoft further identifies the deposition testimony of the following individuals as relevant to the unenforceability of

the '216 patent: Cary Michael Stephen Dreelan (i.e., Dreelan Tr. 25-27, 31-32) and Allan Bruce Bell (i.e., Bell Tr. 10-23).

Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory.

6th SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13 (DECEMBER 22, 2005)

Subject to and without waiving the foregoing general and specific objections, Microsoft, in addition to the foregoing, incorporates by reference its responses to Interrogatory No. 11, the Third Expert Report of Dan S. Wallach, Ph.D., and the Rebuttal Expert Witness Report of Larry S. Nixon.

Microsoft reserves the right to amend, supplement, or clarify its response to this interrogatory.

INTERROGATORY NO. 15

Assuming that infringement is found and that the infringed claim(s) of the '216 patent are not found to be invalid and/or unenforceable, identify and set forth in detail and describe with particularity each factual and legal basis that supports Microsoft's contention that Uniloc is not entitled to any damages, if any, and identify all of the facts, actions, events, witnesses, testimony and documents upon which defendant will rely in support of such contention(s).

RESPONSE TO INTERROGATORY NO. 15 (FEBRUARY 5, 2004)

Microsoft objects to this interrogatory as premature because this action has just begun, and a date for expert disclosure has not yet been set in this case. Plaintiffs bear the burden of proof with respect to damages and have not yet provided their damages contentions. Microsoft objects to this interrogatory to the extent it seeks information protected against disclosure by the attorney-client privilege and/or the work product doctrine. Microsoft further objects to this interrogatory as unduly burdensome in that it

US005490216A

# United States Patent [19]

**Richardson, III**

[11] **Patent Number: 5,490,216**

[45] **Date of Patent: Feb. 6, 1996**

[54] **SYSTEM FOR SOFTWARE REGISTRATION**

[75] Inventor: **Frederic B. Richardson, III,** Brookvale, Australia

[73] Assignee: **Uniloc Private Limited**, Singapore

[21] Appl. No.: **124,718**

[22] Filed: **Sep. 21, 1993**

[30] **Foreign Application Priority Data**

| | | | |
|---|---|---|---|
| Sep. 21, 1992 | [AU] | Australia | PL4842 |
| Oct. 26, 1992 | [AU] | Australia | PL5524 |

[51] **Int. Cl.**$^{6}$ .......... **H04L 9/00**

[52] **U.S. Cl.** .......... **380/4**; 380/23

[58] **Field of Search** .......... 380/3, 4, 23, 24, 380/25

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,654,799 | 3/1987 | Ogaki et al. . | |
| 4,688,169 | 8/1987 | Joshi . | |
| 4,796,220 | 1/1989 | Wolfe . | |
| 4,982,430 | 1/1991 | Frezza et al. . | |
| 4,999,806 | 3/1991 | Chernow et al. | 380/4 |
| 5,191,611 | 3/1993 | Lang | 380/4 |
| 5,199,066 | 3/1993 | Logan | 380/4 |
| 5,222,133 | 6/1993 | Chou et al. | 380/4 |
| 5,239,166 | 8/1993 | Graves . | |
| 5,239,648 | 8/1993 | Nukui | 380/4 |
| 5,287,408 | 2/1994 | Samson | 380/4 |
| 5,291,598 | 3/1994 | Grundy . | |
| 5,313,637 | 5/1994 | Rose | 380/4 |
| 5,319,705 | 7/1994 | Halter et al. | 380/4 |
| 5,337,357 | 8/1994 | Chou et al. | 380/4 |
| 5,343,526 | 8/1994 | Lassers | 380/4 |
| 5,349,643 | 9/1994 | Cox et al. | 380/4 |
| 5,371,792 | 12/1994 | Asai et al. | 380/4 |
| 5,379,433 | 1/1995 | Yamagishi | 380/4 |
| 5,386,468 | 1/1995 | Akiyama et al. | 380/4 |
| 5,388,211 | 2/1995 | Hornbuckle | 380/4 |
| 5,390,297 | 2/1995 | Barber et al. | 380/4 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO9209160 | 5/1992 | WIPO . |

*Primary Examiner*—David C. Cain
*Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear

[57] **ABSTRACT**

A registration system allows digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed. Preferably, the system detects when part of the platform on which the digital data has been loaded has changed in part or in entirety, as compared with the platform parameters, when the software or digital data to be protected was last booted or run. The system relies on a portion of digital data or code which is integral to the digital data to be protected by the system. This integral portion is termed the code portion and may include an algorithm that generates a registration number unique to an intending licensee of the digital data based on information supplied by the licensee which characterizes the licensee. The algorithm in the code portion is duplicated at a remote location on a platform under the control of the licensor or its agents, and communication between the intending licensee and the licensor or its agent is required so that a matching registration number can be generated at the remote location for subsequent communication to the intending licensee as a permit to licensed operation of the digital data in a use mode. The code portion can be identical for all copies of the digital data. The algorithm provides a registration number which can be "unique" if the details provided by the intending licenses upon which the algorithm relies when executed upon the platform are themselves "unique".

**20 Claims, 12 Drawing Sheets**




REGISTRATION NUMBER
ALGORITHM
14
15
16
REGISTRATION NUMBER
ALGORITHM
14
13
12
11
10

FIG. 1


BOOT
IS THIS A NEW COPY ? (INTERNAL CHECKING BY APPLICATION)
NO
GO TO FIG. 3a OR 3b
YES
A
DIALOG BOX: "DEMO OR REGISTER" ?
DEMO
REGISTER
B
DISPLAY PRODUCT INFORMATION BOX: e.g.. SOFTWARE PUBLISHER DETAILS
DEMO MODE OF APPLICATION: NO SAVE OR PRINT CAPABILITY
CANCEL
CANCEL OR AGREE ?
AGREE
B1
LICENSE INFO. DIALOG BOX: DETAILS OF NEW LICENSING AGREEMENT
CANCEL
CANCEL OR CONTINUE ?
CONTINUE
GO TO FIG. 2b

FIG. 2a

FIG. 2b



FROM FIG. 2a
A SERIAL NO. IS GENERATED BY THE APPLICATION USING INFORMATION FROM THE USER ENVIRONMENT (E.G. TIME, MACHINE TYPE, LAST MODIFICATION DATE)
SERIAL NO. IS ENCRYPTED, REARRANGED AND PRESENTED AS A NUMBER IN THE SERIAL NO. FIELD OF THE REGISTRATION DIALOG BOX.
C
REGISTRATION DIALOG BOX: USER MUST ENTER DETAILS IN THE SPECIFIED FIELDS IN ORDER TO REGISTER THE PRODUCT INCLUDING: NAME, COMPANY, ADDRESS, CONTACT NUMBER (PHONE AND CREDIT CARD DETAILS OR CORPORATE ACCOUNT NO.)
USER CALLS THE NEAREST ADMINISTRATION CENTER (FROM CONTACT DIALOG BOX) AND COMMUNICATES THE REGISTRATION DETAILS AS WELL AS THE SERIAL NO. GENERATED BY APPLICATION
PAYMENT DETAILS CONFIRMED (E.G. CREDIT CARD)
PUBLISHER USES REGISTRATION DETAILS IN UNLOCKING APPLICATION
REGISTRATION NO. GENERATED FROM USER DETAILS ADDED TO SERIAL NO. IS ENCRYPTED AND RE-ARRANGED
USER GIVEN REGISTRATION NO.
GO TO FIG. 2c

FIG. 2c


FROM FIG. 2b
USER TYPES IN REGISTRATION NUMBER
APPLICATION USES UNLOCKING ALGORITHM TO CHECK VALIDITY
VALID ?
NO
YES
ALERT DIALOG BOX: USER TOLD THE REGISTRATION NO. IS INCORRECT AND ASKED TO CALL THE OPERATOR FOR ASSISTANCE IN CHECKING REGISTRATION DETAILS. USER GIVEN 3 ATTEMPTS TO REGISTER AFTER WHICH THE PROGRAM AUTOMATICALLY REVERTS TO DEMO VERSION
RUN FULL VERSION
RUN DEMO VERSION

FIG. 3


BOOT
DO REGISTRATION (KEY) DETAILS EXIST IN APPLICATION ?
NO
YES
LOOK FOR DUPLICATE KEY FILE STORED ELSEWHERE ON MACHINE
DO REGISTRATION (KEY) DETAILS MATCH ENVIRONMENT ?
NO
YES
DOES DUPLICATE KEY FILE EXIST ?
YES
NO
COPY DUPLICATE KEY FILE INFORMATION TO APPLICATION
REMOVE KEY INFORMATION IF IT EXISTS
NO
DO REGISTRATION (KEY) DETAILS MATCH ENVIRONMENT ?
YES
RUN FULL VERSION
RUN DEMO VERSION


220
NAME:
ORGANIZATION
ADDRESS
CITY
ZIP/POST CODE
COUNTRY
CREDIT CARD/ORDER#
EXPIRE DATE
LAST USER NO.
SERIAL NO.
PRODUCT NO.
YOUR USER NO.
REGISTRATION NO.
22
50
21

FIG. 4




FIG. 5




FIG. 6


PLAY
FIRST PIECE OF ENCODED INFORMATION IS BROUGHT INTO CONTROLLER INCLUDING A PRODUCT IDENTIFIER.
IS THE CURRENT PRODUCT REGISTERED FOR USE ?
YES
NO
DEMO OR BUY ?
DEMO
ALLOWS ACCESS TO DEMONSTRATION RECORDINGS THAT ARE NOT ENCRYPTED.
BUY
REGISTRATION DATA ENTRY eg: PAYMENT DETAILS AND PERSONAL DATA
COMMUNICATION WITH REGISTRATION SERVICE PROVIDOR
SUPPLY OF REGISTRATION NUMBER TO CUSTOMER
STORE REGISTRATION NUMBER IN WRITABLE MEMORY OF LOCAL CONTROLLER AND WRITABLE STORAGE AREA OF SMART CARD.
ALLOWS ACCESS TO DAC AND DECRYPTION ENGINE

FIG. 7



LOCAL LICENSEE LOCATION
INTERNAL BOND
39
38
USER PROGRAM
ALG
31
EXECUTE ON PLATFORM
LOCAL LICENSEE UNIQUE I.D. GENERATOR
66
REG. NO.
68
PROGRAM SUBSET (DEMO)
MODE SWITCHER
FULL PROGRAM
69
PLAT. I.D
70
PLATFORM UNIQUE I.D GENERATOR
REMOTE REGISTRATION DATABASE LOCATION
61
62
ALG
REGISTRATION DATABASE PROGRAM
63
EXECUTE ON PLATFORM
67
REMOTE LICENSEE UNIQUE I.D. GENERATOR
66
REG. NO.


FIG. 8


VARIABLE
KEY PORTION
72
SYSTEM
INFORMATION
71
50
SERIAL NO.
61
PRODUCT NAME
65
CUSTOMER
INFORMATION
22
PREVIOUS USER
IDENTIFICATION
66
REGISTRATION
NUMBER

FIG. 9




FIG. 10

# SYSTEM FOR SOFTWARE REGISTRATION

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to improvements in systems for software registration and, more particularly, to improvements in arrangements where software is transferable by media such as magnetic disks, CD ROMS and the like.

2. Description of the Related Art

Much commercially available software is provided at time of purchase (or license) on a magnetic media, typically a floppy disk. Frequently the only security feature attached to the software is a simple registration number stored on the media. This registration number identifies that particular copy of the software and it is often required at the time of installation of the software onto any given computer that the installer must provide the registration number independently to the installation routines.

However, such simple security arrangements for the distribution of software on media suffer from at lest two disadvantages: (1) each copy of the software made on any given media at the time of manufacture must include an individual, unique number, programmed into the media, and (2) this arrangement does not prevent copying of the software, once installed on any given computer, to another computer by means of file transfer (as opposed to reinstallation).

WO 92/09,160 to Tan Systems Corporation discloses a registration system which is relatively sophisticated which relies for its security on a requirement that an intending software licensee must obtain from a remote location by file transfer significant and essential portions of the program which the licensee desires to execute. The arrangement disclosed in WO 92/09,160 suffers from a number of deficiencies including:

a. the shell program which the intending licensee initially executes requires a unique identity embodied within the shell prior to distribution of the shell program;

b. the shell program is not, itself, a functional program—that is, it does not include all of the code which the intending licensee wishes to execute. That program must be obtained remotely with all the delays, inconveniences and possibilities of corruption during transit that that entails;

c. the prior art system appears to require and indeed, rely on, encryption to ensure that the program material which is communicated from a remote location is not intercepted for utilization in an unauthorized manner; and

d. it is unclear whether the system can accommodate and react appropriately to the situation where the program, once registered, is transferred in its entirety from one platform to another so as to avoid the requirement for payment of a further registration fee.

U.S. Pat. No. 4,796,220, assigned to Pride Software Development Corporation, discloses a system for unique recognition of a platform on which licensed software is to be executed. However, U.S. Pat. No. 4,796,220 does not contemplate or disclose utilization of information which is unique to the user or intended licensee as part of the registration process which is to be distinguished from identification of the platform upon which the software is proposed to be run.

U.S. Pat. No. 4,688,169 to Joshi broadly discloses the same principles as U.S. Pat. No. 4,796,220 in that it discloses a computer software security system which relies for its security on a "machine identification code unique to the machine" upon which the software to be protected is to be run. Again, the disclosure is limited to identification of the platform and there is no suggestion or contemplation of linking platform identification with unique user identification.



Also this arrangement does not allow the flexibility of transfer of copies of the program from platform to platform which can be run in a demonstration mode.

It is an object of the present invention to address or reduce the above-mentioned disadvantages.

Definitions

Throughout this specification the term "software" is to be interpreted broadly so as to include all forms of digital data which are executable on a platform (as to be later defined). The digital data comprising the software can, for example, be code comprising a word processing program adapted to run on a PC or the like. The software can also, for example, be digital data stored on a CD ROM adapted for playback as music on a CD ROM audio drive. The digital data can be displayable information or information which is otherwise usable by a licensed user.

Throughout this specification the term "platform" denotes an environment to be associated with a computing device such as a microprocessor or other data processing device which permits execution of the digital data (to which reference has previously been made in relation to the term "software") whereby the computer can perform functions on input and output devices associated therewith.

In some circumstances, the "software" or digital data may itself be the operating system environment. Typically, but by no means exclusively, examples of operating system environments include the MicroSoft DOS operating system, the IBM OS/2 operating system or the Macintosh System 7 environment. In the degenerate case of microcontrollers operating from ROM, the operating system environment may be the microcode of the microcontroller which enables the microcontroller to execute machine code.

In this specification, "use mode" refers to use of the digital data or software by its execution on a platform so as to fulfill the seller's/licensor's obligations in relation to the sale or license of the right to execute the digital data or software in the use mode. The use mode is to be distinguished from what might generally be termed unlicensed modes of operation (which is not to say unauthorized modes of operation) as typified by the demonstration modes later described in this specification.

## SUMMARY OF THE INVENTION

In broad terms, the system according to the invention is designed and adapted to allow digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed. In particular forms, the system includes means for detecting when parts of the platform on which the digital data has been loaded has changed in part or in entirety as compared with the platform parameters when the software or digital data to be protected was for example last booted or run or validly registered.

The system relies on digital data or code which forms part of the digital data to be protected by the system. This portion of the digital data which preferably is integral to the digital data to be protected has been termed the "code portion" elsewhere in this specification. The code portion includes an algorithm adapted to generate a registration number which is unique to an intending licensee of the digital data based on

information supplied by the licensee which characterizes the licensee.

The algorithm in the code portion is duplicated at a remote location on a platform under the control of the licensor or its agents and communication between the intending licensee and the licensor or its agent is required so that a matching registration number can be generated at the remote location for subsequent communication to the intending licensee as a permit to licensed operation of the digital data in a use mode.

Preferably, the code portion is integral with the digital data and can be identical for all copies of the digital data. It is the algorithm embedded within the code portion (and which is duplicated at the remote location) which provides a registration number which can be "unique" if the information provided by the intending licensee upon which the algorithm relies when executed upon the platform is itself "unique."

In any event, in particular preferred forms, a serial number (see further on) is included in the registration number generation algorithm which introduces an additional level of uniqueness into the registration number calculation process.

Accordingly, in one broad form of the invention there is provided a system for licensing use of digital data in a use mode, the digital data executable on a platform, the system including local licensee unique ID generating means and remote licensee unique ID generating means, the system further including mode switching means operable on the platform which permits use of the digital data in the use mode on the platform only if a licensee unique ID generated by the local licensee unique ID generating means has matched a licensee unique ID generated by the remote licensee unique ID generating means.

Preferably, the system further includes platform unique ID generating means, wherein the mode switching means will permit the digital data to run in the use mode in subsequent execution of the digital data on the platform only if the platform unique ID has not changed.

Preferably, the mode switching means permits operation of the digital data in the use mode in subsequent execution of the digital data only if the licensee unique ID generated by the local licensee unique ID generating means has not changed.

Preferably, the mode switching means includes part of the digital data.

Preferably, the remote licensee unique ID generating means comprises software which includes the algorithm utilized by the local licensee unique ID generating means to produce the licensee unique ID.

Preferably, the information utilized by the local licensee unique ID generating means to produce the licensee unique ID comprises prospective licensee credit card number, date of birth and full name and address.

Preferably, the platform unique ID generating means forms part of the digital data.

Preferably, the platform unique ID generating means utilizes hard disk information and/or other computer hardware or firmware information to determine the platform unique ID.

Preferably, the platform comprises a computer operating system environment.

Preferably, the digital data comprises a software program adapted to run under the operating system environment.

In a further broad form of the invention, there is provided a security routine or registration means attachable to software to be protected, the registration means generating a



security key from information input to the software which uniquely identifies an intended registered user of the software on a computer on which the software is to be installed.

Preferably, the security key is generated by a registration number algorithm.

Preferably, the registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run (e.g., system clock, last modify date, user name).

Preferably, the registration means is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration means.

Preferably, the registration means checks at the time of boot of the software as to whether it is a first boot of the software to be protected or a subsequent boot. If a subsequent boot is detected, then environment and user details are compared to determine whether the program reverts to a demonstration mode and a new user registration procedure is to commence, or a full version run.

Preferably, the environment details comprise one or more of disc volume name, user name or computer, initialization date of hard disk, hardware identifier (e.g., ROM checksum) or other elements which are generally not user-configurable on the platform.

In a further broad form of the invention, there is provided a method of control of distribution of software, the method comprising providing mode-switching means associated with the software adapted to switch the software between a fully enabled mode and a partly enabled or demonstration mode; the method further comprising providing registration key generating means adapted to generate an enabling key which is a function of information unique to an intending user of the software; the mode-switching means switching the software into fully enabled mode only if an enabling key provided to the mode-switching means by the intending user at the time of registration of the software has matched identically with the registration key generated by the registration key generating means.

Preferably, the enabling key is communicated to the intending user at the time of registration of the software by a third party operating a duplicate copy of the registration key generating means.

In yet a further broad form of the invention, there is provided digital data incorporating registration code, the digital data executable on a platform; the registration code comprising a portion of the digital data executable on the platform so as to switch the digital data between a demonstration mode and a use mode.

Preferably, the registration code when executed on the platform provides local licensee unique ID generating means whereby the digital data can be switched from the demonstration mode to the use mode by execution of the registration code only if a licensee unique ID generated by the local licensee unique ID generating means has matched a licensee unique ID generated by remote licensee unique ID generating means.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention will now be described with reference to the accompanying drawings wherein:

FIG. **1** is a schematic diagram of the relationship and interaction between an intending registered user and a registration authority of software on media secured according to a first embodiment of the invention;

FIGS. **2***a*, **2***b* and **2***c* are segments of a flow chart of the procedure to be followed during registration of software by a user according to a first embodiment of the invention;

FIG. **3** is a flow chart of alternative boot processes according to a second embodiment of the invention;

FIG. **4** is a personal information dialogue box relating to the procedure of FIGS. **2***a*, **2***b*, **2***c* in accordance with a third embodiment;

FIG. **5** is a schematic diagram of a system according to a fourth embodiment of the invention;

FIG. **6** is an implementation of the fourth embodiment of FIG. **5** in relation to a CD ROM drive;

FIG. **7** is a logic flow chart in relation to the decoder box of FIG. **6**;

FIG. **8** is a block diagram of a generalized system according to a fifth embodiment of the invention;

FIG. **9** is a block diagram indicating one particular example of generation of a registration number for the system of FIG. **8**; and

FIG. **10** is a schematic diagram of a sixth embodiment comprising a particular example of the generalized system of FIG. **8**.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

It is to be understood that, in its various embodiments, the present invention is for the protection of digital code/software by control of permission to use the digital code/software. A hardware platform and a remote registration station implemented at least partially by means of electronic hardware are required by the various embodiments.

The code/software to be protected requires at least some adaption to be usable with the invention in its various embodiments. The adaptation can be universal for all copies of the code/software to be protected.

### First Embodiment

With reference to FIGS. **1** and **8**, the system according to embodiments of the invention is designed and adapted to allow digital data **39** or software to run in a use mode on a platform **31** if and only if an appropriate licensing procedure has been followed. In particular forms, the system includes means for detecting when parts of the platform **31** on which the digital data **39** has been loaded has changed in part or in entirety as compared with the platform parameters when the software or digital data to be protected was, for example, last booted or run or validly registered.

The system relies on digital data or code **38** which forms part of the digital data to be protected by the system. This portion of the digital data, which preferably is integral to the digital data to be protected, has been termed the code portion **38** elsewhere in this specification. The code portion **38** includes an algorithm adapted to generate a registration number **66** or local licensee unique ID or registration key which characterizes the licensee. In this instance, the local licensee unique ID generator which generates the registration number comprises the execution of code **38** on platform **31**.



The algorithm in the code portion is duplicated at a remote location on a platform **67** under the control of the licensor or its agents, and communication between the intending licensee and the licensor or its agent is required so that a matching registration number or enabling key can be generated at the remote location for subsequent communication to the intending licensee as a permit to licensed operation of the digital data **39** in a use mode.

Execution of the duplicated code portion on platform **67** comprises, in this instance, the remote licensee unique ID generating means.

Mode switching means can comprise execution of the code portion which additionally performs a comparison of the locally and remotely generated registration numbers.

Preferably, the code portion **38** is integral with the digital data and can be identical for all copies of the digital data. It is the algorithm embedded within the code portion (and which is duplicated at the remote location) which provides a registration number which can be "unique" if the information provided by the intending licensee upon which the algorithm relies when executed upon the platform is itself "unique".

In any event, in particular preferred forms, a serial number (see further on) is included in the registration number generation algorithm which introduces an additional level of uniqueness into the registration number calculation process.

With particular reference to FIG. **1**, a program comprising digital data protected according to a first embodiment of the invention is supplied recorded on a magnetic disk **10**.

Included as part of the software on that disk **10** is a registration and re-registration routine which executes whenever the program protected by the arrangement of the first embodiment "boots".

With reference to FIG. **1** and FIGS. **2***a*, **2***b* and **2***c*, the operation of the security routine will be described on the assumption that the program on the disk **10** protected by the registration routine has not been registered on the platform or is otherwise being loaded for the first time.

The prospective new user **11** inserts disk **10** into the user PC **12** so as to be read by PC **12**.

As part of the software installation procedure, the registration routine is activated causing a series of dialogue boxes to appear on the display **13** of the user PC **12**. Having checked to ensure that the software has not previously been registered on the PC **12**, a dialogue box A (in FIG. **2***a*) is displayed which provides the user with a choice of either seeing a demonstration of the software (which typically has features such as save and/or print disabled) or alternatively an invitation to register ownership/licensee of the software (after which all features of the software are made available to the user).

If the register option is selected or if the user cancels the demonstration in favor of registration, then a contact dialogue box B (in FIG. **2***a*) is presented on the display **13** which provides a list (stored on disk **10** as part of the registration routine) which provides for example, names and contact numbers of the software publishing company together with other general product information.

Following the user's indication of agreement during display of license details (box B1) to proceed to register, the user can contact the registration center after filling out the registration dialogue box C as detailed below. After selecting "continue", the registration routine begins the first step in the generation of a security key which will be unique to the current copy of the software and to certain features of the environment in which it runs.

As shown in FIG. **2***b*, the first step in the generation of the security key comprises the generation of a serial number generated from the current time on the system and, in this example, the last modify date of the software and other information from the computer environment. The serial number is encrypted and rearranged and then presented as a number in the registration dialogue box on the display **13**.

The registration dialogue box C (in FIG. **2***b*) prompts the user for details unique to that user (including, for example, name, company, address, state, contact number) together with financial details for payment for the purpose of becoming a registered user of the software protected by the registration routine (for example Mastercard or corporate account number details). This information, unique to the user, is passed through a registration number algorithm **14** (represented symbolically in FIG. **1**) which generates a registration number or security key from the information unique to the user together with the serial number previously generated. The registration number or security key is not made available to the user of the PC **12** by the PC **12**.

An identical registration number algorithm **14** resides on the registration authority PC **15**. As an integral part of the registration procedure, the prospective new user **11** communicates the information unique to the user which was entered by the user on the user PC **12**, along with the serial number generated by the user's algorithm, to the registration authority **16**. The registration authority feeds this information into the registration authority PC **15** wherein the registration number algorithm **14** should produce an identical registration number or security key to that produced by the user PC **12** if the details communicated to the registration authority by the prospective new user **11** match with the details that have been entered on the user PC **12**. Optionally, the user can communicate the information to the registration authority electronically, e.g., by fax or modem or tone phone.

As a final stage in registration (refer to FIG. **2***d*), the registration authority **16** provides the registration number generated by the registration authority PC **15** to the user **11**. The user **11** enters the registration number into the user PC **12** where the registration routine checks to see whether the entered registration number matches the calculated registration number. If the two match, then a valid registration has taken place and access is provided by the registration routine to a full operating version of the software protected by the registration routine. If there is no match and a preference file (which stores the user details) does not exist then a dialogue box D (FIG. **2***c*) appears on the display **13** of user PC **12** providing the prospective new user **11** with the opportunity to check his/her details or switch to the demonstration version of the software protected by the registration routine.

Again, the registration authority PC **15** can provide to PC **12** the registration number which it generates by electronic means such as modem communication.

It will be evident that it is not obvious to the prospective new user **11** that the registration number which unlocks the full version of the software protected by the registration routine is, in fact, generated from an algorithm residing on the magnetic disk **10** and that it forms part of the software to which access is desired.

In this manner, the registration procedure outlined above ensures that exactly the same details entered by the prospective new user on his/her user PC **12** are those details recorded by the registration authority **16**. It will also be evident that the procedure does not require each magnetic disk **10** containing a copy of the software to be protected to have a unique registration number recorded on the disk at the time of distribution of the disk. Each copy has exactly the same registration number algorithm located upon it. A unique registration number or "security key" is generated only at the time of registration from the details supplied by the prospective new user **11**.

The registration routine behaves generally as follows where any copy of the protected software boots. In this situation, the registration routine checks at the time of boot to see what registration details are present for that particular copy of the software. If no details are present, then it is assumed that the PC is booting from a newly distributed magnetic disk and registration is to occur for the first time. The registration procedure in that case is that followed in respect of FIGS. **2***a*, **2***b* and **2***c*.

In the event that registration details are present, then the registration routine checks a number of parameters which are expected to be unique to the environment in which the software to be protected operates. In this embodiment, the parameters checked are hard disk volume name, user name, and computer name and user password and hard disc initialization date (not generally user configurable on the Apple Macintosh computer). The registration routine then checks these parameters against the corresponding details that it finds from the operating environment of the computer on which the software is running. If a designated combination of these details matches then it is assumed that a properly authorized and registered copy of the software is running and full access to the software is allowed.

In this manner, it is quite in order for users to provide other users with copies of the software protected by the security routine. The security routine attached to the software to be protected determines from the environment in which it operates whether an additional registration fee is required. If it is determined by the registration routine that this is the case, then the registration routine has the capability to provide a fresh registration number as part of an authorized registration procedure pending which the protected software reverts to demonstration mode.

## Second Embodiment

(Auto re-registration)

According to a second embodiment, a more sophisticated procedure suitable for checking at first boot and at subsequent boot is shown in flowchart form in FIG. **3**.

This procedure incorporates redundancy to cope with situations where the key file containing the information from which the current use has been authorized may have been deleted or does not exist on a subsequent boot.

The distinction as against the first embodiment is that a "key file" is created at the time of registration of the software and a duplicate key file is also created at the same time. The duplicate key file is arranged to be stored on the computer at a location separate from the program to be protected. In the case of the Apple Macintosh computer the duplicate key file can be stored in the "system" folder.

Both the key file (stored with the software) and the duplicate key file are encrypted and both contain identical information. The information contained comprises:

1. The user registration details including the serial number,
2. The environment details of the computer, and
3. Details of the application protected by the security routine for which registration is to be or has been obtained.

With reference to FIG. **3**, whenever the protected application boots, a check is made by the registration routine to

determine whether registration details exist in the key file of the protected application. If they do, a comparison is made by the registration routine between what is stored in the key file and the environment to determine whether a change has taken place to the environment as compared with what is stored in the key file. If no change is detected, then the protected application is permitted to run normally.

If there are no registration details present in the key file or if the above-referenced comparison between the key file contents and the application does not show a match, then the re-registration routine of FIG. **3** looks for the existence of a duplicate key file within the environment. If a duplicate key file exists, then the information contained within that duplicate key file is copied to the application key file and comparisons as previously described as between the key file details and the environment and application are made. If the comparison is positive, then the protected application is allowed to run normally. If the comparison proves negative, then the protected application is permitted to run by the registration routine in demonstration mode only. If a duplicate key file is found not to exist at all and the internal key file, if present, brings a negative result, then the protected application is allowed to run in demonstration mode only.

This arrangement provides improved durability for the registration routine in the sense that it is less likely that the protected application will be caused to run in demonstration mode for incorrect reasons.

## Third Embodiment

Tracking System

With reference to FIG. **4**, a modified form of the dialogue box C of FIG. **2*b*** is shown which includes provision for entry of "your user number" in box **21**.

At the time a prospective new user enters his/her details into the other boxes comprising the dialogue box C, there is an option for the user to enter a user number into box **21**. The user number is provided by the registration authority **16** as a number unique to that particular registered user. If the box **21** has the user number details inserted into it, then the registration routine, When the next copy of the protected application is made, will transfer the user number details from box **21** to the "last user number" box **22**. A similar transfer will take place when next a copy is made of the protected application if and only if the person wishing to register the next copy enters their user number details in box **21**. If they do not, then the last user number details in box **22** remain as before. In this manner, a tracking system is available to the registration authority in the form of a tree where any given copy is identified by its ancestry based on current and previous user number as entered into boxes **21** and **22**.

Self-Serialization

In a particular embodiment, a process termed "self-serialization" can be utilized to produce the serial number **50** which is displayable to the user/licensee as illustrated in FIG. **4**.

The serial number **50** is disguised by use of a random or pseudorandom number input to the algorithm which generates the serial number at the time of first boot of the software as part of the initial registration procedure. For example, the serial number, when generated by the self-serialization process, can be generated by a random number routine forming part of the registration software or it can be generated by the registration software with reference to data which is available in a widely varying fashion on the platform on which the software is located—for example, a time reference on the platform. The serial number **50** generated by the self-serialization process can be a required input to the registration algorithm from which the registration number is generated. Clearly, the serial number **50**, as determined and displayed to the user, will then be required to be communicated to the registration authority for input to the registration authority's registration number generating algorithm.

It will be observed that a serial number **50** generated in this manner is likely to be displayed as a different number on each platform on which the software to be protected is to be run and comprises a randomized input to the registration algorithm which is determined and determinable only at the time of registration.

## Fifth Embodiment

With reference to FIG. **5**, there is shown in schematic form a microprocessor **30** adapted to operate under an operating system or upon a platform **31** such as, for example, MicroSoft DOS or Macintosh System **7**. The platform **31** allows relatively high level commands to be used to cause the microprocessor **30** to interact with input/output devices such as keyboard **32**, monitor **33**, loudspeaker **34**, memory **35** and magnetic or CD ROM disk **36**.

By way of example a word processing program comprising a length of code or digital data **37** has been copied onto disk **36**.

The digital data **37** includes registration code portion **38** and use code portion **39**.

The digital data **37** is arranged in such a way that when microprocessor **30** seeks to first execute the digital data **37** by way of operating system or platform **31** the digital data comprising the registration code portion **38** is caused to execute first in a manner previously described in reference to the first embodiment of the invention. The execution of the digital data comprising the registration code portion **38** in conjunction with the operating system or platform **31** comprises a mode switcher which will permit the microprocessor **30** to execute the use code portion **39** of digital data **37** only in a demonstration mode unless and until registration involving reference to an external registration authority is first completed successfully. This registration procedure is as previously described with reference to the first embodiment.

The digital data **37** can comprise, for example, a word processing program such as Wordperfect 6.0 available from Wordperfect Corporation. The registration code portion **38** is integral with the digital data **37** comprising the word processing program. The registration code portion **38** includes the algorithm for calculation of the registration number as previously described in respect of other embodiments of the invention.

It will be appreciated that the registration code portion **38** effectively forms simply a part of the software or digital data **37** to be protected/registered and that the digital data **37** will be or can be identical for all copies of the word processing program produced. The registration code portion **38** allows a unique link to be made between the digital data **37** and an individual authorized or licensed to use the digital data **37** by way of initial execution of a copy of the digital data comprising registration code portion **38**.

With reference to FIGS. **6** and **7**, a specific realization of the fifth embodiment will be described.

With particular reference to FIG. **6**, a decoder **51** is interposed in the datapath from the CD in CD player **52** and a digital-to-analog converter **53**. The digital-to-analog con-

verter 53 is the device by which digitally encoded musical or video information residing on CD ROM 54 is converted to analog form suitable for playback on current mass produced television sets (video) or hi-fi sets (audio).

The decoder 51 comprises part of the platform upon which the digital data 37 is executed and includes means to interpret the code portion 38 of the digital data 37 whereby the registration system is implemented such that the digital data 37 and, more particularly, the use code portion 39 of that digital data 37 can be executed on the platform in a use mode only if the registration procedure to which reference has been made in respect of previous embodiments has been performed.

The registration code portion 38 can include a preview or demonstration related to a subset of the balance of the digital data on the CD 54 which can be executed by the platform without license.

The decoder 61 includes LCD display 55 and keypad 56 whereby the licensee can enter information via keypad 56 and receive information via the LCD display 55 for the purpose of the registration procedure.

In addition a smart card (SRAM) 57 is receivable by the decoder 81 for the purpose of customizing or amending operation of the decoder 51.

