UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNILOC U.S.A., INC. and
UNILOC SINGAPORE PRIVATE LIMITED,

Plaintiffs,

v.

MICROSOFT CORPORATION,

Defendant.

Civil Action No. 03-CV-440 (WES)

**REDACTED**

**MICROSOFT'S OPPOSITION TO PLAINTIFFS' MOTION FOR RECUSAL**

Defendant Microsoft Corporation ("Microsoft") submits this opposition to Plaintiffs' Uniloc U.S.A., Inc. and Uniloc Singapore Private Ltd. (collectively, "Uniloc") motion for recusal under 28 U.S.C. § 455(a). For the reasons set forth below, recusal is inappropriate and Microsoft respectfully requests that the Court deny Plaintiffs' motion.

## I. INTRODUCTION

Recusal of the Court at this late stage of the case would be an enormous waste of judicial resources. The case is nearly four years old. Fact and expert discovery are complete. Claim construction is done. Summary judgment motions have been heard, and are under submission.

Uniloc does not dispute that there is no reason for the Court, standing alone, to recuse itself. Memorandum of Law in Support of Plaintiffs' Motion for Recusal ("Uniloc Br.") at 3 ("[Uniloc] does not have any reason to question the impartiality of Judge Smith.") The connections between the Court's new legal intern, Guy Eddon, and Microsoft, and any alleged conflict arising from those connections, are *not* imputed to the Court, and so do not in any way warrant the sweeping remedy that Uniloc now requests.

With regard to Mr. Eddon specifically, Uniloc has failed to show an "objectively reasonable basis" for doubting his impartiality. His connections to Microsoft—indirect receipt of research funding and publishing contracts for books and articles—are tangential and wholly unrelated to this litigation. Given their remoteness in relevance and time, these connections do not establish the kind of interest or appearance of bias that would require Mr. Eddon's recusal or walling from this case.[1]

Indeed, Mr. Eddon's apparent expertise in computer software—in part reflected by his publications through Microsoft—militates against his recusal or walling from this case. He is qualified to assist the Court in understanding the underlying technical *facts* of this case. He, if

[1] Uniloc knew all or substantially all of these underlying facts about Mr. Eddon, and his attenuated connections with Microsoft, when it sent its May 11, 2007, letter to the Court. (Uniloc Br. at Ex. F.) After recounting these details, Uniloc categorically stated that recusal was not appropriate: "Uniloc does not believe that Your Honor should be recused from this case. Accordingly, a motion for recusal will not be filed by Uniloc."

anything, would serve a more attenuated role than a technical advisor—which Uniloc also vigorously opposes. Uniloc has obviously vetted Mr. Eddon very closely, and on the merits does not dispute that his involvement would help the Court. It is his very expertise that would lead an objective observer not to view his connections to Microsoft as potentially biasing, but rather as affirmation of his abilities.

## II. BACKGROUND

Because of the complexity of the underlying factual issues presented in the parties' pending motions for summary judgment, this Court asked the parties' for suggestions about resources (*e.g.,* technical advisors) to assist it in resolving these motions. Microsoft supported the idea of engaging an appropriate technical advisor to assist the Court with the issues in this case. *See* Dkt. 188, January 18, 2007, Response by Microsoft Corporation to Plaintiffs' 1-10-07 Bench Memorandum re Technical Advisors. Uniloc vigorously opposed. Dkt. 190, January 25, 2007, Reply brief by Uniloc USA, Inc, Uniloc Singapore Private Limited to Microsoft's Response Re: Technical Advisors.

As noted in Uniloc's recusal memorandum, prior to 2000, Microsoft Press published several books authored by Mr. Eddon. Uniloc Br. Exs. H, J, G, and I. [redacted] In addition to books published by Microsoft Press, Mr. Eddon authored other books concerning Microsoft technology.[3] Mr. Eddon has also published several articles related to Microsoft technology in various forums associated with Microsoft. *See* Uniloc Br. Ex. Q and Microsoft Ex. 7. [redacted]

---

[2] Microsoft is providing this information voluntarily in order to expedite resolution of this issue. The publishing contracts were requested for the first time by Uniloc in a footnote of its memorandum. *See* Uniloc Br. at n.3. Note that one of the contracts concerns a book that was never published. *See* Microsoft Ex. 6.

