UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED, Plaintiffs, v. MICROSOFT CORPORATION, Defendant. | C.A. No. 03-440 S |

MEMORANDUM OF DECISION

William E. Smith, United States District Judge.

I have before me a motion to recuse four years into this complicated patent case. The reluctant movants, Uniloc USA, Inc. and Uniloc Singapore Private Ltd. (collectively, "Uniloc"), argue that my association with a supposedly conflicted judicial intern creates the appearance of partiality, and compels my disqualification under 28 U.S.C. § 455(a). Microsoft Corp. ("Microsoft") opposes the motion. Because I find that the intern in question has no conflict of interest, and because I do not believe that my impartiality might reasonably be questioned, Uniloc's motion is denied. My reasoning follows.

I

Several months ago, I asked the parties to consider whether I should appoint a technical advisor in this case. See In re

Peterson, 253 U.S. 300, 312-12 (1920) (observing that district courts have the inherent power to appoint advisors); Reilly v. United States, 863 F.2d 149, 154-161 (1st Cir. 1988) (holding that district courts may appoint technical advisors when "faced with problems of unusual difficulty, sophistication, and complexity"), aff'g 682 F. Supp. 150, 152-53 (D.R.I. 1988) (appointing a technical advisor in a case involving complex economic theories and demonstrably high stakes). There can be little doubt that the issues in this case are extremely complex: claim construction alone resulted in a sixty-one page opinion that construed twenty-four claim terms (an unusually high number of disputed terms). See generally Uniloc USA, Inc. v. Microsoft Corp., 447 F. Supp. 2d 177 (D.R.I. 2006). After hearing the parties' argument on summary judgment, I believed that the issues, while ably advanced by sophisticated counsel, might better be resolved with the technical assistance of an advisor skilled in the art. Consequently, I held a status conference in January 2007 for the purpose of discussing this idea with the parties. Uniloc vigorously objected, suggesting that the use of technical advisors was "disfavored" in the First Circuit and "fraught with the danger" of improper fact-finding. Of particular concern, Uniloc continued, was the delay associated with such an appointment. Microsoft expressed some concern over delay as well, but later concluded that "the technical complexity of this

case, which is compounded by Uniloc's myriad infringement theories, fully warrants the assistance of a technical advisor."

I took the matter under advisement. Two months later, I received an unsolicited application for an unpaid summer internship from a second-year evening student at Fordham Law School, Guy Eddon, who, fortuitously, was just shy of finishing his Ph.D. in computer science at Brown University. His impressive resume indicated some past connections with Microsoft, and I questioned him extensively on this subject during an interview. The substance and extent of those connections are as follows. At the time of the interview, part of Mr. Eddon's graduate work at Brown was indirectly financed by a Microsoft research grant scheduled to expire by the end of the spring semester (before the summer internship would begin). As I understand it, Mr. Eddon's advisor received the grant from the University, which had, in turn, received it from Microsoft. Also, Mr. Eddon has, over the years, written for Microsoft Systems Journal (contributing editor between 1999 and 2002) and has co-authored four programming guides that were published by Microsoft Press (one each in 1997 and 1999 and two in 1998). I learned from a follow-up conversation with Mr. Eddon that he has received royalties from Microsoft for his programming guides, but, given their short shelf-life, last received a check for $3.97 on February 12, 2007; the check before

that was for $8.67 on August 27, 2006. These amounts include royalty payments for all four programming guides.

Out of an abundance of caution, I notified the parties about Mr. Eddon by letter on March 20, 2007. Although I firmly believed that Mr. Eddon could ethically participate in the case, my letter informed them that I had the opportunity to hire an extremely well-qualified judicial intern, disclosed the information above (with the exception of the royalty information I learned of later), and asked whether they believed that these past involvements would present a conflict of interest. Microsoft responded in the negative. Uniloc, mistakenly believing that Mr. Eddon would serve as a technical advisor, objected on largely irrelevant grounds. Although Uniloc did not express any specific objections other than those related to its apparent misunderstanding, I viewed Uniloc's response as an objection based on a perceived conflict or bias.

