UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNILOC USA, INC. and UNILOC SINGAPORE PRIVATE LIMITED,

Plaintiffs,

v.

MICROSOFT CORPORATION,

Defendant.

C.A. No. 03-440 S

OPINION AND ORDER

William E. Smith, United States District Judge.

Uniloc USA, Inc. and Uniloc Singapore Private Limited (collectively, "Uniloc") have brought this patent infringement action against Microsoft Corporation ("Microsoft") for allegedly infringing Uniloc's United States Patent Number 5,490,216 ("the '216 Patent"). Microsoft has moved for summary judgment on non-infringement and invalidity. Also, Uniloc has moved for partial summary judgment on Microsoft's counterclaim of inequitable conduct. The Court heard oral argument on November 29, 2006, and took the matter under advisement. Applying the claim terms as previously construed, Uniloc USA, Inc. v. Microsoft Corp., 447 F. Supp. 2d 177 (D.R.I. 2006), and for the reasons that follow, Microsoft's Motion for Summary Judgment will be granted on the

issue of non-infringement,[1] and Uniloc's Motion for Partial Summary Judgment will be denied as moot.

I. Background and Facts

In the late 1970s, the personal computer revolution changed the market dynamics for software products. See generally Martin Campbell-Kelly, Not All Bad: An Historical Perspective on Software Patents, 11 Mich. Telecomm. & Tech. L. Rev. 191 (2005). Along with the rise of the personal computer came a wave of software piracy. Ever since, software vendors and determined hackers have been locked in an arms-race where new and evermore sophisticated software protection techniques are developed, then "cracked," leading to new development, and so on. Trotter Hardy, Property (and Copyright) in Cyberspace, 1996 U. Chi. Legal F. 217, 251 (1996). Early anti-piracy efforts focused on copy protection technology that made it difficult to duplicate the original software media (e.g., the floppy disks containing the software). These early copy protection systems were broken by "nibbler" programs that made very precise bit-by-bit copies of the original software media.[2] Later, as larger software packages that had to be installed on the user's computer became more prevalent, copy

[1] Because Microsoft's motion is resolved on this issue, the Court does not reach the issue of invalidity.

[2] See Wikipedia, Copy protection, http://www.wikipedia.com/wiki/Copy_protection (describing "nibbler" programs) (as of October 2, 2007).

protection technology became less effective because a legitimate user could simply "loan" the original disks to someone else for the purpose of installing it on their computer; this is sometimes referred to as "pass-along piracy." John A. Rothchild, Economic Analysis of Technological Protection Measures, 84 Or. L. Rev. 489, 548 (2005). Some software vendors responded to pass-along piracy by requiring the use of a hardware "dongle," i.e., a device containing an electronic serial number that had to be plugged into a computer port in order to run the software. Id. at 493 n.7. While this type of system was much harder to break because it required building an equivalent hardware device, users frequently balked at the inconvenience of having to attach a piece of hardware to their computer in order to run a software package. Software copy protection technologies in general were widely regarded as an annoyance to customers. Id. at 546-547.

In the 1990s, many software vendors stopped concentrating on preventing the copying of software media, and, instead, began focusing on preventing the use of already installed software by unlicensed users. The basic premise of such systems is that after installing a software package the user must "validate" or "activate" the software to verify that their installation is legitimate. Id. at 495. The main advantage of this approach is that it renders copying of the original software media relatively unimportant, since even the copied software must be installed and

validated before it can be used. Validation typically requires that the user exchange information with a centralized registration authority managed by the software vendor. Id. This allows the vendor to control whether or not to validate a specific installation of the software. Software validation schemes generally employ a database at the registration authority that tracks all legitimate installations of the software. In order to uniquely identify each legitimate copy of the software shipped and later purchased and installed by a user, software vendors must attach a unique number to each copy of the media. This number can then be checked against the centralized database at the registration authority when users validate their installation. If the database contains information indicating that a particular copy of the software has been installed and validated previously, the registration authority can refuse to validate the new installation based on the suspicion that it is likely fraudulent.

Initially, such validation techniques required that each copy of the software media be encoded with a unique "registration" number that identified that particular copy of the software. This approach, however, was costly and time consuming, because each copy of the software media had to be slightly different from all other copies due to the unique registration number. In turn, this meant that software vendors were unable to use a mass duplication manufacturing process to produce their products. Another weakness

of the software validation approach was that determined copyists could still perform a file-by-file copy of an already installed and "validated" copy of the software. This validated version could then be illegally copied to and run on another system.

