UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC U.S.A., INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br><br>    Plaintiffs,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br><br>    Defendant. | Civil Action No. 03-CV-440 (WES) |

## **TABLE OF CONTENTS**

I.    Background ...........................................................................................................2

    A.    The Accused Products, And The Accused Implementation
          Detail Of Product Activation ............................................................2

    B.    Uniloc's Damages Theory ...............................................................4

         i     Mr. Gemini's <sup>REDACTE</sup> Base ...............................................6

         ii    Mr. Gemini's 25% Rate ..........................................................10

         iii   Mr. Gemini's Supplemental Report .......................................12

II.   Rule 702 Requires That the Court Act as "Gatekeeper" Against
     Unreliable Expert Testimony ...........................................................................13

III.  Mr. Gemini's Opinion Regarding A <sup>REDACTED</sup> Per-Activation Royalty Is
     Unreliable, And He Should Not Be Permitted To Offer Any Testimony
     In This Case ......................................................................................................14

    A.    Mr. Gemini's Opinion That <sup>REDACTE</sup> Is The Appropriate Per-
          Activation Base Is Arbitrary, Unfounded, and Unreliable ...............15

         i     Mr. Gemini Has Failed To Comply With The Entire
             Market Value Rule ..................................................................15

         ii    Mr. Gemini's <sup>REDACTE</sup> Per-Activation Base Is Wholly
             Unfounded ...............................................................................17

         iii   Mr. Gemini's Persistence In Maintaining A <sup>REDACTED</sup> Per-
             Activation Base Despite Uniloc's Abandoning Most Of
             Its Infringement Case Further Underscores That That
             Base Is Arbitrary, Contrived, And Result-Oriented ................19

    B.    Mr. Gemini's Opinion That 25% Is The Appropriate Royalty
          Rate Is Arbitrary, Unfounded, and Unreliable .................................21

         i     Mr. Gemini Applied a Generic "Rule of Thumb"
             Royalty Rate That Is Based on Unreliable Methodology ........22

         ii    Mr. Gemini Pays Only Lip Service To The *Georgia-
             Pacific* Factors .......................................................................24

         iii   Mr. Gemini Should Be Precluded From Offering Any
             Testimony Or Evidence Concerning An Alleged
             Industry Average Royalty Rate Of 11.5% ...............................27

IV.   Conclusion .......................................................................................................31

## TABLE OF AUTHORITIES

### Cases

*Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*,
  No. 95-218-SLR, 1998 WL 151411, at *52 n.46 (D. Del. Mar. 13,
  1998) ..................................................................................................................... 23

*Blake v. Robertson*,
  94 U.S. 728 (1876) ................................................................................................... 6

*Bose Corp. v. JBL, Inc.*,
  112 F. Supp. 2d 138 (D. Mass. 2000) ............................................................... 23, 24

*Bowling v. Hasbro, Inc.*,
  No. C.A. 05-229S, 2008 WL 717741, at *6 (D.R.I. March 17, 2008) ........................ 25

*Children's Broadcasting Corp. v. the Walt Disney Co.*,
  245 F.3d 1008 ......................................................................................................... 20

*Civix v. Expedia*,
  No. 03 C 3792, 2005 WL 5961023 (N.D. Ill. Oct. 25, 2005) .................................... 23

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ................................................................................. 13

*Cooper Tire & Rubber Co. v. Farese*,
  2008 WL 5104745, *4 (N.D. Miss. 2008) ................................................................ 28

*Cornell Univ. v. Hewlett-Packard Co.*,
  2008 WL 2222189, at *2  (N.D.N.Y.  May 27, 2008) ...................................... 6, 16, 21

*Daubert v. Merrel Dow Pharms.*,
  509 U.S. 579 (1993) ............................................................................. 2, 5, 13, 14, 24

*Eaton Corp. v. ZF Meritor LLC*,
  2007 WL 735000, *4 (E.D. Mich. Mar. 8, 2007) ...................................................... 16

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
  131 Fed. Appx. 450 (5th Cir. 2005) ......................................................................... 21

*Fonar Corp. v. General Electric Co.*,
  107 F.3d 1543 (Fed. Cir. 1997) ............................................................................... 23

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ................................................................................................ 13

*Grain Processing Corp. v. American Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ............................................................................... 21

*GSI Group, Inc. v. Sukup Mfg. Co.*,
  2008 WL 4964801 (C.D. Ill. 2008) .......................................................................... 24

*Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH,*
    408 F.3d 1374 (Fed. Cir. 2005)................................................................ 6, 15

*Izume Prods. Co. v. Koninklijke Philips Elecs. N.V.,*
    315 F.Supp.2d 589 (D. Del. 2004)................................................................ 16

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)................................................................ 2, 13, 24

*Libas, Ltd. v. United States,*
    193 F.3d 1361 (Fed. Cir. 1999)................................................................ 24

*Medtronic, Inc. v. Boston Scientific Corp.,*
    2002 WL 34447587 (D. Minn. 2002)................................................................ 20

*Micro Chem., Inc. v. Lextron, Inc.,*
    317 F.3d 1387 (Fed. Cir. 2003)................................................................ 13, 21

*Novozymes A/S v. Genencor Int'l, Inc.,*
    474 F. Supp. 2d 592 (D. Del. 2007)................................................................ 23

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.,*
    989 F. Supp. 547 (D. Del. 1997)................................................................ 23

*Railroad Dynamics, Inc. v. A. Stucki Co.,*
    727 F.2d 1506  (Fed. Cir. 1984)................................................................ 29

*Rite-Hite Corp. v. Kelley Co.,*
    56 F.3d 1538 (Fed. Cir. 1995)................................................................ 16

*Saia v. Sears Roebuck And Co., Inc.,*
    47 F.Supp.2d 141 (D. Mass. 1999)................................................................ 22

*Salgado v. Gen'l Motors Corp.,*
    150 F.3d 735 (7th Cir.1998)................................................................ 28

*Servs., Inc. v. W.H. Munsprufer Dietmar Trenner GMBH,*
    408 F.3d 1374 (Fed. Cir. 2005)................................................................ 6, 15

*Standard Mfg. Co. v. United States,*
    42 Fed. Cl. 748 (Fed. Cl. 1999)................................................................ 23

*Uniloc USA, Inc. v. Microsoft Corp.,*
    290 Fed.Appx. 337 (Fed.Cir. 2008)................................................................ 4, 19

*Uniloc USA, Inc. v. Microsoft, Corp.,*
    290 Fed. Appx. 337 (Fed. Cir. 2008)................................................................ 19

*United States v. Saelee,*
    162 F. Supp. 2d 1097 (D. Alaska 2001) ................................................................ 24

*Univ. v. Hewlett-Packard Co.,*
    2008 WL 2222189, at *2 (N.D.N.Y.  May 27, 2009)................................................................ 6, 16

*Utah Medical Prods., Inc. v. Graphic Controls Corp.*,
    350 F.3d 1376 (Fed. Cir. 2003)..........................................................................27

*Wallace Motor Sales, Inc. v. American Motors Sales Corp.*,
    780 F.2d 1049 (1st Cir. 1985).........................................................................19

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO PRECLUDE TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT, JOSEPH GEMINI**

Uniloc arrives at its REDACTED damages claim in this case by multiplying an unfounded and arbitrary per-activation base of REDACTE by an equally arbitrary 25% rate that is the epitome of a rote and mechanical application of junk science.

