# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

_____
)
UNILOC USA, INC. and                                    )
UNILOC SINGAPORE PRIVATE LIMITED       )
                                                                          )
                    Plaintiffs,                                    )
vs.                                                                       )          Civ. A. No. 03-CV-440 (WES)
                                                                          )
                                                                          )
MICROSOFT CORPORATION,                           )
                                                                          )          **REDACTED**
                    Defendant.                                   )
_____)

## MEMORANDUM OF LAW IN OPPOSITION OF
## DEFENDANT'S MOTION TO PRECLUDE TESTIMONY OF
## PLAINTIFF'S EXPERT WITNESS, JOSEPH GEMINI

Sheri L. Pizzi (R.I. Bar No. 5720)
**TAYLOR DUANE BARTON**
**& GILMAN, LLP**
10 Dorrance Street, Suite 700
Providence, Rhode Island 02903
(401) 273-7171 (Telephone)
(401) 273-2904 (Facsimile)

OF COUNSEL:

Paul J. Hayes, Esq.
Dean G. Bostock, Esq.
**MINTZ, LEVIN, COHN, FERRIS,**
**  GLOVSKY AND POPEO, P.C.**
 One Financial Center
Boston, MA  02111
(617) 542-6000 (Telephone)
(617) 542-2241 (Facsimile)

*Counsel to Plaintiffs,*
*Uniloc USA, Inc. and*
*Uniloc Singapore Private Limited*

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARD........................................................................................10

III.   ARGUMENT ....................................................................................................11

     A.    The Entire Market Value Rule Is Irrelevant ...........................................12

     B.    Mr. Gemini's ▮ Royalty Base Is Not Unfounded ...............................12

     C.    Mr. Gemini's Royalty Rate Is Unaffected By The Number Of
            Claims Infringed Or The Theory Of Infringement .................................17

     D.    Mr. Gemini's Analysis Has Been Accepted By Many Courts................18

     E.    Mr. Gemini Utilized All Of The *Georgia-Pacific* Factors In
            Determining A Royalty Rate In This Case ............................................21

     F.    Mr. Gemini's Opinion Is That The Royalty Rate Would Be ▮
            Per Successful Activation, Not A 25% Royalty ....................................24

IV.   CONCLUSION.................................................................................................26

27407-001 4531562

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*Beatrice Foods Co. v. New England Printing and Lith. Co.,*
    899 F.2d 1171 (Fed. Cir. 1990)...................................................................................7

*Bose Corp. v. JBL, Inc.,*
    112 F. Supp. 2d 138 (D. Mass. 2000) ........................................................................3

*Children's Broadcasting Corp. v. Walt Disney Co.,*
    245 F.3d 1008 (8th Cir. 2001) ...................................................................................1

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993).................................................................................................11

*Hanson v. Alpine Valley Ski Area, Inc.,*
    718 F.2d 1075 (Fed. Cir. 1983)...........................................................................2, 4, 7

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999).................................................................................................11

*Libertad v. Welch,*
    53 F.3d 428 (1st Cir. 1995)......................................................................................16

*Mahurkar v. C.R. Bard, Inc.,*
    79 F.3d 1572 (Fed. Cir. 1996)....................................................................................2

*Medtronic, Inc. v. Boston Scientific Corp.,*
    2002 WL 34447587 (D. Minn. Aug. 8, 2002) ........................................................1, 2

*Rite-Hite Corp. v. Kelly Co., Inc.,*
    56 F.3d 1538 (Fed. Cir. 1995)..............................................................................12, 13

*Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.,*
    295 F.3d 68 (1st Cir. 2002)......................................................................................11

*Snellman v. Ricoh Co., Ltd.,*
    862 F.2d 283 (Fed. Cir. 1989)..............................................................................13, 14

*Ziggity Systems, Inc. v. Val Watering Systems,*
    769 F. Supp. 752 (E.D. Pa. 1990) ..............................................................................1

## **RULES**

Fed. R. Evid. 703 .............................................................................................................................15

Fed. R. Evid. 801(d)(2)(A) ...............................................................................................................16

Plaintiffs, Uniloc USA, Inc. and Uniloc Singapore Private Limited (together "Uniloc"), respectfully submit this memorandum of law in opposition to defendant's motion to preclude the testimony of Joseph Gemini, Uniloc's expert witness on the issue of damages.  For the reasons set forth below, the motion should be denied.

## I.  **INTRODUCTION**

With its non-infringement arguments having been rejected by this Court's claim construction, and the Federal Circuit's opinion reversing summary judgment of non-infringement, Microsoft resorts to filing a plainly meritless motion to exclude the testimony of Uniloc's damages expert, Mr. Gemini.  As set forth below, contrary to Microsoft's arguments, Mr. Gemini's opinion is based upon a host of Microsoft's own pre-litigation documentation and follows the accepted analytic framework set forth in the *Georgia-Pacific* case and endorsed by the Federal Circuit.

