UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC U.S.A., INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br><br>                Plaintiffs,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br>                Defendant. | Civil Action No. 03-CV-440 (WES)<br><br>**REDACTED** |

## MICROSOFT CORPORATION'S PRETRIAL MEMORANDUM

# TABLE OF CONTENTS

Page

I.   Introduction ........................................................................................................... 1

  A.   Issues Remaining In The Case .......................................................................... 1

  B.   Issues that Have Been Disposed of or are Governed by Law of the Case ............. 2

II.  Summary Of Microsoft's Defenses and Counterclaims ..................................... 4

III. Detailed Explanation ............................................................................................ 5

  A.   Microsoft Does Not Infringe and Has Not Infringed the Asserted Claims of the
       '216 Patent ..................................................................................................... 5

       1.   Telephone Activation Is Not Accused Of Infringement; Internet Product
            Activation Is The Only Accused Technology For Trial ............................. 8

       2.   Microsoft Does Not Infringe Claims 12 and 19 Because The Accused
            License Hashes Are Not "Licensee Unique ID[s]/Security Key[s]" .......... 9

       3.   Microsoft Does Not Infringe Claim 12 Because The Inputs To The
            Accused Hashing Functions Do Not Uniquely Identif[y] An Intended
            Registered User ..................................................................................... 10

       4.   Microsoft Does Not Infringe Claims 12 and 19 Because Product
            Activation Is Not A "Registration System" ............................................. 11

       5.   Microsoft Does Not Infringe Claim 12 Because Product Activation Does
            Not Involve "Checking By The Registration Authority That The
            Information Unique To The User Is Correctly Entered At The Time That
            The Security Key Is Generated By The Registration System" ................. 11

       6.   Microsoft Does Not Infringe Claim 19 Because It Does Not Meet The
            "Mode Switching Means" Requirement ................................................... 12

       7.   Microsoft Does Not Infringe Claim 19 Because the Accused Hashing
            Algorithms Are Not "Summer[s]" or Equivalents Thereof ..................... 13

  B.   Microsoft Does Not and Has Not Willfully Infringed the '216 Patent ................. 15

  C.   Asserted Claims 12 and 19 of the '216 Patent are Invalid ................................... 16

       1.   On Uniloc's Attempted Overbroad Reading of its Own Patent, The
            Hellman '093 Patent Anticipates Claims 12 and 19 ................................ 18

       2.   On Uniloc's Attempted Overbroad Reading of its Own Patent, The
            Grundy '598 Patent Anticipates Claims 12 and 19 .................................. 19

-i-

|  |  | 3. | Claims 12 And 19 Are Obvious.................................................................. 22 |
|  | D. | The '216 Patent is Unenforceable......................................................................... 25 |
|  | E. | Any Damages Awarded to Uniloc Should Not Exceed a Reasonable Royalty of $3,000,000 to $7,000,000 .................................................................................... 29 |

IV. Microsoft's Witnesses....................................................................................................... 35

V. Exhibits ............................................................................................................................. 41

VI. Motions in Limine.............................................................................................................. 41

VII. Estimated Time of Trial .................................................................................................... 41

VIII. Additional matters............................................................................................................. 41

## TABLE OF AUTHORITIES

## CASES

Page

*Advanced Display Sys., Inc. v. Kent State Univ.*,
   Nos. 3-96-CV-1480 & 3-96-CV-1608, 2002 WL 1489555 (N.D. Tex. July 10, 2002) ..........30

*Al-Site Corp. v. VSI Intern., Inc.*,
   174 F.3d 1308 (Fed. Cir. 1999)..............................................................................................14

*Alpex Computer Corp. v. Nintendo Co.*,
   102 F.3d 1214 (Fed. Cir. 1996)..............................................................................................14

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001)..............................................................................................16

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
   725 F.2d 1350 (Fed. Cir. 1984)........................................................................................17, 21

*Bayer AG v. Elan Pharm. Research Corp.*,
   212 F.3d 1241 (Fed. Cir. 2000).................................................................................................6

*Black & Decker, Inc. v. Roberts Bosch Tool Corp.*,
   2008 WL 60501 (Fed. Cir. Jan. 7, 2008) (unpublished opinion)...........................................15

*Blake v. Robertson*,
   94 U.S. 728 (1876)..................................................................................................................32

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
   246 F.3d 1368 (Fed. Cir. 2001)..............................................................................................18

*Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*,
   394 F.3d 1348 (Fed. Cir. 2005).........................................................................................26, 27

*Children's Broad. Corp. v. The Walt Disney Co.*,
   245 F.3d 1008 ........................................................................................................................33

*Chiuminatta Concrete Concepts, inc. v. Cardinal Indus., Inc.*,
   145 F.3d 1303 (Fed. Cir. 1998)..............................................................................................14

*Cornell Univ. v. Hewlett-Packard Co.*,
   2008 WL 2222189 (N.D.N.Y. May 27, 2008) (Rader, J.)......................................................32

*Cytologix Corp. v. Ventana Medical Sys., Inc.*,
   424 F.3d 1168 (Fed. Cir. 2005)..............................................................................................13

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005)...........................................................................................2, 21

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
    851 F.2d 1387 (Fed. Cir. 1988)..................................................................................24

*Digital Control Inc. v. Charles Machine Works*,
    437 F.3d 1309 (Fed. Cir. 2006)..................................................................................26

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
    131 Fed. Appx. 450 (5th Cir. 2005)...........................................................................33

*Evans Cooling Systems Inc. v. General Motors Corp.*,
    125 F.3d 1448 (Fed. Cir. 1997)..................................................................................16

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushi Co., Ltd.*,
    493 F.3d 1368 (Fed. Cir. 2007)....................................................................................8

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
    535 U.S. 722 (2002).......................................................................................................8

*Franklin Electric Co. Inc. v. Dover Corp.*,
    2007 WL 5067678 (W.D.Wisc. 2007).........................................................................16

*Friskit, Inc. v. Real Networks, Inc.*,
    2009 WL 59182 (Fed. Cir. Jan. 12, 2009) .................................................................24

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
    318 F.Supp. 1116 (S.D.N.Y. 1970),
    *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).............................................29, 30, 33

*GFI, Inc. v. Franklin Corp.*,
    265 F.3d 1268 (Fed. Cir. 2001)..............................................................................26, 27

*Graham v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966).....................................................................................................22, 23

*Graver Tank & Manufacturing Co. v. Linde Air Products Co.*,
    339 U.S. 605 (1950).......................................................................................................6

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)................................................................................2, 21

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983)..................................................................................31

*Hoffmann-La Roche, Inc. v. Promega Corp.*,
    323 F.3d 1354 (Fed. Cir. 2003)..................................................................................27

*Imonex Servs., Inc. v. W.H. Munsprufer Dietmar Trenner GMBH*,
    408 F.3d 1374 (Fed. Cir. 2005)..................................................................................32

*IPXL Holdings, Inc. v. Amazon.com L.L.C.,*
    430 F.3d 1377 (Fed. Cir. 2005)......................................................................................21

*K-2 Corp. v. Salomon S.A.,*
    191 F.3d 1356 (Fed. Cir. 1999)........................................................................................7

*KSR Int'l Co. v. Teleflex Inc.,*
    127 S. Ct. 1727 (2007)....................................................................................17, 22, 23

*LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n,*
    958 F.2d 1066 (Fed. Cir. 1992)......................................................................................27

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996)........................................................................................................5

*Micro Chem., Inc. v. Lextron, Inc.,*
    317 F.3d 1387 (Fed. Cir. 2003)......................................................................................29

*Microsoft Corp. v. AT & T Corp.,*
    550 U.S. --, 127 S.Ct. 1746 (2007)..........................................................................34, 35

*Mobil Oil Corp. v. Amoco Chems. Corp.,*
    915 F.Supp. 1333 (D.Del 1994)....................................................................................33

*Molins PLC v. Textron, Inc.,*
    48 F.3d 1172 (Fed. Cir. 1995)..................................................................................25, 27

*Muniauction, Inc. v. Thomson Corp.,*
    532 F.3d 1318 (Fed. Cir. 2008)......................................................................................22

*Nat'l Presto Indus., Inc. v. West Bend Co.,*
    76 F.3d 1185 (Fed. Cir. 1996)..........................................................................................8

*Net MoneyIN Inc. v. VeriSign Inc.,*
    545 F.3d 1359 (Fed. Cir. 2008)......................................................................................19

*Netword, LLC v. Centraal Corp.,*
    242 F.3d 1347 (Fed. Cir. 2001)........................................................................................6

*NTP, Inc. v. Research In Motion, Ltd.,*
    418 F.3d 1282 (Fed. Cir. 2005)......................................................................................35

*Ormco Corp. v. Align Technology, Inc.,*
    463 F.3d 1299 (Fed. Cir. 2006)................................................................................24, 25

*Pennwalt Corp. v. Durand-Wayland, Inc.,*
    833 F.2d 931 (Fed. Cir. 1987) (en banc)..........................................................................6

*Prima Tek II, L.L.C. v. Polypap S.A.R.L.,*
    412 F.3d 1284 (Fed. Cir. 2005)........................................................................21

*ResQNet.com, Inc. v. Lansa, Inc.,*
    533 F.Supp.2d 397 (S.D.N.Y. 2008)................................................................15

*Riles v. Shell Exploration & Prod.,*
    298 F.3d 1302 (Fed, Cir. 2002).......................................................................31

*Rite-Hite Corp. v. Kelley Co.,*
    56 F.3d 1538 (Fed. Cir. 1995)........................................................................32

*Rothman v. Target Corp.,*
    No. 2008-1375, slip op. (Fed. Cir. Feb. 13, 2009)..........................................23, 28

*Sage Prods., Inc. v. Devon Indus., Inc.,*
    126 F.3d 1420 ............................................................................................6, 7

*Seagate Tech., LLC, In re*
    497 F.3d 1360 (Fed. Cir. 2007).......................................................................15

*Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd.,*
    204 F.3d 1368 (Fed. Cir. 2000)............................................................25, 26, 27, 28

