UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| UNILOC USA, INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br>　　　　Plaintiffs<br>　　v.<br><br>MICROSOFT CORPORATION,<br>　　　　Defendant | C.A. No. 03-440 S |

**ORDER ON MOTIONS IN LIMINE AND TRIAL MANAGEMENT ISSUES**

WILLIAM E. SMITH, United States District Judge.

Before the Court in this patent case are numerous motions in limine, including motions by both parties to exclude expert damages witnesses under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).  A jury trial is scheduled to begin on March 23, 2009. Uniloc USA, Inc. and Uniloc Singapore Private Limited ("Uniloc") claim Microsoft Corporation's ("Microsoft") Product Activation technology ("MPA") in software products such as Windows and Office infringes Claims 12 and 19 of Uniloc's U.S. Patent 5,490,216 ('216 patent).  Uniloc alleges the infringement was willful; Microsoft asserts an invalidity defense and maintains the '216 patent is unenforceable based on inequitable conduct.  The Court heard argument on the Daubert motions on February 27, 2009 and argument on the remaining motions in limine on March 3, 2009.  Rulings on all motions are set forth below, as well as a ruling on Microsoft's motion to bifurcate the trial into a liability phase and separate damages phase.  Because the Court writes principally for the

parties, the full background of each argument need not be discussed and the Court will strive to be mercifully brief.

A.   Daubert Motions

    1.   Microsoft's Motion to Preclude Testimony of Joseph Gemini (Docket #217)

This motion is DENIED.  Microsoft's challenge to Uniloc's damage expert Joseph Gemini is twofold.  First, it contends that his testimony is unreliable because his damage calculation is based on an unfounded and arbitrary valuation figure that assumes MPA's independent value is $10 per activation.  Second, Microsoft takes issue with Mr. Gemini's reliance on the so-called "25% rule of thumb" which it describes as a "junk science" method for calculating royalty rates.

The Court is well aware of its gatekeeper function under Fed. R. Evid. 702, Daubert, and its progeny that experts may only provide opinion testimony if it is based on sufficient facts or data, is the product of reliable principles and methods, and the witness applies those principles reliably to the facts.  Daubert, 509 U.S. at 592-93; see also Bowling v. Hasbro, Inc., C.A. No. 05-229S, 2008 WL 717741 *1-2 (D.R.I. Mar. 17, 2008).  This motion (and Uniloc's companion motion, discussed below) test the limits of tolerance of Rule 702 and Daubert.  This is so because the world of damage calculation in a patent case is constructed on a fictional foundation that resembles the make believe world of "Second Life."[1]

_____

    [1]   See Wikipedia, Second Life, http://en.wikipedia.org/wiki/Second_Life (describing virtual world

If a jury finds Microsoft has infringed Uniloc's patent, it will be called upon to determine what a reasonable royalty would be. It will be asked to do this by envisioning a fictional or "hypothetical" negotiation wherein these two parties -- or rather their perfectly reasonable avatars -- are transported back in time to negotiate a royalty. They do this with appropriate attention to the so-called Georgia-Pacific factors. Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970). Microsoft claims Mr. Gemini's methodology for concocting the reasonable royalty is just not "good science." But this is like saying Alice did not serve Earl Gray at her tea party. Maybe so, but in this fictional world it is close enough because the starting premise, as discussed below, is at least arguably grounded in the evidence and the rule of thumb calculation and the Georgia-Pacific factors are so widely accepted. If these premises are acceptable (which they seem to be) then the only issue is whether Mr. Gemini is qualified (which he is) and has he accurately performed his task (he has).

The $10 per-activation base is not wholly unfounded. This figure comes from an internal Microsoft document produced during discovery.[2] The Court has reviewed this document and finds Mr.

_____

accessible via the internet) (as of March 15, 2009).

