# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

_____
                                  )
UNILOC USA, INC. and          )
UNILOC SINGAPORE PRIVATE LIMITED    )
                                   )
               Plaintiffs,    )
vs.                             )     Civ. A. No. 03-CV-440 (WES)
                                   )
                                   )
MICROSOFT CORPORATION,       )
                                   )
               Defendant.    )
_____)

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## MOTIONS FOR JUDGMENT AS A MATTER OF LAW,
## <u>NEW TRIAL, OR REMITTITUR</u>

Sheri L. Pizzi (R.I. Bar No. 5720)
**TAYLOR DUANE BARTON**
**& GILMAN, LLP**
10 Dorrance Street, Suite 700
Providence, Rhode Island 02903
(401) 273-7171 (Telephone)
(401) 273-2904 (Facsimile)

Paul J. Hayes, Esq.
Dean G. Bostock, Esq.
**MINTZ, LEVIN, COHN, FERRIS,**
  **GLOVSKY AND POPEO, P.C.**
One Financial Center
Boston, MA 02111
(617) 542-6000 (Telephone)
(617) 542-2241 (Facsimile)

**Attorneys for Plaintiffs, Uniloc USA, Inc.**
  **and Uniloc Singapore Private Ltd.**

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     LEGAL STANDARDS FOR POST-TRIAL MOTIONS ....................................3

III.    ARGUMENT .........................................................................................................4

        A.      Credibility ..................................................................................................5

        B.      Willful Infringement ..................................................................................7

        C.      Infringement.............................................................................................14

                1.      Uniloc Presented Sufficient Evidence That The
                        Licensee Unique ID Is Associated With A Licensee...............14

                2.      Uniloc Presented Sufficient Evidence That The
                        MD5/SHA-1 Is A Summation Algorithm Or
                        Equivalent. .................................................................................20

                3.      Uniloc Established That The Accused Technology
                        Is A Registration System That Uses A Mode
                        Switching Means.........................................................................23

                4.      Uniloc Established Direct Infringement .....................................29

                5.      Microsoft Is Not Entitled To JMOL Or To A New
                        Trial............................................................................................31

        D.      Validity ....................................................................................................32

                1.      The Record Evidence Supports The Jury's Finding That
                        Claim 19 Is Not Anticipated .....................................................33

                2.      Obviousness ...............................................................................38

                3.      Claim 19 Is Not Indefinite, An Argument Microsoft
                        Waived ........................................................................................43

        E.      The Damages Awarded Are Supported By The Evidence....................44

                1.      The Law On Damages In Patent Cases......................................45

                2.      Mr. Gemini's Royalty Was Not Based Upon, And Did Not
                        Violate, The Entire Market Value Rule ....................................45

3.      Mr. Gemini's Analysis Is Supported By The Evidence
        And The Law ............................................................................47

        (a)     $10 Per Activation Is Supported...................................47

        (b)     25% Rule of Thumb.....................................................49

4.      The Damages Award Is Supported By The Evidence And
        Is Not Grossly Excessive ........................................................51

5.      Damages On Activations Initiated Outside The U.S. Were
        Properly Included.....................................................................52

IV.   CONCLUSION............................................................................56

# TABLE OF AUTHORITIES

## CASES

*ATD Corp. v. Lydall, Inc.*,
159 F.3d 534 (Fed. Cir. 1998)................................................................38

*Amsted Indus., Inc. v. Buckeye Steel Castings Co.*,
24 F.3d 178 (Fed. Cir. 1994)..............................................................5, 6

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
119 F.3d 953 (Fed. Cir. 1997).............................................................41

*Bard  Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
586 F. Supp.2d 1083 (D. Az. 2008)................................................12, 13

*Beatrice Foods Co. v. New England Printing and Lith. Co.*,
899 F.2d 1171 (Fed. Cir. 1990)...........................................................48

*Biotec Biologische Naturverpackungen GmbH & Co. v.  Biocorp, Inc.*,
249 F.3d 1341 (Fed. Cir. 2001)...........................................................31

*Bose Corp v. JBL, Inc.*,
112 F. Supp.2d 138 (D. Mass. 2000) ...................................................49

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
977 F.2d 1555 (Fed. Cir. 1993)...........................................................44

*Continental Can Co. USA, Inc. v. Monsanto Co.*,
948 F.2d 1264 (Fed. Cir. 1991)...........................................................42

*Cross Med. Prods. , Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005).....................................................30, 31

*DMI, Inc. v. Deere & Co.*,
802 F.2d 421 (Fed.Cir.1986)..............................................................51

*Decca Ltd. v. United States*,
544 F.2d 1070 (Ct. Cl. 1976) .............................................................55

*Deepsouth Packing Co., Inv. v. Laitram Corp.*,
406 U.S. 518 (1972)......................................................................30, 54

*Figueroa-Torres v. Toledo-Davila*,
232 F.3d at 270 (1st Cir, 2000) .................................13, 15, 16, 18, 31

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
394 F.3d 1368 (Fed. Cir. 2005)...................................................................4, 7, 52

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
110 F.3d 1573 (Fed. Cir. 1997)............................................................................42

*GSI Group, Inc. v. Sukup Mfg. Co.*,
No. 05-3011, 2008 WL 4964801 (C.D. Ill. Nov. 18, 2008) ..................................50

*Hewlett Packard Co. v. Mustek Systems, Inc.*,
2001 WL 36166855 (S.D. Cal. June 11, 2001)......................................................21

*Intel Corp. v. Intern. Trade Com'n*,
946 F.2d 821 (Fed. Cir. 1991)..............................................................................30

*Invitrogen Corp. v. Biocrest Mfg. L.P.*,
424 F.3d 1374 (Fed. Cir. 2005).............................................................................44

*Keisling v. Ser-Jobs for Progress, Inc.*,
19 F.3d 755 (1st Cir. 1994)....................................................................................3

*Marrero v. Goya, of Puerto Rico, Inc.*
304 F.3d at 7 (1st Cir. 2002)....................................................................4, 7, 32, 38

*McGinley v. Franklin Sports*,
262 F.3d 1339 (Fed. Cir. 2001).......................................................................38, 39

*Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*,
554 F.3d 164 (1st Cir. 2009).........................................................................3, 4, 30, 51

*NTP, Inc. v. Research in Motion Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005)......................................................................39, 55, 56

*Schumer v. Lab. Computer Systems, Inc.*,
308 F.3d 1304 (Fed. Cir. 2002)........................................................................33, 34

*In re Seagate*,
497 F.3d 1360 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 1445 (2008) ..........7, 9, 12

*Shane v. Shane*,
891 F.2d 976 (1st Cir. 1989)..............................................................................4, 51

*State Farm Mutual Auto Ins. Co. v. New Horizont, Inc.*,
250 F.R.D. 203 (E.D. Pa. 2008).............................................................................21

*United States v. Lipscomb,*
    539 F.3d 32 (1st Cir. 2008), *cert. denied*, 129 S. Ct. 963 (2009) ............................................5

*United States v. Riccio,*
    529 F.3d 40 (1st Cir. 2008)...................................................................................................47

*United States v. Taylor,*
    166 F.R.D. 356 (M.D.N.C. 1996) ........................................................................................21

*Voda v. Cordis Corp.,*
    536 F.3d 1311 (Fed. Cir. 2008)..........................................................................19, 20, 21, 23

*Weinar v. Rollform, Inc.,*
    744 F.2d 797 (Fed. Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985) .......................................44

*Young v. Lumenis, Inc.,*
    492 F.3d 1336 (Fed. Cir. 2007)..........................................................................................43

## STATUTES AND RULES

35 U.S.C. § 112, ¶ 2 ..............................................................................................................43

35 U.S.C. § 282 ......................................................................................................................38

35 U.S.C. § 284 ......................................................................................................................45

Fed. R. Civ. P. 30(b)(6)..........................................................................................................21

Fed. R. Civ. P. 50 .....................................................................................................................3

Plaintiffs, Uniloc USA, Inc. and Uniloc Singapore Private Limited (together "Uniloc"), respectfully submit this brief in opposition to the motions of defendant, Microsoft Corporation ("Microsoft"), for judgment as a matter of law, new trial, or remittitur.  For the reasons set forth herein, Microsoft's motions should be denied.

## I.    <u>INTRODUCTION</u>

Microsoft's motions should be denied because they consist entirely of re-hashing issues that were previously rejected by the Court, attempting to raise issues that it has waived, and ignoring the substantial evidence presented to the jury that supports the verdict.  In effect, Microsoft wants to retry the entire case - this time to the Court instead of the jury.  Microsoft blames the adverse jury verdict on everyone but itself.  For example, it blames the purported "animus against big companies generally" (Microsoft br. p. 1), notwithstanding the Court's accurate statement that certain members of the jury appeared from their questionnaire to be generally favorable to Microsoft.

Microsoft inappropriately accuses Uniloc's counsel of "inflammatory, unsupported, and internally inconsistent 'black hat' rhetoric and innuendo" (Microsoft br. p. 1), yet points to no objection to any statement made by Uniloc's counsel.  Throughout its brief, Microsoft characterizes the jury as unreasonable despite the fact that it accepted the jury as impaneled. *See id.* at 5 ("No Reasonable Jury" could have found copying or willfulness), 15 ("No Reasonable Jury" could have found infringement), 47 ("No Reasonable Jury" could have found claim 19 not invalid), 61 ("No Reasonable Jury" could have awarded $388 million in damages), 76 ("wholly improper" for "jury to ignore the location of the customer").  Continuing with its criticism of the jury, Microsoft erroneously complains that the verdict was rendered "after brief deliberations," despite the fact that the jury was out for over eight hours.

The truth, however, is that Microsoft presented a weak case to the jury.  For instance, Microsoft promised the jury in its opening that it would prove that the '216 patent was invalid in view of the Grundy patent. *See* Ex. A, p. 75.  Microsoft never introduced the Grundy patent and never mentioned it again.  Microsoft also promised the jury that the evidence would demonstrate that the accused Product Activation technology was independently developed by Messrs. Hughes and Pearce. *See* Ex. A, pp. 53, 54, 58.  The testimony of Messrs. Hughes and Pearce, however, was not credible.  Mr. Hughes was impeached on more than one occasion. *See* Ex. D, pp. 130-132, 200-204.  Mr. Pearce admitted that his resume, touting himself as the sole inventor of the '468 patent, was false. *See* Ex. E, p. 225.  Moreover**,** the only purported evidence of independent development was a hen-scratch in one of Mr. Pearce's notebooks, dated after Uniloc had provided its technology to Microsoft and after Uniloc's patent had been published.

On damages, Microsoft made the disingenuous argument that damages for 266 million instances of infringement could not exceed $7 million.  As Microsoft should have learned from its prior cases, no jury has ever accepted Microsoft's low-ball, lump-sum damages theory.  Nonetheless, Microsoft presented the same unrealistic theory in this case, and the jury rightly rejected it again.  Microsoft also complains about the size of the $388 million verdict.  In doing so, Microsoft ignores the extent of infringement, the value of Product Activation, and the billions of dollars of additional revenue derived from its use. *See* Ex. E, pp. 76-77.  Further, Microsoft was well aware that Uniloc's damages claim was in excess of $560 million.  Nonetheless, Microsoft elected to go to trial and risk suffering such a loss**.**[1]  Accordingly, Microsoft is unworthy of post-trial sympathy.

---

[1]   One week before trial, Uniloc again asked to mediate this case.  In response, Microsoft rejected Uniloc's mediation offer and indicated that "we're lighting the fuse on this thing."

## II.   <u>LEGAL STANDARDS FOR POST-TRIAL MOTIONS</u>

In deciding a Rule 50 motion, the Court must examine the evidence in the light most favorable to Uniloc. *Keisling v. Ser-Jobs for Progress, Inc.*, 19 F.3d 755, 760 (1st Cir. 1994).  In addition, Uniloc is entitled to "the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Id.* (quoting *Cochrane v. Quattrocci*, 949 F.2d 11, 12 n. 1 (1st Cir. 1991)).

"A court is without authority to set aside a jury verdict and direct the entry of a contrary verdict unless the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party. *Keisling*, 19 F.3d at 759-60.  Thus, a jury verdict may not be set aside except upon a "determination that the evidence could lead a reasonable person to only one conclusion." *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 66 (1st Cir. 1993).  "[I]t is for jurors, not judges, to weigh the evidence and determine the credibility of witnesses." *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 22 (1st Cir. 2002).  Thus, in deciding a motion for JMOL, "the court may not take into account the credibility of witnesses, resolve evidentiary conflicts, nor ponder the weight of the evidence introduced at trial . . ." *Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 273 (1st Cir. 2000) (citation omitted).

A motion for JMOL "preserves for review only those grounds specified at the time, and no others." *Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 554 F.3d 164, 171 (1st Cir. 2009) (citations omitted).  "[A] renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is bounded by the movant's earlier Rule 50(a) motion." *Id.* (citation omitted).  Thus, "[t]he movant cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." *Id.* (citation omitted).  Microsoft's motion ignores these fundamental precepts of Rule 50 practice and, instead, impermissibly attempts to retry the case to the Court without a jury.

