# Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * CIVIL ACTION

UNILOC, USA, INC.,    * 03-440-S

ET AL             *

                  *

VS.             * MARCH 27, 2009

                * VOLUME 5

MICROSOFT CORP.,     *

ET AL             * PROVIDENCE, RI

* * * * * * * * * * * *

    HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

        DISTRICT JUDGE

      (JURY TRIAL)

APPEARANCES:

FOR THE PLAINTIFF:    PAUL J. HAYES, ESQ.,

       and EUGENE A. FEHER, ESQ.,

       and PAUL CRONIN, ESQ.

       Mintz, Levin, Cohn, Ferris

       Glovsky & Popeo

       One Financial Center

       Boston, MA  02111

       (617) 542-6000

FOR THE DEFENDANT:    FRANK E. SCHERKENBACH, ESQ.,

       and KURT GLITZENSTEIN, ESQ.

       Fish & Richardson, P.C.

       225 Franklin Street

       Boston, MA  02110-2804

       (617) 542-5070

Court Reporters:    Anne M. Clayton, RPR

       and Debra D. Lajoie, FCRR

       One Exchange Terrace

       Providence, RI  02903

Proceeding reported and produced by computer-aided

      stenography

1  at the same time.  All right?  Everybody understand

2  that?  Okay.

3      Sorry to interrupt your examination.  I should

4  have given that instruction at the beginning.

5      MR. CRONIN:  Thank you, your Honor.  May I

6  proceed?

7      THE COURT:  Yes.

8      MR. CRONIN:  Your Honor, this demonstrative is

9  not objected to.

10     MR. SCHERKENBACH:  No objection.

11 Q.  Mr. Gemini, would you please explain to the jury

12 what is now showing on the ELMO and also shown up on

13 the easel?

14 A.  This is a simple summary of what I've done, I

15 guess, and what I've considered in a global sense.

16 We've discussed the patent statute, you know, is my

17 first step in determining how to determine damages, and

18 then the second item there is something called

19 Georgia-Pacific factors.

20     The second bullet point in this chart is

21 something called Georgia-Pacific factors.  Now, the

22 Georgia-Pacific factors are 15 factors that were laid

23 out in a case years ago called Georgia-Pacific versus

24 U.S. Plywood.  And these 15 factors have been somewhat

25 a standard in determining how to consider a reasonable

1    royalty.  You consider these factors as part of your

2    analysis.  So I've considered that in my analysis here

3    based on those factors.

4        I've also considered another widely accepted

5    methodology called a rule of thumb where you want to

6    kind of isolate the infringement, the accused

7    infringement as it's related to the product, and then

8    to determine a royalty rate you allocate some portion

9    of that benefit of the accused device to the patent

10   owner and leave the remainder part with the accused

11   infringer.  It's usually based on a 25%/75% split.

12   It's called a rule of thumb.  So I consider that also.

13   Q.   So Mr. Gemini, did you consider all three of these

14   items as part of your overall methodology?

15   A.   Yes.

16   Q.   Would you please tell us how the three items shown

17   to the jury work together and help you formulate your

18   opinion in this case.

19   A.   Well, I consider the statute, as we've gone

20   through that.  Then what I do is I like at the

21   Georgia-Pacific factors, and I consider how they may

22   affect a hypothetical negotiation, would they a favor

23   the patent owner.  Would they favor the accused

24   infringer..  I go through each one of those and try to

25   determine how they would factor and how they would

1    adjust my rule of thumb royalty starting point which

2    would be the 25/75% split.  That's kind of how --

3    you'll see more clearly how I've done this.  That's

4    just an overview of what I've done in this analysis.

5    Q.  Mr. Gemini, using the methodology you've just

6    described, have you formed an opinion on the

7    appropriate amount of damages due Uniloc in this case?

8    A.  Yes.

9    Q.  Have you prepared a slide that summarizes your

10   opinion?

11   A.  Yes.

12        THE COURT:  Any objection to this slide?

13        MR. SCHERKENBACH:  No objection, your Honor..

14   Q.  Mr. Gemini, would you please tell the jury what is

15   shown on the slide.

16   A.  This is a summary of my analysis and what I've

17   determined to be the reasonable royalty.

18   Q.  Let's take this one at a time.  The first thing

19   showing is "Reasonable royalty base."  Would you please

20   tell the jury what that is?

21   A.  Yes.  I was provided with information from

22   Microsoft as to the number of licenses, new licenses

23   issued as a result of Product Activation.  And a

24   license that -- Microsoft calls, generally, their sales

25   licenses, so a license to Microsoft is a sale.  So

1    these are the total number of licenses issued during

2    the period of damages in this case.

3    Q.   And please tell the jury what is shown in the

4    middle, the reasonable royalty rate.

5    A.   That's what I've determined the reasonable rate to

6    be applied to each and every accused infringing new

7    license issued.

8    Q.   How did you determine the reasonable royalty rate,

9    Mr. Gemini?

10   A.   I went through my analysis, the methodology we

11   just talked about, the Georgia-Pacific factors, the

12   rule of thumb, I relied on the statute.  So I went

13   through all those procedures.

14   Q.   Shown at the bottom, Mr. Gemini, what does

15   reasonable royalty mean?

16   A.   That's just the multiplication of the new licenses

17   issued, the top line, times the reasonable royalty.

18   Q.   Mr. Gemini you've now provided a summary of your

19   opinion.  Let's take a look at how you formed it and

20   get to the basis of your opinion.

21        MR. CRONIN:  Your Honor, no objection to this

22   slide.

23        THE COURT:  Okay.

24   Q.   Mr. Gemini, would you tell the jury what is

25   showing on the ELMO and also on the easel.

1    A.  These are the Georgia-Pacific factors I mentioned,

2    the 15 of them as they were actually laid out in the

3    court case, and these are factors that are normally

4    considered when you're determining a reasonable

5    royalty.

6    Q.  And have you applied these 15 factors in this

7    case?

8    A.  Yes, I've considered each and every one of them.

9    Q.  And have you applied them in other cases you've

10   worked on?

11   A.  Yes.

12   Q.  Let's walk through these quickly so we can explain

13   them to the jury.

14       Would you please, if you would, just tell us

15   what the factors mean.

16   A.  Do you want individually?

17   Q.  Yes.

18   A.  Okay.  Factors 1 and 2 essentially deal with

19   licensing of the patent at issue in the case, Uniloc's

20   patent, and that's Factor 1.  Factor 2 deals with

21   royalty rates or agreements of Microsoft for comparable

22   technology, anti-piracy type technology.