With reference to FIG. 7, the registration procedure following insertion of CD 54 into CD player 52 is as follows. The user operates the play control and decoder 51 reads from CD 54 code portion 38 of digital data 37 located thereon and executes this code so as to determine whether the digital data is already licensed for the platform. If not, a demonstration is communicated via digital-to-analog converter 63 whilst the user determines whether to register as a licensee of the digital data 37 in the manner indicated in the flowchart of FIG. 7.

## Sixth Embodiment

With reference to FIG. 8, there is shown a block diagram of a system according to a further embodiment of the invention which is to be read in the context of the earlier generalized description in respect of FIG. 1.

The system illustrated in FIG. 8 operates in the manner generally described in respect of previous embodiments and as generally outlined in the diagram. In the context of the block C illustrated in FIG. 4, and with reference to FIG. 9, the algorithm, which generates the unique user identification and which is resident both as the registration code portion 38 in digital data 37 integrally bound to use code portion 39 for execution on local platform 31 and also as remote algorithm 61, is attached to registration database program 62 for execution on the remote platform 63.

The algorithm, in this embodiment, combines by addition the serial number 50 with the software product name 64 and customer information 65 and previous user identification 22 to provide registration number 66.

As discussed earlier, all of the items to be summed, namely items 50, 64, 65 and 22 must be communicated to the remote licensee unique ID generator 67 by the intending licensee whereby algorithm 51 causes the production of a registration number 66 which matches identically with the locally produced registration number. When mode switcher 68 verifies the match, then the mode switcher 68 allows execution on platform 31 of the full user program 39.

Prior to allowing execution of the full program, mode switcher 68 will also check whether platform ID 69 has changed as provided to it by platform unique ID generator 70.

In this embodiment, serial number 50 is comprised of two components, namely system information 71 and a variable key portion 72. The variable key portion 72 provides the characteristic of self serialization described earlier in the specification and, in this embodiment, is generated at the time of registration on platform 31 by reference to a variable platform parameter, in this case reference to system time information, although other parameters which are variable can be utilized in other embodiments.

System information 71 can include information which identifies the hardware comprising the platform 31 on which the user program 39 is to be executed such as, for example, CPU number (where available), or unique parameters associated with the firmware in use. The system information, optionally, can further include system configuration information such as amount of memory, type of processor etc.

It will be noted, therefore, that serial number 50 will appear to an intending licensee when it appears on screen as per box C in FIG. 4 as an apparently random variable having no obvious link to the platform 31 or the user program 39.

However, when the serial number 50 is communicated to the remote licensee unique ID generator 67 a secondary algorithm complementary to the algorithm which generated the serial number including variable key portion 72 and system information 71 is able to "decode" or otherwise strip away the variable key portion 72 so as to make use of the system information 71 if allowable and desirable in the circumstances.

Whether the system information 71 is utilized or not, the serial number 50 generated in this manner provides an input to the algorithm which generates registration number 66 which presents as an apparently variable parameter thereby rendering "cracking" of the software registration system more difficult and unlikely.

## Seventh Embodiment

The schematic diagram of FIG. 10 illustrates a substantially hardware implementation of the invention applicable, for example, for implementation of the CD arrangement of FIG. 6 or the more generalized arrangement of FIGS. 8 and 9.

In this embodiment, a prospective user 80 of digital code 81 on media 82 by its execution on platform 83 firstly inserts the media 82 into an appropriate digital code reading device within platform 83 (e.g., a floppy disk drive or a CD ROM drive).

Customer information C is provided by user 80 both direct to local encoder/decoder 84 and also to local adder or summer 85.

Additionally, product information P derived from media 82 (typically via platform 83) or else via the intermediary of the user (signified by the small man symbol) is provided to encoder/decoder 84 and to summer 85.

Finally, a serial number S derived from platform 83 is supplied either directly or via the intermediary of user 80 to encoder/decoder 84 and to summer 85.

Summer 85 acts as a local licensee unique ID generating means by combining, by addition, customer information C, product information P and serial number S in order to provide a local licensee unique ID here designated Y.

Encoder/decoder 84 transmits the serial number S, the customer information C and the product information P via

modems **86, 87** over the public switched telephone network to a remote encoder/decoder **88** which, in turn, supplies signals S, C and P to the inputs of remote summer **89**. Remote summer **89** combines these signals by addition (thereby acting as a remote license unique ID generating means) so as to provide a summed output, here termed X, which represents a licensee unique ID or enabling key which should match identically with the local licensee unique ID or registration key or registration number Y if inputs S, C and P to summers **85** and **89** are identical.

The licensee unique ID termed X is transmitted back via encoder/decoders and modems **84, 86, 87, 88** to comparator **90** which outputs a high signal if X equals Y. This condition corresponds to the local licensee unique ID matching with the licensee unique ID generated at the remote location by the remote licensee unique ID generating means generally comprising summer **89**.

Digital code **81** on media **82** comprises code identified as a demonstration portion D together with code identified as a use portion U. There may be other kinds of code designated O as well.

Code **81** is executed on platform **83** (for example, a microprocessor or a substantially hardware based, dedicated playback device such as a CD drive) with the code being passed through a mode switcher comprising first gate **91** and second gate **92** together with relay **93**.

First gate **91** energizes relay **93** so as to permit execution of code of type D but not code of any other type such as of type U.

Second gate **92** permits execution of any kind of code by closure of relay **93** provided only that the output of comparator **90** is high (which is to say that X equals Y or that the local licensee unique ID matches with the licensee unique ID generated by the remote licensee unique ID generating means comprising summer **89**).

Comparator **90** together with gates **91, 92** and relay **93** comprise one particular form of mode switcher or switching platform **83** of various kinds of code such as the code of types D and U.

Industrial Applicability

The aforementioned may be applied either in dedicated electronic hardware or by means of more generalized digital computation devices such as microprocessors and the like whereby digital code or software (which may incorporate at least part of the code which, when executed, acts as a licensee unique ID generator) is fully enabled only after following a specified licensing procedure.

The above describes only some embodiments of the present invention and modifications, obvious to those skilled in the art, can be made thereto without departing from the scope and spirit of the present invention.

What is claimed is:

1. A registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

2. The system of claim **1**, wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode.

3. The system of claim **2**, wherein said mode switching means permits operation of said digital data in said use mode in subsequent execution of said digital data only if said licensee unique ID generated by said local licensee unique ID generating means has not changed.

4. The system of claim **3**, wherein said local licensee unique ID generating means comprises part of said digital data when executed on said platform.

5. The system of claim **4**, wherein said mode switching means comprises part of said digital data when executed on said platform.

6. The system of claim **5**, wherein the information utilized by said local licensee unique ID generating means to produce said licensee unique ID comprises prospective licensee details including at least one of payment details, contact details and name.

7. The system of claim **1**, said system further including platform unique ID generating means, wherein said mode switching means will permit said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed.

8. The system of claim **7**, wherein said platform unique ID generating means comprises part of said digital data when executed on said platform.

9. The system of claim **8**, wherein said platform unique ID generating means utilizes hard disc or other platform information to determine said platform unique ID.

**10**. The system of claim **1**, wherein said platform comprises a computer operating system environment.

**11**. The system of claim **10**, wherein said digital data comprises a software program adapted to run under said operating system environment.

**12**. A registration system attachable to software to be protected, said registration system generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed; and wherein said registration system is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration system.

**13**. The registration system of claim **12**, wherein said security key is generated by a registration number algorithm.

**14**. The registration system of claim **13**, wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run.

**15**. The registration system of claim **12**, wherein said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot, and, if a subsequent boot is detected, then environment and user details are compared to determine whether the program reverts to a demonstration mode and a new user registration procedure is to commence or a full version run.

**16**. The registration system of claim **15**, wherein said environment details comprise at least one element which is not user-configurable on the platform.

17. A method of control of distribution of software, said method comprising providing mode-switching means associated with said software adapted to switch said software between a fully enabled mode and a partly enabled or demonstration mode, said method further comprising providing registration key generating means adapted to generate a registration key which is a function of information unique to an intending user of the software; said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key; and wherein said enabling key is communicated to said intending user at the time of registration of said software; said enabling key generated by a third party means of operation of a duplicate copy of said registration key generating means.

18. The method of claim 17, wherein said registration key is also a function of the environment in which said software is installed.

19. A remote registration station incorporating remote licensee unique ID generating means, said station forming part of a registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

20. A method of registration of digital data so as to enable execution of said digital data in a use mode, said method comprising an intending licensee operating a registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

* * * * *

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

UNILOC USA, INC. and

UNILOC SINGAPORE PRIVATE LIMITED

Plaintiffs

v. Civ.A. No. 03-CV-440(WES)

MICROSOFT CORPORATION,

Defendant

---

DEPOSITION OF GREGORY STEPHEN COX

SYDNEY, AUSTRALIA

THURSDAY, 28 APRIL 2005

AUSCRIPT PTY LTD

Level 10, 15 Adelaide Street, Brisbane

Q. So what happened to the idea after that point?

A. I guess we must have talked about it a bit more. I really don't know, it was a bit of a blur that time for me. We discussed it - we did - I don't - actually, I can't really recall. I'm only trying to think of, you know, what we would logically do. But it was - I can't even remember.

Q. Did you play any role in the development of that idea?

A. Only as basically a - probably a sounding board for Ric at that stage. Because the main thrust of the idea was coming from him, the momentum for the idea was coming from him. And - - -

Q. Did there come a time when Mr Richardson involved a computer programmer in the development of this idea?

A. Well, there was, yes, but I don't remember exactly when that was.

Q. Do you remember who that was?

A. For the Macintosh - yes, we were working on Macintosh. It was Cary, Cary Dreelan. Although whether he was the - I can't remember if he was the only - I'm not sure if he was the only one involved then. I think he was probably - yes, he was probably the only other guy involved.

Q. You're aware that Mr Richardson filed a patent application on unlocking technology?

A. Yes.

Q. Did you play any role in the work on that patent application?

A. Only administratively.

Q. What do you mean by that?

A. Phone calls to lawyers to make sure that the patent was going through, follow-up things, some visits to the lawyers. The actual patent - when they were putting the patent down it was mainly Ric and the patent lawyers, I believe, at that stage.

Q. Did you review any draft applications before they were filed?

A. I don't recall.

Q. The lawyers that you referred to, is that the Maxwell firm; Peter Maxwell?

A. I think that was it. It was - Jim Fitzsimmons, I believe, was the lawyer's name.

Q. And then you later played a role in connection with the patent application for the US patent as well; right?

A. Only administratively again. Same kind of thing.

Q. And you worked - in connection with that patent application you worked with the Kenobi Martins firm in the United States?

A. Not much

Q. What was your administrative role in connection with the US patent application?

A. The only things - same again, follow-up calls. I don't remember specifically, just basically the same thing; following up to make sure things were on time and going through and things like that.

Q. Do you recall the name of the lawyer that you worked with there?

A. No.

Q. Was it your job at Uniloc to make sure that the patent application process was going in the right direction?

A. Ric handled most of the - what exactly are you asking me? Technically or - - -

Q. Well, let me start with this. Was there anybody else at Uniloc - and let's go back to the Australian patent application for a moment - was there anybody else at Uniloc that had any role in connection with the Australian patent application other than you or Ric Richardson?

A. No, not that I'm aware of.

Q. Okay. And then as to the US patent application was there anybody at Uniloc that had a role with regard to that application other than you or Ric Richardson?

A. Not that I know of. Not that I remember.

Q. And what was Ric Richardson's role in connection with the US patent application?

A. He had the main role in that of once again working with the lawyers to put it down and get its initial momentum going.

Q. What do you mean "put it down"?

A. Whatever they had to do to put it down on paper.

Q. You mean draft the documents?

A. Yes.

Q. And then what about gaining momentum, what is that? What do you mean by that?

A. Signing whatever forms, putting into - you know, the paperwork.

Q. Did you have any role in dealing with any of the US lawyers on technical issues surrounding the patent application?

A. Not that I remember, no.

Q. And so what was your administrative role? What did you do as part of that?

A. As I said before, I was working closely with Ric, mainly as an assistant, so if there was, you know, phone calls to be made, I might make a phone call or I might - that would be about it, really. Nothing technical.

Q. Were you the company liaison for dealing with the US patent attorneys?

A. They worked mostly with Ric, I'm sorry.

Q. Were you the company liaison for dealing with the Australian patent attorneys?

A. I had more to do with them but, again, it was mostly Ric.

Q. I would like to show you a document that's previously been marked as Ric Richardson exhibit 34. It's a document that bears Bates numbers Uniloc 983 to 992, a letter of January 17, 1996, from Peter Maxwell and Associates to Steve Cox. If you take a minute, my first question is whether you recognise this document?

A. Is it just the front page that you want me to look at?

Q. Let's start with that, yes. Do you recognise this document?

A. I recognise documents like it, yes.

Q. You don't have any reason to doubt that you received this letter on or around January 17, 1996. Correct?

A. No.

Q. Now, there is a reference in the first page of this letter to a German document. Do you see that in the second paragraph?

A. Yes.

Q. And this letter was telling you that this German document had been identified by the European Patent Office in connection with the patent prosecution over there. Right?

MR WODARSKI: Objection.

A. Mm.

BY MR GLITZENSTEIN:

Q. I'm sorry. Yes? One of the - you said "Mm" rather than yes or no. If you could just articulate yes or no.

A. Ask the question again, please?

Q. Sure. Okay. This letter is informing you that the European Patent Office had located this particular German document. Correct?

MR WODARSKI: Objection.

A. Yes.

BY MR GLITZENSTEIN:

Q. And what steps did you take to bring this German document to the attention of the US patent lawyers?

A. I don't remember.

Q. Do you have any recollection at all of making any effort to inform the US patent lawyers that the European Patent Office had located this German document?

MR WODARSKI: Objection.

A. I honestly don't remember if there was efforts made or not. There was - I don't know. I don't remember. I don't know what we did at the time.

BY MR GLITZENSTEIN:

Q. All right. If we could back up to the initial work that was done to develop this unlocking technology, what was the first product that this unlocking technology was applied to?

A. From memory, I think it was Truetime.

Q. And did you have a - - -

A. I don't know if there was a - I can't remember if there was a product that we experimented on or not before that. Truetime, I think, was the first one. Whether it was even the technology that was patented, I don't know.

Q. And was it Cary Dreelan who did the actual work to add the unlocking technology to Truetime?

A. I believe so.

Q. Do you recall whether he had any help?

A. I don't recall.

Q. Do you recall any - withdrawn. Retract my question. What was the internal name, or name that Uniloc gave to this unlocking technology?

A. At that stage?

Q. Yes.

A. The internal name. I don't know if we had an internal name for it then, or not. I can't remember.

Q. The work that was done to modify Truetime to have the unlocking technology, that was done on behalf of Computrix; right?

A. Well, it - at the time, it was just - we were experimenting. It wasn't really done on behalf of anybody.

Q. The work that was done to develop the unlocking technology was done while you and Mr Richardson were with Computrix; right?

A. Yes.

Q. Does the name QuickLok have any meaning to you?

A. QuickLok?

Q. Yes.

A. No.

Q. Does the name Softloc have any meaning to you?

A. I think we - that might be one the names we threw around. Softloc, Softkey, Hardkey, Uniloc. We had - I mean, we were throwing around a few, you know - we had about a dozen different things we were kind of thinking of.

Q. Do you recall any efforts to - withdrawn. Do you recall any proposals made by Ric Richardson to Symantec regarding unlocking technology?

A. To Symantec?

Q. Yes.

A. No.

Q. Do you recall anything about Symantec in the context of software unlocking?

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNILOC USA, INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED<br>Plaintiffs,<br>vs.<br>MICROSOFT CORPORATION,<br>Defendant. | Civ. A. No. 03-CV-440 (WES) |

**PLAINTIFFS' SECOND SUPPLEMENTAL ANSWERS TO DEFENDANT'S INTERROGATORY NOS. 6-8**

Pursuant to Fed. R. Civ. P. 33, plaintiffs, Uniloc USA, Inc. and Uniloc Singapore Private Limited (collectively "Uniloc" or "plaintiffs"), hereby submit the following second supplemental answers to defendant Microsoft Corporation's ("Microsoft" or "defendant") Interrogatory Nos. 6-8.

Uniloc's answers are based on present knowledge and belief. In all cases, Uniloc reserves the right to modify and/or supplement its answers to conform to the results of its continuing investigations. Uniloc's answers are not to be construed as a waiver of any right or objection or as an admission of relevancy, materiality or admissibility in evidence of any information, document or thing provided to Microsoft, nor are they to be construed as a waiver of any past, present or future general or specific objection made to these interrogatories.

In providing answers to Microsoft's interrogatories, where Uniloc employs the phrase "Uniloc may produce documents from which an answer to this interrogatory may be derived," or



CONFIDENTIAL-ATTORNEYS EYES ONLY

words to that effect, Uniloc's employment of such phrase does not constitute a representation that responsive documents exist. Use of such phrase means only that Uniloc will make a good-faith effort and use reasonable diligence to locate responsive documents and things, and that Uniloc will produce at an appropriate time such documents within its possession, custody or control, and only to the extent such documents are not objectionable. By designating documents, however, Uniloc does not represent that the identified documents are the only relevant documents, nor does Uniloc represent that the identified documents are necessarily the most relevant documents. Nor does Uniloc limit its answers to these interrogatories to the information that may be obtained from such documents.

Uniloc generally objects to each and every interrogatory on the grounds set forth in the twelve (12) enumerated objections below. In answering a particular Microsoft interrogatory, Uniloc may set forth and identify one or more of the twelve (12) enumerated objections as additional grounds for objection to such interrogatory. Uniloc may also provide additional objections that were not previously set forth in the twelve (12) enumerated objections. However, to the extent Uniloc has set forth and identified one or more of the twelve (12) enumerated objections and/or set forth and identified any additional objection(s) to a particular Microsoft interrogatory, Uniloc has done so because Uniloc believes such objection(s) to be particularly applicable to the particular Microsoft interrogatory. Accordingly, where Uniloc has not set forth and identified one or more of the twelve (12) enumerated objections, the absence of such objection(s) is not to be construed as waiver of such objections.

## OBJECTIONS

Uniloc generally objects to Microsoft interrogatory Nos. 6-8 on the following twelve (12) enumerated grounds:

1. Uniloc objects to these interrogatories to the extent that they are vague, overly broad, unduly burdensome, not limited in time or scope and to the extent that they seek information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

2. Uniloc objects to these interrogatories to the extent that they seek the disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine. Any inadvertent disclosure of privileged or protected information or documents does not constitute a waiver of the attorney-client privilege and/or the attorney work-product doctrine.

3. Uniloc objects to these interrogatories to the extent that they seek to impose obligations other than those imposed by the Federal Rules of Civil Procedure and/or the Local Rules of the Court.

4. Uniloc objects to these requests to the extent that they seek the identification and/or disclosure of confidential, trade secret and/or proprietary information. Uniloc will identify and/or disclose responsive confidential, trade secret and/or proprietary information to Microsoft that is not otherwise objectionable only after an appropriate protective order has been agreed upon and entered by the Court, and only in accordance with the terms of such protective order.

5. Uniloc objects to Microsoft's interrogatories to the extent that they request "all" information regarding a particular topic and to the extent that the word "all" encompasses information, which is of an overly broad, unduly burdensome, privileged, confidential and/or irrelevant nature.

6. Uniloc objects to the interrogatories to the extent that the information responsive to the interrogatories is publicly available, in the possession of third parties and/or within the possession and control of Microsoft, and thus more easily attainable by defendant.

7. Uniloc objects to the interrogatories to the extent that the interrogatories are repetitive, overlapping and/or duplicative of other interrogatories.

8. Uniloc objects to these interrogatories to the extent that they require Uniloc to draw legal conclusions, interpret legal terms, concepts and/or principles, and/or to interpret statutory law and/or case law in order to provide an answer.

9. Uniloc objects to these interrogatories to the extent that they are premature. To date, Microsoft has not produced documents and/or things responsive to Uniloc's document requests. Nor has Microsoft provided sufficient answers to Uniloc's interrogatories. Nor has Microsoft produced any of its witnesses for deposition. As such discovery may be necessary for Uniloc to answer Microsoft's interrogatories and/or to identify, locate and produce documents and/or things responsive to Microsoft's interrogatories, Uniloc objects to Microsoft's interrogatories as premature.

10. Uniloc objects to the interrogatories to the extent that Microsoft, not Uniloc, possesses and/or controls information, documents and/or things responsive to the interrogatories.

11. Uniloc objects to the Definitions and Instructions in Microsoft's interrogatories to the extent they are inconsistent with the appropriate Federal Rules of Civil Procedure and Local Rules of the Court. Uniloc will rely on the Federal Rules of Civil Procedure, the Local Rules and governing case law with respect to the subject Definitions, Instructions, Interrogatories and Answers. Uniloc also objects to the Definitions and Instructions to the extent they are vague, overly broad and/or unduly burdensome, and to the extent that in conjunction with the individual

interrogatories they seek information, documents and/or things that are irrelevant, not likely to lead to the discovery of admissible evidence, confidential and/or privileged.

12. Uniloc objects to these interrogatories to the extent they exceed twenty-five (25) in number.

**SUPPLEMENTAL ANSWERS**

**INTERROGATORY NO. 6:**

Identify all things or methods (including all programs, software products, source code, object code, shareware, models, prototypes, samples, beta tests and the like) created, devised, made, sold, given away, produced, or manufactured by any person or entity anywhere in the world at any time that practice, employ, implement, or embody, or that are capable of practicing, employing, implementing, or embodying, any claim of the '216 patent.

**ANSWER NO. 6:**

Uniloc objects to this interrogatory to the extent that it is vague, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, particularly because it seeks information about third parties and their products which are not at issue in this case. Uniloc objects to this interrogatory to the extent that it seeks the disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine. Furthermore, as there is no protective order in this case, Uniloc objects to this interrogatory to the extent that it requires Uniloc to disclose confidential information of Uniloc. Indeed, Microsoft avoided responding to Uniloc's proposed draft protective order, which serves to govern the confidential information the parties will exchange in this case, until February 5, 2004, the date that its responses to Uniloc's discovery was due. Until the court enters a protective order, Uniloc objects to this interrogatory as premature.

Notwithstanding and without waiving the foregoing objections, Uniloc identifies the accused products of Microsoft as set forth in the definitions of Uniloc's interrogatories and document requests, and as set forth in the claim chart attached hereto as Exhibit A. Information relating to this interrogatory may be confidential to Uniloc and/or third parties. Without waiving any objections, non-privileged documents and/or things will be produced at a mutually agreeable time and place pursuant to Rule 33(d) in response to defendant's document requests.

**FIRST SUPPLEMENTAL ANSWER NO. 6:**

Notwithstanding and without waiving the objections set forth above, Uniloc provides its first supplemental answer to this interrogatory as follows:

Documents from which an answer to this interrogatory may be derived may include, but are not limited to, the following: UNILOC 1295-1296; UNILOC 2872-2882; UNILOC 3102-3126; UNILOC 4446-4451; UNILOC 5220-5226; UNILOC 5253-5271; UNILOC 5576-5577; UNILOC 7548-7552; UNILOC 7669-7675; UNILOC 8538-8540; UNILOC 8750-8783; UNILOC 8977-8984; UNILOC 9167-9182; UNILOC 9331; UNILOC 10358-10372; UNILOC 10456-10461; UNILOC 11254-11256; UNILOC 14905-14906; UNILOC 14907; UNILOC 14908-14909; UNILOC 14910; UNILOC 15196-15197; UNILOC 15200-15221; UNILOC 15305-15307; UNILOC 15308-15312. Uniloc's investigation into this matter is ongoing and Uniloc will provide a supplemental response, if appropriate, once its investigation is complete.

**SECOND SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 6:**

Notwithstanding and without waiving the objections set forth above, the following individuals and/or entities may have had products that practiced, employed, implemented or embodied one or more claims of the '216 patent.

| **COMPANY NAME** | **PRODUCT NAME** |
| --- | --- |
| Ace Software | Ace File |



CONFIDENTIAL-ATTORNEYS EYES ONLY

| | |
|---|---|
| Ace Software | AtHome: Personal Post office |
| Ace Software | Dazzle Plus |
| Ace Software | Envelope Manager |
| Adobe | Photoshop |
| Aladdin | Stuffit |
| Aldus | Pagemaker |
| Aldus | Persuasion |
| Americom, Inc | Personal emailbox |
| Arts and Letters | Picture Wizard |
| Bitware | Galleria |
| Borland | C++ Frameworks |
| Borland | Paradox |
| Borland | QPW |
| Borland | SideKick |
| Claris | Claris Works (Mac) |
| Claris | Filemaker Pro |
| Claris | Organizer |
| Cognition | Powersmarts |
| Computer Associates | CA-RET |
| Computer Associates | Cricket Image |
| Computer Associates | Realizer |
| Computer Associates | Simply Accounting |
| Computer Associates | Simply Money |
| Computer Associates | Super Calc |
| Computer Associates | Super Project |
| Computrix | TrueTime |
| CSIRO (Aus) | BC Aider |
| CyberMedia | First Aid 1.2 |
| DCA | Crosstalk/Crossfax |
| DDTec | Help Maker |
| Disney | Software Collection |
| DOTEC | WYSI Help |
| Encyclopedia Brittanica | Encyclopedia Brittanica |
| Great Game Products | MicroBridge |
| Hallmark | Card Studio |
| Hasbro Interactive | Smart Games |
| Hasbro Interactive | Yahtzee |
| Hyperchem | Autodesk |
| IBM | IBMWorks for OS2 |
| IBM | OS2 |
| Id Software | Doom |
| Inovatic | Easyreader |
| Intuit | Lawyer |
| Intuit | Quicken |

| | |
|---|---|
| Jack Newton | Troubleshooting Golf |
| Jam Software | Smart Alarms etc |
| Jim Reviit | Write Right (Electronic Book) |
| Legend Entertainment Company | Gateway |
| Lotus | 123 |
| Lotus | AmiPro |
| Lotus | Approach |
| Lotus | Freelance |
| Lotus | Organizer |
| Lucas Arts | Star Wars: Rogue Squadron |
| MapLinx | MapLinx |
| MAUS | Maus Masterplan |
| Maxis | Print Artist |
| Maxis | Sim Farm |
| Meca Software | Taxcut |
| Mecc | Dyno Park Tycoon |
| Mecc | The Oregon Trail |
| Microprose | Civilization |
| Microsoft | Asteroids |
| Neptune Systems | AlarmBook Message System |
| Nova Development | Scrapbook Factory |
| Odyssey | ISYS |
| Panda | Panda Anti Virus |
| PC Voice | Thoughts |
| Phsygnosis | Lemmings |
| Quarterdeck | Manifest |
| Quarterdeck | Quemm |
| Quarterdeck | Sidebar |
| Roadshow | Atmoshere |
| Sierra Online | LodeRunner |
| Simon & Schuster | Amazons and Aliens |
| Simon & Schuster | Curious George |
| Simon & Schuster | Miss Spiders Tea Party |
| Simon & Schuster | Rocky and Bullwinkle |
| Simon & Schuster | Star Trek: The fallen |
| Smith Micro | HotFax |
| Smith Micro | Quicklink Gold |
| Softcode | Tracker |
| SoftKey | Calendar Creator Plus |
| SoftKey (ID software) | Doom |
| Softkey Int | Photo Finish |
| Software Mfg Co | Carbon Copy |
| Spinnaker Software | Resume |
| Sybiz | Quick Accounts |



CONFIDENTIAL-ATTORNEYS EYES ONLY

| | |
|---|---|
| Symantec | Act |
| Symantec | Norton Utilities |
| Symantec | Q & A |
| Symantec | WinFax Pro |
| The Black Electron | Pocket Battles |
| Tom Snyder Productions | TimeLiner |
| Ubisoft | Myst III: Exile |
| Vcom | Autosave |
| Vcom | CD Anywhere |
| Victormax | Wacky Funsters |
| VictorMmax | Virtual Arcade CD |
| WizardWorks | CompuWorks |
| WizardWorks | CompuWorks Total Accountant |
| WizardWorks/Desksoft | Compuworks MultiWorks |
| WordPerfect | Express Fax Plus |
| WordPerfect | InfoCentral |
| WordPerfect | WordPerfect |
| WordPerfect | Works |

**INTERROGATORY NO.7:**

For each thing or method identified in response to Microsoft's Interrogatory No. 6, describe the circumstances of the commercialization and/or publication of such thing or method, including by identifying any entity that made or devised the thing or method and their or its relationship to Uniloc, each person with knowledge of the thing or method, the first offer for sale, first sale, first offer to license, first license, first public demonstration, first public use of the thing or method, and the date(s) and country(ies) during and in which the thing or method was available for use, purchase, or sale.

**ANSWER NO. 7:**

Uniloc objects to this interrogatory to the extent that it is vague, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Uniloc objects to this interrogatory to the extent that it seeks the disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine.

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

UNILOC USA, INC. and

UNILOC SINGAPORE PRIVATE LIMITED

Plaintiffs

v. Civ.A. No. 03-CV-440(WES)

MICROSOFT CORPORATION,

Defendant

---

DEPOSITION OF ALLAN BRUCE BELL

SYDNEY, AUSTRALIA

MONDAY, 3 OCTOBER 2005

AUSCRIPT

Level 10,
15 Adelaide Street, Brisbane

printing disabled, but there was no print code anywhere on that disk; right. They had actually removed it from that particular version, so there was no way you could go back and enable it because the code wasn't there. But Ric's technique was, basically, to provide everything and then allow you to enable the software and, obviously, do that without them - with the developers feeling safe enough that they weren't going to, you know, lose their crown jewels.

BY MR GLITZENSTEIN:

Q. Do you recall how many times you and Mr Richardson discussed this idea?

A. I don't, no. I mean, as I said, you know, I would have so many conversations and, you know, the topics would vary, and these things would - you know, because of the sort of relationship that we had with a lot of these people, these were not necessarily formal meetings, or they were very informal meetings. So, in some cases, you could be discussing something which was material, and in some cases, you would be discussing something which was not material. There was no clear boundaries. You know, these weren't minuted meetings. You know, we were there, basically, as a, you know, free service for them.

Q. Let me show you a document that has been previously marked in this case with the identifier - that's the Ric Richardson exhibit number 53, and it bears production numbers Uniloc 15870 through 15871; and it's a letter from Ric Richardson to Carey Dreelan, dated August 1st, 1992. Do you know Mr Dreelan?

A. Look, I did meet him and - but could I point him out in a crowd? No, I couldn't.

Q. Do you recall that he was one of the programmers that was working with Ric Richardson?

A. Look, only vaguely, you know.

Q. If I could focus you at the bottom of the first page of this document, there's a bullet point where Mr Richardson credits you with the idea of combining a number made up from the time that the software was first modified, with the name of the user as typed into a start-up screen that needs a corresponding number, supplied from Computrix, so that the demo version of the software can be unlocked. Do you see that there?

A. Yes.

MR WODARSKI: Objection.

BY MR GLITZENSTEIN:

Q. And do you recall making that suggestion to Mr Richardson?

MR WODARSKI: Objection.

A. I recall having a conversation with him where we discussed, basically, what makes a computer unique. You know, one of the questions was: if he is putting out CDs, all of those CDs are identical. If I'm installing that CD onto a computer, and, potentially, that is a brand new computer, straight out of the store, and I have two of those, then, theoretically, you would say, well, they're identical. So if I install it on both, I've got an identical set up. Now, if I somehow want to - I need something to make that unique, because I don't want to have a situation where, let's say, if I put a number to it, this one comes up number 3, and then this one comes up number 3. So I get given a code, you know, number 5, well, it works with both because they're identical. And, in fact, every new computer, every 10,000 new computers that come out, start up - they all get the number 3, so suddenly my unlock code works with every single one. So the question is: what makes something unique? That was a discussion that we had. And the nature of these discussions is interactive; you know, they were not a formal: can you give me the answer to this? Here is the answer to that. These were discussions; we bounced things back off each other, you know. And so, you know, he would discuss things with me, and maybe I thought of something, and then he thought of something, and then we bounced things back and forth. And in this particular case, I can remember the conversation where I said that, no, the computers are different. There is always something different in every machine, and it may be something as simple as the amount of time between when I start the machine up and I type my first characters. You know, just doing that alone for each computer will be unique. It will be impossible to get a second computer and type that first character at the same time as I did on the first one. So there is always something that is unique about a computer just because, you know, there's a human involved. I don't recall specifically the suggestion around the time of the modification of the software, but that might have been related to the amount of time between when I start a machine up and I install the software. And I don't recall whether or not that meant that the modification dates were set to the time that the software was installed or not. Again, we're talking, you know, what, some 12 to 15 years ago. And, so, you know, that was, basically, the basis of the conversation - was that there are unique

things between different computers; and, okay, that was something that we discussed. I'm not saying that, you know, it was in any way sort of my idea that I gave to him because, you know, he may have subliminally kind of prompted the idea, you know, in talking with me. So, you know, it may be a joint thing.

BY MR GLITZENSTEIN:

Q. With regard to the portion of that passage that I just read to you that talks about the name of the user, what's your understanding of that?

A. Well, the point is that every person who starts up a machine - one of the things that you do when you get a new machine is you uniquely identify yourself to the machine. Often that's done by doing things such as the name of the hard drive. So, typically, people call the hard drives - this is in the days, you know, when Windows were - they were all C drives. On the Macintosh they actually had names, and so people had all sorts of cute names for the hard drives, for the printers. You know, one of the ones I liked for the printers was - one printer was called Some Day My Prints Will Come, you know, referring to the slow pace of printing; right. So people were very creative, and the Macintosh was appealing to creative people, and people were creative. They would customise their machines in all sorts of different ways.