[redacted]

The Court noted that Mr. Eddon has "over the years, received funding from Microsoft Research grants." Uniloc Br. Ex. B, p. 1. Although unable to identify the particular grant, Microsoft believes that it did not directly fund Mr. Eddon, but rather funded one or more Professors at Brown University who supervised Mr. Eddon's graduate studies. That would place Mr. Eddon in a very large group of people who have, directly or indirectly, been funded by Microsoft. According to the Washington Post, "Microsoft has lavished $500 million over the past five years on research and teaching projects at 1,000 schools, funding efforts by 6,000 academics in computer science, electrical engineering, linguistics, biology, mathematics, graphic arts, music and other fields." *See* Microsoft Ex. 8.

## III. APPLICABLE LAW

A federal judge must recuse himself under 28 U.S.C. § 455(a) "in any proceeding in which his impartiality might reasonably be questioned." Disqualification under § 455(a) requires an objective, rather than subjective, analysis to determine whether there is an appearance of impermissible partiality. *Liteky v. United States*, 510 U.S. 540, 548 (1994). Absent such a showing by the party seeking recusal, recusal should be denied. Indeed, in the First Circuit, "a judge has a duty to preside over a case unless probative evidence demonstrates a reasonable factual basis to doubt his or her impartiality." *Obert v. Republic Western Ins. Co.*, 190 F. Supp. 2d 279, 284 (D.R.I. 2002).

"Disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a *reasonable basis* for doubting the judge's impartiality," and the Court is allowed a "range of discretion" in determining whether

[3] *See, e.g., RPC for NT: Building Remote Procedure Calls for Windows NT Networks*. (CMP Books, April, 1994); *ActiveX Visual Basic 5.0*. (Co-authored with Henry Eddon, McGraw

such a "reasonable basis" exists. *In re Allied-Signal, Inc.*, 891 F.2d 967, 970 (1st Cir. 1989) citing *In re United States*, 666 F.2d at 690 (emphasis in original). *See also In re United States (Franco)*, 158 F.3d 26, 31 (1st Cir. 1998) (First Circuit will not interfere in the wide "gray area" of the District Court's discretion on recusal issues). This determination can take into consideration the full context of the matter, including the complexity of the case, "the need for judicial management by the district court," how common or avoidable the potentially biasing circumstance is, and whether "the potentially disqualifying circumstance facilitates the just and efficient resolution of a case." *In re Allied Signal*, 891 F.2d 967 at 970-972. An erroneous or unnecessary recusal is "inherently inefficient," "delay[s] the administration of justice," and prejudices the parties in cases where a Judge's familiarity with the facts is extensive. *Synder*, 235 F.3d at 45-46 (criminal matter). Only in close cases should doubts be resolved in favor of recusal. *Id.* at 46 and n.1.

Importantly, the conflicts of law clerks, and by extension judicial interns, are not imputed to the judges for whom they work. "Both bench and bar recognize, moreover, that judges, not law clerks, make the decisions." *In re Allied Signal*, 891 F. 2d at 971. Judges are presumed to be able to take into account any biases of their clerks and must be allowed "considerable independence" in deciding how best to make use of a clerk's assistance. *Id.*; *see also First Interstate Bank of Ariz., N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 987-988 (9th Cir. 2000) ("[J]udges (and their law clerks) are presumed to be impartial and to discharge their ethical duties faithfully so as to avoid the appearance of impropriety."). While a clerk "is forbidden to do all that is prohibited to the Judge," *id.*, when a clerk has a conflict of interest, "it is the clerk, not the judge, who must be disqualified." *Parker*, 855 F.2d at 1525 *citing Hunt*, 783 F.2d at 1016. A clerk with a true conflict of interest can be safely walled off from all work on the matter

---

Hill, May, 1998).

giving rise to the conflict, insulating the judge from any appearance of bias warranting recusal. *Hall v. Small Business Admin.*, 695 F.2d 175, 179 (5th Cir. 1983).

With regard to a Judge or clerk's financial or other interests in a party, remote and tangential interests are not sufficient grounds for recusal. *Gas Utils. Co. v. Southern Natural Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993) ("[A] remote, contingent, and speculative interest is not a financial interest within the meaning of the recusal statute...nor does it create a situation in which a judge's impartiality might reasonably be questioned.") quoting *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986).