On April 18, 2007, after careful consideration, I informed the parties by letter that the objection expressed by Uniloc was without any reasonably conceivable basis, and that it was appropriate for Mr. Eddon to work on the case as an unpaid judicial intern. I also invited the parties to file a motion for disqualification, with supporting authority, if there was any reason in light of this decision to question my impartiality in this case. Responding by telecopied letter, Uniloc said that it

"does not believe that Your Honor should be recused from this case," but urged me not to let Mr. Eddon work on the case because of "his prior and possibly ongoing relationship with Microsoft." The letter included representations that Mr. Eddon's books "were offered at the not insignificant retail prices of between $39.99-$49.99," and speculation that he "undoubtedly" entered into publishing agreements with Microsoft and "likely" was remunerated "in money or other compensation." Also, Uniloc referenced the preface to one of the programming guides, which includes a generic acknowledgment of appreciation to an individual employed by Microsoft Press. The letter contained no authority whatsoever; only conjecture that "if the shoe were on the other foot, Uniloc has no doubt that Microsoft would be voicing a similar objection."

I scheduled a hearing to address Uniloc's concerns and to put the discussion, which up to that point had been conducted exclusively through correspondence, on the record. At the hearing, Uniloc continued to object based on its theory of "potential partiality" highlighted in its correspondence, but noted that it "did not see objecting to the potential partiality of the intern as reflecting in any way upon you." I explained that, based on my determination that no ethical rule prohibited Mr. Eddon from working on the case, Uniloc could either agree with my decision on

the record or file a motion addressing its concerns. Uniloc thereafter filed the present motion.

II

Uniloc does not explore a single ethical rule or any other authority for its premise that Mr. Eddon himself is conflicted out of this case.[1] Instead, Uniloc lists Mr. Eddon's past connections to Microsoft as though a conflict of interest would obviously follow. I disagree. A most generous reading of the Code of Conduct for Judicial Employees ("Employees' Code")[2] reveals five possibly applicable provisions, three of which are quickly dispatched.[3] Mr. Eddon owns no stock in Microsoft, see Employees' Code, Canon 3F(2)(a)(iii) and 3F(4), and has disavowed any personal bias or prejudice concerning either Uniloc or Microsoft.

[1] The scant references in a footnote to Uniloc's reply memorandum, (Reply in Supp. of Pl.'s Mot. for Recusal 5 n.7), hardly suffice.

[2] The Employees' Code is provided in the Administrative Office of U.S. Court's Guide to Judiciary Policies and Procedures, vol. 2, ch. 2 (last visited June 13, 2007) [hereinafter, the "Guide"].

[3] Of course, because Mr. Eddon will not be paid, I am not required to apply the Employees' Code in resolving ethical questions surrounding his work on a particular case. See Employees' Code, Introduction (explaining that "nonemployees who serve the Judiciary are not covered by this code, but appointing authorities may impose these or similar ethical standards on such nonemployees, as appropriate"). However, it has been my practice to do so and, in order to give full consideration to Uniloc's motion, I believe it is appropriate to examine the question from this point of reference.

Employees' Code, Canon 3F(2)(a)(i). Also, he has never worked for Microsoft, and none of his publications involved or were in any way related to Microsoft's anti-piracy or product-activation technology that might have given him personal knowledge of disputed evidentiary facts in this case (nor does he have such knowledge from any other source). Id.

Not satisfied with Mr. Eddon's "subjective belief" that he will remain impartial, Uniloc references two instances in the prefatory language of the programming guides where Mr. Eddon expresses appreciation to several individuals employed by Microsoft Press in connection with the publication process. I construe this as an allegation of actual bias under Canon 3F(2)(a)(i) and promptly reject it. These statements are at least eight years old. At best, they are an example of the puffery commonly found in the published works of thoughtful authors. At worst, they are generic acknowledgments of a busy writer who does not wish to be rude. Either way, they are hardly evidence of the prejudice or bias required by Canon 3F(2)(a)(i). Cf. In re United States, 666 F.2d 690, 696 (1st Cir. 1981) (finding that the survival of some residual gratitude from past associations would not "cause a judge to jettison his impartiality" or "violate his deepest professional and ethical commitments").[4] On a related topic, the fact that Mr.

[4] My comparison here and throughout this Part to authorities involving judges' ethical responsibilities is a function of the

Eddon, in a past web-based publication, described an outmoded version of Internet Explorer as "very cool" and as having "neat features" is poor evidence of bias. If I happen to think that a particular Microsoft product is "cool" or "neat" (or if I happen to prefer Microsoft Word over WordPerfect, for example),[5] am I required to recuse? I think not. To do so would be ridiculous, just as it would be ridiculous for me to isolate Mr. Eddon from working on this case because of certain descriptive terms he used eleven years ago to describe a product that much of the world has seen, used, and appreciated.