The '216 Patent offered solutions for both problems. One of its main contributions was to invent a validation process by which the unique registration number could be distributed separately from the software media. Today, this type of number is frequently found on the back of the CD jewel case, and is not part of the software program itself. The advantage of employing the approach described in the '216 Patent is that the software media can once again be mass produced since all copies are identical. In a second contribution, the '216 Patent describes a process that evaluates the user's computer hardware each time the software is run to determine whether it is the same computer on which the software was originally installed. This countermeasure is designed to make it difficult to use a file copying technique to avoid the validation process. Each computer has a unique hardware "signature" that can be detected and compared with the computer hardware in place when the software was originally validated. If the signatures match, the computer on which the software is currently running is assumed to be the same as that on which it was originally installed; otherwise, the software may have been copied to another machine, prompting re-validation.

The Achilles' heel of the invention, however, is its weak security. The '216 Patent requires matching "magic numbers" (values whose only meaning derives from the fact that they match, or fail to match, other values – in the '216 Patent these values are referred to as "licensee unique IDs"), which are generated separately on both the client- and server-side parts of the validation system by the same algorithm, using the same inputs. If the values match, that is considered "proof" that the registration authority validated the installation. But the entire registration system can be bypassed if the user can guess the magic number that would normally be generated by the server. While the chance of randomly guessing the correct magic number is very slight, a determined hacker need only reconstruct the algorithm used by the server to compute that number. Then a relatively simple program can be created that takes the identical inputs as the server-side system and produces the identical magic number that would be produced by the genuine registration authority. A hacker is greatly aided by knowledge that the '216 Patent requires that the same algorithm that produces the magic number on the server is also used to generate the magic number on the client. This makes it possible to crack the validation system by reverse engineering the client-side software to discover the actual algorithm used to compute the magic number. See, e.g., Rothchild, Economic Analysis at 508. It would, of course, be much harder to determine the

algorithm were it only on the server,[3] but the '216 Patent requires that the magic number generator be included on both the client and the server. This requirement is the natural result of the symmetric design of the invention described by the '216 Patent. If the magic number were generated only on the server, there would be no equivalent number on the client for it to match.

Microsoft's Product Activation system is, in a macro sense, similar to the invention described by the '216 Patent. Like the '216 Patent, Microsoft's system is designed to prevent unlicensed users from running their software. However, the process that Microsoft's system uses to accomplish this goal is different in two important ways. First, it does not use the same algorithm on the client and server systems to compute matching magic numbers. For example, the client creates a Product ID using the Product Key (roughly equivalent to the registration number in the '216 Patent) distributed with the software media, the software's version number,

---

[3] The '216 Patent describes the algorithm used to compute the magic numbers as an "adder or summer" or its equivalents. '216 Patent, col. 12, ll. 52-53. This is, of course, a red herring, as a simple arithmetic summation of the values provided by the user would be far too easy to discover and hence to crack. Instead, the inventor of the '216 Patent likely planned to use a far more complex algorithm that would be commensurately more difficult to reverse engineer. Whether or not this "secret" algorithm should have been disclosed in the '216 Patent as the best method is not an issue this Court needs to reach. In all likelihood, the inventor of the '216 Patent was not required to disclose the "secret" algorithm because this would instantly render the invention useless. Fonar Corp. v. General Elec. Co., 107 F.3d 1543, 1549 (Fed. Cir. 1997); see In re Hayes Microcomputer Prods., Inc. Patent Litig., 982 F.2d 1527, 1537-38 (Fed. Cir. 1992).

and a random value. The Product Activation system on the client also generates a Hardware ID by quantifying various components of the computer hardware on which the software is being installed, and then processing this information using a one way mathematical transformation called a "hash" function. The Product ID and Hardware ID are then sent to the server-side registration authority. At the registration authority, a check is performed to determine whether the Product ID received from the client is already stored in the centralized database. If the Product ID is not yet in the database, its absence indicates that this particular copy of the software is being installed for the first time. The first installation of a particular copy of the software is presumptively considered valid, and the Product ID and Hardware ID are then stored in the database as a record of this installation. If the Product ID is already in the database, indicating that this copy of the software has been installed previously, the installation is considered suspect and the user is asked to contact Microsoft's registration authority. This situation may arise in legitimate circumstances; for example, when a user reinstalls the software on a new computer (assuming that it is deleted from the old computer in compliance with the software vendor's licensing rules).[4]

---

[4] Some software licenses may explicitly permit the user to install the software on two computers (for example, a desktop and a laptop computer).