Uniloc's damages expert, Joseph Gemini, gets his REDACTED base figure from a single sentence of a single 30+ page document that was authored before the accused products in this case were launched, and that does not even mention either the accused products or the implementation detail of Product Activation (hashing) that remains at issue in this case. In doing so, Mr. Gemini has failed to follow the well-established rule for patent damages, which in a running royalty setting quite simply says that where, as here, the accused aspect of a product is not the reason customers purchase the product, it is incumbent on the patent owner to prove the portion of the selling price allocable to the accused aspect. The arbitrariness of his REDACTED figure is further underscored by the fact that this was his opinion on the appropriate per-activation base years ago, when Uniloc was accusing eight different aspects of Product Activation of infringement. Even though only one of those aspects remains in the case—the other seven having been disposed of on summary judgment and not appealed by Uniloc—Mr. Gemini steadfastly maintains that the all-too-conveniently round number of REDACTE is still the appropriate figure.

The 25% rate figure which Mr. Gemini applies to that REDACTE is equally unfounded and arbitrary. This number comes from a so-called "rule of thumb" that posits that the "starting point" for determining a reasonable royalty for *every* patent, at *any* time, in *any* industry, for *any* technology—whether it's the cure for cancer or fuzzy dice to hang from the rearview mirror—is 25% of profits. Mr. Gemini did not even apply this junk science properly, since he used the 25% figure as both his starting point and his ending point, paying nothing but lip service to the well-

established *Georgia-Pacific* factors for determining the rate for a running royalty damages theory.

In short, Mr. Gemini has used plainly flawed and unsupportable starting points in a rote and mechanical manner that is the antithesis of the rigor demanded by *Daubert*, *Kumho*, and Federal Rule of Evidence 702 for an expert to earn the privilege of offering opinions to a jury. Mr. Gemini's obviously partisan and result-oriented "analysis" and "opinions" should be excluded in their entirety.

## I.   BACKGROUND

### A.   The Accused Products, And The Accused Implementation Detail Of Product Activation

The accused products in this case are Microsoft's two crown jewel products, Windows and Office.[1]   Windows is Microsoft's ubiquitous operating system, and is the core software that allows users to use their computers.  It runs programs.  It includes a browser, a desktop, and thousands of features and functions.  Microsoft Office is a suite of products, ranging from the Word word-processing application, to the Excel spreadsheet application, to the PowerPoint presentation tool, and numerous other programs.

To say that the utility of these two accused products overwhelms the particular accused implementation detail at issue in this case would be an understatement.  None of the user-oriented functionality of these products is accused of infringement.  This case instead concerns the Product Activation feature, which does not in any way, shape, or form improve the user experience.  It is instead a policing technology, one that aims to verify that the software in

---

[1]   The accused products for which Uniloc has provided infringement contentions are  Office XP, Office 2003, Windows XP, Windows Server 2003, and Digital Media Plus!.  (*See* D.I. No. 171-9, September 22, 2006, Declaration of Laura R. Braden ("Braden Decl."), Exhibit H, Table of Accused Products Identified by Uniloc in Ex. F to September 1, 2005 Expert Report of David Klausner).

question is not installed on more than the permissible number of computers.  Customers do not

clamor for Product Activation.  They dislike it.

Uniloc does not contend that every aspect of Product Activation infringes its patent.

Prior to summary judgment, Uniloc asserted that eight different implementation details of

Product Activation infringed sixteen separate claims of its patent.  After losing on all of its

theories in this Court, Uniloc on appeal abandoned all but one aspect of Product Activation—

hashing of the license data—and two claims, 12 and 19.  While Uniloc was able to eke out a

narrow remand from the Federal Circuit, it is now law of the case that none of the following

previously accused details of Product Activation infringes any claim of Uniloc's patent:

1. Using the Product Key (PKey) to generate the Product ID (PID)[2]
2. Generating the "full" Product ID
3. Generating the Installation ID (IID)
4. Generating the Confirmation ID (CID)
5. Generating the Product Key authenticator
6. Generating the Product Key Hash
7. Reactivating using the license or the CID.

(D.I. No. 171-1, Braden Decl. Ex. A, September 1, 2005 Expert Report of David Klausner

Regarding Non-Infringement, Ex. D at 210-231; D.I. No. 165-1, September 22, 2006

---

[2]   With regard to this issue, this Court held:  "At no point do the values Uniloc identifies as
licensee unique IDs in the context of Microsoft's system, that are generated on the client and
the server, match. Instead, the Product ID generated on the client is later matched with that
same Product ID that was sent to the server, encrypted, and returned from the server in the
'license.' More specifically, the Product ID and Hardware ID generated on the client during
the activation process are compared to the same Product ID stored in the encrypted 'license,'
as well as to the Hardware ID subsequently regenerated on the client upon each use of the
protected software. It is not matched with another Product ID recomputed on the server. In
fact, the *raison d'etre* of licensee unique IDs in the context of the '216 Patent is that they
match. When the licensee unique IDs generated independently on both the client and the
server, by the same algorithm, using the same inputs, match, that match authenticates that the
genuine server side registration system was contacted and approved the activation. Since the
true algorithm by which the licensee unique IDs are generated remains a secret, presumably
only the authentic server side registration system would know it." (D.I. No. 199, October 19,
2007, Opinion and Order on Summary Judgment ("Summary Judgment Order") at 21.)

Memorandum In Support of Microsoft's Motion for Summary Judgment ("Microsoft Summary Judgment Brief") at 19-25.)

The sole remaining accused implementation detail, hashing of the license digest, is a small part of Product Activation. For a full explanation, see *Uniloc USA, Inc. v. Microsoft Corp.*, 290 Fed.Appx. 337 (Fed.Cir. 2008). Briefly, this aspect of Product Activation is essentially an industry standard, developed long prior to Uniloc's patent, for securely communicating information. Specifically, Microsoft's Clearinghouse generates "license data" using the Product ID (PID), Hardware ID (HWID), and other information sent by the client computer. The Clearinghouse then generates a "license digest" by inputting the license data into a one-way hash algorithm. A "digital signature" is then created from the digest by encrypting the output of the hash algorithm with a private key known only to Microsoft. Both the license data and the digital signature are sent back to the client software, which then uses a public key to decrypt the digital signature and recover the license digest. The client software also inputs the received license data into the same hash algorithm used by the Clearinghouse, and compares the output of that function to the license digest recovered by decrypting the digital signature. If the two digests are the same, the client software accepts the license data as authentic and further activation steps take place.

The only issue remaining in this case is whether the use of the hashing function to create a hash of the license data infringes claims 12 and 19 of Uniloc's patent.

###    B.    Uniloc's Damages Theory

Uniloc's damages case is based entirely on a reasonable royalty theory, in accordance with the statutory remedy provided in 35 U.S.C. § 284: "Upon finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement but in no event

less than a reasonable royalty for the use made of the invention by the infringer, together with

costs as fixed by the court."

More specifically, Uniloc contends that it is entitled to a "running royalty," i.e., a royalty

every time one of Microsoft's accused products is activated.[3]  That per-activation royalty figure

is REDACTED, which Uniloc's expert, Mr. Gemini, arrived at by multiplying a REDACTED base amount by a

25% rate.  The approximately REDACTED total damages figure is the product of this REDACTED figure

and the total number of activations to date REDACTED.