A copy of Mr. Gemini's opening, rebuttal and supplemental reports are submitted herewith as Exhibits A - D respectively.[1]  As this Court noted in the *Bowling v. Hasbro* case, the factors set forth in *Georgia-Pacific* are a proper basis for determining the reasonable royalty in patent cases.  As set forth on pages 6-14 of his opening expert report, and as further supplemented in his rebuttal report (Ex. B, pp. 3-10), Mr. Gemini addressed each of the *Georgia-Pacific* factors.  Unlike Microsoft's expert who found that none of these factors favored Uniloc, Mr. Gemini opined that several of the factors favor Microsoft:

> The basis for my opinion is described above and includes consideration of certain factors that would favor Microsoft which include non-exclusivity, the fact that Uniloc and Microsoft do not compete, that Uniloc generally has a policy of licensing, and that Microsoft incurs annual costs to maintain the M[icrosoft] P[roduct] A[ctivation] process.

---

[1] Mr. Gemini supplemented his original report in order to update his calculations as information with respect to the number of infringing Product Activations was provided to Uniloc by Microsoft.

*See* Ex. A, p. 13 (Factor 15). Thus, Mr. Gemini has fully and fairly addressed each of the *Georgia-Pacific* factors and his opinion is not "partisan and results-oriented" as Microsoft asserts on page 2 of its brief.

On pages 3-4 of its brief, Microsoft states that Uniloc "abandoned all but one aspect of Product Activation - hashing of the license data - and two claims, 12 and 19." As Microsoft is aware, Uniloc limited its appeal to these two claims in order to streamline the appeal process. Microsoft has now done the very same thing with its own invalidity defenses. Prior to the January 12, 2009 pre-trial conference, Microsoft relied upon at least six prior art references and numerous combinations thereof. At the pre-trial conference, Microsoft expressly limited its prior art to the Grundy an Hellman patents. Microsoft's assertion that Uniloc has abandoned "all but one aspect" of Product Activation is erroneous. Uniloc asserts that the accused Windows and Office products infringe the asserted patent claims because each product incorporates Product Activation, a registration system designed to prevent casual copying. Uniloc initially identified eight theories of infringement - just as Microsoft initially identified many theories of invalidity. Uniloc's remaining theory of infringement maps each claim element to a corresponding element in Microsoft's Product Activation system and is not limited to only a single aspect of Product Activation. Neither of claims 12 and 19 is a single element claim. To the contrary, each claim covers a registration system having numerous constituent elements (*see* Ex. E, cols. 14-16), each of which Uniloc argues is found in the accused products. *See* Ex. F (claim chart for claim 12), Ex. G (claim chart for claim 19). Thus, Microsoft's assertion that this case is only about "hashing the license data" is incorrect.

The first 12 pages of Microsoft's brief are merely a rehash of the argument made in the argument section thereof that Uniloc responds to *infra*. Microsoft's introductory 12 pages,

-2-

however, epitomize its efforts to mischaracterize Mr. Gemini's opinion and analysis.  Microsoft

complains that Mr. Gemini opines that damages in this case are $████████.  *See, e.g.,* Microsoft

Br., p. 1.  This number, however, is well supported by Microsoft's own pre-litigation documents

relied upon by Mr. Gemini with respect to the value of the accused Product Activation

technology to Microsoft.  Moreover, there is no dispute that the "crown jewel" Windows and

Office products have been very successful for Microsoft.  As of 2005, Microsoft had sold over

$50 billion worth of the infringing Windows and Office products. Ex. A, p. 9 (Factor 8).  In

addition, during the damages period in this case (2003-2009), there have been over ████████

successful activations of the accused products.  *Id.*  Thus, due to ***Microsoft's*** decision to use the

infringing Product Activation technology in its highly successful "crown jewel" products, the

damages number is necessarily going to be large.

Furthermore, according to its own documents, absent Product Activation Microsoft

would lose $██████ dollars a year to "casual copying", a form of software piracy wherein a

user installs software on more than the permitted number of computers.  According to Microsoft:



*See, e.g.,* Ex. H, p. MS-U 010114.

Thus, since this case began in September 2003, but for Product Activation, Microsoft

could have lost in excess of $██████ to casual copying.  Product Activation is a valuable tool

that Microsoft uses to combat this problem with casual copying.  As this Microsoft document

further states with respect to "Product Activation Effectiveness", this technology has resulted in

27407-001 4531562

"███████████████████." *Id.* at p. MS-U 010116.  Thus, the accused Product Activation

technology has admittedly resulted in huge revenue growth for Microsoft.

In an effort to make Product Activation appear unimportant and without value, Microsoft

argues that its customers "do not clamor for Product Activation" and "dislike it".  *See* Microsoft

Br., p. 3.  On page 2 of its brief, however, Microsoft describes the accused Windows and Office

products as "Microsoft's two crown jewel products".  The fact that Microsoft uses Product

Activation to protect these two "crown jewel" products from casual copying, notwithstanding its

customers purported dislike thereof, is evidence of the extreme value that Microsoft places upon

Product Activation.