*Stickle v. Heublin, Inc.,*
    716 F.2d 1550 (Fed. Cir. 1983).......................................................................30

*TechSearch, LLC v. Intel Corp.,*
    286 F.3d 1360 (Fed. Cir. 2002).........................................................................6

*Third Wave Technologies, Inc. v. Stratagene Corp.,*
    405 F.Supp.2d 991 (W.D.Wis 2005) .................................................................30

*Tronzo v. Biomet, Inc.,*
    156 F.3d 1154 (Fed. Cir. 1998).........................................................................6

*Uniloc USA, Inc. v. Microsoft Corp.,*
    290 Fed.Appx. 337 (Fed. Cir. 2008)........................................................2, 3, 9, 33

*Valmont Indus., Inc. v. Reinke Mfg. Co.,*
    983 F.2d 1039 (Fed. Cir. 1993).......................................................................13

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.,*
    520 U.S. 17 (1997).......................................................................................6, 7

*Wilson Sporting Goods Co. v. David Geoffrey & Associates,*
    904 F.2d 677 (Fed. Cir. 1990), *overruled in part on other grounds,*
    *Cardinal Chem. Co. v. Morton Intl., Inc.,* 508 U.S. 83 (1993)..........................7, 15

*Zygo Corp. v. Wyco Corp.*,
  79 F.3d 1563 (Fed. Cir. 1996)............................................................................................5

## STATUTES

35 U.S.C. § 102(a) .............................................................................................................18

35 U.S.C. § 102(e) .............................................................................................................19

35 U.S.C. § 103...................................................................................................................22

35 U.S.C. § 112, ¶ 6....................................................................................................13, 14

35 U.S.C. § 282...................................................................................................................17

35 U.S.C. § 284...................................................................................................................29

35 U.S.C. § 102(b) .............................................................................................................18

## REGULATIONS

37 C.F.R. § 1.56...........................................................................................................26, 27

## RULES

Fed. R. Civ. P. Rule 30(b)(6) .......................................................................................37, 38

Pursuant to the pretrial order and the Court's instructions at the January 12, 2009 pretrial hearing, Defendant Microsoft Corporation ("Microsoft") hereby submits its Pretrial Memorandum in connection with the above-captioned matter.

## I. INTRODUCTION

### A. Issues Remaining In The Case

In the wake of Microsoft's successful motion for summary judgment of non-infringement and the Federal Circuit's narrow remand on a single theory of infringement of two claims of Uniloc's U.S. Patent 5,490,216 ("the '216 patent"), the issues that remain to be determined in the case are: (1) whether the generation and use of a license hash or digest in the Internet version of Microsoft's product activation technology infringes claim 12 and/or claim 19 of the '216 patent; (2) whether any infringement of claims 12 and/or 19 by Microsoft has been willful; (3) whether claims 12 and 19 are invalid; (4) whether the '216 patent is unenforceable; and (5) in the event that either claim is found to be both valid and infringed, and the patent enforceable, the extent of damages to which Uniloc is entitled and whether it is entitled to injunctive relief.

Microsoft also submits that one open issue of claim construction remains to be addressed, and that concerns the term "unique." Microsoft initially proposed that "unique" means one-of-a-kind. (*See* D.I. No. 145, Decision and Order on Claim Construction at 11 (discussing Microsoft's proposal that "unique" be defined to mean "one-of-a-kind").) Although the Court declined to adopt Microsoft's proposed construction, and stated what "unique" does *not* mean (namely, it is not limited to "one of a kind"), the Court has not yet ruled on what that term does mean, other than stating that "[t]he '216 patent clearly contemplates that the licensee unique ID will consist of varying levels of uniqueness that are wholly dependent upon the inputs used to formulate the licensee unique ID." In its opinion on Uniloc's appeal of this Court's grant of

summary judgment, the Federal Circuit acknowledged these statements and noted that "[t]here is no dispute over the district court's construction of 'unique,' with which we agree." *Uniloc USA, Inc. v. Microsoft Corp.*, 290 Fed.Appx. 337, 343 n.3 (Fed. Cir. 2008). Thus, like this Court, the Federal Circuit has held that "unique" does not mean one-of-a-kind. The issue, though, of the metes and bounds of the term remains unresolved.

The term "unique" requires an affirmative construction that draws a meaningful line between "unique" and "not unique." Patent claims must be "sufficiently definite to inform the public of the bounds of the protected invention." *Halliburton Energy Servs., Inc. v. M-I LLC,* 514 F.3d 1244, 1249 (Fed. Cir. 2008); *see also id.* at 1254 (finding the term "fragile gel" indefinite because a person of ordinary skill in the art could not determine how "fragile" the gel must be to be covered by the claim). Whether a claim term is sufficiently definite is a question of law for the Court. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). As it stands, the construction would not allow an accused infringer to determine what is, and what is not, "unique." Is it one in a hundred? One in a million? One in a billion? There are meaningful differences between these numbers, and Uniloc has made clear that it intends to capitalize on the ambiguity surrounding the Court's construction to take different positions on the issue for purposes of infringement than for invalidity. The statute requires clarity on this issue.

**B.**     **Issues that Have Been Disposed of or are Governed by Law of the Case**

Microsoft does not infringe any of claims 1, 2, 7-11, 14-17, and 20 of the '216 patent. Those claims were disposed of by this Court's summary judgment decision, and Uniloc did not appeal this Court's decision as to any of those claims. Thus, Microsoft's non-infringement of claims 1, 2, 7-11, 14-17 and 20, on any theory, is now the law of the case.

Because this Court on summary judgment rejected all of Uniloc's infringement theories on the remaining claims 12 and 19 of the '216 patent and Uniloc appealed that determination only with regard to license hashing, law of the case precludes Uniloc from resurrecting any of its other previously rejected theories of infringement of claims 12 and 19.

It is also law of the case that platform-related user information is not information associated with a licensee. In remanding the case for trial, the Federal Circuit determined that "the licensee unique ID cannot be based solely on platform-related user information." *Uniloc USA, Inc. et al. v. Microsoft Corp.*, 290 Fed.Appx. 337, 343 (Fed. Cir. 2008) (unpublished).

Claim construction of the following terms found in the asserted claims has been determined by this Court:

| Claim Term | Construction[1] |
|---|---|
| 1.  Licensee unique ID/Security key | A unique identifier associated with a licensee |
| 2.  Information…which uniquely identifies an intended registered user | Information that is uniquely associated with a person who intends to become a licensee so as to access full functionality of the digital data |
| 3.  Local licensee unique ID generating means<br>4.  Remote licensee unique ID generating means | **Function**: to generate a local or remote licensee unique ID/registration key<br>**Structure**: a summation algorithm or a summer and equivalents thereof |
| 5.  Algorithm | A set of instructions that can be followed to carry out a particular task |
| 6.  Includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID | Includes the identical algorithm used by the license licensee unique ID generating means to produce the licensee unique ID |
| 7.  Use mode | A mode that allows full use of the digital data or software in accordance with the license |

---

[1]   D.I. No. 145, August 22, 2006, Decision and Order on Claim Construction at 9.

| Claim Term | Construction[1] |
|---|---|
| 8. Mode switching means | **Function**: to permit the digital data or software to run in a use mode/fully enabled mode if the locally generated licensee unique ID/registration key matches with the remotely generated licensee unique ID/enabling key **Structure**: program code which performs a comparison of two numbers or a comparator and equivalents thereof |
| 9. Has matched | A comparison between the locally generated licensee unique ID/registration key and the remotely generated licensee unique ID/enabling key shows that the two are the same |
| 10. Registration system | A system that allows digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed |
| 11. Checking by the registration authority that information unique to the user is correctly entered | Verification by the registration authority that information unique to the user and entered by the user is accurate |
| 12. Wherein said registration system is replicated at the registration authority | Wherein the portion of the registration system that generates a security key from information input to software to be protected is reproduced exactly at the registration authority[2] |

## II.    SUMMARY OF MICROSOFT'S DEFENSES AND COUNTERCLAIMS

In defense of Uniloc's claims of infringement and willful infringement, Microsoft will show that it does not and has not infringed the '216 patent, and that Uniloc has failed in its burden of proving infringement. Microsoft will further show that it has not, and that Uniloc has not shown that Microsoft has, acted in reckless disregard of an objectively high likelihood that its actions have constituted infringement of a valid claim, which is the threshold standard that Uniloc must meet in order to show willful infringement. Microsoft seeks a declaration of no infringement, and no willful infringement.

---

[2]   D.I. No. 199, October 19, 2007, Opinion and Order on Summary Judgment at 27.

Microsoft has raised additional affirmative defenses and counterclaims that the asserted claims of Uniloc's '216 patent are invalid and that the '216 patent is unenforceable. Microsoft will show that claims 12 and 19 of the '216 patent are invalid as anticipated by and/or obvious in view of certain prior art references. Microsoft will further show that the '216 patent is unenforceable due to the inequitable conduct of the inventor of the '216 patent.

In defense of Uniloc's claims to damages, Microsoft will show that a reasonable royalty for any infringement of an asserted enforceable claim not found to be invalid should amount to no more than $3,000,000 - $7,000,000. Anything more would be wholly unwarranted and unsupported by the evidence on which Uniloc has stated it intends to rely.

## III.    DETAILED EXPLANATION

### A.    Microsoft Does Not Infringe and Has Not Infringed the Asserted Claims of the '216 Patent

Microsoft will show that it does not infringe claim 12 or claim 19 of the '216 patent, either literally or under the doctrine of equivalence, and that Uniloc has not and cannot meet its burden on these issues.