[2] In pertinent part, the document reads:

Product Keys are valuable for two major reasons. First, since Product Keys can be used to install a product and create a valid Product ID, you can associate a monetary value to them. An appraisal process found that a Product Key is worth anywhere between $10 and $10,000 depending

Gemini's reading reasonably based in the record evidence. His derivation of the $10 figure is not the product of conjecture or rough approximation; rather, it is grounded in Microsoft's own admission. The Court finds telling that Microsoft has not argued Mr. Gemini ignored other relevant evidence that would suggest $10 per activation is inaccurate or too high a value. If, as Microsoft contends, Mr. Gemini has taken the $10-$10,000 range out of context (and it instead applies to the value of the entire software that Product Keys help protect), that point, as well as any other contextual or substantive criticisms of the calculation, can be addressed on cross-examination.

With respect to Mr. Gemini's use of the 25% rule of thumb, the call is closer but ultimately the opinion is not excludable on this basis. Although the concept of a "rule of thumb" is perplexing in an area of the law where reliability and precision are deemed paramount, the reliability inquiry is a "flexible one." Daubert, 509 U.S. at 594. "The '25% Rule' has been accepted as a proper baseline from which to start [a royalty] analysis." GSI Group, Inc. v. Sukup Mfg. Co., No. 05-3011, 2008 WL 4964801 *12 (C.D. Ill. Nov. 18, 2008) (citing Bose Corp v. JBL, Inc., 112 F. Supp. 2d 138, 165 (D. Mass. 2000)). There has been considerable criticism of the rule, see e.g. Richard S. Toikka, Patent Licensing under

---

on usage. Secondly, Product Keys contain short digital signature technology that Microsoft Research created. For these reasons, it is crucial that Product Keys are handled with maximum security.

<u>Competitive and Non-Competitive Conditions</u>, 82 J. Pat. & Trademark Off. Soc'y 279, 292-93 (2000), much of which is well reasoned. However, the rule's widespread and general acceptance in the field suggests that the reasonableness of Mr. Gemini's reliance on it in fashioning his opinion is a matter that more properly goes to weight as opposed to admissibility.

Taking a different approach, Microsoft argues that the 25% rule is only designed to serve as a starting point for a damage calculation and that because Mr. Gemini does not deviate from the rule this approach is result oriented and unreliable. While Mr. Gemini's apparent rote application of the 25% rule is enough to raise an eyebrow, his expert report reveals that he considered many factors in forming his opinion. Again, Microsoft may rely on cross examination and other tools of the adversary process to address the weaknesses in this testimony.

    2.   <u>Uniloc's Motion to Preclude Testimony of Defendant's Expert Witness, Brian W. Napper</u> (Docket #220)

This motion is DENIED. Mr. Napper concludes the appropriate damages award in this case would be a "paid up" lump-sum royalty of $3-7 million. In sum, Uniloc challenges the reliability and bias of Mr. Napper. It contends the opinion is flawed because Mr. Napper failed to account for Microsoft's use of the invention and the immense cost-savings and revenue generated from MPA, and because he essentially used a faulty application of the <u>Georgia-Pacific</u> factors to rationalize the $3-7 million royalty figure.

After careful review of Mr. Napper's report, it is clear his opinion falls within the bounds of Rule 702 and <u>Daubert</u>.   While Uniloc contends a lump-sum royalty is per se unreliable because it is fundamentally at odds with the compensatory nature of 35 U.S.C. § 284, there is no one correct formula for computing damages in a patent case.   A lump-sum or flat-fee royalty may be proper <u>if</u> there is evidence to support finding Microsoft would have entered into such an agreement at the time the hypothetical negotiation is said to have occurred, or at least that such royalties are (or were) commonly utilized in the industry.   See <u>e.g.</u> <u>Embrex, Inc. v. Service Eng'g Corp.</u>, 216 F.3d 1343, 1350 (Fed. Cir. 2000); <u>Snellman v. Ricoh Co.</u>, 862 F.2d 283, 289 (Fed. Cir. 1988); <u>Stickle v. Heublein, Inc.</u>, 716 F.2d 1550, 1561-63 (Fed. Cir. 1983).   It is true, as Uniloc points out, that many cases discussing lump-sum royalties include some aspect of a combined continuing running royalty.   The lack of any "running" aspect to Mr. Napper's figure is important -- but it goes to the weight of his testimony and may be grist for the cross examination mill.   It does not make it unreliable.