In the First Circuit, the standard for JMOL "is especially exacting where, as here [on the issue of invalidity], the moving party bears the burden of proof on the issue in question." *Marrero v. Goya*, 304 F.3d at 22 (citation omitted). "[T]he party with the burden of proof is entitled to judgment as a matter of law only if its has established its case by 'testimony that the jury is not at liberty to disbelieve.'" *Id.* (citation omitted). "In that situation, relief under Rule 50 is warranted only if the moving party's evidence is 'uncontradicted and unimpeached.'" *Id.* (citation omitted).

A motion for a new trial will only be granted where "the verdict was 'so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice.'" *See Shane v. Shane*, 891 F.2d 976, 981 (1st Cir. 1989) (citations omitted). Although not the case herein, even if "the evidence would support the opposite verdict or [] the court may have reached a contrary result," Microsoft would not be entitled to a new trial. *Id.* (citations omitted).

"'[A] party seeking a remittitur bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'" *Monteagudo v. AEELA*, 554 F.3d at 174. Juries are "free to select the highest figures for which there is adequate evidentiary support." *See Shane v. Shane*, 891 F.2d at 983. In a patent case such as this, "a jury's [royalty] choice simply must be within the range encompassed by the record as a whole." *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (citation omitted).

## III.   **ARGUMENT**

As indicated above, Microsoft asserts that the jury got it wrong on every single issue tried, namely: (1) willful infringement; (2) infringement; (3) validity, and (4) damages. Microsoft is not willing to concede that the jury was correct on any issue in this case. Microsoft ignores the fact that Uniloc presented substantial evidence on all issues, including

Mr. Klausner's claim charts (PX 1098), animation (PX 1094; PX 1094a), drawing (PX 1097), and supporting testimony and documents on the issue of infringement, and that such evidence was accepted by the jury which rejected Microsoft's evidence *contra*.  Thus, Microsoft's repeated assertion that Uniloc presented "no evidence" is blatantly incorrect.

### A.    Credibility

Throughout its brief, Microsoft argues that it presented testimony at trial that supported a verdict in its favor.  Such an argument is improper as simply rearguing the merits to the bench.  Further, the jury rejected such testimony as not credible.  Microsoft does not now get a second bite at the apple by arguing to the Court that such testimony should be believed.  As the Court's instructions properly stated, issues of credibility and the weight of testimony are the province of the jury. *United States v. Lipscomb*, 539 F.3d 32, 40 (1st Cir. 2008), *cert. denied*, 129 S. Ct. 963 (2009).  Thus, in reaching a verdict, a jury may disregard the testimony of witnesses who are not credible. *Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 183 (Fed. Cir. 1994).  Accordingly, the Court gave the jury (without objection) the following proper instruction on the issue of credibility:

> Now, as to the testimony of witnesses, your principal task is to determine the credibility of the witnesses and the weight that you will give to the testimony of each.  Whether a party has sustained its burden of proof does not depend on the number of witnesses it has called or the number of exhibits that it has offered, but instead upon the nature and quality of the evidence that has been presented.
>
> You do not have to accept the testimony of any witness if you do not find that witness credible.  You must decide which witnesses to believe and which facts are true.  To do this, you must look at all the evidence and draw upon your common sense and your personal experience.
>
> * * *
>
> Now, in assessing credibility, you may consider whether on some prior occasion the witness made statements that contradict the

testimony that he or she gave at the time of trial.  If you conclude that a witness did at some prior time make statements that were materially different from what the witness said during this trial, you may take that into account in assessing that witness's credibility or determining the weight that you will give to that witness's testimony.

Ex. J, pp. 166, 167.

Microsoft's witnesses at trial were shown not to be credible.  They were repeatedly impeached and their testimony was repeatedly shown to be inconsistent with Microsoft's own contemporaneous documents:

| **WITNESS** | **IMPEACHED** | **DISAGREED WITH MS DOCUMENT** |
|---|---|---|
| HELLMAN | 1) Ex. G, pp. 42-43<br>2) *Id.* at 49-52<br>3) *Id.* at 60-62. | |
| WALLACH | | PX 246 (Ex. H, pp. 17-19)<br>PX 234 (*id.* at 20-22)<br>PX 256 (*id.* at 24-25)<br>PX 36 (*id.* at 43-44)<br>PX 43 (*id.* at 45-46)<br>PX 1104 (*id.* at 53-54)<br>PX 270 (*id.* at 54-55)<br>PX 26 (*id.* at 55-56)<br>PX 73 (*id.* at 56-57)<br>PX 608 (*id.* at 57-58)<br>PX 244 (*id.* at 59-60) |
| PEIKER | 1) Ex. F, pp. 72-73<br>2) *Id.* at 75-76 | PX 424 (Ex. F,<br>pp. 118-20 |
| HUGHES | 1) Ex. D, pp. 130-32<br>2) *Id.* at 200-04 | PX 239 (Ex. D,<br>pp. 141-43)<br>PX 250 (*id.* at 146-47)<br>PX 50 (*id.* at 170-71) |
| NAPPER | 1) Ex. H, pp. 201-03<br>2) *Id.* at 229-30 | PX 71 (Ex. H, pp.<br>237-38<br>PX 238 (*id.* at 238-39)<br>PX 424 (*id.* at 239-40) |

6

| **WITNESS** | **IMPEACHED** | **DISAGREED WITH MS DOCUMENT** |
|---|---|---|
| RICHARDS | | PX 261 (Ex. I, pp. 55-56) |

Thus, from the record evidence the jury was free to, and obviously did, reject the testimony of Microsoft's witnesses.  A jury's credibility determinations are not to be second-guessed. *Fuji Photo Film*, 394 F.3d at 1379.[2]

## B.    Willful Infringement

Microsoft first argues that no reasonable jury could have found copying or willful infringement.  *See* Microsoft br. pp. 5-15.  As the jury was correctly instructed, "to prove willful infringement, Uniloc must persuade you with clear and convincing evidence that it is highly probable that Microsoft acted with reckless disregard of the claims of Uniloc's patent." Ex. J, p. 143. *See In re Seagate*, 497 F.3d 1360, 1371 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 1445 (2008).  The Court thereafter instructed the jury on the two-part test for willfulness set forth by the Federal Circuit in *In re Seagate*. Ex. J, pp. 143-44.  Microsoft did not object to these instructions.  Uniloc submitted more than sufficient evidence from which a reasonable jury properly instructed could, and did, find willful infringement.

Uniloc introduced evidence that the inventor of the '216 patent, Ric Richardson, visited Microsoft in Australia in 1993. Ex. A, pp. 155:25-158:6.  Mr. Richardson approached Microsoft with his anti-piracy system that he thought might be of interest to Microsoft. Ex. A, p. 156:3-22.  As Mr. Gledhill testified, Mr. Richardson wanted to disclose his new anti-piracy technology to

---

[2]   The testimony of Uniloc's witnesses must be believed when addressing Microsoft's motion for JMOL.  The Court cannot now make credibility findings contrary to the verdict. *Marrero v. Goya*, 304 F.3d at 22.  In its brief in support of its motion for JMOL, Microsoft repeatedly cites to and relies upon the testimony of its own witnesses to contradict the testimony of Uniloc's witnesses.  That testimony is irrelevant in the context of a motion for JMOL.  Obviously, in rejecting all of Microsoft's non-infringement and invalidity defenses, the jury did not believe Microsoft's witnesses.

Microsoft. Ex. A, p. 156.  Mr. Gledhill testified that Microsoft was interested in

Mr. Richardson's anti-piracy system. Ex. A, p. 159.

At the time, Microsoft was having major problems with software piracy. Ex. A, pp.

159:21-160:12.  Mr. Gledhill contacted Microsoft's applications group in Redmond, Washington

to indicate that Mr. Richardson's anti-piracy system may be of interest to Microsoft (*see* Ex. A,

pp. 160:13-161:11).  Mr. Gledhill testified that Microsoft thought it may be able to support and

utilize Mr. Richardson's technology. Ex. A, p. 161.

Before disclosing his anti-piracy technology to Microsoft, Mr. Richardson ensured that

Microsoft executed a non-disclosure agreement ("NDA") in order to protect his now patented

invention (PX 366).  The NDA included the following provisions:

> A.　　The Supplier is the owner of the copyright in certain computer programs (including a computer program known as the "Uniloc Program"), and other documents (the documents and programs being referred to as "the Documents") which embody a concept developed by the Supplier including both technical information and marketing plans ("the Concept").

> B.　　Certain elements of the Concept are the subject of a patent application.

> \* \* \*

> 8.　　The Recipient warrants that it will not attempt to reverse compile or reverse engineer any software provided to it as part of the Confidential Information and the Recipient further warrants that it will not write any software which embodies the Concept or the Confidential Information or any part of it nor any document which describes the Concept or the Confidential Information.

This NDA was executed by Microsoft and Uniloc. *Id.,* p. 3.[3]  Mr. Gledhill conceded that

he understood paragraph B of the NDA stating that Uniloc had a patent application pending on

the provided technology. Ex. A, p. 168:11-22.  The NDA was dated September 28, 1993. *Id.*, p.

1.  The patent application for the '216 patent was filed a week earlier on September 21, 1993. PX

1.  Thus, Uniloc submitted evidence from which a reasonable jury properly instructed could, and

did, conclude that the patent application referenced in the NDA was the application for the '216

patent.  Further, Mr. Richardson testified at trial that the '216 patent "definitely covers [his] --

the product that [he] made, as well as a number of different other ways of doing that product."

Ex. B, pp. 26-27.  Thus, contrary to Microsoft's argument, Uniloc submitted evidence from

which a reasonable jury properly instructed could, and did, conclude that the product provided to

Microsoft embodied Mr. Richardson's patented invention.  Mr. Gledhill sent the Uniloc product

to Microsoft in Redmond, Washington for evaluation. Ex. A, p. 162.  An inspection was made of

the Uniloc product at Microsoft in Redmond, Washington. Ex. A, pp. 162:11-20; 163:24-164:23;

170:2-5.

As noted above, Microsoft was having major problems with software piracy. Ex. A, pp.

159:21-160:12.  As of the time it received Uniloc's software, Microsoft did not have any anti-

piracy technology of its own and was not undertaking any efforts to develop internally any anti-

piracy software of its own. *Id.*  Concerned that Microsoft might attempt to reverse compile and

---

[3]   On page 6-7 of its brief, Microsoft cites *Amazon v. Barnesandnoble.com* and *Leapfrog v. Fisher-Price*
for the proposition that the plaintiff must show that the product copied by the infringer was covered by
the plaintiff's patent.  Unlike in this case, neither the *Amazon* nor the *Leapfrog* case involved a
defendant such as Microsoft who was given specific notice of the pendency of the patent application at
issue.  Thus, these two cases are inapposite.  Further, copying in the *Amazon* case was discussed in
connection with validity, not willfulness.  In the *Leapfrog* case, as Microsoft states, the plaintiff offered
"no evidence" that the copied device was covered by the patent.  In contrast, there is evidence via
Microsoft's acknowledgement in paragraphs A and B of the NDA that the Uniloc sample was covered
by Uniloc's patent application.

reverse engineer Uniloc's code, in addition to having Microsoft agree to paragraph 8 of the

NDA, Uniloc had its exclusive distributor, IBM, send a letter to Microsoft again warning

Microsoft against such actions.

> Per our conversation this morning, I want to confirm that Microsoft will only be conducting normal end user testing of the Uniloc code to determine its viability for use with Microsoft's products.  This testing will not include any reverse engineering, decompiling or disassembly of the Uniloc code.

> Please refer to the Uniloc license which is part of the Note Pad that I gave you for the specific details.  This license does not apply to your use and evaluation of the Uniloc code.  IBM does not support any action that violates the terms of the Uniloc license agreement. I am sure that you agree with this position.  I appreciate your cooperation in this matter.

PX 132, p. UNILOC 14909.

This letter was sent to Mr. Negrin at Microsoft's headquarters in Redmond by Mr. Picker

of IBM. Ex. B, pp. 6:13-7:18.  Mr. Picker reported to Mr. Richardson that the letter had been

sent and further informed Mr. Richardson that Microsoft had also been warned verbally and

again agreed not to reverse engineer, decompile, or disassemble Uniloc's code:

> I have included in this fax a copy of the letter that I have sent Mike Negrin, Microsoft Director of Channel Marketing.  I talked with Mike today and confirmed with him that Microsoft would not be doing any reverse engineering, decompiling or disassembly of the Uniloc code.  I emphasized that they should only be doing user oriented testing of Uniloc to ensure that the Uniloc code would adequately protect their products.

> In addition, I made Mike aware that IBM does not support any action that violates the terms of the Uniloc license agreement.  In my letter you will note that I directed him to the Uniloc license agreement in the Note Pad demo that was very explicit about this topic.  I believe Mike understood Microsoft's obligations.

PX 132, p. UNILOC 14908.

As indicated above, Microsoft acknowledged in the NDA that Uniloc had filed a patent application on its disclosed technology. PX 366, ¶ B.  During the evaluation, in violation of the terms of the NDA and IBM's letter, Microsoft reverse-compiled and reverse-engineered the Uniloc product. PX 133; *see also* Ex. B, pp. 37:13-38:23.  Microsoft introduced no evidence that it returned the Uniloc code to Uniloc.  Mr. Klausner testified, and the jury found, that the accused products use the technology set forth in the '216 patent. Ex. B, pp. 134-158; Ex. C, pp. 123-125.