23       Factor 3 deals with some specifics of what a

24   license could entail, whether it be exclusive or

25   non-exclusive.  We'll get into more detail of what

1    those mean later.  I'll just summarize them now, but

2    there's different rates that may apply, exclusive

3    versus non-exclusive.

4        Factor 4 deals with Uniloc's policy on

5    licensing.  You know, do they want to license their

6    technology or do they want to use it themselves to make

7    their own products?

8        Factor 5 deals with whether Uniloc and Microsoft

9    are competitors in the same area of business selling

10   software products.

11       Factor 6 deals with whether the products that

12   are being sold that use the invention help sales of

13   non-related products such as, for example, does the use

14   of the '216 patent allow Microsoft to sell an X-Box so

15   we'll kind of go through that.

16       Factor 7 deals with the life of the patent.  All

17   patents have a life.  Usually, it's normally 17 to 20

18   years so there's an expiration date on a patent.

19       Factor 8 deals with the profitability of the

20   products made under the patent and the commercial

21   success of those products.

22       Factors 9 and 10 generally deal with the

23   advantages of the patent and how it's used.

24       Factor 11 deals with how Microsoft in this case

25   has used the patent.  What benefit have they achieved

1    from using it.

2         Factor 12 deals with the rule of thumb I've

3    discussed.  What portion of the benefits should go to

4    the patent owner.

5         Factor 13 deals with Microsoft's facilitation of

6    these products.

7         Factor 14 deals with opinion testimony of

8    experts such as myself.

9         And Factor 15 is kind of the structure of the

10   hypothetical negotiation I keep talking about.  That's

11   where it's laid out, the details of it.

12   Q.   Mr. Gemini, in analyzing these factors in a trial

13   like this, is there a way you can group these together

14   and make it easier?

15   A.   Yes, I've done that to try and make it a little

16   easier to go through, because we're going to go

17   through, at least in some sense, each one of them.

18        MR. SCHERKENBACH:  No objection.

19   Q.   Mr. Gemini, would you please tell the jury what's

20   shown on the easel and also on the ELMO.

21   A.   I've tried to just group these 15 factors in the

22   four general categories.  They're just general.  I

23   tried to keep them so we could talk about them more

24   together where they might relate to each other, and

25   I've tried to paraphrase the factors.  You saw the

1    detail of them.  I tried to put down the main points of

2    each factor in those categories.

3    Q.   Let's start to review the Georgia-Pacific factors

4    here, and, if we could, start with Factor Number 15

5    because we've already mentioned -- I believe you

6    already mentioned a bit.

7        Would you please tell the jury a bit more about

8    the hypothetical negotiation.

9    A.   Well, again, the hypothetical negotiation is what

10   you want to do is try and recreate a situation where

11   maybe they're in a board room, Microsoft -- a business

12   person, reasonable business person from Microsoft is

13   sitting down with a reasonable person from Uniloc.  And

14   this happens right at the time first infringement

15   begins, okay, right before the first infringement.

16       And they want to sit down and negotiate a

17   royalty.  It's hypothetical because it didn't happen.

18   It's part of why we're here, because we're trying to

19   determine, you know, what would happen.

20       So this is not really -- it's a recreation of

21   what may happen.  So that's the starting point of my

22   analysis.

23   Q.   Mr.. Gemini, you mentioned at the time of the

24   infringement -- when is that in this case?

25   A.   That's March of 2001.

1    Q.  And in connection with the hypothetical

2    negotiation, does the law require you to make any

3    assumptions when you're performing your analysis?

4    A.  Yes.

5    Q.  Okay.  And have you prepared a slide to show us

6    the assumptions that you're required to make?

7    A.  Yes.

8       MR. CRONIN:  No objection to this, your Honor.

9       MR. SCHERKENBACH:  No objection.

10   Q.  Mr. Gemini, do you recognize what's on the ELMO

11   and also on the easel.

12   A.  Yes.

13   Q.  Would you please tell the jury what it is.

14   A.  These are the basic assumptions you have with the

15   hypothetical negotiation.  These are the required

16   assumptions.

17   Q.  Let's talk about them one at a time.  What does

18   "willing licensor" mean?

19   A.  Willing licensor is Uniloc in this case.  Uniloc

20   is assumed to be willing to license its patent.  In

21   other words, they're not going to give up until there's

22   an agreement.  So they're willing to license.

23   Q.  What does "willing licensee" mean?

24   A.  Willing licensee in this case is Microsoft.

25   Microsoft wants to license Uniloc's patent under this

1    hypothetical negotiation.  So they're sitting down and

2    they're not leaving until they negotiate a royalty.

3    Q.   What is in the middle, "patent is infringed"?

4    A.   Under the hypothetical negotiation, there's no

5    issue of infringement.  The patent is already assumed

6    to be infringed.  In other words, Microsoft can't leave

7    saying we don't think we infringed.  It's already

8    assumed to be infringed.  There's no risk of any

9    infringement at that point.  It's already determined.

10   Q.   What about "patent is valid," what does that mean?

11   A.   The same situation.  These issues are being

12   discussed now, but in a hypothetical negotiation those

13   are not issues.  The patent is valid.  There's no risk

14   to challenging the validity of the patent under the

15   hypothetical negotiation.

16   Q.   And what's shown last, "perfect knowledge"?

17   A.   Perfect knowledge generally means that -- you're

18   going to see a lot of documents today that are internal

19   to Microsoft and internal to Uniloc that, normally, in

20   a negotiation may not be shown to each other.  But in a

21   hypothetical negotiation, all the cards are on the

22   table.  Everybody can see what's happening with each

23   other.  So that's part of the idea of perfect

24   knowledge.

25   Q.   Mr. Gemini, you're not here as a technical expert

1   to provide any opinions on infringement; is that true?

2   A.   That's correct.

3   Q.   So just at a very base level, do you have an

4   understanding of the problem that the '216 patent

5   solves?

6   A.   My understanding is that it solves the problem of

7   casual copying.

8   Q.   What is "casual copying," Mr. Gemini?

9   A.   The way I see casual coping is if I bought one

10   license of Office and I installed it on all of my

11   employees machines that same copy, that is my

12   understanding o casual copying.

13   Q.   Would that be an example of one form?

14   A.   Yes.

15   Q.   Looking at the time of the hypothetical

16   negotiation in this case, which I believe you said is

17   March of 2001, what, if any, concern did Microsoft have

18   with casual copying?

19   A.   Microsoft from what I've seen had a huge concern

20   with casual copying.  Microsoft had indicated in some

21   documents that anti-piracy was a $7 billion a year

22   problem and casual copying was half of that problem, or

23   $3.5 billion a year, according to Microsoft.