Q. And was there a way in the Macintosh computer where somebody could type in their own name? Was that possible?

A. You can - well, I must admit I'm trying to remember, back then, where you would put your name in, specifically. You know, it may be that that was in regards to actually when you would install the software, you would then identify your name, you know, as part of that registration process. So, basically, when I installed the software, you would be asking the user for the name and you would have not only their name, but you would also have, you know, the time from when the machine had been started up to when they physically installed the software. Of course, you would also have the date, because all the machines shift with the clocks pre-set out of the factory. So that when you turned them on, you didn't have to tell it what the time of the day was; that was already done. At the time, that was quite a revolutionary thing. It's not something which was copied until many, many years later. So that's what I mean by there were many unique things about a machine. I could take two machines out of a store and, you know, basically,

US005291598A

# United States Patent [19]

Grundy

[11] Patent Number: 5,291,598

[45] Date of Patent: Mar. 1, 1994

[54] METHOD AND SYSTEM FOR DECENTRALIZED MANUFACTURE OF COPY-CONTROLLED SOFTWARE

[76] Inventor: Gregory Grundy, 1/21 Hewitt Street, Wilston 4051, Queensland, Australia

[21] Appl. No.: 864,836

[22] Filed: Apr. 7, 1992

[51] Int. Cl.[5] .......................... G06F 9/00; G06F 12/14

[52] U.S. Cl. .............................. 395/650; 364/DIG. 1; 364/286.4; 364/286.5; 364/286.6

[58] Field of Search ..................... 395/650; 364/286.4, 364/286.5, 286.6

[56] References Cited

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,652,990 | 3/1987 | Pailen et al. | 364/200 |
| 4,685,055 | 8/1987 | Thomas | 364/200 |
| 5,034,980 | 7/1991 | Kubota | 380/4 |
| 5,113,518 | 5/1992 | Durst et al. | 395/550 |


*Primary Examiner*—Gareth D. Shaw
*Assistant Examiner*—A. Katbab
*Attorney, Agent, or Firm*—Kenyon & Kenyon

[57] ABSTRACT

A system to control the use of an informational product is disclosed. The informational product is stored on a storage medium and executed by a first processor. The informational product is operatable in a plurality of modes. The system comprises three manufacture modules. The first manufacture module, executed by the first processor, generates a registration code for a user of the informational product, the registration code being a function of the identity of the first processor, the identity of the user and the identity of the informational product. The second manufacture module, executed by the first processor, accepts as input an authorization code, verifies the authorization code and, if the verification is successful, changes the operational mode of the informational product. The second manufacture module also stores a user record in the informational product. The third manufacture module examines the user record each time the informational product is activated. The third module determines the operational mode of the informational product as a function of the operational mode stored in the user record and the identity of the processor on which the third module is executed. The third module returns to the informational product the user record.

43 Claims, 11 Drawing Sheets




13
14
CENTRAL DATABASE
112
MEMORY
11
CPU
15
19
20
18
MODEM
MODEM
USER'S CPU
10
INPUT/ OUTPUT DEVICE
16
INPUT/ OUTPUT DEVICE
12

FIG. 1




FIG. 1A
PROCESS OVERVIEW


START
INITIALIZE
201
WRITE ENABLE MESSAGE
GET USER DATA
400
203
202
OK?
N
Y
SAVE LICENSE STATE
204
205
DISPLAY BANNER PAGE
A
GET NEXT OPTION
206
207
208
EXIT OPTION ?
STOP
209
NEW USER OPTION ?
B
225
RECOVER BACKUP OPTION ?
C
232
EVALUATION MODE ?
PROCESS EVALUATION MODE OPTIONS
233
234
PROCESS FULL FUNCTION MODE OPTIONS
210
USE WORKING COPY MESSAGE
211
OK ?
212
ENTER NEW USER DETAILS
RE-ENTER DETAILS MESSAGE
GENERATE REGISTRATION CODE
500
214
213
215
DISPLAY REGISTRATION CODE
216
EXCHANGE REGISTRATION & AUTHORIZATION CODES
217
ENTER AUTHORIZATION CODE
SAVE OWNERSHIP DETAILS
600
218
219
CORRECT PROBLEM MESSAGE
220
RECORD CODE FOR FUTURE MESSAGE
221
RECORD CODE AND INSERT BACKUP DISK
223
CORRECT PROBLEM MESSAGE
PRIME BACKUP
700
222
224
CHANGE LICENSE STATE
226
DISPLAY OWNER DETAILS
227
CONFIRMED
230
CORRECT PROBLEM MESSAGE
228
ENTER AUTHORIZATION CODE
SAVE NEW OWNER DETAILS
600
229
OK
231
CHANGE LICENSE STATE

FIG. 2




FIG. 3 AUTHORIZATION PROCESS




FIG. 4
GET USER DATA MODULE




FIG. 5
GENERATE REGISTRATION CODE MODULE


ENTRY
600
FIX SIMPLE DATA ENTRY ERRORS
601
TRANSLATE AUTHORIZATION CODE INTO BIT ARRAY
602
DECRYPT BIT ARRAY
603
CALCULATE AUTHORIZATION CODE CHECKSUM
604
OK
605
NO
YES
CALCULATE HARDWARE IDENTITY
606
OK
607
NO
YES
PRODUCT ID MATCH
608
NO
YES
VERSION # OK
609
NO
YES
CALCULATE USER DATA CHECKSUM
610
MATCH OK
611
NO
YES
A
RETURN AUTHORIZATION ERROR
612
EXIT
613
A
GENERATE OWNERSHIP DETAILS RECORD
614
ENCRYPT OWNERSHIP DETAILS RECORD
615
STORE OWNERSHIP DETAILS RECORD
616
OK ?
617
NO
YES
RETURN OK STATUS
620
RETURN UPDATE ERROR
618
EXIT
621
EXIT
619

FIG. 6

Case 1:03-cv-00440-S-DLM Document 178-8 Filed 10/16/2006 Page 9 of 26





FIG. 7
PRIME BACKUP MODULE




FIG. 8
FRANKING PROCESS

FIG. 9
DEVELOPER MODULES






FIG. 10
SCHEMATIC OF CENTRAL DATABASE

# METHOD AND SYSTEM FOR DECENTRALIZED MANUFACTURE OF COPY-CONTROLLED SOFTWARE

## FIELD OF INVENTION

The present invention is directed to a computer based method and apparatus to control the distribution of information, and more particularly, a method and apparatus whereby a user of computer software becomes the primary agent of manufacture and distribution of the software under the direct monitoring and control of a centralized control point.

## BACKGROUND OF THE INVENTION

Traditionally, computer software is manufactured and distributed through a system where a developer creates software (by designing a solution to a problem and coding that solution), manufactures the software in mass at a production facility, packages the software and then distributes it to the consumer. The software, in the form of computer code, is stored on a secondary storage device, such as a disk. Software products are generally manufactured by copying the computer code to the required number of storage devices. In a normal distribution chain, the consumer, who may be a purchaser or licensee, generally acquires the software (i.e., a storage device containing a copy of the computer code) from wholesale or retail dealers who in turn have acquired the software from the manufacturer.

A problem with the traditional system for the manufacture and distribution of computer software is that each software developer has its own substantial production, packaging and transportation costs, plus fixed overhead costs for facilities and personnel. When added to the initial investment required to develop software, such costs often make the launching of a new product prohibitive for the developer, especially where the developer is an individual or small corporation. Production and distribution is costly, and these costs are passed on to the consumer by way of higher product prices or fees. Additionally, the developer, where demand for a product is uncertain, may not know how many copies of a piece of software to manufacture and distribute. Production of too many or too few copies results in lost profits.

One approach taken by a segment of the software industry in order to reduce the inherent costs associated with the traditional manufacture and distribution of software is to invite consumer participation through the concept of "shareware" software. Shareware is software available for copying by consumers free of charge or at nominal costs from electronic bulletin boards accessed using modems or through mail order catalogue services. If, after having had an opportunity to use the software for a short period of time, the user decides to keep the software, the user is then under a good faith obligation to register the software and return a fee to the developer or distributor. In practice, the consumer participation in copying and distributing the available software is good, but the honorarium is rarely paid. As a direct consequence of the poor returns to shareware developers in general, the quality of products and level of support is low.

Another and very significant problem facing the manufacturer of computer software is the unauthorized reproduction of software products. Computer software is expensive to design and code, but the duplication of



an individual piece of software can be done swiftly and, relative to the initial production costs, at minimal cost. For example, by using operating system commands, a user can simply copy a program from a storage device such as a disk using one of the user's disk drives to another storage device. This illegal copying of software duplicates, on a small scale, a developer's manufacturing process. However, the unauthorized copying of computer software cannot be controlled by the manufacturer and the distribution of authorized copies cannot be traced.

The software manufacturing industry is placed in an unfortunate position. The purchase price of software is relatively high to reflect the cost of design and coding. The consumer is often averse to paying a high price for software, especially for software that cannot be evaluated before purchase (because the manufacturer will not allow access to the software before the purchase to prevent pre-purchase copying), and when the consumer is faced with a low risk of being detected and prosecuted for copying software, there is a strong incentive to make an unauthorized copy of the software. In effect, unlicensed, pirated software competes directly for the same market as legally manufactured software. The lost revenue to the manufacturer is passed on to the consumer via higher purchase prices, further increasing the incentive for piracy. With the current trend in the industry to develop software which has an intuitive, graphical interface, not requiring manuals to operate it, this problem can only increase as users do not require access to difficult to copy instruction manuals and tutorials. Further, pirated software can be quickly and widely distributed over telephone lines using modems.

One approach the industry has taken to improve the return on investment in the manufacture and distribution of software is to attempt to decrease the amount of software piracy. Software developers have used varying copy protection schemes. These schemes generally prevent a user from copying software or using an unauthorized copy of software. Schemes include "dongles", "code-wheels", storing the software on difficult to copy storage devices such as copy protected disks, using enabling access codes provided in user manuals or by the developer that must be entered before the software will work, or using hardware specific validation codes that allow a piece of software to operate only on one identified computer. Alternatively, a software developer could use a hardware copy protection scheme where an access code is supplied by a unique or difficult to copy hardware device able to be attached to only one computer at a time. Typically, when licensed software is not given an access code, the standard practice is for the software to refuse to operate. See, for example, U.S. Pat. No. 4,562,306 (Method and Apparatus for Protecting Computer Software Using an Active Coded Hardware Device) and 4,748,561 (Method of Protecting Computer Software).

Copy protection schemes have not been effective in stemming the tide of piracy, mainly because there are many specialized anti-copy products available to "unlock" the copy protection. Further, some copy protection schemes prevent consumers from legitimately making backup copies of the software for use when the authorized copy fails or is destroyed.

Another approach to prevent piracy of software is to require the authorized user, upon the first start-up of the software, to input the user's name (which is then stored

in the software's code) such that the user's name will appear on the initialization screen on each successive re-use in order to identify the user to whom the software is licensed or sold. This practice is intended to discourage authorized software users from allowing their software to be reproduced, knowing that they can be identified readily from an unauthorized copy of the software. However, as the software producer is unlikely to know when the software is illegally copied and is unlikely to be able to track down unauthorized users, such a scheme does not discourage copying. Further, there is no identification of users who pirate pirated software.

An approach to reduce piracy prior to purchase but to allow a potential consumer to test a piece of software is to distribute demonstration software without the full functional features of the software program. This permits the user to sample the user interface and certain features of the software without having to purchase the software product "sight unseen". If the user likes the software, the user can contact the developer or distributor for the fully functional software upon registration and payment of a license fee or the purchase price. The problem with such demonstration software is that twice the number of software products have to be produced and distributed. One or more storage mediums containing software must be produced and distributed for demonstration and one or more storage mediums containing different software must be produced and distributed for full function operation. This increases the costs of production and distribution. Further, the user is inconvenienced by twice having to contact or visit the distributor and is delayed until the full function software is obtained.

One solution to the problem of having to obtain additional fully functional software is to initially provide to the user the full function program but to have only certain files active for demonstration purposes. Then, if the user wants to enable the full function, the user must contact the developer or distributor for registration and payment of the license fee or purchase price in return for an access code. However, once the access code is revealed, unauthorized copies can be made and the access code can be passed on with the unauthorized copy of the software. Therefore, this is not effective protection. Typically the process also requires the overhead of serializing each individual software copy at a central point of manufacture.

As a result of the high overhead costs of the traditional means of manufacture and distribution of software, and the significant level of unauthorized reproduction of software, there is a need in the software industry for a system that takes advantage of the software consumers' ability to manufacture and distribute copies of software using their own equipment while at the same time controlling access to the software so that the person who designed and coded the software receives fees for its use. In other words, there is a need in the industry for a method of manufacture and distribution that invites rather than restricts consumer participation in the manufacture and distribution process but does not reduce the incentive of the original manufacturer to create the software.

Software is not the only product that suffers from these problems. Other developers and distributors in the information industry, such as developers and distributors of databases and other informational products, also have difficulties controlling access to their product where it can be loaded onto a user's own machine. They have a product that individual users find easy to copy and distribute, but which is costly for the developer to initially design, make and efficiently distribute. Developers and distributors of information products desire to harness the user's ability to copy and distribute their product but only where they can obtain a fee for their initial involvement.

As a result, there is a significant and substantial need in the information industry to allow developers to sell their information product to the full potential market efficiently, that encourages and takes advantage of consumer participation in the manufacture and distribution of the information products yet has centralized monitoring and control, that permits consumers to evaluate the product prior to the purchase decision, that effectively combats piracy, and that permits developer profit for funding of support and update services.

## SUMMARY OF THE INVENTION

The present invention provides a method and apparatus that monitors and controls the use of information stored on a storage medium. The information, in machine readable form, can be, for example, a computer software program or a database. In the representative embodiment, the information is a software product.

According to the present invention, the software products are created by software developers capable of being operated in two modes. The first mode is a full-function mode, where all the functions and features of the software product are available to the user of the software product. The second mode is an evaluation mode, where only certain functions, decided by the software developer, can be accessed by the user. The evaluation mode allows potential users to try and evaluate features of the software product. Each software product is stored on a storage medium, in the representative embodiment, on disk. On each disk (or set of disks) the software product is capable of being operated in both modes. However, each software product operates in only one mode at a time.

The present invention, in the representative embodiment, involves two computers. A first computer, the user's computer, executes the software product. A second computer, belonging to a Central Authority, contains a database that stores information about software products recognized by the Central Authority and about the users who are authorized to operate software products in full-function mode.

When a new user obtains a disk containing a software product, the software product will operate in the evaluation mode. The new user can freely operate the software in the evaluation mode and make other copies, which will also be in the evaluation mode. If the new user wishes to use the software product in full-function mode, the new user contacts the Central Authority to obtain an authorization code. It is expected that the new user will pay a fee for obtaining the authorization code.

To obtain the authorization code, the new user will conduct, on the user's computer, a registration process. A Get Registration Code Module, a separate executable segment of the software product, produces for the new user a registration code. The registration code is a code made by the Get Registration Code Module based upon, inter alia, the version and identity of the software product, the identity of the user's computer, the identity of the previous user (if any) and data about the new user. (The data about the new user had previously been

entered by the user as requested by the software product.)

The new user transmits the registration code to the Central Authority. At the Central Authority, an authorization process takes place. The registration code is decoded by the Central Authority and from the contained information, an authorization code is made. The new user provides user information to the Central Authority, plus a fee, and obtains the authorization code. The new user then enters the authorization code into the user's computer to become an authorized user and the software product will operate in full-function mode. In some cases, for example, when requested by the software producer, the authorization code is able to be used on later versions of the same software product. Thus, the authorization process and conversion to full-function mode takes place at the user's own site. Details of authorized users and from whom authorized users obtain the software product are stored in the Central Authority's database.

After the user enters the authorization code, a Save Ownership Details Module modifies the executable code of the software product. The modification ensures that the software product will operate free of evaluation mode limitations on the user's computer upon which the registration process took place.

Further, a Prime Backup Module ensures that every authorized user holds a backup copy of the software product. The backup copy is in the evaluation mode, and so can be freely be copied for distribution to other potential users, who can register themselves as authorized users as described above. However, the backup copy is such that if the registered user's software product fails, the backup copy (or a copy of the backup copy) can, using the previously obtained authorization code, be converted to full-function mode.

Each time a user starts the software product, a Get User Data Module checks what mode the software product is operating in. It does this by examining an ownership details record stored by the Save Ownership Details Module. If in evaluation mode, the user can access only designated features of the software product, as discussed above. If in full-function mode, the Get User Data Module will check to see if the software product is being used on the user's computer upon which the registration process took place. If it is not, the software product will automatically revert to evaluation mode. When in full-function mode, the authorized user's name is displayed on the screen.

The four modules above, namely the Get User Data Module, the Generate Registration Code Module, the Save Ownership Details Module and the Prime Backup Module are what are referred to as Manufacture Modules.

When the software product is created, the software developer inserts four "dummy" developer modules into the code of the software product. This is called the priming process. The developer modules simulate the operation and interfaces of the Manufacture Modules for testing and development purposes. The developer modules are made freely available by the Central Authority.

As the next step in the creation of the software product, the software product containing the developer modules is transferred to the Central Authority. The Central Authority performs a Franking Process on the software product whereby the four developer modules are replaced with the four Manufacturers Modules. The software product is placed in evaluation mode, copied and distributed in the marketplace and to potential users. Details of the software product are stored in the Central Authority's database. In performing the Franking Process, the Central Authority is not given access to the software product's source code or object modules, preserving confidentiality.

The Manufacture Modules contain computer instructions that encrypt the registration code and decrypt the authorization code which allows the user to operate the software product in full-function mode. Further, computer instructions allow the detection of whether the software product has been tampered with. In the Authorization Process, the Central Authority checks for tampering of the software product to prevent the proliferation of copies of software products that have been corrupted or tampered with.

Many software developers can create software products that contain developer modules and that are capable of being used in two modes. The Central Authority's database is capable of storing information about various software products and various authorized users.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an exemplary computer system incorporating the information distribution system of the present invention.

FIG. 1A is a data flow diagram illustrating the overall process of the present invention.

FIG. 2 is a flow chart diagram of the operation of the Manufacture Modules of the present invention and their interaction with the host software product.

FIG. 3 is a flow chart diagram of the Authorization process of FIG. 1A.

FIG. 4 is a flow chart diagram of the Get User Data Module of FIG. 2.

FIG. 5 is a flow chart diagram of the Generate Registration Code Module of FIG. 2.

FIG. 6 is a flow chart diagram of the Save Ownership Details Module of FIG. 2.

FIG. 7 is a flow chart diagram of the Prime Backup Module of FIG. 2.

FIG. 8 is a flow chart diagram of the Franking process of FIG. 1A.

FIG. 9 is a flow chart diagram of the Developer Modules of FIG. 1A.

FIG. 10 is an example table structure of the Central Database of FIG. 1A.

## DETAILED DESCRIPTION

Referring now to the drawings, and initially FIG. 1, there is illustrated in block diagram form an exemplary computer system incorporating the information distribution system of the present invention.

A user's computer processor **10** is coupled to a memory device **11** and an input/output device **12**. A secondary storage device **13** contains a copy of an informational product **14**. In the representative embodiment, the informational product **14** is a software product, such as a computer program, and the secondary storage device **13** is a disk. The computer program stored on the secondary storage device **13** is loaded onto the memory device **11**, or is coupled to the memory device **11** and accessed by the user's computer processor **10**. The computer program is executed by the user's computer processor **10**.

A Manufacture Control Agency operates a second computer processor **15**, coupled to a Central Database

112. An operator (not shown) at the Manufacture Control Agency accesses the Central Database by means of a second input/output device **16** coupled to the second computer processor **15**. An Authorization Process **109**, as illustrated below in FIG. **1A**, is conducted using the second computer processor **15**.

The user and the Manufacture Control Agency communicate with each other. In a representative embodiment, the communication takes place via a telephone line **20**. The user's computer processor **10** is coupled to a modem **18** which is coupled to the telephone line **20**. A second modem **19** is coupled to the second computer processor **15** which is also coupled to the telephone line **20**. A registration code (**109***a* FIG. **1A**), as determined by the informational product **14** operating on the user's computer processor **10**, is communicated to the second computer processor **15** which in response returns an Authorization Code (**108***b* FIG. **1A**). The Authorization Code is used to enable the informational product **14** to operate in a fully functional manner, as described below.

Referring now to FIG. **1A**, there is illustrated a data flow diagram showing the various processes of the present invention. The data flow of the present invention is shown in the context of software manufacture and the distribution. However, the present invention is not limited to the manufacture and distribution of software. Other informational products, such as databases, could be the product that is developed and distributed. The diagram shows each component process of the present invention and the inputs and outputs of each process. Each process is shown as an oval labelled and numbered. The inputs to and outputs from the processes are shown as directional lines labelled with a number and a letter.

As input, there is the initial informational product **14** by a developer **101**. The informational product **14** could be, for example, a software product, such as a computer program. The software product could be one developed for use and execution on any type of computer and could carry out any application or utility. In a representative embodiment, the informational product **14** is a software product ("the host software product"), which is input as source code into a Priming process **102** of the present invention (**102***a*). The host software product, in the representative embodiment, is stored on the secondary storage device **13** being a disk.

The software developer, before releasing the host software product to users, performs the Priming process **102** on the host software product. The Priming process **102** involves combining the host software product **102***a* with a set of four Developer Modules **103** in object code **102***b*, that are supplied by a central Manufacture Control Agency, using an industry standard "Linker".

The Manufacture Control Agency makes the Developer Modules **103** in object code **102***b* freely and widely available to all developers for inclusion in their host software products **103**. The Developer Modules **103** are incorporated into the code of the host software product by the developer. The developer is supplied with a specification of the interface of the Developer Modules **103** so as to be able to carry out such incorporation. The unencrypted nature of the Developer Modules **102***b* does not compromise the security of the subsequent manufacture and distribution process as the modules are overwritten in a Franking process **104** with a set of encrypted Manufacture Modules. A more detailed description of the Developer Modules **102***b* is provided below and shown in FIG. **9**.

The resultant software product **104***a*, after completing the priming process **102**, is then tested thoroughly before a copy is sent to the central Manufacture Control Agency where the Franking process **104** is conducted.

Franking is a process whereby the Manufacture Control Agency modifies the primed host software product provided by the developer **104***a* by overwriting the Developer Modules therein with a set of four specifically created Manufacture Modules to create an evaluation mode copy of the host software product. A more detailed description of the Franking process is provided below and shown in FIG. **8**.

The Manufacture Modules created during the Franking Process **104** comprise the software instructions necessary to control the steps of getting data about a new user of the host software product and determining the operational mode of the software each time it is used, generating the registration code needed by new users when arranging to convert their copy of the host software product to full-function mode, performing the conversion to full-function mode, and allowing the user to make a primed backup copy of the host software product. The Franking Process **104** generates Manufacture Modules that are customized to each host software product. The Manufacture Modules contain features which provide security against tampering with or corruption of the code of the host software product.

Part of the Franking process **104** also involves the storage of information **112***a* about the software product in the Central Database **112** operated by the Manufacture Control Agency. The Central Database **112** can contain information about numerous host software products from numerous developers. Information **112***b* is also captured into the Central Database **112** during the authorization process **109** discussed below. The information retained in the Central Database **112** serves three primary purposes. Firstly, data held about each specific host software product is used during the Authorization process **109** when a potential user of the host software product requests authorization to use the software. Secondly, registration data is retained in the Central Database **112** and is used to make payments to the developer for new registrations and to provide the developer with a complete register of the authorized users of its products. Thirdly, genealogical information, obtained in the registration process **112***b*, is stored in the Central Database **112**. The genealogical information is information identifying from which user the newly registered user obtained the software. It can be used as the basis for commercial arrangements which support and encourage the process of duplication and distribution (e.g. through the payment of commissions). The structure of the Central Database **112** is discussed below and is shown in FIG. **10**.

After the Franking process **104** is complete, the software **105***a* can be returned to the developer or to another party for "seeding" of the product into the user community **105**. Seeding **105** is accomplished by making evaluation mode copies of the host software product freely available to potential consumers. The distribution of the initial "seed" copies (or distribution copies **106**) can be conducted through standard industry distribution channels **106***a* such as, for example, electronic bulletin boards, Public Domain Libraries, direct mailing, disk-based magazines and compendium laser disks. The seeding process establishes an initial pool of distribution

copies **106** of the host software product within the user community.

The distribution copies of the host software product in evaluation mode **106** that are placed into the user community by the seeding process are made available for evaluation purposes only. Copies of the software in evaluation mode do not permit operation beyond that level which is necessary for the software consumer to make an evaluation of the host software product's features prior to making a decision to purchase. However, the host software product does contain all the executable code and ancillary files necessary for the software to operate without any restrictions. That is, the consumer is in fact supplied with a complete copy of the software, but can not operate the software in full-function mode until after the registration process **108**, as discussed below, is completed.

The quantity and penetration of the distribution copies **106** within the user community increases as distribution copies **106** of the host software product in evaluation mode (**107***a*) are duplicated **107** and the duplicates **106***b* are passed between users, each who can evaluate the software and can duplicate the software using their own equipment **107** and pass the duplicated copies **106***b* to other potential users. This duplication **107** is a process which all consumers of computer software products are familiar and can carry out using their own hardware equipment **10** to **13**.

As stated above, the distribution copy **106** of the host software product is a copy of the host software product first given to the user as part of the seeding process **105**. It is in evaluation mode. The user will usually copy the distribution copy **106** of the host software product, making an evaluation mode working copy of the host software product. Because the host software product may be stored on the secondary storage device **13** in a compressed form, the user may have to create the working copy by decompressing the distribution copy **106** of the host software product before the host software product can be used. The working copy is a copy of the host software product that the user runs and executes on the user's computer processor **10**. For example, the working copy could be loaded onto the memory device **11**, such as the user's hard disk drive, and is executed by the user's computer processor **10**. The working copy may be in either evaluation mode or full-function mode. (A working copy is to be distinguished from a backup copy of the host software product, which is in evaluation mode. When the user performs a Recover Backup option **225** on the backup copy, as explained below in reference to FIG. **2**, the backup copy (or a copy of the backup copy) will be converted to a full-function working copy. The backup copy of the host software product is created during by the Prime Backup process **700**, explained below in reference to FIG. 7.)

As people within the user community come into contact with the host software product they will evaluate the host software product and decide on its suitability to their requirements. Should the host software product prove satisfactory and the user wishes to make further use of the host software product the user can undertake the registration process **108** and register a copy of the host software product **108***a* with the Manufacture Control Agency. The registration process **108** firstly involves an Authorization process **109** whereby the user provides the Manufacture Control Agency with the registration code **109***a* and receives from the Manufacture Control Agency the Authorization Code **108***b*. In an exemplary embodiment, the exchange of codes can take place directly between the Manufacture Control Agency's computer processor **15** and the user's computer processor **10**, which executes the host software product, via the telephone line **20**. The Authorization Code enables the transformation of an evaluation mode copy of the host software product **108***a* into a full-function mode copy of the host software product **110**. The registration process **108** also transforms an evaluation mode copy of the host software product **108***a* into a backup copy **106***c* which can still be freely passed to other potential users for their use in evaluation mode. This transformation involves storing an identification number and details of the new user in the distribution copy **106** of the host software product originally given to the user, to make it the backup copy. Thus, if the full-function copy **110***a* of the host software product fails, a new full-function copy can be made by reactivating the backup copy of the host software product (or a copy of the backup copy) using the same Authorization Code (see steps **226** to **231** of FIG. **2**). A more detailed description of the registration process is provided below and shown in FIG. **2**, (steps **210** to **224**).

Full-function mode copies of the host software product **110** operate without any of the restrictions which apply to evaluation mode copies. Each time the host software product is used in full-function mode, the name and address of the registered user is displayed on a banner page.

Control over the registration process **108** is provided by the Manufacture Control Agency during the Authorization process **109** through the provision of Authorization codes **108***b*. The Authorization process **109** requires the new product owner to provide information (including the registration code **109***a*) to the Manufacture Control Agency (See step **216** of FIG. **2**). The Authorization process **109** also draws on information **109***b* about each host software product which is stored in the Central Database **112** and results in the storage of information **112***b* about the new user in the Central Database **112**. A more detailed description of the Authorization process **109** conducted by the Manufacture Control Agency is provided below and shown in FIG. **3**.

It should be noted that the registration process **108** and the Authorization Process **109** occur in different physical locations. The registration process **108** is performed using the user's computer processor **10** operating on the host software product. The Authorization Process **109** takes place on the Manufacture Control Agency's computer processor **15** which accesses the Central Database **112**.

In the event that the user of the host software product makes a copy of the full-function product available to an unauthorized user **111***a*, the Manufacture Modules embedded in the host software product contain a mechanism whereby the unauthorized or illegal use **111** of the host software product is detected and the full-function mode copy reverts to an evaluation mode copy **106***d*. A more detailed description of this process is provided below and shown in FIG. **4**, (steps **406** to **411**).

Referring now to FIG. **2**, there is shown a flow chart diagram illustrating the operation of the four Manufacture Modules and their interaction with the host software product according to the present invention. The Manufacture Modules are incorporated into the host software product during the Franking process **104** of FIG. 1A. The modules are executed by a user's com-

puter processor **10** which has a computer memory **11** capable of storing the host software product and its incorporated Manufacture Modules. The four Manufacture Modules are: (1) a Get User Data Module **400**, (2) a Generate Registration Code Module **500**, (3) a Save Ownership Details Module **600**, and (4) a Prime Backup Module **700** (each depicted in FIG. **2** with double bar sides). During the host product development and testing phase **101** and **102**, the functionality provided by these modules is simulated by four equivalent Developer Modules **103**.

FIG. **2** illustrates, without reference to any particular coding language, the interaction between the Manufacture Modules and the standard host software product. In FIG. **2**, the functions not provided by the four Manufacturer modules are provided by the host software product. Thus, the developer of the host software product must know the interface between the host software product and the Manufacturer Modules as well as the function of each module. The actual code used to express the function of the Manufacturer Modules depends upon that of the specific host software product. Minor error handling pathways have been omitted from FIG. **2** to preserve the clarity of the illustration.

The Manufacturer Modules do not directly interface with the user of the host software product. The Manufacturer Modules interface with the user only through the host software product and thus are able to take advantage of the user interface of the host software product.

The initialization code of the host software product is executed **201**. The initialization code performs set-up functions necessary for the operation of the specific host software product, and depends on the host software product.

After the execution of the initialization code **201**, the Get User Data Module **400** is called. A purpose of calling this module is to obtain current ownership details of the host software product for subsequent display on the host software product banner page **205**. If operating in full-function mode, the Get User Data Module **400** returns an ownership details record containing current ownership details. Once the Get User Data Module has completed its function, control is returned to the host software product. The operation of the Get User Data module is illustrated in FIG. **4**.

The Get User Data Module **400** always returns an indication as to whether the host software product is being used by an authorized user. When the Get User Data Module **400** detects unauthorized usage of the host software product, as described below, the host software product will transparently revert from full-function mode to evaluation mode **408** of FIG. **4**.

If operating in evaluation mode, the Get User Data Module **400** returns an ownership details record which indicates that the host software product is operating in evaluation mode. In the event that the process of reverting to evaluation mode will be prevented by write-protection of the storage medium on which the host software product is stored, an error status signal is returned (**412** of FIG. **4**), and the host software product takes this signal **202** and advises the user to write-enable the host software before proceeding **203**. Once the user complies with this directive, the Get User Data module is called again.

The operational state of the host software product is saved **204** for future reference (i.e. at step **232**). The operational state, as discussed above, of the host software may be either evaluation mode or full-function mode.

After storing the operational state, the banner page of the host software product displays information such as the host software product name, version, a copyright notice, and the operational state of the host software product **205**. If the operational state is full-function mode then the name and address details of the current authorized user are displayed; otherwise the banner page indicates that the user is running an evaluation mode copy of the product. The host software product next provides the user with a number of options **206** including (1) executing the host software product (either step **233** or **234** depending on the mode), (2) terminating the host software product's operation by selecting an "exit" function **207**, (3) selecting a "new registration" option to enable the user to obtain an Authorization code to operate the host software product in full-function mode **209**, and (4) selecting a Recover Backup option **225** for re-activating the host software product if it becomes necessary to restore from a backup copy.

If the user selects the exit function **207**, the operation of the host software product including the Manufacture Module is terminated **208** and the user is returned to the operating system environment.

If the user is operating the host software product in evaluation mode and decides that the host software product suits the users requirements, the user may "purchase" the host software product. The user does this by selecting the new registration option **209**. A message is displayed advising the user that they are to use a copy of the distribution copy **106** of the host software product **210**, and the user must confirm that this has been done **211**. (That copy becomes a working copy, which is in evaluation mode.) Without positive confirmation, the Registration process does not proceed. The user is requested to input new user data, such as the user's name, address and telephone number **212**.

The new user data and a previous ownership details record are passed by the host software product to the Get Registration Code Module **500** to create a registration code for use during the Authorization process (see FIG. **3**). However if the new user has failed to provide the requested information, such as the new user's name, address and telephone number (**501** of FIG. **5**), an error status message is returned (**503** of FIG. **5**). The host software product acts upon this error status message **213** and a message advising the user to reenter the required information is displayed **214** and the process continues from step **212**.

If valid user details were entered **213**, the Generate Registration Code Module **500** (as explained below in reference to FIG. **5**) will return a registration code to the host software product which is displayed (on the input/output device **12**) by the host software product to the user **215**.

The registration code displayed **215**, together with new user's data, address and phone number is communicated **216** by the user to the Manufacture Control Agency (via, for example, telephone, facsimile, modem **18** and **19** or mail). Subject to satisfactory commercial arrangements, such as, for example, the payment of a fee, the new user will receive an Authorization code. Upon receipt of this Authorization code from the Manufacture Control Agency, the user then inputs the Authorization code **217** using the host software product's interface. Input of the Authorization code enables the full functions of the host software product by convert-

ing the operational state to full-function mode, as explained below.

The entered Authorization Code **217** is passed to the Save Ownership Details module **600** (See FIG. **6**). This module stores within the host software product details of the new owner so that when the host software product is used in the future on the same hardware, it will operate in full-function mode. If the Save Ownership Details module **600** completes successfully, a new ownership details record will be returned to the host software product.

The process of updating the new owner details may not proceed if a) the Authorization code is not entered correctly or b) the disk is write protected. If the Save Ownership Details Module **600** returns an error indication **218** (and **612** or **618** of FIG. **6**) then the user is advised to ensure that the disk is write enabled and to carefully re-enter the Authorization code **219**.

Upon the successful operation **218** of the Save Ownership Details Module **600**, a message advises the new owner to insert into the user's disk drive the distribution copy **106** of the host software product. This copy (typically in archived and compressed form) will be in evaluation mode as it is the copy from which the current working copy was created and has not been processed as described above **220**. This operation is done so that the host software product stored on the newly inserted disk can be primed to become the backup copy in case the need to restore from the backup media arises. The user is also advised to physically record the Authorization code for safe keeping, as this code will be needed as part of any future recovery process.

The user inserts the distribution copy **106** of the host software product, as advised and records the Authorization code for later reference **221**. Control passes to the Prime Backup Module **700** (as explained in detail in reference to FIG. **7**). (At this stage, it is still the code of the host software product that is executed by the user's computer; the backup copy is modified but not run at step **700**.) On invocation, the Prime Backup Module **700** is passed the new Ownership details record as returned by the Save Ownership Details module **600**. The Prime Backup Module **700** transfers the full details of the new ownership to the backup copy. These details are stored in the executable code of the backup copy. However, the backup copy is left in the evaluation mode, and consequently, the user may allow other potential users to copy the backup copy.

The Prime Backup Module **700** may fail if the disk containing the copy of the host software product was not inserted correctly or was write-protected **222**. If the prime backup process does fail, an error status is returned (see FIG. **7**, **707**) and the user is advised to correct the problem before trying again **223**.

The host software product's operational state in memory is converted to full-function mode **224**. The flow of control continues from step **206**.