## IV. ARGUMENT

### A. Uniloc Has Not Identified Any Basis On Which To Question The Impartiality Of The Court

Uniloc does not dispute this Court's impartiality, independent of Mr. Eddon. Uniloc Br. at 3. This case is nearly four years old. During that time, the Court has resolved claim construction, heard argument on two summary judgment motions, and addressed numerous other pretrial issues. Recusal at this stage of the case would be a serious waste of judicial resources.

Turning to Mr. Eddon, as discussed below, neither the law nor the facts support Uniloc's position. Mr. Eddon's attenuated contacts with Microsoft are not of the sort that would cause an objective observer to call Mr. Eddon's impartiality into question. Should the Court disagree, Mr. Eddon should simply be walled from participation in this case, because any such appearance of bias is not imputed to the Court. *Parker*, 855 F.2d at 1525. Other courts have done precisely this in situations where the intern's relationship with parties or counsel was more direct than any relationship between Mr. Eddon and Microsoft. *See, e.g.*, *Simonson v. General Motors Corp.*, 425 F. Supp. 574, 575-576 (D. Pa. 1976) (excluding a judicial intern from participation in the litigation where he was also working part-time for the law firm of defense counsel).

That resolution, while disposing of the present motion, would not address the Court's interest in obtaining technical assistance with this case. However, that interest could be

addressed by appointing a technical advisor, which, as discussed in Microsoft's briefing on the issue, is fully within the Court's power to do. *See* Dkt. 188, January 18, 2007, Response by Microsoft Corporation to Plaintiffs' 1-10-07 Bench Memorandum re Technical Advisors.

**B. Uniloc's Complaints With Mr. Eddon Do Not Provide A Reasonable Basis To Doubt His Impartiality In This Case**

Uniloc's motion presents no factual basis upon which an objective observer could reasonably doubt Mr. Eddon's impartiality. Mr. Eddon has never been employed by Microsoft, has apparently never been offered employment by Microsoft, and, given his career focus on law, is unlikely to seek employment with Microsoft. Nor has Uniloc identified any connection between Mr. Eddon and the specific technology at issue in this case, or any potential witnesses in this case. Uniloc's motion rests entirely on Mr. Eddon's authorship of books and articles about unrelated Microsoft technology, published by Microsoft entities, and his alleged benefit from Microsoft research funding. Uniloc fails to show how any of these tenuous connections could in any way affect or be affected by anything that happens in this case, or otherwise show why the reasonable objective observer would doubt his impartiality.

**1. Mr. Eddon's Past Publishing Activities With Microsoft Press Are Remote, Tangential, And Irrelevant To This Litigation**

Mr. Eddon's past published books and articles provide no reason to doubt his impartiality in this case. The books relate to older technologies that are not germane to this litigation. [redacted] *See Brody v. President & Fellows of Harvard College*, 664 F.2d 10, 11 (1st Cir. 1981) ("The mere association of a judge with a party, without indication that the judge stands to obtain financial or other gain from a particular outcome, may similarly be insufficient to mandate disqualification… [W]here the interest asserted bears only a tangential relationship to the subject matter of the suit, the alleged bias is even further attenuated."). [redacted]

[redacted] Uniloc thus cannot credibly suggest—and certainly has not shown—that Mr. Eddon has any interest, direct or indirect, in the outcome of this litigation.[4]

The copyright assignments for the books that Uniloc claims establish a continuing legal relationship between Microsoft and Mr. Eddon are similarly stale. Uniloc has cited no authority for its proposition that old contracts on completely unrelated subject matter, or an alleged copyright co-ownership formality, somehow create a perception of bias. These attenuated connections would not cause an objective observer to call Mr. Eddon's impartiality into question.

Uniloc also makes much ado about Mr. Eddon's appreciative statements concerning Microsoft employees in the preface of his books. These somewhat light-hearted acknowledgements are simple courtesies, nothing more. The individuals referenced have no involvement whatsoever with this case and Uniloc has not shown how the time-honored custom of saying "thank you" translates to objective indicia of bias. Moreover, these opinions are further insulated from the Court, because they were made by Mr. Eddon. *In re Allied Signal*, 891 F. 2d at 971.