Microsoft's former and indirect funding of Mr. Eddon's doctoral studies, as well as Mr. Eddon's trickling royalty stream, also fail to rise to the level of a conflict of interest. As a preliminary matter, receiving royalty payments from a party does not qualify as a "financial interest . . . in a party to a proceeding" as prohibited by Canon 3F(2)(a)(iii) and 3F(4). Cf. Gas Utils. Co. of Alabama, Inc. v. S. Natural Gas Co., 996 F.2d 282, 283 (11th Cir. 1993) (per curiam) ("A remote, contingent, and speculative interest is not a financial interest within the meaning of the recusal statute . . . nor does it create a situation in

limited case law construing the Employees' Code.

[5] I take no position on this controversial issue; WordPerfect is perfectly adequate.

which a judge's impartiality might reasonably be questioned.") (quoting In re Placid Oil Co., 802 F.2d 783, 786 (5th Cir. 1986)); Advisory Opinion No. 94 (observing that the royalty payments a judge receives from a party, as long as the case does not involve the minerals in which the judge has the fractional royalty interest, do not qualify as a "financial interest" that would otherwise require recusal); Advisory Opinion No. 75 (holding that a judge who receives a military pension need not recuse when a military service is a party); Advisory Opinion No. 27 (holding that a judge's spouse who is the beneficiary of a trust that leased property to the defendant does not have a "financial interest" in the defendant).[6]

The inquiry continues, however, with Canon 3F(1), which in pertinent part provides:

> A conflict of interest arises when a judicial employee knows that he or she (or the spouse, minor child residing in the judicial employee's household, or other close relative of the judicial employee) might be so personally or financially affected by a matter that a reasonable person with knowledge of the relevant facts would question the judicial employee's ability properly to perform official duties in an impartial manner.

The possible affect here must be "substantial"; a financial interest that could remain static or that could be subject to

[6] The Published Advisory Opinions of the Committee on the Codes of Conduct are provided in the Guide, vol. 2, ch. 4.

exiguous alteration is not enough to create a conflict under Canon 3F(1). See Advisory Opinion No. 94 (observing that a judge would have to recuse only if the value of the judge's fractional royalty interest could be "substantially" affected). Compare Compendium of Selected Opinions § 3.1-7[1](c) (2005) (explaining that saving 60 cents per month on a utility bill could not reasonably be considered "substantial"), with id. § 3.1-7[1](e) (explaining that doubling of a utility bill from $10 to $20 per month - but not proceedings that would likely affect rates only remotely or not at all - could reasonably be considered "substantial").[7] Cf. Brody v. President & Fellows of Harvard College, 664 F.2d 10, 11-12 (1st Cir. 1981) ("The mere association of a judge with a party, without indication that the judge stands to obtain financial or other gain from a particular outcome, may similarly be insufficient to mandate disqualification . . . . [W]here the interest asserted bears only a tangential relationship to the subject matter of the suit, the alleged bias is even further attenuated.").

There is no evidence that Microsoft would rescind or otherwise modify its research grant to Brown University based on the result of this litigation. Such a move would likely be impossible given the fact that the grant was awarded for this past academic year

[7] The Compendium of Selected Opinions of the Committee on the Codes of Conduct is provided in the Guide, vol. 2, ch. 5.

only and Mr. Eddon's advisor has already exhausted the funds. The thought that Microsoft might alter its funding of research projects at the University in the future is too speculative and far-fetched even to merit consideration. Also, there is nothing to suggest that Microsoft would cancel or renegotiate its contractual obligations to provide Mr. Eddon with royalty payments. First, as explained above, the subject matter of the programming guides has nothing to do with the issues disputed in this case. Second, Mr. Eddon's most recent programming guide is eight years out of date – the equivalent of a dinosaur in an industry where technology often becomes obsolete in six months to a year. This is consistent with Mr. Eddon's last royalty payment of $3.97 on February 12, 2007, and the downward spiral of profitability in the months following publication (as an example, consider Mr. Eddon's payment of $8.67 on August 27, 2006). Third, as I understand it, any copyright interest that Mr. Eddon retains is quite restricted, if he has any at all. It appears that the copyrights to the programming guides have passed to Microsoft, and that Mr. Eddon has retained only a "portions" copyright to segments of the code contained in compact discs that accompanied the programming guides (code which he drafted simply to provide illustrations of how one might apply the technology in a given situation). Anyway, this interest would seem to diminish in a fashion corresponding with his royalty payments,

which (no offense to Mr. Eddon) already amount to nothing more than pocket change.