Second, Microsoft's system does not rely on the secrecy of its algorithms for its integrity; instead, it relies on public key cryptography. Joshua L. Colburn, "Don't Read This If It's Not For You": The Legal Inadequacies of Modern Approaches to E-Mail Privacy, 91 Minn. L. Rev. 241, 259 (2006). Public key (or asymmetric) cryptography employs a pair of keys: a public key and a private key. The two keys are always generated together and are mathematically related, usually through manipulation of very large prime numbers.[5] Their critical property, however, is that the private key cannot be practically derived from the public key. Thus, the private key is kept secret, while the public key may be widely distributed. Each key can transform data in just one direction, turning plain text into cipher-text or vice versa. For example, if data is encrypted using the public key, it can be decrypted only with the private key, guaranteeing that the communication is private. On the other hand, data encrypted by the private key can be decrypted by anyone having the public key, thereby authenticating that the message came from whomever has the corresponding private key.

When the registration authority approves a user's installation, the server encrypts the Product ID, Hardware ID, and additional information from the server into a "license" data

[5] See generally Wikipedia, Public-key cryptography, http://en.wikipedia.org/wiki/Public-key_cryptography (as of October 3, 2007).

structure using the secret, private key, and then returns it to the client. Back on the client's system the "license" is decrypted using the public key, yielding the Product ID and Hardware ID stored within. Finally, the client compares those decrypted values with the ones generated on the client initially. If they match, thereby authenticating the "license" returned by the server, the user's installation is considered validated and the protected software is available for full use. The private key, used to encrypt the "license" or the Confirmation ID is stored only on Microsoft's server,[6] so that it cannot be determined by reverse engineering the client software. The user's system contains the mathematically related public key, where it is used to decrypt the "license" or Confirmation ID, revealing the Product ID and Hardware ID. This application of asymmetric key cryptography provides a "digital signature," ensuring that the message from Microsoft's registration authority is authentic.

In sum, Microsoft's system is not as vulnerable as the invention described by the '216 Patent. Rather than relying on a secret algorithm employed to generate matching magic numbers on both the client and the server, Microsoft's system employs asymmetric key cryptography, which allows the use of open and different algorithms on the client and server. So long as the

---

[6] In the case where the user chooses to validate the software by telephone rather than via the Internet, the registration authority generates an encrypted Confirmation ID, a short form of the "license," which is communicated to the user by phone.

private key housed on Microsoft's servers remains secret, it is a very difficult system to bypass.[7] Importantly, it is not the use of encryption per se that makes Microsoft's system substantially different from the invention disclosed by the '216 patent; it is certainly possible to use encryption technology in the context of a software validation system that would infringe upon Uniloc's intellectual property. As described in the analysis that follows, however, it is the way encryption technology is employed by Microsoft's system that takes it outside the claims of the '216 patent and thus precludes a finding of infringement.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment may be had in a patent case (and, in particular, on non-infringement) if there is no genuine issue whether the accused device is encompassed by the patent claims. Novartis Corp. v. Ben Venue Labs., Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001); Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1304 (Fed. Cir. 1999). Since the ultimate burden of proving

[7] The strength of any key-based cryptographic technique is directly related to the difficulty of discovering the key, which in turn depends on the length of the key. As the length of the key increases, the time and effort required to guess the correct key increases. Trying every possible key is known as a brute force attack. An 8 bit key can be one of 256 possible values; a brute force attack on a key this size is trivial. The number of possible key values increases exponentially with the key's size (e.g., a 128-bit key size contains $2^{128}$ possible key values). See Wikipedia, Key size, http://www.wikipedia.org/wiki/Key_size (as of October 3, 2007).

infringement rests with the patentee, an accused infringer seeking summary judgment of non-infringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case. Novartis, 271 F.3d at 1046; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 807 (Fed. Cir. 1999). As in more routine contexts, evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in that party's favor. Bus. Objects, S.A. v. Microstrategy, Inc., 393 F.3d 1366, 1371-72 (Fed. Cir. 2005).

Once the movant overcomes this initial hurdle, the burden shifts to the non-movant to designate specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Novartis, 271 F.3d at 1046. The nonmovant "must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient." Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984); see also Applied Companies v. United States, 144 F.3d 1470, 1475 (Fed. Cir. 1998) ("It is well settled that 'a conclusory statement on the ultimate issue does not create a *genuine* issue of fact.'") (quoting Imperial Tobacco Ltd. v. Philip

Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990) (emphasis in original)); Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc., 45 F.3d 1550, 1562 (Fed. Cir. 1995) ("There must be sufficient substance, other than attorney argument, to show that the issue requires trial."). "[I]nsupportable, [or] specious . . . explanations or excuses will not suffice to raise a *genuine* issue of fact." Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1193 (Fed Cir. 2006) (quoting Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1190 (Fed. Cir. 1993) (emphasis in original)).