The issue presented on this motion is how Mr. Gemini came up with the REDACTED figure,

including Mr. Gemini's failure to apply a proper or reliable methodology in coming up with both

the REDACTE per-activation base and the 25% rate.[4]

On a "running royalty" theory of patent damages, the legal rule determining the

appropriate base in a patent infringement case is well-established.  As discussed further below,

the rule is called the "entire market value rule."  A patent owner may only use the "entire market

value" of the accused product as the base for calculating a running royalty if the accused

infringing aspect of that product is the basis for consumer demand for that product.  *See Imonex*

---

[3]   Microsoft disputes that a running royalty is the appropriate mechanism to calculate the
statutory royalty in this case, but instead contends that a "lump sum" royalty is warranted on
the facts of this case.  When asked at the initial pretrial conference on January 12, 2009,
whether Uniloc intended to raise any *Daubert* challenges, its counsel said it would not.  On
being advised that Microsoft intended to raise the present challenge to Uniloc's damages
expert, Uniloc reversed its position, and stated that it would challenge the lump-sum opinion
of Microsoft's damages expert, Mr. Napper.

[4]   Microsoft also disputes REDACTED figure used by Mr. Gemini.  This
figure is flawed in two respects, both of which will be the subject of a motion in limine if
Uniloc persists with this figure.  The first error is one of double-counting.  The total
activation figure is a combination of first-time activations and re-activations.  Thus, if a
single customer activates a single copy of Microsoft software ten times, REDACTED
REDACTED for a different customer for the exact same product who
activates only once.  The second error is that Uniloc is improperly seeking to recover
damages for Microsoft's overseas sales, in clear contravention of settled Supreme Court

*Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005);

*Cornell Univ. v. Hewlett-Packard Co.*, 2008 WL 2222189, at *2  (N.D.N.Y.  May 27, 2008)

(Rader, J.).  If the specific process that is accused of infringement is not why customers buy the

product, then it is blackletter law that the patentee cannot use the entire value of the product as

the base for calculating running royalty damages.  It is instead incumbent upon the patent owner

to establish what portion of the value of the product should be allocated to the specific accused

element.  *See Blake v. Robertson*, 94 U.S. 728, 733-734 (1876) (affirming nominal damages

where patentee failed to meet its burden to establish portion of damages attributable to infringing

feature of larger product).

As for the rate, Mr. Gemini purports to have based his analysis on the test that was first

set out in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.

1970), *modified and aff'd* 446 F.2d 295 (2d Cir. 1971), and has been widely endorsed as one

appropriate method for determining damages in a patent infringement case.  *See, e.g.*, *Micro*

*Chem. Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003).  The outlines of this method

for calculating the appropriate royalty rate are well-established.  As discussed in detail below,

that test sets out fifteen different factors that must be carefully considered in ascertaining the

royalty rate.

      **i**       **Mr. Gemini's** [REDACTE] **Base**

Mr. Gemini concludes that [REDACTE] per activation is the appropriate royalty base for his

royalty rate calculation.  (*See* Declaration of Rebecca Rogers ("Rogers Decl."), Ex. A,

September. 1, 2005, Expert Witness Report of Joseph Gemini ("Gemini Initial Report") at 11-

12.)                            **REDACTED**

---

authority, in which Microsoft prevailed against AT&T on this precise issue.  *See Microsoft*
*Corp. v. AT&T Corp.*,127 S.Ct. 1746, 1757 (2007).

REDACTED

(*See* Rogers

Decl., Ex. B,

(*Id.* at 4.)

Each

group uses PIDs for different reasons.  (*Iid.* at 26.)

(*Id.* at 6.)

REDACTED

REDACTED


(Rogers Decl., Ex. B,          REDACTED

     Contrary to the plain words and overall context of the document   REDACTED


                                                              Mr.

Gemini contends that          REDACTED          means that Microsoft values *Product Activation* in the accused products, standing alone — again, even though Product Activation did not then exist, and none of the products implicitly referred to in the memo is even accused in this case —          REDACTED

     Uniloc discussed many other aspects of this memo in detail with Ms. Richards at her deposition, spending a total of nine transcript pages on the document.  (Rogers Decl., Ex. C, Richards Deposition at 38-46.)          REDACTED

(*See* Rogers Decl., Ex. B,　　　REDACTED

    Despite all this,　　　　　　　　　　　　　　　　as the supposed value to

Microsoft of the Product Activation process within the later-released accused products.  His

entire discussion of the issue in his expert report is as follows:

---

[5]    When Uniloc asked Susan Cole and Greg Peiker at their depositions whether there was any way to determine the value of Product Activation to Microsoft, both Cole and Peiker answered that the only quantifiable benefit to Microsoft could be found REDACTED


                                   Uniloc and Mr. Gemini ignore this evidence in favor of their own baseless and out-of-context reading of one sentence from the memo in question.

REDACTED

* * *

As explained above,                    REDACTED


(Rogers Decl., Ex. A, Gemini Initial Report at 12.)

When asked at his deposition whether he had assumed the range of REDACTED

represented the value of Product Activation, Mr. Gemini responded "I'm not sure.  You're going

to have to repeat that."  (Rogers Decl., Ex. F, Excerpts from the March 1, 2006, Deposition of

Joseph Gemini ("Gemini Deposition") at 77.)  When asked the question again, Mr. Gemini

responded:

> Based on my reading of this, based on my reading of  Miss. Richards, based on
> my understanding of the amount of money that is at risk here in terms of casual copying,
> and then the amount they were expecting to recover, if only ten percent, based on all this
> information I reviewed.  I came to – I tried to isolate product activation in determining
> my royalty is what I tried to do.  This is – this, at least my understanding, isolates at least
> some range of value, and that's what I've used.

(*Id*. at 84.)

### ii      Mr. Gemini's 25% Rate

Mr. Gemini's 25% royalty rate comes from a "rule of thumb" largely associated with

Robert Goldscheider.  As stated by Mr. Goldscheider, "[t]he Rule suggests that the licensee pay

a royalty rate equivalent to 25 per cent of its expected profits for the product that incorporates the

IP at issue."  (Rogers Decl., Ex. G, December, 2002, article by Robert Goldscheider entitled

*Managing Intellectual Assets for Shareholder Value* ("Goldscheider, *Managing Intellectual*

*Assets*") at 123.)  Mr. Goldscheider has written that "[t]he 25% rule originally occurred to [him]

as a result of a series of successful commercial licenses with which he became involved back in

the late 1950s."  (Rogers Decl., Ex. H, March, 1994, article by Robert Goldscheider entitled

*Litigation Background for Licensing* ("Goldscheider, *Litigation Background*") at 25.)  Since

then, Mr. Goldscheider has advocated for the rule in a number of publications.  (*See, e.g.,*

Rogers Decl., Ex. G; *id.*; Rogers Decl., Ex. I, 1984 article by Robert Goldscheider entitled

*Technology Management Handbook*.)