Microsoft also mischaracterizes Mr. Gemini's royalty rate and the basis for that rate.

Microsoft repeatedly and erroneously argues that Mr. Gemini's royalty rate is 25%.  *See, e.g.,*

Microsoft Br., pp. 1, 10, 12.  In fact, as set forth in his expert report, Mr. Gemini's opinion is that

the appropriate royalty rate in this case would be ████ for each successful activation.  *See* Ex.

A, pp. 13-14, ¶ 20 ("████████████████████████████████████

████████████████████████████").  Were Mr.

Gemini's opinion that the appropriate rate should be ████, the amount of damages would

increase tenfold.

Microsoft also mischaracterizes Mr. Gemini's opinion by arguing that Mr. Gemini's

opinion requires application of the "entire market value" rule and that Mr. Gemini failed to

consider that rule.  *See* Microsoft Br., pp. 5-6.  In fact, Mr. Gemini is not opining that damages

should be calculated in this case under the "entire market value" rule.  In other words, Mr.

Gemini has not calculated damages based on the selling price of the accused products.  Instead,

Mr. Gemini basis his opinion on the specific feature of the accused products that infringes Uniloc's patent, namely Product Activation.

Microsoft also misstates the evidence relied upon by Mr. Gemini. Microsoft erroneously asserts that Mr. Gemini's opinion relies upon a "single sentence" in a Microsoft internal document. *See* Microsoft Br., pp. 6-7. This is simply untrue. Mr. Gemini cites to and relies upon many other documents in his reports, including:

- licensing agreements entered into by Uniloc (*see* Ex. A, p. 7);

- Microsoft's Accounting Policies related to royalties (*id.* at p. 8);

- sales, revenue and profit information regarding the accused products (*id.* at p. 9);

- Microsoft's Annual Reports (*id.* at p. 9);

- Microsoft's SEC Form 10-K submissions (*id.*);

- Microsoft documents indicating that software piracy is a huge problem for Microsoft, which loses $▇▇▇▇ a year to casual copying which is the form of piracy that Uniloc's patent is designed to prevent (*id.* at p. 11);

- Microsoft documentation relating to the costs Microsoft incurs in maintaining the infrastructure that allows product activation to operate (*id.* at pp. 12-13);

- documentation disclosing the number of successful activations (*id.* at p. 13).

An eight-page list of the documents considered by Mr. Gemini is attached as Exhibit B to his original opening report (Ex. A). In his rebuttal report, Mr. Gemini also reviewed many Microsoft documents describing the benefits, savings, and value to Microsoft of using the infringing Product Activation technology, including:



27407-001 4531562



*See* Ex. B, pp. 4-7. Mr. Gemini also analyzed various licenses to which Microsoft was a party. *Id*. at p. 9, ¶ 16. Thus, contrary to Microsoft's argument, Mr. Gemini reviewed, considered, and analyzed a large number of documents in preparing his opinion on the appropriate royalty rate in this case.

Microsoft also criticizes Mr. Gemini's reliance upon the purported single Microsoft document. *See* Microsoft Br., pp. 6-10. This Microsoft document states that "██████████ ████████████████" There is no dispute that Product Keys are placed on the accused versions of Windows and Office and are input by the user to activate the accused products. *See* Ex. I, p. 14, ll. 3-14. Thus, without Product Keys, the user would not be able to activate. The Microsoft document assigns a specific value determined by Microsoft for each Product Key: "████████████████████████ ████████████████████████ ████████████████████████" *See* Ex. J, p. MS-U 102708. Thus, Microsoft had an "██████████" conducted that assessed this specific monetary value to each Product Key used in Product Activation. Accordingly, Microsoft's argument that Mr. Gemini should not be permitted to rely on Microsoft's own evaluation should be rejected.

-6-

In addition, this "████████" has mysteriously disappeared or been destroyed and was never produced to Uniloc by Microsoft. Microsoft has been in continuous patent litigation for years. Microsoft had an obligation to preserve this appraisal but failed to do so. Microsoft should not now be permitted to contradict the ████████ Product Key evaluation relied upon by Mr. Gemini when Microsoft has failed to produce the underlying ████████. *See, e.g., Beatrice Foods Co. v. New England Printing and Lith. Co.*, 899 F.2d 1171, 1176 (Fed. Cir. 1990) (where infringer fails to preserve documents, court "should resolve all doubts against him").

In the present case, Uniloc uncovered documents showing that Microsoft has a policy of thwarting patent plaintiffs from assessing the value of Product Activation. Microsoft produced documents expressly stating as follows:



Ex. K, p. MS-U 488845.

Thus, Microsoft should be estopped from criticizing Mr. Gemini's reliance upon the ████ ████████ evaluation of Product Activation.