To prove infringement of an asserted claim, Uniloc must show, by a preponderance of the evidence, "the presence of every [claim] element or its substantial equivalent in the accused device." *Zygo Corp. v. Wyco Corp.*, 79 F.3d 1563, 1568 (Fed. Cir. 1996). The first step of an infringement analysis, construction of the asserted claims, is a matter of law exclusively within the province of the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). As noted above, this Court construed disputed claim terms in its claim construction and summary judgment orders. (*See generally* D.I. No. 145, August 22, 2006, Decision and Order on Claim Construction ("Claim Construction Order"); *see also* D.I. No. 199, October 19, 2007, Opinion and Order on Summary Judgment ("Summary Judgment Order") at 27.) The second step of an

infringement analysis, determining whether each and every limitation of a claim is found in the accused product, is a question of fact. *TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002).

A patent claim may be "literally infringed" or it may be infringed under the "doctrine of equivalents." "To establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused system." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

Infringement by equivalents occurs when, although a claim element does not have a literal counterpart in the accused device, there is some structure or step in the accused device that is a substantial equivalent of the claimed element. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950). "For infringement by equivalency, all of the elements of the claimed invention or an equivalent thereof must be present in the accused system." *Netword*, 242 F.3d at 1354. There can be no infringement, either literally or under the doctrine of equivalents, when a claim element is completely missing from the accused device or method, i.e., when the device or method does not have any structure or step that corresponds to the claim element. *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 936 (Fed. Cir. 1987) (en banc). The doctrine of equivalents cannot be used by a patentee "to remove entirely ... limitations from the claim." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424; *see also Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997) ("It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."); *Tronzo v.*

*Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998) ("If a theory of equivalence would vitiate a claim limitation, however, there can be no infringement under the doctrine of equivalents as a matter of law.").

The doctrine of equivalents also does not allow a patent claim to encompass subject matter that could not have been patented. Even if the accused product would otherwise infringe the patent under the doctrine of equivalents, "there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art." *Wilson Sporting Goods Co. v. David Geoffrey & Associates*, 904 F.2d 677, 683 (Fed. Cir. 1990), *overruled in part on other grounds, Cardinal Chem. Co. v. Morton Intl., Inc.*, 508 U.S. 83 (1993). "Nor may [the doctrine of equivalents] allow coverage of obvious, or 'trivial,' variation[s] of the prior art ... for such subject matter could not have been patented in the first instance." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1367 (Fed. Cir. 1999).

Whether there is infringement under the doctrine of equivalents turns on the substantiality of the differences between the accused device or process and the claimed invention. *Warner-Jenkinson*, 520 U.S. at 39-40. The analysis is done on an element-by-element basis. That is, for each limitation in the claim that is not literally met, an equivalent must be present in the accused device or process for there to be infringement. If the differences between each claim element and each corresponding structure or step in the accused device are found to be insubstantial, then infringement under the doctrine of equivalents may be met. *Id.*; *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997). One formulation for determining the substantiality of the differences is whether the structure or step in the accused device "performs substantially the same function in substantially the same way to obtain the same result" as the claimed element. *Warner-Jenkinson*, 520 U.S. at 38.

When an accused device is separately patented, the existence of the patent is evidence of substantial differences between the accused device and the prior art, and thus of no infringement under the doctrine of equivalents. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushi Co., Ltd.*, 493 F.3d 1368, 1379-80 (Fed. Cir. 2007) ("we have held that when a device that incorporates the purported equivalent is in fact the subject of a separate patent, a finding of equivalency, while perhaps not necessarily legally foreclosed, is at least considerably more difficult to make out"); *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996) ("The fact of separate patentability is relevant, and is entitled to due weight.").

The doctrine of equivalents also cannot be applied to claim elements that were added by amendment during prosecution to overcome a prior art rejection. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002). In this case, Uniloc added the following elements to claim 12 during prosecution to overcome a prior art rejection:

> wherein said registration system is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration system

It similarly added the following elements to claim 19 during prosecution to overcome the same prior art rejection:

> wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID

As a matter of law, if these elements are not literally present in Product Activation, then there is no infringement.

### 1.   Telephone Activation Is Not Accused Of Infringement; Internet Product Activation Is The Only Accused Technology For Trial

Uniloc appealed this Court's summary judgment order on the narrow point that Microsoft uses the same hashing algorithms on both sides of Product Activation to produce a "license

digest." *See Uniloc USA, Inc.,* 290 Fed.Appx. at 348 (Michel, J., dissenting) ("Uniloc's theory

of infringement in this appeal is that the license digest constitutes a 'licensee unique ID.'").   The

"license digest" is only generated in Internet Product Activation.  Uniloc did not appeal

the Court's summary judgment with regard to any theory of infringement by the distinct

implementation of telephone activation.  Thus, Uniloc is estopped from alleging infringement by

telephone Product Activation, and the scope of trial is limited to the issue of whether the license

hashing aspect of Internet Product Activation infringes claims 12 and 19 of the '216 patent.

### 2.   Microsoft Does Not Infringe Claims 12 and 19 Because The Accused License Hashes Are Not "Licensee Unique ID[s]/Security Key[s]"

Claims 12 and 19 of the '216 patent require a "security key" and a "licensee unique ID,"

respectively.  These terms were construed synonymously as "[a] unique identifier associated

with a licensee." (D.I. No. 145, Decision and Order on Claim Construction, p. 9.)  The Federal

Circuit affirmed this construction on appeal.  *Uniloc USA, Inc. v. Microsoft Corp.,* 290

Fed.Appx. 337, 342-344 (Fed. Cir. 2008).

Microsoft's accused product activation technology lacks this requirement of the claims,

including because the license digest generated by the hash function in the accused products is not

associated with a licensee.  Uniloc cannot even show that the license digest is generated from

anything associated with a licensee, let alone that the digest itself has such an association.  The

inputs to the license digest are (1) the Product ID, which is generated from information derived

from a Product Key supplied with the software media, along with information from the product

media and a random number, and (2) the Hardware ID, an irreversible number generated from

information about various components of the user's computer.

Moreover, the hashing function is one-way, or irreversible, and destroys any association

between the license digest and the inputs that the function uses to create the digest.

-9-

Microsoft's product activation approach was specifically designed to preserve licensee anonymity. As such, it is fundamentally different from that disclosed in the Uniloc patent, every claim of which requires unique identifiers associated with a licensee. The license digests in Microsoft's product activation thus do not meet the claim requirements, either literally or equivalently.

### 3. Microsoft Does Not Infringe Claim 12 Because The Inputs To The Accused Hashing Functions Do Not Uniquely Identif[y] An Intended Registered User

Claim 12 has the additional requirement that the "security key" must be generated from "information input to said software which uniquely identifies an intended registered user of said software." This was construed as "[i]nformation that is uniquely associated with a person who intends to become a licensee so as to access full functionality of the digital data." (D.I. No. 145, Opinion and Order on Claim Construction, p. 22.) The information input to said software which uniquely identifies an intended registered user is entered by the user. (*See* D.I. No. 145, Claim Construction Order at 53 and *infra* at pp. 11-12).

Uniloc also cannot meet its burden on this issue. It cannot show that the information used to create the license digest, or for that matter any information entered by the user as part of product activation, is uniquely associated with a person who intends to become a licensee so as to access full functionality of the digital data, including for the reasons given above. Indeed, the only thing entered by the user in internet activation is the Product Key, which is not associated with a user. Finally, in the case of Office, the Product Key is not even entered by the user until after he or she already has become a licensee.

The differences between using information uniquely associated with an intended licensee, as is done in the try before you buy software registration approach described in Uniloc's patent, and the approach used by Microsoft's product activation, are highly significant. Uniloc will not

-10-

be able to show that the Product Key performs substantially the same function in substantially the same way to achieve substantially the same result as the "information input to said software which uniquely identifies an intended registered user of said software" of claim 12. This element is therefore not present under the doctrine of equivalents.

### 4. Microsoft Does Not Infringe Claims 12 and 19 Because Product Activation Is Not A "Registration System"

Both claim 12 and claim 19 require a "registration system," which is "[a] system that allows digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed." (D.I. No. 145, Claim Construction Order at 49.)

Microsoft 's accused Product Activation process is not a licensing procedure and thus not a "registration system." Licensing occurs through acceptance of the End-User Licensing Agreement, which happens during installation – separate from and prior to any accused activation steps taking place.

Nor can Uniloc show equivalence. The two processes stem from entirely different software distribution models and goals, have different purposes, and are not equivalents.

### 5. Microsoft Does Not Infringe Claim 12 Because Product Activation Does Not Involve "Checking By The Registration Authority That The Information Unique To The User Is Correctly Entered At The Time That The Security Key Is Generated By The Registration System"

Claim 12 of the '216 patent requires a "registration system ... replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration system." The Court construed this limitation, in relevant part, as "[v]erification by the registration authority that information unique to the user and entered by the user is accurate." (D.I. No. 145, Claim Construction Order at 53.)

The Product Activation Clearinghouse does not perform "verification" that any information "unique to the user and entered by the user is accurate." Uniloc cannot point to anything in the Clearinghouse that checks the accuracy of information previously entered by the user in internet activation, let alone show that the Clearinghouse uses the license digest to check the accuracy of *any* information previously entered to generate a license digest on the client's computer. In fact, this is the opposite of the way Product Activation works, and thus Uniloc also cannot demonstrate infringement by equivalents. Moreover, as noted above, Uniloc is precluded from seeking to apply the doctrine of equivalents to this element, which was added by amendment to claim 12 in order to overcome a prior art rejection.

### 6.   Microsoft Does Not Infringe Claim 19 Because It Does Not Meet The "Mode Switching Means" Requirement

Claim 19 of the '216 patent requires a "mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means." A "mode switching means" was construed to have a function "to permit the digital data or software to run in a use mode/fully enabled mode if the locally generated licensee unique ID/registration key matches with the remotely generated licensee unique ID/enabling key" and a corresponding structure of "program code which performs a comparison of two numbers or a comparator and equivalents thereof." (D.I. 145, Claim Construction Order at 41.) A "use mode" was construed as "[a] mode that allows full use of the digital data or software in accordance with the license." (D.I. No. 145, August 22, 2006 Claim Construction Decision and Order ("Claim Construction Order") at 36.)