What Uniloc's challenge comes down to is disagreement with Mr. Napper's approach.   It is free to cross-examine him about his use of the <u>Georgia-Pacific</u> factors, his testimony in other patent cases, his prior testimony for Microsoft, and his prior opinions (as Microsoft's so-called "hired gun") that a $3-7 million lump-sum royalty is appropriate.   If liability is found, the jury will

decide whether the evidence supports a lump-sum or running royalty or some combination thereof based on the opinions of both expert witnesses.

B.   <u>Bifurcation of Liability and Damages</u>

At the <u>Daubert</u> hearing, the Court <u>sua</u> <u>sponte</u> raised the issue of bifurcation of the trial into liability and damages phases. Neither party had moved to bifurcate any issue at trial (or for that matter mentioned it). Uniloc objected to a separate damages phase; counsel for Microsoft said his client "assumed" damages would be bifurcated. The Court issued no ruling. The next week following jury empanelment, Microsoft filed a Motion to Bifurcate Presentation of Liability Issues From That of Damages and Willfulness Issues (Docket #298), to which Uniloc objected.[3]

Fed. R. Civ. P. 42(b) gives the Court discretion to separate issues or claims at trial "for convenience, to avoid prejudice or to expedite and economize." Additional considerations include whether the issue sought to be tried separately (and the related evidence) differs in any significant respect from the primary trial issues, and whether a single trial would create the potential for

---

[3] Though it mentions willfulness, Microsoft offers no argument as to why this issue should be considered separate from infringement. Willfulness is a question of fact for the jury based on whether Uniloc offers clear and convincing evidence that Microsoft acted despite an objectively high likelihood that its actions constituted infringement. <u>In re Seagate Tech., LLC</u>, 497 F.3d 1360, 1368 (Fed. Cir. 2007). If the jury so finds, the Court will exercise its discretion post-trial to determine if damages should be enhanced. <u>See</u> 35 U.S.C. § 284; <u>Jurgens v. CBK, Ltd.</u>, 80 F.3d 1566, 1569-71 (Fed. Cir. 1996).

jury bias.  Uniloc argues that Microsoft is a day late and a dollar short because it never requested bifurcation until now.  And, says Uniloc, although the technology is complex, the case has been pared back and there is no compelling reason to believe jurors will be confused by additional damages testimony.  Microsoft contends a separate damages phase would "enhance juror comprehension" and save time.

In this case, bifurcation is not warranted.  The fact that Microsoft moved for such relief only after the Court's comments suggests the risk of confusion and prejudice is not nearly as troublesome as it now suggests.  In any event, bifurcation would in all likelihood not save much trial time -- the parties agreed examination of damages experts would take one or possibly one and a half days; and other damage evidence is entwined with testimony of fact witnesses.  There is no question the technology presents complex liability questions.  But complexity in any case does not mandate bifurcation.  Weighing all considerations, the risk of distraction or prejudice to Microsoft from presentation of profit and other financial evidence can be minimized by instructions to the jury that damages must be considered apart from liability, and only if it finds MPA infringes either asserted claim (and that the claims are not invalid).  The Court will, as always, emphasize that the presentation of damages evidence in no way suggests or implies Microsoft is liable for the damages Uniloc claims.  Microsoft's Motion to Bifurcate is DENIED.