Microsoft failed to fulfill its promise to the jury to show that it independently developed the accused technology.  Contrary to Microsoft's opening statement, Mr. Hughes testified that he did not conceive the accused technology because he developed the first pilot for Product Activation from the specification provided by Mr. Pearce. Ex. D, p. 119.  Mr. Hughes testified that he has no knowledge of where Mr. Pearce may have come up with the diagram in the specification Mr. Pearce gave him for Product Activation. Ex. D, p. 119:7-10.  Mr. Pearce testified that he joined Microsoft's anti-piracy group in 1995 and that he had no experience with anti-piracy technologies prior to that time. Ex. E, pp. 201:18-202:10.

Mr. Pearce admitted that Microsoft did not use the combination of a PID and a HWID until after Uniloc gave Microsoft the Uniloc product. Ex. E, p. 212.  Mr. Pearce admitted when cross-examined that his initial job was to gather "competitive" intelligence to determine what third-parties were doing to prevent casual copying. Ex. E, p. 232:11-21.  When questioned how Product Activation worked, Mr. Pearce, the purported architect of the system, professed ignorance. Ex. E, p. 224:6-15.

The hen-scratch in Mr. Pearce's notebook purportedly disclosing his conception of Product Activation does not disclose using a PID and a HWID in a registration system. Ex. E,

pp. 244:24-245:14.  Further, this notation, dated June 6, 1996, is after Microsoft had received in Redmond, Washington, the Uniloc code, after Microsoft had hacked into same, and after the publication of Uniloc's patent in February 1996.  Microsoft did not introduce any testimony or documentary evidence showing development of the accused product prior to:  (a) its hacking into Uniloc's code; (b) Mr. Pearce's "competitive" intelligence activities, or (c) the publication of the Uniloc patent in February 1996.[4]

Willful infringement is determined in light of the totality of the circumstances. *See In re Seagate*, 497 F.3d at 1369.  In its opening statement, Microsoft told the jury that it did not know of the '216 patent prior to the institution of suit in 2003. Ex. A, p. 54:12-14.  As eventually admitted by Microsoft in its closing, however, that statement was not true. *See* Ex. J, pp. 60-61. In fact, Uniloc established that Microsoft knew of the '216 patent in 1999 (*see* PX 466, pp. UNILOC  6899, 6905), well prior to the launch of the accused product in the United States in 2001.

Microsoft did not introduce any evidence that, after gaining knowledge of the '216 patent, it did any investigation or any patent clearance activity before launching Office in 2001. Microsoft did not introduce any opinion of counsel that the '216 patent was not infringed or is invalid.  Microsoft also did not introduce any evidence whatsoever that, prior to the introduction of the accused products, it formed any belief that the '216 patent was invalid or not infringed.

The Federal Circuit stated in *Seagate* that it would "leave it to future cases to further develop the application of this [new willfulness] standard." *Id.*  Numerous cases since *Seagate* have addressed the issue of willful infringement under this new standard.  For example, in *Bard*

---

[4]  Per usual, Microsoft tells only half the story.  In footnote 1 on page 9 of its brief, Microsoft states that the Patent and Trademark Office ("PTO") began publishing patents on the internet in 1998, citing to a website publication not of record.  Microsoft ignores that published patents were readily available on the Internet from Lexis-Nexis since at least 1994. Ex. K.

*Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 586 F. Supp.2d 1083, 1088-89 (D. Az. 2008), the court upheld a jury's willfulness finding on facts similar to this case.  In *Bard*, the court found that defendant's reliance upon the same prior art for its invalidity argument as previously found by the PTO not to invalidate the patent-in-suit was evidence of willfulness. *Id.* Similarly, in the present case, Microsoft relied upon the Wolfe patent.  The Wolfe patent, however, was found by the PTO not to invalidate the '216 patent. *See* PX 1 (listing Wolfe patent as having been examined by PTO examiner).

Though Microsoft was granted summary judgment of non-infringement, it knew full well that the sole basis for the Court's decision - lack of same algorithm on both sides - was erroneous, as evidenced by its concession to the Federal Circuit and as specifically noted in the Majority Opinion of Judge Moore. PX 12, p. 7.[5]  Microsoft did not bring this error to the attention of the District Court.  Instead, Microsoft continued to infringe and reap the economic benefits thereof.  Given the totality of the evidence as set forth above, the lack of credibility of Microsoft's witnesses, and the law requiring that the benefit of all inferences inure to Uniloc, Uniloc submits that a reasonable jury could, and did, determine that Microsoft's infringement was willful under the law of the Federal Circuit which, Microsoft does not dispute, the jury was correctly instructed.

---

[5]   On page 12 of its brief, Microsoft's refers to the Minority Opinion.  That Opinion, however, is but one of the many facts presented to the jury under the "totality of the circumstances" relating to the issue of willfulness.  The jury rightfully rejected Microsoft's argument.  This is not surprising in view of the Majority Opinion which is the controlling law of the case.  Furthermore, it is not the province of the Court to resolve in the context of a JMOL motion, "evidentiary conflicts, nor ponder the weight of the evidence introduced at trial", *Figueroa-Torres*, 232 F.3d at 273, as Microsoft now urges the Court to do.

C.    **Infringement**

On pages 15-47 of its brief, Microsoft argues that no reasonable jury could have found infringement in this case.  Microsoft, however, ignores the record evidence submitted by Uniloc, the lack of credibility of its own witnesses, and instead attempts to have this Court take up the role of fact-finder.  Uniloc will address each of Microsoft's arguments below.

1.    **Uniloc Presented Sufficient Evidence That The Licensee Unique ID Is Associated With A Licensee**

The Court construed the term "Licensee unique ID" in claim 19 as "a unique identifier associated with a licensee."  PX 1108.  On pages 16-23 of its brief, Microsoft argues that Uniloc failed to prove that the Licensee unique ID is associated with a licensee.  As typical, Microsoft ignores the evidence presented to the jury that satisfied this claim construction, including the testimony of Mr. Klausner that the jury obviously believed.  Ex. B, pp. 143:24-144:10; Ex. C, pp. 24, 25, 26, 29, 36, 37, 60-61, 66, 67, 68; Ex. D, pp. 8-10.

For example, Mr. Klausner testified, *inter alia*, as follows:

> Q.    Okay.  And then what happens next, the next slide we'll see?
>
> A.    The user has to enter a valid product key, so in this case, the user is entering the information and then starts to type in the product key, and that's now the product key that's associated with that user.  The user has entered it.
>
> Q.    Okay.
>
> A.    And that association, as we will see later, maintains between the user and the product key and its derivatives throughout the Microsoft system, going from the local side to the remote side and back.

Ex. B, pp. 143:24-144:10.

> Q.    Is that a unique number?
>
> A.    And the Product Key was unique.  And so the PID is also associated with the user because it is also unique.

Ex. C, p. 24:17-20.

14

Q.   Okay.  And you indicated that the PID is uniquely associated with the user.  Why is that?

A.   Since the Product Key is unique, if you create a -- if you use an algorithm that maintains the uniqueness, then the PID is also unique, and we have heard testimony from witnesses that the PID is also unique to the user.

Ex. C, p. 25:1-7.

Q.   Okay.  And then that PID and Hardware ID, which is you've said is unique as we look at it, what happens to that next?

A.   Since this entire grouping of three things, PID, Hardware ID and X is still also unique and associated with that user, it goes down two different paths.  And we'll do them one at a time.

*Id.*, p. 29:10-16.

Q.   Now, when -- after that PID and the Hardware ID go through the MD5 and create what -- what happens?  I think the next slide will probably tell.

A.   Yes.  We continue, and the output of the MD5 algorithm is a remote licensee unique ID.

Q.   Why, generally, we'll get into this in a little more detail, but why do you say that it's remote?

A.   It's remote because it's created here on the clearinghouse.

Q.   And why is it unique and to whom?

A.   And it's a licensee unique ID, meaning it's unique to the licensee because it is created from information that is unique and associated with the licensee, which is, in turn, created from the Product Key that is also unique to the licensee.

*Id.,* pp. 36:20-37:9.

Q.   And let's just talk about the licensee unique ID.  Does the accused product have a licensee unique ID?

A.   Yes.

*Id.,* p. 62:22-25.

Q.   Now, let's talk about -- you've pointed out the remote licensee unique ID.  What is the basis for your opinion -- and

you've pointed it out as B -- basis for the opinion that it is a licensee unique ID, as construed by the Court?

A.    This is a unique number, and it is generated as a result of a unique number to that user, and this is generated here as a unique number to that user from a unique number to that user.  And so the association is maintained from here, through here, through here.

*Id.,* p. 66:6-15.

Q.    Let me show you PX 250.

*Id.,* p. 66:21.

Q.    So here it's indicating that the Product Key is unique, and the Product ID that is developed in the software as a result thereof is unique, right?

A.    Yes.

Q.    And it doesn't get any less unique simply because it goes through an MD5 hash algorithm, correct?

A.    For the purposes of this case, that's correct.  I mean, mathematically, because it gets shorter, there is less of a string of numbers, but the string that results is still unique to every human being on the planet.

Q.    Right.  And it's unique to the particular user who typed in the Product Key, as you said?

A.    Yes.

*Id.,* pp. 67:16-68:4.

Q.    If we look at, I believe, the board depicting the accused product activation, you were asked questions about -- these random number questions.  What is the unique number going into the MD5 hash?

THE COURT:  Go ahead.

A.    The unique number that goes into the MD5 hash is the license on the clearinghouse and the license on the user local machine.

Q.    Okay.  And what in that license is unique?  What is the number that is unique?

16

A.    The PID, at least, is unique.

Q.    Okay.  Now, if you combine, as you said, a PID that is unique with a hardware ID that is quasi, as you said, unique, you get a unique number, correct?

A.    Correct.

Q.    That's a matter of fundamental mathematics, so to speak, right?

A.    Yes.

Q.    And if you put that unique number through the MD5 algorithm, you end up with another unique number called the remote licensee unique ID, right?

A.    Right.

Q.    And that doesn't change simply because there is also a random number, if at all, put through, correct?

A.    The uniqueness of the remote licensee unique ID does not change because there is any random part in here.

Ex. D, pp. 8:24-10:1.

Microsoft also ignores the testimony of its own expert, Dr. Wallach, acknowledging the

unique association between the output of the MD5 hash and the PID identifier.  As testified by

Dr. Wallach:

Q.    Good.  And one thing that is going -- or one identifier, so to speak, that is going into the MD5 hash algorithm is what is called the PID, correct?

A.    Yes.

Q.    And if -- that PID is a number, correct?

A.    It's a number.

Q.    All right.  And if any of those digits in the number are changed in any manner -- right? -- the output of that MD5 algorithm will change, correct?

A.    That's correct.

Ex. H, p. 13:5-14.[6]

Finally, Microsoft ignores its own contemporaneous documents characterizing the PID as an identifier associated with the user. For example, PX 129, a Microsoft document entitled "Product Licensing and Activation," states as follows:

> The PID provides product information about each application; included is the product name, the media (if applicable), the version, the sales channel and the product language. The PID also contains a unique sequence that is used to identify a license (a license is a customer's right to own the copy of software). In this sense, the PID is a "message" that is used to identify a software license (and is also used by technical support and sustaining engineering to support the product once it ships). It functions as a fingerprint for each customer license; like fingerprints on people, the Product ID is different for any two customer licenses. In this way, a Product ID identifies a specific license for a specific Microsoft product.

*Id.,* p. MS-U 421083.

Another Microsoft document introduced by Uniloc states as follows:

> Windows Product Activation (WPA) is based on Desktop Licensing Technology (DLT) developed for Office 10, called Office Activation Wizard (OAW). WPA relies on the customer contacting (online or by phone) Microsoft's backend database service (clearinghouse) to create an association between the customer-specific Product ID (PID) with that customer's computer.

PX 248, p. MSI 105531.

Another Microsoft document, PX 255, reiterates the unique association between the PID and the user:

> Activation associates owner's Product ID with machine Hardware ID (HWID) at Microsoft clearinghouse.

---

[6] Thus, the assertion on page 17 of Microsoft's brief that the output of the algorithm "is not an identifier" is contrary to the evidence presented at trial and the testimony of Microsoft's expert. *See also* Ex. C, pp. 42:3-14, 66-71; Ex. D, pp. 8-11.

PX 255, p. MSI 105406;[7] *see also*  PX 129, p. MS-U 00421113 ("**customer's** unique, 20-digit

Product ID number"); PX 247, p. MSI 115762 ("**user's** PID….**end customer's** PID"),

p. MSI115765 ("**user's** PID"); PX 248, p. MSI 105532 ("**user's** unique Product Key"), p. MSI

105531 ("the **customer-specific** Product ID (PID)") (all bold added).[8]

Uniloc also introduced a Microsoft email stating that "the HWID can be considered

personal info as can the PID."  PX 823, p. MS-U 282772.  Uniloc introduced numerous other

Microsoft documents stating that the Product Key and PID are unique to a licensee's particular

installation, thus reaffirming the association therebetween. *See* PX 148, p. MS-U 946156 ("The

product ID is unique to that software installation and is generated from the product key used

during installation"); PX 246, p. MS-U 017403 ("Product ID is unique to that software

installation and is generated from the product key used during installation"); PX 250, p. MS-

U 00468856 ("The Product ID is unique to the installation of Windows").  Thus, Uniloc

introduced overwhelming evidence that the accused products literally infringe claim 19.  Such

evidence also supports a finding of infringement of claim 19 under the doctrine of equivalents.