24   Q.   How did Microsoft address this problem, if at all?

25   A.   Well, they implemented Microsoft Product

1    Activation, a system of Product Activation.

2    Q.   Now in your role as an expert, Mr. Gemini, what is

3    your understanding, if any, of how Product Activation

4    relates to this case?

5    A.   My understanding is that's what's being accused, a

6    Microsoft Product Activation system as is used by

7    Microsoft is accused of infringing the '216 patent.

8    Q.   As a damages expert, what, if anything, are you

9    required to assume about Product Activation?

10   A.   As we said, that it infringed based on what's

11   being accused.

12   Q.   Now, did the Product Activation system, did it

13   work?

14   A.   From Microsoft information, it did, yes.

15   Q.   Okay.  So again, at the time of the hypothetical

16   negotiation, in what products was Microsoft planning to

17   use Product Activation, if any?

18   A.   Microsoft was planning to use it in what they

19   would call their crown jewel products, which are Office

20   and Windows.

21   Q.   Now, you say crown jewels.  Please tell us how big

22   these products were to Microsoft in terms of revenues,

23   gross revenues at the time of the hypothetical

24   negotiation.

25   A.   The revenues for those products were in the

1    billions of dollars a year.

2    Q.   What's the basis for you to say that they're in

3    the billions?

4    A.   I've seen information from their annual reports

5    and documents produced in the case.

6    Q.   And would all of this information about Product

7    Activation success and Microsoft's revenues be known to

8    Uniloc at the time of this hypothetical negotiation?

9    A.   Yes.

10    Q.   And why is that?

11    A.   Under the idea, again, of perfect knowledge.

12    Q.   And what, if any, effect does this have on the

13    reasonable royalty that's being negotiated at the time

14    between Uniloc and Microsoft?

15    A.   Well, based on this information, in my opinion, it

16    would be a benefit to Uniloc.

17    Q.   Why is that?

18    A.   Well, you could see that Microsoft had a major

19    financial problem with casual copying.  And Uniloc had

20    a patent that would assist to reduce casual copying.

21    Q.   Mr. Gemini, in the group of factors that we looked

22    at, we're doing Group IV, so let's round this out and

23    talk about Factor 14.  I believe you touched on it.

24        Would you please briefly explain what that

25    means, Factor 14.

1    A.   Generally, that's the opinions of qualified

2    experts, such as myself, or any other qualified experts

3    in the case.

4    Q.   Let's move on now, Mr. Gemini, to Group I.  And

5    would you please tell us just a bit about this group.

6    A.   This group deals with licenses and licensing

7    policies of the parties, generally.  Parties meaning

8    Uniloc and Microsoft.

9    Q.   What, if any, evidence have you seen that relates

10   to these factors?

11   A.   I've seen license agreements produced by both

12   parties.

13   Q.   So Uniloc and Microsoft have produced licenses in

14   this case?

15   A.   Yes.

16   Q.   Let's take a look at Uniloc's first.

17        MR. SCHERKENBACH:  There's no objection to any

18   of these, your Honor.

19        THE COURT:  Thank you.

20   Q.   Mr. Gemini, I'm going to hand you what's been

21   marked as PX 625, 626 and 627.

22        Would you take just a few minutes to look at

23   them.  Just briefly review those.  Let me know when

24   you're done.

25   A.   Okay.

1    Q.  Do you recognize what I've handed to you as 625,

2    626 and 627?

3    A.  Yes.

4    Q.  Would you please tell the jury what they are.

5    A.  These are licenses of Uniloc entered into for

6    anti-piracy technology.

7    Q.  And have you reviewed and considered these in

8    forming your opinion in this case?

9    A.  Yes.

10   Q.  Would you please tell me what, if any, technology

11   or patents did these license agreements relate to?

12   A.  They relate to anti-piracy technology, and one of

13   them includes the '216 patent at issue in this case.

14   Q.  Which one is that, Mr. Gemini?

15   A.  That would be Exhibit 625, the license agreement

16   between Uniloc Corporation and XtreamLok.

17   Q.  So the XtreamLok license is a license to the '216

18   patent?

19   A.  Yes.

20   Q.  And are the other two agreements licenses to

21   Uniloc's technology?

22   A.  Yes.

23   Q.  And based on your review of these agreements,

24   Mr. Gemini, please tell the jury what, if any, payment

25   terms they contain.

1    A.  They contain payment terms under a running

2    royalty.  And a running royalty, basically, means that

3    as the user or the person licensing the technology

4    sells something, Uniloc gets paid a royalty based on

5    that sale, each and every sale they get a royalty,

6    whether it be a percentage or a per unit dollar amount

7    per sale, that's how Uniloc entered into these

8    agreements.

9    Q.  Mr. Gemini, if you could look at PX-626, which I

10   believe is the license to Curious Software.  Do you see

11   that?

12   A.  Yes.

13   Q.  Would you please tell us what specific payment

14   terms it contains, if any.

15   A.  Well, according to Exhibit B of the license

16   agreement, Uniloc agreed to a royalty with Curious of

17   3% on products with the list price in excess of $900

18   and 5% on products with a list price of less than $900.

19   Q.  So for products that are priced less than $900,

20   this license gives Uniloc a 5% running royalty?

21   A.  Yes.  And, additionally, it says:  In no event

22   should it be less than one dollar, just to be clear.

23   Q.  So Mr. Gemini, all three of these licenses of

24   Uniloc were all running royalty licenses?

25   A.  Yes.

1    Q.  And they all related to anti-piracy technology or

2    the '216 patent?

3    A.  Yes.

4    Q.  What, if anything, does that tell us or tell you

5    about Uniloc's licensing practices?

6    A.  That Uniloc enters into agreements based on a

7    running royalty for their anti-piracy technology.

8    Q.  Mr. Gemini, I'm going to hand you PX-458, 459, 462

9    and 463.

10       MR. SCHERKENBACH:  There's no objection to any

11   of these, your Honor.

12       THE COURT:  Thank you..

13       (Plaintiff's Exhibits 458, 459, 462 and 463

14   admitted in full.)

15   Q.  Have you had a chance to look through them,

16   Mr. Gemini?

17   A.  Yes.

18   Q.  And do you recognize them?

19   A.  Yes.

20   Q.  Have you reviewed them in this case?

21   A.  Yes, I have.

22   Q.  Could you please tell the jury what they are.

23   A.  These are license agreements entered into by

24   Microsoft where they're licensing somebody else's

25   technology related, again, to anti-piracy technology.