If at some future time the executable image of the software product is lost or becomes corrupted, the user will need to restore the host software product from the backup copy. The user will first create a copy of the backup copy. This copy, which will be used as a working copy, will be in evaluation mode. In order to restore the working copy to full functionality, the user will need to select the Recover Backup Option **225**. If the user selects the Recover Backup Option **225**, the user data of the registered owner is displayed **226** and the user is asked to confirm that these details are correct before proceeding **227**. If the user data is not correct, the flow of control continues from step **206**. The display **226** also advises the user that recovery is best performed when using a copy of the backup copy.

After the user confirms that the user data as displayed on the input/output device **12** is correct and that a working copy is being used **227**, the user is asked to enter the Authorization code **228**. This is the same authorization code obtained at step **216**.

The Authorization code as entered **228** and the ownership details record are then passed to the Save Ownership Details Module **600**. If the disk containing the backup copy is write-protected or if the Authorization code was entered incorrectly, the Save Ownership Details Module **600** returns an error indication **612** or **618** of FIG. **6** and the host software product decides **229** to advise the user to correct the problem **230** before trying again.

The operational state in memory of the backup copy is changed to full-function mode **231**. The flow of control continues from step **206**.

If the user does not select any of the options **207**, **209** or **225**, the host software product determines **232** what mode it is to operate in by examining the information passed to it by the Get User Data Module **400**. If in evaluation mode, the host software product is then run in evaluation mode **233**. If in full-function mode, the host software product is then run in full-function mode **234**.

Referring now to FIG. **3**, there is illustrated in flow chart form the operation of the Authorization process **109** of FIG. **1A**. These operations, performed at the Manufacture Control Agency, register a new user of the host software product. In the representative embodiment, the Authorization process **109** is executed by the Manufacture Control Agency's computer processor **15**.

When a new user contacts the Manufacture Control Agency in order to register a product, an operator at the Manufacture Control Agency records in the Central Database **112** data about the new user **301**. The operator will enter via the input/output device **16** the Registration Code **302** as displayed to the user at step **215** of FIG. **2**. The registration code in the representative embodiment is in an alpha-numeric format suitable for communication between the new user and the Manufacture Control Agency (e.g. AAA-999-AAA-999-AAA).

The registration code can be in a format to allow it to be checked for errors. The following is an example of such an error checking process. The registration code as entered at step **302** is converted to an underlying packed array of bits. Some bits contain a checksum, which is extracted and compared with a newly calculated checksum of the bits **303**. If the registration code checksum as calculated do not match **304**, this indicates that the registration code has been entered incorrectly **304**. In this case, the operator is advised of the problem **305** and given the opportunity to re-enter the code.

If the registration code checksum values as calculated do match **304**, bit values which represent a Product/version Identification Code are extracted from the registration code **306**.

The Product/Version Identification Code **306** is then used as a key to retrieve the details of the product being registered (such as, for example, host software product name, Product Identification Number, version number, a software product specific encryption/decryption key,

anti-virus checksum, latest version number and price) **307** from the central database **112**.

Using the software product specific encryption/decryption key code as retrieved **307**, the registration code is decrypted and then unpacked into its component fields **308**. In the representative embodiment, the fields include a user data cross-reference code, a hardware identification code, an anti virus-checksum, and a previous Owner Identification Number.

The user data cross-reference code as extracted **309** is the checksum originally calculated (**505** FIG. **5**) from the owner data as entered by the user during the registration process (**212** FIG. **2**). A second checksum based on the user data as entered via the input/output device **16** by the Manufacture Control Agency operator is also calculated **309**.

The user data cross-reference code and the second checksum **309** are compared **310**. If these do not match it is an indication that the User Data as entered by the Manufacture Control Agency operator **301** does not match the User Details as originally entered by the new user at step **212**. There is also a possibility that the mismatch could have resulted from a mis-entry of the Registration Code **302**. In the event of a mismatch, an error message is displayed **311** and the operator given the opportunity to correct the data entry problems.

If there is a match **310**, the anti-virus checksum as originally calculated during the Franking process (**810** FIG. **8**) retrieved from the central database **112** is compared with the checksum of the host software product as calculated in the process of generating the registration code (**507** FIG. **5**) and derived from that registration code **308**. If these two checksums do not match **312**, it indicates that the host software product has in some way been deliberately or accidentally corrupted. In the event of such corruption the operator is warned **312** to advise the user **313** that the host software product is not suitable for registration and the process is terminated **314**.

If the anti-virus checksums match **312**, the details of the product (e.g. host software Product Name, Version Number, Price and Latest Version) are displayed **315** so that the Manufacture Control Agency operator can confirm these details with the new user **316**.

Next, a new Owner Identification Number is allocated from the next available number in the Manufacture Control Agency's database **317**.

After the Owner Identification Number is allocated to the new user **317**, an Authorization code is generated **318**. The Authorization code is generated using a four step process. In the first step, an authorization record is assembled which contains, in the representative embodiment, the owner data checksum, the host software product identification code, the latest product Version Number, the hardware identification code, the newly allocated Owner Identification Number and a checksum of the authorization record itself. During the second step, the authorization record is packed into a bit array. The mapping between the fields of the authorization record and packed bit array ensures that the minimum number of bits necessary to represent the information content of each field is used. The third step provides for the bit array to be encrypted using the software product specific encryption/decryption key. Finally, in step four, the encrypted bit array is encoded in a format suitable for communication, e.g. "AAA-999-AAA-999-AAA".



The Authorization code is then displayed **319** on the input/output device **16** and the Manufacture Control Agency operator communicates it to the new user **320** and **108***b*. If the version of the host software product which the new user is registering is older than the latest version of the product which is available, this fact is highlighted to the operator on this display so that the operator can advise the new user that the registration number being provided will also be useable if the user subsequently obtains a copy of a more current version.

To complete the Authorization process, the Manufacture Control Agency updates the Central Database **112** with details of the new registration: e.g. date, name, address, phone number, allocated Owner Identification Number, product identification number, latest product version number, and previous Owner Identification Number.

Referring now to FIG. **4**, there is illustrated the Get User Data module **400** of FIG. **2**. The Get User Data Module **400** returns an ownership details record to the host software product. The Get User Module **400** is one of the four Manufacturer Modules.

Retrieving the ownership details record enables the host software product to determine the proper operational state (evaluation or full-function) for the use of the host software product. The ownership details record is also necessary so that the name and address of the current registered owner can be displayed on the banner page of all full-function copies **205**. This acts as an important deterrent to unauthorized duplication. Further, the ownership information also allows the Owner Identification Number of the previous owner to be tracked when new product registrations are made.

The first step is to load an encrypted ownership details record **401**. (The ownership details record is encrypted (at step **806** or **615**) using the software product specific encryption/decryption key generated during the Franking Process **104** (as discussed below in relation to step **803**). The ownership details record is stored as part of the host software product's code segment (at step **616** FIG. **6**).) The ownership details record contains, if operating in full-function mode, details of the registered user. However, if this is the first use of the host software product, an initialized ownership details record originally created as part of the program code segment of the host software product (**806** FIG. **8**) is loaded to memory. The ownership details record indicates the mode of operation of the host software product.

The ownership details record is decrypted into its respective fields (e.g., owner name, address, phone number, hardware identification code, Owner Identification Number, and an operational state flag which indicates if this copy of the product is evaluation mode or full function mode) **402** using the software product specific encryption/decryption key.

If the host software product is in evaluation mode **403**, the ownership details record is returned to the host software product **404** and control returns to step **202** of FIG. **2** **405**. When the host software product is in evaluation mode, the name, address, phone number and Owner Identification Number fields of the ownership details record will contain information about the previously registered owner. (If this is use of a copy of the host software product which has not previously been through the registration process **108**, the ownership details record contains initialized data and sets the mode as evaluation mode: see step **806**.) These details will not

be displayed on the banner page but are stored in case needed when restoring from a backup copy. The previous Owner Identification Number is used as part of the process of registering a new owner.

If the operational status indicates that the software product is authorized to operate in full-function mode **403**, further checking is necessary in order to ensure that the software is still being used on the hardware for which it was authorized. A current hardware identification code is generated **406**. The method of generating the hardware identification code is different for each type of computer hardware, and is known in the art. If the hardware provides direct support for a unique machine number then this is used as the basis for the hardware identification code. Alternately, where a unique machine number is not available, but the hardware is operating in a networked environment, then the hardware identification code can be based on the local area network (LAN) address of the computer. If neither a unique machine number nor LAN address is available, then a relatively distinctive hardware identification code is calculated as a checksum ranged over the ROM BOIS of the computer hardware.

After the hardware identification code is generated **406**, it is compared **407** with the hardware identification code which was recorded in the ownership details record at steps **614** to **616** of FIG. **6**. If the hardware identification codes match, the full-function ownership details record is returned to the host software product **404** and the module returns control to step **202** of FIG. **2 405**.

If the hardware identification codes do not match **407**, this indicates that the specific software product is being used on computer hardware for which it is not authorized. The operational state of the host software product is changed to evaluation mode **408** and a copy of the resultant ownership details record is re-encrypted using the software product specific encryption/decryption key **409**.

After the encrypted ownership details record is generated **409**, the host software product is opened for writing at an offset calculated during the Franking process **804** FIG. **8** and the new ownership details record is written to the storage device, in the representative embodiment being a disk, containing the host software product **410**.

If this is successful **411** then the module returns an evaluation only ownership details record to the host software product **404** and exits **405**.

If, however, the storage device is write-protected, then the down grading of the operational state will fail **411** and the Get User Data Module will return control to the host software product **413** with an error status signal which indicates that the host software product is being used without authorization **412**. In this case the host software product will advise the user that the storage device containing the host software product must be write-enabled before proceeding **203** FIG. **2**.

Referring now to FIG. **5**, there is illustrated in flow chart form the process of generating a registration code by the Generate Registration Code Module **500** of FIG. **2**. The Generate Registration Code Module **500** is one of the four Manufacturer Modules.

A registration code is used as a concise and reliable method of transferring a set of information from a new user to the Manufacture Control Agency in a manner which is not readily subject to fraudulent abuse (see **302**). The registration code also provides for a cross-check on the validity of other information provided by a new user to the Manufacture Control Agency at the time of registration (See FIG. **3**). As illustrated in FIG. **2**, this module is called by the host software product at step **500**. The information passed to the Generate Registration Code Module **500** by the host software product is the new user data and the ownership details record. (The Ownership Details record contains details of the previous authorized user at this stage.)

The generation of a registration code begins with a validity check of the user data **501** as entered **212** FIG. **2**. The validity check comprises a simple test of the address field to ensure that the new user has input a suitable number of characters. If the user did not enter at step **212** a suitable number of characters in the address field **502**, then an error status message is returned **503** and the registration routine exits **504**. This is only a simple first-line check which prevents the new user from attempting to register a software product with a frivolous amount of address information. A far more rigorous check occurs at the time of registration when the Manufacture Control Agency operator scrutinizes the information provided by the new user and the user data cross-check process is performed **310**.

If the user data validity check **502** passes, a checksum of the user data is created **505**. This checksum will be used during the Authorization process as a cross-reference to validate the user data as communicated to the Manufacture Control Agency **310** FIG. **3**. The cross-reference can be a hash value based on only the alphanumeric characters in the user data. (All lower-case letters are converted to upper-case and white space is ignored before the hash value is calculated.)

Next, the hardware identification code is generated **506**. The method of generating the hardware identification code is the same as described in step **406** FIG. **4**. This code is passed to the Manufacture Control Agency as part of the registration code **216** and returned as part of the Authorization Code for use at the time when the software product undergoes the transformation from evaluation mode to full-function mode **224**?? and subsequently every time the product is activated **407**. This ensures that the product is being used on the hardware for which it was authorized.

After the hardware identification code is generated **506**, an anti-virus checksum of the host software product is calculated **507**. This checksum could be calculated, for example, by ranging a "hashing" algorithm across all the executable instructions of the host software product's code. When generating the product checksum, however, that portion of the code where the ownership details record is stored is excluded from the calculations as this data is subject to change. This checksum is used by the Manufacture Control Agency at the time of registration in order to ensure that the copy of the product being registered has not be corrupted in any way. See **312** of FIG. **3**.

A registration record is then assembled **508** which contains the user data cross-reference code, the hardware identification code, anti-virus checksum, and the previous owner's Identification Number. The registration record is then packed into a bit array **509** with each field of the record occupying no more bits than is necessary to encode the information content of the field. After the bit array is created **509** it is encrypted **510** using the software product specific encryption/decryption key. Algorithms which pack and encrypt the registration bit array are known in the art. Any one of these

many techniques, commonly known in the industry, may be used.

The bits representing the Product/Version Identification code are added to the packed bit array **511**. A checksum is then calculated from the bits in the array and added to the packed bit array **512**. This checksum will be used by the Manufacture Control Agency to avoid operator data-entry errors **304**. The Product/Version Identification code and the data-entry checksum is added after the encryption process **510** as both these details are needed by the Manufacture Control Agency before the registration code can be decrypted.

After the final component is added to the packed bit array **512**, it is converted to a form suitable for oral or written communication by the prospective owner to the Manufacture Control Agency **513**; for example "AAA-999-AAA-999-AAA" and returned to the host software **514** for display **215** FIG. **2** to the user.

Referring now to FIG. **6**, there is illustrated the flow chart diagram of the Save Ownership Details Module **600** FIG. **2**. The Save Ownership Details Module **600** is one of the four Manufacturer Modules.

Once the user inputs into the host Software Product the Authorization code received from the Manufacture Control Agency **217** FIG. **2** it is passed to the Save Ownership Details Module **600** and a new ownership details record is created and stored. The ownership details record is stored in the program code segment of the host software product, overwriting the previous ownership details record.

A function of the Save Ownership Details Record module **600** is to check and fix any input error that may have been made by the user when keying in the Authorization code. In the representative embodiment, the following scheme is used. Because many users may fail to distinguish between an "0" (letter) and a "0" (numeral 0) or between an "1" (letter) and a "1" (numeral one), or use lower case where upper case is required, all characters are transposed to a canonical character set **601** which is not sensitive to such mis-entries. By way of example, the Authorization Code is transposed into the format "AAA-999-AAA-999-AAA". All lower case characters are transposed to their upper case equivalents. Any numerical characters representing of zero (0) or one (1) appearing in an "AAA" group are transposed to the letter "O" or letter "L" appropriately. Likewise, the reverse process is performed where a letter "O" or "L" appear in numeric groups.

Once the Authorization code is transposed into a canonical character set **601**, it is converted to a packed bit array **602** and decrypted **603** using the software product specific encryption/decryption key.

After the Authorization code is decrypted **603**, the packed bit array is unpacked into its component record fields: owner data cross-reference, the software product identification number, the product version number, the hardware identification code, the new Owner Identification Number, and a checksum of the authorization record itself.

The sub-fields of the Authorization code are then checked for validity. The validity checks ensure that the Authorization Code checksum matches a freshly calculated checksum **604** and **605**, that the authorized hardware identification code matches the freshly generated hardware identification code **606** and **607**, that the authorized product identification number matches the actual product identification number **608** as recorded in the specific software product during the Franking process **608**, that the authorized product version number is greater than or equal to the software version number **609** as stored during the Franking process, and that the authorized owner data cross-reference corresponds to the owner data entered by the user **610** and **611**. If any of these validity checks fail, the module returns to the host software product **613** and **218** with an authorization error indication **612**. (See **218** and **219** of FIG. **2**) If the Authorization code validates, a new ownership details record is constructed **614** comprising the new owner data (such as, for example, name, address and telephone number), the newly calculated hardware identification code, the new Owner Identification Number (as obtained from a sub-field of the authorization record), and an operational state field having the value "full-function".

After the new ownership details record is created **614**, it is encrypted **615** using the software product specific encryption/decryption key. The encrypted record is then stored in the host software product's program code segment at an address which corresponds to the load address where the ownership details record is stored **616**. The offset at which the new ownership details record is written is that determined during the Franking process **804**.

If the update is successful **617**, control returns to the host software product **621** at step **218** with a success status and the new ownership details record **620**. If the storage media which contains the executable code is write-protected then the update process will fail and will return to the host software product **619** with a failure status **618**. In this case, the host software product will advise the user to write-enable the disk **219** before proceeding.

Referring now to FIG. **7**, there is illustrated the Prime Backup Module **700** of FIG. **2**. This module is one of the four Manufacturer Modules.

The Prime Backup Module **700** modifies a copy, for example, the distribution copy **106**, of the host software product (to create a backup copy of the host software product in evaluation mode) so that it is suitable both for duplicating to make sample copies of the host software product for other potential users, and for future use in recovering a working copy of the product if necessary.

The Ownership Details Record stored at step **616** of FIG. **6** is used by the Prime Backup Module. The first step is to modify the ownership details record as passed by the calling host software product to set the operational state to evaluation mode **701**.

The resultant evaluation mode Ownership Details Record is then encrypted **702** using the software product specific encryption/decryption key and written to the distribution copy at the location of the ownership details record **703** as calculated and stored as part of the Franking process, see **804**.

If the update operation is successful **704**, the Prime Backup Module **700** returns control to the host software product (more correctly, to the backup copy's copy of the code of the host software product) **706** with a success status **705**. If the update operation fails for any reason **704**, the Prime Backup Module **700** returns **708** an error status **707**. In the case of an error return, the host software product will advise the user of the problem **223** and give the user an opportunity to correct the problem.

Referring now to FIG. **8**, there is illustrated in flow chart form the Franking process **104** of FIG. **1A**.

The Franking process comprises steps whereby the Developer Modules (preinserted by the software developer **101**) are overwritten with Manufacturing Modules by the Manufacturing Control Agency.

Upon the receipt of a host software product by the Manufacture Control Agency from a software developer, the first step of the Franking process carried out by the Manufacture Control Agency is the recording of details about the host software product in the Central Database **112**: for example, name, version and accompanying commercial details (e.g. product price, developer name and address etc.) **801**. The host software product is assigned two identification numbers **802**. The first number, a Product Identification Number, uniquely identifies the product and the second, a Product/Version Identification Code, identifies the specific product/version combination. If an earlier version of the product has already been manufactured, a new product identification number is not issued as the former product identification number is retained. The identification numbers together with the product details are stored in the Manufacture Control Agency's central database **112** for later reference. In particular, it is during the registration process **108** that the product identification will be used by the Manufacture Control Agency as a key when automatically retrieving other details of the specific software product being registered by a prospective user **306** and **307**.

After the assignment of the product identification numbers **802**, each host software product is assigned its unique software product specific encryption/decryption key **803**. The software product specific encryption/decryption key is computer generated at random and cross-referenced with the Manufacture Control Agency's Central Database **112** to ensure that no duplication of keys exists. If a duplication of key occurs, a new key is generated and again cross-referenced with the database until there is no duplication with an existing software product specific encryption/decryption key.

Once the software product specific encryption/decryption key has been generated **803**, the host software product is scanned to locate a signature sequence of bytes existing in the executable code of the developer modules **804**. Locating the signature sequence of bytes in the executable file permits the Manufacturing Control Agency to determine the relative location of the Developer Modules and, therefore, the target locations to overwrite the Developer Modules with the Manufacture Modules and the target location at which ownership details record is stored.

As the host software product can be distributed in a compressed form, it may also be necessary to locate the future position of the ownership details record within the compressed distribution copy of the host software product for use during the Prime Backup process **703**. To achieve this, the host software product is compressed on a trial basis and the offset within the compressed output stream which corresponds to the start of the ownership details record is recorded.

The contents of the ownership details record are initialized **805** to a state which is suitable for inclusion in the initial seed copies of the host-software product. In particular, the operational state is set to indicate that the host software product is not yet authorized to operate in full-function mode. The operational state, stored as part of the ownership details record in the host software product's code, is used at step **403**, as discussed above, to determine the mode of operation of the host software product.

Once the initial ownership details record is generated, it is encrypted **806** using the software product specific encryption/decryption key and written out as high order language source code in a series of data definition statements for inclusion within the subsequent compilation of the Manufacture Modules **807**.

The customized Manufacture Modules are generated from source code **807** which is parameterized to accept variable definitions for the following data: the host software Product Identification Number, the Product/Version Identification Code, the version number, the software product specific encryption/decryption key, a target offset within the host product's executable of the Manufacture Modules, and the target offset of the ownership details record within the compressed distribution copy, and the target offset of the ownership details record within the uncompressed working copy. The Manufacture Modules's source code is compiled with the supplied parameters to create a single object module. That object module is then linked with a standard skeleton set of host modules to create a donor executable image **808**.

The Manufacture Modules and the Developer Modules contain certain assembly code instructions, the purpose of which is to ensure that (1) both the code and data of the Manufacture Modules are stored at adjacent memory addresses within the code segment of the host software product; (2) the entry points of the four modules which are directly callable from the host software product are at the same memory addresses in both the Developer Modules and the Manufacture Modules (this is typically achieved through the use of a jump table); and (3) the Manufacture Modules are self contained in that they do not call any functions or subroutines within the body of the host software product.

It is also important in the generation of the customized Manufacture Modules that the resultant code as inserted in a number of different host software products does not contain common instruction sequences which could act as a signature sequence around which hackers might base code to defeat the security of the system. Accordingly, the sequence in which the component routines of the Manufacture Modules are combined to produce the object module is randomized and the modules themselves are periodically re-written while preserving the underlying algorithm.

The donor executable image as generated in step **808** contains the Manufacture Modules at a known location within the image. The executable image is then opened for reading and positioned at the beginning of the Manufacture Modules. The specific host software product to be franked is opened for writing at the beginning of the Developer Modules as determined earlier **804**. The bytes of the Developer Modules are then overwritten **809** with the bytes of the full Manufacture modules. The Developer Modules contain sufficient bytes to ensure that the overwriting process does not encroach beyond address space reserved by the Developer Modules. Any space within the Developer Modules is padded out with random data. Upon completion of the overwrite of the Manufacture Modules, the files are closed.

A compressed version of the host software product's executable image can be created. The compressed version is created with specialized software which compresses the executable image using a compression format well known in the industry. The format must be one

which supports uncompressed sequences of bytes within the compressed file. The specialized software ensures that the bytes of the executable image which contains the encrypted ownership details record are not stored in a compressed form. This is to make sure that the Prime Backup process can simply write the new ownership details record to the distribution copy **106**.

An anti-virus checksum is then calculated **810**, for example, by passing the host software product's executable instructions through a "hashing" algorithm. The host software product checksum is calculated across all executable instructions of the host software product's code. When generating the anti-virus checksum, however, that portion of the code where the ownership details record is stored is excluded from the calculations as this data is subject to change. Code within the Manufacture Modules themselves will re-calculate this code checksum at the time of the Registration process (**507** FIG. **5**) so that the Manufacture Control Agency can confirm that the host software product has not been deliberately or accidentally corrupted.

With the calculation of the anti-virus checksum **810**, the Franking process is completed by recording the product checksum **810** and the software product specific encryption/decryption key **803** in the Manufacture Control Agency's Central Database **112**, for later use during the Authorization process (FIG. **3**).

Referring now to FIG. **9**, there is illustrated the Developer Modules **103** of FIG. **1**A.

The Developer Modules **103** are provided to allow developers to simulate the operation of the Manufacture Modules during the product development and testing phases **101** and **102**. The Developer Modules are not complex. Unlike the Manufacture Modules, there is no bit packing and unpacking, no encryption and decryption, and the complex process of updating the executable image is avoiding by the simple expedient of storing the ownership details in an ancillary file. The Developer Modules reserve sufficient address space for their subsequent replacement by the Manufacture Modules and the Developer Modules also contain a signature sequence by which their placement within each product can be located.

The Get Ownership Details Record process is simulated first by reading the ancillary file which contains the ownership details record **902**. If the record is read correctly **903** it is returned to the calling host software product **904**. If the record input fails **903** a blank "evaluation-model" record is created **907** and written back **908**.

The Save Ownership Details module **600** is simulated starting at entry point **914**. The developer can simulate the incorrect entry of an Authorization code simply by including a predefined error code, such as a "Z", when entering the code. Thus, if a "Z" is included **915**, an error status **917** will be returned. Otherwise a "full-function" ownership details record based on the owner data supplied is created **916**. The ownership details record is stored in a separate file **908**. If the update to the ancillary file is successful, the ownership details are returned **910**. If the update fails, an error status is returned **912**.

Simulation of the Prime Backup Module **700** starts at the entry point **906**. An "evaluation-model" record is created from the ownership details supplied **907**. The ownership details record is stored in a separate file **908**. If the update to the ancillary file is successful the ownership details are returned **910**. If the update fails an error status is returned **912**.

Simulation of the Get Authorization Code starts at the entry point **919**. The developer can simulate the incorrect entry of user data by simply including a code, such as a "Z", when entering the user address field. Thus, if a "Z" is included **920** an error status **917** will be returned. If the user address field does not contain a "Z", an Authorization Code will be returned **921** to the host software product. However, as this is only for test purposes, the code returned is always the same.

Referring now to FIG. **10**, there is illustrated an example table structure of the Central Database **112** of FIG. **1**A. The Central Database **112** is operated by the Manufacture Control Agency and is accessed by the Manufacture Control Agency during the Franking Process **104** and the Authorization Process **109**.

In the representative embodiment, there are five tables, **1001** to **1005**, namely, a developer table **1001**, a product table **1002**, a version table **1003**, a license table **1004** and an owner table **1005**.

The developer table **1001** contains information about each developer of host software products recognized by the Manufacture Control Agency.

The product table **1002** contains information about each host software product received by the Manufacture Control Agency, recorded at step **801**.

The version table **1003** contains information about each version of each host software product and is accessed by the Manufacture Control Agency at step **307**.

The license table **1004** contains information listing the authorized users for each host software product. It also contains information as to from whom the authorized user obtained the host software product. Each entry in the license table **1004** is made at step **321**.

The owner table **1005** contains detailed information about each authorized user recognized by the Manufacture Control Agency. Each entry in the owner table **1005** is given to the Manufacture Control Agency at step **301**.

What is claimed is:

**1**. A system to create and control the use of an informational product stored on a storage medium, the informational product operatable in a plurality of modes including a first mode and a second mode, the mode of operation being stored in an ownership details record of the informational product, the system comprising:

a first processor ascertaining if the mode of operation of the informational product is the first mode or the second mode by accessing an ownership details record stored in the informational product each time the informational product is activated, the ownership details record initially set to the first mode, and when them ode of operation of the informational product is ascertained to be the first mode, generating a registration code for a user of the informational product, the registration code comprising a previous user part to identify a previous user of the informational product; and

a second processor, accepting as input the registration code, allocating a unique user code to the user of the informational product, and generating a unique authorization code, the authorization code being a function of the registration code and the user code;

wherein, the first processor, responsive to accepting as input the authorization code and thereafter determining the validity of the authorization code,

and if the authorization code is valid, changing the mode of operation of the informational product from the first mode to the second mode.

2. The system of claim 1 wherein the registration code further comprises a first processor identification part, a user identification part, an informational product identification part and a check-sum part.

3. The system of claim 1 wherein the registration code further comprises a firs processor identification part.

4. The system of claim 1 wherein the registration code further comprises a user identification part.

5. The system of claim 1 wherein the registration code further comprises an informational product identification part.

6. The system of claim 1 wherein the registration code further comprises a check-sum part.

7. The system of claim 1 wherein the authorization code is further a function of the identity of the first processor, the user description part, the identity of the informational product and a version number of the informational product.

8. The system of claim 1 wherein the authorization code is further a function of the identity of the first processor.

9. The system of claim 1 wherein the authorization code is further a function of the user description part.

10. The system of claim 1 wherein the authorization code is further a function of the identity of the informational product.

11. The system of claim 1 wherein the authorization code is further a function of a version number of the informational product.

12. The system of claim 1 wherein the first mode is an evaluation m ode and the second mode is a full-function mode.

13. The system of claim 1 wherein the first processor further comprises means for creating a reproduction of the informational product.

14. The system of claim 13 wherein the reproduction of the informational product is stored on the storage medium in a compressed form.

15. The system of claim 1 wherein the first processor further comprises means for storing in the informational product the identity of the first processor and the user description part.

16. The system of claim 1 wherein the informational product comprises means for selecting evaluation mode if the informational product is not executed by the first processor.

17. The system of claim 1 wherein the informational product is a computer software program.

18. The system of claim 1 wherein the storage medium is a disk.

19. The system of claim 1 further comprising a central database coupled to the second processor, the central database to store the identity of the informational product, a user code and a previous user part.

20. The system of claim 1 wherein the first processor is coupled to the second processor by a modem.

21. A programmable processor to authorize the use of an informational product stored on a storage medium, the informational product including a user record and operatable in a plurality of modes by the programmable processor, the operational modes comprising a full-function mode and an evaluation mode, the operational modes being stored in the user record, the informational product initially operating in the evaluation mode, the programmable processor comprising:

means for examining the user record each time the informational product is activated;

means for determining the operational mode of the informational product as a function of the operational mode stored in the user record and the identity of the processor on which the informational product is executed;

means for generating a registration code for a user of the informational product when the operational mode of the informational product is determined to be the evaluation mode, the registration code being a function of the identity of the programmable processor, the identity of the user and the identity of the informational product;

means for accepting the registration code as input at a second processor;

means for generating an authorization code at the second processor;

means for accepting as input the authorization code; and

means for performing a verification function to verify the authorization code, and if the verification is successful, changing the operational mode of the informational product to full-function mode, and thereafter storing in the informational product a user record comprising the identity of the user, the identity of the programmable processor and the operational mode.

22. The programmable processor of claim 21 further comprising means for accepting as input the registration code and thereafter generating a unique authorization code as a function of the registration code.

23. The programmable processor of claim 21 further comprising means for creating a backup copy being a copy of the informational product in evaluation mode and for storing therein a user record.

24. The programmable processor of claim 23 further comprising means for receiving from the user the authorization code and for inputting the authorization code to enable the backup copy of the informational product to operate in full-function mode.

25. The programmable processor of claim 21 wherein the informational product is a computer software program.

26. The programmable processor of claim 21 wherein the storage medium is a disk.

27. The programmable processor of claim 21 wherein the programmable processor is coupled to the second processor by means of a modem.

28. The system of claim 13 wherein the first processor further comprises means for setting the mode of operation of the reproduction of the informational product to the first mode and storing the mode of operation in the ownership details record in the reproduction of the informational product.

29. The system of claim 1 wherein the first processor further comprises means, activated after the first processor accepts the input of the authorization code, for decoding the authorization code to obtain an owner identification number.

30. The system of claim 1 wherein the first processor further comprises means for storing the mode of operation in the ownership details record in the informational product.

31. A method to authorize and control the user of an informational product stored on a stored medium, the

informational product being executed by a first processor and operatable in a plurality of modes including a first mode and a second mode, the method comprising the steps of:

at the first processor, providing an ownership details record that includes the mode of operation of the informational product, the ownership details record being stored in the informational product;

at the first processor, accessing an ownership details record stored in the informational product each time the informational product is activated;

at the first processor, ascertaining if the mode of operation of the informational product is the first mode or the second mode by examining the ownership details record;

if the mode of operation of the informational product is the second mode, enabling a user to operate all functions of the informational product at the first processor; and

if the mode of operation of the informational product is the first mode, enabling the user to operate a predefined set of functions of the informational product at the first processor so as to evaluate the informational product and, if requested by the user, (i) generating, when requested by the user, a registration code at the first processor, (ii) at a second processor, accepting as input the registration code, (iii) at the second processor, allocating a unique user code to the user of the informational product, (iv) at the second processor, generating a unique authorization code, the authorization code being a function of the registration code and the user code, (v) providing the authorization code to the first processor, (vi) at the first processor, accepting as input the authorization code, (vii) at the first processor, determining the validity of the authorization code, and (viii) at the first processor, changing the mode of operation of the informational product from the first mode to the second mode if the authorization code is valid.

**32**. The method of claim **31** wherein the first mode is an evaluation mode and the second mode is a full-function mode.

**33**. The method of claim **31** further comprising the steps of:

making a copy of the informational product;

inserting the ownership details record in the copy of the informational product; and

modifying the ownership details record so that the copy of the informational product operates in the first mode.

**34**. The method of claim **31** wherein the registration code comprises a previous user part to identify a previous user of the informational product.

**35**. The method of claim **31** wherein the registration code comprises a check-sum part and at least one of: a first processor identification part, a user identification part, and an informational product identification part.

**36**. The method of claim **31** wherein the authorization code is further a function of the identity of the first processor, the suer description part, the identity of the informational product and a version number of the informational product.

**37**. The method of claim **36** further comprising the steps of:

determining if the informational product is being executed by the first processor; and

setting the mode of operation to the first mode if the informational product is not being executed by the first processor.

**38**. The method of claim **31** further comprising the step of storing the mode of operation in the ownership details record.

**39**. The method of claim **31** further comprising the steps:

decoding the authorization code to obtain a user identification code; and

storing a user identification code in the ownership details record.

**40**. The method of claim **31** wherein the informational product is a computer software program.

**41**. The method of claim **31** wherein the informational product is a database.

**42**. The system of claim **13** wherein the first mode is an evaluation mode and the second mode is a full-function mode, and wherein the first processor comprises means, if a reproduction is made of the informational product, for causing the reproduction of the informational product to initially operate in evaluation mode.

**43**. The system of claim **42** wherein the first processor further comprises means for retrieving ownership information from the ownership details record of the reproduction of the informational product, causing said ownership information to be displayed on an input/output device coupled to the first processor, and means for accepting as input the authorization code and thereafter determining the validity of the authorization code, the first processor changing the mode of operation of the reproduction of the informational product form evaluation mode to full-function mode if the authorization code is valid.

* * * * *

MAIL ROOM DEC 27 1994 TRADEMARK OFFICE

#7 Amend A 1/20/95

CLAUTZ1.001AUS PATENT

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | |
|---|---|---|---|---|
| Applicant | : | Frederic B. Richardson, III | ) | Group Art Unit 2202 |
| Serial No. | : | 08/124,718 | ) | |
| Filed | : | September 21, 1993 | ) | |
| For | : | SYSTEM FOR SOFTWARE REGISTRATION | ) | |
| Examiner | : | David C. Cain | ) | |

## AMENDMENT IN RESPONSE TO JUNE 24, 1994 OFFICE ACTION

Hon. Commissioner
of Patents and Trademarks
Washington, D.C. 20231

Dear Sir:

In response to the June 24, 1994 Office Action, please amend the above-captioned patent application as follows:

IN THE CLAIMS:

Please cancel Claims 22-24 and 27-29 without prejudice.

In Claim 13, at line 1, please delete "security routine or".

Please amend Claim 18 as follows:

18. (Amended) The registration system of Claim 17, wherein said environment details comprise **[one or more elements of elements which are]** at least one element which is generally not user-configurable on the platform.



MS-U 467218

**Serial No.** : 08/124,718
**Filed** : September 21, 1993

REMARKS

The foregoing amendments are responsive to the June 24, 1994 Office Action. The Examiner is respectfully requested to enter the foregoing amendments and to consider the following remarks in support of the patentability of the claims submitted herein for reconsideration.