In sum, Mr. Eddon's connection to Microsoft is certainly not the kind of direct interest that implicates an appearance of partiality under § 455(a). *Compare, e.g., Lilieberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988) (finding an appearance of partiality where the judge currently served as a university trustee and the university was negotiating with one of the parties concerning the property at issue in the case). Mr. Eddon's connections with Microsoft are less direct than other connections between judges and parties that have been found not to create an impermissible appearance of partiality under § 455(a). *See, e.g., Parrish v. Board of*

[4] Notably, Uniloc does not seek recusal under 28 U.S.C. § 455(b)(4), which requires recusal without any consideration of reasonableness, but imposes a requirement that a judge "knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a *financial interest in the subject matter in controversy or in a party to the proceeding*, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4) (emphasis added).

*Comm'rs*, 524 F.2d 98, 102 (5th Cir. 1975) (finding no appearance of bias where trial judge was the former President of the defendant bar association and had presided over the bar admission rule change that was the subject of the litigation); *Brody* 664 F.2d at 11 (finding there was no appearance of bias in a case in which Harvard University was a party, where the judge previously attended Harvard University); *Cheney v. United States Dist. Court*, 541 U.S. 913, 917 (U.S. 2004) (finding no appearance of bias where Justice Scalia regularly socialized with Vice President Cheney, a named party to the suit at issue); *Oriental Fin. Group, Inc. v. Fed. Ins. Co.*, 467 F. Supp. 2d 176, 181 (D.P.R. 2006) (finding *ex post* that the trial judge did not need to recuse himself where his daughter's father-in-law was a director of the plaintiff corporation).

**2. Mr. Eddon's Indirect Benefit from Microsoft's Widely Dispersed Research Funding Is Remote, Tangential, And Irrelevant To This Litigation And Likewise Does Not Create an Appearance of Bias**

Uniloc also argues for recusal because Mr. Eddon has, in some form, received research funding originating from Microsoft. This is hardly surprising. Microsoft has made extensive research grants to universities in the United States and abroad. According to the Washington Post, Microsoft has funded approximately 6,000 academics at 1,000 schools, much of it in unrestricted grants that are unconnected to Microsoft aside from the origin of the funding. *See* Microsoft Ex. 8. Mr. Eddon was apparently a tangential recipient of such funds.

Indeed, it is difficult to imagine a highly qualified candidate with experience in software research who has not, at some point, had some connection to Microsoft, whether through funding, giving of talks, or more directly through collaborative research. Given the prevalence of such contacts, they would not create any appearance of bias in the mind of the knowledgeable objective observer.

**3. Mr. Eddon Is Evidently Well-Qualified To Assist The Court In Understanding The Facts Underlying The Summary Judgment Motions**

Uniloc's demand for recusal also ignores the broader context of Mr. Eddon's role. As the Court has stated, Mr. Eddon will not serve in the same capacity as would a neutral third party, such as a technical advisor. Uniloc Br. Ex. E, p. 1. His expertise will likely come into play in assisting the Court in understanding the technology at issue in this litigation, in the context of the positions taken by the parties on summary judgment. His role is not to offer opinions, but rather to explain facts. This role greatly attenuates any concerns about bias.

Mr. Eddon's qualifications presumably make him one of a limited number of people with the proper expertise to undertake this role. This is a software patent case, and he has, or soon will have, a Ph.D. in Computer Science. He is available to the Court at a time while summary judgment motions are under submission, and he has an interest in the law.

These considerations further counsel against recusal. *See In re Allied-Signal, Inc.*, 891 F.2d at 970-972. The defendant in *Allied Signal* moved for recusal because the District Judge's two main law clerks were related to partners of the law firms representing the plaintiffs. The District Judge denied the motion, and the First Circuit affirmed. The Court found that the pool of law clerks able to effectively assist in the complex litigation at issue was very small (the federal bar of Puerto Rico was so small that it was difficult to find qualified clerks who did not have some relatives employed by local law firms), which would cause an objective observer to see less risk of bias. The Court noted that "the more common a potentially biasing circumstance and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality." *Id.* The expertise of the clerks also militated against recusal. "[T]he greater the extent to which the potentially disqualifying circumstance facilitates the just and efficient resolution of a case, the less likely a knowledgeable observer will consider it a sign of judicial partiality." *Id.*

Thus, any potential risk of an appearance of impermissible partiality is mitigated where the clerk has specialized abilities and knowledge which are useful for the best resolution of the case at hand. Here, it is Mr. Eddon's computer science expertise—reflected by the fact that he is a published author on the subject—that both makes him valuable to the Court and constitutes the basis for Uniloc's motion. Uniloc has obviously vetted Mr. Eddon very closely, and on the *merits* does not dispute that his involvement would help "facilitate [a] just and efficient resolution" of this case. It is this very expertise that would lead an objective observer not to view his connections to Microsoft as potentially biasing, but rather as affirmation of his abilities.