The only remaining provision of possible application is Canon 2, which reads: "A judicial employee should not engage in any activities that would put into question the propriety of the judicial employee's conduct in carrying out the duties of the office." It seems to me that the strictures of Canon 2 are limited to situations involving the impropriety or the appearance of impropriety on account of "activities" during judicial employment, such as but not limited to the pursuit of post-judicial employment. See generally Compendium of Selected Opinions § 2.5 ("Judges and Judicial Employees Negotiating for Future Employment"). Compare this with the broad language in § 455(a) (requiring recusal for any reason when, knowing all the facts, a judge's "impartiality might reasonably be questioned"), discussed at length below. If Uniloc had made an argument under Canon 2 (it did not), I would be curious to hear which of Mr. Eddon's "activities" this summer would put the propriety of his conduct in question. Surely, Canon 2 would bar Mr. Eddon's participation in this case if, during the course of his internship, he were to accept employment with Microsoft, for example. See Advisory Opinion 74 (requiring isolation when a law clerk accepts employment with a lawyer or law firm in a pending case). But short of that, the only thing that can arguably (but

hardly) be described as an "activity" under Canon 2 is Mr. Eddon's residual contract and copyright interest in his programming guides; as I explained above, however, this interest is attenuated and inconsequential. Knowing these facts, no reasonable person would question the propriety of Mr. Eddon's participation in this case.

III

Section 455(a) of Title 28 of the United States Code provides that, "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[8] The statute "was designed to promote public confidence in the integrity of the judicial process by replacing the subjective 'in his opinion' standard with an objective test." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 858 (1988); see also United States v. Cowden, 545 F.2d 257, 265 (1st Cir. 1976) (reviewing the legislative history behind the changes to § 455(a) in a criminal case involving allegations of the appearance of impropriety). Perception is reality under § 455(a): a judge may be required to recuse even in the absence of an actual bias. See Liteky v. United States, 510 U.S. 540, 548 (1994) (describing § 455(a) as a

[8] The recusal decision in this case is governed by the law of the First Circuit. See Baldwin Hardware Corp. v. Franksu Enter. Corp., 78 F.3d 550, 556 (Fed. Cir. 1996) (holding that substantive and procedural issues not within the exclusive jurisdiction of the Federal Circuit are guided by the law of the regional circuit).

"catchall" recusal provision covering more than the specific of illustrations of 28 U.S.C. § 144); In re Martinez-Catala, 129 F.3d 213, 220 (1st Cir. 1997) (observing that "recusal is required regardless of the judge's own inner conviction that he or she can decide the case fairly despite the circumstances"); see also Offutt v. United States, 348 U.S. 11, 14 (1954) (saying that "justice must satisfy the appearance of justice").

The statute has standards, however; "unsupported, irrational, or highly tenuous speculation" is not enough to trigger recusal under § 455(a). In re United States, 666 F.2d at 694, 695 n.* (distinguishing "the standard for judging Caesar's wife," that is, the standard of mere suspicion). Rather, the statute "requires a judge to step down only if the charge against her is supported by a factual foundation and 'the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality.'" In re United States, 158 F.3d 26, 30 (1st Cir. 1998) (quoting In re United States, 666 F.2d at 695) (emphasis in original); see also In re Allied-Signal Inc., 891 F.2d 967, 970 (1st Cir. 1989) ("Only if the district court's decision to sit 'cannot be defended as a rational conclusion supported by [a] reasonable reading of the record' will we insist upon disqualification.") (emphasis in original) (quoting

In re United States, 666 F.2d at 695). As one member of the Court has observed, recusal under § 455(a)

> is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings. I think we all would agree that a high threshold is required to satisfy this standard. Thus, under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

Liteky, 510 U.S. at 557-48 (Kennedy, J., concurring).

In an ordinary case, doubts should be resolved in favor of recusal. In re United States, 158 F.3d at 30 (citing Nichols v. Alley, 71 F.3d 347, 352 (10th Cir. 1995); United States v. Dandy, 998 F.2d 1344, 1349 (6th Cir. 1993)). But cases implicating § 455(a) are rarely ordinary, see In re United States, 158 F.3d at 31 (observing that recusal cases are almost always sui generis), and district courts maintain a wide range of discretion to decide whether recusal is required. See id. at 30 (observing that "the challenged judge enjoys a margin of discretion"); Allied-Signal, 891 F.2d at 970 (same); In re United States, 666 F.2d at 695 ("[T]he analysis of allegations, the balancing of policies, and the resulting decision whether to disqualify are in the first instance committed to the district judge. And, since in many cases reasonable deciders may disagree, the district judge is allowed a