Given the numerous factual issues involved and the need for expert testimony in these cases, a motion for summary judgment should be approached cautiously. Amhil Enters. Ltd. v. Wawa, Inc., 81 F.3d 1554, 1557-58 (Fed. Cir. 1996); SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116, (Fed. Cir. 1985) ("[I]nfringement is itself a fact issue, [so] a district court must approach a motion for summary judgment of infringement or non-infringement with a care proportioned to the likelihood of its being inappropriate."). Nevertheless, where a patentee opposes the motion with only "conclusory allegations, improbable inferences, and unsupported speculation," Smith v. Stratus Computer, Inc., 40 F.3d 11, 13 (1st Cir. 1994) (internal citations and quotation marks omitted), a defendant's motion for non-infringement must be granted.

B. The Law of Infringement

It is hornbook patent law that infringement of even a single claim entitles a patentee to damages. CollegeNet, Inc. v. ApplyYourself, Inc., 418 F.3d 1225, 1236 (Fed. Cir. 2005). A patentee can show infringement in two ways. The first, "literal" infringement, exists "when the accused device literally embodies each limitation of the claim." Kraft Foods, Inc., v. Int'l Trading Co., 203 F.3d 1362, 1370 (Fed. Cir. 2000); Imatec, Ltd., v. Apple Computer, Inc., 81 F. Supp. 2d 471, 484 (S.D.N.Y. 2000) ("To be liable for literal, direct infringement, a defendant must duplicate each element of a patent claim exactly."). However, the absence of even one element of a claim will defeat an action for literal infringement. Bayer AG v. Elan Parm. Research Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000) ("If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."); Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed. Cir. 1998) (holding the absence of a single limitation fatal to plaintiff's case). The second, the so-called "doctrine of equivalents," often softens the stringency of this "all limitations" requirement. Judge Learned Hand described the doctrine as designed "to temper unsparing logic and prevent an infringer from stealing the benefit of the invention." Royal Typewriter Co. v. Remington Rand, Inc., 168 F.2d 691, 692 (2d Cir. 1948). Thus, "[a] device that does not literally infringe a claim

may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device." Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1423 (Fed. Cir. 1997). Under the doctrine, then, a substantially equivalent process producing substantially the same result by substantially the same means will also infringe. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608 (1950) (citing Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42 (1929)).[8]

---

[8] The Court finds that the '216 patent is a non-pioneering invention, and thus limits its discussion on this matter to a footnote. Whether a patent describes a pioneer invention is relevant to the range of possible equivalents that should be considered under the doctrine of equivalents. As a general rule, a "pioneer invention is entitled to a broad range of equivalents." Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1528, 1532 (Fed. Cir. 1987); see also Sealed Air Corp. v. United States Int'l Trade Comm'n, 645 F.2d 976, 984 (C.C.P.A. 1981). By contrast, "an invention representing only a modest advance over the prior art is given a more restricted (narrower range) application of the doctrine." Thomas & Betts Corp. v. Litton Sys., Inc., 720 F.2d 1572, 1580 (Fed. Cir. 1983). "One must start with the claim, and, though a 'non-pioneer' invention may be entitled to some range of equivalents, a court may not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." Perkin-Elmer, 822 F.2d at 1532. The first sentence of the '216 Patent describes the invention as relating "to improvements in systems for software registration and, more particularly, to improvements in arrangements where software is transferable by media such as magnetic disks, CD ROMS and the like." '216 Patent, col. 1, ll. 5-8. This is clearly not language describing a pioneering invention. The '216 Patent goes on to discuss the limitations of prior inventions in this field, and distinguishes itself by stating that "[i]t is an object of the present invention to address or reduce the above-mentioned disadvantages." '216 Patent, col. 2, ll. 11-12. Given the significant and closely related prior art cited by the '216 Patent, as well as the prosecution history during which

The critical limitation of the doctrine of equivalents, however, is that it cannot be applied to the invention as a whole or even to a single claim in its entirety; rather, it applies only to individual claim limitations. Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 40 (1997); Perkin-Elmer, 822 F.2d at 1532 ("Though the doctrine of equivalents is designed to do equity, and to relieve an inventor from a semantic strait jacket when equity requires, it is not designed to permit wholesale redrafting of a claim to cover non-equivalent devices, i.e., to permit a claim expansion that would encompass more than an insubstantial change."); see also Carman Indus., Inc. v. Wahl, 724 F.2d 932, 942 (Fed. Cir. 1983) (doctrine applies only where there is a "minor modification"); Sage Prods., 126 F.3d at 1424 (doctrine applies only where there are "insubstantial differences"). Where an accused device performs substantially the same function to achieve substantially the same result, but does so in a substantially different manner than described by a claim limitation, there can be no infringement of the claim even under the doctrine of equivalents. Perkin-Elmer, 822 F.2d at 1531 n.6 ("That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs

---

the inventor went to some length to distinguish this invention from the prior art, the Court finds that the '216 Patent is not a pioneering invention.

the function and achieves the result in a substantially different way."); see also Graver Tank, 339 U.S. at 608.