 In 2002, Mr. Goldscheider and others undertook an empirical study to determine how

well the "rule of thumb" matched reality.  Averaged over "thousands" of licensing transactions,

the study found a "median royalty rate as a percentage of average licensee operating profit

margins" of "26.7 per cent."  (*See* Rogers Decl., Ex. G at 132-33.)  However, Mr. Goldscheider's

data also reflect tremendous variation both among industries and within each industry.  Breaking

down the rates by industry, the study found a range of "from 8.5 per cent for semiconductors to

79.7 per cent for the automotive industry."  (*Id*. at 133.)  Even within an industry, royalty rates

varied widely.  For example, the 119 software industry licenses had royalty rates that ranged

from 0% up to 70%.  (*Id*. at 128.)  Because it was impossible to gain "access to expected (or

actual) product profit rates," the authors merely aggregated those licenses within an industry for

which they could obtain information,, and then compared this average to published profit

margins in the industry, again to the extent available.  (*Id*. at 133.)

 Given the wide variation in real-world licenses, many commentators have criticized

reliance on the "25% rule," pointing out that the rule does "not account[] for the different levels

of risk assumed by a licensor and licensee, [does] not separat[e] out the benefit of a licensed

technology when it is used in combination with other technology, and, most importantly, [does]

not compar[e] the value of the licensed technology to available alternative technologies."

(Rogers Decl., Ex. J, Ted Hagelin, *Valuation of Patent Licenses*, 12 Tex. Intell. Prop. L.J. 423,

425-26 (2004).)  As another commentator puts it, "a value arrived at in such a manner will only

be correct by coincidence." (Rogers Decl., Ex. K, Mark Berkman, *Valuing Intellectual Property Assets for Licensing Transactions*, 22 The Licensing Journal 16, 16 (April 2002).)

Mr. Goldscheider has specifically explained that his rule is not meant to be applied to the incremental value of the patent, that is, the benefit that the licensee obtains by using the patent in its product rather than an alternative technology. (Rogers Decl., Ex. G, at 126 ("The 25 Per Cent Rule, in its pure sense, should be applied to fully loaded operating profits, not to already computed incremental benefits.").) Commentators have been particularly critical of this disconnect between the 25% figure and the incremental value of the patent. Focusing on this problem, one has called the rule "an exercise in arbitrary business analysis," and decries its continued use "despite [its] inappropriateness." (Rogers Decl., Ex. L, Paul E. Schaafsma, *An Economic Overview of Patents*, 79 J. Pat. & Trademark Off. Soc'y 241, 252 (1997); *see also* Rogers Decl., Ex. K.)

### iii    Mr. Gemini's Supplemental Report

In a supplemental expert report dated January 14, 2009, Mr. Gemini applied the same [REDACTED] base and same 25% rate for his royalty calculation. In short, even though Uniloc now only accuses of infringement one out of the eight implementation details of Product Activation that were accused at the time Mr. Gemini originally came up with his [REDACTED] figure, that figure remains unchanged.

His supplemental report also presented a new theory of damages based on a royalty rate of 11.5%. This new rate was based on two article abstracts. (*See* Rogers Decl., Ex. M, January 14, 2009, Supplemental Report of Joseph Gemini ("Gemini Supplemental Report") at 5.) Both abstracts were in his possession when he wrote his original report and when he was deposed, and yet were not identified then as a basis for his opinions. (Rogers Decl., Ex. F, Gemini Deposition at 156-157.)

## II.   RULE 702 REQUIRES THAT THE COURT ACT AS "GATEKEEPER" AGAINST UNRELIABLE EXPERT TESTIMONY

Federal Rule of Evidence 702, as amended in light of *Daubert v. Merrel Dow Pharms.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), provides that an expert may give opinion testimony if (1) the opinion is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003).  The court must act as a "gatekeeper" to exclude expert testimony that "is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case."  *Id*. at 1391.

Concluding that these requisites were not satisfied by the plaintiff's damages expert, the court in *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000), reversed a $133 million antitrust damages award.  The expert, an economics professor at Stanford University, had used an economic model to "construct a hypothetical market which was not grounded in the economic reality of the stern drive engine market . . . [and] ignored inconvenient evidence."  *Id*. at 1056.  The expert's conclusions were unreliable because the foundations of his opinion erroneously disregarded the evidence:

> Dr. Hall's expert opinion should not have been admitted because it did not incorporate all aspects of the economic reality of the stern drive engine market and because it did not separate lawful from unlawful conduct. Because of the deficiencies in the foundation of the opinion, the ex-pert's resulting conclusions were "mere speculation."

*Id*. at 1057.

In *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997), the Supreme Court clarified that a court's gatekeeper role is not limited to an evaluation of the reliability of the methods used by an expert, but extends to a review of the strength of the connection between an expert's conclusion

13

and the facts on which that conclusion is based.  The Court observed that "[t]rained experts

commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of

Evidence requires a district court to admit opinion evidence that is connected to existing data

only by the *ipse dixit* of the expert."  *Id*. at 146.  As a result, "[a] court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered," and in such cases

the expert's testimony is unreliable and should be excluded.  *Id*.

III.  **MR. GEMINI'S OPINION REGARDING A** <sup>REDACTED</sup> **PER-ACTIVATION ROYALTY IS UNRELIABLE, AND HE SHOULD NOT BE PERMITTED TO OFFER ANY TESTIMONY IN THIS CASE**

The errors in Mr. Gemini's analysis are pervasive, extending to his determination of both

base and rate, and his resulting opinion is far too unreliable to be admissible as expert testimony.

There are at least six flaws, the first three infecting his base determination and last three tainting

his rate conclusion.  Each of these independently warrants striking the entirety of his analysis,

and precluding him from offering any testimony in this case:

1.  Mr. Gemini's base analysis fails to comply with the Entire Market Value Rule,

    in that he fails to offer any evidence that the <sup>REDACTE</sup> figure is the allocated value of

    the accused implementation detail of Product Activation within the accused

    products.

2.  Mr. Gemini's conclusion that <sup>REDACTE</sup> is the appropriate per-unit base is founded on

    a single document that does not even mention the accused products in this case,

    or the accused implementation detail.  The specific sentence on which his

    opinion critically hinges does not even remotely suggest that the <sup>REDACTED</sup> figure is

    related to any value that Microsoft places on Product Activation, let alone on the

    accused "license data hashing" portion of Product Activation.

3. Mr. Gemini's <sup>REDACTE</sup> per-unit base is arbitrary, contrived, and result-oriented, as plainly betrayed by his persistence in using this figure even though the scope of this case has narrowed dramatically since he offered his initial opinion.

4. Mr. Gemini's 25% rate is based on a fundamentally unreliable methodology that averages together wildly varying royalty rates across all kinds of companies and industries.

5. Mr. Gemini pays only lip service to the *Georgia-Pacific* test for determining the reasonable royalty in a running royalty setting. The 25% "rule of thumb" is not just a starting point for Mr. Gemini. It is his starting point and his ending point, and he fails to connect the myriad *Georgia-Pacific* factors, or the facts of this case, to his 25% conclusion in any meaningful way.

6. Mr. Gemini's attempt two weeks ago to offer an alternative royalty rate of 11.5% comes not only far too late, but further underscores the arbitrary and inconsistent nature of his 25% rate calculation.

For all of these reasons, Mr. Gemini's testimony should be excluded. We consider each separately below.