Microsoft also erroneously argues that the co-author of this document, Ms. Richards, did not know anything about Product Activation. Microsoft Br., p. 7. Microsoft attempts to denigrate this document further by arguing that Ms. Richards was not knowledgeable about Product Activation and was not questioned extensively about the document at her deposition. Microsoft Br., pp. 6-8. Microsoft is incorrect. Ms. Richards was specifically questioned about

product keys and Product Activation - and she answered knowledgeably.  For example, she testified as follows:



27407-001 4531562



27407-001 4531562



Ex. I, pp. 14-18.

Thus, contrary to Microsoft's argument, Ms. Richards was knowledgeable regarding Product Activation.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Evidence 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) require the district court to act as a "gate-keeper" to determine "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the fact in issue." *Daubert*, 509 U.S. at 592-93. Those factors that may assist the district court in making this determination include: whether the theory/technique can be and has been tested; whether the theory/technique has been subject to peer review and publication; the known or potential rate of error; and the level of acceptance within the relevant scientific community. *Id.* at 593-94.

"Although the approach is flexible by its nature (after all, expert testimony and the peculiar facts of each case so demand), an overarching concern is on the 'evidentiary relevance and reliability' of the proposed testimony." *Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F. 3d 68, 81 (1st Cir. 2002) (quoting *Daubert*, 509 U.S. at 595). In *Kumho Tire*, the Supreme Court held that the gate-keeping function applies to technical and other specialized knowledge in addition to scientific testimony. 526 U.S. at 441. The Court stressed that a district court must have "considerable leeway" in both "how to determine reliability" and "its ultimate conclusion.". *Id.* at 152-53.

## III.   ARGUMENT

On pages 14-15 of its brief, Microsoft lists six reasons for excluding Mr. Gemini's testimony. These are addressed below *seriatim*.

A.    **The Entire Market Value Rule Is Irrelevant**

On pages 15-17 of its brief, Microsoft erroneously asserts that Mr. Gemini "failed to comply with the entire market value rule." In fact, Mr. Gemini did not fail to comply with this rule because it is not germane to his opinion. Under the entire market value rule, a party attempts to obtain a royalty based on the price of the entire product, notwithstanding that its patent only covers a portion of the accused products. *See Rite-Hite Corp. v. Kelly Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995). Microsoft argues that Mr. Gemini has failed to show that customers demand Product Activation and, therefore, Uniloc is not entitled to damages based on the entire market value of the accused products. *See* Microsoft Br., pp. 15-16.

Microsoft's argument that Mr. Gemini has failed to comply with the entire market value rule is specious. Mr. Gemini does not base his royalty calculation on the value of the entire Windows or Office product (which sell for around $150 a copy). Therefore, Mr. Gemini does not use the entire market value rule as a basis for his royalty calculation (and Microsoft does not cite to any reference in Mr. Gemini's reports to the entire market value rule). As a result, Mr. Gemini does not need to show customer demand for the patented feature and Microsoft's argument must be rejected.

As explained in his reports, Mr. Gemini bases his royalty on the value of Product Activation feature in the accused products. *See, e.g.*, Ex. A, p. 12 (Factor 12). Mr. Gemini's royalty rate is ███ per activation, and is not calculated under the entire market value rule as a percentage of the price of the entire product.

B.    **Mr. Gemini's ███ Royalty Base Is Not Unfounded**

On pages 17-19 of its brief, Microsoft argues that the base ███ value used by Mr. Gemini to calculate a reasonable royalty is "grossly inflated". Nothing could be further from the truth.

As a result of an internal "appraisal", Microsoft itself placed a value of between ███████ per Product Key used for Product Activation:



Ex. J, p. MS-U 102708.

This statement clearly relates to Product Keys.  Mr. Gemini could have selected, on the basis of this statement, a much higher value than ███ for his royalty base.  He did not.  Instead, he picked the lowest value stated by Microsoft and, accordingly, his ███ royalty base is unquestionably not inflated.

Microsoft argues that this ██████████ value set forth above is not an evaluation of Product Keys, but is instead "the value of the entire software product protected by the Product Key."  *See* Microsoft Br., p.18.  This argument is disingenuous.  Nothing in this paragraph refers or relates to the value of the entire software product.  To the contrary, this paragraph specifically states that "██████████████████████████████████████████████████████████" *Id.*  Contrary to Microsoft's argument, this document does not say that the accused Windows or Office products are worth between ██████████.  Thus, Microsoft's argument should be rejected.  Moreover, to the extent there is a dispute regarding the meaning of this document, it is a matter to be resolved by the jury.  *See, e.g., Snellman v. Ricoh Co., Ltd.*, 862 F.2d 283, 289 (Fed. Cir. 1989).