As discussed in Microsoft's summary judgment brief, Product Activation has a "grace period." (D.I. 165-1, Microsoft Summary Judgment Brief at 46-48.) The grace period occurs

prior to activation, prior to the generation of the license digest (the alleged "licensee unique ID"), and thus occurs without any need to match the license digest generated by the Clearinghouse with the one generated by the client software. All features and functions of the software are available during the grace period in accordance with the relevant license. (D.I. No. 168 Hughes Decl. ¶ 8; D.I. No. 169, Gunyakti Decl. ¶ 7; D.I. 171-30, Braden Decl. Ex. CC). The grace period is therefore a "use mode" under the Court's construction. There is no switching to a "use mode" only upon matching of local and remote license digests, as the periods prior to and after the matching process are both "use modes."

Because Product Activation does not "switch" into a "use mode," it cannot infringe claim 19 under the doctrine of equivalents, including because the doctrine cannot be used to vitiate a claim limitation.

7.      **Microsoft Does Not Infringe Claim 19 Because the Accused Hashing Algorithms Are Not "Summer[s]" or Equivalents Thereof**

Claim 19 of the '216 patent requires both "local" and "remote" "licensee unique ID generating means." Under 35 U.S.C. § 112, ¶ 6, an element in a claim may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof. For an accused device to literally infringe a claim that contains a means plus function element analyzed under § 112, ¶ 6, the accused device must, with respect to that element, (i) perform the identical function recited in the claim, and (ii) perform that function using means identical to, or the equivalent of, the structures, materials or acts described in the patent specification. *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993). To show infringement, a plaintiff must perform a comparison of the structure in the accused device and the structure in the specification and show the same or equivalent structure in the accused product performing the same function. *Cytologix Corp. v. Ventana Medical Sys.,*

*Inc.*, 424 F.3d 1168, 1178 (Fed. Cir. 2005) (reversing jury finding of infringement of claims

containing means-plus-function limitations because the patentee "failed to identify the structure

in the specification that is the 'temperature controlling means' and compare it to the structure of

the accused device."); *see also Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222

(Fed. Cir. 1996) (stating that, to establish infringement under § 112, ¶ 6, it is insufficient for the

patent holder to present testimony "based only on a functional, not a structural, analysis.").

In its claim construction order, this Court construed the term "licensee unique ID

generating means" as having a function "to generate a local or remote licensee unique

ID/registration key" and the structure of "a summation algorithm or a summer and equivalents

thereof." (D.I. No. 145, Claim Construction Order at 25-28.)

The accused hashing functions in Microsoft's Product Activation are far different,

structurally, from the simple summation algorithms disclosed in the '216 patent. They are

neither summers nor the equivalents of summers, as Uniloc's own witness has admitted.

Moreover, the accused hashing functions are undisputed prior art to the Uniloc patent,

and thus there is no infringement of claim 19 under the doctrine of equivalents. A technology

developed before the patent issued, but not disclosed in the patent, cannot infringe a means-plus-

function term under the doctrine of equivalents, as a matter of law. *Al-Site Corp. v. VSI Intern.,

Inc.*, 174 F.3d 1308, 1320 n. 2 (Fed. Cir. 1999) ("A proposed equivalent must have arisen at a

definite period in time, i.e., either before or after patent issuance. If before, a § 112, ¶ 6

structural analysis applies and any analysis for equivalent structure under the doctrine of

equivalents collapses into the § 112, ¶ 6 analysis."); *see also Chiuminatta Concrete Concepts,

inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1310-11 (Fed. Cir. 1998). Even if the accused

product would otherwise infringe the patent under the doctrine of equivalents, "there can be no

infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art." *Wilson Sporting Goods Co. v. David Geoffrey & Associates*, 904 F.2d 677, 683 (Fed. Cir. 1990).

**B.** **Microsoft Does Not and Has Not Willfully Infringed the '216 Patent3**

Uniloc is unable to show that either requirement of willful infringement – (i) that Microsoft "acted despite an objectively high likelihood that its actions constituted infringement of a valid patent," and (ii) that the objectively high risk "was either known or so obvious that it should have been known" to Microsoft – is met in this case. *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007).

Microsoft first became aware of both Uniloc's patent and its infringement allegations when it was served with Uniloc's complaint in this case. Throughout the pendency of the case, Microsoft has relied in good faith on substantial and reasonable merits arguments on both non-infringement and invalidity that preclude a finding of willful infringement, arguments that have been fully considered and endorsed by Microsoft's liability expert, Dr. Wallach. *See, e.g., ResQNet.com, Inc. v. Lansa, Inc.*, 533 F.Supp.2d 397 (S.D.N.Y. 2008) (holding that the objective prong of *Seagate* cannot be met where non-infringement and invalidity arguments "were substantial, reasonable and far from the sort of easily-dismissed claims that an objectively reckless infringer would be forced to rely upon"); *Black & Decker, Inc. v. Roberts Bosch Tool Corp.*, 2008 WL 60501, at *6-7 (Fed. Cir. Jan. 7, 2008) (unpublished opinion) (noting that "legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a

---

[3]    Microsoft has moved *in limine* to preclude Uniloc from offering evidence relating to willfulness. (D.I. 240, Microsoft's Motion in Limine to Preclude Uniloc from Offering Evidence of Willful Infringement). This section outlines the evidence Microsoft will put on to rebut Uniloc's allegations of willful infringement if Uniloc is allowed to make them at trial.

valid patent."). Indeed, on presenting only a small fraction of its defenses, Microsoft obtained

summary judgment of non-infringement. This alone shows that Uniloc cannot satisfy the

objective prong of the willfulness test. *Franklin Electric Co. Inc. v. Dover Corp.*, 2007 WL

5067678, \*8 (W.D.Wisc. 2007) (holding that a grant of summary judgment of non-infringement

precludes a finding of willfulness, even where later reversed by the Federal Circuit).

Microsoft independently developed, and obtained numerous patents on, its Product

Activation technology, which is substantially different from what Uniloc patented. Microsoft

also firmly believes that the claims of the '216 patent are invalid, including for the reasons set

forth in Microsoft's Motion for Summary Judgment, and those set forth in the report of its

liability expert. (D.I. 173, Memorandum in Support of Microsoft's Motion for Summary

Judgment of Non-Infringement and Invalidity, pp. 57-68.)

Uniloc's allegations that Microsoft copied its patented technology are innuendo and

attorney argument. Uniloc cannot show that anything in Microsoft's product activation was

derived from anything Microsoft learned from either Uniloc's patent or any of its commercial

implementations. (*See* D.I. 240, Microsoft's Motion *In Limine* to Preclude Uniloc from Offering

Evidence on Willfulness, which is incorporated herein by reference). All that Microsoft learned

about Uniloc's patented technology before the filing of this lawsuit was that it did not work.

### C.   Asserted Claims 12 and 19 of the '216 Patent are Invalid

Uniloc has neither properly nor consistently applied the claims in the same manner for

infringement as for validity, and as a consequence has put itself in the untenable position of

accusing the prior art of infringement. On this basis, claims 12 and 19 are thus invalid. *See*

*Evans Cooling Systems Inc. v. General Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997)

(holding that infringement allegations are a proper basis for finding invalidity); *see also*

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent

-16-

may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.").

In this case, Microsoft relies, at least in part, on prior art that was not before the patent examiner during the examination of the '216 patent. Because the examiner never considered this prior art, the PTO has never addressed the question whether it invalidates the '216 patent. As a result, there is no reason to impose a heightened burden of proof on Microsoft to show that such art invalidates, and the burden of proof should remain that of a preponderance of the evidence, broadly applicable in civil cases. Indeed, the Supreme Court went out of its way recently to note that in such situations, the rationale for the presumption of validity under 35 U.S.C. § 282, and thus for the heightened burden of proof, is questionable. *See KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1745 (2007) ("We . . . think it appropriate to note that the rationale underlying the presumption [of validity] – that the PTO, in its expertise, has approved the claim – seems much diminished" where a defense of invalidity rests on evidence that the PTO never had an opportunity to consider.).

Moreover, the rationale for the heightened burden of proof fails in any situation in which the PTO's expertise has not been brought to bear on the relevant question. *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984) ("When an attacker . . . produces prior art *or other evidence not considered in the PTO*, there is . . . no reason to defer to the PTO so far as its effect on validity is concerned.") (emphasis added). Thus, in a case such as this one, in which the examiner failed to consider the relevant portions of a prior art reference, at least in part due to misrepresentations made by the applicant, the usual preponderance of the evidence standard should also apply even with respect to art which was formally cited (but misrepresented) to the Patent Office.

In any event, Microsoft can and will show invalidity by clear and convincing evidence. *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).

### 1.   On Uniloc's Attempted Overbroad Reading of its Own Patent, The Hellman '093 Patent Anticipates Claims 12 and 19

U.S. Patent 4,659,093 to Professor Martin Hellman, entitled "Software Distribution System," was filed on July 11, 1983, and issued on April 14, 1987. The Hellman patent is prior art to Uniloc's patent under 35 U.S.C. § 102(a) ("patented . . . before the invention thereof by the applicant for patent") and § 102(b) ("patented . . . more than one year prior to the date of the application for patent in the United States").

Generally, Hellman discloses a system for licensing the use of computer software installed on a user's computer. The user can request an authorization for an additional number of uses, N, which can be either a specific number or can indicate unlimited use. To make a request, the user enters into his computer: (1) the name of the software product, (2) N, the number of uses requested, and (3) the user's billing information. This information is then communicated to the software vendor, along with: (4) a random number R generated by the user's computer, and (5) a serial number that identifies the user's computer.

If the software vendor accepts the request, it sends back an authorization that is derived from N, R, and a value H that is derived from the software product itself. That authorization is generated using an algorithm. In fact, in some embodiments of Hellman that algorithm is a hashing function, which was old even in 1983 when Prof. Hellman filed his patent, and he discusses it extensively as background. In either scenario, the algorithm generates a value A, which is provided to the user. The user's computer uses the same algorithm to generate a check value C. If C and A match, the user's computer accepts the authorization.