C.    <u>Motions in Limine</u>

<u>Plaintiff Uniloc's Motions</u>

    1.    <u>Motion to Preclude Non-Infringement Arguments</u> (Docket #237)

This motion is DENIED.    The Court does not agree with Uniloc that Microsoft's non-infringement argument that MPA does not have a licensee unique ID generating means is barred by the Federal Circuit's decision after Microsoft argued on appeal alternative grounds for affirming this Court's summary judgment.    <u>See</u> <u>Uniloc USA, Inc. v. Microsoft Corp.</u>, 290 Fed. Appx. 337, 2008 WL 3539749 (Fed. Cir. Aug. 7, 2008).    The fact that the Federal Circuit rejected as "without merit" Microsoft's argument that <u>as a matter of law</u> its MPA hashing algorithm was not a licensee unique ID generating means does not mean it decided <u>as a matter of law</u> that MPA did, in fact, infringe this element.    The more appropriate interpretation of the Federal Circuit's decision is that evidence exists to support a jury finding that MPA <u>does</u> have a licensee unique ID generating means -- such that summary judgment for Microsoft would be unwarranted.    While the "law of the case" doctrine Uniloc urges is applicable in many situations, this is not one of them.    The law of the case here is simply that whether MPA has a licensee unique ID generating means is a factual question for the jury.    As to Uniloc's remaining contentions, for the reasons discussed during argument Microsoft is not precluded from arguing non-infringement with respect to "use mode," "mode switching

means," or "unique identifier associated with a licensee," provided, however, that it does not reargue this Court's construction of those terms as affirmed by the Federal Circuit.

2. <u>Motion Regarding Non-U.S. Activations</u> (Docket #238)

For the reasons (and to the extent) discussed below with respect to Microsoft's Motion to Preclude Uniloc from Seeking Damages for or Referring to Microsoft's Foreign Sales, and From Seeking Damages For Multiple Activations on a Single Computer (Docket #234), Uniloc's Motion Regarding Non-U.S. Activations is GRANTED.

3. <u>Motion Regarding Profit Margins of Accused Products</u> (Docket #239)

This motion is DENIED.  For the reasons outlined at oral argument, the Court will not order Microsoft to produce certain product-specific profit numbers that have not already been disclosed or calculated during the years of discovery in this case. Assigning a (somewhat arbitrary) minimum profit margin to the accused products as Uniloc suggests would amount to a sanction against Microsoft not supported by the current record.  As evident during argument, though it may lack a precise number, Uniloc has plenty of evidence and prior testimony about profits and can deal with this issue through examination of Microsoft's witnesses.

4. <u>Motion to Limit Defendant's Invalidity Argument to the Grundy and Hellman Patents</u> (Docket #241)

This motion is DENIED.  Microsoft has represented that the Grundy and Hellman patents will be the "primary references" in its

obviousness defense.   In response to Uniloc's recent written disclosure of infringement theories, Microsoft submitted a supplemental pretrial memorandum setting forth in detail the combinations of prior art on which it intends to rely at trial.

5.   <u>Motion Regarding the "VISTA" Version of Windows</u> (Docket #242)

This motion is DENIED as moot.   Both parties agree not to refer to Microsoft's VISTA product during trial.

6.   <u>Motion to Preclude Microsoft from Referring at Trial to Alternative Theories of Infringement</u> (Docket #243)

This motion is DENIED.   Uniloc has stated unequivocally that its alternative theories of infringement on which it lost at summary judgment and/or "dropped" on appeal to the Federal Circuit have no relevance at trial.   <u>See</u> Motion in Limine Transcript, 70-71, Mar. 3, 2009.   However, evidence of alternative theories may be relevant to Microsoft's cross-examination of Uniloc's damages expert Joseph Gemini, Microsoft's defense of Uniloc's willfulness claim and invalidity issues regarding commercial success of accused products.   Having said that, as discussed during oral argument, Microsoft is directed not to elicit detailed or lengthy testimony about the prior summary judgment proceedings and/or the Federal Circuit decision or dissent by Chief Judge Michel.   Uniloc may renew its objection to this evidence should it believe Microsoft is impermissibly dwelling on this information and/or using the evidence in an inappropriate manner.

7. <u>Motion Regarding Cross-Examination of Mr. David Klausner</u> (Docket #244)

This motion is DENIED as moot.  Both parties agree not to refer to Mr. Klausner's work with children or call him an actor.