*See*, *e.g. Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008) (infringement under

doctrine of equivalents if differences between accused product and patent claim are

"insubstantial").

---

[7]   In typical fashion, Dr. Wallach, admittedly the owner of a house, a car and eyeglasses, dutifully
testified that he did not know what the term "owner" meant. Ex. H, pp. 29:19-30:23.

[8]   In footnote 7 on page 20 of its brief, Microsoft once again improperly urges the Court in the context of
a motion for JMOL to decide factual matters directly contrary to its own documents and previously
decided adversely to Microsoft by the jury.  Based on the record evidence, the jury properly rejected
Prof. Wallach's multiple PID theory.

Given the above, Uniloc provided more than sufficient evidence from which a reasonable jury could and did find that the licensee unique ID is a unique identifier associated with the licensee.

  **2.**  **Uniloc Presented Sufficient Evidence That The MD5/SHA-1 Is A Summation Algorithm Or Equivalent.**

The Court construed the structure of the limitation "licensee unique ID generating means" as "a summation algorithm or a summer and equivalents thereof." *See* PX 1108.  On pages 25-39 of its brief, Microsoft argues that Uniloc did not prove that the hashing (MD5/SHA-1) algorithm in the accused product activation system is a summation algorithm or an equivalent.  Once again, Microsoft ignores evidence of record.  In addition to the testimony of Mr. Klausner explaining how the MD5/SHA-1 hashing algorithm works and functions (*see* Ex. C, pp. 30:11-35:21, 40:1-5, 95:3-13; 120:12-124:11), Uniloc introduced a host of documents supporting its position that the MD5/SHA-1 is a summation algorithm.  For example, Uniloc introduced United States patent number 6,263,432 granted to NCR Corporation, an independent third-party with no stake in this case. *See* PX 1103.  The NCR patent, which Microsoft's brief totally ignores, explicitly identifies the MD5 hash as a summation algorithm:

> The Message Digest/Hash is represented by a summation ($\Sigma$) algorithm (equated to, or exemplary of, the MD5 protocol or other hashing algorithm).  Hence, to calculate the Message Digest/Hash, a summation algorithm is implemented using all eight fields of data in step 2.

*Id.*, col. 9:52-58.

Uniloc introduced the actual code used by the MD5 and SHA-1 algorithms, which also demonstrated that the MD5 algorithm performs summation.  PX 1095, pp. 4-5 (MD5); PX 1096, pp. 4-6 (SHA-1).  Uniloc also introduced Microsoft's own technical dictionary, which defines a hash, *inter alia*, as "the addition of a set of numbers".  PX 36, p. UNILOC 85583.  Uniloc

introduced a document from Microsoft's website stating that a hash is created "by adding [numbers] together".  PX 35, p. UNILOC 85566.

Uniloc introduced numerous additional documents demonstrating that the MD5 and SHA-1 algorithms are summation algorithms. *See* PX 43, p. UNILOC 85631 (defining "checksum" as "summation"); *id.* at UNILOC 85661 (defining "hashes and checksums" as including "MD5, and SHA-1"); *see also* PX 50, p. UNILOC 85803 ("Hashing is also referred to as MD5 checksum"); PX 60, p. UNILOC 85900 (describing "Q Hasher" as an "MD5/SHA-1 Checksum Tool"); PX 61, p. UNILOC 85904 (defining MD5 and SHA-1 as checksums).

On pages 28-31 of its brief, Microsoft argues, as it did at trial, that Mr. Cooper, one of Uniloc's Rule 30(b)(6) witnesses, "admitted nonequivalence" of the MD5 and SHA-1 algorithms.  The jury properly rejected Microsoft's argument.  Contrary to Microsoft's argument, Rule 30(b)(6) testimony is not the same as a judicial admission. *See State Farm Mutual Auto Ins. Co. v. New Horizon, Inc.*, 250 F.R.D. 203, 213 (E.D. Pa. 2008) (rejecting party's attempt to "elevate Rule 30(b)(6) deposition testimony into an irrebuttable judicial admission."); *United States v. Taylor*, 166 F.R.D. 356, 362 n. 6 (M.D.N.C. 1996) (Rule 30(b)(6) statement not tantamount to a judicial admission).  "[T]hat the [Rule 30(b)(6)] witness's statements are 'binding' on the corporation merely means that the witness has authority to speak on the corporation's behalf - it does not mean that the corporation cannot later vary its answer." *Hewlett Packard Co. v. Mustek Systems, Inc.*, 2001 WL 36166855 at *2 n. 1 (S.D. Cal. June 11, 2001).[9]

Further, Microsoft cleverly omits from its quoted passages of Mr. Cooper's testimony the portions that contradict Microsoft's argument.  For example, on page 29 of its brief, Microsoft cites to pages 100:21-102:05 of the Cooper testimony, but only quotes page 101:23-102:05.  On

---

[9]    This argument by Microsoft was rejected at the *Daubert* hearing, and the Court gave the proper instructions to the jury (Ex. J, pp. 174-75) which were not objected to by Microsoft.

page 101:5-7, Mr. Cooper was asked "What's the mechanism that [MD5] uses to create the hash?" and answered "I don't really know. It's a little cryptography." Ex. G, p. 101. Similarly, Microsoft cites to pages 102:10-103:06 but omits to quote page 102:22-23 where Mr. Cooper was asked "What is SHA -- how does SHA-1 work?" and answered "I couldn't begin to tell you." *Id.* at p. 102. The jury heard all of this testimony, not just the snippets quoted in Microsoft's brief, as well as hearing the other testimony and seeing the exhibits regarding summation set forth above. The jury determined that the weight of the evidence favored Uniloc and rejected Microsoft's argument that was: (1) presented by witnesses who were not credible, and (2) contradicted by Microsoft's own documents.

On pages 31-36 of its brief, Microsoft argues that Uniloc did not present evidence from which the jury could find that the MD5 and SHA-1 algorithms are equivalent to a summation algorithm. Microsoft is wrong.[10] The Court construed the structure of the licensee unique ID generating means to be "a summation algorithm or a summer and equivalents thereof." *See* PX 1108. Uniloc, therefore, had to prove that the accused algorithms are a summation algorithm or equivalent to a summation algorithm. As set forth above, Uniloc submitted more than sufficient evidence that the accused algorithms are summation algorithms and the jury agreed. For example, Uniloc introduced the patent of independent third-party NCR stating specifically that, *inter alia*:

> The Message Digest/Hash is represented by a summation ($\Sigma$) algorithm (equated to, or exemplary of, the MD5 protocol or other hashing algorithm). Hence, to calculate the Message Digest/Hash, a summation algorithm is implemented using all eight fields of data in step 2.

---

[10] Microsoft argues that its witnesses, Dr. Wallach, Prof. Hellman and Mr. Hughes, testified that the MD5 and SHA-1 algorithms are not equivalent. The cited testimony of Messrs. Wallach, Hellman, and Hughes is irrelevant to a JMOL motion. Further, as the Court instructed the jury, however (*see* Ex. J, pp. 166-71), the jury was free to reject such testimony, particularly when such witnesses were not credible.

PX 1103, col. 9:52-58.

Microsoft argues on pages 31-32 that expert testimony was lacking on the issue of equivalents.  Microsoft is wrong.  As set forth above, Uniloc produced ample evidence that the MD5/SHA-1 are summation algorithms.  Uniloc also presented evidence on equivalence.  For example, Mr. Klausner specifically testified regarding infringement under the doctrine of equivalents, including testimony explaining how the accused algorithm perform a summing function. *See* Ex. C, pp. 106-124.  Uniloc also introduced the source code for the MD5 and SHA-1 algorithms, which describes the function and operation of the MD5/SHA-1 algorithms. *See* PX 1095, pp. 9-16; PX 1096, pp. 10-18.  Accordingly, and when considered with the additional evidence set forth above, Uniloc submitted sufficient evidence from which a reasonable jury could, and did, determine that the MD5 and SHA-1 algorithms are each a summation algorithm or an equivalent thereof, i.e. any alleged differences between accused algorithms and claim 19 are "insubstantial". *See Voda v. Cordis*, 536 F.3d at 1326.  Microsoft simply disagrees with the jury's verdict.[11]

### 3.  Uniloc Established That The Accused Technology Is A Registration System That Uses A Mode Switching Means

The Court construed "registration system" in claim 19 as "a system that allows digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed." *See* PX 1108.  As set forth below, Uniloc presented more than sufficient evidence from which the jury expressly found that the accused products comprise such

---

[11] On pages 36-38 of its brief, Microsoft argues that the contemporaneous documents entered into evidence at trial "do not fill the gap" allegedly left by Mr. Klausner.  According to Microsoft, "[n]one of these documents, when examined more than superficially, says what Uniloc wants it to say."  This argument was presented to the jury, which rejected same and made the factual determination of infringement.

a system. *See* Jury Verdict (D.I. 358), pp. 1, 3.  On pages 39-44 of its brief, Microsoft argues that

Uniloc failed to establish that the accused technology is a "registration system" because Uniloc's

evidence purportedly "focused only on what Uniloc referred to as the 'digital license.'"

Microsoft is wrong.

Uniloc introduced a plethora of evidence from which the jury could, and did, find that the

accused system is a "registration system" that infringes under the Court's instruction that the

applicable license is the EULA.

The Court's jury instruction on the issue of "use mode" was as follows:

> Now, the next claim term is "use mode."  I defined that term in my
> claim construction as a mode that allows a full use of the digital
> data or software in accordance with the license.

> Now, as to use mode, let me give you some further detail on this
> term.  In the claim construction order you have heard about, I held
> that the term "use mode" meant full use in accordance with the
> license.  With respect to whether restrictions or limitations existed
> on full use, I found, and the Court of Appeals affirmed, that
> limitations could be either functional or temporal, that is time-
> based.

> So what you will need to  decide is whether Product Activation
> allows for full use in accordance with the license or is limited in
> some way.

> The license to which I refer in this definition of use mode is, in this
> case, the EULAs in Product Activation or the end-user license
> agreements, which have been admitted into evidence.

> Thus, you must consider whether Product Activation has a use
> mode that allows a full use of the digital data or software in
> accordance with the EULAs.

Ex. J, pp. 138-139.

At trial, the factual question of whether the jury believed Uniloc (that the software is not

fully functional until activation) or Microsoft (that the software is fully functional pursuant to the

EULA when purchased) was decided favorably to Uniloc.  This is not surprising.  As set forth

below, Uniloc's expert, Mr. Klausner, presented an animation describing the EULA licensing

procedure and the installation and activation processes. *See* PX 1094; PX 1094a, p. 4.

Mr. Klausner testified that the software is not fully functional unless the user activates which, as

demonstrated, occurs after the terms of the EULA are accepted by the user:

> Q.   Well, activation, the technology that's at issue in this case is mandatory, right?
>
> A.   The user is given a choice as to whether they wish to activate or not, as we've all seen.  If the user chooses not to activate, they continue in a degraded mode until they become disabled.

Ex. C, p. 133:1-6.

> Q.   Let's talk about the grace period a little bit, Mr. Klausner. You testified on direct examination that, in Office XP, certain updating capabilities are not available during the grace period, correct?
>
> A.   Yes.
>
> Q.   And, in your view, that's the reason why the grace period is not in use mode?  That's your opinion?
>
> A.   It's not in full use mode.
>
> Q.   Because of that?
>
> A.   And because upgrades are not available either.
>
> Q.   Updates and upgrades?
>
> A.   And it's a time-elapsed period, which is consistent with the Judge's construction of the claim.

*Id*. at p. 177:5-18.

> Q.   And what, if anything, happens to the software if the user doesn't choose to activate it?
>
> A.   In the case of Microsoft Office XP, which is what I installed here, the product will offer some of its functionality, but the functionality and the features are degraded.
>
> For example, it's possible to open a document, create some text, save it and print it, but it's not possible to upgrade this

product from Microsoft or to receive Microsoft updates, updates on fixes and repairs to the product.

And, for example, I actually installed Microsoft XP several days ago, and when I first activated it, suddenly there were millions of bytes of updates available to me, but those are not available if I hadn't activated my product.

Ex. B, p. 146:20-147:10.

Q.    Before cookie time, I think I asked you the question what, if anything, happens to the software if the user does not choose to activate.  And you answered, but could you just tell us again so we know where we're going here.

A.    Yes.  If the user chooses not to activate, they can make use of most of the features and functions of the product, but they cannot get updates from Microsoft, and they cannot get upgrades from Microsoft.

Q.    And so they do not have full functionality at that point in time, right?

A.    That's correct.  And also, they can only use the product, in this case, Microsoft Office XP for 50 times.  They can start and stop Microsoft Word 50 times.  The 51st time, another window comes up that forces an activation if they want to use it at all.  And after that point, if the user still doesn't choose to activate, all they can do is view a document.  They will not be able to create a document.  They will not be able to save a document, and they will not be able to print a document unless they activate the product.

*Id.*, p. 149:5-25.

Q.    Okay.  And now, once this activation is completed like you just said, what, if any, use does the individual who bought it have now?