1    Q.   So these four Microsoft license agreements relate

2    to anti-piracy technology?

3    A.   Yes.

4    Q.   Could you tell the jury what, if any, payment

5    terms these Microsoft licenses contain.

6    A.   These, again, are licenses based on a running

7    royalty rate.

8    Q.   So based on this, Mr. Gemini, what does it tell us

9    about Microsoft's licensing practices when it comes to

10   anti-piracy technology?

11   A.   Again, based on this information, Microsoft enters

12   into agreements based upon a running royalty for

13   anti-piracy technology.

14   Q.   Now, based on Microsoft's and Uniloc's licenses,

15   the licenses that you've just discussed with the jury

16   or shown to the jury, in your view, what type of

17   license would Microsoft and Uniloc entered into at the

18   time of the hypothetical negotiation?

19   A.   A running royalty based on, as I showed you on the

20   slide of summarizing my calculation based on each

21   license issued.

22   Q.   Now, the licenses that we just looked at, both

23   Uniloc and Microsoft, were they exclusive or

24   non-exclusive?

25   A.   They were non-exclusive.

1    Q.  I believe you mentioned that just briefly when you

2    were going through the factors, but tell the jury a bit

3    about what the difference is between exclusive and

4    non-exclusive, if you will.

5    A.  An exclusive license would mean you're only going

6    to license one party to use your patent.  So you're not

7    going to license it to anybody else.

8         Non-exclusive means you're open to license it to

9    whoever you want.  And, normally, an exclusive license

10   because you're focusing just on one party would call

11   for a higher royalty because you're not able to license

12   other people in the industry.

13        So I've assumed in this case that a license

14   would be non-exclusive because that's the policy at

15   least of what I've seen of these licenses that we just

16   looked, they're non-exclusive, which tends to favor

17   Microsoft because it would be a higher royalty if it

18   were exclusive, normally.

19   Q.  So in considering, I belive, Factor 3, exclusive

20   or non-exclusive, your opinion is that factor favors

21   Microsoft?

22   A.  Yes.

23   Q.  And, Mr. Gemini, do Uniloc and Microsoft compete?

24   A.  No, they do not.

25   Q.  Can you explain to the jury a bit about what that

1    means and its relation to the Georgia-Pacific factors.

2    A.   Well, sometimes you have situations where you have

3    a patent owner who actually makes a product and sells

4    it in competition with the accused infringer.

5         So when they're making a product that is in

6    direct competition with the accused infringer's

7    product, the patent owner might be less likely to want

8    to license because they want to keep the patent to

9    themselves so they can make their own product and make

10   their own profit.

11        This not the situation here.  Uniloc does not

12   compete in the same area of business as Microsoft.  So

13   in my opinion, it's a non-competitive situation, which,

14   again, would tend to favor Microsoft in a hypothetical

15   negotiation.

16   Q.   Mr. Gemini, when did the '216 patent issue, if you

17   know?

18   A.   I believe November of 1996.

19   Q.   And do you know when it expires?

20   A.   In 2013.

21   Q.   How does that evidence or those facts relate to

22   the Georgia-Pacific factors, if at all?

23   A.   Well, Factor 7 deals with the life of the patent.

24   And what you want to do is consider what life would be

25   remaining at the time of the hypothetical negotiation.

1    And since the negotiation occurs in 2001, the patent

2    would have had a good dozen years or so left on its

3    life.

4        Now, the technology industry is somewhat fluid.

5    Technology changes pretty quickly, and I don't think

6    the duration of the patent is very significant in this

7    situation.  So I didn't give it any weight, meaning I

8    didn't say it favored Microsoft and I didn't say it

9    favored Uniloc, because I just don't believe, in my

10   opinion, it has any effect on the negotiation.

11   Q.   Mr. Gemini, let's now turn to Group II.  Please

12   tell us about Factors 9 and 10, briefly.

13   A.   Factors 9 and 10 generally deal with the

14   advantages of the patent and how it's used.

15   Q.   What, if any, evidence have you seen that relates

16   to Factors 9 or 10?

17   A.   I've seen evidence indicating that it's a

18   break-through technology, this technology of the '216

19   patent.

20   Q.   Mr. Gemini, I'm handing you what's been marked as

21   PX-251.

22       MR. SCHERKENBACH:  No objection.

23       THE COURT:  Thank you.

24       (Plaintiff's Exhibit 251 admitted in full.)

25   Q.   Mr. Gemini, are you familiar with this document?

1    A.  Yes.

2    Q.  And have you seen it and reviewed it in

3    consideration in forming your opinion in this case?

4    A.  Yes.

5    Q.  Please tell us what it is.

6    A.  This is an internal-use document of Microsoft.

7    It's entitled "Product Activation - Frequently Asked

8    Questions - Internal Use Only."

9    Q..  Do you see on the first page it says:  What is

10   Product Activation?

11   A.  Yes.

12   Q.  What, if anything, does it say about Product

13   Activation right under that heading?

14   A.  It says:  Product Activation is new anti-piracy

15   technology that has been tested in seven countries and

16   Office 2000's Office Registration Wizard.

17   Q.  Mr. Gemini, what else does this document indicate,

18   if anything, about Factors 9 and 10?

19   A.  If you turn to page three, the first question

20   there, it states:  Hasn't this kind of anti-piracy

21   technology been tried before and failed.

22       Then it states:  Activation technologies that

23   have been used in the past have not been easy for

24   customers and were generally viewed as unacceptable by

25   customers in the industry.

1      And it says a couple lines later:  Product

2   Activation is a break-through technology that makes

3   activating a natural part of using the software and

4   avoids the pitfalls of anti-piracy methods used in the

5   early days of the PC industry.

6      So this indicates to me that the accused

7   Microsoft Product Activation is a break-through

8   technology that is an advantage over older

9   technologies.

10  Q.   What, if any, effect would this have on the

11  hypothetical negotiation and the royalty rate that's

12  being negotiated between Microsoft and Uniloc?

13  A.   In my opinion, this factor would favor Uniloc.

14  Q.   Mr. Gemini, is that because you have to assume

15  that the patent infringes?

16  A.   Yes.  You assume that, as I said at the beginning,

17  I'm assuming there's infringement and that the Product

18  Activation is the infringing act.

19  Q.   Okay.  Mr. Gemini, let's turn to Group III, which

20  is, I believe, our last group of the Georgia-Pacific

21  factors.

22      Would you tell us briefly about this grouping of

23  the factors.