Discussion of Information Disclosure Statement

Applicant is submitting herewith an Information Disclosure Statement and form PTO-1449 listing U.S. Patent No. 5,291,598 to Grundy which will be discussed below.

Response to Rejection of Claims 22-24 and 27-29 Under 35 U.S.C. § 101

The Examiner rejected Claims 22-24 and 27-29 under 35 U.S.C. § 101 as being directed to non-statutory subject matter. Applicant respectfully disagrees with the Examiner's characterization of the claims as being directed to non-statutory subject; however, in order to expedite the consideration of the other claims, Applicant has canceled Claims 22-24 and 27-29 herein without prejudice. Applicant specifically reserves the right to pursue the canceled claims in a continuation application.

Response to Rejection of Claims 13-18 Under 35 U.S.C. § 112, Second Paragraph

The Examiner rejected Claims 13-18 under 35 U.S.C. § 112, second paragraph, as being indefinite because of the use of the word "or" in Claim 13.

Applicant has amended Claim 13 to delete the phrase "security routine or".

Applicant respectfully submits that the word "or" appearing in Claim 17, line 4, cannot be construed to claim a separate embodiment.

Although not necessary, Applicant has amended Claim 18 to replace the phrase having the word "or" with a phrase having the same meaning but without having the word "or".

In view of the amendments to Claim 13 and Claim 18, Applicant respectfully submits that Claims 13-18 comply with the requirements of 35 U.S.C. § 112, second paragraph, and

**Serial No.** : 08/124,718
**Filed** : September 21, 1993

Applicant respectfully requests the Examiner to withdraw the rejection of Claims 13-18 under 35 U.S.C. § 112, second paragraph.

The Examiner also rejected Claims 27-29 under 35 U.S.C. § 112, second paragraph, for the same reason as the rejection of Claims 13-18. This rejection is rendered moot by the cancellation of Claims 27-29, but will be addressed if Claims 27-29 are pursued in a continuation application.

Response to the Rejection of Claims 1-30 Under 35 U.S.C. § 102

The Examiner rejected Claims 1-30 under 35 U.S.C. § 102 as being anticipated by U.S. Patent No. 5,222,133 to Chou, et al. The rejection of Claims 22-24 and 27-29 is moot in view of their cancellation herein. Claims 1-21, 25, 26, and 30 will be discussed below.

Applicant respectfully submits that Chou is not particularly relevant to the claims of the present application because Chou covers a variation of a hardware lock whereby each and every copy of the software to be protected must have unique identity information embedded in it at the time of manufacture so that it can communicate with a local hardware lock. In Chou, all communicating security devices are local. Therefore, with particular reference to pending Claim 1, for example, Chou does not include "local licensee unique ID generating means" as well as "remote license unique ID generating means". Current Claim 1 is therefore clearly patentably distinguished over Chou.

Furthermore, an underlying "behavioral" feature of the present invention is that a single common algorithm is embedded in all copies of software to be protected. Hence, the software protected by the present invention does not need unique identifying numbers prestored in each copy of the software. The uniqueness is ultimately provided by the end users of the software in the course of supplying their own identification details, which details are subsequently checked by use of a matching algorithm at a remote location. This important behavioral feature of Applicant's claimed invention ("local licensee unique ID generating means") is nowhere to be found in Chou.

**Serial No.** : 08/124,718
**Filed** : September 21, 1993

Applicant respectfully submits that the foregoing remarks are fully responsive to the rejections raised by the Examiner under 35 U.S.C. § 102 with respect to Chou. Applicant respectfully requests the Examiner to withdraw the rejection of Claims 1-21, 25, 26 and 30 under 35 U.S.C. § 102.

Discussion of Newly Cited Reference

The Examiner's attention is directed to U.S. 5,291,598 to Grundy submitted herewith and identified on form PTO-1449. The Examiner's consideration of Grundy is respectfully requested. Applicant respectfully submits that Claims 1-21, 25, 26 and 30 of the present application is patentably distinguished over Grundy for the following reasons.

The key to the present invention as claimed in Claim 1, for example, is that a "licensee unique ID" generated by a local licensee unique ID generating means has matched a licensee unique ID generated by a remote licensee unique ID generating means (see the last four lines of Claim 1 as filed). This matching requirement reflects the fact that the underlying algorithms which process identifying information input into both the local licensee unique ID generating means and the remote licensee unique ID generating means are the same and that both ID generating means rely upon the same information to generate the licensee unique ID. In effect, no new information is provided to the remote licensee unique ID generating means as compared with the information supplied to the local licensee unique ID generating means.

Grundy does not disclose or suggest the claimed invention. In particular, in Grundy, a "registration code" derived from information available on the local computer is inputted to a remote computer which, in turn, generates an "authorization code" which is a function of not only the registration code but also a user code. The user code is allocated by the remote computer. See, for example, page 15, lines 49 to 58 of Grundy; Fig. 3, box 317, of Grundy relating to the authorization process; and Claim 1 of Grundy.

Because additional information is added at the remote computer in Grundy, it follows automatically that a simple comparison or match of the registration code derived from the local

computer and the authorization code derived from the remote computer is not possible. In order for the local computer to deem the authorization code as valid, the local computer is required to somehow take account of the additional information which has been added by the remote computer. Grundy does not describe precisely how this is achieved, but it is clear that the validity of the authorization code of Grundy cannot be determined as a simple match of the registration code with the authorization code.

Accordingly, Claim 1 of the present application which requires a match of the local license unique ID with the remote licensee unique ID is patentably distinguished over the fundamentally more complex process outlined in Grundy.

For similar reasons, Claims 2-12, which depend from Claim 1, and Claims 13-21, 25, 26 and 30 are patentably distinguished over Grundy.

Summary

Having amended the claims in response to the rejections under 35 U.S.C. § 112, and having submitted the foregoing arguments in support of the patentability of the claims, Applicant respectfully submits that Claims 1-21, 25, 26 and 30 are now in condition for allowance, and Applicant respectfully requests allowance of Claims 1-21, 25, 26 and 30.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR

Dated: December 21, 1994

By: Jerry T. Sewell

Jerry T. Sewell
Registration No. 31,567
Attorney of Record
620 Newport Center Drive
Sixteenth Floor
Newport Beach, CA 92660
(714) 760-0404

JTS-8687
941219/1

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/124,718 | 09/21/93 | RICHARDSON F | CLAUTZ1.001A |

CAIN, D EXAMINER

22M2/0330

| ART UNIT | PAPER NUMBER |
|---|---|
| 2202 | 9 |

JERRY T. SEWELL
KNOBBE, MARTENS, OLSON & BEAR
620 NEWPORT CENTER DRIVE
16TH FLOOR
NEWPORT BEACH, CA 92660-8016

DATE MAILED: 03/30/95

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined ☒ Responsive to communication filed on 12/27/94 ☐ This action is made final.

A shortened statutory period for response to this action is set to expire 3 month(s), — days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☒ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice of Draftsman's Patent Drawing Review, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ ______

**Part II SUMMARY OF ACTION**

1. ☒ Claims 1 - 30 are pending in the application.

   Of the above, claims ______ are withdrawn from consideration.

2. ☒ Claims 22 - 24, 27-29 have been cancelled.
3. ☐ Claims ______ are allowed.
4. ☒ Claims 1-21, 25, 26, 30 are rejected.
5. ☐ Claims ______ are objected to.
6. ☐ Claims ______ are subject to restriction or election requirement.
7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.
8. ☐ Formal drawings are required in response to this Office action.
9. ☐ The corrected or substitute drawings have been received on ______. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice of Draftsman's Patent Drawing Review, PTO-948).
10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on ______, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).
11. ☐ The proposed drawing correction, filed ______, has been ☐ approved; ☐ disapproved (see explanation).
12. ☐ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. ______ ; filed on ______.
13. ☐ Since this application apppears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.
14. ☐ Other

MS-U 467225

EXAMINER'S ACTION

1. The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
>
> Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

2. Claims 1-21, 25, 26 and 30 are rejected under 35 U.S.C. § 103 as being unpatentable over Grundy.

Grundy teaches a registration system for licensing execution of digital data in a use mode (column 4, lines 27-34), the system including local licensee unique ID generating means (Get User Data Module) and remote licensee unique ID generating means(registration code decoded to retrieve User Data and converted to authorization code - column 5, lines 5-7), the system further including mode switching means (column 5, lines 10-12) which permits use of the digital data only if the licensee unique ID (User Data stored 301) has matched licensee unique ID generated by the remote licensee unique ID generating means (User data decoded from authorization code 318)

The difference between Grundy and claim 1 is the code protocols. In the Grundy system, the local generates a registration code which contains user data. The remote decodes the registration code to retrieve the user data and creates an authorization code, which is transmitted back to the local. The local decodes the authorization code, which then must match the original user data.

It would have been obvious, in the Grundy system, to hash the user data to create an authorization code match, instead of decoding the authorization code to retrieve the user data, because such a translation is merely a matter of protocol.

Applicant argues that the difference between Grundy and the claims is the presence of additional data (the owner identification number) in the authorization code. There is, however, no indication in Grundy that this information cannot be provided to the local user, nor is there any limitation in the claims which would prohibit vendor information from being part of the authorization process.

3. Any inquiry concerning this communication or earlier communications from the examiner should be directed to Primary Examiner David Cain whose telephone number is (703) 308-0463. The examiner can normally be reached on Monday-Friday from 6:30AM - 3:00PM EDT. The fax number for Group 2200 is (703) 305-3603.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Thomas Tarzca, can be reached at (703) 308-1689.

Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-0511.

David Cain

DAVID C. CAIN
PRIMARY EXAMINER
GROUP 2200

MAIL ROOM JUL 5 1995 PAT. & TRADEMARK OFF.

CLAUTZ1.001AUS

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant | : | Frederic B. Richardson, III | Group Art Unit 2202 |
| Serial No. | : | 08/124,718 | |
| Filed | : | September 21, 1993 | |
| For | : | SYSTEM FOR SOFTWARE REGISTRATION | |
| Examiner | : | David C. Cain | |

RECEIVED
JUL 26 1995
GROUP 2200

AMENDMENT IN RESPONSE TO MARCH 30, 1995 OFFICE ACTION

Assistant Commissioner for Patents
Washington, D.C. 20231

Dear Sir:

In response to the March 30, 1995 Office Action, please amend the above-captioned patent application as indicated below.

IN THE CLAIMS:

Please cancel Claims 1-21, 25, 26 and 30 without prejudice.

Please add Claims 31 - 50 as follows:

31. A registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently

**Serial No.** : 08/124,718
**Filed** : September 21, 1993

generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

32. The system of Claim 31, wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm, said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode.

33. The system of Claim 32, wherein said mode switching means permits operation of said digital data in said use mode in subsequent execution of said digital data only if said licensee unique ID generated by said local licensee unique ID generating means has not changed.

34. The system of Claim 33, wherein said local licensee unique ID generating means comprises part of said digital data when executed on said platform.

35. The system of Claim 34, wherein said mode switching means comprises part of said digital data when executed on said platform.

36. The system of Claim 35, wherein the information utilized by said local licensee unique ID generating means to produce said licensee unique ID comprises prospective licensee details including at least one of payment details, contact details and name.

37. The system of Claim 31, said system further including platform unique ID generating means, wherein said mode switching means will permit



MS-U 467231

said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed.

8 ~~38~~. The system of Claim 7 ~~37~~, wherein said platform unique ID generating means comprises part of said digital data when executed on said platform.

9 ~~39~~. The system of Claim 8 ~~38~~, wherein said platform unique ID generating means utilizes hard disc or other platform information to determine said platform unique ID.

10 ~~40~~. The system of Claim 1 ~~31~~, wherein said platform comprises a computer operating system environment.

11 ~~41~~. The system of Claim 10 ~~40~~, wherein said digital data comprises a software program adapted to run under said operating system environment.

12 ~~42~~. A registration system attachable to software to be protected, said registration system generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed; and wherein said registration system is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration system.

13 ~~43~~. The registration system of Claim 12 ~~42~~, wherein said security key is generated by a registration number algorithm.

14 ~~44~~. The registration system of Claim 13 ~~43~~, wherein said registration number algorithm combines information entered by a prospective registered user

**Serial No.** : 08/124,718
**Filed** : September 21, 1993

unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run.

15 ~~45~~. The registration system of Claim 12 ~~42~~, wherein said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot, and, if a subsequent boot is detected, then environment and user details are compared to determine whether the program reverts to a demonstration mode and a new user registration procedure is to commence or a full version run.

16 ~~46~~. The registration system of Claim 15 ~~45~~, wherein said environment details comprise at least one element which is not user-configurable on the platform.

17 ~~47~~. A method of control of distribution of software, said method comprising providing mode-switching means associated with said software adapted to switch said software between a fully enabled mode and a partly enabled or demonstration mode, said method further comprising providing registration key generating means adapted to generate a registration key which is a function of information unique to an intending user of the software; said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key; and wherein said enabling key is communicated to said intending user at the time of registration of said software; said enabling key generated by a third party means of operation of a duplicate copy of said registration key generating means.

18 ~~48~~. The method of Claim 17 ~~47~~, wherein said registration key is also a function of the environment in which said software is installed.

**Serial No.** : 08/124,718
**Filed** : September 21, 1993

19 ~~49~~. A remote registration station incorporating remote licensee unique ID generating means, said station forming part of a registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

20 ~~50~~. A method of registration of digital data so as to enable execution of said digital data in a use mode, said method comprising an intending licensee operating a registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

**Serial No.** : 08/124,718
**Filed** : September 21, 1993

REMARKS

The foregoing amendments are responsive to the March 30, 1995 Office Action. The Examiner is respectfully requested to enter the foregoing amendments and to consider the following remarks in support of the patentability of the claims submitted herein for reconsideration. By way of a preamble the Examiner is advised that new Claim 31 is substantially a combination of canceled Claim 1 and Claim 6. New Claim 42 is substantially a combination of canceled Claim 13 and Claim 16. New Claim 47 is substantially a combination of canceled Claim 19 and Claim 21. New Claim 49 is substantially a combination of canceled Claim 25 and Claim 6. New Claim 50 is substantially a combination of canceled Claim 26 and Claim 6.

The new claims subsidiary to these claims correspond substantially to the claims which were subsidiary to the respective canceled main claims.

Response to Rejection of Claims 1-21, 25, 26 and 30 Under 35 U.S.C. Sub-section 103

The Examiner has withdrawn objections based on Chou, et al., and now relies on U.S. Patent No. 5,291,598 to Grundy to reject all pending claims as obvious in light of the disclosure of Grundy.

In response, the Applicant submits herewith redrafted claims, the main claims of which include, broadly, the following two distinguishing limitations:

(a) The "Licensee Unique ID" on which the registration system relies for matching for verification purposes is generated locally, and

(b) The algorithm used to generate locally the "Licensee Unique ID" is replicated remotely for the purposes of remote generation of a separate "Licensee Unique ID" for matching purposes.

It is inherent in the system of the present application, as claimed, that the "Licensee Unique ID" is entirely the product of data generated locally as distinct from data added before



MS-U 467235

delivery of the software to the local location for use (thereby distinguishing over Chou) or subsequently from a remote location (thereby distinguishing over Grundy).

The fundamental principles underlying the operation of the present invention are simple yet highly effective. The uniqueness of identity by which each copy of the software to be protected is distinguished from any other copy is provided by each and only each new user: to reiterate the system does not require the introduction of any unique identifiers from any other source, either before delivery of the software for use by the intending user or subsequent to delivery thereof.

Applicant respectfully submits that the uniqueness of identity upon which Grundy must ultimately rely for operation of its system of registration derives from a unique identifier provided from a remote location: Grundy refers to the unique identifier as a "Unique User (ID) Code" or simply "User Code."

The User Code of Grundy is generated on the second platform (the remote location) and from it the second platform generates a "Unique Authorization Code" being a function of the registration code derived from the first platform and the "User Code."

The Unique Authorization Code is then transferred to the first platform (the local location) where, by means not fully disclosed in Grundy, a determination is made whether the Authorization Code is "valid" and, if so, the protected software is allowed to run in its second mode (presumably full operation mode).

It is not at all clear from the disclosure of Grundy as to whether the previously derived "Registration Code" is ever utilized to help check the validity of the Authorization Code: one is perfectly entitled to infer from the total disclosure of Grundy that any element of uniqueness to be associated with the software to be protected is injected and derived at the second platform (the remote location) and, furthermore, that whether an Authorization Code is valid or not derives directly from data first arising at the second platform (the remote location).

This is the complete reverse of the system of the present invention where the uniqueness derives entirely locally.

**Serial No.** : 08/124,718
**Filed** : September 21, 1993

It is submitted that this local generation of the unique identifying feature for each copy of the software to be protected is one distinguishing feature of the present invention. Grundy does not disclose or suggest this feature or manner or operation. Furthermore, there is insufficient disclosure in Grundy to determine precisely what data is relied upon or checked in order to determine whether an "Authorization Code" is "valid" or not: in short, it is unclear from the disclosure of Grundy as to precisely what the enabling data or enabling data comparison is which permits the protected software to run in its second mode.

The fact that the algorithm which generates the unique ID generating means of the present invention is replicated at a remote location permits the following two features of the present invention not to be found in Grundy:

(1) A direct comparison for matching purposes of the licensee unique ID data at the local location, and

(2) A confirmation that the user details provided to the remote location match identically with the user details provided to the software to be protected and from which the unique ID is generated.

In addition, the Grundy system requires a mechanism for encrypting the registration code for its return trip from the second platform to the first platform: Applicant respectfully submits that the encryption key is the "User Code" generated at the second platform. Without the communication of the encryption key (the user code) to the first platform it will not be possible to decrypt the authorization code and hence, it will not be possible to make any use of the authorization code for validation purposes. Advantageously, the system of the claimed invention does not require that an encryption key be passed from the second platform to the first platform.

The Examiner states that "the Grundy local decodes the authorization code which then must match the original user data."

It is respectfully submitted that Grundy does not disclose a mechanism for decoding the authorization code, hence it follows that Grundy does not disclose a mechanism by which there

can be a match with original user data. Therefore, by a mechanism not specifically disclosed in Grundy, the "Unique User Code" must, somehow, be communicated to the first platform because it amounts to a decryption key without which no useful information can be derived from the authorization code.

By contrast, the invention of the present application does not require any decryption key to pass from the second platform (the remote location) to the first platform (the local location) because the same algorithm is used at both locations. This feature is now clearly included in all proposed main claims, and, it is submitted, patentably distinguishes the present invention over Grundy.

The Examiner states that it would have been obvious to "hash the user data" to create an authorization code match instead of decoding the authorization code to retrieve the user data. Applicant reiterates that no mechanism is provided in Grundy by which it is possible to retrieve the user data from the authorization code: it is respectfully submitted that the Examiner is using hindsight to make an assumption which the disclosure of Grundy does not warrant. Applicant respectfully submits that without the "Unique User Code" (the decryption key) it would simply not be possible by any mechanism (least of all hashing) to derive the user data so as to "create an authorization code match."

There is not a mere matter of protocol distinguishing Applicant's claimed system from the Grundy system: there is a fundamental difference in operation between the two systems. Furthermore, it is respectfully submitted that the Examiner is using hindsight to make assumptions as to how the Grundy system works, assumptions which do not automatically follow from the disclosure of Grundy.

In the Examiner's last paragraph relating to Grundy, the Examiner argues that Grundy does not preclude providing additional information to the local user. The fact, if true, that Grundy does not teach away from providing the information does not therefore mean that Grundy teaches that the information is provided or that doing so would be obvious.

**Serial No.** : 08/124,718
**Filed** : September 21, 1993

Applicant respectfully submits that the system of the present application, as now claimed, is distinguished over Grundy. Applicant respectfully submits that the foregoing remarks are fully responsive to the rejections raised in the second official action, and Applicant respectfully requests allowance of revised Claims 31 to 50.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR

Dated: JUNE 30, 1995

By: Jerry T. Sewell

Jerry T. Sewell
Registration No. 31,567
Attorney of Record
620 Newport Center Drive
Sixteenth Floor
Newport Beach, CA 92660
(714) 760-0404

REC-2604
950629/1



MS-U 467239

SYSTEM FOR SOFTWARE REGISTRATION

## FIELD OF THE INVENTION

This invention relates to improvements in systems for software registration and, more particularly, to improvements in arrangements where software is transferable by media such as magnetic disks, CD ROMS and the like.

## BACKGROUND ART

Much commercially available software is provided at time of purchase (or licence) on a magnetic media, typically a floppy disk. Frequently the only security feature attached to the software is a simple registration number stored on the media. This registration number identifies that particular copy of the software and it is often required at the time of installation of the software onto any given computer that the installer must provide the registration number independently to the installation routines.

However, such simple security arrangements for the distribution of software on media suffer from at least two disadvantages (1) each copy of the software made on any given media at the time of manufacture must include an individual, unique number, programmed into the media and, (2) this arrangement does not prevent copying of the software, once installed on any given computer, to another computer by means of file transfer (as opposed to reinstallation).

WO 92/09,160 to Tau Systems Corporation discloses a registration system which is relatively sophisticated which

relies for its security on a requirement that an intending software licensee must obtain from a remote location by file transfer significant and essential portions of the programme which the licensee desires to execute. The arrangement disclosed in WO 92/09,160 suffers from a number of deficiencies including:-

(a) the shell programme which the intending licensee initially executes requires a unique identity embodied within the shell prior to distribution of the shell programme;

(b) the shell programme is not, itself, a functional programme - that is, it does not include all of the code which the intending licensee wishes to execute. That programme must be obtained remotely with all the delays, inconveniences and possibilities of corruption during transit that that entails;

(c) the prior art system appears to require and indeed, rely on, encryption to ensure that the programme material which is communicated from a remote location is not intercepted for utilisation in an unauthorised manner;

(d) it is unclear whether the system can accommodate and react appropriately to the situation where the programme, once registered, is transferred in its entirety from one platform to another so as to avoid the requirement for payment of a further registration fee.

U.S. 4,796,220, assigned to Pride Software Development Corporation, discloses a system for unique recognition of a platform on which licensed software is to be executed. However, U.S. 4,796,220 does not contemplate or disclose utilisation of information which is unique to the user or intended licensee as part of the registration process which is to be distinguished from identification of the platform upon which the software is proposed to be run.

U.S. 4,688,169 to Joshi broadly discloses the same principles as U.S. 4,796,220 in that it discloses a computer software security system which relies for its security on a "machine identification code unique to the machine" upon which the software to be protected is to be run. Again, the disclosure is limited to identification of the platform and there is no suggestion or contemplation of linking platform identification with unique user identification.

Also this arrangement does not allow the flexibility of transfer of copies of the programme from platform to platform which can be run in a demonstration mode.

[insert page 3a] →

It is an object of the present invention to address or reduce the abovementioned disadvantages.

DEFINITIONS

Throughout this specification the term "software" is to be interpreted broadly so as to include all forms of digital data which are executable on a platform (as to be later defined). The digital data comprising the software can, for example, be code comprising a word processing

→ 3a

programme adapted to run on a PC or the like. The software can also, for example, be digital data stored on a CD ROM adapted for playback as music on a CD ROM audio drive. The digital data can be displayable information or information which is otherwise usable by a licensed user.

Throughout this specification the term "platform" denotes an environment to be associated with a computing device such as a microprocessor or other data processing device which permits execution of the digital data (to which reference has previously been made in relation to the term "software") whereby the computer can perform functions on input and output devices associated therewith.

In some circumstances the "software" or digital data may itself be the operating system environment. Typically, but by no means exclusively, examples of operating system environments include the Microsoft DOS operating system, the IBM OS/2 operating system or the Macintosh System 7 environment. In the degenerate case of microcontrollers operating from ROM the operating system environment may be the microcode of the microcontroller which enables the microcontroller to execute machine code.

In this specification "use mode" refers to use of the digital data or software by its execution on a platform so as to fulfil the seller's/licensor's obligations in relation to the sale or license of the right to execute the digital data or software in the use mode. The use mode is to be distinguished from what might generally be termed unlicensed modes of operation (which is not to say

3a

DE-A-4019652 discloses (see in particular col. 2, l. 30 to col. 3, l. 54 and the claims) a protection apparatus against unauthorised use of commercial software, which uses a unique target machine identifier (Rechneridentifications-Merkmal RID) - optionally combined with an individual security code RP - to produce a unique password. The target machine is required to have a unique "fingerprint" RID stored permanently in hardware (e.g. PROM) and accessible to software routines. When a licence is bought to run software on a particular machine, this RID (and optionally the software licence number SRN) is communicated to the software vendor, who supplies a unique access code in return. The unique target machine identifier RID is used (possibly combined with an individual security code RP allocated by the vendor and the software licence number SRN) by the software on the target machine to produce a common internal password (generelles Softwarepaßwort) which enables the software to run.

Hence, the apparatus restricts use of software to designated target machines, without restricting creation of safety backup copies of purchased software.

→ 4

unauthorised modes of operation) as typified by the demonstration modes later described in this specification.

DISCLOSURE OF THE INVENTION

In broad terms the system according to the invention is designed and adapted to allow digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed. In particular forms the system includes means for detecting when parts of the platform on which the digital data has been loaded has changed in part or in entirety as compared with the platform parameters when the software or digital data to be protected was for example last booted or run or validly registered.

The system relies on digital data or code which forms part of the digital data to be protected by the system. This portion of the digital data which preferably is integral to the digital data to be protected has been termed the code portion 38 elsewhere in this specification. The code portion includes an algorithm adapted to generate a registration number which is unique to an intending licensee of the digital data based on information supplied by the licensee which characterises the licensee.

The algorithm in the code portion is duplicated at a remote location on a platform under the control of the licensor or its agents and communication between the intending licensee and the licensor or its agent is required so that a matching registration number can be generated at the remote location for subsequent

communication to the intending licensee as a permissive to licensed operation of the digital data in a use mode.

Preferably the code portion is integral with the digital data and can be identical for all copies of the digital data. It is the algorithm embedded within the code portion (and which is duplicated at the remote location) which provides a registration number which can be "unique" if the information provided by the intending licensee upon which the algorithm relies when executed upon the platform is itself "unique".

In any event in particular preferred forms a serial number (see further on) is included in the registration number generation algorithm which introduces an additional level of uniqueness into the registration number calculation process.

Accordingly in one broad form of the invention there is provided a system for licensing use of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means.

Preferably said system further includes platform unique ID generating means, wherein said mode switching

means will permit said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed.

Preferably said mode switching means permits operation of said digital data in said use mode in subsequent execution of said digital data only if said licensee unique ID generated by said local licensee unique ID generating means has not changed.

Preferably said mode switching means includes part of said digital data.

Preferably said remote licensee unique ID generating means comprises software which includes the algorithm utilised by said local licensee unique ID generating means to produce said licensee unique ID.

Preferably the information utilised by said local licensee unique ID generating means to produce said licensee unique ID comprises prospective licensee credit card number, date of birth and full name and address.

Preferably said platform unique ID generating means forms part of said digital data.

Preferably said platform unique ID generating means utilises hard disk information and/or other computer hardware or firmware information to determine said platform unique ID.

Preferably said platform comprises a computer operating system environment.

Preferably said digital data comprises a software programme adapted to run under said operating system

environment.

In a further broad form of the invention, there is provided a security routine or registration means attachable to software to be protected, said registration means generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed.

Preferably said security key is generated by a registration number algorithm.

Preferably said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run (eg system clock, last modify date, user name).

Preferably said registration means is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration means.

Preferably said registration means checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot. If a subsequent boot is detected then environment and user details are compared to determine whether the programme reverts to a demonstration mode and a new user registration procedure is to commence, or a full version run.

Preferably said environment details comprise one or more of disc volume name, user name or computer, initialisation date of hard disc, hardware identifier (eg. ROM cheksum) or other elements which are generally not user-configurable on the platform.

In a further broad form of the invention there is provided a method of control of distribution of software, said method comprising providing mode-switching means associated with said software adapted to switch said software between a fully enabled mode and a partly enabled or demonstration mode; said method further comprising providing registration key generating means adapted to generate an enabling key which is a function of information unique to an intending user of the software; said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key generated by said registration key generating means.

Preferably said enabling key is communicated to said intending user at the time of registration of said software by a third party operating a duplicate copy of said registration key generating means.

In yet a further broad form of the invention there is provided digital data incorporating registration code, said digital data executable on a platform; said registration code comprising a portion of said digital data executable

on said platform so as to switch said digital data between a demonstration mode and a use mode.

Preferably said registration code when executed on said platform provides local licensee unique ID generating means whereby said digital data can be switched from said demonstration mode to said use mode by execution of said registration code only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by remote licensee unique ID generating means.

<u>BRIEF DESCRIPTION OF THE DRAWINGS</u>

Embodiments of the invention will now be described with reference to the accompanying drawings wherein:-

Fig. 1 is a schematic diagram of the relationship and interaction between an intending registered user and a registration authority of software on media secured according to a first embodiment of the invention,

Figs 2a, 2b, 2c are segments of a flow chart of the procedure to be followed during registration of software by a user according to a first embodiment of the invention,

Fig. 3 is a flow chart of alternative boot processes according to a second embodiment of the invention,

Fig. 4 is a personal information dialogue box relating to the procedure of Figs. 2a, 2b, 2c in accordance with a third embodiment,

Fig. 5 is a schematic diagram of a system according to a fourth embodiment of the invention,

Fig. 6 is an implementation of the fourth embodiment of Fig. 5 in relation to a CD ROM drive,

Fig. 7 is a logic flow chart in relation to the decoder box of Fig. 6,

Fig. 8 is a block diagram of a generalised system according to a fifth embodiment of the invention,

Fig. 9 is a block diagram indicating one particular example of generation of a registration number for the system of Fig. 8 and

Fig. 10 is a schematic diagram of a sixth embodiment comprising a particular example of the generalised system of Fig. 8.

MODES FOR CARRYING OUT THE INVENTION

It is to be understood that, in its various embodiments, the invention is for the protection of digital code/software by control of permission to use the digital code/software. A hardware platform and a remote registration station implemented at least partially by means of electronic hardware are required by the various

embodiments.

The code/software to be protected requires at least some adaption to be useable with the invention in its various embodiments. The adaptation can be universal for all copies of the code/sofware to be protected.

1. FIRST EMBODIMENT

With reference to Figs. 1 and 8 the system according to embodiments of the invention is designed and adapted to allow digital data 39 or software to run in a use mode on a platform 31 if and only if an appropriate licensing procedure has been followed. In particular forms the system includes means for detecting when parts of the platform 31 on which the digital data 39 has been loaded has changed in part or in entirety as compared with the platform parameters when the software or digital data to be protected was for example last booted or run or validly registered.

The system relies on digital data or code 38 which forms part of the digital data to be protected by the system. This portion of the digital data which preferably is integral to the digital data to be protected has been termed the code portion 38 elsewhere in this specification. The code portion 38 includes an algorithm adapted to generate a registration number 66 or local licensee unique ID or registration key which is unique to an intending licensee of the digital data based on information supplied by the licensee which characterises the licensee. In this instance the local licensee unique ID generator which

generates the registration number comprises the execution of code 38 on platform 31.

The algorithm in the code portion is duplicated at a remote location on a platform 67 under the control of the licensor or its agents and communication between the intending licensee and the licensor or its agent is required so that a matching registration number or enabling key can be generated at the remote location for subsequent communication to the intending licensee as a permissive to licensed operation of the digital data 39 in a use mode.

Execution of the duplicated code portion on platform 67 comprises, in this instance, the remote licensee unique ID generating means.

Mode switching means can comprise execution of the code portion which additionally performs a comparison of the locally and remotely generated registration numbers.

Preferably the code portion 38 is integral with the digital data and can be identical for all copies of the digital data. It is the algorithm embedded within the code portion (and which is duplicated at the remote location) which provides a registration number which can be "unique" if the information provided by the intending licensee upon which the algorithm relies when executed upon the platform is itself "unique".

In any event in particular preferred forms a serial number (see further on) is included in the registration number generation algorithm which introduces an additional level of uniqueness into the registration number

calculation process.

With particular reference to Fig. 1 a programme comprising digital data protected according to a first embodiment of the invention is supplied recorded on a magnetic disk 10.

Included as part of the software on that disk 10 is a registration and re-registration routine which executes whenever the programme protected by the arrangement of the first embodiment "boots".

With reference to Figs. 1 and Figs. 2a, 2b and 2c the operation of the security routine will be described on the assumption that the programme on the disk 10 protected by the registration routine has not been registered on the platform or is otherwise being loaded for the first time.

The prospective new user 11 inserts disk 10 into the user PC 12 so as to be read by PC 12.

As part of the software installation procedure the registration routine is activated causing a series of dialogue boxes to appear on the display 13 of the user PC 12. Having checked to ensure that the software has not previously been registered on the PC 12 a dialogue box A (in Fig. 2a) is displayed which provides the user with a choice of either seeing a demonstration of the software (which typically has features such as save and/or print disabled) or alternatively

an invitation to register ownership/license of the software (after which all features of the software are made available to the user).

If the register option is selected or if the user cancels the demonstration in favour of registration then a contact dialogue box B (in Fig. 2a) is presented on the display 13 which provides a list (stored on disk 10 as part of the registration routine) which provides for example, names and contact numbers of the software publishing company together with other general product information.

Following the user's indication of agreement during display of license details (box B1) to proceed to register, the user can contact the registration centre after filling out the registration dialogue box C as detailed below. After selecting "continue", the registration routine begins the first step in the generation of a security key which will be unique to the current copy of the software and to certain features of the environment in which it runs.

As shown in Fig. 2b, the first step in the generation of the security key comprises the generation of a serial number generated from the current time on the system and, in this example, the last modify date of the software and other information from the computer environment. The serial number is encrypted and rearranged and then presented as a number in the registration dialogue box on the display 13.

The registration dialogue box C (in Fig. 2b) prompts the user for details unique to that user (including, for example, name, company, address, state, contact number) together with financial details for payment for the purpose of becoming a registered user of the software protected by

the registration routine (for example Mastercard or corporate account number details). This information, unique to the user, is passed through a registration number algorithm 14 (represented symbolically in Fig. 1) which generates a registration number or security key from the information unique to the user together with the serial number previously generated. The registration number or security key is not made available to the user of the PC 12 by the PC 12.

An identical registration number algorithm 14 resides on the registration authority PC 15. As an integral part of the registration procedure the prospective new user 11 communicates the information unique to the user which was entered by the user on the user PC 12, along with the serial number generated by the user's algorithm, to the registration authority 16. The registration authority feeds this information into the registration authority PC 15 wherein the registration number algorithm 14 should produce an identical registration number or security key to that produced by the user PC 12 if the details communicated to the registration authority by the prospective new user 11 match with the details that have been entered on the user PC 12. Optionally the user can communicate the information to the registration authority electronically eg. by fax or modem or tone phone.