## V. CONCLUSION

For the foregoing reasons, Microsoft respectfully requests that the Court deny Plaintiffs' Motion for Recusal.

**Dated**: May 29, 2007

By: /s/ Joseph V. Cavanagh, Jr.
Joseph V. Cavanagh, Jr. #1139
**BLISH & CAVANAGH**
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903
(401) 831-8900 (Telephone)
(401) 751-7542 (Facsimile)

Frank E. Scherkenbach
Kurt L. Glitzenstein
Laura R. Braden
**FISH & RICHARDSON P.C.**
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Isabella Fu, Esq.
**MICROSOFT CORPORATION**
One Microsoft Way
Redmond, WA 98052-6399
Telephone: (415) 882-8080
Facsimile: (415) 936-7329

Attorneys for Defendant
MICROSOFT CORPORATION

**CERTIFICATE OF SERVICE**

I certify that on May 29, 2007, I caused a true and correct copy of the foregoing REDACTED MICROSOFT'S OPPOSITION TO PLAINTIFFS' MOTION FOR RECUSAL to be served via ECF on the following counsel of record:

Francis A. Connor, III
Sheri L. Pizzi
Taylor Duane Barton & Gilman, LLP
10 Dorrance Street, Suite 700
Providence, RI 02903

Attorneys for Plaintiffs
UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED

Paul J. Hayes
Dean G. Bostock
Paul J. Cronin
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

Counsel for Plaintiffs
UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED

/s/ Lorraine D. Leclerc

# {END BRACKET}

## Phoenix Rising

Guy Eddon

**Phoenix** is neither a compiler nor a JITer, but will eventually transform both. It is the codename for an internal Microsoft project that provides an extensible framework for the analysis, optimization, and modification of code during compilation. Think of Phoenix as a tool that allows you to peek into the black box at the heart of compilers in order to see and modify their internals. Current uses of Phoenix inside Microsoft include code obfuscation, visualization, and custom assembly rewriting. Phoenix is the result of a joint endeavor by Microsoft Research and the Developer Division, and is currently available in pre-beta form for noncommercial use to qualified researchers affiliated with recognized institutions (see www.research.microsoft.com/phoenix).

The Phoenix toolkit provides a prototype that will, in time, replace the Microsoft standard compiler back end (c2.exe), as well as the Microsoft® .NET Framework just-in-time (JIT) compiler (mscorpjt.dll) and pre-JITer (ngen.exe). The Phoenix c2 back end can generate code for two distinct target instruction sets: Intel machine code (both 32- and 64-bit) and Microsoft intermediate language (IL). Furthermore, using these Phoenix-enabled compilers, it is easy to build custom compiler plug-ins simply by extending the Phx.PlugIn and Phx.Phase classes and then overriding the Phase.Execute method with your own code.

Indeed, plug-ins have complete access to all the compiler's internal data structures. For example, the following code fragment implements a compiler phase that displays the name of each method processed. (A more sophisticated compiler plug-in might implement an advanced optimization.)

```
public class DisplayNamesPhase : Phx.Phase {
   protected override void Execute(Phx.Unit unit) {
      Phx.FuncUnit func = unit as Phx.FuncUnit;
      Console.WriteLine("Function name: {0}", func.NameString);
   }
}
```

Thus, Phoenix makes it straightforward to implement compiler extensions without writing a new compiler from scratch—in effect, it makes it possible to simply utilize the engineering in Phoenix in order to build extensions that focus solely on the problem you're trying to solve.




Phoenix uses an internal intermediate representation (IR) as the basis for code analysis and transformation. For a program to be rewritten, it first needs to be converted to the Phoenix IR by one of the supplied readers (native code, IL, and abstract syntax tree readers are provided with Phoenix, and others can be written for nonstandard code formats). Once the IR has been instrumented, it can be written out to an executable. From this perspective, the back-end compiler provided by Phoenix is really just an application written on top of the Phoenix framework. It uses Phoenix readers to convert input code to IR, and invokes any requested Phoenix plug-ins to transform the code; finally, it writes out the modified code in the desired format (native or IL). Phoenix programs can therefore be written either as compiler plug-ins or as meta-programming tools run post-compilation.