range of discretion."). But see In re United States, 158 F.3d at 36 (Torruella, J., dissenting) (saying that he would impose a de novo standard of review to recusal determinations) (citing In re Hatcher, 150 F.3d 631, 637 (7th Cir. 1998)). If, in the exercise of that discretion, a judge determines that recusal is unnecessary or unwise, the judge is duty bound to sit and hear the case. See In re United States, 441 F.3d 44, 67 (1st Cir. 2006) (criminal case); Brody, 664 F.2d at 12 ("There is as much obligation upon a judge not to recuse himself when there is no occasion as there is for him to do so when there is . . . .") (quoting In re Union Leader Corp., 292 F.2d 381, 391 (1st Cir. 1961)); see also Blizard v. Frechette, 601 F.2d 1217, 1221 (1st Cir. 1979) (recognizing the abrogation of the so-called "duty to sit" doctrine, but holding that judges must still hear cases unless the statute prohibits it).

IV

Without the benefit of its underlying assumption that a conflict exists, Uniloc's argument under § 455(a) is unsupportable. Uniloc submits no authority that says a judge must recuse when he hires a non-conflicted unpaid judicial intern with tenuous connections to a party. If any exists, my independent research has not found it. The statute is silent on this issue; so is its mirroring provision in the Code of Conduct for United States Judges

("Judges' Code").[9] See Judges' Code, Canon 3C(1) ("A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned."). Nor are there any relevant proscriptions in the local rules of this District or of the First Circuit. See First Circuit Local Rule 46(e) (prohibiting law clerks from engaging in the practice of law during the during the terms of service, or appearing before the court at counsel table or on brief for one year following separation from service).

The cases I have reviewed that pose a derivative § 455(a) question, mostly involving law clerks, either found that a conflict existed, see, e.g., Corrugated Container Antitrust Litig. Steering Comm. v. Mead Corp., 614 F.2d 958, 967-68 (5th Cir. 1980) (finding that a law clerk likely violated ethical canons in giving a press interview after a criminal case), or assumed that one did, see, e.g., Allied-Signal, 891 F.2d at 971 (assuming that the law clerks' relationship with defense counsel "raises a slight cloud"); Hunt v. Am. Bank & Trust Co. of Baton Rouge, Louisiana, 783 F.2d 1011, 1015-16 (11th Cir. 1986) (assuming that a law clerk would be prohibited from working on a case involving a law firm with which the law clerk had accepted employment); in other cases, inquiring courts have proceeded directly to the recusal question because the conflict was, unlike the present case, apparent. See, e.g., Parker

[9] The Judges' Code is provided in the Guide, vol. 2, ch. 1.

v. Connors Steel Co., 855 F.2d 1510, 1523-28 (11th Cir. 1988) (law clerk's father, who had previously clerked for the same judge, was a senior partner at the law firm representing a party in the case); Hall v. Small Bus. Admin., 695 F.2d 175, 177-79 (5th Cir. 1983) (law clerk was a member of plaintiffs' class in a case on which the law clerk was working); Kennedy v. Great Atl. & Pac. Tea Co., Inc., 551 F.2d 593, 596-99 (5th Cir. 1977) (law clerk personally inspected the scene of a slip and fall and later testified for one of the parties in the case). Then the question became whether, as a result of the law clerk's conflict of interest, the judge should have recused, see, e.g., Allied-Signal, 891 F.2d at 971 (holding that the judge properly refused to recuse); Parker v. Connors Steel Co., 855 F.2d 1510, 1523-28 (11th Cir. 1988) (holding that the judge's failure to recuse was harmless error), or, if possible, isolated the law clerk from working on the case. See, e.g., Allied-Signal, 891 F.2d at 972 (observing that the appropriate remedy for addressing a law clerk's conflict of interest is for the clerk, not the judge, to be disqualified); Hall, 695 F.2d at 177-79 (requiring recusal because the judge did not isolate the law clerk from the case in time).