In short, infringement of a claim can be found only where, under both literal and equivalent readings, an inquiring court, drawing all inferences in favor of Uniloc, finds all elements of the claim in the accused device. If any are missing, there is no infringement as a matter of law.

C. Uniloc's Claims

The '216 Patent has five independent claims (Claims 1, 12, 17, 19 and 20) and multiple dependent claims. "It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed[.]" Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546, 1553 (Fed. Cir. 1989); see also Teledyne McCormick Selph v. United States, 558 F.2d 1000, 1004 (Ct. Cl. 1977) (stating that it "has long been established that a dependent claim . . . cannot be infringed unless the accused device is also covered by the independent claim"). Because the Court finds that Microsoft's Product Activation system does not infringe independent claims 1, 12, 17, 19, and 20 of the '216 Patent, it follows that all dependent claims are similarly not infringed. The ensuing discussion is therefore limited to two elements of Claim 1, one element of Claim 12, two elements of Claim 17, and two identical elements of Claims 19 and 20, as provided in the chart below.

| '216 Claim | Element missing in Microsoft's device |
|---|---|
| Claim 1 | Licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means. |
| | Remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID. |
| Claim 12 | Wherein said registration system is replicated at a registration authority. |
| Claim 17 | Enabling key . . . has matched identically with said registration key. |
| | Enabling key generated by a third party means of operation of a duplicate copy of said registration key generating means. |
| Claims 19 and 20 | Licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means. |
| | Remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generated means to produce said licensee unique ID. |

1. Claim 1: A Symmetric System

Claim 1 of the '216 Patent requires that "a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means." For purposes of this analysis, the relevant terms are "licensee unique ID," "local and remote licensee unique ID generating means," and "has matched." The constructions of those terms are shown below. See Uniloc, 447 F. Supp. 2d at 183-200.

| Claim Term | Court's Construction |
|---|---|
| 1. Licensee unique ID | A unique identifier associated with a licensee. |
| 6. Local licensee unique ID generating means<br>7. Remote licensee unique ID generating means | Function: to generate a local or remote licensee unique ID.<br>Structure: a summation algorithm or a summer and equivalents thereof. |
| 16. Has matched | A comparison between the locally generated licensee unique ID and the remotely generated licensee unique ID shows that the two are the same. |

One of Uniloc's theories of infringement identifies the licensee unique ID as the Product ID that Microsoft's system generates on the client. However, this theory fails because the Product ID is generated only on the client, not on the server. In another theory, Uniloc posits that the licensee unique ID is the "license" data structure that Microsoft's Product Activation system generates on the server using an encryption algorithm. This "license" is subsequently sent and decrypted on the client. However, this theory of infringement fails to satisfy two separate elements of Claim 1. First, the "license" data structure is generated only on the server. Second, the ordering of steps is incorrect: the "license" data structure is generated first on the server and subsequently decrypted on the client. Claim 1 imposes a temporal ordering limitation on the operation of the '216 invention. It requires that the licensee unique ID must be generated first on the client and then matched with a licensee unique ID subsequently generated on the server. This ordering of

steps is detrimental to Uniloc's efforts to find a licensee unique ID in Microsoft's system that meets the requirements of Claim 1.

Uniloc responds to this difficulty by citing its expert's report: "Mr. Klausner provides evidence that the accused products infringe claim 1 under all 'theories'" by referencing sixty-eight pages of that report. (Pl.'s Mem. Opp'n Def. Mot. Sum. J. 36-37.) Page 31 of Mr. Klausner's report indeed addresses this limitation of Claim 1 by stating that, "[i]t is my opinion that the accused Microsoft products perform within the literal scope of this element. My analysis with respect to literal infringement of this element is set forth in Exhibit D." (Klausner Decl., Ex. 2, Tab D at 31.) Exhibit D is a 300 page report; pages 44 through 52 seem relevant. (Ex. D to Klausner Expert Report at 44-52.) Nowhere in these pages, however, which cite to thousands of lines of Microsoft's source code, is there any inkling of evidence that might show that Microsoft's system generates licensee unique IDs first on the client and then subsequently on the server using the same algorithm, as required by Claim 1 of the '216 patent. Id.