**A.    Mr. Gemini's Opinion That** <sup>REDACTE</sup> **Is The Appropriate Per-Activation Base Is Arbitrary, Unfounded, and Unreliable**

**i    Mr. Gemini Has Failed To Comply With The Entire Market Value Rule**

As previewed above, it is the rare case in which a patent owner is entitled to use the entire market value of the accused product as the base for calculating running royalty damages. That only happens where the patentee complies with the "entire market value rule" ("EMV rule"). *See, e.g.*, *Imonex Servs., Inc. v. W.H. Munsprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1379 (Fed. Cir. 2005). One of the prerequisites to the application of that rule is that the

patented component is "the basis for customer demand or substantially create[s] the value of the component parts." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995). "Accordingly, expert testimony offering the entire market value of accused products as the royalty base is only appropriate when it has been demonstrated, by a preponderance of the evidence, that the patented invention was the 'basis for demand' of those products." *Cornell Univ. v. Hewlett-Packard Co.*, 2008 WL 2222189, at *2 (N.D.N.Y.  May 27, 2009).  Where, as here, the patentee fails to supply any evidence that the component related to the patent is the basis of customer demand for an accused product, a patentee may not rely on this theory, and any expert testimony invoking the entire market value rule must be excluded.  *Id*. at *4.

As numerous courts have recognized, this requirement helps to prevent multiple recoveries across different cases or patents.  *See, e.g.*, *Eaton Corp. v. ZF Meritor LLC*, 2007 WL 735000, *4 (E.D. Mich. Mar. 8, 2007) ("If not for this restriction, an infringer could be required to pay multiple recoveries on a single product to numerous patentees."); *Izume Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F.Supp.2d 589, 614 (D. Del. 2004), aff'd 140 Fed. Appx. 236 (Fed. Cir. 2005)  ("In the absence of this restriction, an infringer could be required to pay multiple recoveries on a single product to numerous patentees, each of whom file infringement claims directed to different components of the product without regard to the extent to which its patented component contributed to the overall profitability of the product.").

Uniloc has failed to offer any evidence to show that the accused implementation detail of Product Activation is the basis for customer demand of the accused products, and thus fails to satisfy the mandatory prerequisite for application of the EMV rule.  *See, e.g.*, *Rite-Hite*, 56 F.3d at 1549; *Cornell Univ.*, 2008 WL 2222189, at *2.  Not only do the accused products include thousands of features, but the record clearly reflects that Product Activation — which is not a

user feature at all — is a source of customer dissatisfaction, rather than the reason they buy the products.[6]  (*See, e.g.*, Rogers Decl., Ex. D, Cole Deposition at 8 ("it has been a large PR hit"), 64 ("activation has been a dissastisfier for customers"); Ex. N, November 7, 2005, Expert Report of Brian Napper at 20-23 (collecting record references to angry customer emails).)  The EMV rule forbids Uniloc from using the value of the accused software products as the base for its running royalty calculation. Mr. Gemini's report is therefore unreliable and should be excluded because that is exactly what he attempts to do.

>ii        Mr. Gemini's REDACTE Per-Activation Base Is Wholly Unfounded

Uniloc will no doubt respond that the accused products in this case are priced at far more than $10, and so Mr. Gemini did not base his damages figure on the entire market value of the accused products.

Yet that is exactly what Mr. Gemini seeks to do.  The underlying sentence on which he relies specifies a *range* of values,     REDACTED     .  Mr. Gemini cleverly selects the low-end of the range, allegedly in order to be conservative.  (Rogers Decl., Ex. A, Gemini Initial Report at 12.)  But that is not the real reason.  He does so in order to try to disguise his grossly inflated base.  Using the low end of a wide range of product values—where the selling prices of the accused products fall within the range—does not change the fact that the figures in question are in fact product values, and so are off-limits for use as a running royalty base unless the EMV rule can be satisfied, which here it plainly cannot.

---

[6]   In his rebuttal report, Gemini implies, without expressly arguing, that Product Activation might drive sales of Microsoft products.  As evidence he cites sections of a "frequently asked questions document explaining that by reducing piracy the software industry can invest more in product development, quality and support.  (Rogers Decl., Ex. O, December 8, 2005, Rebuttal Report of Joseph Gemini ("Gemini Rebuttal Report") at 4.)  This single reference, which evidently represents Microsoft's attempt to limit the bad PR caused by the Product Activation program, falls far short of the kind of factual showing required to establish that Product Activation is the basis for customer demand.

The context of the REDACTED figure in a paragraph discussing security, and the explanation of that value as resulting from the ability to install a product,   REDACTED


Moreover, there is no connection whatsoever between the REDACTE figure in this document, and Product Activation.  Not one of the software products on which Uniloc seeks to recover damages in this case is discussed in the document, and there is no discussion of the one remaining implementation detail that is still on the table in this case.   REDACTED

---

[7]   At his deposition Gemini justified his conclusion by pointing to the description of the value of a  product key as the result of an "appraisal process." (Rogers Decl., Ex. F, Gemini Deposition at 82-83.)  He contended that because he did not have access to the appraisal process, he was forced to take the result of the appraisal at face value.  This does not aid Mr. Gemini's analysis.  The "appraisal" was of the value of Product Keys.  His inability to understand the source of this "appraisal" does not explain why he can take an evaluation of one thing, a single product key, and apply it to another, Product Activation technology.  Furthermore, from the context of the paragraph it appears that the "appraisal" was simply based on the value of the protected products.

REDACTED

. (*See* Rogers Decl., Ex. B,

Product Support Memo at 26.)                    REDACTED

Still further, Uniloc cannot lay a foundation for admitting the document on the basis it

seeks.  *See Wallace Motor Sales, Inc. v. American Motors Sales Corp.*, 780 F.2d 1049, 1060 (1st

Cir. 1985) (admission of business record requires witness "with knowledge of the contents of the

record").                    REDACTED

(Rogers Decl., Ex. C, Richards Deposition at 19 and 39.)  Uniloc had every

opportunity to put Mr. Gemini's strained and unsupported reading of the passage to Ms.

Richards.                    REDACTED

(*Id.* at 44.)

Uniloc bears the burden on this issue, had every opportunity to lay its foundation, and cannot

simply avoid asking the right questions so as to keep the field clear for its expert to give the

sentence any reading he desires.  Mr. Gemini is certainly no "expert" in reading Microsoft

internal documents.

     iii     **Mr. Gemini's Persistence In Maintaining A $10 Per-Activation Base Despite Uniloc's Abandoning Most Of Its Infringement Case Further Underscores That That Base Is Arbitrary, Contrived, And Result-Oriented**

When he first offered his opinion that the appropriate per-activation base was [REDACTED] Uniloc

was asserting sixteen claims of the '216 patent against eight different implementation details of

Product Activation.  *See Uniloc USA, Inc. v. Microsoft, Corp.*, 290 Fed. Appx. 337, 339 (Fed.

Cir. 2008).  The case is now only about two claims, and a single implementation detail—hashing of the license data.  *See id*. at 341.  It is simply not permissible for Mr. Gemini to opine that precisely the same[REDACTED] base is appropriate now as before.  *See Children's Broadcasting Corp. v. the Walt Disney Co.*, 245 F.3d 1008, 1018 (affirming district court's exclusion of expert testimony concerning damages that, among other factors, was based on a report that assumed the defendants had engaged in all forms of wrongful conduct alleged in the complaint, including some that did not survive summary judgment).  This unreliability is exacerbated by his failure to offer any principled basis for allocating the overall value of the accused products to the particular accused implementation detail(s) of Product Activation.  There is thus no way to understand from his analysis how the substantially diminished scope of the infringement allegations affects his conclusion on the appropriate base.