Mr. Gemini's ███ base as the value of a Product Key used in Product Activation is also well supported by a host of additional Microsoft documents that he relies upon.  Product

-13-

Activation is used by Microsoft to prevent casual copying.  Casual copying is a huge, ███ ███ a year, problem for Microsoft.  *See* Ex. H, p. MS-U 010114.  As Jeffrey Raikes, Group Vice President of Microsoft, testified to the U.S. Senate Committee on Foreign Relations, casual copying comprises "████████████████████████████" *See* Ex. L, p. MS-U 000455.  As Mr. Raikes further testified, Microsoft "████████████████ ███████████████████████████████████ ███████████████████████████████████████ ██████████████████" *Id.*



As stated in Mr. Gemini's opening report, Microsoft's worldwide sales of Office XP and Windows XP since 2000 exceed $50 billion.  *See* Ex. A, p.9 (Factor 8).  These products are hugely profitable to Microsoft, returning gross margins of approximately ████.  *Id.* at p. 10. According to Microsoft, Product Activation is so effective that it enabled Microsoft to enjoy revenue growth in the retail sector of ████.  *See* Ex. H, p. MS-U 010116.  Thus, Product Activation has resulted in tremendous revenue growth for Microsoft.  Thus, it is not unreasonable for Mr. Gemini to rely upon a minimal ████ royalty base in determining a ████ per activation royalty for a technology that brings such a massive financial revenue growth to Microsoft by reducing the ██████ a year problem that Microsoft faces each year due to casual copying.  Perhaps the ultimate accolade demonstrating that Microsoft appreciates the extraordinary value of Product Activation is that Microsoft incorporates Product Activation into its "crown jewels", i.e. Windows and Office, and forces its customers to activate even though the process is "a source of customer dissatisfaction".  *See* Microsoft Br., p. 17.

On page 18 of its brief, Microsoft argues that the document Mr. Gemini relies upon does not discuss the accused products.  Microsoft is wrong.  The document discusses Office products.

*See* Ex. J, p. MS-U 102691.  There is no dispute that Office products are accused of

infringement.  *See* Microsoft Br., p. 2 ("[t]he accused products in this case are Microsoft's two

crown products, Windows and Office").  On page 18, Microsoft also asserts that the accused

products had not been launched at the time of this document, arguing that there is no connection

between the document and Product Activation.  This argument is disingenuous.  Microsoft well

knew the value of Product Activation as of the time of this document in 2000.  Microsoft has

admitted in its interrogatory responses that Product Activation was used since 1997 in Hungarian

Word 1997, since 1998 in Brazilian Publisher 1998 and was used in Office 2000.  *See* Ex. M, pp.

6-7.  As Microsoft's Mr. Hughes testified at trial in the *z4 v. Microsoft* case, the Product

Activation used in the present accused products is the same as was used in the early Brazilian

Publisher product:

> Q.  So in terms of the architecture, or to use your better expression the way it
> works, is the way it worked in Brazilian Publisher the same as the way it
> worked in Microsoft Office which is the same as the way it worked in
> Windows XP?
>
> A.  Yes, they all had the same characteristics.

Ex. N, p. 97.

Thus, the fact that the accused products had not been launched is not germane.[2]  Microsoft was

well aware of the value of Product Activation from the earlier products.

On page 19, Microsoft argues in desperation that the document containing the

████████ valuation of Product Activation is inadmissible because Ms. Richards allegedly is

unfamiliar with Product Activation.  Microsoft's argument defies reality.  First, a document does

not have to be admissible for an expert to rely upon it.  *See* Fed. R. Evid. 703.  This document is

27407-001 4531562

admissible, however, as the admission of a party opponent under Fed. R. Evid. 801(d)(2)(A). *See*

*also Libertad v. Welch*, 53 F.3d 428, 443 (1st Cir. 1995) (press release issued by party opponent

admissible as admission).   Thus, Microsoft's argument must be rejected.

Moreover, as Microsoft concedes, Ms. Richards is one of the authors of the documents as

stated on the face thereof. *See* Ex. J, p. MS-U 102684.   As set forth *supra*, Ms. Richards is

familiar with product keys and Product activation.   At her deposition, Ms. Richards also testified

that the document is a Microsoft business record and thus is admissible:



---

[2] On page 19, Microsoft states that it is law of the case that the "use of Product Keys to calculate
PIDs" does not infringe Uniloc's patent.   There has been no such determination in this case and
Microsoft cites no support for this statement.

27407-001 4531562



Ex. I, pp. 38-39.

Thus, Microsoft's desperate argument that the document is inadmissible is meritless.

### C. Mr. Gemini's Royalty Rate Is Unaffected By The Number Of Claims Infringed Or The Theory Of Infringement

On pages 19-21 of its brief, Microsoft throws out another desperate and bizarre argument. Microsoft argues that Mr. Gemini's opinion is flawed because Uniloc now only asserts that two of the claims of the '216 patent are infringed under a single theory of infringement. The fact that Uniloc dropped several of the claims prior to the appeal is irrelevant, as Chief Judge Michel of the Federal Circuit stated when counsel for Microsoft raised this point at the appeal hearing:

> MR. SCHERKENBACH: . . . the approach pursued by the plaintiff was to overwhelm the district court with many, many theories, in fact, we can't even agree on how many theories there were - eight theories, twelve theories . . .
>
> CHIEF JUDGE MICHEL: It really doesn't matter at this point . . .