-18-

The Hellman patent discloses every limitation of claims 12 and 19, arranged as in the claims, and on Uniloc's attempted overbroad application thus anticipates those claims. *See Net MoneyIN Inc. v. VeriSign Inc.*, 545 F.3d 1359, 1369-70 (Fed. Cir. 2008). Uniloc's arguments to the contrary are all either contradicted by the Hellman patent specification, or inconsistent with Uniloc's infringement allegations, or both. Uniloc cannot draw any relevant distinctions between the accused aspect of Product Activation and the system disclosed in the Hellman patent.

### 2.     On Uniloc's Attempted Overbroad Reading of its Own Patent, The Grundy '598 Patent Anticipates Claims 12 and 19

U.S. Patent 5,291,598 to Gregory Grundy, entitled "Method and System for Decentralized Manufacture of Copy-Controlled Software," was filed on April 7, 1992, and issued on March 1, 1994. The Grundy patent is prior art to Uniloc's patent under 35 U.S.C. § 102(e) ("described in . . . a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent").

Generally, Grundy describes a system in which users can try a software product in "evaluation mode" before they buy it, with the full functionality of the software only available after the user registers it. When a user is ready to buy, he enters his personal information, such as name, address, and telephone number, into the software. From this information, the software computes a "checksum of the user data," which "can be a hash value." This checksum, together with other information, is used to form a "registration code," which is displayed to the user.

To continue the registration process, the user contacts the registration authority and provides his personal information, together with the registration code. The registration authority performs the same checksum calculation using the personal information received from the user, and compares this to the checksum extracted from the registration code. The registration process

proceeds only if the two values are the same.  To authorize full use of the software, the registration authority creates an "authorization code," again formed in part by the user data checksum, and transmits this code to the user.

To complete the process, the user enters the authorization code into the software.  The software again computes a checksum of the user data and compares this to the checksum extracted from the authorization code.  The authorization is accepted only if the two values are the same.

Thus, Grundy discloses the use of the identical algorithm to generate the user data checksum three times:  the first time on the local computer when the user is preparing the request, the second time on the remote computer when it receives and is evaluating the request, and the third time on the local computer when it receives and is evaluating the authorization.

The Grundy patent discloses every limitation of claims 12 and 19, arranged as in the claims, and on Uniloc's attempted overbroad reading thus anticipates those claims.  Grundy very clearly discloses the hashing of personal information to create a user data checksum, and thus is, if anything, closer to Uniloc's claims than Product Activation, which does not use any information that originates with the user.  Furthermore, Uniloc cannot reconcile its assertion that Grundy's checksum hash functions are not summers with its allegation that Microsoft's specific hash functions are.  Finally, Grundy's user data checksum serves at least one purpose that is identical to that served by the security key in Uniloc's patent, namely ensuring that the user gives the registration authority the same information that he used to personalize his copy of the

software. Therefore, Grundy's user data checksum must be "unique" under any definition consistent with Uniloc's patent.[4]

Grundy is cited on the face of the '216 patent and was the subject of rejections during prosecution that led to extensive claim amendments and arguments. Nevertheless, "a patent may be found to be anticipated on the basis of a reference that had properly been before the patent examiner in the United States Patent and Trademark Office ('PTO') at the time of issuance." *IPXL Holdings, Inc. v. Amazon.com L.L.C.*, 430 F.3d 1377, 1381 (Fed. Cir. 2005); *see also Prima Tek II, L.L.C. v. Polypap S.A.R.L.*, 412 F.3d 1284, 1287 (Fed. Cir. 2005). The burden of proof, even on a challenger relying on prior art that was before the PTO, is never more than that of clear and convincing evidence. *American Hoist*, 725 F.2d at 1359-60. Language from cases about a "burden . . . to show that the PTO was wrong" is merely a generalization about the ease or difficulty with which a challenger might meet the burden, not a heightened burden in itself. *Id.*

In this case, the PTO's error, and the reasons for that error, are readily apparent from the prosecution history of the '216 patent. As further described below in the context of Microsoft's claim of inequitable conduct, Uniloc made affirmative, material misrepresentations about the Grundy patent when it disclosed that patent to the PTO. As a result, the patent examiner was misled to focus only on the registration and authorization codes, which are not identical, rather than the user data checksums, which are. Even apart from the issue of intent relevant to

---

[4]   Uniloc's persistence that the license digest in Product Activation is unique while hashed values in the prior art are not if anything underscores the indefiniteness problems with this term noted above. *See Halliburton Energy Servs., Inc. v. M-I LLC,* 514 F.3d 1244, 1254 (Fed. Cir. 2008) (finding the term "fragile gel" indefinite because a person of ordinary skill in the art could not determine how "fragile" the gel must be to be covered by the claim); *see also Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (Indefiniteness is a question of law for the court).

inequitable conduct, this history explains how and why the PTO erred and why Microsoft can show by clear and convincing evidence that the Grundy patent anticipates the asserted claims.

### 3.    Claims 12 And 19 Are Obvious

Uniloc's infringement allegations are so broad that under those allegations, Grundy and Hellman each anticipate the asserted claims. Even if a jury were to find differences between either Grundy or Hellman and Uniloc's patent, however, those differences would be slight enough that Uniloc's patent would nevertheless be invalid as obvious.

A claim is invalid as obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

Obviousness is ultimately a question of law for the court. *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1745-46 (2007). That legal determination rests on three primary factual considerations: (1) "the scope and content of the prior art," (2) any "differences between the prior art and the claims at issue," and (3) "the level of ordinary skill in the pertinent art." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). Where an invention is a combination of elements from the prior art, the invention is obvious if it is no "more than the predictable use of prior art elements according to their established functions." *KSR*, 127 S. Ct. at 1740; *see also Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1325-27 (Fed. Cir. 2008). There need not be any explicit teaching, suggestion, or motivation in the art to combine elements in order to show that the combination is obvious. *KSR*, 127 S. Ct. at 1741-42.

In this case, Microsoft contends that there are no differences between either the Grundy patent or the Hellman patent and the asserted claims. Even if a jury were to find gaps, however, any such gaps would have been easily filled at the time of invention by the knowledge of one

-22-

skilled in the art and by the teaching of other prior art references. Uniloc's claims are thus no "more than the predictable use of prior art elements according to their established functions." *See KSR*, 127 S. Ct. at 1740.

For example, even if Grundy's user data checksum were somehow not "unique," it would have been obvious to one skilled in the art to make it large enough to be unique, in order to increase the security of the system. The Hellman patent and extensive prior art on one-way hash functions teach as much, and Grundy specifically notes that the user data checksum can be computed using a hash function . Similarly, even if the inputs to Hellman's hash digests were not already "associated with" a licensee, it would have been obvious to one skilled in the art to create such an association by using the billing information, already collected by the system, as an additional input. This would have served the goal of tying the user information to the authorized software as taught, e.g., by the Grundy patent. The Hellman patent and extensive prior art on one-way hash functions amply teach as much.

In addition to the primary *Graham* factors above, secondary considerations of non-obviousness, such as commercial success due to the merits of the claimed invention, a long-felt need for the solution provided by the claimed invention, and copying of the claimed invention by others, are part of an obviousness determination. *See Graham*, 383 U.S. at 17-18. As described above, however, Microsoft has a strong prima facie case of obviousness, and "a strong prima facie obviousness showing may stand even in the face of considerable evidence of secondary considerations." *Rothman v. Target Corp.*, No. 2008-1375, slip op. at 16 (Fed. Cir. Feb. 13, 2009).

In any event, Uniloc has no evidence of relevant secondary considerations. (*See* D.I. 236, Microsoft's Motion *In Limine* to Preclude Uniloc from Offering Evidence or Testimony of

-23-

Alleged Secondary Considerations of Non-Obviousness and to Preclude Untimely Expert Opinions, which is incorporated herein by reference). In order to be relevant, there must be a nexus between any alleged evidence of secondary considerations and the claimed invention. *See Ormco Corp. v. Align Technology, Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006). Uniloc bears the burden of proving such a nexus. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

Uniloc has no evidence whatsoever to tie any alleged secondary considerations to the subject of its claims. The suggestion that the success of the Windows and Office products, with their thousands of features, is somehow due to the use of license hashing in Product Activation is absurd on its face. Even if it were proper to consider the "success" of the Product Activation program itself, Uniloc has no evidence that any such success can be attributed to the particular, allegedly infringing, use of license hashing. *See, e.g., Friskit, Inc. v. Real Networks, Inc.*, 2009 WL 59182, at *6 (Fed. Cir. Jan. 12, 2009) (unpublished) ("[The patentee's] inability to relate the success of [the accused infringer's] products to the [alleged novel aspect of its claimed invention] is fatal to its claim that the commercial success of the invention is evidence of nonobviousness."). Similarly, Uniloc has no evidence that any long-felt need at Microsoft for anti-piracy solutions *generally* was a felt need for the *specific* solution alleged to infringe Uniloc's claims. Finally, Uniloc has no evidence that any alleged copying by Microsoft involved the particular license hashing detail.[5] *See, e.g., id.* (no nexus where the patentee "failed to introduce sufficient evidence to show that the copied technology fell within the scope of the asserted claims"); *see also id.* ("Copying by the accused infringer . . . has limited probative value in the absence of evidence of failed development efforts by the infringer."). By focusing on

---

[5]   Moreover, no such copying actually took place, as described further above in the context of Uniloc's willfulness allegations.

Product Activation as a whole, rather than the particular alleged infringement, Uniloc is effectively trying to take credit for anti-piracy and other technologies that it certainly did not invent, which is precisely what the nexus requirement is meant to prevent. *See Ormco*, 463 F.3d at 1312.

Because any differences between the prior art and Uniloc's claims are slight at best, and because there are no relevant secondary considerations in this case, claims 12 and 19 are invalid as obvious.