8. <u>Motion Regarding the Prosecution History of the Patent-In-Suit</u> (Docket #245)

This motion is DENIED.  Uniloc argues prosecution history is only relevant to claim construction, which is over and done with.  But evidence of the prosecution history of the '216 patent is relevant to Microsoft's invalidity defense.  Prosecution history can refer to a wide range of potential evidence, and there is obviously a possibility of overlap between evidence of prior art which may or may not have been before the patent examiner (and which would support Microsoft's invalidity defense), and evidence that more directly relates to inequitable conduct.  Microsoft concedes the claim of inequitable conduct is for the Court, not the jury, to decide.  The Court will therefore handle this evidence on a case-by-case basis at trial.  By way of providing some guidance, Microsoft may introduce evidence of prior art and invalidity of the patent by anticipation and obviousness.  It may not, however, refer to evidence or imply through its questioning of witnesses that there was a deliberate attempt by Uniloc to deceive or mislead the patent office in any respect, including with regards to portions of prior art (i.e., the Grundy patent) that may or may not have been misrepresented to the examiner.  The Court will hear all evidence of inequitable conduct outside the presence of the jury.

12

9.    <u>Motion  to  Preclude  the  Testimony  of  Martin  Hellman</u>
(Docket #246)

This motion is DENIED.  Dr. Hellman may testify as a fact
witness for Microsoft about his patented invention, U.S. Patent
4,658,093, and the state of the prior art.  Microsoft as part of
its invalidity defense claims Dr. Hellman's patent anticipates and
makes obvious the '216 patent.  Dr. Hellman has not been designated
as an expert and may not opine as to matters that are before the
jury to decide as outlined at the March 3, 2009 hearing (including
whether Uniloc's patent is or is not invalid).  The Court is
mindful of the fine line that exists with a witness like Dr.
Hellman who has highly technical -- albeit factual -- knowledge as
a non-expert witness.  As a general rule, the Court will not permit
him to offer <u>any</u> opinion testimony unless specifically approved in
advance by the Court.   Furthermore, given what appears to be
equivocal testimony on several key points at his first deposition
years ago, the Court will permit Uniloc to conduct another
deposition of Dr. Hellman before trial on the issues about which he
will testify.

10.   <u>Motion in Limine Regarding Inequitable Conduct</u> (Docket
#247)

This motion is GRANTED IN PART for the reasons stated above
with respect to Uniloc's Motion No. 8 (Docket #245).  Evidence
designed to suggest Uniloc failed to disclose material information
or mislead the PTO examiner will be excluded from the jury because
such evidence is relevant only to inequitable conduct.

<u>Defendant Microsoft's Motions</u>

    1.    <u>Motion to Preclude Uniloc from Seeking Damages for or Referring to Microsoft's Foreign Sales, and From Seeking Damages For Multiple Activations on a Single Computer</u> (Docket #234)

This motion is GRANTED IN PART. The Court first addresses foreign sales of accused products or, more accurately, foreign licenses. There is no dispute that Microsoft does not actually sell software such as Microsoft Office to individual foreign users (or any other users). Rather, it permits customers to use the software through a licence via an "End User License Agreement." As discussed <u>supra</u>, Uniloc's damages expert assigns a MPA value ($10) to these licensed products. As part of the overall damage calculation, Uniloc's expert multiples 25% of that per-product value (or $2.50) by a total activations number that includes the activation of both foreign and domestic licences. Microsoft claims this calculation runs afoul of <u>Microsoft v. AT&T Corp.</u>, 550 U.S. 437 (2007) and that Uniloc is only entitled to damages based on licenses issued within the United States. While the parties tee this up as a damages question, the issue is much more fundamental: whether Microsoft can be found to infringe Uniloc's '216 patent when part of the MPA system involves an extraterritorial component. Put another way, does Microsoft "use" the claimed system "within the United States" as required by 35 U.S.C. § 271(a) even when Product Activation is used during activation of software on a foreign computer?