A.    At the point where the activation has been successful, the user will see that this screen changes to a screen that says, "Activation complete."

At this point, if the user clicks "finish," they will have full use of the product, meaning after 50 times of using Microsoft Word, they can go on to the 51st time.  They are not restricted to saving, to printing, to creating new documents, and, also very important, they can receive

> upgrades and they can receive updates, including fixes to the product.
>
> Q.   Can they then use it for the intended time for which it was designed, namely, the next five or six years or so, then?
>
> A.   Yes.  Actually, I'm still using Microsoft Office from 1997. So I've been using it for 12 years.

*Id,* pp. 154:24-155:16.

Microsoft's expert, Dr. Wallach, could not disagree with Mr. Klausner's testimony because Dr. Wallach did not bother to determine whether or not upgrades are available prior to activation:

> Q.   Yeah.  And if you haven't got Windows XP, say you're upgrading from Windows to another Windows, if the first one isn't activated, you're not going to be able to upgrade it, correct?
>
> A.   I've never tried it, so I don't know.
>
> Q.   So you don't know.  Okay.  So then given that you don't know, you don't have the knowledge to dispute the testimony of Mr. Klausner, who says, in fact, in his direct, that you can't do it unless you activate, right?  Because you just said you don't know?
>
> A.   I just said I haven't had the chance to try it.

Ex. H, p. 114:2-12.

Uniloc also introduced Microsoft's own documentation stating that full functionality is not available until activation.  For example, Microsoft created a PowerPoint presentation to illustrate via screen shots how Product Activation works. *See* DX 9a-N.  When counsel for Microsoft published the presentation to the jury, however, slide DDX-49 had been artfully removed.  Counsel for Uniloc was not surprised by this attempted redaction.  Microsoft did not want the jury to see the following statement from Microsoft's own screen shot which Uniloc introduced into evidence:

> Thank you for installing Microsoft Office Professional Edition 2003. You must activate your installation to fully enable all of the features. This wizard will guide you through the activation process.

PX 1104.

During the cross-examination of Dr. Wallach, Uniloc introduced slide DDX-49 as plaintiffs' exhibit PX 1104. In addition, Uniloc introduced a document from Microsoft's technical support website stating that "Products that include MPA technology must be activated with the Microsoft License Clearinghouse." PX 270, p. 1. Dr. Wallach again dutifully testified that he disagreed with this contemporaneous Microsoft document. Ex. H, pp. 54-55. The second page of that same Microsoft document states that "To obtain full use of the Office Installation, the user must complete the activation." PX 270, p. 2. Dr. Wallach again disagreed with this statement by Microsoft. Ex. H, p. 55.[12]

Uniloc also introduced a Microsoft document entitled "Description of Microsoft Product Activation". This document states that "All Office 2003 Edition retail products contain software-based Product Activation technology, which means you need to activate your Office 2003 Edition products to use them." PX 608, p. 1. Predictably, Dr. Wallach disagreed with this Microsoft document. Ex. H, pp. 57-58. Uniloc also introduced a Microsoft document entitled "Product Activation Frequently Asked Questions" which states that "activation is the only method to become a verified licensed customer." PX 251, p. MS-U 211073; *see also* PX 26, p. MS-U 000028 ("To obtain full use of the Office installation, the user simply needs to complete the activation process….Typical Windows functionality will not be accessible until activation is successfully completed."); PX 73, p. MS-U 000279 ("To fully use Microsoft Office, you must

---

[12]  Microsoft conveniently ignores the testimony of Mr. Hughes, who conceded that the normal use of the accused software is for years, not fifty times. Ex. D, pp. 159-160.

activate it."); PX 240, p. MS-U 481169 ("activation is required"); PX 242, p. MS-U 946092 ("To fully use Microsoft Office, you must activate it."); PX 259, p. MS-U 098507 ("product activation is required"); PX 434, p. MS-U 018161 ("Disclosure that activation is required for full use of the product must be visible on the external packaging….Terms in the EULA must indicate that Activation is necessary for full use of the product").

Thus, it is not surprising that the jury accepted Uniloc's evidence and rejected Microsoft's evidence that was squarely contradicted by its own documentation.  As shown by the above record evidence, Microsoft's argument that Uniloc did not prove the accused products are a registration system having a use mode because Uniloc "focused only on what Uniloc referred to as the 'digital license'" is plainly wrong.  The above evidence, including Microsoft's own contemporaneous documents, is more than sufficient for a reasonable jury to find, as it did**,** that the accused software is not fully functional prior to activation.[13]

### 4.        Uniloc Established Direct Infringement

On pages 44-46 of its brief, Microsoft argues that Uniloc did not prove direct infringement because there is no record evidence that Microsoft supplies, assembles or uses the users' computers on which the Product Activation software is installed.  This argument must be rejected because it has been waived by Microsoft for a number of reasons.  This non-infringement argument was not raised in the list of non-infringement defenses set forth in Microsoft's pretrial memorandum. *See* D.I. 291, pp. 5-15.  Likewise, Microsoft did not raise this non-infringement argument in its motion for JMOL filed at the close of Uniloc's case (*see* D.I. 349-2), and counsel for Microsoft did not raise this argument when Microsoft moved orally for

---

[13]  In footnote 13 on page 44 of its brief, Microsoft argues that "[a]t a minimum", the Court should order a new trial and instruct the jury "on the meaning of the EULA."  This argument is specious as Microsoft accepted the Court's jury instructions as given without objection.

JMOL at the end of Uniloc's case-in-chief (*see* Ex. F, p. 4) or at the conclusion of the trial (*see* Ex. I, pp. 100-102).  Thus, this argument was waived by Microsoft. *See Monteagudo v. AEELA*, 554 F.3d at 171 (a motion for JMOL "preserves for review only those grounds specified at the time, and no others").

In any event, Microsoft's argument that evidence that <u>Microsoft</u> supplies, assembles or uses the user's computer is a requirement of claim 19 is legally erroneous**.**  Microsoft supplying, assembling or using the user's computer is not an element of claim 19.  Thus, as before, Microsoft is improperly inviting the Court to import an extraneous limitation into claim 19. Microsoft cites *Cross Med. Prods. , Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 (Fed. Cir. 2005) for the proposition that "there can be no direct infringement of an apparatus claim by one entity where a third party completes the apparatus, such as by establishing one of its elements." Microsoft br., p. 45 (also citing *Deepsouth Packing Co., Inv. v. Laitram Corp.*, 406 U.S. 518 (1972) for the same proposition).

The *Cross* and *Deepsouth* cases are inapposite.  As stated above, Microsoft supplying, assembling or using the user's computer is not one of the elements of claim 19. *See* Claim 19 (PX 1, cols. 15-16).  With respect to the user's computer, claim 19 recites "digital data executable on a platform" (to wit, the user's computer). *Id.*, col. 15:24-25.  Thus, in claim 19, the data has to be "executable", i.e. capable of execution, on a platform (the user's computer).  As Mr. Klausner testified (Ex. C, p. 85), which testimony was not rebutted by Prof. Wallach, and as the jury found, the data is capable of being executed on the user's computer.  Microsoft ignores the Federal Circuit's reference in the *Cross* opinion to the decision in *Intel Corp. v. Intern. Trade Com'n*, 946 F.2d 821 (Fed. Cir. 1991). *See Cross*, 424 F.3d at 1311.  As the Federal Circuit explained, "[t]he claim at issue in *Intel* called for a 'programmable selection means' and thus

required only that the accused device be capable of operating in the enumerated mode." *Id.*  As claim 19 recites the "digital data executable on a platform", the data need only be capable of being executed on a platform.  Uniloc proved and the jury found on an element-by-element basis that the accused Product Activation system incorporates each element of claim 19 as construed by the Court. *See* Jury Verdict (D.I. 358), Q. 1.  Therefore, Microsoft's argument should be rejected.

### 5.   <u>Microsoft Is Not Entitled To JMOL Or To A New Trial</u>

On pages 46-47 of its brief, Microsoft argues that, due to the purported insufficiency of the evidence, the Court should grant JMOL or grant Microsoft a new trial.  For the reasons set forth above, the record evidence is more than sufficient to support the jury's verdict that Microsoft infringed claim 19 of the '216 patent.  As a result, Microsoft's claims for relief should be denied.

Microsoft alternatively argues that it is entitled to a new trial because, Microsoft asserts, "[i]t is impossible to ascertain whether the jury based its finding of infringement on literal infringement, or infringement under the doctrine of equivalents." *See* Microsoft br., p. 46. Microsoft has clearly waived this argument also.  In substance, Microsoft argues that the jury verdict form is unclear as to whether the jury returned a verdict of literal infringement or infringement under the doctrine of equivalents.  Microsoft, however, was given the express opportunity by the Court to object to the verdict form.  Microsoft did not object to any part of the verdict form. *See* Ex. L (Charge Conf. Tr.), p. 8.  Accordingly, Microsoft was satisfied with the wording of the jury verdict form and cannot now, after the fact and having lost the case, complain that the verdict form was unclear, ambiguous, or in any other way inadequate. Therefore, Microsoft's request for a new trial on this basis should be rejected. *See Figueroa-Torres*, 232 F.3d at 272; *see also Biotec Biologische Naturverpackungen GmbH & Co. v.*

*Biocorp, Inc.*, 249 F.3d 1341, 1349-50 (Fed. Cir. 2001) (affirming jury verdict of literal

infringement, thereby rendering unnecessary need to address equivalents, where "jury did not

specify whether it found literal infringement or infringement under the doctrine of equivalents").

### D.   Validity

On pages 47-60 of its brief, Microsoft argues that no reasonable jury could have found

claim 19 not invalid.  Microsoft argues that: (1) claim 19 is anticipated by Hellman;  (2) claim 19

is obvious in view of Hellman or Hellman in combination wit the Wolfe patent, and (3) claim 19

is invalid as indefinite.  The jury properly rejected arguments (1) and (2) at trial.  Microsoft's

motion with respect to Hellman and Wolfe is nothing more than a re-hash of those arguments.

With respect to argument (3), Microsoft waived the defense of invalidity for indefiniteness.

As explained above, the standard for JMOL "is especially exacting where, as here [on the

issue of invalidity], the moving party bears the burden of proof on the issue in question."

*Marrero v. Goya*, 304 F.3d at 22 (citation omitted).  "[T]he party with the burden of proof is

entitled to judgment as a matter of law only if its has established its case by 'testimony that the

jury is not at liberty to disbelieve.'" *Id.* (citation omitted).  "In that situation, relief under Rule 50

is warranted only if the moving party's evidence is 'uncontradicted and unimpeached.'" *Id.*

(citation omitted).  As set forth below, Prof. Hellman was repeatedly impeached and Prof.

Wallach's testimony was repeatedly shown to be inconsistent with Microsoft's own documents.

Thus, Microsoft's argument and paucity of evidence fail to meet this "especially exacting"

standard, particularly on the defenses of anticipation and obviousness which must both be proved

by clear and convincing evidence.

### 1.     The Record Evidence Supports The Jury's Finding That Claim 19 Is Not Anticipated

In closing argument, counsel for Microsoft instructed the jury to answer "no" to verdict question 2, which asked if claim 19 was anticipated. Ex. J, p. 87 ("we actually think there's no anticipation"). Thus, Microsoft's present anticipation argument is frivolous.

Anticipation is a question of fact that must be proved by clear and convincing evidence. *See, e.g.*, *Schumer v. Lab. Computer Systems, Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002). The Court properly instructed the jury that to prove anticipation Microsoft must prove by clear and convincing evidence that a single prior art reference (Hellman) discloses each of the elements of claim 19 arranged as set forth in claim 19. Ex. J, p. 146. As mandated by the Federal Circuit, expert testimony on anticipation must identify each claim element in the prior art reference. *See Schumer*, 308 F.3d at 1315-16. Notwithstanding this standard and the heightened burden of proof, Microsoft's expert admitted on cross-examination that he did not even bother to refer to each and every element of claim 19. As testified by Dr. Wallach:

> Q.   Now, good afternoon Mr. Wallach. You provided on direct to the jury testimonies on your opinions on infringement and validity, true?
>
> A.   Of claim 19, yes.
>
> Q.   Right. And frankly, in your entire testimony on Claim 19, you never referred to each and every element of that claim, isn't that true?
>
> A.   That's correct.

Ex. G, p. 186:9-16.

Dr. Wallach also conceded on cross-examination that he never compared each and every element of claim 19 to each element in the Hellman reference:

Q.   All right.  And with respect to Hellman, you did not compare each element of the claimed invention with Hellman to Hellman, correct?

A.   Each element?   My discussion focused on several specific elements.

Q.   But you didn't compare each element of the claimed invention, Claim 19, to Hellman, isn't that true?

A.   In my direct testimony, that's true.

Ex. H, p. 70:7-14.

Recognizing that its expert, Dr. Wallach, provided legally insufficient testimony on the issue of anticipation, Microsoft attempted to bootstrap its theory based upon the lay testimony of Prof. Hellman.  Prof. Hellman, however, was not an expert in this case and, therefore, did not offer opinion testimony comparing each limitation of claim 19 to the Hellman patent.