24  A.   This grouping generally deals with the

25  profitability of the products made using the patent or

1    implementing the patent and the extent of use by

2    Microsoft of those products and the patents.

3    Q.   Let's touch on Factor 6 just briefly.  What, if

4    any, evidence have you seen in this case that relates

5    to Factor 6?

6    A.   I haven't seen anything to indicate that by using

7    Product Activation Microsoft is able to sell, like I

8    said earlier, stuff like X-Box or unrelated products to

9    Office or Windows.  So at this point, I don't consider

10   that factor relevant.

11   Q.   Let's look at Factor 13, cost.  Please tell us

12   about cost.

13   A.   Microsoft has indicated that they spend

14   approximately $65 million a year to facilitate Product

15   Activation; 55 million, roughly, is based on -- or is

16   the cost to facilitate a phone facility for people who

17   call in to activate, and then $10 million is related to

18   the Internet portion of their activations.

19        So I've considered that, that Microsoft spends

20   money to -- spends a significant amount of money to

21   keep this Microsoft Product Activation working.

22   Q.   So on a yearly basis, Microsoft spends

23   approximately $65 million just to keep Product

24   Activation in service?

25   A.   Yes.

1    Q.  What, if anything, does that telling you about the

2    value or benefit of Product Activation to Microsoft?

3    A.  It tells me that it's important to them to spend

4    that much money to keep maintaining that type of

5    service.

6    Q.  We're going to turn now to Factors 8 and 11.  Let

7    I ask you, Mr. Gemini, what, if any, evidence have you

8    seen that relates to these factors?

9    A.  Well, I've seen a number of documents indicating

10   that Microsoft -- as we've said earlier, Microsoft had

11   a problem with casual copying and that to solve this

12   problem they wanted to implement Product Activation.

13   And as a result of implementing Product Activation,

14   they've seen an increase in sales.

15   Q.  Let's take a look at some of the documents you've

16   seen.

17        Mr. Gemini, I'm going to hand you a group of

18   documents and ask you to review them briefly.  PX-374,

19   238, 71, 375, 415, 631, and 148.

20        MR. SCHERKENBACH:  There's no objection.

21        THE COURT:  Thank you.

22        (Plaintiff's Exhibits 374, 238, 71, 375, 415,

23   631 and 148 were admitted in full.)

24   Q.  Mr. Gemini, have you had a chance to flip through

25   the documents that I've handed you?

1    Q.  Mr. Gemini, do the other documents in that bundle

2    also address the issue of casual copying?

3    A.  Yes.

4    Q.  To save us all some time, we won't go through them

5    all.  We have other documents to move on to.

6        Now, in the document we just discussed, which

7    was PX-71, I believe it said that the key to increasing

8    sales and reducing software piracy, have you seen any

9    other documents indicating that Product Activation

10   increases sales or reduces piracy?

11   A.  Yes.

12   Q.  Mr. Gemini, I'm going to hand you another package

13   of documents, PX-391, 72, 494, 423, 238, 71 is also in

14   there, we already looked at that, 238 and 434.

15       MR. SCHERKENBACH:  There's no objection.

16       THE COURT:  Thank you.

17       (Plaintiff's Exhibits 391, 72, 494, 423, 238 and

18   434 were admitted in full.)

19   Q.  Mr. Gemini, after you've had a moment to look

20   through those, please let me know.

21   A.  Okay.

22   Q.  Mr. Gemini, are those all Microsoft documents?

23   A.  Yes.

24   Q.  And you recognize them?

25   A.  Yes.

1   A.  Yes.

2   Q.  Have you also seen documents that speak to what,

3   if any, success Microsoft was having with Product

4   Activation in solving this problem?

5   A.  Yes, I have.

6   Q.  Mr. Gemini, I'm going to hand you a bundle of

7   documents, and we're not going to go through them

8   all -- I think we'd be here for a long time -- PX-424,

9   433, 435, 440, 436, 238, 445, 446, 447, 248, 629, 240,

10   261, 434, 441, and 427.

11       MR. SCHERKENBACH:  No objection to any of those.

12       THE COURT:  Thank you.

13       (Plaintiff's Exhibits 424, 433, 435, 440, 436,

14   238, 445, 446, 447, 248, 629, 240, 261, 434, 441, and

15   427 were admitted in full.)

16   Q.  Mr. Gemini, I think I forgot to give you a couple.

17   A.  Okay.

18   Q.  Mr. Gemini, have you had a chance to thumb through

19   those documents?  If you do, let me know.

20   A.  Yes.

21   Q.  Do you recognize those documents?

22   A.  Yes.  I considered all of these documents.

23   Q.  Okay.  They're Microsoft documents?

24   A.  Yes.

25   Q.  And you've reviewed them and made them part of the

1    factors and, also, the application of the rule of

2    thumb?

3    A.  Yes, I considered all the factors.  I started with

4    the 2.50.  That was kind of a value I had.  I went

5    through the factors, tried to weigh each one based on

6    whether it favored Uniloc, whether it favored

7    Microsoft.  As I mentioned, some favored Microsoft, and

8    some favored Uniloc.

9        I felt that the data, at least in terms of what

10   Microsoft was losing, how effective Product Activation

11   was to casual copying and increasing sales, I felt

12   that, that strongly favored Uniloc, and you can

13   adjust -- the idea is to adjust this 25% up or down

14   depending on how it favors either party.

15       I felt strongly that I could have adjusted that

16   number up based on the data I've seen.  But there's

17   also factors that favor Microsoft and significant

18   factors that favor Microsoft.  So I -- in my opinion, I

19   felt that the 2.50, $2.50, was reasonable based on my

20   analysis of all these factors.

21   Q.  Now, with the $2.50 reasonable royalty rate,

22   what's the next thing that you do when determining the

23   reasonable royalty due Uniloc in this case?

24   A.  Well, I apply it to the accused infringing sales.

25   Q.  Okay.  Does is that also referred to as the

1    Q.   Okay.  Please tell the jury what is shown at the

2    top of the columns, just so we all understand it.

3    A.   Those are product categories of -- Microsoft

4    internal product categories that they use to signify

5    Office and Windows products.

6    Q.   And is the total new licenses issued number shown

7    at the bottom right-hand corner?

8    A.   Yes.

9    Q.   And what is that number?

10   A.   225,978,721.

11   Q.   And so those are the total new licenses issued

12   during the damages period?

13   A.   Yes.

14   Q.   Okay.  So, having determined the royalty rate,

15   which is $2.50 per new license issued, and the royalty

16   base, what's the next thing you did?

17   A.   I multiplied the two numbers together to come up

18   with the reasonable royalty.