As a final stage in registration (refer Fig. 2c) the registration authority 16 provides the registration number generated by the registration authority PC 15 to the user

11. The user 11 enters the registration number into the user PC 12 where the registration routine checks to see whether the entered registration number matches the calculated registration number. If the two match then a valid registration has taken place and access is provided by the registration routine to a full operating version of the software protected by the registration routine. If there is no match and a preference file (which stores the user details) does not exist then a dialogue box D (Fig. 2c) appears on the display 13 of user PC 12 providing the prospective new user 11 with the opportunity to check his/her details or switch to the demonstration version of the software protected by the registration routine.

Again, the registration authority PC 15 can provide to PC 12 the registration number which it generates by electronic means such as modem communication.

It will be evident that it is not obvious to the prospective new user 11 that the registration number which unlocks the full version of the software protected by the registration routine is, in fact, generated from an algorithm residing on the magnetic disk 10 and that it forms part of the software to which access is desired.

In this manner the registration procedure outlined above ensures that exactly the same details entered by the prospective new user on his/her user PC 12 are those details recorded by the registration authority 16. It will also be evident that the procedure does not require each magnetic disk 10 containing a copy of the software to be

protected to have a unique registration number recorded on the disk at the time of distribution of the disk. Each copy has exactly the same registration number algorithm located upon it. A unique registration number or "security key" is generated only at the time of registration from the details supplied by the prospective new user 11.

The registration routine behaves generally as follows where any copy of the protected software boots. In this situation, the registration routine checks at the time of boot to see what registration details are present for that particular copy of the software. If no details are present then it is assumed that the PC is booting from a newly distributed magnetic disk and registration is to occur for the first time. The registration procedure in that case is that followed in respect of Figs. 2a; 2b and 2c.

In the event that registration details are present then the registration routine checks a number of parameters which are expected to be unique to the environment in which the software to be protected operates. In this embodiment the parameters checked are hard disc volume name, user name, and computer name and user password and hard disc initialisation date (not generally user configurable on the Apple Macintosh computer). The registration routine then checks these parameters against the corresponding details that it finds from the operating environment of the computer on which the software is running. If a designated combination of these details matches then it is assumed that a properly authorised and registered copy of the

software is running and full access to the software is allowed.

In this manner, it is quite in order for users to provide other users with copies of the software protected by the security routine. The security routine attached to the software to be protected determines from the environment in which it operates whether an additional registration fee is required. If it is determined by the registration routine that this is the case then the registration routine has the capability to provide a fresh registration number as part of an authorised registration procedure pending which the protected software reverts to demonstration mode.

2. <u>SECOND EMBODIMENT</u> (Auto re-registration)

According to a second embodiment a more sophisticated procedure suitable for checking at first boot and at subsequent boot is shown in flow chart form in Fig. 3.

This procedure incorporates redundancy to cope with situations where the key file containing the information from which the current use has been authorised may have been deleted or does not exist on a subsequent boot.

The distinction as against the first embodiment is that a "key file" is created at the time of registration of the software and a duplicate key file is also created at the same time. The duplicate key file is arranged to be stored on the computer at a location separate from the programme to be protected. In the case of the Apple Macintosh computer the duplicate key file can be stored in

the "system" folder.

Both the key file (stored with the software) and the duplicate key file are encrypted and both contain identical information. The information contained comprises:

1. The user registration details including the serial number,
2. The environment details of the computer, and
3. Details of the application protected by the security routine for which registration is to be or has been obtained.

With reference to Fig. 3 whenever the protected application boots a check is made by the registration routine to determine whether registration details exist in the key file of the protected application. If they do a comparison is made by the registration routine between what is stored in the key file and the environment to determine whether a change has taken place to the environment as compared with what is stored in the key file. If no change is detected then the protected application is permitted to run normally.

If there are no registration details present in the key file or if the above referenced comparison between the key file contents and the application does not show a match then the re-registration routine of Fig. 3 looks for the existence of a duplicate key file within the environment. If a duplicate key file exists then the information contained within that duplicate key file is copied to the application key file and comparisons as previously

described as between the key file details and the environment and application are made. If the comparison is positive then the protected application is allowed to run normally. If the comparison proves negative then the protected application is permitted to run by the registration routine in demonstration mode only. If a duplicate key file is found not to exist at all and the internal key file if present brings a negative result then the protected application is allowed to run in demonstration mode only.

This arrangement provides improved durability for the registration routine in the sense that it is less likely that the protected application will be caused to run in demonstration mode for incorrect reasons.

3. <u>THIRD EMBODIMENT - TRACKING SYSTEM</u>

With reference to Fig. 4 a modified form of the dialogue box C of Fig. 2b is shown which includes provision for entry of "your user number" in box 21.

At the time a prospective new user enters his/her details into the other boxes comprising the dialogue box C, there is an option for the user to enter a user number into box 21. The user number is provided by the registration authority 16 as a number unique to that particular registered user. If the box 21 has the user number details inserted into it then the registration routine, when the next copy of the protected application is made, will transfer the user number details from box 21 to the "last user number" box 22. A similar transfer will take place

when next a copy is made of the protected application if and only if the person wishing to register the next copy enters their user number details in box 21. If they do not, then the last user number details in box 22 remain as before. In this manner a tracking system is available to the registration authority in the form of a tree where any given copy is identified by its ancestry based on current and previous user number as entered into boxes 21 and 22.

4. SELF SERIALISATION

In a particular embodiment a process termed "self serialisation" can be utilized to produce the serial number 50 which is displayable to the user/licensee as illustrated in Fig. 4.

The serial number 50 is disguised by use of a random or pseudo random number input to the algorithm which generates the serial number at the time of first boot of the software as part of the initial registration procedure. For example the serial number, when generated by the self serialisation process, can be generated by a random number routine forming part of the registration software or it can be generated by the registration software with reference to data which is available in a widely varying fashion on the platform on which the software is located - for example a time reference on the platform. The serial number 50 generated by the self serialisation process can be a required input to the registration algorithm from which the registration number is generated. Clearly the serial number 50 as determined and displayed to the user will then

be required to be communicated to the registration authority for input to the registration authority's registration number generating algorithm.

It will be observed that a serial number 50 generated in this manner is likely to be displayed as a different number on each platform on which the software to be protected is to be run and comprises a randomised input to the registration algorithm which is determined and determinable only at the time of registration.

5. FIFTH EMBODIMENT

With reference to Fig. 5 there is shown in schematic form a microprocessor 30 adapted to operate under an operating system or upon a platform 31 such as, for example, Microsoft DOS or Macintosh System 7. The platform 31 allows relatively high level commands to be used to cause the microprocessor 30 to interact with input/output devices such as keyboard 32, monitor 33, loudspeaker 34, memory 35 and magnetic or CD ROM disc 36.

By way of example a word processing programme comprising a length of code or digital data 37 has been copied onto disc 36.

The digital data 37 includes registration code portion 38 and use code portion 39.

The digital data 37 is arranged in such a way that when microprocessor 30 seeks to first execute the digital data 37 by way of operating system or platform 31 the digital data comprising the registration code portion 38 is caused to execute first in a manner previously described in

reference to the first embodiment of the invention. The execution of the digital data comprising the registration code portion 38 in conjunction with the operating system or platform 31 comprises a mode switcher which will permit the microprocessor 30 to execute the use code portion 39 of digital data 37 only in a demonstration mode unless and until registration involving reference to an external registration authority is first completed successfully. This registration procedure is as previously described with reference to the first embodiment.

The digital data 37 can comprise, for example, a word processing programme such as Wordperfect 5.1 available from Wordperfect Corporation. The registration code portion 38 is integral with the digital data 37 comprising the word processing programme. The registration code portion 38 includes the algorithm for calculation of the registration number as previously described in respect of other embodiments of the invention.

It will be appreciated that the registration code portion 38 effectively forms simply a part of the software or digital data 37 to be protected/registered and that the digital data 37 will be or can be identical for all copies of the word processing programme produced. The registration code portion 38 allows a unique link to be made between the digital data 37 and an individual authorised or licensed to use the digital data 37 by way of initial execution of a copy of the digital data comprising registration code portion 38.

With reference to Figs. 6 and 7 a specific realisation of the fifth embodiment will be described.

With particular reference to Fig. 6 a decoder 51 is interposed in the data path from the CD in CD player 52 and a digital to analogue converter 53. The digital to analogue converter 53 is the device by which digitally encoded musical or video information residing on CD ROM 54 is converted to analogue form suitable for playback on current mass produced television sets (video) or hi-fi sets (audio).

The decoder 51 comprises part of the platform upon which the digital data 37 is executed and includes means to interpret the code portion 38 of the digital data 37 whereby the registration system is implemented such that the digital data 37 and, more particularly, the use code portion 39 of that digital data 37 can be executed on the platform in a use mode only if the registration procedure to which reference has been made in respect of previous embodiments has been performed.

The registration code portion 38 can include a preview or demonstration related to a subset of the balance of the digital data on the CD 54 which can be executed by the platform without license.

The decoder 51 includes LCD display 55 and keypad 56 whereby the licensee can enter information via keypad 56 and receive information via the LCD display 55 for the purpose of the registration procedure.

In addition a smart card (SRAM) 57 is receivable by

the decoder 51 for the purpose of customising or amending operation of the decoder 51.

With reference to Fig. 7 the registration procedure following insertion of CD 54 into CD player 52 is as follows. The user operates the play control and decoder 51 reads from CD 54 code portion 38 of digital data 37 located thereon and executes this code so as to determine whether the digital data is already licensed for the platform. If not, a demonstration is communicated via digital to analogue converter 53 whilst the user determines whether to register as a licensee of the digital data 37 in the manner indicated in the flow chart of Fig. 7.

6. <u>SIXTH EMBODIMENT</u>

With reference to Fig. 8 there is shown a block diagram of a system according to a further embodiment of the invention which is to be read in the context of the earlier generalised description in respect of Fig. 1.

The system illustrated in Fig. 8 operates in the manner generally described in respect of previous embodiments and as generally outlined in the diagram. In the context of the block C illustrated in Fig. 4 and with reference to Fig. 9 the algorithm which generates the unique user identification and which is resident both as the registration code portion 38 in digital data 37 integrally bound to use code portion 39 for execution on local platform 31 and also as remote algorithm 61 attached to registration database programme 62 for execution on the remote platform 63.

The algorithm, in this embodiment, combines by addition the serial number 50 with the software product name 64 and customer information 65 and previous user identification 22 to provide registration number 66.

As discussed earlier all of the items to be summed, namely items 50, 64, 65 and 22 must be communicated to the remote licensee unique ID generator 67 by the intending licensee whereby algorithm 61 causes the production of a registration number 66 which matches identically with the locally produced registration number. When mode switcher 68 verifies the match then the mode switcher 68 allows execution on platform 31 of the full user programme 39.

Prior to allowing execution of the full programme mode switcher 68 will also check whether platform ID 69 has changed as provided to it by platform unique ID generator 70.

In this embodiment serial number 50 is comprised of two components, namely system information 71 and a variable key portion 72. The variable key portion 72 provides the characteristic of self serialisation described earlier in the specification and, in this embodiment, is generated at the time of registration on platform 31 by reference to a variable platform parameter, in this case reference to system time information although other parameters which are variable can be utilised in other embodiments.

System information 71 can include information which identifies the hardware comprising the platform 31 on which the user programme 39 is to be executed such as, for

example, CPU number (where available), or unique parameters associated with the firmware in use. The system information, optionally, can further include system configuration information such as amount of memory, type of processor etc.

It will be noted, therefore, that serial number 50 will appear to an intending licensee when it appears on screen as per box C in Fig. 4 as an apparently random variable having no obvious link to the platform 31 or the user programme 39.

However, when the serial number 50 is communicated to the remote licensee unique ID generator 67 a secondary algorithm complementary to the algorithm which generated the serial number including variable key portion 72 and system information 71 is able to "decode" or otherwise strip away the variable key portion 72 so as to make use of the system information 71 if allowable and desirable in the circumstances.

Whether the system information 71 is utilised or not the serial number 50 generated in this manner provides an input to the algorithm which generates registration number 66 which presents as an apparently variable parameter thereby rendering "cracking" of the software registration system more difficult and unlikely.

7. SEVENTH EMBODIMENT

The schematic diagram of Fig. 10 illustrates a substantially hardware implementation of the invention applicable, for example, for implementation of the CD

arrangement of Fig. 6 or the more generalised arrangement of Figs. 8 and 9.

In this embodiment a prospective user 80 of digital code 81 on media 82 by its execution on platform 83 firstly inserts the media 82 into an appropriate digital code reading device within platform 83 (eg a floppy disk drive or a CD ROM drive).

Customer information C is provided by user 80 both direct to local encoder/decoder 84 and also to local adder or summer 85.

Additionally product information P derived from media 82 (typically via platform 83) or else via the intermediary of the user (signified by the small man symbol) is provided to encoder/decoder 84 and to summer 85.

Finally, a serial number S derived from platform 83 is supplied either directly or via the intermediary of user 80 to encoder/decoder 84 and to summer 85.

Summer 85 acts as a local licensee unique ID generating means by combining, by addition, customer information C, product information P and serial number S in order to provide a local licensee unique ID here designated Y.

Encoder/decoder 84 transmits the serial number S, the customer information C and the product information P via modems 86, 87 over the public switched telephone network to a remote encoder/decoder 88 which, in turn, supplies signals S, C and P to the inputs of remote summer 89. Remote summer 89 combines these signals by addition

(thereby acting as a remote licensee unique ID generating means) so as to provide a summed output here termed X which represents a licensee unique ID or enabling key which should match identically with the local licensee unique ID or registration key or registration number Y if inputs S, C and P to summers 85 and 89 are identical.

The licensee unique ID termed X is transmitted back via encoder/decoders and modems 84, 86, 87, 88 to comparator 90 which outputs a high signal if X equals Y. This condition corresponds to the local licensee unique ID matching with the licensee unique ID generated at the remote location by the remote licensee unique ID generating means generally comprising summer 89.

Digital code 81 on media 82 comprises code identified as a demonstration portion D together with code identified as a use portion U. There may be other kinds of code designated O as well.

Code 81 is executed on platform 83 (for example a microprocessor or a substantially hardware based, dedicated playback device such as a CD drive with the code being passed through a mode switcher comprising first gate 91 and second gate 92 together with relay 93.

First gate 91 energises relay 93 so as to permit execution of code of type D but not code of any other type such as of type U.

Second gate 92 permits execution of any kind of code by closure of relay 93 provided only that the output of comparator 90 is high (which is to say that X equals Y or

that the local licensee unique ID matches with the licensee unique ID generated by the remote licensee unique ID generating means comprising summer 89).

Comparator 90 together with gates 91, 92 and relay 93 comprise one particular form of mode switcher or switching means suitable for recognizing and allowing execution on platform 83 of various kinds of code such as the code of types D and U.

INDUSTRIAL APPLICABILITY

The aforementioned may be applied either in dedicated electronic hardware or by means of more generalised digital computation devices such as microprocessors and the like in order to regulate use of digital code.

The above describes only some embodiments of the present invention and modifications, obvious to those skilled in the art, can be made thereto. ~~without departing from the scope and spirit of the present invention~~

A < characterized in that said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot, and, if a subsequent boot is detected, then duplicate copies of the environment and user details are compared to determine whether the program reverts to a demonstration mode and a new user registration procedure is to commence or a full version run>

CLAIMS

1. A registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means, <A>.

2. The system of claim 1 wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm; said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode.

3. The system of claim 2 wherein said mode switching means permits operation of said digital data in said use mode in subsequent execution of said digital data only if said licensee unique ID generated by said local licensee unique ID generating means has not changed.

4. The system of claim 3 wherein said local licensee unique ID generating means comprises part of said digital data when executed on said platform.

5. The system of claim 4 wherein said mode switching means comprises part of said digital data when executed on

said platform.

6. The system of claim 5 wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilised by said local licensee unique ID generating means to produce said licensee unique ID.

7. The system of claim 5 wherein the information utilised by said local licensee unique ID generating means to produce said licensee unique ID comprises prospective licensee details including at least one of payment details, contact details and name.

8. The system of claim 1 said system further including platform unique ID generating means, wherein said mode switching means will permit said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed.

9. The system of claim 8 wherein said platform unique ID generating means comprises part of said digital data when executed on said platform.

10. The system of claim 9 wherein said platform unique ID generating means utilises hard disk or other platform information to determine said platform unique ID.

11. The system of claim 1 wherein said platform comprises a computer operating system environment.

12. The system of claim 11 wherein said digital data comprises a software programme adapted to run under said operating system environment.

13. A ~~security routine or~~ registration means attachable to software to be protected, said registration means generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed, <a.A. 17>

14. The registration means of claim 13 wherein said security key is generated by a registration number algorithm.

15. The registration means of claim 14 wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run.

16. The registration means of claim 13 wherein said registration means is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the registration key is generated by the security means.

~~17. The registration means of claim 13 wherein~~ characterized in that said registration means checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot, and, if a subsequent boot is detected then <duplicate copies of the> environment and user details are compared to determine whether the programme reverts to a demonstration mode and a new user registration procedure is

to commence or a full version run.>

17 ~~18~~. The registration means of claim 13 ~~17~~ wherein said environment details comprise one or more of elements which are generally not user-configurable on the platform.

18 ~~19~~. A method of control of distribution of software, said method comprising providing mode-switching means associated with said software adapted to switch said software between a fully enabled mode and a partly enabled or demonstration mode; said method further comprising providing registration key generating means adapted to generate a registration key which is a function of information unique to an intending user of the software; said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key, < B >

19 ~~20~~. The method of claim 18 ~~19~~ wherein said registration key is also a function of the environment in which said software is installed.

20 ~~21~~. The method of claim 18 ~~19~~ wherein said enabling key is communicated to said intending user at the time of registration of said software; said enabling key generated by a third party operating a duplicate copy of said registration key generating means.

B < characterized in that said method checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot, and, if a subsequent boot is detected, then duplicate copies of the environment and user details are compared to determine whether the program reverts to a demonstration mode and a new user registration procedure is to commence or a full version run>

~~a demonstration mode and a use mode.~~

~~23. The digital data of claim 22 wherein said registration code, when executed on said platform, provides local licensee unique ID generating means whereby said digital data can be switched from said demonstration mode to said use mode only if a licensee unique ID generated by said local licensee unique ID generating means matches a licensee unique ID generated by remote licensee unique ID generating means.~~

~~24. The digital data of claim 22 wherein said registration code is integrally bound to said digital data.~~

21 ~~25~~. A remote registration station incorporating remote licensee unique ID generating means, said station forming part of a registration system <--> ~~for licensing execution of digital data in a use mode, said digital data executable on~~ a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated ~~by said remote licensee unique ID generating means,~~ <o.A. 17>

22 ~~26~~. A method of registration of digital data so as to enable execution of said digital data in a use mode, said method comprising an intending licensee operating a registration system <--> ~~for licensing execution of digital data in a use mode, said digital data executable on a platform~~

<according to claim 1;>

said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means, <O.A. 17>.

27. Media or a transmission medium incorporating the digital data of claim 22.

28. Media or a transmission medium incorporating said local licensee unique ID generating means of the registration system of claim 1.

23 29. Media or a transmission medium incorporating code adapted, upon execution on a platform, to provide said remote licensee unique ID generating means of the registration system of claim 1.

30. A remote registration station including said remote licensee unique ID generating means forming part of the registration system of claim 1.




FIG. 1

SUBSTITUTE SHEET



BOOT
IS THIS A NEW COPY ? (INTERNAL CHECKING BY APPLICATION)
NO
GO TO FIG. 3a OR 3b
YES
A
DIALOG BOX: "DEMO OR REGISTER" ?
DEMO
REGISTER
B
DISPLAY PRODUCT INFORMATION BOX: e.g.. SOFTWARE PUBLISHER DETAILS
DEMO MODE OF APPLICATION: NO SAVE OR PRINT CAPABILITY
CANCEL
CANCEL OR AGREE ?
AGREE
B1
LICENSE INFO. DIALOG BOX: DETAILS OF NEW LICENSING AGREEMENT
CANCEL
CANCEL OR CONTINUE ?
CONTINUE
GO TO FIG. 2b


FIG. 2a




FIG. 2b

**SUBSTITUTE SHEET**

FIG. 2c


FROM FIG. 2b
USER TYPES IN REGISTRATION NUMBER
APPLICATION USES UNLOCKING ALGORITHM TO CHECK VALIDITY
VALID ?
NO
YES
ALERT DIALOG BOX: USER TOLD THE REGISTRATION NO. IS INCORRECT AND ASKED TO CALL THE OPERATOR FOR ASSISTANCE IN CHECKING REGISTRATION DETAILS. USER GIVEN 3 ATTEMPTS TO REGISTER AFTER WHICH THE PROGRAM AUTOMATICALLY REVERTS TO DEMO VERSION
RUN FULL VERSION
RUN DEMO VERSION

FIG. 3




SUBSTITUTE SHEET


220
NAME:
ORGANIZATION
ADDRESS
CITY
ZIP/POST CODE
COUNTRY
CREDIT CARD/ORDER#
EXPIRE DATE
LAST USER NO.
SERIAL NO.
PRODUCT NO.
YOUR USER NO.
REGISTRATION NO.
22
50
21

FIG. 4




FIG. 5




FIG. 6




FIG. 7

SUBSTITUTE SHEET




*FIG. 8*

**SUBSTITUTE SHEET**


VARIABLE KEY PORTION
72
SYSTEM INFORMATION
71
50
SERIAL NO.
61
PRODUCT NAME
65
CUSTOMER INFORMATION
22
PREVIOUS USER IDENTIFICATION
66
REGISTRATION NUMBER

FIG. 9




FIG. 10

SUBSTITUTE SHEET

# INTERNATIONAL SEARCH REPORT

International application No.
PCT/AU 93/00483

**A. CLASSIFICATION OF SUBJECT MATTER**
Int. Cl.[5] G06F 15/21, 9/44

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
IPC : G06F 15/21, 9/44

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched
AU : IPC as above

Electronic data base consulted during the international search (name of data base, and where practicable, search terms used)
Derwent : (REGIST: or LICEN: or PROTECT: or SECUR: or VALID: or AUTHORIS: or VERIF:)
Japio : as above and (SOFTWARE: or PROGRA:)

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to Claim No. |
|---|---|---|
| A | WO,A, 92/09160 (TAU SYSTEMS CORPORATION) 29 May 1992 (29.05.92) See whole document | |
| A | US,A, 4982430 (FREZIA et al) 1 January 1991 (01.01.91) See whole document | |
| A | US,A, 4796220 (WOLFE) 3 January 1989 (03.01.89) See whole document | |
| A | US,A, 4688169 (JOSHI) 18 August 1987 (18.08.87) See whole document | |

[X] Further documents are listed in the continuation of Box C.

[X] See patent family annex.

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance
"E" earlier document but published on or after the international filing date
"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)
"O" document referring to an oral disclosure, use, exhibition or other means
"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention
"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone
"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art
"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 16 December 1993 (16.12.93) | 30 DEC 1993 (30.12.93) |

| Name and mailing address of the ISA/AU | Authorized officer |
|---|---|
| AUSTRALIAN INDUSTRIAL PROPERTY ORGANISATION<br>PO BOX 200<br>WODEN ACT 2606<br>AUSTRALIA | M. EASTHOPE |
| Facsimile No. 06 2853929 | Telephone No. (06) 2832212 |

**INTERNATIONAL SEARCH REPORT**

International application No.
PCT/AU 93/00483

| C(Continuation). | DOCUMENTS CONSIDERED TO BE RELEVANT | |
|---|---|---|
| Category* | Citation of document, with indication, where appropriate of the relevant passages | Relevant to Claim No. |
| A | US,A, 4654799 (OGAKI et al) 31 March 1987 (31.03.87)<br>See whole document | |

**INTERNATIONAL SEARCH REPORT**

International application No.
PCT/AU 93/00483

**Box I** Observations where certain claims were found unsearchable (Continuation of Item 1 of first sheet)

This international search report has not established in respect of certain claims under Article 17(2)(a) for the following reasons:

1. [X] Claims Nos.: 22-24
because they relate to subject matter not required to be searched by this Authority, namely:

Mere presentation of information

2. [ ] Claim Nos.:
because they relate to parts of the international application that do not comply with the prescribed requirements to such an extent that no meaningful international search can be carried out, specifically:

3. [ ] Claims Nos.:
because they are dependent claims and are not drafted in accordance with the second and third sentences of Rule 6.4(a).

**Box II** Observations where unity of invention is lacking (Continuation of item 2 of first sheet)

This International Searching Authority found multiple inventions in this international application, as follows:

1. [ ] As all required additional search fees were timely paid by the applicant, this international search report covers all searchable claims

2. [ ] As all searchable claims could be searched without effort justifying an additional fee, this Authority did not invite payment of any additional fee.

3. [ ] As only some of the required additional search fees were timely paid by the applicant, this international search report covers only those claims for which fees were paid, specifically claims Nos.:

4. [ ] No required additional search fees were timely paid by the applicant. Consequently, this international search report is restricted to the invention first mentioned in the claims; it is covered by claims Nos.:

**Remark on Protest**

[ ] The additional search fees were accompanied by the applicant's protest.

[ ] No protest accompanied the payment of additional search fees.

Form PCT/ISA/210 (continuation of first sheet(1))(July 1992) copjne

**INTERNATIONAL SEARCH REPORT**

Information on patent family members

International application No.
PCT/AU 93/00483

This Annex lists the known "A" publication level patent family members relating to the patent documents cited in the above-mentioned international search report. The Australian Patent Office is in no way liable for these particulars which are merely given for the purpose of information.

| Patent Document Cited in Search Report | | Patent Family Member | | | | | |
|---|---|---|---|---|---|---|---|
| WO | 9209160 | CA | 2095723 | EP | 556305 | US | 5103476 |
| | | US | 5222134 | | | | |
| US | 4982430 | CA | 1295412 | DE | 3679711 | EP | 200704 |
| | | JP | 61248636 | | | | |
| US | 4796220 | | | | | | |
| US | 4688169 | | | | | | |
| US | 4654799 | | | | | | |
| | | | | | | | END OF ANNEX |

CLAUTZ1.001AUS

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

MAIL ROOM FEB 23 1994 PAT. & TRADEMARK OFF.

| | | | |
|---|---|---|---|
| Applicant | : | Frederic Bailier Richardson, III | Group Art Unit Unknown |
| Serial No. | : | 08/124,718 | |
| Filed | : | September 21, 1993 | |
| For | : | SYSTEM FOR SOFTWARE REGISTRATION | |
| Examiner | : | Unknown | |

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231, on

February 16, 1994
(Date)

Jerry T. Sewell, Reg. No. 31,567

RECEIVED '94 MAR -8 AM 10 35 SPECIAL PROCESSING AND CORRESPONDENCE BRANCH

INFORMATION DISCLOSURE STATEMENT #4 6-10-94

Hon. Commissioner
of Patents and Trademarks
Washington, D.C. 20231

Dear Sir:

Enclosed herewith is Form PTO-1449, including copies of the documents therein listed. This statement is being mailed more than three months after the filing date, but before receipt of a first Office Action on the merits, and is therefore believed to comply with 37 C.F.R. § 1.97(b)(3); You are hereby authorized to charge the fee under 37 C.F.R. § 1.17(p) to our deposit account No. 11-1410.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR

Dated: February 16, 1994

By: Jerry T. Sewell

Jerry T. Sewell
Registration No. 31,567
Attorney of Record
620 Newport Center Drive
Sixteenth Floor
Newport Beach, CA 92660
(714) 760-0404

JTS-6511:sb
940215/1

#4

SHEET 1 OF 1

FORM PTO-1449 U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT

(USE SEVERAL SHEETS IF NECESSARY)

MAIL ROOM FEB 24 1994 PAT. & TRADEMARK OFC.

ATTY. DOCKET NO.: CLAUTZ1.001AUS

SERIAL NO.: 08/124,718

APPLICANT: Richardson, III

FILING DATE: September 21, 1993

GROUP: Unknown

U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|
| dc | 4654799 | 03/31/87 | Ogaki, et al. | | | |
| dc | 4688169 | 08/18/87 | Joshi | | | |
| dc | 4796220 | 01/03/89 | Wolfe | | | |
| dc | 4982430 | 01/01/91 | Frezza, et al. | | | |
| dc | 5239166 | 08/24/93 | Graves | | | |

FOREIGN PATENT DOCUMENTS

| | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | TRANSLATION NO |
|---|---|---|---|---|---|---|---|
| dc | WO 9209160 | 05/29/92 | PCT | | | | |

OTHER DOCUMENTS (INCLUDING AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC.)

EXAMINER: David Cain

DATE CONSIDERED: 6/21/94

*EXAMINER: INITIAL IF REFERENCE CONSIDERED, WHETHER OR NOT CITATION IS IN CONFORMANCE WITH MPEP 609; DRAW LINE THROUGH CITATION IF NOT IN CONFORMANCE AND NOT CONSIDERED. INCLUDE COPY OF THIS FORM WITH NEXT COMMUNICATION TO APPLICANT.

JTS-6512:sb
940215/1

Peter Maxwell
and associates
patent and trade mark attorneys

**Peter F. Maxwell B.Sc., F.I.P.A.A..**
James V. Maxwell Dip. Law (SAB)
George Griziotis B.Sc. (Hons)
Peter R. Vaughan B.Agr.Sc.
Charles V. Maxwell
Denise M. Sylvester (Accountant)

Blaxland House
5 Ross Street
North Parramatta
Sydney
New South Wales
Australia

P.O. Box 2309
North Parramatta
New South Wales 2151 Australia
**Telephone (02) 683 3411**
International +61 2 683 3411
**Facsimile +612 683 5795**

17 January 1996

Mr Steve Cox
Uniloc Corporation Pty Limited
PO Box 919
BROOKVALE NSW 2100

Dear Steve

RE: European Patent Application No 93 920 609.0
SYSTEM FOR SOFTWARE REGISTRATION
Our Reference: 93 1 168 PFM:gb

I refer to my letter of 7 July 1995 and enclose a copy of our associate's report of 5 January 1996 regarding the Supplementary Search Report.

Our associate has reviewed the additional citation raised by the European Patent Office (German specification 40 19 652 A1) and concluded that it should not cause any real problems.

In accordance with the practice of the European Patent Office, our associate will indicate that you wish to proceed with the application.

In the ordinary course of events, I doubt if the application will be examined before 1997.

Our account in respect of the Supplementary Search Report and the disbursement to our associate in that regard is enclosed.

Kind regards

P.F. Maxwell

Peter Maxwell

/us6/pat/3-l

PATENTANWÄLTE **KAHLER KÄCK FIENER STURM** EUROPEAN PATENT ATTORNEYS

DIPL.-ING. KURT KAHLER
ASSESSOR JOSEF FIENER
PATENTANWÄLTE, MINDELHEIM

DIPL.-WIRTSCH.-INGENIEUR
DIPL.-ING. JÜRGEN KÄCK
DR.PHIL. DIPL.-CHEM.
HANS-GEORG STURM
PATENTANWÄLTE, LANDSBERG

Kahler Käck Fiener Sturm, PO Box 1249 D-87712 Mindelheim

**Mailing Address:**
Maximilianstrasse 57
P. O. Box 1249
D-87712 Mindelheim

Telephone: +49-8261-3027
Facsimile 1: +49-8261-6563
Facsimile 2: +49-8191-59209

Peter Maxwell and Associates
Patent and Trade Mark Attorneys
P.O. Box 2309

North Parramatta
New South Wales 2151
Australia

ADVANCE FAX
+8 Pages

---

**European Patent Application No. 93920609.0**
**UNILOC (SINGAPORE) PRIVATE LIMITED**
**"System For Software Registration"**
**YOUR REF.: 93 1 168**
**OUR REF.: UL 25043EP.K2 L/em**

Confirmation

**5. Januar 1996**

---

**Dear Mr. Maxwell:**

This is to inform you of the receipt of the supplementary European search report in respect of the above-identified patent application. According to Art. 157(2) EPC, a supplementary European search report has to be drawn up in respect of all international applications. As you may gather from the European search report, the Examiner cites one reference, copy of which is enclosed. The Search Examiner considers this document as being "particularly relevant" concerning Applicant's claims 1 and 8 to 14 indicated by the letter X, but merely as "technological background" concerning Applicant's claims 4 to 6 and 15 to 30 indicated by category A. As you may also gather from the search report, claim 30 is cited twice, one time in category X and one time in category A. After reviewing the prior art document we consider the quoting of Applicant's claim 30 in category X as **not** justified. We would like to comment this reference (available in German language only) as follows:

DE 40 19 652 A1 (published on January 2, 1992) describes a method whereby a computer-ID-feature to be arranged in every objective-computer is used to limit the operation of the software to the corresponding objective-computer in order to have an effective protection against unauthorized copying. This method is characterized in that a computer or processor is provided with an individual, undestroyable and unchangeable

computer-ID-feature, such as a type code, serial number, date of production, etc., which may be read via software. Firstly, this computer-ID-feature may be supplemented with a software-license-number and, furthermore, the computer-ID-software-feature supplemented with the software-license-number may be supplemented with a complement, such that a general software-based password results.

The technical and organizational handling is disclosed in column 3, lines 39 to 51 of this reference: "In buying a software-product, the buyer gets the corresponding master disks together with a software-recording-number (SRN). In a first step, the buyer installs the software by means of a setup-disk (setup-programme). After the input of all parameters, a computer-ID-feature (RID) is solved and outputted on the printer/screen. The buyer communicates the RID and the software-recording-number (SRN) to the software-producer and receives an individual computer-password (RP). After inputting this RP, it is stored in both configuration files or in a special password file."

A basic requirement is, thereby, a hardware-ID-means which is not yet available in conventional computers or microprocessors and which should be, according to the reference cited, integrated in a ROM or PROM in order to be unchangeable.

According to Applicant's claim 1 for which the reference is quoted category X, Applicant's invention requires a remote licensee unique ID generator for generating a registration number independently from a local licensee unique ID generator. Only if the registration numbers from both local and remote licensee unique ID generators match, a mode switching means will allow a full operation mode. Thus, such a structure is **not** disclosed in the reference cited, which just discloses that the licensee gets a special password, the so-called complement, from the producer of the software. Therefore, there exists **no** reference to a special remote registration station including a remote licensee unique ID generator. Thus, in our opinion, the reference **fails** to fully disclose the subject-matter of the present invention as defined in claim 1, such that we consider this reference as **not** relevant.

Furthermore, the reference cited is quoted category X concerning Applicant's claims 8 to 14. But Applicant's claims 8 to 12 concern a specification of a registration system according to Applicant's claim 1 providing a platform unique ID generator comprising part of digital data necessary to run the software in a fully enabled mode in a subsequent execution. There exist **no** passages in the reference that indicate a structure such as this, such that we consider the reference as **not** relevant concerning Applicant's claims 8 to 12.