For a real-life example of Phoenix's utility, suppose you want to analyze what fraction of your code users actually execute on a daily basis by building an instrumented version of your program that

collects and records such data. Traditionally, you'd need to write a program that reads in a Portable Executable (PE) binary file, figures out what's code and what's data, identifies each function, basic block, and instruction, inserts the instrumentation code, recomputes all the addresses to adjust for the added code, and then writes out a valid PE binary. With Phoenix, by contrast, you just need to write a program that adds the instrumentation at the appropriate places in the binary; all the grunt work of reading and writing the PE file, identifying elements in the binary code, and recomputing addresses is done for you. Due to its extensible nature, Phoenix has been attracting the interest of computer scientists involved in programming language research.

I've recently been using Phoenix to integrate a transaction processing model with object-oriented programming languages like C# and Java. As in databases, the goal is to make a block of statements succeed or fail as an atomic unit. If code in an atomic block throws an exception, the transaction is rolled back and all mutations must be undone. Before Phoenix, I would have had to write a new compiler or modify an existing one in order to test these ideas. With a framework like Phoenix, however, I can simply implement this code transformation as a compiler plug-in and rely on a commercial-quality compiler.

---

**Guy Eddon** is a PhD candidate in Computer Science at Brown University where his research focuses on autonomic computing. Prior to graduate school, he worked for over a decade in IT and wrote about component software for *Microsoft Systems Journal* and Microsoft Press.

---

subscribe! to MSDN Magazine now

From the November 2005 issue of MSDN Magazine.

---

© 2007 Microsoft Corporation and CMP Media, LLC. All rights reserved; reproduction in part or in whole without permission is prohibited.

**Related Articles from MSDN Magazine:**

- **C# 3.0:** The Evolution Of LINQ And Its Impact On The Design Of C# by Anson Horton
- **Wicked Code:** Scalable Apps with Asynchronous Programming in ASP.NET by Jeff Prosise
- **Garbage Collection:** Automatic Memory Management in the Microsoft .NET Framework by Jeffrey Richter
- **CLR Inside Out:** 9 Reusable Parallel Data Structures and Algorithms by Joe Duffy
- **CLR Inside Out:** New Library Classes in "Orcas" by Mike Downen, Inbar Gazit, and Justin Van Patten
- **.NET Tools:** Ten Must-Have Tools Every Developer Should Download Now by James Avery
- **Extreme ASP.NET:** Web Deployment Projects by Fritz Onion
- **Cutting Edge:** Perspectives on ASP.NET AJAX by Dino Esposito

washingtonpost.com

# Microsoft's Big Role on Campus

Donations Fund Research, Build Long-Term Connections

By Ariana Eunjung Cha
Washington Post Staff Writer
Monday, August 25, 2003; Page A01

Advertisement




REDMOND, Wash. -- Bearing gifts of cash, software and computers worth $25 million, Microsoft Corp. came to the Massachusetts Institute of Technology in 1999, saying it wanted to jointly develop educational technologies. Some scholars expressed more suspicion than gratitude.

At a celebration to kick off the collaboration, students and faculty members heckled the speakers, insisting the computer company's software wasn't worthy of use or study at MIT. Some took boxes of Microsoft's Office 2000 software and stomped on them. An editorial in the school newspaper wondered: Had the school sold itself out to become the "Microsoft Institute of Technology?"

Today, four years into the five-year partnership, the protests are over and Microsoft technology is firmly entrenched at MIT.

Aeronautical design classes now use Microsoft's Flight Simulator computer program. Electrical engineering and computer science professors are putting their courses online using Microsoft's PowerPoint presentation software. The university's educational computer network is being overhauled to use Microsoft's .Net architecture. Video games, hardly an MIT priority but a strong commercial interest of Microsoft's, have suddenly become a subject of scholarly inquiry.

Similar transformations are taking place at university campuses across the nation, escalating the debate over corporate influence on academia. Such concerns about donations have been raised in fields of study as diverse as auto engineering and medicine, but Microsoft's donations are a special case. Because students are likely to keep using the technology after graduation, they help to maintain Microsoft's software industry dominance.