Here, Uniloc's argument puts the cart before the horse. It is generally understood that a law clerk, or any member of the judge's staff for that matter, "is forbidden to do all that is prohibited

to the judge." Hall, 695 F.2d at 177-79; Price Bros. Co. v. Philadelphia Gear Corp., 629 F.2d 444, 447 (6th Cir. 1980) (holding that "a judge may not direct his law clerk to do that which is prohibited to the judge"); Judges' Code, Canon 3B(2) ("A judge should require court officials, staff, and others subject to the judge's direction and control, to observe the same standards of fidelity and diligence applicable to the judge."). But the reverse is not always true, as Uniloc's argument presumes: "A judge is not necessarily forbidden . . . to do all that is prohibited to each of his clerks." Hunt, 783 F.2d at 1015-16; see also Allied-Signal, 891 F.2d at 971 (observing that "[b]oth bench and bar recognize . . . that judges, not law clerks, make the decisions"); Corrugated Container, 614 F.2d at 968 ("[W]e think it fitting to restrict those situations in which the bias of a law clerk will work to disqualify the clerk's employer. Clearly, a law clerk's views cannot be attributed to the judge for whom the clerk works."); Advisory Opinion 74 (isolating law clerk who accepts employment with a lawyer or law firm in a pending case will generally silence questions about a judge's impartiality in that case). Where, as here, an intern has no conflict of interest in the first place, there is nothing that could be imputed to the judge that might require the intern's isolation, let alone the drastic remedy of recusal.

V

Although I do not believe that the presence of a non-conflicted judicial intern in my chambers implicates § 455(a), I feel compelled to address Uniloc's argument based on the breadth of the statute's language and purpose, see Liteky, 510 U.S. at 548, and the reality that the whole is sometimes greater than the sum of the parts. Cf. Martinez-Catala, 129 F.3d at 221 ("The cumulative effect of a judge's individual actions, comments and past associations could raise some question about impartiality, even though none (taken alone) would require recusal."). Several factors (some general, some special) lead me to conclude that no reasonable and knowledgeable person would question my impartiality in this case.[10]

A

Mr. Eddon's past connections to Microsoft, as discussed in greater detail supra Part II, are weak and remote. He has never been an employee of Microsoft, harbors no bias or prejudice against either party, and has no personal knowledge of any of the disputed

---

[10] Uniloc does not invoke Canon 3C(1) of the Judges' Code as an independent ground for my disqualification; however, because § 455(a) and Canon 3C(1) are coextensive, the result is the same. See First Interstate Bank of Arizona v. Murphy, Weir & Butler, 210 F.3d 983, 987 (9th Cir. 2000) (recognizing that the mandate of § 455(a) is identical to an earlier provision of the Judges' Code, now embodied in Canon 3C(1)); Advisory Opinion No. 90 (describing § 455(a) as "a provision comparable to Canon 3C(1)").

facts in this case. His publications for Microsoft Press are outmoded, and the royalties he receives from them are insignificant and unlikely to change as a result of this litigation. Also, his connection to the Microsoft research grant was peripheral and has since been terminated. If it is true that "few knowledgeable people would expect that [an actual conflict of interest] would ordinarily cause most law clerks to actually commit the serious ethical breach of seeking to influence a judge improperly," Allied-Signal, 891 F.2d at 971, fewer still would expect that these gossamer connections (that do not, in themselves, create an actual conflict) would cause an intern to do likewise. See Byrne v. Nezhat, 261 F.3d 1075, 1102 (11th Cir. 2001) ("A law clerk has little incentive to influence a judge in an effort to curry favor with a former employer."); see also First Interstate Bank, 210 F.3d at 988 (recognizing that judges are not infallible, "[b]ut despite this, judges (and their law clerks) are presumed to be impartial and to discharge their ethical duties faithfully so as to avoid the appearance of impropriety").

At the same time, this case is complex and time consuming. It involves a sophisticated registration system to reduce the unauthorized use of software by allowing digital data to run in a use mode of a computer platform only if the appropriate licensing procedure has been followed. Uniloc has advanced at least twelve

infringement theories. Last year, the parties submitted a joint designation of twenty-four disputed claim terms (a high number, from what I can gather anecdotally). See Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995). Claims construction took almost an entire summer - not including time spent reading the extensive briefing, attending a technical tutorial, and conducting a Markman hearing - and generated a lengthy decision (for which a prior law clerk provided the laboring oar). See generally Uniloc, 447 F. Supp. 2d 177. The stakes are also quite high; during the summary judgment hearing, counsel represented to me that, as of 2005, damages were estimated at $525 million. It seems to me that the case stands to benefit from, if it does not absolutely require, Mr. Eddon's participation, and that, consequently, a knowledgeable observer would be less likely to view his participation as a sign of judicial partiality. See Allied-Signal, 891 F.2d at 972 (observing, in the context of a highly complex class action involving two arguably conflicted law clerks, that "other things being equal, the greater the extent to which the potentially disqualifying circumstance facilitates the just and efficient resolution of a case, the less likely a knowledgeable observer will consider it a sign of judicial partiality").