Finally, both theories fail because even were the Court to find generation of licensee unique IDs on the client and the server in the correct order, the licensee unique IDs produced by the client and the server must match. '216 Patent, Claim 1. The Court's construction of the disputed claim term "has matched" to mean "a comparison between the locally generated licensee unique

ID/registration key and the remotely generated licensee unique ID/enabling key shows that the two are the same" reveals the problem. See Uniloc, 447 F. Supp. 2d at 200. At no point do the values Uniloc identifies as licensee unique IDs in the context of Microsoft's system, that are generated on the client and the server, match. Instead, the Product ID generated on the client is later matched with that same Product ID that was sent to the server, encrypted, and returned from the server in the "license." More specifically, the Product ID and Hardware ID generated on the client during the activation process are compared to the same Product ID stored in the encrypted "license," as well as to the Hardware ID subsequently regenerated on the client upon each use of the protected software. It is not matched with another Product ID recomputed on the server. In fact, the raison d'être of licensee unique IDs in the context of the '216 Patent is that they match. When the licensee unique IDs generated independently on both the client and the server, by the same algorithm, using the same inputs, match, that match authenticates that the genuine server-side registration system was contacted and approved the activation. Since the true algorithm by which the licensee unique IDs are generated remains a secret, presumably only the authentic server-side registration system would know it.

If, as Uniloc contends, the licensee unique ID is the "license" generated and encrypted on the server and subsequently

decrypted by the client, its contents are later matched with the Product ID and Hardware ID, not another "license" generated by the client. The "license" is only a container for data initially collected and processed by the client; it does not directly match any other value. In this sense, it is not a magic number, but data with an intrinsic meaning. Once returned from the server and decrypted on the client, its contents match the original values collected by the client. At no point are the individual values that comprise the "license" recomputed on the server.

Turning to another disputed element, Claim 1 requires that the "remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID." Id. at 188. The relevant terms are "algorithm" and "includes the algorithm utilized by said local licensee unique ID generating means to produce said [remote] licensee unique ID." The definitions are shown below. See id. at 192-95.

| Claim Term | Court's Construction |
|---|---|
| 9. Algorithm | A set of instructions that can be followed to carry out a particular task |
| 10. Includes the algorithm utilized by said local licensee unique ID generating means to produce said [remote] licensee unique ID | Includes the identical algorithm used by the local licensee unique ID generating means to produce the [remote] licensee unique ID |

The '216 Patent describes an invention where the values entered by the user on the client side are converted into a licensee unique ID, and then those raw inputs (but expressly not the client's computed licensee unique ID) are sent to the server and calculated into a licensee unique ID on the server side by the same algorithm. The server's licensee unique ID is then sent back to the client where it is compared to the client's original licensee unique ID. They must match in order for the software to be successfully validated. By contrast, in Microsoft's system, the values generated on the client that might be considered licensee unique IDs (the Product ID and/or the Hardware ID), and the values that might be considered licensee unique IDs generated on the server (the "license"), are computed by different algorithms and their values do not match.

Uniloc strains to find an instance of the same algorithm on both the client and server side of Microsoft's system. First, Uniloc points to Microsoft's use of encryption and decryption technology as constituting the "same" algorithm, but encryption and decryption algorithms are inverses, not the same algorithm. Next, Uniloc notes that the * * * * * * * * * REDACTED * * * * * * * * * * * * * algorithms are present on both the client and server side of Microsoft's Product Activation system. According to Uniloc, Mr. Klausner "independently reviewed the source code and provided evidence that the algorithms in question were present in the source

code for the accused products and the source code for the Microsoft Clearinghouse." (Pl.'s Mem. Opp'n Def. Mot. Sum. J. 15.) Once again Uniloc misses the point: the '216 Patent calls for the same algorithm to be <u>used</u> on both sides as the generating means of matching licensee unique IDs. That is simply not the case in Microsoft's system; its values that might qualify as licensee unique IDs are produced on both the client and the server, but these licensee unique IDs are produced by different algorithms, using different inputs, and hence the resulting licensee unique IDs do not match.

Finally, even were encryption and decryption to be considered the "same" algorithm under the doctrine of equivalents, the order of their use in generating licensee unique IDs in Microsoft's system does not follow the order required by the '216 Patent. In Microsoft's system, the "license" is first encrypted on the server and then subsequently decrypted on the client. This is precisely the reverse order from that specified in Claim 1. As Microsoft notes:

> At the Clearinghouse, this algorithm encrypts data, while on the user's computer, it decrypts data. Thus, the encryption algorithm on the remote side takes certain data D, and encrypts it into E. On the local side, the decryption algorithm starts with the encrypted data E, and decrypts it to D. The algorithms are thus the exact opposite of one another. They also do not have the same outputs: the output of the encryption algorithm is the encrypted value E, and the output of the decryption algorithm is the decrypted value D. E and D are not the same, and are not compared for matching purposes.

(Def. Mot. Sum. J. 35. (internal citations and emphasis omitted).)