The inferences required to move from the one sentence he relies on to Mr. Gemini's conclusion are both unstated and unfounded.  "[T]here is simply too great an analytical gap between the data and the opinion proffered."  *Joiner*, 522 U.S. at 146.

In *Medtronic, Inc. v. Boston Scientific Corp.*, 2002 WL 34447587 (D. Minn. 2002), a proffered damages expert relied on a single document that did not directly refer to convoyed sales to support his opinion that "the level of 'convoyed sales' associated with the [accused product] indicates that a relatively high royalty rate is appropriate."  *Id*. at *11.  At his deposition, the expert was unable to identify what products were sold in convoyed sales or what the volume of convoyed sales was.  *Id*.  Finding that the expert was unable to "identify a reliable factual basis" for his opinion that convoyed sales warranted a relatively high royalty rate, the district court excluded him from testifying on this issue.  *Id*. at *12.  So too should Mr. Gemini's testimony as to the appropriate base for a running royalty be excluded.  Mr. Gemini's "inability

to link his opinion to the realities of this case is a prime example of 'the hypothetical [] lapsing into pure speculation,' that the Federal Circuit law prohibits." *See Cornell*, 2008 WL 2222189 at *4, quoting *Grain Processing Corp. v. American Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

### B. Mr. Gemini's Opinion That 25% Is The Appropriate Royalty Rate Is Arbitrary, Unfounded, and Unreliable

Mr. Gemini uses a similarly unreliable approach to arrive at his conclusion that 25% is the "reasonable" royalty rate for this case. The law regarding the establishment of a reasonable royalty rate for a running royalty theory is well-settled, and not in dispute. The question boils down to what the patentee and accused infringer would have agreed to in a "hypothetical negotiation" prior to the initiation of the alleged infringement. The Federal Circuit has:

> endorsed the conceptual framework of a hypothetical negotiation between patentee and infringer as a means for determining a reasonable royalty. Factors relevant in a reasonable royalty determination using this method include those set out in *Georgia-Pacific*.

*Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003). The "*Georgia-Pacific* factors" are a list of fifteen factors that provide a framework within which a royalty rate resulting from a hypothetical negotiation may be determined. The hypothetical negotiation/*Georgia-Pacific* methodology requires that the reasonable royalty rate be determined through an analysis of the actual circumstances existing between the patent owner and the defendant. *Georgia-Pacific*, 318 F.Supp. at 1120-1121 ("Where a willing licensor and a willing licensee are negotiating for a royalty, the hypothetical negotiations would not occur in a vacuum of pure logic."). Mr. Gemini did not follow this rule of law, opting instead to apply the 25% "rule".

Courts routinely exclude expert opinions based on general rules rather than the specific facts of the case. For example, in *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 Fed. Appx. 450, 453 (5th Cir. 2005), the court affirmed exclusion of an expert opinion that used "a yardstick

measure of lost profits" made up of sales and growth data from an entire trade association to prove the plaintiff's actual damages.  The expert made no effort to demonstrate that the plaintiffs' firms were reasonably similar to the businesses in the trade association and did not allow for losses caused by any factor other than the alleged antitrust violation by the defendant. *Id*. (affirming the district court's finding that the expert's model was "irrelevant insofar as it was not in any respect anchored to the specific agreements or marketing practices challenged by the plaintiffs.").  Similarly, in *Saia v. Sears Roebuck And Co., Inc.*, 47 F.Supp.2d 141, 145-146 (D. Mass. 1999), the court excluded an expert's damages opinion in part because it was based on "a statistically average value of life," as opposed to the actual life circumstances of the plaintiff. What these cases and others show is the mechanical or generic application of a rule of thumb is not appropriate, and not sufficient to get to the jury. While Mr. Gemini failed this test in this case, as a threshold matter he began with a rule which, itself, is junk science and should be rejected for that independent reason.  We deal with that threshold issue first.

> **i     Mr. Gemini Applied a Generic "Rule of Thumb" Royalty Rate That Is Based on Unreliable Methodology**

The so-called "25% rule of thumb" used by Mr. Gemini lacks any reliability as a basis for determining the hypothetical royalty to which the parties would have agreed in any particular case, and should therefore be rejected.  As noted above, the rule has its origins in one person's particular experiences from the 1950s, and has been perpetuated since then largely as a matter of inertia.  What little empirical data there is shows that, even assuming the 25% figure accurately reflected an average at some point in time in the past, across all industries and all licenses, it masks tremendous variation among industries, among firms within an industry, and among the different types of licenses held by any one firm.  The 25% figure is thus meaningless in the context of any one case and is irrelevant to a reasoned opinion on setting a reasonable royalty.

To even use it as a starting point, let alone use it as the exclusive basis for setting a royalty, is akin to using the average price of a home in the United States as the starting point for negotiating the sale of a particular home in a particular neighborhood.  Such coarse averages can only serve to mislead, by either artificially inflating values that fall significantly below the average or artificially depressing values that fall significantly above the average.

While courts have sometimes applied the "25% rule," no court has "adopt[ed] this test as a matter of law." *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547 (D. Del. 1997).  Indeed, some courts mentioning the rule have gone on to describe why the rule is inapplicable under the particular facts of the case.  *See, e.g.*, *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, No. 95-218-SLR, 1998 WL 151411, at *52 n.46 (D. Del. Mar. 13, 1998); *see also Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 606 (D. Del. 2007) (noting that while the 25% approach "has been used," it has "no particular analytical justification").  In some cases, while challenging the way in which it was applied, the accused infringer "did not challenge the reliability of the 25% Rule." *Civix v. Expedia*, No. 03 C 3792, 2005 WL 5961023 (N.D. Ill. Oct. 25, 2005); *see also Fonar Corp. v. General Electric Co.*, 107 F.3d 1543, 1553 (Fed. Cir. 1997) (finding expert testimony that one-quarter of profits would be a reasonable royalty in that case to be substantial evidence supporting a damages award, without mentioning the 25% rule or any other basis for the expert's determination); *Standard Mfg. Co. v. United States*, 42 Fed. Cl. 748, 764-66 (Fed. Cl. 1999) (accepting defendant's argument that 25% of profits was an appropriate starting point for a Georgia-Pacific analysis, and rejecting the patentee's suggestion for a higher rate set as a percentage of cost savings); *Bose Corp. v. JBL, Inc.*, 112 F. Supp. 2d 138, 167 (D. Mass. 2000) (although Microsoft's counsel in this case represented the plaintiff in *Bose*, the defendant's expert there conceded that the 25% approach

was "common and reasonable"). Where courts have explicitly rejected challenges to the rule, they have done so without substantial analysis. *See GSI Group, Inc. v. Sukup Mfg. Co.*, 2008 WL 4964801 (C.D. Ill. 2008) (citing *Bose* and noting only that the rule "has been accepted").