*See* http://oralarguments.cafc.uscourts.gov/mp3/2008-1121.mp3 at 19:38-50.

Mr. Gemini bases his royalty calculation on the number of successful activations of the accused products. *See* Ex. A, pp. 13-14, ¶ 20. The number of activations has not changed as a result of

Uniloc dropping some of the patent claims from this case. Thus, Mr. Gemini properly maintains his opinion that the royalty should be ■■■ per activation.

Neither of the cases cited by Microsoft supports its factually incorrect argument. *Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir. 2001) is not even a patent case and stands for the proposition that, in a case involving multiple but different claims of liability ("any breach of contract, use of confidential information, or any misappropriation of trade secret"), it can be error not to adjust damages if one or more of the claims fails. *Id.* The only count at issue in this case is for patent infringement. Uniloc will be entitled to its damages regardless of whether or not Microsoft infringes one or both remaining asserted claims of the '216 patent. *Ziggity Systems, Inc. v. Val Watering Systems*, 769 F. Supp. 752, 819 (E.D. Pa. 1990) ("amount of damages is not affected by the number of claims infringed because the patent is infringed regardless of whether one, some, or all of its claims are infringed"). Microsoft's reliance on *Medtronic, Inc. v. Boston Scientific Corp.*, 2002 WL 34447587 (D. Minn. Aug. 8, 2002) is likewise off the mark. In that case, the expert opined that damages should be awarded on "convoyed sales", i.e. on sales of unpatented products sold with the infringing product. The expert, however, "could not identify what products (if any) are sold in 'convoyed sales' or what the volume of 'convoyed sales' was." *Id.* In the present case, Uniloc is not requesting damages on convoyed sales and Mr. Gemini does not address the issue. Moreover, Mr. Gemini has identified the infringing products, the identification of which is not in dispute.

**D.     Mr. Gemini's Analysis Has Been Accepted By Many Courts**

On pages 21-24 of its brief, Microsoft argues that Mr. Gemini's "opinion that 25% is the appropriate royalty rate is arbitrary, unfounded and unreliable." Microsoft is wrong on the facts and the law. As stated previously, Mr. Gemini does not opine that the royalty rate in this case is 25%. As stated in numerous places in this brief, and in his expert reports, Mr. Gemini opines

-18-

that the appropriate royalty is ███ per activation. *See* Ex. A, pp. 12-13. The 25% referred to by

Mr. Gemini is not the royalty rate. It is 25% of the minimum ██ admitted value to Microsoft of

each Product Key used for Product Activation. *Id.*

This royalty is small when compared with the profit that Microsoft has made as a result

of the use of the infringing Product Activation software used to protect the accused Windows

and Office products. Microsoft's own documents state that: (1) Microsoft's annual loss to casual

copying, absent Product Activation is ███████; (Ex. H, p. MS-U 010114); (2) "███████

███████████████████████████████████████" (Ex. O, p. MS-U 098623);

(3) even a ████ effectiveness of Product Activation results in ████████████ of

added revenue to Microsoft (Ex. P, p. 15); (4) Product Activation has increased sales of

additional licenses by ████ (Ex. K, p. MS-U 488845), and (5) based upon Microsoft's measured

effectiveness of Product Activation, ███████████████████████████

████████. *See* Ex. H, p. MS-U 010116. Microsoft has sold over $60 billion worth of these

products. Thus, Product Activation has generated an additional $24 billion in revenues resulting

in net profits (64%) to Microsoft of $15.36 billion. One fourth of this net profit is approximately

$3.84 billion, twice the amount of the total damages calculated for the entire infringement period

by Mr. Gemini. The Federal Circuit has endorsed the award of one third of the value of the use

of the invention as reasonable. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080

(Fed. Cir. 1983) (affirming royalty rate in the amount of one-third of the benefit to the defendant

from using the patented invention). The Federal Circuit has also stated that "courts have

employed methodologies in calculating reasonable royalties in which the royalties exceed the

infringer's profit." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1580 n. 1 (Fed. Cir. 1996). Mr.

Gemini's ████ per activation royalty is nowhere near Microsoft's 64% profit on the accused

-19-

products that cost approximately $150 each.  Thus, Mr. Gemini's approach and methodology is well supported by the law and Microsoft's own contemporaneous documents.

As Microsoft concedes, the fifteen *Georgia-Pacific* factors are an accepted and appropriate framework upon which an expert can build his reasonable royalty rate.  *See* Microsoft Br., p. 21.  Mr. Gemini did exactly that.  As set forth on pages 6-14 of his opening report (Ex. A), on pages 3-10 of his rebuttal report (Ex. B), and on pages 3-4 of his supplemental report (Ex. D), Mr. Gemini acknowledges the appropriateness of the *Georgia-Pacific* factors and addresses each one in arriving at his royalty rate.  Thus, Mr. Gemini's royalty rate is not arbitrary, unfounded or unreliable.