### D.    The '216 Patent is Unenforceable

As previously described, the Grundy '598 patent plainly uses personal information to derive a security key and otherwise discloses every element of the asserted claims. The Grundy patent was also the subject of extensive argument between Richardson and the PTO. Richardson was only able to obtain his patent over Grundy by misrepresenting the teachings of Grundy and misdirecting the patent examiner away from the most relevant portions of Grundy, namely (as noted above) the identical computations of the user data checksum. Uniloc has not offered any explanation from those involved to explain away or try to excuse these myriad gross misrepresentations of fact. Richardson's misrepresentations about Grundy were so material and so unsupportable that an intent to deceive is readily inferred, and the Richardson '216 patent should therefore be held unenforceable by reason of inequitable conduct.

Patent applicants and those substantively involved in the preparation or prosecution of a patent application are required to prosecute patent applications with candor, good faith, and honesty. *Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd.,* 204 F.3d 1368, 1373 (Fed. Cir. 2000); *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed. Cir. 1995). If an applicant makes material misrepresentations to, or withholds material information from, the PTO

-25-

with an intent to deceive, the patent is rendered unenforceable by reason of inequitable conduct. *Semiconductor,* 204 F.3d at 1373 ("[I]nequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.").

Materiality and intent must be established by clear and convincing evidence and then weighed to determine whether the equities warrant a conclusion that inequitable conduct occurred. *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.,* 394 F.3d 1348, 1351 (Fed. Cir. 2005). The more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa. *Semiconductor,* 204 F.3d at 1375; *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001). "Proof of high materiality and that the applicant knew or should have known of that materiality makes it difficult to show good faith to overcome an inference of intent to mislead." *Semiconductor,* 204 F.3d at 1375.

Information is material to patentability if "a reasonable examiner would have considered [it] important in deciding whether to allow the patent application." *Digital Control Inc. v. Charles Machine Works,* 437 F.3d 1309, 1314-16 (Fed. Cir. 2006). 37 C.F.R. § 1.56 provides an alternative formulation. *See id.* at 1316 ("[T]he 'reasonable examiner' standard and our case law interpreting that standard were not supplanted by the PTO's adoption of a new Rule 56."). Under that Rule, information is material to patentability when:

> [I]t is not cumulative to information already of record or being made of record in the application, and
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
> (i) Opposing an argument of unpatentability relied on by the Office, or
> (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56. Materiality is not limited to prior art but instead embraces *any* information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent. *GFI,* 265 F.3d at 1274.

Turning to the intent to deceive, it is well established that "[i]ntent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequence of which are presumably intended by the actor." *Semiconductor,* 204 F.3d at 1374-75; *see also Bruno,* 394 F.3d at 1354 ("Intent need not, and rarely can, be proven by direct evidence."); *Molins,* 48 F.3d at 1180. Intent to deceive is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially where there is no good faith explanation for the applicant's action or inaction. *Bruno,* 394 F.3d at 1354; *see also LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed. Cir. 1992) (inference of deceptive intent was supported by evidence of applicant making patentability arguments that could not have been made had the withheld prior art been disclosed); *GFI,* 265 F.3d at 1275. There is no requirement that the evidence to establish intent to deceive must come directly from the inventor or prosecuting attorney. *Hoffmann-La Roche, Inc. v. Promega Corp.,* 323 F.3d 1354 (Fed. Cir. 2003) ("Intent, however, is typically proved inferentially, and a finding of intent does not require a confession from the stand by the inventor or prosecuting attorney.").

From the beginning, when Richardson first submitted Grundy to the PTO, he directed the examiner's attention to the registration and authorization codes and distinguished Grundy on the basis that these codes are not directly compared, misdirecting the examiner from the fact that the user data checksums *are* directly compared. When the examiner rejected the claims based on Grundy, Richardson continued to misdirect the examiner away from the user data checksums and focus on the registration and authorization codes, affirmatively misrepresenting the contents and

-27-

functions of those codes. For example, Richardson asserted that the "User Code" in Grundy, an identification number associated with each user, somehow functions as an "encryption key" for the authorization code, even though the patent nowhere describes any connection between the User Code and encryption, and explicitly describes decrypting the authorization code with a product-specific, not user-specific, key.

These and other misrepresentations were highly material as they were integral to convincing the examiner that the salient distinguishing feature of Grundy was the use of encrypted registration and authorization codes that had to be decrypted, rather than simply matched. Such high materiality, coupled with the fact that the representations were entirely unsupportable, "makes it difficult to show good faith to overcome an inference of intent to mislead." *See Semiconductor,* 204 F.3d at 1375.

Nor can these misrepresentations be characterized as the type of "attorney argument" that applicants are free to make before the PTO. As the Federal Circuit recently reaffirmed, "the law prohibits genuine misrepresentations of material fact." *Rothman,* slip op. at 30. In the *Rothman* case, the Federal Circuit held that general statements about the nature of the products at issue, nursing garments, and whether they are sufficiently analogous to regular garments, were within the bounds of attorney argument.[6] *Id.* at 29-31. Here, Richardson made detailed, specific, and erroneous factual assertions about the prior art reference before the examiner; such assertions cannot be characterized as mere "attorney argument."

---

[6] The statements complained of in that case were as follows:
Nursing garments are highly specialized garments that are designed produced and sold by a small segment of the clothing industry. Nursing garments, as distinguished from maternity garments, are not analogous prior art to women's garments in general. A nursing bra has a detachable nursing flap, structural feature not found in a regular bra. Therefore, it is improper to combine a prior art reference from nursing garments with a prior art reference from garments generally, with no connection to nursing garments.
*Id.* at 29.

Finally, Richardson's failure to disclose to the PTO Grundy's own assertions that his patent anticipated Richardson's claims further contributes to the inference that Richardson was trying to hide the true contents of the Grundy patent. Grundy and his attorneys made statements to Richardson that the Grundy patent covered "exactly the system" described in a Uniloc press release describing the Uniloc technology, and was "in direct conflict" with Uniloc's Australian patent. (*See* D.I. no. 176, Exs. 17, 18 & 19 to the Declaration of Kurt Glitzenstein in support of Microsoft's Opposition to Plaintiffs' Motion for Partial Summary Judgment). Uniloc never disclosed these statements to the PTO. Grundy's own views could well have caused the examiner to reconsider Richardson's representations more skeptically. Because Richardson obtained his patent by obscuring the teachings of Grundy, he committed inequitable conduct and his patent is unenforceable.

### E.  Any Damages Awarded to Uniloc Should Not Exceed a Reasonable Royalty of $3,000,000 to $7,000,000

The damages to which Uniloc would be entitled for any infringing sales would be a reasonable royalty. 35 U.S.C. § 284. Such a reasonable royalty may be determined according to the factors outlined in *Georgia-Pacific*, and the framework of a hypothetical negotiation. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd* 446 F.2d 295 (2d Cir. 1971); *see Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003). The date of the hypothetical negotiation would have been March, 2001.[7]

The hypothetical negotiation/*Georgia-Pacific* methodology requires that the reasonable royalty be determined through an analysis of the actual circumstances existing between the

---

[7]   The first activations of Office XP occurred in March, 2001.

patent owner and the defendant. *Georgia-Pacific*, 318 F.Supp. at 1120-1121 ("Where a willing

licensor and a willing licensee are negotiating for a royalty, the hypothetical negotiations would

not occur in a vacuum of pure logic."). The relevant circumstances in this case include

Microsoft's patent licensing practices, which include a policy of licensing patents for lump sum

amounts between ▇▇▇▇▇▇▇▇▇▇. (D.I. No. 223/224, January 26, 2009, Rogers

Declaration, Ex. N, November 7, 2005, Expert Report of Brian Napper at 12). *See Georgia-*

*Pacific*, 318 F.Supp. at 1120 (listing as factor to consider "[t]he rates paid by the licensee for the

use of other patents comparable to the patent in suit"), *Stickle v. Heublin, Inc.*, 716 F.2d 1550,

1561-63 (Fed. Cir. 1983) (affirming damages award based on lump sum amount in industry in

which "use royalties" were uncommon); *Third Wave Technologies, Inc. v. Stratagene Corp.*, 405

F.Supp.2d 991, 1012 (W.D.Wis 2005) (holding that lump sum damage award "is proper when

the evidence shows that it is commonly utilized in the industry"); *Advanced Display Sys., Inc. v.*

*Kent State Univ.*, Nos. 3-96-CV-1480 & 3-96-CV-1608, 2002 WL 1489555, at *6 (N.D. Tex.

July 10, 2002) (lump-sum payments may be used to calculate a reasonable royalty)

(unpublished). Another significant factor is Uniloc's poor financial health, and its inability to

successfully license or sell its technology made under the patent.[8] The parties to a hypothetical

negotiation would have also considered the difficulty of measuring any benefit from Product

Activation, as well as the significant annual costs of maintaining it. Another significant factor in

the hypothetical negotiation would be the limited additional benefit, if any, of the '216 patent

above the Microsoft technology which pre-existed the adoption of the allegedly infringing

---

[8]   For example, Uniloc partnered with IBM to market Uniloc's technology in the 1990's, ▇
▇▇▇▇▇▇▇▇▇. (*See* D.I. No. 217, January 26, 2009,
Declaration of Rebecca Rogers ("Rogers Decl."), Exhibit N, November 7, 2005 Expert Report of
Brian Napper at 11).

license hash – Uniloc tacitly concedes this pre-existing technology does not infringe, and it has certainly never been accused of infringement in this case or otherwise.

The parties would also have considered whether the component of the accused product covered by the '216 patent formed the basis for consumer demand of the accused product. *See, e.g.*, *Riles v. Shell Exploration & Prod.*, 298 F.3d 1302, 1312 (Fed, Cir. 2002) (reversing jury award of reasonable royalty based on expert's model relying on entire construction cost of oil platform, without isolating the value of patented anchoring method); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080 (Fed. Cir. 1983) (affirming royalty based on cost savings of patented feature, and not price of entire machine). Here, it is clear that Product Activation formed no part of the basis for customer demand for the accused products; in fact, it is undisputed that customers disliked the feature.

Considering all of the relevant factors, a reasonable royalty would be between $3 and $7 million dollars. (D.I. No. 217, January 26, 2009, Rogers Declaration, Ex. N, November 7, 2005, Expert Report of Brian Napper at 32.)