Infringement occurs if the infringer "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. § 271(a). It is settled law that § 271(a) has a limited territorial reach and that to be actionable the infringing act must occur within the United States. NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1313 (Fed. Cir. 2005). In certain cases, the test for determining whether infringement occurs within the United States first depends on whether the patented invention is a "system" or a "method." Id. Because both parties agree that the claims at issue in this case are system claims, the Court need not dwell on the distinction.[4] In sum, use of a system claim may give rise to infringement (and thus be included in damages) if the United States is "the place at which the system as a whole is put into service;" i.e., "the place where control of the system is exercised and beneficial use of the system is obtained." Id. at 1317-18. Use of a method claim, in contrast, will not give rise to infringement unless each individual step or stage of the claimed method is performed wholly within the United States. Id. at 1318. Focusing then on system claims, a claim of infringement is only actionable (and inclusion of foreign licenses in the damages calculation proper) if the United States is "the

_____

[4] During oral argument counsel for Microsoft agreed this case only concerns system claims. See Motion in Limine Transcript, 41:10-13, Mar. 3, 2009 ("the NTP case also considered the issue of method claims, which aren't at issue in this case anymore"); see also '216 patent columns 14-16 ("a registration system").

place at which the system as a whole is put into service;" i.e., "the place where control of the system is exercised and beneficial use of the system is obtained." NTP, 418 F.3d at 1317-18.

Microsoft argues that the system test for where use occurs in NTP is beside the point and urges a strict application of the Supreme Court's decision in AT&T. 550 U.S. 437. However, the holding of AT&T is inapposite to this case because the Court's central holding was limited to export from the United States of "components" under § 271(f), which has never been a theory advanced in this case. Although much has been made by Microsoft and others about the AT&T decision and the Supreme Court's comments about the presumption against extra-territorial reach of United States patent law,[5] the AT&T analysis simply does not apply to the technology in this case.

The Federal Circuit's NTP "system as a whole" framework for system claims with a foreign element, while not on all fours, is more appropriate. When foreign individuals obtain licenses and activate their Microsoft software via the Microsoft Clearinghouse in the United States, the MPA system truly is (as both parties acknowledge) "partly within and partly outside" the United States for purposes of infringement under Uniloc's § 271(a) theory, a system not unlike NTP.

---

[5] See, e.g., Timothy R. Holbrook, Extraterritoriality in U.S. Patent Law, 49 Wm. & Mary L. Rev. 2119, 2131-36 (2008); Eric W. Guttag, When Offshore Activities Become Infringing: Applying § 271 to Technologies that "Straddle" Territorial Borders, 14 Rich. J.L. & Tech. 1, 31-38 (2007).

Microsoft attempts to distinguish <u>NTP</u> by arguing that Uniloc's theory regarding foreign license activations has always required both a local (foreign individual) and remote (U.S. Clearinghouse) component to MPA, and that it cannot focus solely on the Clearinghouse as the situs of use at the eleventh hour in an effort to sweep foreign licenses into the damages calculation. Microsoft is, in essence, making the argument <u>NTP</u> rejected: that <u>all</u> parts of a collective system must be within the United States to infringe, and that because MPA is at best a 50/50 tie Uniloc's theory fails. A careful reading of <u>NTP</u> belies Microsoft's conclusion.

Therefore, the questions that must be answered before Microsoft's foreign licenses can be includable in any damage calculation are: 1) where the system as a whole is put into service; 2) where control of the system is exercised; and 3) where beneficial use of the system is obtained. Because the answers to these questions are fact intensive and will depend substantially on the evidence at trial, they are properly left for the jury. Therefore, the Court will allow evidence of foreign licenses to be presented at trial; however, the Court will instruct the jury that it may only include these licences in the damage calculation if the answer to each of the above questions is the United States. The Court will require the jury to answer special interrogatories to address the above questions and further to indicate how it arrived at any damage award, by specifying the number of domestic and foreign licenses they found to be infringed.

Turning to multiple activations, the issue is whether Uniloc may include <u>all</u> software activations using MPA in a damages award or, as Microsoft argues, only "first time" activations (otherwise known as New Licenses). Uniloc claims each re-activation following a New License (such as when a person activates a second or third time after a hard drive crash) is a separate act of infringement for which it deserves compensation. Microsoft retorts that Uniloc bases its damages calculation on the purported value of MPA ($10) per individual <u>sale</u> of an accused product, and would be double dipping (or more) if allowed to include re-activations.