The question on anticipation is what that patent discloses to one of ordinary skill in the art at the time of the invention, not what it discloses to Prof. Hellman at trial in 2009.  Nowhere did Prof. Hellman offer proof as to what the Hellman patent disclosed to one of ordinary skill in the art at the time of the Richardson invention.  Such testimony is required when anticipation is alleged. *See Schumer*, 308 F.3d at 1315-16.  In fact, any such testimony by Prof. Hellman would be expert in nature and *per se* impermissible because he was never identified as an expert witness by Microsoft.  Thus, it is not surprising that Prof. Hellman did not render same.

With respect to Prof. Hellman's sketches, on cross-examination, he admitted that such sketches are not in the prior art Hellman patent or disclosed in the specification thereof.  Ex. F, pp. 204:1-205:17.  He further admitted that he substantively authored the drawings and specifications, could have disclosed in the patent an identifier associated with the licensee if he had chosen**,** but did <u>not</u> do so.

34

Q.   Sir, could you turn to page 85 of your deposition?

A.   I'm there.

Q.   And I asked you the question: Right.  And you certainly, if
you wanted to indicate that information associated with the
user, unique information was input into the cryptographic
function, you certainly had the ability to disclose that in the
figures, if you so chose.  Answer: Correct.  Question: And
you didn't?  Answer: Correct.

Ex. G, p. 61:14-24.

Q.   (Reading:) And you also had the ability to describe in the
patent if you so chose -- Answer: In the specification?
Question: Yes.  Answer: Yes.  And you didn't?  Answer: Line
11, correct.  Did I read your testimony under oath and the
questions and answers correctly?

A.   Yes, you did.

Ex. G, p. 62:9-18.

Finally, when specifically confronted with what was disclosed in the patent, he conceded

that none of the inputs to the cryptographic function 38 is a unique identifier associated with the

user, i.e. a licensee unique ID. Ex. G, pp. 42-45.  Though Prof. Hellman attempted to

impermissibly broaden his patent disclosure by referring to the patent drawings as describing

merely "an" embodiment thereof, the patent itself clearly states that "the invention has been

described in accordance with one embodiment." DX S-3, col. 12:27-28.  Prof. Hellman testified

that the statements contained in his patent were true and submitted to the PTO under oath. *See*

Ex. G, p. 34.

With regard to the system actually disclosed in his patent, Prof. Hellman conceded that it

was a hardware-based system, wherein the manufacturer of the software manufactured the

hardware. Ex. G, p. 33.  As testified by Prof. Hellman, this arrangement is akin to a hardware

identifier such as a preinstalled dongle which everyone dislikes. Ex. G, p. 40:17-22.  As testified by Prof. Hellman:

> Q.   Okay.  Now, let's -- and SK is a number generated by a piece of hardware manufactured by the manufacturer, correct?
>
> A.   It's, as described in the patent, it's stored in a piece of hardware, stored in memory, which is a piece of hardware, correct.
>
> Q.   So it's a hardware identifier, it comes from the hardware, not the user, correct?
>
> A.   Correct.

Ex. G, p. 42:2-10.

With regard to Microsoft's "serial number" argument (Microsoft br. p. 50), not surprisingly such was rejected by the jury.  As stated in the Hellman patent, the serial number, identification number, user name or similar identifier is unique to base unit 12. *See* DX S-3, col. 5:63-65.  As testified by Prof. Hellman, the serial number and secret key are <u>different</u> and the serial number is <u>not</u> an input to the cryptographic function 38. Ex. G, pp. 58-60.

Prof. Hellman also testified that the serial number is a hardware (not user) identifier:

> Q.   Now, the next item on your list that I'm pointing to the Elmo here is the serial number?
>
> ***
>
> A.   Well, good.  Serial number is a serial number, identification number, user name or similar identifier **unique to base unit 12**.
>
> Q.   Why does the authorization request in your patent **identify the base unit** with a unique identifier?
>
> A.   Well, remember, I don't want a user to be able to share his or her authorization with other users.  **I want to tie the authorization to a specific computer,** which has a unique serial number.

Ex. F, pp. 155-156 (emphasis added).

Microsoft's random number argument (Microsoft br., pp. 49-50), was likewise rejected by the jury.  The Hellman patent discloses that R is a random number associated with a component in the user's computer. *See* DX S-3, col. 5:66-68**;** col. 9:2-5.  More particularly, the Hellman patent explains that R is associated with a *noisy amplifier*, not a particular *user*.  *Id.* at col. 9:58-63**.**  As admitted by Prof. Hellman, R is associated with the hardware, not the user.  As testified by Prof. Hellman:

> Q.  All right.   Now, let's look at R.   R is a random number, correct?
>
> A.  Correct.
>
> Q.  And R, I think you've referenced it in your patent, but R is described in your patent as being generated from a noisy amplifier, correct?
>
> A.  One -- yes, it describes that as a typical way to do it.
>
> Q.  And, in fact, if we look at -- okay.  And a noisy amplifier is a piece of hardware, correct?
>
> A.  Yes it is.
>
> Q.  And the noisy amplifier where you describe R coming from is in the base unit, correct?
>
> A.  Yes.
>
> Q.  And in your patent, the only place in your patent this random number generator is described to be located is in the base unit, correct?
>
> A.  Yes, R is generated by -- only by the base unit.

Ex. G, pp. 45-46.

Finally, to the extent Microsoft attempts to bootstrap its obviousness argument through the testimony of Prof. Hellman**,** the jury was free to disregard same as not credible.  Prof. Hellman was put forth as an independent fact witness.  Given: (1) the financial arrangement with Prof. Hellman, wherein Microsoft contractually paid him $735/hour to testify as a purported

independent fact witness (PX 1107, p. 1); (2) his engagement agreement allowing Microsoft to

terminate his services at will (*id.*, p. 2), and (3) his multiple impeachments at trial (*see* Ex. G,

pp. 42-43, 49-52, 60-62), the jury, as instructed by the Court, was free to disregard any or all of

his purportedly independent testimony.[14]  Simply put, the jury found that Microsoft did not prove

its case on anticipation by clear and convincing evidence.

Thus, in view of the above, it was entirely reasonable for the jury to conclude that

Microsoft failed to prove by clear and convincing evidence that the Hellman patent anticipated

claim 19.

### 2.    Obviousness

As with anticipation, Microsoft burden of obtaining JMOL is "especially exacting where,

as here [on the issue of invalidity], the moving party bears the burden of proof on the issue in

question." *Marrero v. Goya*, 304 F.3d at 22.  Given the lack of evidence presented by Microsoft,

a reasonable jury could, and did, conclude that Microsoft failed to prove by clear and convincing

evidence that claim 19 was obvious in view of Hellman and/or Hellman in combination with

Wolfe.

Obviousness is a legal conclusion based upon underlying facts identified below. *ATD*

*Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998).  In the present case, the parties,

however, agreed that the ultimate issue of obviousness would be decided by the jury, which

found that claim 19 would not have been obvious. *See* D.I. 358, p. 4.  As this Court correctly

instructed the jury, claim 19 is presumed valid. Ex. J, p. 145. *See also* 35 U.S.C. § 282.  As a

result, Microsoft's burden of proof was by clear and convincing evidence. *McGinley v. Franklin*

*Sports*, 262 F.3d 1339, 1349 (Fed. Cir. 2001).  The defense of obviousness is based upon four

---

[14]  Microsoft did not object to the Court's credibility instruction.

factual inquiries, namely (1) the scope and content of the prior art; (2) the differences between the elements of claim 19 and the prior art; (3) the level of skill of ordinary skill in the prior art at the time of the invention; and (4) secondary consideration of non-obviousness. *Id.*; s*ee also* Ex. J, pp. 147-156.  Microsoft did not come close to meeting its burden of proof on the issue of obviousness.

Dr. Wallach did not even compare the elements of claim 19 to the prior art, let alone point out the differences between the elements of claim 19 and the Hellman and/or Wolfe patent. *See* Ex. G, p. 207:20-25; Ex. H, p. 70:7-14.  Neither did Dr. Wallach combine the Hellman and Wolfe patents. *See* Ex. H, p. 70:15-20.  Similarly, Dr. Wallach ignored all secondary considerations.  As testified by Dr. Wallach:

> Q.   The Judge can instruct the jury on that one, but what I'm just
>      trying to get on the record here is you did not discuss with the
>      jury the secondary, as you say, considerations such as
>      long-felt need at the time of the invention?
>
> A.   Correct.
>
> Q.   You did not discuss another secondary consideration such as
>      copying by the defendant, correct?
>
> A.   That was not part of my direct.

Ex. H, p. 71:12-21.

With respect to the Hellman reference, Dr. Wallach performed no analysis of the elements of the claim and their relationship to the prior art, let alone provide any explanation as to why Hellman would render obvious the claim to one of ordinary skill in the art of the time of the invention.  The only testimony proffered by Dr. Wallach was a one-line statement that claim 19 was obvious in view of Hellman. Ex. H, p. 70:21-24.  Such conclusory testimony is insufficient to prove obviousness, let alone by clear and convincing evidence. *See*, *e.g.*, *NTP, Inc. v. Research in Motion Ltd.*, 418 F.3d 1282, 1324-25 (Fed. Cir. 2005) (expert's "testimony was

conclusory and failed to analyze and explain the claim language and which components of the

prior art embodied each element of the asserted claims"); *see also z4 v. Microsoft Corp.*, 507

F.3d 1340, 1355 (Fed. Cir. 2007).

With regard to the Wolfe patent, Dr. Wallach rendered no opinion relative to

obviousness. As testified by Dr. Wallach:

> Q. Plenty. So the examiner found that Wolfe did not anticipate
> the Claim 19 and did not render obvious Claim 19, correct?
>
> A. I believe that's correct.
>
> Q. Right. He had to because he issued the patent with the claim
> we see, true?
>
> A. Yes.
>
> Q. Okay. And you talked about Wolfe, but you did not, on direct,
> render an opinion on Wolfe, correct?
>
> A. That's correct.

Ex. H, p. 69:16-25.

Similarly, Dr. Wallach testified that he provided no opinion with regard to the

combination of Wolfe and Hellman. Again, as testified by Dr. Wallach:

> Q. Okay. And with respect to the question of obviousness, you
> did not identify the elements in -- excuse me, you did not
> combine, so the record is clear, on your direct Hellman and
> Wolfe, correct?
>
> A. In my direct, I made no combination of Hellman and Wolfe.

Ex. H, p. 70:15-20.

In closing, counsel for Microsoft conceded that Hellman did not anticipate claim 19 and

in fact told the jury that Microsoft does not believe claim 19 is anticipated and said the jury

should check the "no" box in answering question 2 of the verdict form. Ex. J, pp. 86:19-87:5

("we actually think there's no anticipation"). Thereafter, counsel informed the jury that

Microsoft's obviousness case was based on the <u>combination</u> of Hellman and Wolfe. *Id.*  Not surprisingly, given Microsoft's closing argument and Dr. Wallach's testimony above, that he rendered no opinion with respect to such combination, the jury rightfully rejected this argument.[15]

Secondary considerations are no longer considered "secondary", but may "often be the most probative and cogent evidence in the record." *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957 (Fed. Cir. 1997) (citation omitted).  Given the indisputable evidence put forth by Uniloc, such considerations independently support the jury's rejection of Microsoft's defense of obviousness.  For example, Uniloc introduced evidence of long-felt need.  Uniloc introduced the testimony by Mr. Gledhill that, at the time of the invention, Microsoft did not have adequate anti-piracy software to prevent casual copying which was a "major problem" for, and a "major cause of loss of revenue" to, Microsoft . Ex. A, pp. 159:25-160:9.  Microsoft's contemporaneous documents indicated that Microsoft was losing billions to casual copying. *See*, *e.g.*, PX 238, p. 10114.  Further, as testified by Mr. Pearce:

> Q.    Sir, when you began the development product -- project of Product Activation, there was a recognition by Microsoft, was there not, that they were losing billions of dollars to casual copying? Isn't that true?
>
> A.    According to my boss, yes, that was the common figure thrown around.

Ex. E, p. 241:19-25.

---

[15]  Microsoft's unsupported argument that claim 19 is obvious because one could take the hashing algorithm of Wolfe**,** a hardware-based system (Ex. G, p. 179:10-14), and substitute it for the hashing algorithm of Hellman, another hardware-based system (Ex. F, pp. 155:22-156:2), was correctly rejected by the jury.  This hindsight lawyer's argument is unsupported by any testimony of its expert.  Further, as noted in the aforementioned section on anticipation, Prof. Hellman conceded that the inputs to his cryptographic function 38 were not uniquely associated with the user.  Thus, irrespective of the purported combination now suggested by Microsoft's counsel, the resulting system remains a hardware-based, dongle approach having no licensee unique ID.  Not surprisingly, this hindsight attorney argument was rejected by the jury.

Nevertheless, Microsoft did not come up with Product Activation until well after the Richardson invention was made in 1992.

Uniloc also introduced evidence of attempts and failures by Microsoft.  As testified by Mr. Pearce, prior to Product Activation, Microsoft introduced a product called HDDI.  This approach, however, was akin to the use of a dongle, was universally disliked, and went nowhere. Ex. E, p. 243:11-23.