19   Q.   Do you know that number off the top of your head?

20   A.   Oh, it's --

21   Q.   Would you like to see the summary of your opinion?

22   A.   -- approximately $565 million.

23   Q.   Is that number shown in the summary of opinion

24   board we saw earlier?

25   A.   Yes.

1    Q.   Mr. Gemini, now that we've determined the base and

2    the rate, you multiply them together and you get the

3    reasonable royalty rate shown at the bottom?

4    A.   Yes.

5    Q.   And, for the record, will you please read it?

6    A.   $564,946,803.

7         MR. CRONIN:  Your Honor, could we have a brief

8    side-bar with Mr. Scherkenbach?

9         THE COURT:  Yes.

10        (Side- bar conference.)

11        MR. CRONIN:  Mr. Scherkenbach and I had a brief

12   discussion before I started about prejudgment interest.

13   We've reached an agreement that we wouldn't be

14   presenting any evidence to the jury.  I just wanted to

15   get that on the record so there wouldn't be any issue.

16        MR. SCHERKENBACH:  It's agreed.  I believe it's

17   an issue for the Court to decide after trial.

18        MR. CRONIN:  So don't we, but I didn't want

19   there to be any question.

20        THE COURT:  You both agree on that?

21        MR. CRONIN:  Yes.

22        THE COURT:  Good.

23        MR. CRONIN:  Thank you, Your Honor.

24        MR. SCHERKENBACH:  Thanks.

25        (End of side-bar conference.)

1      MR. CRONIN:  May I proceed, Your Honor?

2      THE COURT:  Yes.

3    Q.  So, Mr. Gemini, the reasonable royalty due Uniloc,

4    in your view, is $564,946,803, is that correct?

5    A.  Yes.

6    Q.  Now, what, if anything, have you done to determine

7    if, even in your own view, that opinion is reasonable,

8    given all the information in this case?

9    A.  Well, I did kind of a check to determine whether

10   that number was reasonable.  It's, obviously, you know,

11   a significant amount of money.  I wanted to check to

12   make sure it was a reasonable number.

13   Q.  And have you performed any calculations to show

14   the revenues that Microsoft has made from the accused

15   products that contain Product Activation?

16   A.  Yes, I've made an estimate, based on the data that

17   we went through, of what Microsoft has realized, at

18   least my estimate, from Product Activation.

19   Q.  Now, Mr. Gemini, would you please tell us how you

20   went about estimating the gross revenues for the

21   accused products.

22   A.  Well, I estimated -- I took the royalty base of

23   approximately 226 million licenses, and to get revenue

24   on those licenses, I had some data from Microsoft that

25   was more general in terms of Windows and Office

1    products, and I was able to calculate an average sales

2    price on Windows, Office and -- I'm sorry, Microsoft

3    Office and Microsoft Windows products of approximately

4    $85 per license.

5        I multiplied 226 million licenses times $85 to

6    come up with a revenue figure of approximately

7    $19.28 billion during this period of damages.

8    Q.   So, in the period of damages, you've estimated

9    that the revenue attributable to the accused products

10   is approximately $19.28 billion?

11   A.   Yes.

12   Q.   Okay.  And that was done off of Microsoft's

13   internal documents?

14   A.   That's correct.

15   Q.   Okay.  Well, having determined that the revenue

16   Microsoft has made, or estimated what it's made from

17   the accused products, what, if any, comparison have you

18   done between that amount, the $19.28 billion amount,

19   and your reasonable royalty of roughly $565 million?

20   A.   Well, I wanted to see what percentage that was,

21   what an effective royalty rate would be based on the

22   reasonable royalty amount and based on the total dollar

23   volume of sales.

24   Q.   And have you prepared a chart or a graph or a pie

25   chart to show us this comparison?

1   A.  Yes.

2       MR. CRONIN:  Your Honor, there's no objection.

3       MR. SCHERKENBACH:  Right, there is no objection.

4       THE COURT:  Thank you.

5   Q.  Mr. Gemini, do you recognize what is shown in that

6   chart?

7   A.  Yes.

8   Q.  Okay.  Please explain to the jury what it is.

9   A.  Well, it's essentially my comparison.  The entire

10  pie is the 19.27 billion dollars of Microsoft revenue,

11  and the royalty compared to that is approximately 2.9%.

12       And, in my experience, and data I've seen as far

13  as industry royalty rates for software, which are

14  generally above -- on average, above 10% or 10, 11%, I

15  felt that this royalty was reasonable and well within

16  that range.

17  Q.  So, if we can step back a minute, when you compare

18  the royalty -- well, step back further.

19       Your opinion in this case was based off the

20  methodology that you've told the jury, the statute, the

21  Georgia-Pacific factors and rule of thumb, correct?

22  A.  Yes.

23  Q.  So your opinion isn't -- you're not basing your

24  opinion off of the $19.27 billion, is that correct?

25  This is just a comparison?

1    A.  This is a comparison.

2    Q..  Right, okay.  But when you compare the royalty to

3    the total revenues, you get about a 3% royalty, is that

4    correct?

5    A.  That's correct.

6    Q.   And you've compared that 3% royalty to what is --

7    did you say the average royalty in the software

8    industry is?

9    A.  Yes, I use -- in my business, I use licensing

10   statistics that are provided.  There's organizations

11   that provide licensing statistics, and the software

12   industry, according to this data is, on average, around

13   10, 11, 11.5%.

14   Q.   So, when you compare the 3% royalty, as shown on

15   the chart, to the 10 or 11.5% that's the average in the

16   software industry, in your view, how does it compare?

17   A.   Well, it's obviously lower, but it -- to me, it's

18   reasonable.  It shows that it's a reasonable rate in

19   terms of -- in relation to industry data.

20   Q.   It would be about a third of the average rate in

21   the industry?

22   A.  Yes.

23   Q.   Turning back to the $19.27 dollar figure,

24   Mr. Gemini, what, if any, attempt have you made to

25   estimate the revenues that are attributable to Product

1    Activation from this amount?

2    A.   Well, again, I used that 19.27 billion as a

3    starting point, and then we saw data that I went

4    through that talked about estimates and how much

5    Microsoft felt revenue was increasing as a result of

6    Product Activation.  You saw data showing 35 to 48%.  I

7    think, in China, it showed 140% for just a specific

8    period..  But then at least it gave me some idea of how

9    much revenue has increased as a result of Product

10   Activation.

11   Q.   Have you -- well, what, if anything, did you do to

12   the 19.27 billion to estimate the revenues that

13   Microsoft would have made without Product Activation?

14   A.   Well, I applied that -- I looked at the 35 to 48%

15   that they were indicating they were experiencing, as

16   far as revenue growth.  I used kind of a middle

17   range of 40% to try and determine how much of the

18   19.27 billion could be estimated as related to

19   Microsoft Product Activation.

20   Q.   Okay.  And what did you do after that?

21   A.   Well, I determined that, at least in my estimate,

22   based on the data that I used, Product Activation

23   accounted for about 5.5 billion of additional revenue

24   to Microsoft during that period, based on those

25   numbers.