However, Applicant's claims 13 and 14 disclose a security routine or registration means attachable to software to be protected, said registration means generating a security key by registration number algorithm. Likewise, the reference discloses in column 3, lines 32 to 36, that "the software is, by means of a checking-routine, able to effectively check the authorization of the software-utilization before the execution of the actual user-programme and is able to prevent execution, if necessary", which seems to anticipate Applicant's claims 13 and 14, such that we consider the reference as **relevant** concerning Applicant's claims 13 and 14.

Furthermore, the reference cited is quoted category A concerning Applicant's claims 4 to 6 and 15 to 30. As the reference does not provide a mode switching means switching software into fully enabled mode, if an enabling key has matched identically with the registration key provided from a remote registration station or a digital data incorporating registration code with the digital data executable on a platform so as to switch the digital data between a demonstration mode and a use mode etc., we agree with the Examiner to consider this reference as **not** relevant concerning Applicant's claims 4 to 6 and 15 to 30.

Thus, in our opinion, the application should be allowable as European patent, as Applicant's claims 1 and 8 to 12 are **not** anticipated by the reference cited, due to the above-mentioned reasons. Concerning Applicant's claims 13 and 14 which seem to be anticipated, we suggest to await the Examiner's statement in a first Office Action and to make the necessary amendments, if required.

Furthermore, we enclose two EPO Communications dated November 22 and November 24, 1995, informing of the publication number 0 689 697 and requesting us to indicate within two months of notification, whether Applicant desires to proceed further. Since the International **and** the enclosed supplementary European search report are rather favourable, we **will file** an appropriate request in due time, if we do not receive your instruction to the contrary until

**January 22, 1996.**

If there are any questions left, please do not hesitate to contact us. Enclosed please find our debit note for the services rendered.

Encl.:
Supplementary European Search Report
1 Reference (by advance fax)
2 EPO Communications
Debit Note

Yours very truly,

KAHLER, KÄCK, FIENER & STURM

Josef Fiener

Josef Fiener

P.B.5818 - Patentlaan 2
2280 HV Rijswijk (ZH)
☎ (070) 3 40 20 40
TX 31651 epo nl
FAX (070) 3 40 30 16

| Europäisches Patentamt | European Patent Office | Office européen des brevets |
|---|---|---|
| Zweigstelle in Den Haag Recherchen-abteilung | Branch at The Hague Search division | Département à La Haye Division de la recherche |

Fiener, Josef
Patentanwälte Kahler, Käck, Fiener & Sturm
P.O. Box 12 49
D-87712 Mindelheim
ALLEMAGNE

EINGANG/RECEIPT
31. OKT. 1995
KAHLER, KÄCK, FIENER & STURM

30.11.95 BERI.

Datum/Date 27.10.95

| Zeichen/Ref./Réf. | Anmeldung Nr./Application No./Demande n°./Patent Nr./Patent No./Brevet n°. |
|---|---|
| UL 25043EP.e0 F | 93920609.0 - - |
| Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire: UNILOC (SINGAPORE) PRIVATE LIMITED | |

# COMMUNICATION

The European Patent Office herewith transmits

- ☐ the European search report
- ☐ the declaration under Rule 45 EPC
- ☐ the partial European search report under Rule 45 EPC
- ☒ the supplementary European search report concerning the international application under Article 157(2) EPC

relating to the above-mentioned European patent application. Copies of the documents cited in the search report are enclosed.

The following specifications given by the applicant have been approved by the Search Division :

☐ Abstract ☐ Title ☐ Figure

- ☐ The abstract was modified by the Search Division and the definitive text is attached to this communication.
- ☐ The following figure will be published with the abstract, since the Search Division considers that it better characterises the invention than the one indicated by the applicant.

Figure:

- ☐ Additional copy(copies) of the documents cited in the European search report.

EUROPÄISCHES PATENTAMT DEN HAAG - EUROPEAN PATENT OFFICE THE HAGUE - OFFICE EUROPÉEN DES BREVETS LA HAYE

## REFUND OF THE SEARCH FEE

If applicable under Article 10 Rules relating to fees, a separate communication from the Receiving Section on the refund of the search fee will be sent later.

European Patent Office

# SUPPLEMENTARY EUROPEAN SEARCH REPORT

Application Number
EP 93 92 0609

## DOCUMENTS CONSIDERED TO BE RELEVANT

| Category | Citation of document with indication, where appropriate, of relevant passages | Relevant to claim | CLASSIFICATION OF THE APPLICATION (Int.Cl.5) |
|---|---|---|---|
| X | DE-A-40 19 652 (KUHN ALOIS) 2 January 1992 | 1,8-14, 30 | G06F15/21<br>G06F9/44<br>G06F1/00 |
| A | * abstract; claims * | 4-6, 15-30 | |
| | ----- | | |

TECHNICAL FIELDS SEARCHED (Int.Cl.5)
G06F

The supplementary search report has been drawn up for the claims attached hereto.

1

| Place of search | Date of completion of the search | Examiner |
|---|---|---|
| THE HAGUE | 17 October 1995 | Fournier, C |

CATEGORY OF CITED DOCUMENTS

X : particularly relevant if taken alone
Y : particularly relevant if combined with another document of the same category
A : technological background
O : non-written disclosure
P : intermediate document

T : theory or principle underlying the invention
E : earlier patent document, but published on, or after the filing date
D : document cited in the application
L : document cited for other reasons

& : member of the same patent family, corresponding document

EPO FORM 1503 03.82 (P04C06)

# ANNEX TO THE EUROPEAN SEARCH REPORT ON EUROPEAN PATENT APPLICATION NO. EP 93 92 0609

This annex lists the patent family members relating to the patent documents cited in the above-mentioned European search report.
The members are as contained in the European Patent Office EDP file on
The European Patent Office is in no way liable for these particulars which are merely given for the purpose of information.

17-10-1995

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
|---|---|---|---|
| DE-A-4019652 | 02-01-92 | NONE | |

EPO FORM P0459

For more details about this annex : see Official Journal of the European Patent Office, No. 12/82

(19) BUNDESREPUBLIK DEUTSCHLAND

DEUTSCHES PATENTAMT

(12) **Offenlegungsschrift**

(10) **DE 40 19 652 A1**

(51) Int. Cl.[5]: **G 06 F 12/14**

G06F1/00N7R2

(21) Aktenzeichen: P 40 19 652.6
(22) Anmeldetag: 20. 6. 90
(43) Offenlegungstag: 2. 1. 92

DE 40 19 652 A1

(71) Anmelder:
Kuhn, Alois, 8939 Waal, DE

(74) Vertreter:
Herrmann-Trentepohl, W., Dipl.-Ing., 4690 Herne; Kirschner, K., Dipl.-Phys.; Grosse, W., Dipl.-Ing.; Bockhorni, J., Dipl.-Ing., Pat.-Anwälte, 8000 München

(72) Erfinder:
gleich Anmelder

(56) Für die Beurteilung der Patentfähigkeit in Betracht zu ziehende Druckschriften:

| | |
|---|---|
| US | 46 85 055 |
| EP | 03 02 710 A2 |
| EP | 01 19 886 A1 |
| EP | 01 05 242 A2 |

DE-Z: ZELTWANGER, Holger: Kopierschutz für Programme und Zugangsschutz für Daten. In: Elektronik 17/22.8.1986, S.48-51;
- US-Z: IBM Technical Disclosure Bulletin, Vol.32, No.6A, November 1989, S.264;

DOC

(54) Verfahren zum Schutz von Software gegen unzulässiges Kopieren

(57) Zum wirksamen Schutz von Software gegen unzulässiges Kopieren wird softwareseitig ein in jedem Zielrechner anzuordnendes Rechner-Identifikations-Merkmal zur Begrenzung der Lauffähigkeit der Software auf dem jeweiligen Zielrechner genutzt. Dabei kann das Rechner-Identifikations-Merkmal mit einer Software-Lizenznummer ergänzt werden. Das um die Software-Lizenznummer ergänzte Rechner-Identifikations-Merkmal kann weiterhin mit einem Komplement komplettiert werden, so daß sich stets ein generelles softwareseitiges Paßwort ergibt.

DE 40 19 652 A1

UNILOC 990

## Beschreibung

Die Erfindung betrifft ein Verfahren zum Schutz von Software gegen unzulässiges Kopieren, wenn die Software in einem entsprechenden Computer installiert ist.

Das unzulässige Kopieren von auf einem Computer installierter Software, sogenannter Originalsoftware, wird Raubkopieren genannt. Unter Raubkopieren lassen sich die unterschiedlichsten Formen der sogenannten Computer-Kriminalität zusammenfassen. Darunter fällt beispielsweise das Kopieren von Originalsoftware und Weiterverkauf auf eigene Rechnung, der Einsatz einer mit Einzellizenz erworbenen Originalsoftware auf gleichzeitig mehreren Anlagen oder das unberechtigte Kopieren von Software von Mitarbeiter und der Einsatz auf privaten Anlagen. Insgesamt sind die Erscheinungsformen des Raubkopierens unüberschaubar.

Lt. Schätzung der VSI (Vereinigung zur Förderung der Deutschen Software-Industrie) entsteht der Software-Industrie durch Raubkopieren ein Umsatzschaden von jährlich mindestens 500 Mill. DM.

Nach herrschender Meinung ist für jeden Rechner ein Originalprogramm oder eine Mehrfachlizenz für alle Computer eines Betriebes bzw. Netzes zu beziehen.

Die bisher bekannten Verfahren zum Schutz vor Raubkopieren sind zum Teil reine softwareseitige Kopierschutzmaßnahmen, die durch entsprechende Kopierprogramme übergangen werden können.

Weiterhin werden in großer Zahl kombinierte Hardware/Software-Kopierschutzmaßnahmen ergriffen. Beispielsweise ist es bekannt, auf einer Originaldiskette eine versteckte Fehlerspur anzuordnen, die bei normalem Kopieren nicht mit übertragen wird. Es wird dadurch eine sogenannte Systemdiskette gebildet, die jeweils beim Start des Programmes eingelegt werden muß.

Eine andere Art des Softwareschutzes liegt in der Festlegung und Abfragung eines Paßwortes.

Weiterhin ist eine Möglichkeit bekannt, bei der mit der Software ein sogenanntes Hardlock, also ein hardwareseitiges Schloß, mitgeliefert wird. Dieses wird an einer entsprechenden Schnittstelle des Computers angeordnet und enthält einen Speicher- oder Prozessorbaustein. Entweder wird dem Speicherbaustein eine entsprechende Kombination durch die Software entnommen oder es wird mittels eines besonderen Algorithmusses eine eingegebene Zahlenkombination modifiziert und durch die Software wieder abgefragt. Damit kann die Originalsoftware jeweils erkennen, ob der Rechner, auf dem sie gestapelt wurde, für ihren Ablauf legitimiert ist.

Alle genannten Maßnahmen haben den Nachteil gemeinsam, daß sie umgangen werden können. Weiterhin sind sie im einzelnen nicht zur Vermeidung aller Erscheinungsformen des Raubkopierens geeignet.

So kann ein Paßwortschutz nicht verhindern, daß die gleiche Software auf beliebig vielen Rechner installiert und betrieben wird, sofern der Nutzer das Paßwort kennt. Mitarbeiter eines Betriebes können somit ohne weiteres die im Dienst zur Verfügung gestellte Software auch zu Hause betreiben.

Das Anordnen von Fehlerspuren auf Originaldisketten hat sich als unsinnig erwiesen, da inzwischen gute Kopierprogramme diese Fehlerspur identisch mitübertragen.

Der Einsatz von sogenannten Hardlocks ist ebenfalls umgehbar, indem entweder durch eine entsprechende Software die Existenz des Hardlocks simuliert oder einfach das Hardlock durch Auslesen und Nachbau kopiert wird.

Weiterhin haben die bekannten Maßnahmen den Nachteil gemeinsam, daß sie auf die Software bezogen sind. Eine andere Software macht eine andere Maßnahme erforderlich.

Unter Berücksichtigung bestimmter Randbedingungen besteht also seitens der softwareproduzierenden Industrie Bedarf nach einem echten Softwareschutz für ihre Originalsoftware.

Eine Randbedingung ist dabei, daß der rechtmäßige Benutzer jederzeit die Möglichkeit haben muß, beliebig viele Sicherheitskopien seiner Originalsoftware zu erstellen. Weiterhin muß die Verwendung dieser Software auf mehreren Betriebs- oder Netzrechnern möglich sein. Möglicher organisatorischer oder verwaltungsseitiger Aufwand muß auf ein vertretbares Maß reduziert sein.

Unter Berücksichtigung der Randbedingung liegt der Erfindung die Aufgabe zugrunde, ein Verfahren zum Schutz von Software gegen Raubkopieren anzugeben, bei welchem gewährleistet ist, daß die Software nicht unberechtigterweise auf einem anderen als dem vom Software-Hersteller lizensierten Rechner ablaufen kann.

Diese Aufgabe wird durch die kennzeichnende Merkmale des Patentanspruches 1 gelöst. Vorteilhafte Ausgestaltungen der Erfindung sind in den Unteransprüchen gekennzeichnet.

Dabei ist nach Maßgabe der Erfindung vorgesehen, durch Anordnen und Nutzen eines speziellen Paßwortverfahrens mit einem hardwareseitig erzeugtem Rechneridentifikations-Merkmal (RID), gleichsam einem Fingerabdruck des Rechners, die Lauffähigkeit von Software auf jedem individuellen Zielrechner zu begrenzen.

Der Lösungsvorschlag erfüllt alle in der Zielvorstellung formulierten Bedingungen. Durch Verknüpfung eines Paßwortverfahrens mit einem neu einzurichtenden Rechneridentifikationsmerkmals läßt sich ein nahezu perfekter Sortwareschutz aufbauen.

Die Rechner/Prozessoren können von den Herstellern mit einem individuellen, unzerstörbaren, unveränderbaren Identifikations-Merkmal, das über Software gelesen werden kann, ausgestattet weden. Bei diesem könnte es sich z. B. um eine mehrstellige Kombination aus Hersteller, Rechnertyp, -serie, Herstellungsdatum und laufende Nummer handeln. Sie sollte jeden produzierten Rechner eindeutig, gleich einem Fingerabdruck, identifizieren.

In Verbindung mit dieser RID kann der Software-Hersteller einen rechnerindividuellen Paßwortschutz aufbauen. Die Abarbeitung eines Programmes kann von der Eingabe eines rechnerindivuellen, vom Softwarehersteller ausgegebenen und registrierten Paßwortes abhängig gemacht werden.

Im folgenden wird die Erfindung anhand von Beispielen und Ausführungsvorschlägen sowie der Beschreibung eines möglichen organisatorischen Ablaufs erläutert.

Gemäß einem Ausführungsbeispiel kann die RID und eine Software-Lizenz-Nr. vom Softwarehersteller durch ein registriertes Rechnerpaßwort zu einem generellen Softwarepaßwort komplementiert werden.

Bei diesem Paßwortverfahren wird die mit jeder Originalsoftware ausgelieferten Softwareregistrier-Nr. (SRN) mit dem RID durch ein rechnerindividuelles Paßwort (RP) zu einem generellen Softwarepaßwort kom-

plementiert. Bei den genannten Paßwörtern sollte es sich um mehrstellige, verschlüsselte Wertekombinationen handeln, um das Erkennen von Strukturen und Gesetzmäßigkeiten soweit wie möglich zu erschweren.

Beispiel:

Software-Register-Nr. (SRN)
+ Rechneridentifikations-Merkmal
+ Rechnerindividuelles Paßwort (RP) → Komplement
= Generelles Softwarepaßwort

Das generelle Softwarepaßwort wäre somit das Schlüsselwort, durch das der Zugang zur Software eröffnet wird.

Bei dem genannten Ausführungsbeispiel handelt es sich um ein sehr stark vereinfachtes Anschauungsmodell, das von jedem Softwarehersteller beliebig erweiterbar und variierbar ist. Das generelle Softwarepaßwort kann beispielsweise, um das Erscheinungsmuster unterschiedlich zu halten, mit variablen Daten, wie Datum, Seriennummern und verschiedenen Algorithmen verschleiert werden.

Wesentlich ist bei diesem Verfahren:
Ein eindeutiges Rechneridentifikationsmerkmal, das einem rechnerindividuellen "Fingerabdruck" gleicht und hardwareseitig erzeugt wird, wird mit einem Rechnerpaßwort nach den Vorstellungen des Softwareherstellers kombiniert. Durch dieses Rechnerpaßwort kann die Lauffähigkeit von Software auf jeden einzelnen Rechner begrenzt werden. Softwarekopien wären nur noch auf dem registrierten Rechner einsetzbar.

Die Software wäre nun selbst in der Lage, vor Ausführen der eigentlichen Anwenderfunktionen die Berechtigung der Softwarebenutzung durch eine Prüfroutine wirksam zu kontrollieren und gegebenenfalls die Ausführung zu unterbinden.

Bei diesem Ausführungsbeispiel gestaltet sich die technische und organisatorische Handhabung beispielsweise wie folgt: Beim Kauf eines Software-Paketes erhält der Käufer die entsprechenden Originaldisketten mit der Angabe der Software-Registrier-Nr. (SRN). Als erster Schritt installiert der Käufer die Software mit der Installationsdiskette (SETUP-Programm). Dieses löst nach Eingabe aller Parameter das Rechner-Identifikationsmerkmal (RID) und gibt es auf den Drucker/Bildschirm aus. Der Käufer teilt dem Softwarehersteller die RID und die Software-Registrier-Nr. (SRN) mit und erhält von diesem das rechnerindividuelle Paßwort (RP) zugeteilt. Nach Eingabe dieses RP wird dieses beiden Konfigurationsdaten oder in einer speziellen Paßwortdatei gespeichert. Damit erhält dieser Rechner eine überprüfbare Nutzungsberechtigung, die erst wieder bei einer Neuinstallation durch Eingabe des RP erneuert werden müßte.

Die Originalsoftware kann zu Sicherungszwecken beliebig oft kopiert werden, kann jedoch ohne RP auf keinem anderen Rechner eingesetzt werden.

Bei Mehrfachlizenzen ist der geschilderte Vorgang für jeden Rechner zu wiederholen. Bei Netzwerklizenzen sind entsprechend alle RP von allen Netzteilnehmern abzuspeichern.

Voraussetzung ist dabei eine hardwareseitige Rechneridentifikations-Einrichtung (RIE). Bei dieser Rechner-Identifikations-Einrichtung handelt es sich um ein hardwareseitig installiertes rechnerindividuelles Merkmal — gleich einem Fingerabdruck — das unveränderbar, nicht überlagerbar und eindeutig jeden Rechner zu einem unverwechselbaren "Individuum" macht. Dieses Identifikationsmerkmal muß über Programmbefehl lesbar sein und darf nur über eine Konstante ausgegeben werden.

Das Rechner-Identifikationsmerkmal (RID) könnte ein mehrstelliger Wert mit folgendem beispielhaftem Aufbau sein.
Herstellername; -code; -kürzel
Rechnertyp;
Seriennummer;
Herstellungsdatum;
Laufende Nummer.

Daß der Rechner selbst diese Funktion integriert hat, kann natürlich erst mit neuen Herstellungsbatches realisiert werden. Dieses Verfahren könnte somit erst in Jahreszeiträumen zum Einsatz kommen. Dieses Rechner-Identifikations-Merkmal sollte in einem ROM oder PROM abgelegt sein, also nicht mehr veränderbar sein und über eine Programmanfrage als Konstante ausgegeben werden.

Zur Zeit kann nur eine externe oder zusätzliche Einheit vorgesehen werden. Dieses Verfahren kann schon mit der Auslieferung einer neuen Software-Version realisiert werden. Die neue Software-Version kann das Vorhandensein einer Ein-/Ausgabe(E/A)-Einheit RIE als Hardwarestecker an einer Schnittstelle oder als E/A-Einheit in einem freien Steckplatz erzwingen. Diese Zusatzeinrichtung würde sozusagen als "Pseudoeingabegerät" die RID liefern.

Die Rechner-Identifikations-Einrichtungen (RIE) können zudem nach Änderung der Kommunikations-Software (Protokolle) für mehr Netzsicherheit sorgen. Unerwünschte, unberechtigte Eindringlinge könnten somit sicher identifiziert und abgewiesen werden.

## Patentansprüche

1. Verfahren zum Schutz vom Software gegen unzulässiges Kopieren, **dadurch gekennzeichnet**, daß softwareseitig ein in jedem Zielrechner anzuordnendes Rechner-Identifikations-Merkmal zur Begrenzung der Lauffähigkeit der Software auf jedem individuellen Zielrechner abgefragt und genutzt wird.

2. Verfahren nach Anspruch 1, dadurch gekennzeichnet, daß ein unzerstörbar und unveränderbar in der Rechnerhardware angeordnetes Rechner-Identifikations-Merkmal genutzt wird.

3. Verfahren nach wenigstens einem der Ansprüche 1 oder 2, dadurch gekennzeichnet, daß das Rechner-Identifikations-Merkmal mit einer Software-Lizenznummer ergänzt wird.

4. Verfahren nach Anspruch 3, dadurch gekennzeichnet, daß das um die Softlizenznummer ergänzte Rechner-Identifikations-Merkmal softwareseitig mit einem Komplement ergänzt wird, so daß sich ein softwareseitig feststehendes generelles Paßwort ergibt.

5. Verfahren nach einem der vorhergehenden Ansprüche, dadurch gekennzeichnet, daß softwareseitig vor Ausführen der eigentlichen Anwenderfunktionen die Berechtigung der Softwarebenutzung kontrolliert wird.

CORPORATE TRANSLATIONS

# CERTIFICATE OF TRANSLATION

**Date:** ***Tuesday, April 05, 2005***

**Client:** ***Fish & Richardson P.C.***
***225 Franklin St.***
***Boston, MA 02110***

**Document:** **Patent Application Open to Public Inspection_** DE4019652A1

Corporate Translations Inc., hereby certifies that to the best of our knowledge and experience, has made an accurate and complete translation from ***German*** into ***English*** of the document(s) referenced above. The project has been adeptly managed through the three-phase quality process by three different experts: the translator, editor and proofreader. The translation team was specifically selected for their expertise in the subject matter to insure an accurate translation.

All necessary information including qualifications and expertise for the translation teams is on file at Corporate Translations Inc.

Certified by: ______________________
Toni Andrews
Production Manager

Corporate Translations, Inc. Reference Number: 4729

**CORPORATE TRANSLATIONS Inc.** Projects@corporatetranslations.com
1300 Aviation Blvd. Redondo Beach CA 90278 ☎ 310-376-1400 310-376-1394

19) FEDERAL REPUBLIC OF GERMANY

GERMAN PATENT OFFICE

12) **Patent Application Open to Public Inspection**

10) **DE 40 19 652 A 1**

51) Int. Cl.[5]: G 06 F 12/14

G 06F1/00N7R2

21) Application number: P 40 19 652.6
22) Filing date: 6-20-90
43) Date of publication: 1-2-92

DE 40 19 652 A1

71) Applicant:
Kuhn, Alois, 8939 Waal, DE

74) Agent:
Herrmann-Trentepohl, W., Dipl.-Ing. (Graduate in Engineering), 4690 Herne; Kirschner, K., Dipl.-Phys. (Graduate in Physics); Grosse, W., Dipl.-Ing.; Bockhorni, J., Dipl.-Ing., Patent Attorneys, 8000 Munich

72) Inventor:
same as applicant

58) The following documents should be considered when evaluating patentability:

US 46 85 055
EP 03 02 710 A2
EP 01 19 886 A1
EP 01 05 242 A2

DE-Z: ZELTWANGER, Holger: Copy protection for programs and access protection for data. In: Electronik 17/8-22-1986, pages 48-51;
- US-Z: IBM Technical Disclosure Bulletin, Vol. 32, No. 6A, November 1989, page 264;

DOC

54) Procedure to protect software against unauthorized copying

57) In order to effectively protect software against unauthorized copying, an assigned computer identification attribute will be used in the software that is installed in each target computer in order to limit executability of the software to the respective target computer. At the same time, the computer identification attribute can be supplemented with a software license number. In addition, the computer identification attribute with a software license number can be further supplemented with a complement in order to generate a general password for the software.

DE 40 19 652 A1

DE 40 19 652 A1

1

Description

The invention concerns a process to protect software against unauthorized copying when the software is installed in a corresponding computer.

The unauthorized copying of software that is installed on a computer, the so-called original software, is known as software pirating. The different forms of so-called computer crime can be summarized under the heading of pirate copying. This includes for example, copying of original software and reselling it for a profit, the simultaneous use of original software on several machines with the purchase of a single license or the unauthorized copying of software from coworkers and subsequent use on home computers. All together, there are a vast number of possible manifestations of pirate copying.

According to estimates from the VSI (Association of the German Software Industry), the software industry loses at least 500 million DM in sales every year due to pirate copying.

The prevailing opinion is that one original program or a multiple license should be purchased for each computer in a company and/or network.

Prior established procedures to protect against pirated copies have included copy protection measures that are partially software-based and that can be bypassed using the corresponding copy programs.

In addition, large numbers of combined hardware/software copy protection measures have been implemented. For example, a known practice is to install hidden defective tracks on an original disk that will not be transferred during normal copying. In this manner, a so-called system diskette is created that must be inserted each time the program is started.

Another type of software protection is to establish and request a password.

In addition, there is a known method wherein a so-called hardlock, or a hardware-based lock, is delivered along with the software. This is attached to a corresponding interface and contains a memory or processor component. Either the corresponding combination is extracted from the memory component by means of software or an entered number combination is modified by means of a special algorithm and then requested by the software. In this manner, the original software can always recognize whether the computer in which it is stored is authorized to run the software.

The common disadvantage of all of these methods is that they can be circumvented. In addition, in some cases they are not suitable to prevent all possible eventualities of pirated copies.

For example, password protection cannot prevent the same software from being installed and operated on any number of computers if the user knows the password. Thus, coworkers at a company can easily take the software that is made available to them at work and use it at home.

UNILOC 991a

The installation of defective tracks on original diskettes has proven ineffective because good copy programs are now capable of identically transferring this defective track.

The use of the so-called hardlock is also circumventable by either simulating the existence of the hardlock via software or simply copying the hardlock through reading and reproduction.

In addition, the known methods have the same disadvantage in that they are software-based. Different software requires the use of a different method.

Because of certain constraints, the software production industry also needs true software protection for their original software.

One constraint is that the authorized user must always have the ability to produce as many back-up copies of their original software as needed. In addition, it must be possible to use the software on several company or network computers. Possible organizational or administrative-based uses must be reduced to a reasonable level.

Considering these constraints, the purpose of this invention is to specify a procedure to protect software against pirating wherein it is guaranteed that the software cannot be executed without authorization on any computer other than the computer licensed by the software manufacturer.

This task is solved by the characteristic attribute of claim 1. Advantageous embodiments of the invention are characterized in the dependant claims.

According to the invention, the executability of software will be limited to each individual target computer by installing and using a special password procedure with a hardware-generated computer identification attribute (CIA) - a virtual computer fingerprint.

The proposed solution meets all of the conditions established in the objective. Combining a password procedure with a newly established computer identification attribute will result in near perfect software protection.

Manufacturers can equip computers/processors with an individual, indestructible and unchangeable identification attribute that can be read by means of software. In this manner, for example, multiple combinations of manufacturers, computer types, computer series, manufacture dates and serial numbers can be processed. They should then unequivocally identify each manufactured computer just like a fingerprint.

In conjunction with the computer identification attribute (CIA), the software manufacturer can create computer-specific password protection. The execution of a program can be rendered dependent on inputting a password that is provided and registered by the software manufacturer.

The following paragraphs will illustrate the invention using examples and possible embodiments as well as the description of a possible organizational procedure.

According to one embodiment, the computer identification and a software license number from the software manufacturer can be complemented with a registered computer password in order to obtain a general software password.

UNILOC 991b

With this password procedure, the software registration number (SRN) that is delivered with each original software package is supplemented with a computer identification attribute (CIA) by means of a computer-specific password (CP), resulting in a general software password. The so-called passwords should be multi-encrypted value combinations in order to complicate the recognition of structures and patterns as much as possible.

Example:

Software Registration number (SRN)
+ Computer Identification Attribute
<u>+ Individual Computer Password (CP) → Complement</u>
= General Software Password

Thus, the general software password would be the keyword that opens access to the software.

The above-mentioned example of an embodiment of the invention involves a highly simplified display model that can be expanded and varied at the discretion of any software manufacturer. For example, the general software password can be concealed with variable data such as dates, serial numbers and different algorithms in order to vary the pattern of occurrence.

Essentially, this process provides:

An unambiguous computer identification attribute that is similar to an individual computer "fingerprint" and that is produced by means of hardware combined with a computer password according to the vision of the software manufacturer. With this computer password, the executability of the software can be limited to each individual computer. Software copies can then only be used on the registered computer.

Before executing its user functions, the software would use a check routine to effectively control authorization to use the software and if needed, to prevent the execution of said software.

The technical and organizational application of this example of an embodiment of the invention is carried out as follows: Along with the purchase of a software package, the purchaser receives the corresponding original diskettes indicating the software registration number (SRN). For the first step, the purchaser installs the software with the installation diskette (SET-UP program). After entering all the parameters, this program creates the computer identification attribute (CIA) and displays it on the screen or printer. The purchaser supplies the software manufacturer with the CIA and the software registration number (SRN) and receives the individual computer password (CP) from the manufacturer. After entering this CP, both of these configuration data units will be stored in a special password file. In this manner, this computer receives verifiable user authorization that does not need to be renewed until the product is re-installed at which time the CP must be re-entered.

The original software can be copied as often as needed for back-up purposes. However, without the CP, it cannot be used on any other computer.

UNILOC 992a

For multiple use licenses, protected access for each computer is repeated. For network licenses, all of the CPs for all network members are stored accordingly.

For this purpose, a hardware-based computer identification device (CID) is required. This computer identification device involves an installed hardware-based individual computer attribute, similar to a fingerprint, transforming each computer into a distinct "individual". This identification attribute must be readable over program errors and must only be issued over a constant.

The computer identification attribute (CIA) can be a multiple value with the following configuration:

Manufacturer's name, code or abbreviation
Computer type;
Series number;
Manufacture date;
Serial number.

Of course, since this function is integrated into the computer, it can only be carried out with newly manufactured batches. This procedure cannot be applied until the start of the annual period. This computer identification attribute should be stored on a ROM or PROM so that it can no longer be changed and be distributed as a constant by means of a program query.

At this time, only an external or additional unit can be envisioned. This procedure can also be carried out with the delivery of a new software version. The new software version can force the existence of an input/output (I/O) unit (IOU) as a hardware connection to an interface or as an I/O unit in a free slot. This additional device would deliver the CIA as a "Pseudo Input Device".

The computer identification device (CID) can also provide increased network security by changing the communications software (protocols). Undesired and unauthorized intruders can be immediately identified and rejected.

Patent Claims

1. Procedure to protect software against unauthorized copying, characterized in that a computer identification attribute will be requested and used in the software installed on each target computer in order to limit executability of the software to each individual target computer.
2. Procedure according to claim 1, characterized in that an indestructible and unchangeable computer identification attribute is used in the computer hardware.
3. Procedure according to at least one of claims 1 and 2, characterized in that the computer identification attribute is supplemented with a software license number.
4. Procedure according to claim 3, characterized in that the computer identification attribute that is supplemented with the software license number is supplemented with a complement generated by the software, resulting in a fixed general password.
5. Procedure according to one of the preceding claims, characterized in that the software controls authorization to use the software before individual user functions can be executed.

UNILOC 992b

(19) BUNDESREPUBLIK DEUTSCHLAND

DEUTSCHES PATENTAMT

(12) **Offenlegungsschrift**

(10) **DE 40 19 652 A 1**

(51) Int. Cl.5: **G 06 F 12/14**

G06F1/00N7R2

(21) Aktenzeichen: P 40 19 652.6
(22) Anmeldetag: 20. 6. 90
(43) Offenlegungstag: 2. 1. 92

DE 40 19 652 A 1

(71) Anmelder:
Kuhn, Alois, 8939 Waal, DE

(74) Vertreter:
Herrmann-Trentepohl, W., Dipl.-Ing., 4690 Herne; Kirschner, K., Dipl.-Phys.; Grosse, W., Dipl.-Ing.; Bockhorni, J., Dipl.-Ing., Pat.-Anwälte, 8000 München

(72) Erfinder:
gleich Anmelder

(56) Für die Beurteilung der Patentfähigkeit in Betracht zu ziehende Druckschriften:

US 46 85 055
EP 03 02 710 A2
EP 01 19 886 A1
EP 01 05 242 A2
DE-Z: ZELTWANGER, Holger: Kopierschutz für Programme und Zugangsschutz für Daten. In: Elektronik 17/22.8.1986, S.48-51;
- US-Z: IBM Technical Disclosure Bulletin, Vol.32, No.6A, November 1989, S.264;

DOC

# (54) Verfahren zum Schutz von Software gegen unzulässiges Kopieren

(57) Zum wirksamen Schutz von Software gegen unzulässiges Kopieren wird softwareseitig ein in jedem Zielrechner anzuordnendes Rechner-Identifikations-Merkmal zur Begrenzung der Lauffähigkeit der Software auf dem jeweiligen Zielrechner genutzt. Dabei kann das Rechner-Identifikations-Merkmal mit einer Software-Lizenznummer ergänzt werden. Das um die Software-Lizenznummer ergänzte Rechner-Identifikations-Merkmal kann weiterhin mit einem Komplement komplettiert werden, so daß sich stets ein generelles softwareseitiges Paßwort ergibt.

DE 40 19 652 A 1

UNILOC 990

Beschreibung

Die Erfindung betrifft ein Verfahren zum Schutz von Software gegen unzulässiges Kopieren, wenn die Software in einem entsprechenden Computer installiert ist.

Das unzulässige Kopieren von auf einem Computer installierter Software, sogenannter Originalsoftware, wird Raubkopieren genannt. Unter Raubkopieren lassen sich die unterschiedlichsten Formen der sogenannten Computer-Kriminalität zusammenfassen. Darunter fällt beispielsweise das Kopieren von Originalsoftware und Weiterverkauf auf eigene Rechnung, der Einsatz einer mit Einzellizenz erworbenen Originalsoftware auf gleichzeitig mehreren Anlagen oder das unberechtigte Kopieren von Software von Mitarbeiter und der Einsatz auf privaten Anlagen. Insgesamt sind die Erscheinungsformen des Raubkopierens unüberschaubar.

Lt. Schätzung der VSI (Vereinigung zur Förderung der Deutschen Software-Industrie) entsteht der Software-Industrie durch Raubkopieren ein Umsatzschaden von jährlich mindestens 500 Mill. DM.