"Universities have become much more open to corporate donations even when they have strings attached, and they are less likely today to assess the long-term impact of these donations on academic freedom," said Lawrence C. Soley, a professor at Marquette University and author of "Leasing the Ivory Tower: The Corporate Takeover of Academia."

**Donations to 1,000 Schools**

Microsoft has lavished $500 million over the past five years on research and teaching projects at 1,000 schools, funding efforts by 6,000 academics in computer science, electrical engineering, linguistics, biology, mathematics, graphic arts, music and other fields. Microsoft partners are among computer science's biggest luminaries: A. Richard Newton, dean of the engineering school at the University of California at Berkeley; Eugene H. Spafford, who runs Purdue University's influential cybersecurity institute; and Gail E. Kaiser, a Columbia University researcher who is one of the nation's most

prominent software engineering experts and one of the few tenured female professors in the field.



SOURCE: Microsoft Corp. THE WASHINGTON POST

The software giant's donations have allowed universities to follow through on projects they could not have otherwise dreamed of, given their limited research budgets. The collaborations have not only led to new products on store shelves but work dominating academic journals focused on high-tech innovation.

The corporation, however, has also directly or indirectly influenced curriculums and research priorities, drawing an outcry from critics who say the donations are turning computer science departments into vocational schools where mastery of proprietary computer programs are valued over the study of theory.

Hal Abelson, a computer science professor who co-directs the MIT-Microsoft partnership, said the donations have allowed MIT to make class readings and other material freely available on the Web, benefiting not only the school community but the world at large.

"That is not distorting the research agenda, but doing things we otherwise might not have," he said.

Microsoft, for its part, acknowledges that its donations are about business development as well as philanthropy, but that it is a win-win situation for everyone.

"The success of the field comes from innovations through university environment," said Rick Rashid, Microsoft's senior vice president for research. "Microsoft prospers when universities prosper."

Still, others lament that even if everyone has the best of intentions, the end result portends a future when innovation in the field of computers will be greatly influenced, if not controlled, by a single company.

"[I worry] that in the face of budget shortfalls, universities will sacrifice their research autonomy, offering up curriculum and academic integrity to the highest bidder," said Mark Schaan, a Rhodes scholar at Oxford University who was part of a group of students at the University of Waterloo, the Canadian equivalent of MIT, who last year urged administrators to turn down Microsoft's donations.

**Project 42 Sets the Tone**

Microsoft first began to reach out to universities in a serious way in the mid-1990s with Project 42.

At the time, Microsoft software was dismissed as too clunky, too slow, too unreliable and too uncool among many researchers on the cutting edge of technology. Microsoft was seen as an imitator and not an innovator -- it created the Windows operating system based on Apple Computer Inc.'s graphical interface, the Internet Explorer browser for the Web based on Netscape Communications Corp.'s Navigator. The dot-com upstarts fueling the boom, more than a few predicted, would soon be in a position to out-innovate the aging software maker.

Microsoft's salvation: Project 42, named after the mysterious response the supercomputer in Douglas Adams's "Hitchhiker's Guide to the Galaxy" gives when asked for the meaning of life. Later unveiled as .Net, Project 42 was a set of software tools that would allow disparate systems to communicate more

effectively across the Internet -- and to keep Microsoft relevant in a world where PCs were no longer the center of the computing universe.

The company concluded that to make .Net a success, it had to get academics involved. Not only would their imprimatur lend credibility to the technology, Microsoft would benefit from their technical expertise. In 1998, the company began to quietly fly academics to its headquarters for previews of the technology. Damien Watkins, then a lecturer at Monash University in Australia, recalled that some of his peers wore Linux T-shirts to show their skepticism. In the end, though, they were won over in part by the promise of the technology -- and by a $150,000 donation the company made to the university, he said.

"I think Microsoft has changed a lot over the last five to 10 years. Setting up Microsoft Research and working with university faculty is a sign that they are looking a lot further into the future than they had done previously," said Watkins, who was so impressed with .Net technology that he began teaching it to his students, then founded a private firm that uses .Net technologies. He is now applying for a job at Microsoft.

Today, more than 2,000 professors from top-tier schools are considered close collaborators with Microsoft, accepting cash, software, hardware or other in-kind donations from the company for specific research projects or classes. An additional 4,000 have less formal relationships with the company but still receive free equipment and support.