The risk of injustice to the parties were I to recuse is also quite high. This case is approaching its fourth year of gestation in my chambers. A new judge would face a considerable learning curve and untold hours of preparation before reaching a point where resolving the parties' summary judgment motions (which I currently have under advisement) would be possible, even with the assistance of a technical advisor or computer-savvy intern or law clerk. This would translate into unnecessary repetition and expense for the parties. Compare Allied-Signal, 891 F.2d at 973 (identifying repetitious litigation as a significant risk of injustice to the parties that affects the remedy calculous), with Parker, 855 F.2d at 1526 (finding that recusal was appropriate in part because the risk of injustice to the parties was nonexistent). There is also a special (and perhaps unique) consideration in this case that makes me not so easily replaceable. At present, there are two active district court judges in this district (including myself) and one vacancy. Chief Judge Lisi, the other active district court judge, has already recused from this case. Theoretically, the case could be reassigned to one of the two senior judges; however, one (Judge Torres) has already served as a settlement judge, and the other (Judge Lagueux) may choose not to accept the case in light of

his other commitments.[11] This means that, were I to recuse, the case might possibly be transferred to another district, further impeding a just and efficient resolution.[12]

The hardly unavoidable coincidence of Mr. Eddon's connection to Microsoft is another special feature of this case. The risk that an intern pursuing (or a technical advisor with) an advanced degree in computer science will have at least some connection to Microsoft is not inappreciable. According to the Washington Post, "Microsoft has lavished $500 million over the past five years on research and teaching projects at 1,000 schools, funding efforts by 6,000 academics in computer science, electrical engineering, linguistics, biology, mathematics, graphic arts, music and other fields." Microsoft's Big Role on Campus; Donations Fund Research, Build Long-Term Connections, Washington Post, August 25, 2003, at A01. Uniloc itself recognized (if only to criticize) Microsoft's pervasive reach into academia and the industry at large when we

---

[11] And while not a factor in my decision, it is worth mentioning that Judge Lagueux does not use a computer in either his work or personal life and has no intention to start doing so. This would, quite obviously, affect the learning curve if he were to take the case.

[12] Where the case would ultimately land (New Hampshire, Maine, or Massachusetts) is hard to tell. Anecdotally, I can attest to the fact that cases involving common stock holdings have been transferred to me from these districts on several occasions. Of course, shares of Microsoft are, for active investors, commonly held stock.

discussed the possibility of appointing a technical advisor. (Ironically, I ultimately chose not to seek a technical advisor in part because of the acrimony that the selection process would have engendered.) A knowledgeable observer would less likely see this relationship, which arises out of a common circumstance as opposed to an odd coincidence, as a suggestion of bias. See Allied-Signal, 891 F.2d at 971 (observing that, "other things being equal, the more common a potentially biasing circumstance and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality").

One last observation on this score. When I first invited the parties to move for my disqualification if they wished to do so, Uniloc responded as follows: "Uniloc does not believe that Your Honor should be recused from this case. Accordingly, a motion for recusal will not be filed by Uniloc." At the subsequent hearing on this matter, Uniloc explained that it "did not see objecting to the potential partiality of the intern as reflecting in any way upon you." Choosing to seek my disqualification after all, Uniloc said: "As previously indicated, Uniloc does not have any reason to question the impartiality of Judge Smith. Uniloc has been instructed, however, that it cannot maintain its objection to Mr. Eddon without filing a motion to recusal [sic] Judge Smith. Given

this choice, Uniloc moves for recusal."[13] These statements undermine Uniloc's central argument. How could a knowledgeable person question my impartiality in this case if the party moving for my disqualification does not? See Allied-Signal, 891 F.2d at 972 (observing that "the parties' own words and deeds may help determine the extent to which a knowledgeable observer would see, in a particular circumstance, a sign of partiality").

B

An obvious but important distinction between this and other derivative § 455(a) cases is that an intern is not a law clerk, or even a temporary one. Law clerks are handpicked legal advisors with considerable (although not undue) influence over the outcomes of cases.[14] Ever increasingly, they enter clerkships (as I require) with post-graduate legal experience; some spend their careers

[13] The only explanation I see for this curious statement is that Uniloc misinterpreted my instructions during the hearing (as it did earlier with respect to my remarks about how I would employ a technical advisor, had I appointed one). In any event, Uniloc's motivations for seeking my disqualification are irrelevant.