In sum, Microsoft's system is not the symmetric system taught by the '216 Patent. This is not simply an oversight of the '216 Patent claims, but, rather, a direct result of the design of its invention. The requirement that the client- and server-side algorithms be the same and produce matching values from identical inputs is the only measure of security in the invention described by the '216 Patent. Contrariwise, Microsoft's system uses public key cryptography to ensure the integrity of the activation process. Public key cryptography is an asymmetric system where a private key encrypts data (e.g., the "license" data structure) and a mathematically related public key decrypts it. In the configuration used by Microsoft's system, public key cryptography is employed to authenticate the message returned from the server. This type of digital signature depends only on the secrecy of the private key for its integrity.

This very technical difference has very broad implications for the scope of protection afforded to the '216 Patent. It is here that the macro level difference between the invention described by the '216 Patent and Microsoft's system can be seen most clearly. While Uniloc's invention is an improvement over the prior art (in part because it does not require a unique serial number to be burned into each copy of the software media), its symmetry renders it vulnerable to attack by determined hackers. This is not an

insubstantial weakness given that a major goal of the invention is to "prevent copying of the software . . . to another computer[.]" '216 Patent Column 1. Microsoft's asymmetric system is far more difficult to crack, as it requires discovering Microsoft's secret key. Unlike the secret algorithm intended for use but not disclosed by the '216 Patent, Microsoft's secret key is not part of the client software and thus is far more difficult to discover.

Uniloc points to several other algorithms (e.g., PIDStringtoPIDStruct and FEncryptDecryptUsingPIDHWID) found on both the client and server side of Microsoft's system. Once again, Uniloc misses the point. It is not sufficient merely to find the identical code on both the client and server systems. Rather, those algorithms must be used in a manner infringing the claims of the '216 Patent. Uniloc cannot show that the algorithms are used on the client and the server to produce matching licensee unique IDs in the correct order as described by the limitations of Claim 1. Many programs contain a high percentage of code copied from other programs, but that does not make those programs the same. For example, the "strlen" function, which computes the length of a text string, is a common algorithm found in nearly every program.[9] Surely, its mere presence or even use on both the client and server side of Microsoft's system does not infringe on the '216 Patent.

[9] See Wikipedia, strlen, http://en.wikipedia.org/wiki/Strlen (as of October 9, 2007).

Were that the case, nearly every software program would infringe Uniloc's intellectual property. The critical inquiry is whether the algorithms are used for the purpose taught by the '216 Patent. For all the reasons explained above, the Court finds, as a matter of law, that they are not.

2. Independent Claim 12: The Registration Authority

Claim 12 of the '216 Patent describes the workings of a "registration system generating a security key from information input to said software . . . on a computer on which said software is to be installed; and wherein said registration system is replicated at a registration authority . . . ." The definitions given these terms follow. See Uniloc, 447 F. Supp. 2d at 205.

| **Claim Term** | **Court's Construction** |
|---|---|
| 1. Security key | A unique identifier associated with a licensee |
| 22. Wherein said registration system is replicated at the registration authority | Wherein the registration system attachable to software to be protected is reproduced exactly at the registration authority |

Upon further reflection, the Court has decided to clarify its construction of claim term 22 as follows: **Wherein the portion of the registration system that generates a security key from information input to software to be protected is reproduced exactly at the registration authority.** This clarifies that only the portion of the registration system responsible for generating the security key must be replicated exactly at the registration authority, not the entire registration system, as the previous

construction implied. This reading follows the broader stance of Claim 12, which describes the registration system as "generating a security key from information input to [the] software . . . ." See Utah Med. Prods., Inc. v. Graphic Controls Corp., 350 F.3d 1376, 1382 (Fed. Cir. 2003) (noting that there is substantial authority for the clarification of a disputed claim term, particularly where the Court clarifies its construction "to more closely align its interpretation with the claim language and the specification's description . . . ."); Jack Guttman, Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002) (stating that "[d]istrict courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves. . . . This is particularly true where issues involved are complex, either due to the nature of the technology or because the meaning of the claims is unclear from the intrinsic evidence." (internal citation omitted)).

Even with this clarification, however, Uniloc still cannot point to any potential evidence tending to show that the portion of Microsoft's system that generates a security key is reproduced exactly at the registration authority. The parties' proposed constructions at the Markman hearing are telling on this issue. Uniloc's proposal required only that the registration authority "also [have] a system that generates a security key." Uniloc, 447

F. Supp. 2d at 205. Here, Uniloc attempted to summarily dispose of the replication requirement, a central limitation of Claim 12. However, though Claim 12 requires the security key generating means to be replicated at the registration authority, this does not mean that the entire registration system must be reproduced exactly at the registration authority. Microsoft's proposed construction, by contrast, attempted to disallow the use of encryption or decryption technology to meet the definition of replicated. Id. As with any process, the important distinction here is not just whether the technology exists on the client and the server, but how it is used. So the mere presence of encryption and decryption technology on the client and the server does not, without more, suffice to yield a system that "is replicated at the registration authority." '216 Patent Claim 12.