Courts have frequently relied on the commonness of the approach to validate it. *See Bose*, 112 F. Supp. 2d at 167. However, whether an approach is generally accepted is only one of the factors for courts to consider in a *Daubert* analysis and, since *Daubert*, is no longer the touchstone of reliability. *See Daubert*, 509 U.S. at 588. Other factors to be considered include "(1) the testability of the hypothesis; (2) whether the theory or technique has been subject to peer review and publication; [and] (3) the known or potential rate of error." *Id.* at 593-94. As described above, Goldscheider has advocated the 25% rule in a series of publications, but there is no indication that these have been peer reviewed in any significant way. To the contrary, peer commentary and analysis is largely critical of the method as overly simplistic. Moreover, testing of the method against real-world data has only demonstrated the unreliability of the method as a way of predicting results in any individual case. In the face of this statistical unreliability, even widespread use cannot validate the approach. *See Kumho Tire*, 526 U.S. at 151; *Libas, Ltd. v. United States*, 193 F.3d 1361, 1369 (Fed. Cir. 1999) (finding a test method to be unreliable despite its possible general acceptance where the method failed to satisfy any of the other *Daubert* factors and offered no other assurances of reliability); *see also United States v. Saelee*, 162 F. Supp. 2d 1097, 1105 (D. Alaska 2001) ("[T]he fact that this type of evidence has been generally accepted in the past by courts does not mean that it should be generally accepted now, after *Daubert* and *Kumho*.").

      **ii**        **Mr. Gemini Pays Only Lip Service To The *Georgia-Pacific* Factors**

Even accepting that Mr. Gemini used the 25% rule as a starting point, he ultimately failed to base his royalty rate opinion on real-world factors relating to the accused products and the

parties.  In his report, Mr. Gemini merely parrots the *Georgia-Pacific* factors and generally

recites evidence that may fall within the ambit of each factor.  (Rogers Decl., Ex. A, Gemini

Initial Report at 7-13.)  This "check the box" approach does not come close to satisfying the

legal test laid out in *Georgia-Pacific*.  In fact, the entirety of Mr. Gemini's analysis of the

appropriate rate is in substance found in his discussion of just two factors: factors 11 and 12.  (*Id*.

at 11-12.)  Nowhere else in either of his reports does Mr. Gemini provide an opinion (let alone

analysis) as to how (or whether) the "*Georgia-Pacific*" evidence he cites affects the reasonable

royalty rate.  Most critically, he does not indicate the extent to which each factor might drive the

royalty rate up or down from the 25% figure.  *See Bowling v. Hasbro, Inc.*, No. C.A. 05-229S,

2008 WL 717741, at *6 (D.R.I. March 17, 2008) ("The fundamental defect in Lapidus' report …

is [his] failure to connect the *Georgia-Pacific* factors to his ultimate conclusion as to the

reasonable royalty rate that would have resulted from a hypothetical negotiation between these

parties").  In fact, Mr. Gemini's collection of evidence if anything shows that a number of

*Georgia-Pacific* factors indicate that a lower royalty rate would be appropriate.  (Rogers Decl.,

Ex. A, Gemini Initial Report at 8-13 (factor 2—Microsoft prefers lump sum payments to running

royalties; factor 3—any license would be non-exclusive and therefore lower; factor 4—Uniloc is

willing to license the patent; factor 5—Uniloc and Microsoft are not competitors; factor 6—

Microsoft has realized no additional convoyed sales because of Product Activation).)

The one and only place in either report where Mr. Gemini explains how he arrived at his

reasonable royalty rate is where he invokes the putative 25% rule of thumb.  (*Id*. at 12.)  It is

evident from his reports that he uses this "rule" as both a starting and ending point for his

analysis.  Nowhere is this more clearly demonstrated than in his failure to address the fact that

the allegedly infringing technology comprises but one very small component of Product

Activation and that, in turn, that component is not a feature of the product but a hurdle to using it

which users dislike. This critical issue is squarely implicated by *Georgia-Pacific* factor 13.[8]

Yet in his discussion of this factor, Mr. Gemini digresses into a discussion of the annual costs of

maintaining both internet infrastructure and telephone call centers used for Product Activation,

costs which he then fails to incorporate into his eventual royalty rate. (*Id*. at 12-13.)

Notably absent is any discussion or consideration by Mr. Gemini of the real-world

conditions identified in factor 13, such as the technology that predated and/or has nothing to do

with Microsoft's development of Product Activation technology, the extensive costs of

developing and supporting the Product Activation program that are borne by Microsoft, the

significant business risk undertaken by Microsoft in the face of open and substantial customer

hostility to Product Activation, and the relatively small role that the one remaining accused

implementation detail plays in the larger Product Activation program.

Mr. Goldsheider, the proponent of the "25% rule of thumb," explicitly states that the rate

should not be applied to the incremental value of the patent to the licensee. (Rogers Decl., Ex.

G, Goldscheider, *Managing Intellectual Assets* at 126.) But by ignoring the potentially minor

role of the patent in the licensee's product and the potential availability of substitute

technologies, the 25% rule allows patentees with only marginal improvements on existing

technology to extract exorbitant sums far in excess of the value added by the patent. *See* Rogers

Decl., Ex. J, Hagelin, *supra*, at 427-28). Commentators have rightly criticized the "rule of

thumb" for leading to such absurd results, and this provides further reason to reject the rule as

unreliable. Mr. Goldscheider has defended against such criticisms by noting that the rule is

intended to be used in conjunction with an analysis of additional factors such as the incremental

---

[8]   "The portion of the realizable profit that should be credited to the invention as distinguished
     from non-patented elements, the manufacturing process, business risks, or significant

value of the patent, an analysis in which Mr. Gemini does not seriously engage.  (Rogers Decl.,

Ex. G, Goldscheider, *Managing Intellectual Assets* at 131.)  To say that one can and should use

other factors to adjust the 25% figure, however, does not in any way justify using 25% as the

baseline rate.

Thus, Mr. Gemini has offered no reliable methodology to support his opinion that it

would be reasonable for defendants to pay fully 25% of the supposed "value" of a product key to

Uniloc.  Instead, he reaches that conclusion by mechanically applying a generic "rule of thumb,"

even though the rule's leading proponent has repeatedly warned that it is wrong to do so.

(Rogers Decl., Ex. G, Goldscheider, Managing Intellectual Assets at 132.)  The law of

reasonable royalty damages requires consideration and analysis of all relevant facts and

circumstances present in the case.  *Micro Chemical*, 317 F.3d at 1393.  Where, as here, an

expert's testimony fails to offer a reliable means for calculating a reasonable royalty as to the

technology at issue, it is likely to mislead and confuse the jury and should be excluded.  *Utah

Medical Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1385-1386 (Fed. Cir. 2003)

(affirming district court's exclusion of expert testimony on reasonable royalty damages where

the district court, "concluded, after fully considering the evidence, that Graphic Controls had not

shown that the license agreements used in its expert's analysis were in any way comparable to

the [patent-in-suit].").

### iii   Mr. Gemini Should Be Precluded From Offering Any Testimony Or Evidence Concerning An Alleged Industry Average Royalty Rate Of 11.5%

In his supplemental expert report, dated January 14, 2009, Mr. Gemini for the first time

identified two abstracts as allegedly suggesting that the "industry average royalty rate" is

"approximately 11.50% for software," and that this 11.5% rate is somehow applicable to a

---

features or improvements added by the infringer."  *Georgia-Pacific*, 318 F.Supp. 1120.

determination of what a reasonable royalty would be in this case for the patent-in-suit.  (Rogers Decl., Ex. M, Gemini supplemental report at 3.)