On pages 22-24, Microsoft attempts to criticize Mr. Gemini's apportionment of 25% of the ██ admitted value of each Product Key to Product Activation to Uniloc with the remaining 75% of value with Microsoft.  Microsoft concedes, however, that many Courts have accepted this apportionment analysis. *See* Microsoft Br., pp. 23-24.  In fact, Microsoft admits, as it must, that its own counsel in this case used the same type of analysis in *Bose Corp. v. JBL, Inc.*, 112 F. Supp. 2d 138, 167 (D. Mass. 2000).  *See* Microsoft Br., p. 23.  It is not surprising that many Courts have accepted the apportionment analysis - it makes good sense in the hypothetical license negotiation that is deemed to take place under the *Georgia-Pacific* analysis.  Microsoft's own evaluation is that the Product Keys used for Product Activation are each worth ██████.  Ex. J, p. MS-U 102708.  Ms. Richards testified that she agreed with this valuation, with the sole exception that the ██████ number might be a little high. Ex. I, p. 44.  Thus, the admitted value to Microsoft of each Product Key used for Product Activation is <u>at least</u> ██.  It is more than likely that reasonable persons seeking to negotiate a license for this valuable technology that saves Microsoft billions of dollars a year otherwise lost to piracy would agree upon a license

-20-

under which Microsoft would agree to pay to the inventor of the technology (Uniloc) ███

███████████████. Thus, it is not surprising that this apportionment analysis has been

specifically endorsed by the Federal Circuit. *See Hanson v. Alpine Valley*, 718 F.2d at 1080

(affirming royalty rate in the amount of one-third of the benefit to the defendant from using the

patented invention). Accordingly, Microsoft's criticism of Mr. Gemini's apportionment analysis,

an analysis accepted by many Courts and based upon an admitted ██ value, must be rejected.

### E. Mr. Gemini Utilized All Of The *Georgia-Pacific* Factors In Determining A Royalty Rate In This Case

On pages 24-27 of its brief, Microsoft argues, incorrectly, that Mr. Gemini "pays only lip

service" to the *Georgia-Pacific* factors. As stated in paragraph 19 thereof ("[m]y reasonable

royalty analysis includes an analysis of each of the[] *Georgia-Pacific* factors"), Mr. Gemini's

opening report addresses each of the *Georgia-Pacific* factors. Ex. A, p. 6, ¶ 19. Mr. Gemini's

analysis is set forth on pages 6-14 of his opening report. *See* Ex. A, pp. 6-14. Thus, Microsoft's

statement, on page 25 of its brief, that "the entirety of Mr. Gemini's analysis of the appropriate

rate is in substance found in his discussion of just two factors: factors 11 and 12" is simply

untrue as a reading of Mr. Gemini's report clearly demonstrates.

Likewise untrue is Microsoft's statement that "critically, [Mr. Gemini] does not indicate

the extent to which each factor might drive the royalty rate up or down from the 25% figure."

Microsoft Br., p. 25. Contrary to Microsoft's argument, Mr. Gemini does indicate that the

*Georgia-Pacific* factors tend towards raising or lowering the royalty rate in this case. For

example, Mr. Gemini states in his analysis of Factor 3 that he has "assumed that any license

would have been non-exclusive and would favor a lower royalty. Normally, an exclusive license

would require a higher royalty than that of a non-exclusive license." Ex. A, p. 8. On page 13 of

his opening report, Mr. Gemini explains which factors favor Microsoft, i.e. a lower royalty rate, and which factors favor Uniloc, i.e. a higher royalty rate:



Ex. A, p. 13.

Mr. Gemini fairly considered the *Georgia-Pacific* factors and found that some factors favor Uniloc and others favor Microsoft (unlike Microsoft's biased expert who found that none of the factors favor Uniloc).

On pages 25-26 of its brief, Microsoft criticizes Mr. Gemini royalty rate because the infringing technology "comprises but one very small component of Product Activation" and because "users dislike" this feature. The first part of this argument is factually erroneous. Uniloc alleges that Microsoft's Product Activation infringes, not "one very small component" of Product Activation. With respect to users disliking Product Activation, Microsoft's expert (Mr. Napper) raised such an argument in his report responding to Mr. Gemini's opening report. In

Mr. Gemini's rebuttal to Mr. Napper's report, Mr. Gemini submitted evidence that Product Activation is not the customer problem that Mr. Napper and Microsoft contend, including:



*See* Ex. B, p. 3.



27407-001 4531562



*Id.* at p. 4.

Thus, citing to Microsoft's own documents, Mr. Gemini addressed the issue of customer

reaction to using Product Activation. He disagrees with Microsoft's assertion that Product

Activation is such a problem to users that would warrant a reduction in the royalty rate.