Uniloc has argued that it is entitled to a reasonable royalty consisting of a $2.50 per activation running royalty.[9] (D.I. No. 217, January 26, 2009, Rogers Declaration, Ex. A, September 1, 2005, Expert Witness Report of Joseph Gemini at 12.) Uniloc arrives at this royalty by multiplying ▆▆▆▆▆▆▆▆▆▆. (*Id.*) This royalty incorporates a number of significant errors, and grossly overestimates the result of the hypothetical negotiation. *See* D.I. No. 217, January 26, 2009, Defendant's Memorandum In Support Of Its Motion To Preclude

---

[9]  Uniloc has calculated a running royalty beginning in October, 2003. This is because, having failed to mark its products, Uniloc may only recover damages for a period beginning after September 26, 2003, when the suit was filed.

Testimony Of Plaintiff's Damages Expert, Joseph Gemini ("Defendant's Daubert Motion"), which incorporated herein by reference.

The first error is in the ██ base that Uniloc adopts. The base is taken entirely from a ████████████████████████████ in a single memo, written by the Product Support Services group at Microsoft. However, there is no connection between the ██ figure in the document and Product Activation. (*See* Defendant's Daubert Motion at 17-19).

The use of this base also runs afoul of the entire market value rule. A patent owner is only entitled to use the entire market value of accused products as the base for calculating running royalty damage when the patentee complies with the "entire market value rule. *See, e.g., Imonex Servs., Inc. v. W.H. Munsprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1379 (Fed. Cir. 2005); *Cornell Univ. v. Hewlett-Packard Co.*, 2008 WL 2222189, at *2 (N.D.N.Y. May 27, 2008) (Rader, J.). One of the prerequisites to the application of that rule is that the patented component is "the basis for customer demand or substantially create[s] the value of the component parts." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995). The ██ figure on which Uniloc's rate is based is simply the value of an entire software product protected by a Product Key. (D.I. No. 217, January 26, 2009, Defendant's Daubert Motion at 18.) However, neither Product Activation as a whole, nor the accused hashing detail of Product Activation at issue in this case, is the basis of customer demand for the accused products. Therefore, the entire market value rule does not apply and Uniloc may not use the ██ figure as a base for its royalty. It is instead incumbent upon Uniloc to establish what portion of the value of the product should be allocated to the specific accused element. *See Blake v. Robertson*, 94 U.S. 728, 733-734 (1876) (affirming nominal damages where patentee failed to meet its burden to establish portion of damages attributable to infringing feature of larger product).

Second, the 25% rate that Uniloc applies to that base is also in error. This rate is a general so-called "rule of thumb," adopted without basis or modification from the work of Robert Goldscheider. (*See* D.I. No. 217, January 26, 2009, Defendant's Daubert Motion at 22-27.) However the *Georgia-Pacific* factors require a fact-specific inquiry, and any royalty must be grounded in the specific facts of a case and not based on general rules. *See, e.g., Mobil Oil Corp. v. Amoco Chems. Corp.*, 915 F.Supp. 1333, 1353 (D.Del 1994) ("some of the *Georgia-Pacific* factors may be of minimal or no relevance to a particular case and other factors may have to be molded by the Court to fit the facts of the case at hand"); *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 Fed. Appx. 450, 453 (5th Cir. 2005) (affirming the district court's finding that the expert's model, which used a "yardstick measure of lost profits," was "irrelevant insofar as it was not in any respect anchored to the specific agreements or marketing practices challenged by the plaintiffs."). Uniloc's claimed royalty fails to meet this requirement.

Uniloc's persistence in maintaining a ▮▮ per activation royalty figure even after abandoning most of its infringement case further underscores the failure of Uniloc to connect its proposed royalty with the facts of this case. When Mr. Gemini first offered his opinion that the appropriate per-activation base was ▮▮, Uniloc was asserting sixteen claims of the '216 patent against eight different implementation details of Product Activation. *See Uniloc USA, Inc. v. Microsoft, Corp.*, 290 Fed. Appx. 337, 339 (Fed. Cir. 2008). The case is now only about two claims, and a single implementation detail—hashing of the license data. *See id.* at 341. Uniloc cannot not maintain that precisely the same ▮▮ royalty is appropriate now as before. *See Children's Broad. Corp. v. The Walt Disney Co.*, 245 F.3d 1008, 1018 (affirming district court's exclusion of expert testimony concerning damages that, among other factors, was based on a

report that assumed the defendants had engaged in all forms of wrongful conduct alleged in the complaint, including some that did not survive summary judgment).

Third, Uniloc's application of the ███ royalty "per activation" is flawed. Because each licensed copy of software may be activated multiple times, this method of counting royalty payments would require multiple payments for the same licensed product, even knowing no new product had been sold. Any damages based on a running royalty would more appropriately be based on new licenses issued, which represents the first activation of a product. (*See* D.I. No. 234, February 10, 2009, Microsoft's Motion *In Limine* to Preclude Uniloc from Seeking Damages for or Referring to Microsoft's Foreign Sales, and from Seeking Damages for Multiple Activations on a Single Computer, which is incorporated herein by reference; *see also* D.I. No. 217, January 26, 2009, Rogers Declaration, Ex. N, November 7, 2005, Expert Report of Brian Napper at 32.)

Finally, Uniloc's "per activation" rate reveals an additional problem, in that it includes both U.S. and foreign products. No infringement occurs under the United States patent law when a patented product is made and sold in another country. *Microsoft Corp. v. AT & T Corp.*, 550 U.S. --, 127 S.Ct. 1746, 1750 (2007). To avoid extraterritorial application of U.S. patent laws, the number of activations on which Uniloc relies for its damages calculation must be modified to reflect the percentage of activations that occurred in the United States. Uniloc has suggested that because some Microsoft Clearinghouses are located in the United States, the activation of foreign computers using those Clearinghouses occurs within the United States. (*See* D.I. No. 238, February 10, 2009, Plaintiffs' Motion *In Limine* Regarding Non-US Activations (MIL No. 2) at 2; D.I. No. 264, February 17, 2009, Plaintiffs' Opposition To Microsoft's Motion *In Limine* To

Preclude Uniloc From Seeking Damages For Or Referring To Microsoft's Foriegn Sales, And From Seeking Damages For Multiple Activations On A Single Computer at 3-5.)

When considering the location of use of a system alleged to infringe a system claim, however, the critical issue is the location "at which the system as a whole is put into service, *i.e.*, the place where control of the system is exercised and beneficial use of the system is obtained." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) (concluding that infringing use of a patented cell phone system occurred in the United States because the use of that system was controlled by cell phone users located in the United States, even though certain relay components of the claimed system were located in Canada). In the case of Product Activation, the system is evenly split between the user's computer and the Clearinghouse. Indeed, with regard to claims 12 and 19, both the local side and the remote side of the claimed system were emphasized—and given equal weight—during prosecution for patentability. (*See* D.I. No. 156, September 9, 2006, Braden Declaration, Ex. BB, excerpts from the July 126, 1995 Amendment In Response to March 30, 1995 Office Action at 3). Therefore, both the local and remote components of the claimed system must be in the United States, and be used in the United States, for infringement to occur under the United States patent laws. Furthermore, Uniloc's damages theory has never distinguished between the respective roles of the Clearinghouse and the end-user's computer. It cannot not change its theory to focus entirely on the Clearinghouse in an effort to end-run the Supreme Court's *AT&T* decision.

## IV.    MICROSOFT'S WITNESSES

In support of its defenses and counterclaims, and based on its understanding of Uniloc's claims and allegations, Microsoft presently intends to call the following witnesses to testify at trial:

1.    **Mr. Aidan Hughes** (live):  Mr. Hughes, a Microsoft employee, will testify regarding the structure, function, and operation of Microsoft Product Activation, relevant to non-infringement. Mr. Hughes will further testify regarding Microsoft's independent development of Microsoft Product Activation, relevant to invalidity, damages, and willfulness.  Mr. Hughes will also testify regarding the historical and current development and use of hashing and encryption technologies at Microsoft, relevant to damages and willfulness.  Microsoft estimates that its direct examination of Mr. Hughes will take 2.5 hours.

2.    **Mr. Greg Peiker** (live):  Mr. Peiker, a Microsoft employee, will testify regarding (1) the operation and development of Microsoft Product Activation, relevant to damages; (2) the benefit, if any, to Microsoft of using Product Activation, relevant to damages; (3) the revenue and profits of the accused products, relevant to damages; (4) Microsoft's objective and subjective belief that it does not infringe the '216 patent, relevant to willfulness; and (5) damages issues generally. Microsoft estimates that its direct examination of Mr. Peiker will take 1.5 hours.

3.    **Ms. Susan Cole** (deposition):  Ms. Cole, a Microsoft employee, will testify regarding (1) the operation and development of Microsoft Product Activation, and the costs associated therein, relevant to damages; and (2) the benefit, if any, to Microsoft of using Product Activation, relevant to damages. Microsoft estimates that presentation of Ms. Cole's testimony will take 10 minutes.

4.    **Prof. Daniel Wallach** (live):  Mr. Wallach will provide expert testimony as to (1) non-infringement of the '216 patent by Microsoft Product Activation, (2) the invalidity of that patent by anticipation and obviousness, and (3) material misrepresentations made to the Patent Office during its prosecution, relevant to unenforceability.  Microsoft estimates that its direct examination of Dr. Wallach will take 5 hours.

5.      **Mr. Brian Napper** (live):  Mr. Napper will provide expert testimony as to damages. Microsoft estimates that its direct examination of Mr. Napper will take 2.5 hours.

6.      **Prof. Martin Hellman** (live):  Prof. Hellman, named inventor of U.S. Patent 4,658,093, will testify regarding (1) the scope and content of his '093 patent, relevant to invalidity; and (2) the state of the art in hashing, encryption, and software security, relevant to invalidity.  Microsoft estimates that its direct examination of Dr. Hellman will take 2.5 hours.