The Court agrees that the value of MPA is basically complete upon initial activation and creation of a New License. A sale is a sale under Uniloc's $2.50 per product theory -- the fact that an accused product may be activated a second or third time does not mean there is value inherent in such activation, or at least not as much as Uniloc assigns. Moreover, even if re-activations could be said to bring some additional value to Microsoft by ensuring a user reactivates in compliance with his or her prior license, Uniloc has made no attempt to connect these anticipated re-activations to what Uniloc and Microsoft would have agreed to in 2001. The notion that Microsoft would have agreed to pay a $2.50 royalty per product sold <u>and</u> per re-activation by a user (indefinitely, regardless of how many times a person's hard drive crashed, for example) strikes the Court as far-fetched.

2.   <u>Motion to Preclude Plaintiffs from Relying on Microsoft
     Documents that Use the Word "Registration" to Meet Their
     Burden of Showing that Product Activation is a
     "Registration System"</u> (Docket #235)

This motion is DENIED.  Microsoft maintains that Uniloc will

try to use old and/or unrelated documents with the magic words

"Registration" or "Registration System" as a way to meet its burden

to prove MPA meets this Court's claim construction of the term

"Registration System."  What Uniloc should do, Microsoft argues, is

have its expert explain to the jury how and why MPA is, in fact, a

"Registration System."  Microsoft's concern is that the jury will

see this term in a Microsoft document and simply assume it refers

to what is contained in the '216 patent.  Uniloc says that beyond

its expert's testimony, it is entitled to introduce documents that

are (it claims) directly related to MPA technology and show that

MPA does in fact have a "Registration System" under the Court's

claim construction.  While Microsoft's concern is legitimate, a

wholesale exclusion of these documents would be premature and

inappropriate.  The Court will make individual determinations at

trial based on the relevance and foundation Uniloc may be able to

establish connecting the documents to the actual architecture of

MPA technology.  Documents will not be admitted simply because they

contain the term "registration" in them, absent some showing of

relevance to the claims at issue.  Should some or all of the

documents be admitted, the Court will give appropriate instructions

to the jury about the meaning of "Registration System" and how

documents using these terms may be permissibly considered in determining whether MPA infringes.

   3.   <u>Motion to Preclude Uniloc from Offering Evidence or Testimony of Alleged Secondary Considerations of Non-Obviousness and to Preclude Untimely Expert Opinions</u> (Docket #236)

This motion is DENIED.  At the heart of this dispute are two categories of potential evidence.  The first is evidence of the commercial success of Product Activation in what Uniloc refers to as Microsoft's "crown jewel" products, Office and Windows (in other words, the effectiveness of MPA in these products in stopping casual copying and the resulting cost savings and revenue for Microsoft).  The second category is evidence suggesting Microsoft copied Uniloc's software in or around 1993 after it received a sample and, according to Uniloc, reverse-engineered and/or disassembled the code.  Shortly thereafter, the theory goes, Microsoft began work on developing MPA.

Secondary considerations are relevant to rebut a claim of obviousness.  <u>Graham v. John Deere & Co.</u>, 383 U.S. 1, 17-18 (1996); <u>Simmons Fastener Corp. v. Ill. Tool Works, Inc.</u>, 739 F.2d 1573, 1575 (Fed. Cir. 1984).  Microsoft balks at Uniloc's purported objective indicia of non-obviousness based on lack of relevance, unless and until Uniloc establishes a nexus between this evidence and the '216 patent.  Otherwise, says Microsoft, Uniloc will be taking credit for features it did not invent.  <u>See Ormco Corp. v. Align Tech., Inc.</u>, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006).