Finally, with regard to commercial success, the jury found that Product Activation infringed claim 19.  Accordingly, Microsoft's own infringing products may be considered on the issue of commercial success. *See Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) (sale of over 14,800 infringing machines evidence of commercial success rebutting obviousness).  As the Federal Circuit has determined, "[i]t is not necessary, however that the patented invention be solely responsible for the commercial success, in order for this factor to be given weight appropriate to the evidence". *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991).

The commercial success of the invention is indisputable.  As a result of using Product Activation in its infringing "crown jewel" products for years, Microsoft put in its pocket over $5.5 billion in additional revenue. Ex. E, pp. 76-77.  Whether the consumer likes or dislikes Product Activation is irrelevant.  Microsoft obviously appreciates Product Activation and the commercial benefits thereof.

Given the above, Uniloc respectfully submits that a reasonable jury could and did reject Microsoft's argument that claim 19 was obvious to one of ordinary skill in the art at the time of the invention.

### 3.      Claim 19 Is Not Indefinite, An Argument Microsoft Waived

On pages 57-60 of its brief, Microsoft argues that claim 19 is invalid under 35

U.S.C. § 112, ¶ 2 for indefiniteness.  Microsoft, however, waived this argument in its pretrial

memoranda.  Microsoft's invalidity arguments are set forth on pages 16-25 of its pretrial

memorandum. *See* D.I. 291, pp. 16-25.  Microsoft asserts therein that claim 19 is invalid in view

of the prior art but does not assert that claim 19 is invalid for indefiniteness.  In footnote 4 on

page 21, Microsoft refers to purported "indefiniteness problems" with the term "unique" but does

not state affirmatively that claim 19 is invalid for indefiniteness.  Similarly, in its supplemental

pretrial memorandum filed two weeks before trial (D.I. 306), Microsoft alleges invalidity in view

of the prior art, but not for indefiniteness.  Bearing in mind that Microsoft has the burden of

proving indefiniteness by clear and convincing evidence, *Young v. Lumenis, Inc.*, 492 F.3d 1336,

1344-45 (Fed. Cir. 2007), its failure to specifically assert invalidity for indefiniteness in its

pretrial memoranda results in Microsoft having waived the argument.

In any event, the Court addressed the term "unique" during claim construction.  Contrary

to its position now that the term "unique" is indefinite, in its claim construction brief, Microsoft

argued that "unique" has a "plain and ordinary meaning" and proposed a definition of "unique"

as being "one-of-a-kind." *See* D.I. 139, pp. 33-34.  The Court properly rejected Microsoft's

proposed "one-of-a-kind" construction as being inconsistent with the language of the

'216 patent. *See* D.I. 145, pp. 11-12.  Noting that there was no dispute over this Court's

construction of "unique" as not being "one-of-a-kind", the Majority Opinion of the Federal

Circuit explicitly agreed with this interpretation. *See* PX 12, p. 9 n. 3.  This Court instructed the

jury in accordance with this meaning of the term "unique." Ex. J, p. 137.  Microsoft did not

object to the Court instructing the jury on this element of claim 19 or to the instruction given.

Thus, the term "unique" is not indefinite and Microsoft waived its argument to the contrary.

Microsoft's indefiniteness argument should also be rejected for a failure of proof. To prove indefiniteness of claim language, Microsoft had to show by clear and convincing evidence that the term "unique" was "insolubly ambiguous" to "a skilled artisan." *See*, *e.g.*, *Invitrogen Corp. v. Biocrest Mfg. L.P.*, 424 F.3d 1374, 1383-84 (Fed. Cir. 2005). Microsoft offered no clear and convincing evidence on this issue. None of Microsoft's witnesses testified that the term "unique" is insolubly ambiguous or indefinite. The only trial testimony cited by Microsoft is from Mr. Klausner, who certainly did not testify that the claim is indefinite. As it did unsuccessfully at trial, Microsoft attempts to confuse the issue of uniqueness with the issue of randomness. Also, as indicated above, Microsoft conceded that this term is not "insolubly ambiguous" during claim construction when it argued that "unique" has "a plain and ordinary meaning," although the meaning proposed by Microsoft was wrong, as confirmed by the Federal Circuit. Thus, Microsoft failed completely to prove indefiniteness.

### E.      The Damages Awarded Are Supported By The Evidence

On pages 61-76 of its brief, Microsoft re-hashes the failed arguments on damages that it made in its *Daubert* motion. *Cf.* D.I. 217. For the reasons that those arguments were rejected pretrial, they should likewise be rejected now. Going into trial, Microsoft knew that Uniloc would ask the jury to award Uniloc around $565 million in damages. Aware of the risk of such an award, Microsoft elected nonetheless to proceed to trial. Microsoft should not now be heard to complain that the jury awarded approximately 68% of Uniloc's damages request and rejected Microsoft's damages case. The jury "had every right to believe the evidence presented to it respecting a proper damage award sufficient to compensate [Uniloc] for the injury." *Weinar v. Rollform, Inc.*, 744 F.2d 797, 808 (Fed. Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985). "To the extent that there were conflicts in the evidence, neither the trial court upon motion for judgment n. o. v., nor the appellate court may substitute its choice of result for that of the jury." *Brooktree*

*Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1580 (Fed. Cir. 1993).  Thus, Microsoft's argument on the issue of damages should be rejected.

### 1.       The Law On Damages In Patent Cases

On pages 62-63 of its brief, Microsoft espouses its idea of the applicable "Damages Law" in this case.  Notably, Microsoft ignores the basis for assessing damages in patent cases, namely the statute - 35 U.S.C. § 284 - which states as follows:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty *for the use made of the invention by the infringer*, together with interest and costs as fixed by the court.

(emphasis added).

As it did at trial, Microsoft ignores the compensatory nature of the statute.  There is no dispute the evidence at trial showed that approximately 266 million infringing activations had taken place.  Thus, the task of the jury was to ensure that Uniloc was adequately compensated for each act of infringement.

Microsoft instead argues that Uniloc failed to establish an entitlement to damages under the Entire Market Value rule.  As Microsoft is aware, however, Uniloc did not request an award of damages under the Entire Market Value rule.  Mr. Gemini's calculation was based upon 25% of the admitted $10 value of each successful activation resulting in a new license issued.  His royalty was not based on the value ($85.00) of the entire software package.  Thus, Microsoft's attempts to create a Entire Market Value straw man to knock down should be rejected.

### 2.       Mr. Gemini's Royalty Was Not Based Upon, And Did Not Violate, The Entire Market Value Rule

Microsoft expands upon its erroneous Entire Market Value argument on pages 63-64 of its brief.  According to Microsoft, "Mr. Gemini's self-styled 'check' was in substance a

back-door argument that damages should be based on the entire market value of the accused

products." This argument must be rejected because Mr. Gemini made perfectly clear that his

royalty calculation was not based upon the entire market value rule and that the $19.27 billion

number was for comparison purposes:

> Q.    So, if we can step back a minute, when you compare the
>        royalty -- well, step back further.  Your opinion in this case
>        was based off the methodology that you've told the jury, the
>        statute, the Georgia-Pacific factors and rule of thumb,
>        correct?
>
> A.    Yes.
>
> Q.    So your opinion isn't -- you're not basing your opinion off
>        of the $19.27 billion, is that correct?   This is just a
>        comparison?
>
> A.    This is a comparison.

Ex. E, pp. 74:17-75:1.

Further, Microsoft did not object to Mr. Gemini's testimony on this issue. Ex. E, pp. 71-

75.  Neither did Microsoft move to strike any of Mr. Gemini's testimony.  Thus, Microsoft

cannot now complain that Mr. Gemini's testimony regarding this "check" was improper.  In

addition, Microsoft cross-examined Mr. Gemini and, therefore, was provided the opportunity to

develop whatever testimony Microsoft thought necessary to challenge same.

Microsoft also ignores the fact that the Court specifically instructed the jury that it could

not award damages based on Microsoft's entire revenues on sales of the accused products:

> In considering all of these [damages] factors, keep in mind two
> overarching principles.  First, you may not award damages based
> on Microsoft's entire revenue from all the accused products in this
> case.

Ex. J, pp. 161:23-162:1.

It is assumed that the jury "scrupulously" followed these instructions, to which Microsoft did not object. *See United States v. Riccio*, 529 F.3d 40, 45-46 (1st Cir. 2008) ("our system of trial by jury is premised on the assumption that jurors will scrupulously follow the court's instructions") (citation omitted).  Contrary to Microsoft's argument, the jury did not award damages based upon the Entire Market Value rule in this case and Uniloc, therefore, did not have to prove customer demand for Product Activation.

**3.**       <u>**Mr. Gemini's Analysis Is Supported By The Evidence And The Law**</u>

**(a)**       <u>**$10 Per Activation Is Supported**</u>

On page 65-68 of its brief, Microsoft argues that Mr. Gemini's reliance upon a value of $10 per activation is unsupported.  Again, this is a re-hash of Microsoft's failed *Daubert* motion. As the Court stated at the *Daubert* hearing (*see* Ex. M, pp. 76-77), the document referenced by Microsoft that Mr. Gemini relies upon for the $10 value is plain on its face, as set forth below: [16]

> <u>SECURITY</u>
>
> Product Keys are valuable for two major reasons.  First, since Product Keys can be used to install a product and create a valid Product ID, you can associate a monetary value to them.   An appraisal process found that a Product Key is worth anywhere between $10 and $10,000 depending upon usage.   Secondly, Product Keys contain short digital signature technology that Microsoft Research created.  For these reasons, it is critical that Product Keys are handled with maximum security.

PX 261, p. MS-U 102708.

In its Order denying Microsoft's motion *in limine* on this issue, the Court found that:

> [Mr. Gemini's] derivation of the $10 figure is not the product of conjecture or rough approximation; rather, it is grounded in Microsoft's own admission.  The Court finds telling that Microsoft has not argued Mr. Gemini ignored other relevant evidence that would suggest $10 per activation is inaccurate or too high a value.

---

[16] Mr. Gemini relied upon many other documents in support of his opinion. *See*, *e.g.*, Ex. E, pp. 33, 41, 45, 50.

D.I. 322, p. 4.

As the Court also observed at the *Daubert* hearing, the document "does say what it says." Ex. M, p. 77.  Microsoft produced no other documentation identifying the value of Product Activation.  Further, the "appraisal" upon which the above excerpt was based was never produced by Microsoft in this case.  Neither did Microsoft bring the author of the document (Ms. Chainani) to trial.  As a result, Microsoft's complaint about Mr. Gemini's reliance upon this Microsoft document should be rejected. *See*, *e.g.*, *Beatrice Foods Co. v. New England Printing and Lith. Co.*, 899 F.2d 1171, 1176 (Fed. Cir. 1990) (where infringer fails to preserve documents, court "should resolve all doubts against him").

On pages 66-67, Microsoft argues, as it did at trial, that the documents relied upon by Mr. Gemini relate to technology other than Product Activation.  The jury properly rejected this argument.  As Uniloc demonstrated at trial, Microsoft's argument is contradicted by its own documents.  For example, Uniloc introduced PX 238, dated February 21, 2001 and titled "Office XP Product Activation Review.  Under the heading "Product Activation", this document states: "Name evolution: Maynard > LVP > ORW > MPA." *See* PX 238, p. MS-U 010115.  Uniloc also introduced an email from Susan Cole dated January 1, 2001 stating that Microsoft was "rolling out product activation (aka forced registration, office registration wizard, license verification program etc." *See* PX 90.  Thus, Microsoft's efforts to distinguish the "$10-$10,000" per Product Key document (*see* PX 261, p. MS-U 102708) on the grounds that it discusses LVP, not Product Activation, were, as the jury obviously found, not credible and contrary to the evidence.  Moreover, it is self-apparent from the document itself that PX 261 was directed to the technology used in Product Activation because it discusses the Product Key, the PID and the HWID features used in Product Activation. *See*, *e.g.*, PX 261, pp. MS-U 102687-88.  Ms.

Richards also told the jury on cross-examination that LVP was the precursor to Product Activation. Ex. I, p. 58:4-7. Thus, Microsoft's LVP argument was properly rejected by the jury.

Finally, Microsoft argues that Ms. Richards testified that the excerpt above does not place a value on Product Activation. Microsoft br., p. 67. Again, Microsoft attempts to have the Court impermissibly weigh the evidence. Nevertheless, during cross-examination Ms. Richards testified that: (1) the document refers to PIDs and HWIDs that are used in Product Activation, and (2) the document refers to the License Verification Program ("LVP") which, she and Ms. Cole admitted, was the precursor to Product Activation. Ex. I, pp. 56-59. Ms. Richards also testified that she did not author this excerpt and had not seen the appraisal upon which it was based. Ex. I, pp. 60-61. Notably, the author of the Microsoft document, Ms. Chainani (*see* PX 1114, p. 1), an individual obviously knowledgeable about the appraisal was**,** like the appraisal itself, conspicuously absent from trial. Thus, Microsoft's attempts to use Ms. Richards to neutralize PX 261 failed.