1    Q.  And what, if any, calculation did you perform to

2    determine that the revenue attributable to Product

3    Activation is roughly $5.5 billion?

4    A..  Well, I took the $19.27 billion of revenue and

5    applied the 40% rate that was within the range of what

6    they were experiencing in growth and determined how

7    much the 19.27 billion was Microsoft Product Activation

8    revenue.

9    Q.  And what, if anything, did you do with Microsoft's

10   overall gross profit margin, the $5.5 billion range?

11   A.  Well, from that 5.5 billion of additional revenue

12   that I've estimated as to what related to Product

13   Activation, I applied Microsoft's gross profit rate to

14   try and determine an estimate of the total profits

15   Microsoft has realized as a result of Product

16   Activation.

17       And we had discussed profit rates of 81 to 87%

18   in their annual reports.  I applied that to the

19   $5.5 billion.  So I've estimated the additional profit

20   of Product Activation to be approximately $4.6 billion

21   when you take 5.5 billion times -- I used 84%, the

22   middle of that range of 81-87, to come up with

23   4.6 billion, roughly.

24   Q.  Have you prepared a chart to show the calculation

25   you just described?

1    gone up and down with Mr. Gemini on the use of this.

2         THE COURT:  That's cross-exam.

3         MR. CRONIN:  Right.  But on redirect, I should

4    be able to show that another court has accepted this.

5         THE COURT:  You're confusing admissibility with

6    weight.  Okay?

7         This court did just what I did, which is held

8    that, you know, even though I have my doubts about it,

9    that because it's generally accepted, that it survives

10   the Daubert challenge and that he can testify.  That's

11   the admissibility prong.  The rest of this goes the

12   weight.  That's fair cross-examination.  What

13   Mr. Scherkenbach did is fair cross-examination.

14        Now, if you think that you can point out that

15   there are patent licenses that have been successfully

16   negotiated, which have, at the end of the negotiation

17   process, have a number that is relied from the rule of

18   thumb, that's certainly fair.  You can get that out of

19   him because that's what Mr. Scherkenbach went after.

20        MR. CRONIN:  He also crossed over into the world

21   of litigation as well.  It's not clear.  I should have

22   a chance to show the jury that he's not a charlatan.

23   He's not.  I have the Bose case here that

24   Mr. Scherkenbach's firm has used.  I think it's really

25   unfair.  Mr.. Scherkenbach really took a good shot at

1    A.   Greg Peiker.

2    Q.   So is it fair to say, then, in your experience

3    with Microsoft, you had two different job roles or

4    responsibilities that related to Product Activation?

5    A.   Yes.

6         MR. HAYES:  Objection.  Leading.  Move to

7    strike.

8         THE COURT:  All right.  I'll sustain the

9    objection.  Strike the answer.  You can ask it in a

10   nonleading fashion.

11        MR. SCHERKENBACH:  Okay.

12   Q.   How many jobs at Microsoft have you had related to

13   Product Activation?

14   A.   Two.

15   Q.   All right..  Let's talk about the first of those,

16   okay?

17   A.   Okay.

18   Q.   Tell us what you did when you joined the

19   Anti-Piracy Technical Initiative groups in late 1995.

20   A.   Well, it being a new group, my manager had the

21   responsibility for defining the strategy and what the

22   group was going to do.

23        I was the first hire to start thinking about,

24   from his lead, what types of technical initiatives were

25   things that we would be interested in pursuing.

1        So, at first, say, the first three to six months

2    of that role, I was learning about anti-piracy, what it

3    was, what the company thought it was, what other

4    programs the company had underway that, as it turns

5    out, were nontechnical, and, also, how -- well, it was

6    a lot of learning when I first started.

7    Q.   So did you have any anti-piracy experience before

8    you joined the Anti-Piracy Technical Initiatives group

9    in late '95?

10   A.   No.  No.

11   Q.   Okay.  Did you -- and you said one of the things

12   you did was research other things that had happened in

13   the company related to anti-piracy?

14   A.   Yes.

15   Q.   Did you do any research or evaluation of third

16   party products related to anti-piracy?

17   A.   I did.  As a course of that role, we were -- well,

18   I was forwarded unsolicited mail from third parties who

19   had copy protection schemes that they wanted to sell

20   Microsoft.

21       And so, if it made it to me through my manager

22   for a technical evaluation, I would own that.  I think

23   we did a couple of those that first year, and we

24   actually would outsource the actual evaluation, and

25   then I would own the -- owning that results within the

1    Q.  Is there any chance -- strike that.

2        Whose idea was it to combine the use of a

3    product ID and a hardware ID in an anti-piracy system

4    for software?

5    A.  It was mine, and I was helped implementing it by

6    Aidan Hughes.

7    Q.  Is there any chance you got that idea from Uniloc?

8    A.  No way.

9    Q.  Turn in your binder to Exhibit 0-2.

10   A.  Okay.

11   Q.  Do you recognize that document?

12   A.  I do.

13   Q.  What is it?

14   A.  It's a copy of my engineering notebook, starting

15   at dates 18 June 1996, through April 4 -- 4 April 1997.

16   Q.  Did you keep that notebook in the ordinary course

17   of your work at Microsoft?

18   A.  I did.

19   Q.  Are the notes roughly contemporaneous with the

20   information they reflect?

21   A.  Yes..

22   Q.  And they relate to your work at Microsoft?

23   A.  They do.

24       MR. SCHERKENBACH:  Your Honor, I'd move the

25   admission of Exhibit 0-2 at this time..

1   Q.  Right.  You did no implementation of Product

2   Activation in any Microsoft product, correct?

3   A.  That's correct.

4   Q..  Huh?

5   A.  That's correct.

6   Q.  And, in fact, you don't know how Product

7   Activation was implemented in any Microsoft product,

8   correct?

9   A.  Correct.

10  Q.  And you don't know, for example, what algorithms

11  are or are not used in any Microsoft product, correct?

12  A.  Correct.

13  Q.  Okay.  Yet you say you are the de -- a designer of

14  Product Activation?

15  A.  That's correct.

16  Q.  Okay.  Now, sir, my brother talked about a patent

17  of yours, which I think -- here it is.  Do you have it

18  up there, PX -- I think it's PX-236?