Nach herrschender Meinung ist für jeden Rechner ein Originalprogramm oder eine Mehrfachlizenz für alle Computer eines Betriebes bzw. Netzes zu beziehen.

Die bisher bekannten Verfahren zum Schutz vor Raubkopieren sind zum Teil reine softwareseitige Kopierschutzmaßnahmen, die durch entsprechende Kopierprogramme übergangen werden können.

Weiterhin werden in großer Zahl kombinierte Hardware/Software-Kopierschutzmaßnahmen ergriffen. Beispielsweise ist es bekannt, auf einer Originaldiskette eine versteckte Fehlerspur anzuordnen, die bei normalem Kopieren nicht mit übertragen wird. Es wird dadurch eine sogenannte Systemdiskette gebildet, die jeweils beim Start des Programmes eingelegt werden muß.

Eine andere Art des Softwareschutzes liegt in der Festlegung und Abfragung eines Paßwortes.

Weiterhin ist eine Möglichkeit bekannt, bei der mit der Software ein sogenanntes Hardlock, also ein hardwareseitiges Schloß, mitgeliefert wird. Dieses wird an einer entsprechenden Schnittstelle des Computers angeordnet und enthält einen Speicher- oder Prozessorbaustein. Entweder wird dem Speicherbaustein eine entsprechende Kombination durch die Software entnommen oder es wird mittels eines besonderen Algorithmusses eine eingegebene Zahlenkombination modifiziert und durch die Software wieder abgefragt. Damit kann die Originalsoftware jeweils erkennen, ob der Rechner, auf dem sie gestapelt wurde, für ihren Ablauf legitimiert ist.

Alle genannten Maßnahmen haben den Nachteil gemeinsam, daß sie umgangen werden können. Weiterhin sind sie im einzelnen nicht zur Vermeidung aller Erscheinungsformen des Raubkopierens geeignet.

So kann ein Paßwortschutz nicht verhindern, daß die gleiche Software auf beliebig vielen Rechner installiert und betrieben wird, sofern der Nutzer das Paßwort kennt. Mitarbeiter eines Betriebes können somit ohne weiteres die im Dienst zur Verfügung gestellte Software auch zu Hause betreiben.

Das Anordnen von Fehlerspuren auf Originaldisketten hat sich als unsinnig erwiesen, da inzwischen gute Kopierprogramme diese Fehlerspur identisch mitübertragen.

Der Einsatz von sogenannten Hardlocks ist ebenfalls umgehbar, indem entweder durch eine entsprechende Software die Existenz des Hardlocks simuliert oder einfach das Hardlock durch Auslesen und Nachbau kopiert wird.

Weiterhin haben die bekannten Maßnahmen den Nachteil gemeinsam, daß sie auf die Software bezogen sind. Eine andere Software macht eine andere Maßnahme erforderlich.

Unter Berücksichtigung bestimmter Randbedingungen besteht also seitens der softwareproduzierenden Industrie Bedarf nach einem echten Softwareschutz für ihre Originalsoftware.

Eine Randbedingung ist dabei, daß der rechtmäßige Benutzer jederzeit die Möglichkeit haben muß, beliebig viele Sicherheitskopien seiner Originalsoftware zu erstellen. Weiterhin muß die Verwendung dieser Software auf mehreren Betriebs- oder Netzrechnern möglich sein. Möglicher organisatorischer oder verwaltungsseitiger Aufwand muß auf ein vertretbares Maß reduziert sein.

Unter Berücksichtigung der Randbedingung liegt der Erfindung die Aufgabe zugrunde, ein Verfahren zum Schutz von Software gegen Raubkopieren anzugeben, bei welchem gewährleistet ist, daß die Software nicht unberechtigterweise auf einem anderen als dem vom Software-Hersteller lizensierten Rechner ablaufen kann.

Diese Aufgabe wird durch die kennzeichnende Merkmale des Patentanspruches 1 gelöst. Vorteilhafte Ausgestaltungen der Erfindung sind in den Unteransprüchen gekennzeichnet.

Dabei ist nach Maßgabe der Erfindung vorgesehen, durch Anordnen und Nutzen eines speziellen Paßwortverfahrens mit einem hardwareseitig erzeugtem Rechneridentifikations-Merkmal (RID), gleichsam einem Fingerabdruck des Rechners, die Lauffähigkeit von Software auf jedem individuellen Zielrechner zu begrenzen.

Der Lösungsvorschlag erfüllt alle in der Zielvorstellung formulierten Bedingungen. Durch Verknüpfung eines Paßwortverfahrens mit einem neu einzurichtenden Rechneridentifikationsmerkmals läßt sich ein nahezu perfekter Sortwareschutz aufbauen.

Die Rechner/Prozessoren können von den Herstellern mit einem individuellen, unzerstörbaren, unveränderbaren Identifikations-Merkmal, das über Software gelesen werden kann, ausgestattet weden. Bei diesem könnte es sich z. B. um eine mehrstellige Kombination aus Hersteller, Rechnertyp, -serie, Herstellungsdatum und laufende Nummer handeln. Sie sollte jeden produzierten Rechner eindeutig, gleich einem Fingerabdruck, identifizieren.

In Verbindung mit dieser RID kann der Software-Hersteller einen rechnerindividuellen Paßwortschutz aufbauen. Die Abarbeitung eines Programmes kann von der Eingabe eines rechnerindivuellen, vom Softwarehersteller ausgegebenen und registrierten Paßwortes abhängig gemacht werden.

Im folgenden wird die Erfindung anhand von Beispielen und Ausführungsvorschlägen sowie der Beschreibung eines möglichen organisatorischen Ablaufs erläutert.

Gemäß einem Ausführungsbeispiel kann die RID und eine Software-Lizenz-Nr. vom Softwarehersteller durch ein registriertes Rechnerpaßwort zu einem generellen Softwarepaßwort komplementiert werden.

Bei diesem Paßwortverfahren wird die mit jeder Originalsoftware ausgelieferten Softwareregistrier-Nr. (SRN) mit dem RID durch ein rechnerindividuelles Paßwort (RP) zu einem generellen Softwarepaßwort kom-

plementiert. Bei den genannten Paßwörtern sollte es sich um mehrstellige, verschlüsselte Wertekombinationen handeln, um das Erkennen von Strukturen und Gesetzmäßigkeiten soweit wie möglich zu erschweren.

Beispiel:

Software-Register-Nr. (SRN)
+ Rechneridentifikations-Merkmal
+ Rechnerindividuelles Paßwort (RP) → Komplement
= Generelles Softwarepaßwort

Das generelle Softwarepaßwort wäre somit das Schlüsselwort, durch das der Zugang zur Software eröffnet wird.

Bei dem genannten Ausführungsbeispiel handelt es sich um ein sehr stark vereinfachtes Anschauungsmodell, das von jedem Softwarehersteller beliebig erweiterbar und variierbar ist. Das generelle Softwarepaßwort kann beispielsweise, um das Erscheinungsmuster unterschiedlich zu halten, mit variablen Daten, wie Datum, Seriennummern und verschiedenen Algorithmen verschleiert werden.

Wesentlich ist bei diesem Verfahren:
Ein eindeutiges Rechneridentifikationsmerkmal, das einem rechnerindividuellen "Fingerabdruck" gleicht und hardwareseitig erzeugt wird, wird mit einem Rechnerpaßwort nach den Vorstellungen des Softwareherstellers kombiniert. Durch dieses Rechnerpaßwort kann die Lauffähigkeit von Software auf jeden einzelnen Rechner begrenzt werden. Softwarekopien wären nur noch auf dem registrierten Rechner einsetzbar.

Die Software wäre nun selbst in der Lage, vor Ausführen der eigentlichen Anwenderfunktionen die Berechtigung der Softwarebenutzung durch eine Prüfroutine wirksam zu kontrollieren und gegebenenfalls die Ausführung zu unterbinden.

Bei diesem Ausführungsbeispiel gestaltet sich die technische und organisatorische Handhabung beispielsweise wie folgt: Beim Kauf eines Software-Paketes erhält der Käufer die entsprechenden Originaldisketten mit der Angabe der Software-Registrier-Nr. (SRN). Als erster Schritt installiert der Käufer die Software mit der Installationsdiskette (SETUP-Programm). Dieses löst nach Eingabe aller Parameter das Rechner-Identifikationsmerkmal (RID) und gibt es auf den Drucker/Bildschirm aus. Der Käufer teilt dem Softwarehersteller die RID und die Software-Registrier-Nr. (SRN) mit und erhält von diesem das rechnerindividuelle Paßwort (RP) zugeteilt. Nach Eingabe dieses RP wird dieses beiden Konfigurationsdaten oder in einer speziellen Paßwortdatei gespeichert. Damit erhält dieser Rechner eine überprüfbare Nutzungsberechtigung, die erst wieder bei einer Neuinstallation durch Eingabe des RP erneuert werden müßte.

Die Originalsoftware kann zu Sicherungszwecken beliebig oft kopiert werden, kann jedoch ohne RP auf keinem anderen Rechner eingesetzt werden.

Bei Mehrfachlizenzen ist der geschilderte Vorgang für jeden Rechner zu wiederholen. Bei Netzwerklizenzen sind entsprechend alle RP von allen Netzteilnehmern abzuspeichern.

Voraussetzung ist dabei eine hardwareseitige Rechneridentifikations-Einrichtung (RIE). Bei dieser Rechner-Identifikations-Einrichtung handelt es sich um ein hardwareseitig installiertes rechnerindividuelles Merkmal — gleich einem Fingerabdruck — das unveränderbar, nicht überlagerbar und eindeutig jeden Rechner zu einem unverwechselbaren "Individuum" macht. Dieses Identifikationsmerkmal muß über Programmbefehl lesbar sein und darf nur über eine Konstante ausgegeben werden.

Das Rechner-Identifikationsmerkmal (RID) könnte ein mehrstelliger Wert mit folgendem beispielhaftem Aufbau sein.
Herstellername; -code; -kürzel
Rechnertyp;
Seriennummer;
Herstellungsdatum;
Laufende Nummer.

Daß der Rechner selbst diese Funktion integriert hat, kann natürlich erst mit neuen Herstellungsbatches realisiert werden. Dieses Verfahren könnte somit erst in Jahreszeiträumen zum Einsatz kommen. Dieses Rechner-Identifikations-Merkmal sollte in einem ROM oder PROM abgelegt sein, also nicht mehr veränderbar sein und über eine Programmanfrage als Konstante ausgegeben werden.

Zur Zeit kann nur eine externe oder zusätzliche Einheit vorgesehen werden. Dieses Verfahren kann schon mit der Auslieferung einer neuen Software-Version realisiert werden. Die neue Software-Version kann das Vorhandensein einer Ein-/Ausgabe(E/A)-Einheit RIE als Hardwarestecker an einer Schnittstelle oder als E/A-Einheit in einem freien Steckplatz erzwingen. Diese Zusatzeinrichtung würde sozusagen als "Pseudoeingabegerät" die RID liefern.

Die Rechner-Identifikations-Einrichtungen (RIE) können zudem nach Änderung der Kommunikations-Software (Protokolle) für mehr Netzsicherheit sorgen. Unerwünschte, unberechtigte Eindringlinge könnten somit sicher identifiziert und abgewiesen werden.

Patentansprüche

1. Verfahren zum Schutz vom Software gegen unzulässiges Kopieren, **dadurch gekennzeichnet**, daß softwareseitig ein in jedem Zielrechner anzuordnendes Rechner-Identifikations-Merkmal zur Begrenzung der Lauffähigkeit der Software auf jedem individuellen Zielrechner abgefragt und genutzt wird.
2. Verfahren nach Anspruch 1, dadurch gekennzeichnet, daß ein unzerstörbar und unveränderbar in der Rechnerhardware angeordnetes Rechner-Identifikations-Merkmal genutzt wird.
3. Verfahren nach wenigstens einem der Ansprüche 1 oder 2, dadurch gekennzeichnet, daß das Rechner-Identifikations-Merkmal mit einer Software-Lizenznummer ergänzt wird.
4. Verfahren nach Anspruch 3, dadurch gekennzeichnet, daß das um die Softlizenznummer ergänzte Rechner-Identifikations-Merkmal softwareseitig mit einem Komplement ergänzt wird, so daß sich ein softwareseitig feststehendes generelles Paßwort ergibt.
5. Verfahren nach einem der vorhergehenden Ansprüche, dadurch gekennzeichnet, daß softwareseitig vor Ausführen der eigentlichen Anwenderfunktionen die Berechtigung der Softwarebenutzung kontrolliert wird.

24

EPA/EPO/OEB
D-80298 München
☎ (089) 2399-0
TX 523 656 epmu d
FAX (089) 2399-4465

Europäisches Patentamt | European Patent Office | Office européen des brevets

Generaldirektion 2 | Directorate General 2 | Direction Générale 2

Fiener, Josef
Patentanwälte
Kahler, Käck, Fiener et col.,
P.O. Box 12 49
87712 Mindelheim
ALLEMAGNE

**Telephone Numbers:**

**Primary Examiner** (substantive examination) (089) 2399-2667

**Formalities Officer / Assistant** (Formalities and other matters) (089) 2399-2211

| Application No. | Ref. | Date |
|---|---|---|
| 93 920 609.0-2201 | UL 25043EP.eO F | 02.02.99 |

Applicant
UNILOC (SINGAPORE) PRIVATE LIMITED

**Communication pursuant to Article 96(2) and Rule 51(2) EPC**

The examination of the above-identified application has revealed that it does not meet the requirements of the European Patent Convention for the reasons enclosed herewith. If the deficiencies indicated are not rectified the application may be refused pursuant to Article 97(1) EPC.

You are invited to file your observations and insofar as the deficiencies are such as to be rectifiable, to correct the indicated deficiencies within a period

**of 4 months**

from the notification of this communication, this period being computed in accordance with Rules 78(3) and 83(2) and (4) EPC.

Amendments to the description, claims and drawings are to be filed where appropriate within the said period in **three copies** on separate sheets (Rule 36(1) EPC).

**Failure to comply with this invitation in due time will result in the application being deemed to be withdrawn (Article 96(3) EPC).**

EUROPÄISCHES PATENTAMT - EUROPEAN PATENT OFFICE - OFFICE EUROPÉEN DES BREVETS

QUESSON C J
Primary Examiner
for the Examining Division

**EXRE coded**
28.01.99 SL

Enclosure(s): 6 page/s reasons (Form 2906)

**Registered Letter**
EPO Form 2001 10.96CSX

HS21032, 28.01.1999

MS-U 969989

25

| Bescheid/Protokoll (Anlage) | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|
| Datum / Date / Date | Blatt / Sheet / Feuille 1 | Anmelde-Nr.: / Application No.: / Demande n°: 93 920 609.0 |

The examination is being carried out on **the following application documents**:
the application documents as originally filed

------

1. Claims 22-24 and 27-28 are rejected under Art. 52(2) EPC, because they are directed to digital data as such or to media incorporating said digital data. Such subject matter is explicitly excluded from patentability under Art. 52(2) EPC, see the Guidelines, Chapter IV, 2.2, in particular the section "Programs for computers" , which are quoted in the following paragraph. Generally speaking, "a data-processing operation can be implemented either by means of a computer program or by means of special circuits". "With this point in mind, examination in this area should be guided by the following approach: a computer program claimed by itself or as a record on a carrier is not patentable irrespective of its content."

2. **Clarity**
The application does not meet the requirements of Article 84 EPC, because claims 1- 30 are not clear for the following reasons.

2.1. The wording of claim 13 "a security routine or registration means" is obscure, at least because the claim category - method or apparatus ? - is unclear. (cf. Guidelines C-III 3.1 - 3.7a and Rule 29 EPC). The requirements of Article 84 EPC are not met.

2.2. The wordings "licensee unique ID" in claim 1 and "registration key" in claim 19 appear to designate the same feature, contrary to the requirement of Rule 35(13) EPC that the terminology should be consistent.
Similarly, "enabling key" in claim 19 appear to be nothing else than the "remote licensee unique ID" of claim 1, and the features of claim 21, although differently worded, appear to be identical to the "remote licensee unique ID generator" of claim 1 .
Hence the same term should be used throughout the claims to designate the same feature.

2.3. Reference signs in parentheses should be inserted in the claims to increase their intelligibility, Rule 29(7) EPC. This applies to both the preamble and characterising portion (see the Guidelines, C-III, 4.11).

2.4. Claim 30 appears to be redundant with claim 25 and should be deleted.

3. **Prior art**

The following documents (D) are referred to in this communication; the numbering will be adhered to in the rest of the procedure:

D1 : DE-A-4019652

3.1. D1 is considered at present as being closest, and discloses (see in particular col. 2, l. 30 to col. 3, l. 54 and the claims) a protection apparatus against unauthorised use of commercial software, which uses a unique target machine identifier (Rechneridentifications-Merkmal RID) - optionally combined with an individual security code RP - to produce a unique password. The target machine is required to have a unique "fingerprint" RID stored permanently in hardware (e.g. PROM) and accessible to software routines. When a licence is bought to run software on a particular machine, this RID (and optionally the software licence number SRN) is communicated to the software vendor, who supplies a unique access code in return. The unique target machine identifier RID is used (possibly combined with an individual security code RP allocated by the vendor and the software licence number SRN) by the software on the target machine to produce a common internal password (generelles Softwarepaßwort) which enables the software to run.

Hence, the apparatus restricts use of software to designated target machines, without restricting creation of safety backup copies of purchased software.

4. **Novelty and Inventive Step**

4.1. The present application does not meet the requirements of Articles 52(1) and 54(1) and (2) EPC because the subject-matter of claims 1-16,19-21,25-26 and 30 is not new.

A (novelty) comparison between independent claims 1 and 26 on one hand and D1 on the other shows that the (essential) features of claim 1 all have their correspondence in D1 as shown below, where the text of claim 1 is repeated and the corresponding features of D1 are indicated between brackets:

A registration system for licensing execution of digital data in a use mode, said digital data (Software) executable on a platform (Zielrechner), said system including local licensee unique ID generating means (generelles Software Paßwort, see col. 3, l.8-11 and 49-54) and remote licensee unique ID generating means (see col. 2. l. 51-56 and col. 3 l. 39-49), said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means (see "Zugang zur Software eröffnet wird", col. 3, l. 12-14 and 32-36, as well as claim 5).

4.2. It could be objected that
(i) D1 does not explicitly mention matching the local licensee unique ID with the licensee unique ID generated remotely by the licensor, and
(ii) according D1, further information can be used for obtaining the unique ID (not only the RID, but also the individual security code RP allocated by the vendor and the software licence number SRN).
However, matching is obviously implied by D1, and using further information is optional, as clearly appears in particular from claims 1-2 of D1.
Hence it would be obvious for the skilled person to contemplate combining all the features set out in claims 1 and 26, which therefore at least lack an inventive step as required by Articles 52(1) and 56 EPC.

4.3. Independent claim 13, as far as it can be understood, also lacks novelty, or at least an inventive step with respect to D1, since the unique target machine identifier RID (Rechneridentifications-Merkmal RID) is defined as a specific information unique to the target machine and thus to the licensee.

4.4. Dependent claims 2-12 and 14-16, as well as method claims 19-21, and claims 25 and ~~30~~ 29, do not appear to contain any additional features which, in combination with the features of any claim to which it/they refer/s, meet the requirements of the

EPC with respect to novelty and inventive step, the reasons being as follows:

4.4.1. As to claim 2, the same reasoning as for claim1 is valid;
As to claim 3, it is apparent that the free use of the software is possible only if no change of "generelles Softwarepaßwort" - resulting e.g. from a change of RID - has happened.
As to the features of claims 4 and 5, see col. 3, l. 32-36 of D1 ("Die Software wäre selbst in der Lage ..." und "vor Ausführen ...").
The feature of claims 6 - namely using in the remote licensee unique ID generating means software comprising the algorithm utilised on the target platform - is an obvious possibility to the skilled designer in view of D1.
As to claim 7, including in the information utilised to produce the ID prospective licensee details, rather than the information linked to the target computer as proposed as an example by D1 (col. 4, l.4-11), constitutes a minor variation which cannot be seen as involving an inventive step, partly because this variation lies in the content of information rather than being of technical nature.
The "platform unique ID generating means" of claims 8-12 are clearly anticipated by the means generating the RID in D1 (see "hardwareseitig erzeugten RID", col. 2, l. 32-33, and the unit RIE for generating the RID, col. 4, l. 20-28).
As to apparatus claims 14-16, the same reasoning as above applies.

4.4.2. Concerning independent method claim 19, it is held that allowing, when the unique ID or and security key is found to be invalid, the protected data or software to be used in a demonstration mode only, rather than refusing completely access (to the fully enabled mode), is a technically straightforward alternative for the skilled person, especially since proposing freely accessible (i.e. without a license) test- or demo-versions of a programme or an information data base, is a well known commercial practice in the software market.
As far as dependent claims 20-21 are concerned, their features do not either contribute to inventive activity, the "environment" being anticipated by the platform specific information and the "third party" by the software vendor of D1.

4.4.3. Independent claim 25 and claim ~~30~~ 29, both directed to a "remote registration station", lack novelty or at least inventive step with respect to D1, where means would clearly be provided on the side of the vendor for producing, based on the

user or Platform specific information provided by the intending licensee, the "remote licensee unique ID" (RP, see col. 2, l. 51-53 and col. 3, l. 46-48).

------

In conclusion, the present set of claims is not allowable.

5. As set out above in relation with claim 19, the feature of claim 17 of allowing, when the unique ID or and security key is found to be invalid, the protected data or software to be used in a demonstration mode only, rather than refusing completely access (to the fully enabled mode), is not considered as involving an inventive step.
However, some features of dependent claim 17 - namely checking whether it is a first boot or a subsequent boot of the software to be protected -, are neither disclosed nor suggested in their present form in any of the documents cited in the search report.
These features, as set out at p.21, l.11-14, apparently solves a specific technical problem.

It is suggested therefore that one or more new independent claim(s) be drafted to include these features, taking care to fulfill the following requirements of the EPC:

5.1. An adequate number of independent claims in the same category should be filed in order to satisfy the requirements of Article 84, i.e. conciseness and clarity.
As to conciseness, reference is made to the Guidelines (Part C , chapter III, paragraph 5.1) in respect of the established practice that the requirement of conciseness applies not only to individual claims but to the claims as a whole. Rule 29(5) reinforces this conclusion.
Under Rule 29(2), a European patent application should contain two or more independent claims in the same category only where it is not appropriate to cover the subject-matter of the application by a single independent claim; undue repetition of wording between one claim and another is to be avoided by the use of dependent form .

5.2. EACH of the independent claims should contain all the technical features essential

to the performance or the invention. Thus based on said claims the skilled person should not need to employ an inventive step in order to find a solution to the problem posed. See the requirements of Article 84 and Rules 29(1) and (3) EPC (cf. Guidelines C-III 2.1, 4.3(ii) and 4.4).
In the present case it is held that claim 17 does not specify HOW the registration means detects whether it is a first boot or a subsequent boot. Supplementary features appear to be described at pages 19-21, and should be taken over in any independent claims.

If the Applicant is of the opinion that one or more of the above mentioned features are not essential to the performance of the invention, he has to show convincingly, e.g. by means of additional documents or evidence, that the respective feature is not in fact essential (cf. Guidelines C-III 4.3(ii) ).
However the Applicant should be aware that only these features allow the distinction of the claimed subject matter from the prior art as disclosed in D1.

5.3. The independent claim(s) should be properly cast in the two part form, with those features which in combination are part of the prior art (see document D1) being placed in the preamble (Rule 29(1) EPC).

5.4. The description must be brought into conformity with the new claims to be filed:
To meet the requirements of Rule 27(1)(c) EPC, document D1 should be identified in the description and the relevant background art disclosed therein should be briefly discussed.
Care should be taken during revision, especially of the introductory portion including any statements of problem or advantage, not to add subject-matter which extends beyond the content of the application as originally filed, Article 123(2) EPC.
In order to expedite the procedure the applicant is requested to indicate with his reply the location(s) in the application as originally filed of the passage(s) forming a basis for the amendment(s).
The applicant should also indicate in the letter of reply the difference vis à vis the state of the art and the technical significance thereof.

CH. QUESSON

35

PATENTANWÄLTE **KAHLER KÄCK FIENER et col.**

EUROPEAN PATENT ATTORNEYS
DIPL.-ING. KURT KAHLER
ASSESSOR JOSEF FIENER
PATENTANWÄLTE, MINDELHEIM

DIPL.-WIRTSCH.-INGENIEUR
DIPL.-ING. JÜRGEN KÄCK
EUROPEAN PATENT ATTORNEY
DIPL.-PHYS., DR. RER. NAT.
MICHAEL KLEINSCHMIDT
PATENTANWÄLTE, LANDSBERG

**Mailing Address:**
Maximilianstrasse 57
P.O. Box 1249
D-87712 Mindelheim

Telephone: 08261-3027
Facsimile: 08261-6563

Kahler Käck Fiener et col., P.O. Box 1249, D-87712 Mindelheim

European Patent Office
Erhardtstr. 27

80298 München

---

**European Patent Application No. 93 920 609.0-2201**
**UNILOC (SINGAPORE) PRIVATE LIMITED**

**18. November 1999**

**OUR REF.: UL 25043EP.E5 F/em**

---

**In Response to the Communication Dated 09.09.99:**

According to Art. 121 EPC, **further processing** of the above-identified European patent application is requested. The fee for further processing is paid by the enclosed cheque, and the omitted act is completed by the enclosed response.

Encl.:
Payment Form
Cheque for EUR 76,00
Response to the First Office Action

Josef Fiener

RFPR1

23. 11. 99 SL

Await Fee

MS-U 969977

36

PATENTANWÄLTE **KAHLER KÄCK FIENER et col.**

EUROPEAN PATENT ATTORNEYS
DIPL.-ING. KURT KAHLER
ASSESSOR JOSEF FIENER
PATENTANWÄLTE, MINDELHEIM

DIPL.-WIRTSCH.-INGENIEUR
DIPL.-ING. JÜRGEN KÄCK
EUROPEAN PATENT ATTORNEY
DIPL.-PHYS., DR. RER. NAT.
MICHAEL KLEINSCHMIDT
PATENTANWÄLTE, LANDSBERG

**Mailing Address:**
Maximilianstrasse 57
P.O. Box 1249
D-87712 Mindelheim

Telephone: 08261-3027
Facsimile: 08261-6563

Kahler Käck Fiener et col., P.O. Box 1249, D-87712 Mindelheim

European Patent Office
Erhardtstr. 27

80298 München

---

**European Patent Application No. 93 920 609.0-2201**
**UNILOC (SINGAPORE) PRIVATE LIMITED**

**18. November 1999**

**OUR REF.: UL 25043EP.E6 F/em**

---

**In Response to the First Office Action Dated 02.02.99:**

Present claims 1 - 30 are amended as proposed by the Examining Division, i. e., claims 22 - 24 and 27 - 28 are presently **not** prosecuted, as objected under item 1 of the examination report. With respect to the clarity objection under item 2.4, claim 30 is deleted. As regards the insertion of reference numerals, this will be done as soon as general allowability is achieved. The same is respectfully requested for the discussion of the cited prior art (D1).

As proposed under item 5 of the Office Action, the features of claim 17 (being considered to be novel **and** inventive) are incorporated into the independent claims along the lines of description page 21, l. 11 - 14.

Now the claims are considered to be in good condition, such that general allowability may be stated in a second Office Action requested hereby. If, however, basic objections as regards novelty and/or allowability should be maintained, it is respectfully requested to send an invitation for an interview (or as a precaution, for oral proceedings). As indicated above, the description will be brought into conformity with the claims as soon as allowability thereof is stated.

Encl.:
Amended Claim Set
(replacement pages, in triplicate)

Josef Fiener

37



CLAIMS

1. A registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means, ⟨6A. 17⟩.

2. The system of claim 1 wherein said local licensee unique ID generating means generates said local licensee unique ID by execution of a registration algorithm which combines information in accordance with said algorithm; said information uniquely descriptive of an intending licensee of said digital data to be executed in said use mode.

3. The system of claim 2 wherein said mode switching means permits operation of said digital data in said use mode in subsequent execution of said digital data only if said licensee unique ID generated by said local licensee unique ID generating means has not changed.

4. The system of claim 3 wherein said local licensee unique ID generating means comprises part of said digital data when executed on said platform.

5. The system of claim 4 wherein said mode switching means comprises part of said digital data when executed on

said platform.

6. The system of claim 5 wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilised by said local licensee unique ID generating means to produce said licensee unique ID.

7. The system of claim 5 wherein the information utilised by said local licensee unique ID generating means to produce said licensee unique ID comprises prospective licensee details including at least one of payment details, contact details and name.

8. The system of claim 1 said system further including platform unique ID generating means, wherein said mode switching means will permit said digital data to run in said use mode in subsequent execution of said digital data on said platform only if said platform unique ID has not changed.

9. The system of claim 8 wherein said platform unique ID generating means comprises part of said digital data when executed on said platform.

10. The system of claim 9 wherein said platform unique ID generating means utilises hard disk or other platform information to determine said platform unique ID.

11. The system of claim 1 wherein said platform comprises a computer operating system environment.

12. The system of claim 11 wherein said digital data comprises a software programme adapted to run under said operating system environment.

13. A ~~security routine or~~ registration means attachable to software to be protected, said registration means generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed, <a.1. / 17>

14. The registration means of claim 13 wherein said security key is generated by a registration number algorithm.

15. The registration means of claim 14 wherein said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software to be protected is to run.

16. The registration means of claim 13 wherein said registration means is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the registration key is generated by the security means.

~~17. The registration means of claim 13 wherein~~ characterized in that said registration means checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot, and, if a subsequent boot is detected then environment and user details are compared to determine whether the programme reverts to a demonstration mode and a new user registration procedure is

40



to commence or a full version run.>

17 ~~16~~. The registration means of claim ~~17~~ 13 wherein said environment details comprise one or more of elements which are generally not user-configurable on the platform.

18 ~~19~~. A method of control of distribution of software, said method comprising providing mode-switching means associated with said software adapted to switch said software between a fully enabled mode and a partly enabled or demonstration mode; said method further comprising providing registration key generating means adapted to generate a registration key which is a function of information unique to an intending user of the software; said mode-switching means switching said software into fully enabled mode only if an enabling key provided to said mode-switching means by said intending user at the time of registration of said software has matched identically with said registration key, < a.A. 17 >.

19 ~~20~~. The method of claim ~~19~~ 18 wherein said registration key is also a function of the environment in which said software is installed.

20 ~~21~~. The method of claim ~~19~~ 18 wherein said enabling key is communicated to said intending user at the time of registration of said software; said enabling key generated by a third party operating a duplicate copy of said registration key generating means.

~~22. Digital data incorporating registration code, said digital data executable on a platform; said registration code comprising a portion of said digital data executable on said platform so as to switch said digital data between~~

a demonstration mode and a use mode.

23. The digital data of claim 22 wherein said registration code, when executed on said platform, provides local licensee unique ID generating means whereby said digital data can be switched from said demonstration mode to said use mode only if a licensee unique ID generated by said local licensee unique ID generating means matches a licensee unique ID generated by remote licensee unique ID generating means.

24. The digital data of claim 22 wherein said registration code is integrally bound to said digital data.

21 25. A remote registration station incorporating remote licensee unique ID generating means, said station forming part of a registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means, <O.A. 17>.

22 26. A method of registration of digital data so as to enable execution of said digital data in a use mode, said method comprising an intending licensee operating a registration system for licensing execution of digital data in a use mode, said digital data executable on a platform,

42



said system including local licensee unique ID generating means and remote licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means, <O.A. 17>.

~~27. Media or a transmission medium incorporating the digital data of claim 22.~~

~~28. Media or a transmission medium incorporating said local licensee unique ID generating means of the registration system of claim 1.~~

23 ~~29~~. Media or a transmission medium incorporating code adapted, upon execution on a platform, to provide said remote licensee unique ID generating means of the registration system of claim 1.

~~30. A remote registration station including said remote licensee unique ID generating means forming part of the registration system of claim 1.~~

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

UNILOC USA, INC. and

UNILOC SINGAPORE PRIVATE LIMITED

Plaintiffs

v. Civ.A. No. 03-CV-440(WES)

MICROSOFT CORPORATION,

Defendant

---

DEPOSITION OF GREGORY LAWRENCE GRUNDY

SYDNEY, AUSTRALIA

THURSDAY, 28 APRIL 2005

AUSCRIPT PTY LTD

Level 10, 15 Adelaide Street, Brisbane

telephone conference, did you discuss anything to do with Uniloc or Mr Richardson with anyone else?

A. Oh, I would have told Mark, the guy that I'm working with that this has come out of the woodwork, and I don't know what it's about. And that, so yes, I told Mark. And there's not too many other people that I know I would tell something like that, they're not interested in it. And so, no, I don't - Mark knew.

Q. Okay.

A. But I - as my understanding was, that I - only allowed not to talk to people who was fighting with Uniloc.

Q. And would you mind if we took a photocopy of your two hand - the two notes you have before you and just mark them as an exhibit before you leave today?

A. I wouldn't mind. They're a bit embarrassing, but I wouldn't mind.

MR WODARSKI: And so we'll just mark that as the next sequential exhibit. Is that 11?

MR SCHERKENBACH: I think it's 10.

MR WODARSKI: All right.

BY MR WODARSKI:

Q. So before you leave we'll add those to the record as Grundy exhibit 10. You - in talking today about your understanding of the technology - your technology, you were asked whether or not the same algorithm existed on both the user and registration side. Do you recall that discussion?

A. Yes.

Q. Okay. Is that same algorithm concept discussed anywhere in your issued US patents?

MR SCHERKENBACH: Objection. Lacks foundation.

A. Yes, I'm sure in there I could find a point at which it says, you know, "The hash key or the encryption code is calculated on this machine, and it's got to be the same one that was calculated and passed from the other machine". So I can find that in there I'd say, without too much difficulty.

BY MR WODARSKI:

Q. And to what entity did you sell the dead patent?

A. Xtreme Lock.

Q. Do you know who any of the principals of that entity are?

A. Vanessa Henderson. Is that a principle. I don't know if it's a principle, but that was the lady that contacted me. And that was the lady that I said I couldn't speak to her.

Q. Do you know where she's located?

A. Here in Brisbane somewhere.

Q. Okay. Did you confer with any Kenyon and Kenyon lawyers regarding the production of files from your client files at that firm, as part of this litigation?

A. Not directly, no. It was via John. John asked me if they had my permission, and I said they did.

Q. Very well.

A. I don't think there was an e-mail directly.

Q. What remuneration or consideration did you receive for the selling of the dead patents?

A. 8000.

MR WODARSKI: I have no further questions. Thank you very much, Mr Grundy.