Microsoft's total research and development budget -- $4.7 billion in 2003, $4.3 billion in 2002 and $4.4 billion in 2001 -- is estimated to be more than all the rest of the software industry spends together. Each year, Microsoft gives away about $100 million of that to universities.

In comparison, according to the National Science Foundation, computer science department expenditures at all universities and colleges from all sources for 2001 was less than $1 billion.

The collaborations have resulted in refinements in handwriting recognition, better ways to compress music and video files for electronic transmission, and new theories about how to better search the Web. Microsoft researchers and their partners now produce about 120 papers in 20 journals per year, a relatively large number. In 2001, for instance, 30 percent of the papers presented at the influential Conference on Programming Language Design and Implementation meeting were by Microsoft researchers. At this year's SIGGRAPH computer graphics conference, some 14 percent were Microsoft works.

Among those who say they have benefited from Microsoft's donations is Howard University associate professor Todd E. Shurn. Two years ago, he was struggling with how to best teach a multimedia class that would combine computer science, art and communications skills.

Two of Shurn's former students, who had gone on to work at Microsoft and had come back to Washington on a recruiting visit, had an idea: Why not build the class around Windows Media Player? The class could create a new interface, or "skin," for the program. The professor was intrigued. He fiddled around with the technology for a few days and concluded it was worth testing. Microsoft provided $5,000, software and books and sent one of its technicians to help set up the computers the students would be using. The experiment was a success, Shurn said, so much so that he expanded the project the next year to include a contest open to the entire school. Microsoft, of course, provided the money for the awards.

Shurn estimates that when he first started at Howard a decade ago, nearly all computer-oriented projects involved machines running Unix-based operating systems. Now, he said, about 80 percent of assignments rely on Microsoft Windows.

"Our migration toward Microsoft began because of pricing and then, as a result of Microsoft becoming very active on campus, it accelerated," Shurn said.

**Thanks, But No Thanks**

Microsoft's efforts to reach out to some other universities, however, have not gone as smoothly.

California State University students and faculty urged administrators in 1997 to turn down a $300 million gift from Microsoft and three other companies because it required an exclusive contract for upgrading the computer and phone system at the 22 campuses. At the University of Michigan in 1999, after administrators signed a deal with Microsoft, a major donor, to sell technology at the Michigan Student Union, students protested by handing out diskettes with the free Windows alternative Linux.

And at the University of Waterloo last year, administrators announced a $1.6 million donation from Microsoft. At the same time they announced they would change the curriculum to introduce Microsoft's C# programming language into the first-year programming course instead of the more popular and long-established C++ they were currently using. Students and faculty rebelled.

The university ultimately backed down this spring, saying for now the classes will be "multilingual." A faculty senate is evaluating the proposed curriculum changes.

Doug Leland, head of university relations for Microsoft, said there is often some hostility when company representatives first step on college campuses. There is "a deep level of the unknown," he said. But, he said, the "attitude of campuses towards Microsoft has changed dramatically in the past few years."

"We've really broken through a lot of those trust and credibility issues," he said.

One way Microsoft has done that is by offering some gifts with no strings attached or by allowing academics to have a great deal of freedom with the money they are given.

The MIT partnership, which runs from 1999 to 2004 and is designed to develop educational technologies in an initiative called "iCampus," is the company's showcase example. Even though the projects must be approved by a six-member committee, half of whom are MIT employees and half of whom are Microsoft employees, the academics own the intellectual property developed and have the freedom to publish what they wish without a review from Microsoft. Professors also have the option not to participate in the Microsoft collaboration.

An MIT contingent of professors, led by Abelson, were among 350 faculty members who attended a recent gathering of Microsoft academic partners at the company's headquarters here in Washington. At the three-day, expenses-paid event, the professors stayed at the Hyatt Regency, dined with Microsoft chairman Bill Gates on tables decorated with fresh peach lilies, and took boat cruise on Lake Washington.

It was part academic conference, part networking event. It was also a unique promotional opportunity for Microsoft.

At a question-and-answer session between the academics and Gates, one professor asked the Microsoft founder about his views about the study of information technology, a part of computer science that emphasizes on how documents, spreadsheets and other data should be handled. What kinds of technologies should students majoring in this subject be taught?

Gates replied quickly and with a smile: "Microsoft Office."

*Researcher Richard S. Drezen contributed to this report.*

© 2003 The Washington Post Company