[14] Note that some recent commentators have criticized the amount of influence law clerks wield, at least at the Supreme Court. See, e.g., Courtiers of the Marble Palace: The Rise and Influence of the Supreme Court Law Clerk (2006) (suggesting that liberal or conservative Supreme Court law clerks unduly influence their justices' decision making); Sorcerer's Apprentices: 100 Years of Law Clerks at the United States Supreme Court (2006) (similar, but cast in terms of an empirical study).

clerking. The panel in Hall, for example, captured the role of the law clerk rather well:

> Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision. Clerks are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be.

Hall, 695 F.2d at 179. For this reason, many judges, including myself, do not hear cases involving their former law clerks, at least for a time following their separation from service. Compare Fredonia Broad. Corp. v. RCA Corp., 569 F.2d 251, 255-56 (5th Cir. 1978) (holding that the judge should have recused under § 455(a) after being made aware that his former law clerk was actively involved as counsel for a party in a case in which the law clerk had participated during his clerkship), overruled on other grounds by Riquelme Valdes v. Leisure Res. Group, Inc., 810 F.2d 1345, 1350 n.3 (5th Cir. 1987), with Martinez-Catala, 129 F.3d at 221 (affirming judge's decision not to recuse under § 455(a) in a case in which one of the defense counsel had once clerked for the judge because, "after a self-imposed cooling off period," the likelihood that a judge's partiality might reasonably be questioned was minimal, and further observing that "any lawyer who studies a judge's past rulings can make an informed guess as to how the judge is likely to approach an issue").

Of course, the role of the law clerk is not without parallel. For instance, cases involving ad hoc advisors appear to fall under the same rubric. See In re Kensington Int'l Ltd., 368 F.3d 289, 308-11 (3d Cir. 2004) (analogizing asbestos advisors to law clerks for the purposes of a derivative challenge a judge's impartiality under § 455(a), and distinguishing between "conflicted advisors who participate or influence a judge" and "an expert or other assistant to the judge who is disinterested and non-conflicted"); see also In re Kempthorne, 449 F.3d 1265, 1270-71 (D.C. Cir. 2006) (applying § 455(a) to a special master, and analogizing the clearly-conflicted special master's assistant to the conflicted ad hoc advisors in Kensington). In Kensington, the advisors worked directly under the judge on a task that defined their length of appointment, with the authority to "mediate disputes, hold case management conferences, and consult with the attorneys," giving them "a special position of trust and influence over the judge" akin to that of a law clerk. Kensington, 368 F.3d at 308; accord Kempthorne, 449 F.3d at 1270-71 (observing that the conflicted assistant was hired by and reported directly to the special master).

But judicial interns do not equate, although this necessarily depends on the structural dynamics of a given chambers. To my knowledge, only one reported case has involved a derivative attack on a judge's impartiality based on an intern's conflict of

interest. Simonson v. Gen. Motors Corp., 425 F. Supp. 574 (E.D. Pa. 1976) (refusing to recuse because the part-time unpaid judicial intern, who also worked for a law firm with a case pending before the court, had been isolated from that particular case). Unlike the advisors in Kensington or the assistant in Kempthorne, the intern in Simonson was directly supervised by a law clerk, who in turn reported to the judge. The internship was also relatively short, lasting, it appears, for only a semester (the assumption being that the cases on which the intern works often began before and will continue after the internship). These factors limited the extent to which a knowledgeable observer would have cast a suspicious eye upon the judge under § 455(a). See Simonson, 425 F. Supp. at 576. Many of these factors are present in the case under review. Mr. Eddon will work directly under one of my law clerks (on this case and others), who in turn reports to me on his progress and performance. Also, Mr. Eddon's internship will terminate at some point this summer, after which the case will continue in my chambers until final disposition. This is not to belittle his contribution, but to recognize that his participation will be limited to a relatively small speck on the continuum of this case.

* * *

The short of the matter is that the recusal statute does not permit me to recuse from a case, however tedious and complex, based on my intern's relationship with one of the parties when that relationship is weak, remote, and separate from the issues in dispute. This is especially (if not always) true when the relationship between the intern and the party does not create a conflict of interest in the first place.

For all of these reasons, Uniloc's Motion for Recusal is DENIED.

It is so ordered.

WESmith

William E. Smith
United States District Judge

Date: 6/14/07