Uniloc suggests that Claim 12 "requires that the registration system be attachable to the software to be protected and that it generate a security key." (Pl.'s Mem. Opp'n Def. Mot. Sum. J. 32.) Here, Uniloc attempts to return to its earlier proposed (and subsequently rejected) reading of Claim 12. In support of its argument that "the registration system is indeed replicated at the Microsoft Clearinghouse[,]" Uniloc cites Klausner's expert report at 92-107. However, this limitation of Claim 12 is discussed on pages 61-63 of Klausner's report. (Klausner Decl., Ex. 2, Tab D at 61-63.) In substance, Klausner is only able to state that, "the

function performed by software code of the [Microsoft Registration System] is that of having the same software code present at the [Microsoft Clearinghouse] . . . as is present at the local computer of the Customer . . . ." Id. at 62. This is insufficient to meet Uniloc's burden. As explained previously, mere presence of the same computer code on both sides of the system does not suffice to yield a "registration system [that] is replicated at the registration authority[.]" '216 Patent Claim 12.

Claim 12 of the '216 Patent requires an essential symmetry between the process of generating a security key on the client and the process on the server to achieve a measure of integrity. Microsoft's system, by contrast, relies on asymmetric cryptography to authenticate the "license" returned from the server. Thus, the Court finds that independent Claim 12 and its dependent Claims 13-16 are not infringed by Microsoft's system.

3. Independent Claims 17, 19 and 20: Same Algorithm Produces Matching IDs

Claim 17 of the '216 Patent requires that the "enabling key . . . has matched identically with said registration key." Furthermore, Claim 17 requires that the "enabling key [be] generated by a third party means of operation of a duplicate copy of said registration key generating means." The relevant terms here are "registration key," "enabling key," "has matched," and "generated by a third party means of operation of a duplicate copy

of said registration key generating means." Their respective constructions follow. See Uniloc, 447 F. Supp. 2d at 183-200.

| **Claim Term** | **Court's Construction** |
|---|---|
| 2. Registration key<br>3. Enabling key | A unique identifier associated with a licensee |
| 11. Generated by a third party means of operation of a duplicate copy of said registration key generating means | Generated by a third party's use of a duplicate copy of the registration key generating means |
| 16. Has matched | A comparison between the locally generated registration key and the remotely generated enabling key shows that the two are the same |

These limitations of Claim 17 are nearly identical to the elements of Claim 1 analyzed previously. Claim 1 requires that the "licensee unique ID . . . generated by said local licensee unique ID generating means has matched a licensee unique ID . . . generated by said remote licensee unique ID generating means," and that the "remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means . . . ." As noted in the claim construction opinion, "'third party means of operation' simply denotes that the remote location uses a duplicate copy of the registration key generating means." Id. at 195. Because Microsoft's system does not use the same algorithm (i.e., "a duplicate copy of the registration key generating means") on the

client and server to produce matching registration/enabling keys, there can be no infringement of this claim.

Claims 19 and 20 of the '216 Patent require that the

> licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

The only difference between these elements of Claims 19 and 20, and the equivalent elements of Claim 1, is the lack of the ordering requirement unique to Claim 1. Claim 1 requires that the "licensee unique ID <u>first</u> generated by said local licensee unique ID generating means has matched a licensee unique ID <u>subsequently</u> generated by said remote licensee unique ID generating means[,]" (emphasis supplied), whereas Claims 19 and 20 do not specify a required ordering. Nevertheless, for the reasons articulated in the discussion of Claim 1, minus the ordering requirement, this Court finds that Microsoft's system does not generate matching licensee unique IDs on the client and the server using the same algorithm.

## III. <u>Conclusion</u>

Digital copies of digital data are perfect, providing little incentive to the dishonest to acquire works legitimately. Software developers as well as those engaged in more artistic endeavors suffer when their creations are copied and consumed illegally.

This case presents two competing processes for protecting computer software, one patented, the other not. Patents on algorithms implemented in computer software can be a useful way of both protecting existing inventions and encouraging the development of new processes. But when those processes take an accused device outside the claims of the patent, there is no infringement.

For all of these reasons, Microsoft's Motion for Summary Judgment is GRANTED, and Uniloc's Motion for Partial Summary Judgment is DENIED as moot.

It is so ordered.

William E. Smith
United States District Judge
Date: 10/19/07