The deadline for Uniloc to submit its expert reports on damages was January 3, 2005. Mr. Gemini knew about the two abstracts, and the supposed 11.5% "standard industry rate," prior to that deadline.  (Rogers Decl., Ex. F, Gemini deposition at 157-158.)  Mr. Gemini did not disclose in any of his previous reports that he was relying on this 11.5% royalty figure as an industry standard rate applicable to his damages analysis, nor did he disclose this as a basis during his deposition.  To the contrary, Mr. Gemini testified that the abstracts from which he had derived the figure had not even been printed for use in this case.  (*Id*. at 158.)

Given his failure to include that information, or offer this opinion, in his initial reports, he should be precluded from introducing that information now.  "[C]ourts have routinely rejected untimely 'supplemental' expert testimony where the opinions are based upon information available prior to the deadline for expert disclosures."  *Cooper Tire & Rubber Co. v. Farese*, 2008 WL 5104745, *4 (N.D. Miss. 2008).  *See also Salgado v. Gen'l Motors Corp.*, 150 F.3d 735, 741-43 (7th Cir.1998) (affirming exclusion of "supplemental" expert testimony based on untimely disclosure because opinions were based on information available prior to the deadline for service of initial reports).

In addition, neither Mr. Gemini's reports, his deposition testimony, nor the abstracts themselves establish how the 11.5% rate is at all relevant.  Mr. Gemini himself does not know whether the rate was derived from patent licenses, and if so, whether those licenses were for software that in any way resembles what is recited in the asserted claims.  (*See* Rogers Decl., Ex. F, Gemini deposition at 159 ("I don't know the details of what types of technology are included").)

The sole source for Mr. Gemini's opinion that the "industry average royalty rate" for software at the time of the hypothetical negotiation would have been 11.5% comes from two single-page abstracts of articles that were published in the December 2002 and December 2004 editions of a quarterly journal called the Licensing Economics Review.  (*See* Rogers Decl., Ex. M, Gemini supplemental report at 3.)  Those abstracts were first produced to Microsoft during Mr. Gemini's March 1, 2006 deposition.  (*See* Rogers Decl., Ex. F, Gemini deposition at 156-57; Rogers Decl., Ex. Q, Licensing Economics Review Article Abstracts (article abstracts).)

The December 2002 abstract states that the average industry royalty rate for software licensing transactions was 11.5%.  The December 2004 abstract places that figure at 11.6%.  But neither abstract specifies the subject matter of those licensing transactions.

To be relevant to the reasonable royalty inquiry in this case, the 11.5% average software industry royalty rate should relate to patent licenses for software that in some way resembles what is recited in the asserted claims of the patent-in-suit.  *See, e.g.*, *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1518  (Fed. Cir. 1984) (holding that licenses relating to products entirely distinct from the patented product were insufficient to establish an industry standard royalty rate and refusing to apply the rates of those licenses in determining a reasonable royalty).  However, the abstracts make clear that the studies they report on are not based on licensing situations comparable to the hypothetical negotiation in this case.  For example, the studies include only running royalty agreements.  (*See* Rogers Decl., Ex. R, Dec., 2002, Licensing Economics Review at 8; Ex. S, Licensing Economics Review, Dec., 2004, Licensing Economics Review at 8.)  They thus deliberately exclude agreements with lump-sum royalty payments, even though the evidence in this case clearly shows that Microsoft regularly enters into lump-sum agreements.  Indeed, since the studies only included royalties that were a percentage of "gross

29

sales" or "net sales," they appear to have even excluded the "per-unit" type of royalty that Uniloc

seeks in this case.  (*Cf.* Rogers Decl., Ex. G, Goldscheider, Managing Intellectual Assets at 132

(distinguishing "fee per unit" from "running royalties on sales").)  Furthermore, Mr. Gemini

relies on the average royalty rate for the software industry, but this average rate may well reflect

a large proportion of licenses for finished software products or other aggregations of intellectual

property rights, whereas the hypothetical negotiation in this case is for a bare patent license.  (*See*

Rogers Decl., Ex. M, Gemini supplemental report at 3.)  There is no way to tell from the

abstracts whether the purported average industry license rates they describe relate to finished

software products, bare patents, trademarks, copyrights, trade secrets, or some combination of

these.

    For his part, Mr. Gemini has no idea as to what the 11.5% average royalty rate relates.

He testified that all he knew was that the rates described in the abstracts related to software

transactions.  (Rogers Decl., Ex. F, Gemini deposition at 159.)  He could not tell what sort of

software or technologies were the subject of those transactions.  (*Id*.)  Nor was he able to say

whether or not the software licensing transactions referred to in the abstracts related solely to

patent licenses.  (*Id*. at 160.)

    In short, neither Mr. Gemini's reports, his deposition testimony, nor the abstracts

themselves provide any indication that the 11.5% purported "industry standard royalty" is in any

way relevant to the reasonable royalty analysis in this case.  For this reason alone, testimony and

evidence concerning that rate should be precluded.

    Finally, in all three of his expert reports Mr. Gemini opines that the appropriate royalty

would be calculated using the 25% rule.  Now, in his third report, while maintaining his position

that the 25% rule applies, he simultaneously argues that an 11.5% industry-average rate is also

germane.  (*See* Rogers Decl., Ex. M, Gemini supplemental report at 3.)  By belatedly pointing to an alleged "industry standard" 11.5% royalty rate, Mr. Gemini has only weakened his argument with respect to the 25% rule.  He does not attempt to reconcile these different methods and values, or how to relate one to the other, and he provides no reason whether or why one supposed industry average is more appropriate than another.  His changing position on this issue, and his lack of any reliable method for choosing one rate over another, further show why his opinion should be excluded.

**IV.     CONCLUSION**

For the foregoing reasons, the Court should preclude Mr. Gemini from offering any testimony in this case, on any issue.

31

Dated:  January 26, 2009

By:  /S/ Joseph Cavanagh
    Joseph V. Cavanagh, Jr. #1139
    **BLISH & CAVANAGH**
    Commerce Center
    30 Exchange Terrace
    Providence, Rhode Island 02903
    (401) 831-8900 (Telephone)
    (401) 751-7542 (Facsimile)

    Frank E. Scherkenbach
    Kurt L. Glitzenstein
    **Fish & Richardson, P.C.**
    225 Franklin Street
    Boston, MA  02110-2804
    Telephone:  (617) 542-5070
    Facsimile:  (617) 542-8906

    Of Counsel:
    Isabella E. Fu, Esq.
    **MICROSOFT CORPORATION**
    One Microsoft Way
    Redmond, WA  98052-6399
    Telephone:  (425) 882-8080
    Facsimile:  (425) 936-7329

    Attorneys for Defendant
    MICROSOFT CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 26, 2009 I caused a true and correct copy of the foregoing

Defendant's Memorandum in Support of *in Limine* Motion to Preclude Testimony of Joseph

Gemini to be served electronically via ECF on the following:

Francis A. Connor, III                               Attorneys for Plaintiffs
Jennifer L. Buckley                                  UNILOC USA, INC. and
Taylor Duane Barton & Gilman, LLP                    UNILOC SINGAPORE
10 Dorrance Street, Suite 700                        PRIVATE LIMITED
Providence, RI  02903


Paul J. Hayes                                        Counsel for Plaintiffs
Dean G. Bostock, Esq.                                UNILOC USA, INC. and
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.  UNILOC SINGAPORE
One Financial Center                                 PRIVATE LIMITED
Boston, Massachusetts 02111



/S/ Joseph Cavanagh