Moreover, whether it customers like Product Activation or not Microsoft saves up to █████████

a year by implementing this infringing technology in the accused products (*see, e.g.*, Ex. H, p.

MS-U 010114) and increases its revenues by ██████. *Id.* at p. MS-U 010116.

**F.    Mr. Gemini's Opinion Is That The Royalty Rate**
      **Would Be ████ Per Successful Activation, Not A 25% Royalty**

On pages 27-31 of its brief, Microsoft erroneously argues that Mr. Gemini somehow

opines in his January 8, 2009 Supplemental Report (Ex. D) that a reasonable royalty rate in this

case would be 11.5%. In fact, in his supplemental report (Ex. D) as in his opening report (Ex.

A), Mr. Gemini maintains his opinion that a reasonable royalty in this case would be ████ per

each successful activation - "Under the royalty rate of ████ per activation the total royalty due

to Uniloc is approximately █████████ calculated through October 2008." Ex. D, ¶ 5. As the

accused products sell for around $150 per copy, this equates to a royalty rate of less than ████.

Mr. Gemini notes that this rate is only a fraction of the industry average rate of 11.5% for

software products. *Id.* at p. 3, ¶ 5. He does not, however, opine that 11.5% is the applicable rate

in this case. Microsoft is simply mischaracterizing Mr. Gemini's Supplemental Report. In any

event, this is nothing new to Microsoft. As Microsoft concedes on page 29 of its brief, Mr.

27407-001 4531562

Gemini produced the documents reflecting this industry rate to counsel for Microsoft at his deposition on March 1, 2006. Mr. Gemini testified in his deposition in March of 2006 that the industry average rate for software is 11.5%. *See* Ex. Q, pp. 157-58. Thus, Microsoft cannot claim surprise that Mr. Gemini merely observes that his royalty rate of ███ per activation is lower than the industry average rate for software.

As an additional argument, Microsoft argues on page 29 of its brief that the 11.6% industry average is not for patent licenses "for software that in some way resembles what is recited in the asserted claims of the patent-in-suit." Microsoft cites *Railroad Dynamics v. Stucki* as "holding that licenses relating to products entirely distinct from the patented product were insufficient to establish an industry standard royalty rate". The 11.5% rate referred to by Mr. Gemini is for software. There is no dispute that this case involves software, namely Product Activation in Microsoft's Windows and Office software products. Thus, Microsoft's argument is misplaced and should be rejected. Microsoft also complains that the "studies include only running royalty agreements." Microsoft Br., p. 29. Microsoft ignores the fact that Mr. Gemini's opinion is that a running, per activation royalty is appropriate in this case. *See* Ex. A, p. 13. Thus, the studies are relevant to Mr. Gemini's opinion.[3]

On pages 30-31 of its brief, Microsoft complains that Mr. Gemini has not provided an extended analysis of the 11.5% average royalty rates for software products, Mr. Gemini, however, is not opining that the royalty rate in this case should be 11.5%. Rather, Mr. Gemini is simply observing that his rate of ███ per activation is reasonable for the reason that it is less

---

[3] In contrast, Microsoft's expert opines that the license in this case would be a one time lump sum license. Thus, the studies referenced by Mr. Gemini may not be relevant to Microsoft's expert's opinion whose damages number of ███████ is pulled from thin air. They are relevant, however, to Mr. Gemini's opinion.

than the industry average rate of 11.5%.  Extensive analysis is not needed for this simple

comparison.  Thus, Microsoft's argument should be rejected.

## IV.   __CONCLUSION__

For the reasons set forth above, Uniloc requests that defendant's Daubert motion be

denied.

27407-001 4531562

Dated:   February 9, 2009                    Respectfully submitted,

                                            **UNILOC USA, INC.**
                                            **UNILOC SINGAPORE PRIVATE LIMITED**


                              By:     /s/  Sheri L. Pizzi
                                     Sheri L. Pizzi (R.I. Bar No. 5720)
                                     **TAYLOR DUANE BARTON**
                                     **     & GILMAN, LLP**
                                     10 Dorrance Street, Suite 700
                                     Providence, Rhode Island 02903
                                     (401) 273-7171 (Telephone)
                                     (401) 273-2904 (Facsimile)

                                     OF COUNSEL:

                              By:     /s/  Dean G. Bostock
                                     Paul J. Hayes, Esq.
                                     Dean G. Bostock, Esq.
                                     **MINTZ, LEVIN, COHN, FERRIS,**
                                     **     GLOVSKY AND POPEO, P.C.**
                                     One Financial Center
                                     Boston, MA  02111
                                     (617) 542-6000 (Telephone)
                                     (617) 542-2241 (Facsimile)


<u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic File ("NEF"), and paper copies will be sent to those indicated as non-registered participants on February 9, 2009.


                                      /s/  Dean G. Bostock


4530699v.1