7.      **Mr. Larry Nixon** (live):  Mr. Nixon may provide expert testimony as to (1) patent office practice and procedure; (2) prosecution of the '216 patent; (3) unenforceability; and (4) invalidity of the '216 patent.  Microsoft estimates that its direct examination of Mr. Nixon will take 1.5 hours.

8.      **Mr. Tim Cooper** (deposition):  Mr. Cooper, a Uniloc employee and Rule 30(b)(6) designee in this case, will testify regarding (1) the structure, function, and operation of embodiments of the patented invention, relevant to willfulness, invalidity and non-infringement; (2) the structure, function, and operation of the accused hashing algorithms, relevant to non-infringement; (3) the use of the accused hashing algorithms by Uniloc, relevant to willfulness and damages; (4) the lack of commercial success of the patented invention, relevant to damages; and if necessary (5) may testify to rebut Uniloc's allegations that its technology was copied by Microsoft.  Microsoft estimates that presentation of Mr. Cooper's testimony will take 30 minutes.

9.      **Mr. Brad Davis** (deposition):  Mr. Davis, the current Uniloc CEO, will testify regarding (1) the revenue attributable to Uniloc's products, relevant to damages; (2) the lack of commercial success of Uniloc's products, relevant to damages; (3) the value of Uniloc and the '216 patent,

relevant to damages; and (4) damages issues generally. Microsoft estimates that presentation of Mr. Davis's testimony will take 30 minutes.

10.     **Mr. Cary Dreelan** (deposition): Mr. Dreelan, a former Uniloc employee, will testify regarding (1) the development of the patented invention, related to invalidity; (2) the structure, function, and operation of embodiments of the patented invention, relevant to willfulness, invalidity and non-infringement; (3) the lack of commercial success of the patented invention, relevant to damages; and, if necessary, (4) may testify to rebut Uniloc's allegations that its product was copied by Microsoft. Microsoft estimates that presentation of Mr. Dreelan's testimony will take 15 minutes.

11.     **Mr. Craig Etchegoyen** (deposition): Mr. Etchegoyen, a Uniloc investor and employee, will testify regarding (1) the revenue attributable to Uniloc's products, relevant to damages; (2) the lack of commercial success of Uniloc's products, relevant to damages; (3) the value of Uniloc and the '216 patent, relevant to damages; and (4) damages issues generally. Microsoft estimates that presentation of Mr. Etchegoyen's testimony will take 20 minutes.

12.     **Mr. Greg Fonti** (deposition): Mr. Fonti, a former Uniloc investor, will testify regarding (1) the lack of commercial success of Uniloc's products, relevant to damages; (2) the value of Uniloc and the '216 patent, relevant to damages; and (3) damages issues generally. Microsoft estimates that presentation of Mr. Fonti's testimony will take 10 minutes.

13.     **Mr. David Lethe** (deposition): Mr. Lethe, a Uniloc employee and Rule 30(b)(6) designee in this suit, will testify regarding (1) the structure, function, and operation of the accused hashing algorithms, relevant to non-infringement; (2) the lack of commercial success of Uniloc's products, relevant to damages and invalidity; and (3) the copying of Microsoft Product

-38-

Activation by Uniloc, relevant to non-infringement, willfulness and damages. Microsoft estimates that presentation of Mr. Lethe's testimony will take 20 minutes.

14.   **Mr. Ric Richardson** (deposition): Mr. Richardson, named inventor of the '216 patent, will testify regarding (1) the development of the patented invention, related to invalidity; (2) the structure, function, and operation of embodiments of the patented invention, willfulness, invalidity and non-infringement; (3) the lack of commercial success of the patented invention, relevant to damages; (4) the copying of Microsoft Product Activation by Uniloc, relevant to non-infringement, willfulness and damages; (5) the prosecution of the '216 patent, relevant to unenforceability and invalidity; and if necessary (6) may testify to rebut Uniloc's various allegations that its product was copied by Microsoft. Microsoft estimates that presentation of Mr. Ric Richardson's testimony will take 1 hour.

15.   **Mr. Sky Richardson** (deposition): Mr. Richardson, Chief Information Officer of Uniloc USA as of July 2005, will testify regarding (1) the development of the patented invention, related to invalidity; (2) the structure, function, and operation of embodiments of the patented invention, relevant to willfulness, invalidity and non-infringement; (3) the copying of Microsoft Product Activation by Uniloc, relevant to non-infringement, willfulness and damages; and if necessary (4) may testify to rebut Uniloc's allegations that its product was copied by Microsoft. Microsoft estimates that presentation of Mr. Sky Richardson's testimony will take 20 minutes.

Certain of the testimony indicated above as being presented by deposition might instead be presented by live cross-examination, depending on those witnesses Uniloc brings to trial.

Also, depending on the nature of the evidence introduced by Uniloc at trial, and the resolution of the pending motions, Microsoft may call the following witnesses to testify:

1.     **Ms. Veronica Richards** (live or deposition): Ms. Richards, a former Microsoft employee, may testify regarding the Microsoft document used by Uniloc's damages expert to formulate a reasonable royalty base. Microsoft estimates that its direct examination of Ms. Richards would take 30 minutes.

2.     **Mr. Caglar Gunyakti** (live): Mr. Gunyakti, a Microsoft employee, may testify regarding the structure, function, and operation of Microsoft Product Activation, relevant to non-infringement, Microsoft's independent development of product activation, and to rebut Uniloc's allegations. Microsoft estimates that examination of Mr. Gunyakti would take 1 hour.

3.     **Mr. Gregory Grundy** (deposition): Mr. Grundy, named inventor of U.S. Patent 5,291,598 may testify regarding (1) the scope and content of his '598 patent, relevant to invalidity and unenforceability; and (2) the circumstances of his notifying Uniloc of his patent prior to the issuance of the '216 patent, relevant to invalidity and unenforceability. Microsoft estimates that presentation of Mr. Grundy's testimony would take 30-45 minutes.

4.     **Mr. Gregory Cox** (deposition): Mr. Cox, a former Uniloc employee, may testify regarding the desirability of features of Microsoft Product Activation, relevant to damages. Microsoft estimates that presentation of Mr. Cox's testimony would take 10 minutes.

5.     **Mr. David Pearce** (live): Mr. Pearce, a Microsoft employee, may testify about Microsoft's independent development of product activation and to rebut Uniloc's allegations. Microsoft estimates that presentation of Mr. Pearce's direct testimony would take 1 hour.

6.     **Mr. Hakan Olsson** (live): Mr. Olsson, a Microsoft employee, may testify to rebut Uniloc's copying allegations. Microsoft estimates that examination of Mr. Olsson would take 1 hour.

7.     **Dr. Vance Gledhill** (deposition):  Dr. Gledhill, a former Microsoft employee, may testify to rebut Uniloc's copying allegations.  Microsoft estimates that presentation of Dr. Gledhill's testimony would take 20 minutes.

8.     **Mr. Daniel Petre** (deposition):  Mr. Petre, a former Microsoft employee, may testify to rebut Uniloc's copying allegations. Microsoft estimates that presentation of Mr. Petre's testimony would take 15 minutes.

9.     **Ms. Tania Clubb** (deposition):  Ms. Clubb, a former Uniloc officer, may testify in rebuttal to Uniloc's allegations that its technology was copied by Microsoft.  Ms. Clubb may also testify regarding the lack of commercial success of Uniloc's products, relevant to damages. Microsoft estimates that presentation of Ms. Clubb's testimony would take 15 minutes.

## V.     EXHIBITS

In accordance with the Court's instructions at the January 12, 2009 pretrial conference, Microsoft's exhibit list will be submitted on March 13, 2009.

## VI.     MOTIONS IN LIMINE

Microsoft's motions in limine were filed on February 10, 2009.

## VII.     ESTIMATED TIME OF TRIAL

Microsoft estimates needing approximately 3-4 trial days to put on its case (not counting Uniloc's cross-examination) and will also cross examine Uniloc's witnesses.

## VIII.    ADDITIONAL MATTERS

Microsoft requests that counsel be permitted to make brief transition statements to introduce witnesses testifying during trial, including those testifying by deposition.  Such statements would not include argument or commentary on the evidence.

Dated:  February 27, 2009

By:  /s/ Joseph V. Cavanagh, Jr.
    Joseph V. Cavanagh, Jr. #1139
    **BLISH & CAVANAGH**
    Commerce Center
    30 Exchange Terrace
    Providence, Rhode Island 02903
    (401) 831-8900 (Telephone)
    (401) 751-7542 (Facsimile)

    Frank E. Scherkenbach
    Kurt L. Glitzenstein
    Fish & Richardson, P.C.
    225 Franklin Street
    Boston, MA  02110-2804
    Telephone:  (617) 542-5070
    Facsimile:  (617) 542-8906

    Of Counsel:

    Isabella E. Fu, Esq.
    MICROSOFT CORPORATION
    One Microsoft Way
    Redmond, WA  98052-6399
    Telephone:  (425) 882-8080
    Facsimile:  (425) 936-7329

    Attorneys for Defendant
    MICROSOFT CORPORATION

## CERTIFICATE OF SERVICE

I certify that on February 27, 2009 I caused a true and correct copy of the foregoing MICROSOFT CORPORATION'S PRETRIAL MEMORANDUM to be served via ECF on the following:

| | |
|---|---|
| Francis A. Connor, III<br>Jennifer L. Buckley<br>Taylor, Duane, Barton & Gilman, LLP<br>10 Dorrance Street<br>Suite 700<br>Providence, RI 02903 | Attorneys for Plaintiffs<br>UNILOC USA, INC. and UNILOC<br>SINGAPORE PRIVATE LIMITED |
| Paul J. Hayes, Esq.<br>Dean G. Bostock, Esq.<br>Mintz, Levin, Cohn, Ferris, Glovsky and<br>Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111 | Counsel for Plaintiffs<br>UNILOC USA, INC. and UNILOC<br>SINGAPORE PRIVATE LIMITED |

/s/ Joseph V. Cavanagh, Jr.