It may well be true that Uniloc's evidence of secondary considerations will be inadequate to overcome a final conclusion that the claims at issue are obvious as a matter of law based on the prior art (depending, of course, on Microsoft's affirmative evidence in support of invalidity). But after careful review, the Court determines that wholesale exclusion of all secondary consideration evidence at this stage would be premature. Microsoft presents a persuasive argument about the tenuous nexus between the claimed non-obvious feature(s) of the '216 patent and commercial success of MPA, as well as the so-called generalized copying allegations.  It can make these potentially powerful points at trial and the jury and this Court will give Uniloc's secondary considerations whatever weight -- if any -- may be warranted in the face of Microsoft's obviousness evidence. See Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1327-28 (Fed. Cir. 2008) (nexus between merits of invention and secondary consideration evidence is required for evidence to be given substantial weight); Frisket, Inc. v. Real Networks, Inc., No. 2007-1583, 2009 WL 59182 *6 (Fed. Cir. Jan. 12, 2009) (unpublished opinion) (copying evidence properly given little weight absent sufficient evidence to show allegedly copied technology fell within scope of asserted claims).

As to untimely expert opinions or late disclosure of secondary consideration evidence, the Court cannot fully evaluate Microsoft's objection in the context of a motion in limine, especially given the evolving nature of both side's theories over the past five

years and ongoing supplementation of expert reports.   Objections will be individually addressed at trial.

   4.   <u>Motion to Preclude Uniloc from Offering Evidence of Willful Infringement</u> (Docket #240)

This motion is DENIED.   In its motion, Microsoft in essence asks for summary judgment on Uniloc's willful infringement claim. The evidence of objective baselessness under <u>In re Seagate Tech.</u>, it contends, is insufficient to warrant sending the question to a jury.   497 F.3d 1360 (Fed. Cir. 2007).   This may well be true, but it is too early to decide.   Uniloc may present evidence of willful infringement and, if appropriate, Microsoft may renew its argument in the form of a Rule 50 motion.

   5.   <u>Motion to Preclude Uniloc from Using for Any Purpose Evidence of Other Disputes or Proceedings Involving Microsoft</u> (Docket #249)

This Motion is GRANTED IN PART.   Microsoft takes aim at three categories of evidence: (1) licenses entered into as part of litigation settlements in other cases; (2) references to the <u>Burst.com</u> litigation or allegations of Microsoft spoliation; and (3) prior testimony on Microsoft's behalf by expert Brian Napper. As to (1), Uniloc hopes to have its damages expert reference license fees as part of settlements in other Microsoft patent litigation in an effort to cast doubt upon the appropriateness of Microsoft's $3-7 million damages theory -- for example, the fact that Microsoft paid $440 million to settle patent litigation several years ago.   This evidence will be excluded for two reasons.

First, settlements offered, negotiated or made under threat of litigation are generally not considered probative of a reasonable royalty because in the usual course they do not provide an accurate reflection of what a willing licensor would do in an arm's length transaction.  See Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078-79 (Fed. Cir. 1983); 3Com Corp. v. Realtek Semiconductor Corp., No. C 03-2177 VRW, 2008 WL 783383, *4-5 (N.D. Cal. Mar. 24, 2008); Spreadsheet Automation Corp. v. Microsoft Corp., 587 F. Supp. 2d 794, 800-01 (E.D. Tex. 2007); Donnelly Corp. v. Gentex Corp., 918 F. Supp. 1126, 1133-34 (W.D. Mich. 1996).  Second, whatever relevance the evidence could have as to reasonable royalty is substantially outweighed by the unfair prejudice to Microsoft and juror confusion that would likely result from these collateral issues.  See Fed. R. Evid. 403, 408.

As to (2), Uniloc has agreed not to reference the Burst.com litigation or allegations of spoliation so the issue is moot.  As to (3), the Court rejects the argument that Uniloc should be barred from impeaching Mr. Napper on the basis of his prior damages testimony.  This is fair game for cross-examination to show bias and so long as the testimony is limited in scope so as to avoid unfair prejudice and confusion, it is permissible.

IT IS SO ORDERED.

William E. Smith
United States District Judge
Date: 3/16/09