### (b)   25% Rule of Thumb

On pages 68-69 of its brief, Microsoft argues that the 25% Rule of Thumb used in Mr. Gemini's analysis is "unsound and divorced from the facts of this case". This is another re-hash of Microsoft's failed *Daubert* motion and, thus, should be rejected anew. As the Court stated in denying Microsoft's motion, the 25% rule is accepted:

> With respect to Mr. Gemini's use of the 25% rule of thumb, the call is closer but ultimately the opinion is not excludable on this basis. Although the concept of a "rule of thumb" is perplexing in an area of the law where reliability and precision are deemed paramount, the reliability inquiry is a "flexible one." Daubert, 509 U.S. at 594. "The '25% Rule' has been accepted as a proper baseline from which to start [a royalty] analysis." GSI Group, Inc. v. Sukup Mfg. Co., No. 05-3011, 2008 WL 4964801 *12 (C.D. Ill. Nov. 18, 2008) (citing Bose Corp v. JBL, Inc., 112 F. Supp.2d 138, 165 (D. Mass. 2000)). There has been considerable criticism of the rule, see e.g. Richard S. Toikka, Patent Licensing under

> <u>Competitive and Non-Competitive Conditions</u>, 82 J. Pat. & Trademark Off. Soc'y 279, 292-93 (2000), much of which is well reasoned.  However, the rule's widespread and general acceptance in the field suggests that the reasonableness of Mr. Gemini's reliance on it in fashioning his opinion is a matter that more properly goes to weight as opposed to admissibility.
>
> Taking a different approach, Microsoft argues that the 25% rule is only designed to serve as a starting point for a damage calculation and that because Mr. Gemini does not deviate from the rule this approach is result oriented and unreliable.  While Mr. Gemini's apparent rote application of the 25% rule is enough to raise an eyebrow, his expert report reveals that he considered many factors in forming his opinion.  Again, Microsoft may rely on cross examination and other tools of the adversary process to address the weaknesses in this testimony.

D.I. 322, pp. 4-5.

Also, during the argument on the motion, counsel for Microsoft withdrew its opposition to the Rule of Thumb, stating to the Court that "if you're inclined to just let that one [25% Rule of Thumb] go because its been used in other cases, albeit without challenge, you know, so be it." *See* Ex. M, pp. 72-73.  At trial, the Court reiterated its findings during the *Daubert* proceedings that the Rule of Thumb is "generally accepted.*"* Ex. E, p. 179.  Microsoft should not now be allowed to complain that the 25% Rule of Thumb was used in Mr. Gemini's analysis or to simply repeat a legal argument this Court has already rejected.

Microsoft's argument that somehow Mr. Gemini failed to apply the *Georgia-Pacific* factors in his analysis is also wrong.  Mr. Gemini analyzed each of the *Georgia-Pacific* factors at trial. Ex. E, pp. 17-41.  Microsoft also erroneously asserts that Mr. Gemini failed to consider moving from a 25% apportionment in view of the *Georgia-Pacific* factors. *See* Microsoft br., p. 69.  In fact, Mr. Gemini testified that he "considered all the factors" and that "some favored Microsoft, some favored Uniloc." Ex. E, p. 67.  Mr. Gemini testified that "[he] felt strongly that [he] could have adjusted [the 25%] number up based on the data" but that "$2.50, was reasonable

based on his analysis of all the[] factors." *Id.*  Microsoft cross-examined Mr. Gemini.  Thus,

Microsoft was given the opportunity to demonstrate that Mr. Gemini's analysis was flawed.

Obviously, the cross-examination on this issue was ineffective and the jury believed Mr. Gemini.

### 4.       The Damages Award Is Supported By The Evidence And Is Not Grossly Excessive

On pages 69-70 of its brief, Microsoft argues that the damages award of $388 million is

"grossly excessive."  Based on the record evidence, Microsoft's argument must be rejected.

"'[A] party seeking a remittitur bears a heavy burden of showing that an award is grossly

excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial

of justice to permit it to stand.'" *Monteagudo v. AEELA*, 554 F.3d at 174.  To the extent that

there are conflicts in the evidence, neither the trial court upon motion for judgment n.o.v. (now

JMOL) nor the appellate court may substitute its choice of result for that of the jury. *DMI, Inc. v.*

*Deere & Co.,* 802 F.2d 421, 427 (Fed.Cir.1986).

The jury in this case was "free to select the highest figures for which there is adequate

evidentiary support." *See Shane v. Shane*, 891 F.2d at 983.  It is undisputed that the number of

successful activations for which new license were issued was 225,978,721. *See* Ex. E, p. 70.

Mr. Gemini opined that a running royalty would have been negotiated at a rate of $2.50 per new

license, resulting in a total royalty payment of $564,946,803. *Id.* at pp. 70-71.  Thus, Mr. Gemini

testified that the damages caused by Microsoft's infringement are approximately $565 million.

Microsoft argued that damages were $3-7 million.  The jury awarded $388 million,

approximately 68% of what was supported by the evidence.  Thus, the amount awarded falls

within the ranges offered by the parties.  As a result, the amount of the award is reasonable in

view of the large amount of infringement.  Microsoft's argument that $7 million is the

"maximum amount that is supported by the record" (Microsoft br., p. 70) was rejected by the

jury.  As the Federal Circuit has stated, "a jury's [royalty] choice simply must be within the

range encompassed by the record as a whole." *Fuji Photo Film*, 394 F.3d at 1378 (citation

omitted).  In this case, the $388 million awarded is "within the range" of $3-565 million

encompassed by the trial record.  Therefore, Microsoft's motion for a new trial on damages or

for a remittitur should be denied.

### 5.    Damages On Activations Initiated Outside The U.S. Were Properly Included

On pages 70-76 of its brief, Microsoft repeats its failed motion *in limine* that Uniloc

cannot recover damages for activations that were initiated outside of the United States.

Microsoft argues, as it did before, that the facts of this case are governed by the decision in

*Microsoft Corp. v. AT&T*.  As explained in Uniloc's opposition to Microsoft's motion *in limine*,

the *AT&T* case is not controlling because in that case the entire infringing product was

manufactured, sold, and used outside the United States.  The Court agreed with Uniloc that the

facts of this case are more in line with those in the *NTP* case, where part of the system at issue

therein was within the United States and part was outside the United States. *See* D.I. 322, p. 16.

Based upon the *NTP* case, the Court correctly instructed the jury, without any objection

by Microsoft, that it could only award damages for activations initiated outside the United States

if it answered three questions in the affirmative:

> There is one final aspect to damages that I need to discuss you
> with.  If you decide that a damage award is appropriate, then you
> must determine whether to include activations of Microsoft's
> accused products by users located outside of the United States.  In
> other words, you must decide whether activation by a foreign user
> outside of the United States gives rise to liability under the United
> States patent laws.  To answer this question, you must consider
> each of the three following questions in the context of Microsoft's
> accused products licensed to and activated by users located outside
> of the United States.

> There are three questions.  These are three questions you must consider.  They're not all in the verdict form.  All right?  The three questions are as follows:  One, whether the Microsoft Product Activation system as a whole is put into service within the United States;   second, whether control of the Microsoft Product Activation system is exercised within the United States;  and third, whether the beneficial use of the Microsoft Product Activation system is obtained within the United States.  If the answer to all three of these questions is yes, then you should consider or include activations of Microsoft accused products by users located outside the United States to the extent you deem appropriate in making a damages award.  If the answer to even one of these three questions is no, then you should not include these foreign activations in a damages award.

Ex. J, pp. 162-63.

As indicated by the jury's answer to question 5 of the verdict form, the jury determined that Uniloc presented evidence supporting affirmative responses to these three questions.  *See* D.I. 358.  Uniloc presented unrebutted evidence by Mr. Klausner that the accused Microsoft system as a whole is put into service by Microsoft in the United States, control of the system is exercised by Microsoft in the United States, and beneficial use of the system is obtained by Microsoft in the United States. Ex. C, pp. 73-76; *see also* Ex. J, p. 120 (stipulation that the ClearingHouses for worldwide activations are located within the United States).  As a result, under controlling Federal Circuit law, the jury decided these factual questions and properly included damages initiated from outside the United States.

On pages 73-74 of its brief, Microsoft argues that the prosecution history of the '216 patent supports its argument regarding activations initiated from outside the United States.  The prosecution history was before the jury. *See* DX C-8.  Microsoft**,** however, did not even bother to raise this factual prosecution history argument in its closing**.**  Thus, Microsoft has waived this afterthought argument.  Such waiver notwithstanding, Microsoft's prosecution history argument is also unavailing.  The snippet of prosecution history relied upon by Microsoft

simply indicates the uncontroversial point that the algorithm is used on both the remote and local parts of the system.  It does not discuss the fact that the entire ClearingHouse system is located and operated by Microsoft in the United States.  The jury decided this factual question based upon unrebutted testimony of Mr. Klausner (Ex. C, pp. 27-30, 61, 73-76) and its verdict is, thus, fully justified.

On pages 74-76 of its brief, Microsoft argues, citing *Deepsouth Packing Co., Inv. v. Laitram Corp.*, 406 U.S. 518 (1972), that direct infringement under Section 271(a) is limited "to assembly of all elements in the United States. *See* Microsoft br., p. 76.  Microsoft never raised this *Deepsouth* argument in its pretrial memorandum or in its motion *in limine*.  Likewise, Microsoft did not make this argument in its motion for JMOL of non-infringement at the close of Uniloc's case-in-chief. *See* D.I. 349-2.  Microsoft, therefore, waived the argument. *See Monteagudo v. AEELA*, 554 F.3d at 171 (a motion for JMOL "preserves for review only those grounds specified at the time, and no others").

Microsoft's argument is also legally erroneous.  Microsoft's *Deepsouth* argument was rejected by the Federal Circuit in *NTP*.  More particularly, the argument made by the infringer in *NTP* was as follows:

> On appeal, RIM argues that the district court erred in its interpretation of the infringement statute.  RIM does not appeal the jury's finding that its customers use, *i.e.*, put into service, its systems and methods for transmitting email messages.  RIM has, however, appealed whether any direct infringement, by it or its customers, can be considered "within the United States" for purposes of section 271(a).  Citing the Supreme Court's decision in *Deepsouth*, RIM contends that an action for infringement under section 271(a) may lie only if the allegedly infringing activity occurs within the United States.  RIM urges that, in this case, that standard is not met because the BlackBerry Relay component, described by RIM as the "control point" of the accused system, is housed in Canada.  For section 271(a) to apply, RIM asserts that the entire accused system and method must be contained or

> conducted within the territorial bounds of the United States.  RIM
> thus contends that there can be no direct infringement as a matter
> of law because the location of RIM's Relay outside the United
> States precludes a finding of an infringing act occurring within the
> United States.

*NTP*, 418 F.3d at 1314.

This is the same erroneous argument by RIM as Microsoft is attempting (again) to foist upon the Court in this case. *See* Microsoft br., p. 74 ("consistent with *Deepsouth*, there can be no damages for the use of the patented invention unless the entire system is used in the United States").  Thus, in *NTP*, RIM was found to directly infringe notwithstanding that the infrastructure used to process signals to and from Blackberry users in the United States was located in Canada:

> In [*Deepsouth*], both the act of making and the resulting patented
> invention were wholly outside the United States.  By contrast, this
> case involves a system that is partly within and partly outside the
> United States and relates to acts that may be occurring within or
> outside the United States.
>
> * * *
>
> As our predecessor court concluded, infringement under section
> 271(a) is not necessarily precluded even though a component of a
> patented invention is located outside of the United States.
>
> * * *
>
> The use of a claimed system under section 271(a) is the place at
> which the system as a whole is put into service, *i.e.*, the place
> where control of the system is exercised and beneficial use of the
> system obtained. *See Decca*, 544 F.2d at 1083.  Based on this
> interpretation of section 271(a), it was proper for the jury to have
> found that use of NTP's asserted system claims occurred within the
> United States. [Footnote omitted].

*NTP*, 418 F.3d at 1315-17; *see also Decca Ltd. v. United States*, 544 F.2d 1070, 1083 (Ct. Cl. 1976) (direct infringement although one of the claimed elements, a transmitting station, was located in Norway).

In this case, the ClearingHouse infrastructure used to control the Product Activation

system is located in the United States and the jury found that "the place where control of the

system is exercised and beneficial use of the system [is] obtained" is the United States.  As a

result, consistent with *NTP*, the jury found direct infringement under section 271(a),

notwithstanding that some user's of the infringing software are located outside the United States.

**IV.**    **CONCLUSION**

For the reasons set forth above, Microsoft's motions for judgment as a matter of law, for

a new trial and/or for remittitur should be denied.

Dated:   May 29, 2009

Respectfully submitted,

**UNILOC USA, INC.**
**UNILOC SINGAPORE PRIVATE LIMITED**

By:    /s/  Sheri L. Pizzi
Sheri L. Pizzi (R.I. Bar No. 5720)
**TAYLOR DUANE BARTON**
  **& GILMAN, LLP**
10 Dorrance Street, Suite 700
Providence, Rhode Island 02903
(401) 273-7171 (Telephone)
(401) 273-2904 (Facsimile)

OF COUNSEL:

By:    /s/  Dean G. Bostock
Paul J. Hayes, Esq.
Dean G. Bostock, Esq.
**MINTZ, LEVIN, COHN, FERRIS,**
  **GLOVSKY AND POPEO, P.C.**
One Financial Center
Boston, MA  02111
(617) 542-6000 (Telephone)
(617) 542-2241 (Facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic File ("NEF"), and paper copies will be sent to those indicated as non-registered participants on May 29, 2009.

/s/  Dean G. Bostock

4609734v.1