19  A.  The '468 patent?

20  Q.  Yes, this has been -- this has obviously been in

21  evidence, so we'll put it up.

22  A.  Yes.

23      MR. HAYES:  Can everybody see this?

24      Okay.

25  Q.  And you are a co-inventor on that patent, not a

1    sole inventor, right?

2    A..   That's correct.

3    Q.   So you did -- you singularly did not author this

4    patent, correct?

5    A.   Correct.

6    Q.   And this patent is one of the key patents for

7    Product Activation, correct?

8    A.   I've written that, yes.

9    Q.   In fact, sir, let me show you -- do you have a

10   copy of this?

11       Now, sir, could you tell us what that is?

12   A.   It's a -- it looks like a print-out from a website

13   called Linkedin, which is a business networking type of

14   website, and it's a summary of my -- of my resume

15   basically.

16   Q.   All right.  And it's got a picture of you?

17   A..   Yes.

18   Q.   And you created it, right?

19   A.   Yes.

20   Q.   And in it you say you authored United States

21   Patent 6243468, and that statement is false, correct?

22   A.   In the strictest sense of the word, yes.

23   Q.   Okay.  And then you go on to say that, This patent

24   is, quote, one of the key patents for Product

25   Activation, right?

1    we see that, that issued in February of '96.

2    A.  Okay.

3    Q.  Four months before these conception you say of

4    yours and in your notebook, right?

5    A.  Yes.

6    Q.  Okay.  And when you came onboard, I think you did

7    tell us that, as Program Manager, you had no experience

8    in designing the program, but -- program, I mean,

9    anti-piracy, right?

10   A.  Correct.

11   Q.  Okay.  But one of your functions when you came

12   onboard was to do competitive intelligence, isn't that

13   true?

14   A.  Yes.

15   Q.  And what competitive intelligence was, was finding

16   out, both from within Microsoft and from any other

17   sources, such as trade magazines, newspaper articles,

18   journal articles and the rest, about what copy

19   protection schemes were out there for personal

20   computers, true?

21   A.  True.

22   Q.  So it wasn't as if you just came onboard and

23   sniffed around Microsoft; you looked at trade

24   magazines, newspaper articles, journal articles and the

25   rest, true?

1      MR. HAYES:  It's not irrelevant.  I don't mind

2   if I don't use it with him, Judge.  What I do want to

3   know, I want to offer this and get this in because this

4   shows that they knew, Microsoft knew of our patent

5   before they launched it.

6      THE COURT:  Well, you don't need to do it

7   through him.  He doesn't know about this document.

8   We'll argue about this separately.

9      MR. HAYES:  But, you know, I'm -- the reason

10  being is I wanted a witness to sponsor it, that's all.

11     THE COURT:  Well, okay, but I'm not -- it can

12  come -- if it comes in, it can come in as an official

13  Government record, and you can offer it..  That way you

14  don't need to put it through a witness who's never seen

15  it and doesn't know it.

16     MR. HAYES:  Okay.

17     THE COURT:  Okay.  Let's move through this.

18     (End of side-bar conference.)

19  Q.  Sir, when you began the development product --

20  project of Product Activation, there was a recognition

21  by Microsoft, was there not, that they were losing

22  billions of dollars to casual copying?  Isn't that

23  true?

24  A.  According to my boss, yes, that was the common

25  figure thrown around.

1    A.   On the floppy disk versions of those, yes.

2    Q.   And that was considered -- and that, that, that

3    hardware ID was not in a registration system, correct?

4    A.   Correct.

5    Q.   And, in fact, the use of that hardware ID, as

6    implemented, wasn't good for -- it was on floppy disks,

7    but it wasn't good for the type of disks that we use

8    today, right?

9    A.   It physically couldn't work on the type of disks

10   we use today.

11   Q.   Right.  And when you tried to put it on to

12   Office 98, you had to use not only the software, but

13   you had to use the floppy disk as sort of a dongle,

14   right?

15   A.   We -- we actually had a project, at this same

16   approximate time that we were coming up with the early

17   plans for this forced registration pilot, to market --

18   to try a test-market for that.  We called it HDDI with

19   CD, so we were going to ship a floppy disk with a

20   CD-ROM, yes.

21   Q.   And that went really nowhere because everybody

22   disliked it, correct?

23   A.   Correct.

24   Q.   All right.  Okay.  And on -- were you in the

25   testimony -- were you in here --

1          MR. HAYES:  To just sort of speed right through

2     this, Judge, but I got to do it.

3     Q.   -- for the testimony of our damage expert,

4     Mr. Gemini?

5     A.  No.

6     Q.  Oh, okay.  Too bad..

7          And bottom line is -- the bottom line -- I'll

8     just speed straight through it -- is that Product

9     Activation, as you understood it, was effective --

10    correct? -- at reducing --

11    A.  From the objectives that I set as a Technical

12    Program Manager for those pilots, yes, it was.

13    Q.   And it's obviously clear that, in fact, if you

14    reduce casual copying, then that will necessarily add

15    revenue to Microsoft?

16    A.  I wouldn't say that, no.

17    Q.  You don't think so?

18    A.  I don't know either way -- either one way or the

19    other.

20    Q.  You don't know either way?

21    A.  I don't know one way or the other.

22         MR. HAYES:  All right.  So we'll let the

23    document speak to that.

24    Q.   And, sir, in your notebook in June, when you say

25    combine a PID and a hardware ID, you -- you remember we

1    were looking at that page?  I think it was --

2    A.  497?

3    Q.  Yeah, whatever it is.  What number is it?

4    A.  497.

5        THE COURT:  477, I think.

6        MR. HAYES:  477.

7        THE WITNESS:  Oh, sorry.

8    Q.  All right.  It says, Machine ID incorporated with

9    PID?  Do you see that?

10   A.  Yes.

11   Q.  All right.  There's nothing in there about

12   utilizing a machine ID and a PID in a registration

13   system, is there?

14   A.  No.

15   Q.  There's no suggestion -- in fact, that, what you

16   just wrote, Machine ID incorporated with PID, would

17   adequately describe Office 98 and Office 95 because it

18   had a PID and it had a machine ID?

19   A.  It actually was -- as I believe I said before,

20   that looks like a question that I was asking Mary

21   about, Is there any machine ID incorporated with PID?

22   Q.  Excuse me.  What you state here, Machine ID

23   incorporated with PID, would adequately describe the

24   floppy disk one that failed -- right? -- because it had

25   the PID --