UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC U.S.A., INC. and<br>UNILOC SINGAPORE PRIVATE LIMITED,<br><br>        Plaintiffs,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br>        Defendant. | Civil Action No. 03-CV-440 (WES) |

**REPLY IN SUPPORT OF MICROSOFT CORPORATION'S MOTIONS FOR
<u>JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR REMITTITUR</u>**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

I. INTRODUCTION ................................................................................................1

II. UNILOC FAILED TO PROVE WILLFUL INFRINGEMENT .........................2

    A.    Uniloc Failed at Trial, and Continues to Fail Post-Trial, to Identify Any Evidence, Let Alone the Required Clear and Convincing Evidence, of an "Objectively High Likelihood" That Product Activation Infringes Claim 19 and That That Claim Is Valid............................................................................ 3

    B.    Uniloc Failed at Trial, and Continues to Fail Post-Trial, to Identify Any Evidence, Let Alone the Required Clear and Convincing Evidence, That an Objectively High Likelihood That Product Activation Infringes Claim 19 Was "Either Known or So Obvious That It Should Have Been Known" to Microsoft.................................................................................................... 5

    C.    Uniloc's Alleged Evidence of Copying Does Not Satisfy the Subjective Prong................................................................................................................ 7

        1.    Uniloc Fails to Cite to Any Evidence That the Sample It Provided to Microsoft Embodied Claim 19 ............................................... 7

        2.    Uniloc Also Has No Evidence that Anything Was Copied from the Uniloc Sample, or from the '216 Patent ...................................... 9

    D.    Uniloc Does Not Dispute That It Built Its Entire Case Around Its Copying Allegations; Given That Those Allegations Were Baseless, at Minimum a New Trial Is Warranted ................................................................................... 11

III. UNILOC FAILED TO PROVE INFRINGEMENT.........................................12

    A.    Uniloc Failed To Prove that Microsoft's License Digest is a "Licensee Unique ID".................................................................................................... 12

        1.    Uniloc Does Not Even Address Microsoft's Main Argument That Hashing Deliberately Destroys Any Possible Association Between the Licensee and the License Digest........................................... 12

        2.    Uniloc Improperly Tries to Read "Associated With" Out of Claim 19 by Conflating It with the Separate Requirement of "Unique"............ 12

        3.    Uniloc Fails to Identify Any Particularized Linking Testimony Sufficient to Sustain a Verdict of Infringement under the Doctrine of Equivalents .............................................................................. 15

        4.    Microsoft Did Not Waive Its Argument That It Is Entitled, at a Minimum, to a New Trial Because Uniloc Failed to Prove Infringement Under the Doctrine of Equivalents.................................... 16

B.      Uniloc Failed to Prove That MD5 and SHA-1 Are Summation Algorithms or Equivalents .............................................................................................. 18

      1.      Mr. Cooper's 30(b)(6) Admission of Non-Equivalence Is Dispositive of Non-Infringement .................................................. 18

      2.      Uniloc's Failure to Counter Microsoft's Expert Testimony Is Independently Dispositive of Non-Infringement ............................. 20

      3.      Uniloc Cannot Meet Its Burden by Showing That MD5 and SHA-1 Merely Perform Summation ............................................ 21

      4.      Uniloc Failed to Offer the Particularized Linking Testimony Required, as a Matter of Law, to Show Infringement of This Element ................................................................................... 22

C.      Uniloc Failed to Prove That Product Activation Is a "Registration System" ....... 24

D.      Uniloc Failed to Prove That Product Activation Has a "Mode Switching Means" ..................................................................................................... 25

E.      Uniloc Failed to Prove Direct Infringement .......................................... 25

      1.      Microsoft Does Not Make, Use, Import, Sell, or Offer to Sell the Registration System of Claim 19 ............................................. 25

      2.      Microsoft Did Not Waive This Issue ...................................... 28

IV.     CLAIM 19 IS INVALID, AS A MATTER OF LAW ....................................... 31

A.      Based on Uniloc's Infringement Contentions and Uncontradicted and Unimpeached Trial Evidence, Hellman Anticipates Claim 19 ........................... 31

B.      Claim 19 Is Also Obvious in Light of Hellman, Alone or in Combination With Wolfe .............................................................................................. 35

C.      Microsoft Has Consistently Argued That Claim 19 Is Indefinite as Construed ................................................................................................. 37

V.      UNILOC HAS NOT SHOWN EVIDENCE SUFFICIENT TO SUPPORT THE JURY'S DAMAGES AWARD ................................................................... 39

A.      Neither of Mr. Gemini's Alternative Royalty Theories Supports the Award ....... 39

      1.      Uniloc Failed to Support Mr. Gemini's $2.50 Per Activation Figure and 25% Rule of Thumb ............................................... 40

      2.      Mr. Gemini's Entire Market Value "Check" Was Impermissible as a Matter of Law ...................................................................... 43

B.      Uniloc's Total Damages Are Grossly Excessive .................................. 44

C.      The Evidence Does Not Warrant Damages for Foreign Activations .................. 44

VI.     CONCLUSION .............................................................................. 47

## TABLE OF AUTHORITIES

## CASES

*Agrizap, Inc. v. Woodstream Corp.,*
   520 F.3d 1337 (Fed. Cir. 2008)...........................................................................36

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
   239 F.3d 1343 (Fed. Cir. 2001)............................................................................7

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.,*
   586 F.Supp.2d 1083 (D. Az. 2008) ......................................................................5

*Beatrice Foods Co. v. New England Printing & Lith. Co.,*
   899 F.2d 1171 (Fed. Cir. 1990).............................................................................41

*Biotech Biologishce Naturverpackungen GmbH & Co. v. Biocorp, Inc.,*
   249 F.3d 1341 (Fed. Cir. 2001)............................................................................17

*Black & Decker, Inc. v. Bosch Tool Corp.,*
   2008 WL 60501 (Fed. Cir. Jan. 7, 2008) ..............................................................3

*Boston Scientific Scimed, Inc. v. Cordis Corp.,*
   554 F.3d 982 (Fed. Cir. 2009)..............................................................................35

*Bowling v. Hasbro, Inc.,*
   No. C.A. 05-229S, 2008 WL 717741 (D.R.I. March 17, 2008) ...........................42

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993).............................................................................................13

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,*
   296 F.3d 1106 (Fed. Cir. 2002).............................................................................22

*Centricut, LLC v. Esab Group, Inc.,*
   390 F.3d 1361 (Fed. Cir. 2004)..........................................................20, 21, 24, 33

*Chrabaszcz v. Johnston School Committee,*
   474 F.Supp.2d 298 (D.R.I. 2007).........................................................................30

*Coffman v. Hitchcock Clinic, Inc.,*
   683 F.2d 5 (1st Cir. 1982).....................................................................................39

*Cohesive Techs. v. Waters Corp.,*
   543 F.3d 1351 (Fed. Cir. 2008).............................................................................3

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,*
   424 F.3d 1293 (Fed. Cir. 2005).............................................................................26

*Cybor Corp. v. FAS Techs., Inc.,*
   138 F.3d 1448 (Fed. Cir. 1998)..................................................................20

*Datamize, LLC v. Plumtree Software, Inc.,*
   417 F.3d 1342 (Fed. Cir. 2005)..................................................................38

*Daubert v. Merrel Dow Pharms.,*
   509 U.S. 579 (1993)..................................................................................39

*Decca Ltd. v. United States,*544
   F.2d 1070 (Ct. Cl. 1976) ..........................................................................45

*Deepsouth Packing Co., Inc. v. Laitram Corp.,*
   406 U.S. 518 (1972)................................................................26, 44, 45, 46

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,*
   851 F.2d 1387 (Fed. Cir. 1988)..................................................................36

*DSU Medical Corp. v. JMS Co.,*
   Ltd., 471 F.3d 1293 (Fed. Cir. 2006) ........................................................28

*Duro-Last, Inc. v. Custom Seal, Inc.,*
   321 F.3d 1098 (Fed. Cir. 2003)..................................................................28

*Ecolochem, Inc. v. Southern California Edison Co.,*
   227 F.3d 1361 (Fed. Cir. 2000)..................................................................37

*Evans Cooling Systems Inc. v. General Motors Corp.,*
   125 F.3d 1448 (Fed. Cir. 1997)..............................................................31, 32

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.,*
   64 F.3d 1553 (Fed. Cir. 1995)....................................................................30

*Figuera-Torres, et al. v. Toledo-Dávila, et al.,*
   232 F.3d 270 (1st Cir. 2000) .....................................................................18

*Franklin Electric Co. v. Dover Corp.,*
   2007 WL 5067678 (W.D. Wis Nov. 15, 2007).............................................4

*Fuesting v. Zimmer,*
   448 F.3d 936 (7th Cir. 2006) .....................................................................31

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
   318 F. Supp. 1116 (S.D.N.Y. 1970)...........................................................42

*Gillespie v. Sears, Roebuck & Co.,*
   386 F.3d 21 (1st Cir. 2004)............................................................16, 17, 43

*Halliburton Energy Services, Inc. v. M-I LLC,*
   514 F.3d 1244 (Fed. Cir. 2008)..............................................................37, 38

*Intel Corp. v. Intern. Trade Com'n,*
   946 F.2d 821 (Fed. Cir. 1991)..................................................................27

*Iqbal v. Ashcroft,*
   129 S.Ct. 1937 (2009)...........................................................................10

*Johns Hopkins University v. Datascope Corp.,*
   543 F.3d 1342 (Fed. Cir. 2008).........................................................13, 14

*Kemco Sales, Inc. v. Control Papers Co., Inc.,*
   208 F.3d 1352 (Fed. Cir. 2000)..............................................................23

*Layne v. Vinzant,*
   657 F.2d 468 (1st Cir. 1981)............................................................34, 35

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.,*
   2005 WL 1331216 (D. Del. June 6, 2005)...................................................7

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.,*
   485 F.3d 1157 (Fed. Cir. 2007)..............................................................36

*Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan, Inc.,*
   873 F.2d 1422 (Fed. Cir. 1989)..............................................................15

*MacQuarrie v. Howard Johnson Co.,*
   877 F.2d 126 (1989)...........................................................................42

*Malta v. Schulmerich Carillons, Inc.,*
   952 F.2d 1320 (Fed. Cir. 1991).........................................................20, 29

*Marrero v. Goya of P.R., Inc.,*
   304 F.3d 7 (1st Cir. 2002)....................................................................33

*Mendenhall v. Cedarapids, Inc.,*
   5 F.3d 1557 (Fed. Cir. 1993)................................................................35

*Microsoft Corp. v. AT&T Corp.,*
   550 U.S. 437 (2007)....................................................................28, 44, 46

*Midwest Indus., Inc. v. Karavan Trailers, Inc.,*
   175 F.3d 1356 (Fed. Cir. 1999)..............................................................28

*Network Commerce, Inc. v. Microsoft Corp.,*
   422 F.3d 1353 (Fed. Cir. 2005)..............................................................23

*NTP, Inc. v. Research In Motion, Ltd.,*
   418 F.3d 1282 (Fed. Cir. 2005)....................................................44, 45, 46

*Nutrition 21 v. Thorne Research, Inc.,*
   930 F.2d 867 (Fed. Cir. 1991)...............................................................38

*Odetics, Inc. v. Storage Tech. Corp.,*
  185 F.3d 1259 (Fed. Cir. 1999)............................................................22

*Optivus Tech. v. Ion Beam Applications S.A.,*
  469 F.3d 978 (Fed. Cir. 2006)............................................................37

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,*
  806 F.2d 1565 (Fed.Cir.1986)............................................................29

*Pfizer, Inc. v. Apotex, Inc.,*
  480 F.3d 1348 (Fed. Cir. 2007)............................................................5

*Pharmastem Therapeutics v. Viacell, Inc.,*
  491 F.3d 1342 (Fed. Cir. 2007)............................................................5

*Prima Tek II, L.L.C. v. Polypap, S.A.R.I.,*
  412 F.3d 1284 (Fed. Cir. 2005)............................................................5

*Proveris Scientific Corp. v. Innovasystems, Inc.,*
  536 F.3d 1256 (Fed. Cir. 2008)............................................................33

*Read Corp. v. Powerscreen of America, Inc.,*
  44 Fed. Appx. 502 (Fed. Cir. 2002)............................................................23, 29

*Richardson-Vicks Inc. v. Upjohn Co.,*
  122 F.3d 1476 (Fed. Cir. 1997)............................................................36

*Riles v. Shell Exploration & Prod. Co.,*
  298 F.3d 1302 (Fed. Cir. 2002)............................................................40

*Rothman v. Target Corp.,*
  556 F.3d 1310 (Fed. Cir. 2009)............................................................36

*Schumer v. Lab. Computer Sys., Inc.,*
  308 F.3d 1304 (Fed. Cir. 2002)............................................................33

*In re Seagate,*
  497 F.3d 1360 (Fed. Cir. 2007)............................................................2, 3, 5, 6, 7

*Service Auto Supply Co. v. Harte & Co.,*
  533 F.2d 23 (1st Cir. 1976)............................................................34

*SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.,*
  225 F.3d 1349 (Fed. Cir. 2000)............................................................35, 36

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,*
  537 F.3d 1357 (Fed. Cir. 2008)............................................................38

*State Farm Mutual Automobile Ins. Co. v. New Horizont, Inc.,*
  250 F.R.D. 203 (E.D. Pa. 2008)............................................................19

*State Indus., Inc. v. A.O. Smith Corp.,*
    751 F.2d 1226 (Fed. Cir. 1985)....................................................................8

*Tang v. Rhode Island Dept. of Elderly Affairs,*
    163 F.3d 7 (1st Cir., 1998)........................................................................39

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.,*
    90 F.3d 1558 (Fed. Cir. 1996)..............................................................15, 29

*Unisplay, S.A. v. American Elec. Sign Co.,*
    69 F.3d 512 (Fed. Cir., 1995)...................................................................40

*Veritas Operating Corp. v. Microsoft Corp.,*
    562 F.Supp.2d 1141 (W.D. Wash. 2008)....................................................6

*Voda v. Cordis Corp.,*
    536 F.3d 1311 (Fed. Cir. 2008)............................................................15, 16

*Yee v. City of Escondido,*
    503 U.S. 519 (1992)..................................................................................29

*Zygo Corp. v. Wyko Corp.,*
    79 F.3d 1563 (1996)..................................................................................27

## STATUTES

35 U.S.C. § 112......................................................................................22, 23, 27

## RULES

Fed. R. Civ. P. 30(b)(6)..................................................................................18

Fed. R. Civ. P. 50.......................................................................................1, 31

Fed. R. Civ. P. 50(a)..........................................................................28, 29, 30

Fed. R. Civ. P. 50(b)..........................................................................28, 29, 30

Fed. R. Civ. P. 59.........................................................................................16

Fed. R. Evid. 702.........................................................................................39

## I.      INTRODUCTION

In advocating for blind deference to the jury, Uniloc ignores the power and responsibility of this Court to serve as a gatekeeper, to insure that jury trials are won only through legally sufficient evidence.

Uniloc also ignores most of the reasons why its evidence was insufficient, as a matter of law, to sustain the verdict.  As to its marquee issue, copying, Uniloc has not even met its threshold obligation to prove the relationship between its asserted claim 19 and the thing Microsoft supposedly copied.  On infringement, Uniloc has no response to Microsoft's proof that any possible link between a Product Key and a licensee is destroyed in generating the accused license digest, and also improperly conflates the separate claim requirements of "unique" and "associated" because it has no proof of the latter.  Uniloc also disregards its obligations in law both to provide expert testimony on structural equivalence and to compare structures as a whole, not just selected components.  Uniloc also continues to ignore the requirements of the EULA found relevant by the Court, as well as the undisputed fact that Product Activation is a wholly separate process from the EULA licensing procedure.  So too does Uniloc persist pressing fundamentally contradictory positions on infringement and validity, even though it must prove infringement of a valid claim.

Uniloc cannot sustain a $388 Million judgment – a figure that leaves even Uniloc scratching its head to explain, and that makes no sense given the undisputed failure of the underlying technology – by ignoring the law, the plain requirements of the claim, and the Court's constructions of the key terms.  While rote recitation of the claim language and waving hands at stacks of documents and conclusory expert testimony may have worked at trial, Rule 50 stands to ensure that such unfair and unwarranted results do not stand.

## II.     UNILOC FAILED TO PROVE WILLFUL INFRINGEMENT

While there is no dispute on the law of willful infringement, Uniloc predicates its

opposition on the "reckless" language of *Seagate*, as though that is all that it was required to

show at trial.  But *Seagate* was clear that the label of "recklessness," standing alone, is

meaningless. There is an explicit and stringent two-part test for proving willfulness:

> We fully recognize that "the term [reckless] is not self-defining." … Accordingly,
> to establish willful infringement, a patentee must show by clear and convincing evidence
> that the infringer acted despite an objectively high likelihood that its actions constituted
> infringement of a valid patent. … The state of mind of the accused infringer is not
> relevant to this objective inquiry.  If this threshold objective standard is satisfied, the
> patentee must also demonstrate that this objectively-defined risk (determined by the
> record developed in the infringement proceeding) was either known or so obvious that it
> should have been known to the accused infringer.

*In re Seagate*, 497 F.3d 1360, 1372 (Fed. Cir. 2007).  Moreover, where, as here, a willfulness

claim is asserted in the original complaint, that "complaint must necessarily be grounded

exclusively in the accused infringer's pre-filing conduct."  *Id*. at 1374.

No reasonable jury could have concluded that there was an objectively high likelihood

that product activation infringes claim 19, and that that claim is valid.   As to the subjective

prong, there is no evidence that anyone at Microsoft even knew about the '216 patent before

being sued by Uniloc, let alone knew of any objectively high likelihood that claim 19 was

infringed and valid.

Uniloc does not even attempt to identify evidence to satisfy these two prongs.  It instead

devotes itself to rehashing the fundamentally flawed, but nonetheless highly inflammatory,

copying story that it successfully used to distract the jury from the real issues in the case.  The

alleged copying here is irrelevant to the objective prong, which essentially concerns the

reasonableness of Microsoft's non-infringement and invalidity defenses.  *Id*. at 1371,1372 ("It is

[a] high risk of harm, objectively assessed, that is the essence of recklessness at common law."

[quoting *Safeco Ins. Co. of Am. v. Burr*, 127 S.Ct. 2201, 2215 (2007)]  The state of mind of the accused infringer is not relevant to this objective inquiry.")  Nor is it *per se* relevant to the subjective prong.  The issue posed by that prong is whether Microsoft knew, or should have known, that it would be liable for infringing a valid claim 19.  Uniloc has to this day not even proven that the allegedly copied sample embodied claim 19, let alone linked  the alleged 1993-94 copying to the 1996 inception of Product Activation, or to the 2001 incorporation of the hashing algorithm that lies at the heart of Uniloc's infringement case.

A.     **Uniloc Failed at Trial, and Continues to Fail Post-Trial, to Identify Any Evidence, Let Alone the Required Clear and Convincing Evidence, of an "Objectively High Likelihood" That Product Activation Infringes Claim 19 and That That Claim Is Valid**

To satisfy the objective prong of *Seagate*, Uniloc must show, by clear and convincing evidence, that *all* of Microsoft's claim construction positions, non-infringement defenses, and invalidity defenses were baseless.  *Black & Decker, Inc. v. Bosch Tool Corp.*, 2008 WL 60501, at *6-7 (Fed. Cir. Jan. 7, 2008) (unpublished opinion) ("legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent.").

Despite this, Uniloc does not confront the fact that Microsoft proposed a claim construction under which Product Activation indisputably did not infringe claim 19, or any other claim of the '216 patent.  Given that Chief Judge Michel agreed with Microsoft's construction, it is beyond any dispute that Microsoft's proposed construction was *reasonable*, and that alone is fully dispositive of willfulness.  *Cohesive Techs. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008) (affirming a finding of no willful infringement after concluding that the asserted claims were subject to a "reasonable construction" under which the accused products would not infringe).

-3-

Uniloc does not even address *Cohesive Technologies*, let alone attempt to distinguish it.
It instead relegates the Chief Judge's opinion to a footnote, as "but one of the many facts
presented to the jury under the 'totality of the circumstances' relating to the issue of willfulness."
[Opp. at 13 n.5]  What Uniloc is asking this Court to believe is that the jury parsed the Minority
Opinion, and found Chief Judge Michel's agreement with Microsoft's claim construction to be
*unreasonable*.  No reasonable jury could have concluded on this record that Microsoft had not
presented a reasonable claim construction entitling it to non-infringement.  That, in and of itself,
warrants JMOL of no willfulness.

Uniloc likewise does not address, or attempt to distinguish, *Franklin Electric Co. v.
Dover Corp.*, 2007 WL 5067678, *8 (W.D. Wis Nov. 15, 2007), holding that the court's prior
grant of summary judgment of non-infringement, even though reversed on appeal (as here),
"establishes defendants' conduct in selling its product was not reckless in the sense that there
was an 'objectively high likelihood' that its actions were infringement."  That too independently
warrants JMOL of no willfulness.  Uniloc instead rehashes its unfounded accusation that
Microsoft "knew" that the summary judgment decision was wrong, ignoring the inconvenient
fact that Judge Michel would have affirmed it.

So too does Uniloc ignore the entire array of Microsoft's liability defenses in this case:
(1) non-infringement based on "unique identifier associated with a licensee"; (2) non-
infringement based on "licensee unique ID generating means"; (3) non-infringement based on
"registration system"; (4) non-infringement based on "mode switching means;" (5) invalidity
based on the indefiniteness of "unique"; (6) invalidity based on anticipation by Hellman; and (7)
invalidity based on obviousness over Hellman and Wolfe.

Uniloc does not contend, let alone offer clear and convincing evidence to show, that any of these defenses is objectively baseless.  Uniloc instead rests its entire objective prong analysis on a critique of just one part of one of Microsoft's invalidity defenses, item (7) in the above list. Uniloc contends that it satisfied the stringent objective prong in *Seagate* because the Wolfe patent, which Microsoft relies upon as a *secondary* reference in its obviousness defense, was cited to the Patent Office during prosecution.  Uniloc relies on *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 586 F.Supp.2d 1083, 1088-89 (D. Az. 2008), stating that "In *Bard*, the court found that the defendant's reliance upon the same prior art for its invalidity argument as previously found by the PTO not to invalidate the patent-in-suit was evidence of willfulness." [Opp. at 13]

This argument does not withstand scrutiny.  First, Uniloc is wrong on the facts. Microsoft does not rely on Wolfe *alone*.  At trial, Wolfe was combined with Microsoft's primary invalidity reference, Hellman, and Hellman was not cited to the Patent Office.  [Trial Tr., Day 7 at 167; Ex. D-8]  Uniloc is also wrong on the law.  The Federal Circuit has repeatedly held patents invalid over art cited to the Patent Office.  *See, e.g., Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007); *Pharmastem Therapeutics v. Viacell, Inc.*, 491 F.3d 1342, 1366-67 (Fed. Cir. 2007); *Prima Tek II, L.L.C. v. Polypap, S.A.R.I.*, 412 F.3d 1284, 1287 (Fed. Cir. 2005). In short, a legitimate and *bona fide* invalidity defense can be based on prior art considered by the Patent Office.

> **B.    Uniloc Failed at Trial, and Continues to Fail Post-Trial, to Identify Any Evidence, Let Alone the Required Clear and Convincing Evidence, That an Objectively High Likelihood That Product Activation Infringes Claim 19 Was "Either Known or So Obvious That It Should Have Been Known" to Microsoft**

Uniloc pays only lip service to the subjective prong of *Seagate*:  "the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the

infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."  Not only must Uniloc show that Microsoft was aware of claim 19 of the '216 patent before Uniloc filed suit, but that Microsoft subjectively knew, or should have known, about the objective risk of infringement of a valid claim 19.

Uniloc has not shown any of this.  Uniloc's sole evidence of Microsoft's alleged pre-suit awareness of the '216 patent is the fact that it was cited during prosecution of Microsoft's Larsson patent.  The Larsson patent was not directed at Product Activation, but rather to a different technology lacking any server component.  [Trial Ex. 465, "Abstract"]  The citation of the '216 patent was in a routine patent prosecution document mailed to Microsoft's outside patent counsel, and there is no evidence that the '216 patent was ever communicated to or identified to anyone at Microsoft, let alone anyone involved with Product Activation.  [*See* Microsoft Opposition, D.I. 372, at 9-11]  This does not support a finding of willfulness.  *Veritas Operating Corp. v. Microsoft Corp.*, 562 F.Supp.2d 1141, 1277, 1288 (W.D. Wash. 2008) (adopting special master's recommendation of summary judgment of no willfulness where patent-in-suit was cited as a basis for rejecting claims during the prosecution of two Microsoft patents).[1]

Thus, Uniloc has not identified any evidence showing that the relevant people at Microsoft even knew of the '216 patent.  And *Seagate* requires more.  It requires clear and convincing evidence that the alleged "objectively-defined risk … was either known or so obvious that it should have been known to" Microsoft.  In short, not only must Uniloc show that all of Microsoft's liability defenses in this case are objectively baseless, but also that Microsoft knew or should have known that they are objectively baseless.  No such evidence was presented to the jury, and Uniloc's opposition does not even suggest it was.

---

[1] Uniloc also improperly suggests that Microsoft had a duty of care to evaluate the '216 patent as a consequence of its citation during prosecution of the Larsson patent.  [Opp. at 12]  *Seagate* expressly overruled the authority establishing such a duty of care.  *In re Seagate*, 497 F.3d at 1371.

### C.      Uniloc's Alleged Evidence of Copying Does Not Satisfy the Subjective Prong

As noted above, evidence of copying is only potentially relevant, if at all, to the

subjective prong of *Seagate*.  *In re Seagate*, 497 F.3d at 1372.  Specifically, evidence of copying

is only relevant if it reflects that the infringer either knew, or should have known, of an

objectively high risk of infringement of an invalid patent.  Thus, if the infringer copied the patent

owner's product, knowing it to be patented, with no basis to believe the claims that it embodied

were invalid, then such copying evidence could bear on the subjective prong.

That is not the situation here.  Uniloc has not  shown that the allegedly copied Uniloc

sample practiced claim 19 of the '216 patent, let alone that Product Activation was in any way

derived from that sample.

### 1.      Uniloc Fails to Cite to Any Evidence That the Sample It Provided to Microsoft Embodied Claim 19

Because Uniloc failed to show that the sample it provided to Microsoft had any of the

characteristics or elements of asserted claim 19, its alleged evidence that Microsoft copied that

sample is irrelevant to willfulness.  *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 2005 WL

1331216, at *2 (D. Del. June 6, 2005)*; Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d

1343, 1366 (Fed. Cir. 2001).

Uniloc attempts to distinguish *Leapfrog* and *Amazon* in a footnote.  However, in this

case, as in *Leapfrog*, Uniloc presented no expert evidence establishing that the Uniloc sample

met any element of the asserted claim.  *See Leapfrog* at *2.  Nor did Uniloc "adduce *some*

evidence that [plaintiff's product alleged to have been copied] is an embodiment of the 'ideas or

design' of the asserted claim."  *Id.*   As to *Amazon*, while true that that case addressed the issue

of copying in the context of obviousness rather than willfulness, Uniloc fails to explain why

copying should be analyzed differently in the two contexts.  Indeed, since willfulness must be

shown by clear and convincing evidence rather than the preponderance standard applicable to showing copying as a secondary factor of non-obviousness, the requirement on the patent owner to show that the copied article embodied the claim should if anything be *more* stringent in the willfulness context.

The only argument advanced by Uniloc to suggest that its sample "was covered by the patent" is "Microsoft's acknowledgement in paragraphs A and B of the NDA that the Uniloc sample was covered by Uniloc's patent application."  [Opp. at 9, n.3]  However, these paragraphs merely say that "certain elements" of a "concept" embodied in a computer program and other documents "are the subject of a patent application."  [Trial Ex. 366, ¶¶ A-B]  The patent application is not identified, and Uniloc's observation that the NDA followed the U.S. filing date of the '216 patent by a week hardly suffices even to identify it, let alone to have put Microsoft on notice of it.  The statement regarding the patent application also does not show that the sample Uniloc provided to Microsoft embodied any elements of asserted claim 19 or that Microsoft had sufficient knowledge to willfully infringe.  *See State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("To willfully infringe *a patent*, the patent must exist and one must have knowledge of it.  A 'patent pending' notice gives one no knowledge whatsoever.").

The NDA also does not state which if any elements of the undefined "concept" were embodied in the computer program, versus which were embodied in "other documents," which there is no evidence Microsoft received.  [*See* Trial Tr., Day 1, 158: 13-25; 164:3-10; 167:21-168:10]  The NDA is simply silent on the key issue of how the Uniloc sample given to Microsoft functioned, or whether it embodied any of the elements of claim 19.

Nor does the Richardson testimony cited by Uniloc close the evidentiary gap: "The patent was written by my patent attorney, so from the way that he explained to me that he wrote this, it definitely covers my – the product that I made, as well as a number of different other ways of doing that product." [Trial Tr., Day 2 at 26:19-23 (quoted in part at Opp. at 9)]  Mr. Richardson was not testifying about the sample that Uniloc provided to Microsoft.  Nor did he describe the technical content of the sample, or state that it embodied claim 19.  Very much to the contrary, Mr. Richardson steadfastly refused to discuss what did, and what did not, embody his patent.  [*See* Trial Tr., Day 2, 71:19-24 ("Q.  Is machine-locking the only requirement of your patent in order for a product to be using your patent? …. A.  I don't - - I don't comment on the patent.  I only comment on my product."); 66:21-67:1 ("Q.  Well, do you consider time bombing to be an embodiment of your patent? …. A.  Sorry.  The patent describes - - it protects my invention.  I don't want to comment on that.")]   There is simply no foundation for any attempt now for Uniloc to rely on any of Mr. Richardson's testimony about his patent, and what it covers.

### 2. Uniloc Also Has No Evidence that Anything Was Copied from the Uniloc Sample, or from the '216 Patent

Uniloc also remains unable to point to any evidence, let alone the requisite clear and convincing evidence, showing that Microsoft copied anything from Uniloc to develop Product Activation.  Uniloc has never connected anyone associated in any way with Uniloc's sample or patent with anyone who worked on the development of Product Activation.

The centerpiece of Uniloc's opposition is its allegation that Microsoft analyzed its sample by reverse engineering and/or reverse compiling it in violation of the NDA.  As set forth in Microsoft's Opposition to Uniloc's Motion for Enhanced Damages and a Permanent Injunction, that contention also was unproven at trial.  [*See* Microsoft Opp., D.I. 372, at 7]

Moreover, Uniloc's own evidence shows that the details of Microsoft's rights to evaluate the Uniloc sample were circumscribed by the license agreement that was included with the sample, not the NDA.  [Opp. at 10; "Please refer to the Uniloc license which is part of the Note Pad that I gave you for the specific details;" "the Uniloc license agreement in the Note Pad demo that was very explicit about this topic."]  *Uniloc never offered this license agreement into evidence, and does not rely on it now.*  There is thus simply no record on which Uniloc can establish that Microsoft did anything wrong when it evaluated the sample.  Evidence that at most fails to disprove the possibility of copying does not compel the conclusion that copying occurred, and thus is insufficient as a matter of law to prove willfulness by a preponderance of the evidence – much less provide the "clear and convincing" evidence that Uniloc is required to provide here.  *See Iqbal v. Ashcroft*, 129 S.Ct. 1937, 1949 (2009) ("facts that are 'merely consistent with' a defendant's liability [ ] 'stop[] short of the line between possibility and plausibility of 'entitlement to relief.'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Beyond this fatal flaw in its story, Uniloc has no response at all to the undisputed record, based on its own documents cited in Microsoft's initial brief, that the Uniloc sample provided to Microsoft was completely ineffective, and that Uniloc responded to this embarrassment by attempting to fix the problems.  [*See* Microsoft Mem. at 8; Trial Exs. 133, X-6 and Q-6]

On the absence of any evidence linking Microsoft's evaluation of the Uniloc sample with its development of Product Activation, Uniloc tries to shift its burden to Microsoft, complaining that Microsoft did not provide evidence showing development of the accused product prior to "(a) its hacking into Uniloc's code; (b) Mr. Pearce's 'competitive' intelligence activities, or (c)

the publication of the Uniloc patent in February 1996."[2]  [Opp. at 12]  There is simply nothing in the record showing that anything from Uniloc's sample, or its patent, was used in the development of Product Activation.  No testimony from Mr. Pearce or Mr. Hughes suggested this, and no documents show or suggest that any aspect of Product Activation, especially  the accused hashing function, was copied from anything obtained from Uniloc.[3]

As to Uniloc's assertion that Mr. Klausner's testimony regarding infringement of claim 19 establishes that Microsoft copied something from Uniloc's patent, that is plainly not the test; if it were, then every instance of literal infringement would *ipso facto* be copying, and every literal infringer would be a willful infringer.

D.      **Uniloc Does Not Dispute That It Built Its Entire Case Around Its Copying Allegations; Given That Those Allegations Were Baseless, at Minimum a New Trial Is Warranted**

As demonstrated by Uniloc's perfunctory motion for enhanced damages, it does not seriously believe that this is a case warranting punitive damages.  The copying allegations were designed to inflame, confuse, and prejudice the jury, in order to distract them from the merits of the case.  Uniloc's copying allegations infected nearly every aspect of the trial.  Uniloc does not

---

[2] Uniloc improperly attempts to rely on new evidence to show that Lexis-Nexis offered access to issued patents to its subscribers in 1994.  [Opp. at 12, n.4, Ex. K]  This is not in the record.  Nor is there any evidence that Mr. Pearce, who was not an attorney or a patent agent, was a Lexis-Nexis subscriber or otherwise had access to or did access the patent in 1996.  Uniloc's criticism of Microsoft's evidence showing that the Patent Office did not publish patents on the Internet until 1998 is remarkably ironic, given its tacit admission that its counsel had no record support for the strenuous  argument made in close that that Mr. Pearce must have downloaded the '216 patent from the Internet.

[3] As it did in its Motion for Enhanced Damages, Uniloc mischaracterizes the testimony of Mr. Pearce and Mr. Hughes in arguing that Microsoft did not show independent development.  Uniloc represents that Mr. Hughes "testified that he did not conceive the accused technology" and misleadingly states that "Pearce admitted that MSFT did not use the combination of a PID and HWID until after Uniloc gave Microsoft the Uniloc product."  [Opp. at 11] This is incorrect.  [*See* Microsoft Opposition to Uniloc Motion for Enhanced Damages and a Permanent Injunction, D.I. 372, at 8-9]  Uniloc also states that "When questioned how Product Activation worked, Mr. Pearce, the purported architect of the system, professed ignorance."  [Opp. at 11]  Uniloc mischaracterizes Mr. Pearce's testimony that he did not know "how Product Activation was implemented" in Microsoft's products.  As Mr. Pearce explained, he did not work on Product Activation in any shipping products, but rather worked on its development in three pilot programs.  [Trial Tr., Day 5, at 247].  All of this is also irrelevant to the present motion, since it was not Microsoft's burden to establish independent development.

dispute that this was its marquee issue.  In the event the Court grants JMOL of no willful

infringement, the interests of justice at minimum warrant a new trial on all other issues.

**III.    UNILOC FAILED TO PROVE INFRINGEMENT**

    **A.    Uniloc Failed To Prove that Microsoft's License Digest is a "Licensee Unique ID"**

Nothing in the pages of testimony and documents cited by Uniloc supports the jury's

finding that Microsoft's license digest is a "unique identifier *associated with a licensee*"

(emphasis added).

        **1.    Uniloc Does Not Even Address Microsoft's Main Argument That Hashing Deliberately Destroys Any Possible Association Between the Licensee and the License Digest**

Uniloc contends that Microsoft's license digest is the Licensee Unique ID of claim 19,

because that is the output of the hash functions at the local and remote sides.

This theory is predicated on Uniloc's conclusory assertion that typing in a Product Key

causes it to be associated with the user.  Mr. Klausner's *ipse dixit* on this point should be

disregarded.  But even if it is not, Microsoft demonstrated that even this alleged "association" is

deliberately destroyed, for reasons of privacy, by the hashing routines that Microsoft uses to

create the license digest.  [Microsoft Mem. at 16-17]  Uniloc does not refute this fact, and none

of the documents on which it now relies shows any association between the license digest and

the licensee.  This is dispositive of non-infringement.

        **2.    Uniloc Improperly Tries to Read "Associated With" Out of Claim 19 by Conflating It with the Separate Requirement of "Unique"**

A "licensee unique ID" is a "unique identifier associated with a licensee."  The only

alleged evidence identified in Uniloc's opposition on the key point of whether the license digest

is a unique identifier associated with a licensee is two lines of Klausner testimony.   In the first,

Mr. Klausner asserts, without explanation, that "The user has to enter a valid product key, so in

this case, the user is entering the information and then starts to type in the product key, and that's now the product key that's associated with that user." [Opp. at 14] Mr. Klausner then continued (with no question posed by Uniloc's counsel):

> And that association, as we will see later, maintains between the user and the product key and its derivatives throughout the Microsoft system, going from the local side to the remote side and back.

*Id.*

This is *ipse dixit* upon *ipse dixit*. Such conclusory and unsupported expert testimony does not support a jury verdict. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *Johns Hopkins University v. Datascope Corp.*, 543 F.3d 1342, 1349 (Fed. Cir. 2008).[4] Mr. Klausner never explained the basis for his conclusion that the Product Key becomes uniquely associated with the user – who at that point is not even a licensee – merely by virtue of the user typing it in.[5] Mr. Klausner never explained what the "derivatives" of the Product Key are, let alone offer a reasoned opinion that the license digest is such a "derivative." Nor did Mr. Klausner ever follow through on his promise to explain "later" how the alleged association "between the user and the product key and its derivatives" are maintained "throughout the Microsoft system, going from the local side to the remote side and back."

To the contrary, Mr. Klausner's subsequent testimony, cited by Uniloc in its opposition, shows that Mr. Klausner in offering his unsupported opinion on association was in fact improperly conflating "associated" and "unique." [*Id.* at 14-16] For example, Mr. Klausner states that "the PID is also associated with the user *because it is also unique*." [*Id.* at 14 (emphasis added)] Setting aside the indefiniteness of "unique," Uniloc must show that the license digest is not only unique, but is also "associated with a licensee." It has failed to do so.

---

[4] Microsoft cited both cases in its opening brief. Uniloc did not address or distinguish either.
[5] Indeed, Uniloc and Mr. Klausner do not even address the undisputed fact that the Product Key is not even unique to a given user, given that two different people can type in the same Product Key.

Uniloc also fails to explain the fundamental contradiction between Mr. Klausner's conclusory testimony, quoted above, and his opinion that "any result of a hash function utilizing a random number would be random, rather than a licensee unique ID." [*See* Microsoft Mem. at 20]  There is no dispute that the hash function that generates the license digest utilizes a random number.  [Klausner Testimony, Trial Tr., Day 3, at 196:23-197:6]  By Mr. Klausner's own admission, then, the license digest is not a licensee unique ID.  This simply cannot be reconciled with his sweeping assertion – on which Uniloc essentially hinges its entire infringement case – that "that association, as we will see later, maintains between the user and the product key and its derivatives throughout the Microsoft system, going from the local side to the remote side and back."

Nor does the other evidence identified by Uniloc provide any basis on which the jury could properly have determined that the license digest is associated with the licensee.  Uniloc touts Dr. Wallach's testimony, but all that he said was that changing a digit in the PID will change the license digest.  [*Id*. at 15]  That in no way shows that the license digest is associated with a licensee.  If anything, it further supports the undisputed fact that the hash function destroys any possible association.

Uniloc's final batch of evidence is a series of documents suggesting that Product Keys or PIDs are associated with licenses, computers, etc.[6]  The fundamental failing of this evidence is that not a single one of the passages identified and relied upon by Uniloc discusses the license digest.  That is what Uniloc must prove is associated with a licensee.  Its failure to do so is dispositive of non-infringement.

---

[6] These documents do not show an association between the Product Key or the PID and the licensee, *i.e.*, the person who has licensed the software, as opposed to the person's computer or the license itself.  The bulk of these documents describe an association between the Product Key or the PID and the license or the computer.  While there are some document that refer to a "customer's" or a "user's" Product Key or PID, that is not evidence of "association," any more than the serial number on a dollar bill is "associated with" the person whose pocket it is in.

3.      **Uniloc Fails to Identify Any Particularized Linking Testimony Sufficient to Sustain a Verdict of Infringement under the Doctrine of Equivalents**

As to whether the "licensee unique ID" element of claim 19 is present in Product Activation under the doctrine of equivalents, Uniloc does not even attempt to argue that Mr. Klausner's conclusory testimony concerning the function, way, and result of the "remote registration station incorporating remote licensee unique ID generating means" element of claim 19 supports a verdict of infringement under the doctrine of equivalents. [*See* Microsoft Mem. at 21-22]  In a single sentence, Uniloc contends that its purported evidence of literal infringement of this element of claim 19 "also supports a finding of infringement of claim 19 under the doctrine of equivalents." [Opp. at 19]

Uniloc is wrong on the law.  "The evidence and argument on the doctrine of equivalence cannot merely be subsumed in plaintiff's case of literal infringement." *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan, Inc.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989); *see also Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) ("a patentee must provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents.").

Uniloc sole authority in support of its position is inapposite.  In *Voda v. Cordis Corp.*, 536 F.3d 1311, 1327 (Fed. Cir. 2008), the plaintiff's experts offered specific testimony that the difference in shape between the accused element and the patent element in question "was so insubstantial that cardiologists would have difficulty distinguishing the two during use" as well as particularized testimony that the accused element performed the same function as the patented element, in the same way, to achieve the same result.  There is no such testimony here from Mr.

-15-

Klausner. Uniloc cites to no particularized testimony from Mr. Klausner that the differences between the licensee unique ID of the patent and Microsoft's license digest are insubstantial. Uniloc does not even point to Mr. Klausner's conclusory function, way, and result testimony as proof that a jury could have found infringement under the doctrine of equivalents.

> **4. Microsoft Did Not Waive Its Argument That It Is Entitled, at a Minimum, to a New Trial Because Uniloc Failed to Prove Infringement Under the Doctrine of Equivalents**

If the Court does not enter JMOL of non-infringement, Uniloc's failure to present sufficient evidence of infringement under the doctrine of equivalents at minimum warrants a new trial on the liability issues. It simply cannot be determined from the verdict form whether the jury found literal infringement of claim 19 or infringement under the doctrine of equivalents. [*See* Microsoft Mem. at 46-47; Opp. at 31-32]

Microsoft did not waive this issue. Nor is it saying that the verdict form was defective. Rather, given the nature of the verdict form, which Uniloc accepted, Uniloc's failure of proof makes it impossible to determine the basis for the jury's infringement finding.

Uniloc's position on waiver ignores the controlling First Circuit authority cited in Microsoft's brief that explicitly declined to find "waiver" where an appellant requested a new trial on the basis of the insufficiency of the evidence supporting one theory of liability, where the verdict form did not specify the theory under which liability was found. *Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 30-31 (1st Cir. 2004).[7] Specifically, the jury had returned a verdict for the plaintiff answering seven special interrogatories, including one addressed to whether the defendant had breached an implied warranty of merchantability and one addressed to whether the defendant was negligent, both of which the jury answered affirmatively. *Gillespie*, 386 F.3d at

---

[7] Uniloc does not dispute that First Circuit law governs the determination of a Rule 59 motion for a new trial premised on non-patent-specific bases. [*See* Microsoft Mem. at 4-5]

25. At trial, the plaintiff had advanced three theories of design defect in support of both claims. The First Circuit found that the evidence did not support one of the three theories because the plaintiff had not contradicted evidence that the alleged defect was not the cause in fact of his injury. *Id.* at 27. Although "thin," the evidence on the other two theories was sufficient to go to the jury. *Id.* at 28-29. The Court held that a new trial was required because one of the three theories was insufficient to support the verdict, and the verdict form made it impossible to determine if that was the theory on which the jury had based its verdict. *Id.* at 29-30 ("as the verdict may have rested solely on the [defective] theory, a new trial is required").

The Court rejected the argument that Uniloc in substance makes here, finding that an appellant that does not request a special verdict does not thereby "waive" a claim of error that could have been isolated by a more specific verdict form. "This court has never adopted such a rule and has regularly vacated general verdicts where the award might have been rescued if either side had sought and obtained an adequate special verdict." *Id.* at 31. The court concluded that "we should not adopt a waiver rule" and further noted that "[t]he term 'waive' is misleading; either side in this case could have asked for the special verdict to further break down the negligence and warranty claims by theory of defect." *Id.*

The cases cited in Uniloc's brief are inapposite. In *Biotech Biologishce Naturverpackungen GmbH & Co. v. Biocorp, Inc.*, 249 F.3d 1341 (Fed. Cir. 2001), the defendant did not appeal the denial of its motion for a new trial, so the Federal Circuit of course did not address whether a new trial was warranted where the jury did not specify whether it found literal infringement or infringement under the doctrine of equivalents. [*See* Brief of Defendants-*Appellants Biocorp, Inc. and Novamont S.p.A.*, 2000 WL 34401864, at *2-3 ("Statement of Issues") attached hereto as Ex. A] In *Figueroa-Torres,* the Court did not find that any one of the

three sets of claims asserted against the defendant was insufficiently supported by the evidence, and also noted that the defendant had "not made any coherent argument on appeal" addressing the lack of particularization of the verdict.  *Figuera-Torres, et al. v. Toledo-Dávila, et al.*, 232 F.3d 270, 276-277, 272 n. 1 (1st Cir. 2000).

### B.      Uniloc Failed to Prove That MD5 and SHA-1 Are Summation Algorithms or Equivalents

Although it was not Microsoft's burden to disprove infringement of the "licensee unique ID generating means" elements of claim 19, it did.  It proved it through Uniloc's corporate designee, and it proved it through its own expert.  Uniloc was required, as a matter of law, to provide meaningful counters to this evidence.  It did not.  It based its case entirely on uncorroborated third-party hearsay documents that did not come even close to satisfying its burden on this nuanced technical issue.

#### 1.      Mr. Cooper's 30(b)(6) Admission of Non-Equivalence Is Dispositive of Non-Infringement

Uniloc does not dispute that Mr. Cooper testified, under oath, that the MD5 and SHA-1 hashes are not summation algorithms, or their equivalents.  Uniloc does not dispute that Mr. Cooper was the company's designee on exactly this subject matter.

Nor does Uniloc dispute the central legal point of Microsoft's moving papers:  As a matter of law Mr. Cooper is presumed to have the knowledge of and speak for the corporation on the topics on which he was designated.  Microsoft cited four cases on this point.  [Microsoft Mem. at 30-31]  Uniloc does not respond to a single one of them.

Uniloc has only two counters to this dispositive point. First, Uniloc cites authority to the effect that "[t]hat the [Rule 30(b)(6)] witness's statements are 'binding on the corporation merely means that the witness has authority to speak on the corporation's behalf- it does not mean that the corporation cannot later vary its answer."  [Opp. at 21, citing *Hewlett Packard Co. v. Mustek*

*Systems, Inc.*, 2001 WL 36166855 at *2 n. 1 (S.D. Cal. June 11, 2001)]  That never happened here; *Uniloc never varied Mr. Cooper's answer*.  Although a 30(b)(6) admission prior to trial does not operate as a judicial admission, it can certainly take on such effect when the admitting party does not contradict that admission at trial and does not put forth a "reasonable explanation" for the prior admission.  *State Farm Mutual Automobile Ins. Co. v. New Horizont, Inc.*, 250 F.R.D. 203, 212 (E.D. Pa. 2008) (fact that 30(b)(6) testimony is not a judicial admission "does not mean . . . that the party may retract prior testimony with impunity.").  Mr. Cooper did not come to trial to try to rationalize or explain-away his admissions.  No other Uniloc witness contradicted or explained Mr. Cooper's testimony.  It is therefore binding on Uniloc.

Uniloc's second response is that "Microsoft cleverly omits from its quoted passages of Mr. Cooper's testimony the portions that contradict Microsoft's argument," *i.e.*, the portions of testimony to the effect that Mr. Cooper did not have full knowledge of the details of MD5 and SHA-1.  [Opp. at 21]  Microsoft was not so "clever," and the testimony in question does not "contradict" anything Mr. Cooper said.  Microsoft expressly dealt with this testimony by Mr. Cooper at page 30 of its opening brief.  As to the alleged "contradiction," there was none.  The fact that Mr. Cooper said he does not have full knowledge of the details of these two hash functions does not "contradict" his bottom-line conclusion that they are not summations or equivalents.

The issue here is simple.  Uniloc used attorney argument improperly to impeach the competence of its own 30(b)(6) witness, and to say that he did not know what he was talking about.  The law is clear.  It was incumbent upon Uniloc to counter Mr. Cooper's statements with evidence.  It did not do so.  The jury was not free to disregard those statements, and they are dispositive of non-infringement.

## 2.   Uniloc's Failure to Counter Microsoft's Expert Testimony Is Independently Dispositive of Non-Infringement

Uniloc does not dispute that Microsoft's expert, Prof. Wallach, gave expert testimony negating infringement – that one-way hash functions such as MD5 and SHA-1 are not the same as or equivalent to summation.[8]   [Microsoft Mem. at 32]   Uniloc also does not dispute that its expert, Mr. Klausner, did not offer any opinion that MD5 and SHA-1 are the same as or equivalent to summation.[9]   [*Id*.]

Uniloc therefore runs headlong into *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004), *citing Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002) ("'[T]ypically' expert testimony will be necessary in cases involving complex technology.").   Where a case presents complex technology, "where the accused infringer offers expert testimony negating infringement, the patentee cannot satisfy its burden of proof by relying only on testimony from those who are admittedly not expert in the field." *Id*.   Microsoft cited this case, for this proposition, in its moving papers.   Uniloc's response?   None.   Uniloc does not dispute this central point of law.   It has no expert evidence to counter Microsoft's expert testimony negating infringement.

---

[8] In its opposition brief, Uniloc, without legal citation, asserts that the testimony of Mr., Hughes and Professors Hellman and Wallach is "irrelevant to a JMOL motion."   To the contrary, the testimony of Microsoft's witnesses is entirely relevant where Uniloc failed completely to provide contrary testimony at trial, underscoring its failure to put in evidence that MD5 and SHA-1 are "summation algorithms" or equivalents. *See, e.g., Centricut*, 390 F.3d at 1370 ("Suffice to say that in a case involving complex technology, *where the accused infringer offers expert testimony negating infringement*, the patentee cannot satisfy its burden of proof by relying only on testimony from those who are admittedly not expert in the field.") (emphasis added). ).   Moreover, while the Court must defer to the jury when there is a genuine dispute of material fact, this is not so when there is absolutely no evidence on one side. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (JMOL is appropriate "if the jury's factual findings are not supported by substantial evidence"); *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320 (Fed. Cir. 1991) (affirming JMOL of noninfringement where patentee failed to present sufficient evidence).   Finally, Microsoft has also moved for a new trial, which does permit the Court to weigh evidence.

[9] Uniloc asserts that "Mr. Klausner specifically testified regarding infringement under the doctrine of equivalents, including testimony explaining how the accused algorithm performs a summing function."   [Opp. at 23.]   Uniloc makes a blanket cite to pages 106-24 of its Exhibit C in alleged support of this assertion.   Nothing in those 19 pages shows that Mr. Klausner offered an opinion that MD5 and SHA-1 algorithms are the same as or equivalent to summation.   The first six pages are simply Mr. Klausner's rote and conclusory testimony on the doctrine of equivalents.

Uniloc instead rests on the "numerous additional documents demonstrating that the MD5 and SHA-1 algorithms are summation algorithms," with its favorite example apparently being the NCR patent.  [Opp. at 21]  Many of these documents are third-party documents.  All are unsworn out-of-court statements, not subject to cross-examination by Microsoft, on which Uniloc is now heavily relying for the truth.  Indeed, all are at best expressions of *lay opinions*. On the clear, and unrebutted, authority of *Centricut*, "where [Microsoft] offers expert testimony negating infringement, [Uniloc] cannot satisfy its burden of proof by relying only on testimony from those who are admittedly not expert in the field."  *Centricut*, 390 F.3d at 1370.

### 3.   Uniloc Cannot Meet Its Burden by Showing That MD5 and SHA-1 Merely Perform Summation

In the only technical testimony by Mr. Klausner regarding the operation of the MD5 and SHA-1 hashes, he identified only a handful of lines in the source code and/or pseudo code for each that showed addition.  [Trial Ex. 1095 at 5 and 14; Trial Ex. 1096 at 7;  Klausner Testimony, Trial Tr. Day 3 at 120:17-124:11]  In short, there is no dispute that MD5 and SHA-1 perform numerous functions and operations beyond mere addition.  [Klausner testimony, Trial Tr. Day 3 at 33:08-35:02 (admitting that MD5 uses "more than two kinds [of operations], but two primary kinds of operation to do its work [summing and left shifting]") and 122:21-122:23 ("Now, I'm not saying that that's all that MD5 does, but that's a significant portion of the MD5 algorithm."); *see also, e.g.*, Wallach Testimony, Trial Tr. Day 7 at 145:06-147:01 ("Mr. Klausner also failed to tell you about a structure inside MD5, which is what's called a compressive function."), Trial Tr. Day 8 at 119:18-120:03 (MD5 and SHA-1 perform circular shifting, which is "a left shift and then to get the high bits, a right shift to get the low bits, and then a logical OR to put them together")]

Uniloc apparently contends that all it needs to show in order to satisfy this claim element is that the algorithms somewhere perform summation, and that the entireties of the rest of the algorithms can simply be ignored.  [*See, e.g.*, Opp. at 20 ("Uniloc…demonstrated that the MD5 algorithm performs summation.")]  Uniloc is wrong on the law, and its opposition is notably silent on case authority for this point.  It also fails to address, let alone distinguish, the authority cited by Microsoft clearly holding to the contrary.  The appropriate comparison is between MD5 and SHA-1 as a whole and a "summation algorithm," not between particular steps taken within MD5 and SHA-1 and summation.  *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999) ("The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations.  Rather, the claim limitation is the overall structure corresponding to the claimed function.  This is why structures with different numbers of parts may still be equivalent under § 112, ¶ 6, thereby meeting the claim limitation."); *see also Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002) (the "corresponding structure must include all structure that actually performs the recited function").  This too is dispositive of infringement.

### 4.    Uniloc Failed to Offer the Particularized Linking Testimony Required, as a Matter of Law, to Show Infringement of This Element

Because of the weakness of its expert evidence, Uniloc seeks, as it did at trial, to support the verdict by relying on its lawyers' interpretation of so-called "contemporaneous documents."  For the reasons stated above, this evidence is simply incompetent, as a matter of law, to counter the expert testimony of Professor Wallach, a qualified expert in this field.

This evidence is deficient as a matter of law for a second reason as well.  To take Uniloc's favorite document, the third-party hearsay NCR patent, Uniloc relies entirely on its statement that "The Message Digest/Hash is represented by a summation ($\Sigma$) algorithm (equated

to, or exemplary of, the MD5 protocol or other hashing algorithm). Hence, to calculate the Message Digest/Hash, a summation algorithm is implemented using all eight fields of data in step 2." [Opp. at 20 and 22]

Uniloc is not even clear what it contends this passage means. Is "a summation ($\Sigma$) algorithm" "equated to" MD5, or merely "exemplary of" MD5? Neither the document nor Uniloc says which it is.[10]

Uniloc cannot maintain that this document is evidence that a MD5 *is* summation. The source code and Mr. Klausner's testimony plainly demonstrate that MD5 is far more than mere summation.

If Uniloc instead contends that this document is evidence that MD5 is *equivalent to* summation, the document certainly does not say that. Even if it did, such a conclusory assertion would fail the requirement, well-settled in Federal Circuit authority, that equivalents must be shown by non-conclusory, particularized linking testimony. *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005), *quoting Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) ("[A] patentee…must provide particularized testimony and linking argument…presented on a limitation-by-limitation basis."); *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000) ("[T]he "way" and "result" prongs are the same under both the section 112, paragraph 6 and doctrine of equivalents tests."); *Read Corp. v. Powerscreen of America, Inc.*, 44 Fed. Appx. 502, 505-507 (Fed. Cir. 2002) (finding that the testimony of plaintiff's expert on the issue of structural equivalents provided an inadequate evidentiary basis to support the jury's verdict because "[h]e

---

[10] While Microsoft is not suggesting the Court weigh the evidence for JMOL, it bears noting that, on a plain reading of this passage in context, the "summation algorithm" is being used in place of "the MD5 protocol or other hashing algorithm," in order to simplify the presentation of the other aspects of the patent; in short, the authors used a summation algorithm to illustrate their idea because a MD5 would have been too complicated to explain. [Trial Ex. 1103 at 9:33]

did not compare the accused structure to the claim or offer any explanation as to whether or how it would perform in substantially the same way as the claimed invention").

In short, if Mr. Klausner had taken the stand and offered opinion testimony that parroted *verbatim* the statement in the NCR patent, and the similar conclusory statements in the other "contemporaneous documents" relied upon by Uniloc, while that might have cured Uniloc's *Centricut* problem – indeed, the ambiguities surrounding Uniloc's "contemporaneous documents" amply illustrate why *Centricut* imposes the requirement of live expert testimony – it still would not have been a legally sufficient evidentiary basis on which a jury could find that MD5 and SHA-1 are equivalent to summation. What was absent from Mr. Klausner's testimony, and what is absent from Uniloc's "contemporaneous documents," is reasoning and explanation. Absent those critical pieces, the jury did not have a proper or sufficient evidentiary basis to find infringement of this element.

### C.    Uniloc Failed to Prove That Product Activation Is a "Registration System"

On pages 39-42 of its opening brief, Microsoft explained, in detail, how on the undisputed record no reasonable jury could have found Product Activation to be a "registration system," as plainly required by claim 19. The issue is a simple one. A "registration system" is one that allows "digital data or software to run … if and only if" an appropriate *legal* licensing procedure has been followed. In the accused Microsoft products, there is no dispute that legal licensing occurs *prior to* Product Activation. [Microsoft Mem. at 41] Product Activation itself is thus not a registration system.

Uniloc does not even attempt to answer this argument. Uniloc devotes a single sentence directed to it, on page 24: "Uniloc introduced a plethora of evidence from which a jury could, and did, find that the accused system is a "registration system" that infringes under the Court's instruction that the applicable license is the EULA." But then it fails to deliver on the promised

"plethora of evidence."  Uniloc instead immediately proceeds to address only the "use mode" requirement of claim 19, which is of course a separate and different requirement.  Uniloc's wholesale failure to provide any evidence that Product Activation is in any way a legal licensing procedure is fully and independently dispositive of non-infringement.

### D.      Uniloc Failed to Prove That Product Activation Has a "Mode Switching Means"

So too does Uniloc's analysis of the "use mode" aspect of the "mode switching means" fail to meet the substance of that issue.  Uniloc devotes six pages of its opposition to chronicling record evidence on the issue of whether the accused software is "fully functional" prior to activation.  That is not the question.  The relevant question is whether, prior to activation, "Product Activation allows for full use *in accordance with the license* or is limited in some way."  [Opp. at 24, citing jury instruction; emphasis added]  The relevant license is the EULA.  Uniloc did not show or explain the EULA to the jury, and does not claim that it did.  Uniloc also does not discuss the EULA in its opposition brief, or explain how or why a user does not have full use of the software during the grace period *in accordance with the provisions of the EULA*.  As it did before the jury, Uniloc bases its opposition on this issue entirely on the issue of whether and when the accused software products offer "full functionality."  That is irrelevant, and Uniloc here too has failed to meet its burden of proof.

### E.      Uniloc Failed to Prove Direct Infringement

#### 1.      Microsoft Does Not Make, Use, Import, Sell, or Offer to Sell the Registration System of Claim 19

It is far too late in the day for Uniloc to contend that claim 19 does not require the user's computer as one of its elements.  In its Supplemental Pretrial Memorandum, Uniloc stated, in its infringement analysis of claim 19, that Product Activation "is a registration system which resides both at the Clearinghouse and the user's software" and "includes program code resident in the

copy of accused product on the user's computer that compares the local licensee unique ID generated on the user's computer with the remote licensee unique ID generated at the Clearinghouse."  [D.I. No. 306, Glitzenstein Decl. Ex. A, Plaintiffs' Supplemental Pretrial Memorandum at 5, 7]  Claim 19 explicitly requires a "local licensee unique ID generating means," which Uniloc contends is the one-way hashing algorithm running on the user's computer:  "Specifically, the MD5 hashing (summation) algorithm generates at the user's computer a unique identifier associated with a licensee for the accused Microsoft Office products, and the SHA-1 hashing (summation) algorithm generates at the user's computer a unique identifier associated with a licensee for the accused Windows products."  [*Id*. at 6-7]  Mr. Klausner's infringement demonstrative showed two computers, one local and the other remote. [*See* Trial Ex. 1097]

The fact that the Product Activation system encompasses software running on both the user's computer and the Clearinghouse has also been a central factor in determining whether Uniloc is entitled to damages for software installed and activated outside of the United States. [*See, e.g.*, D.I. No. 234]  In responding to Microsoft's motion *in limine* on this issue, Uniloc located and submitted a declaration from a Ukrainian individual who had installed and activated the accused products on his computer in the Ukraine.  [D.I. No. 264-3]  Clearly the user's computer is relevant to claim 19.

This case is thus exactly like *Cross Medical*, which held that there is no direct infringement where a third party must add something to complete the alleged infringement. *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 (Fed. Cir. 2005); *see also Deepsouth Packing Co., Inc. v. Laitram Corp.*, 406 U.S. 518, 528 (1972).  The

"registration system" of claim 19 is not complete until the software is installed on the user's

computer.  This is not an "extraneous limitation," but rather what the claim plainly requires.

Uniloc's reliance on *Intel Corp. v. Intern. Trade Com'n*, 946 F.2d 821 (Fed. Cir. 1991), is

misplaced.  *Intel* did not state a blanket rule that an accused apparatus need only be capable of

operating in an infringing mode.  *Intel*'s holding turned on the unique claim language there, as

the Federal Circuit emphasized in its opinion:  "Because the language of claim 1 refers to

"program*able* selection means" and states "whereby *when* said alternate addressing mode is

selected" (emphases added), the accused device, to be infringing, need only be capable of

operating in the page mode."  *Intel*, 946 F.2d at 832 (emphasis in original).  *Intel* did not

establish a general rule of law that infringement of apparatus claims can be proven by showing

the capability to infringe, a point repeatedly emphasized by the Federal Circuit in post-*Intel*

decisions.  *See, e.g., Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (1996) ("Zygo argues that

under the precedent of Intel . . .  a device which is CAPABLE of infringing use does not escape

infringement although not actually used in an infringing manner.  However, Zygo overreads

*Intel*.  By its literal terms the claim involved in Intel only required 'capability' [of performing the

function].")  Unlike Uniloc's claim 19, *Intel's* claim expressly required only capability.

Here, unlike in *Intel*, claim 19 requires a "remote registration station" that includes

several local components, including a "local licensee unique ID generating means."[11]  For

infringement, this "means" must be found in corresponding structure of the accused device.

35 .S.C. § 112, ¶ 6.  In the accused system, that structure is the MD5 and the SHA-1 algorithms

running on the user's computer, as reflected in both Uniloc's Supplemental Pretrial

Memorandum and the infringement theory that it presented at trial.  [*See, e.g.*, Klausner

---

[11] Uniloc cites to the word "executable," but that only applies to the "digital data," not the "licensee unique ID generating means."

testimony, Trial Tr. Day 2 at 135:21-136:07, 143:12-145:15; Trial Tr. Day 3 at 166:06-167:17,

170:13-172:16]  In short, the accused "registration system" is not "made" or "used" until the user

installs the software on his or her computer, and runs the program.  *Microsoft Corp. v. AT&T*

*Corp.*, 550 U.S. 437 (2007) ("Neither Windows software (e.g., in a box on the shelf) nor a

computer standing alone (i.e., without Windows installed) infringes AT&T's patent.

Infringement occurs only when Windows is installed on a computer, thereby rendering it capable

of performing as the patented speech processor.")  Since it is beyond dispute that Microsoft does

not do these actions, it is beyond dispute that it is not a direct infringer, even under Uniloc's

theory of infringement.

### 2.    Microsoft Did Not Waive This Issue

Underscoring the weakness of its position on the merits, Uniloc's primary response to

this issue is that Microsoft "waived" its Rule 50(b) JMOL argument of no direct infringement by

not making a proper Rule 50(a) motion at the close of evidence.[12]  Uniloc incorrectly contends

that First Circuit law governs this issue.  [Opp. at 30 *citing Monteagudo v. AEELA*, 554 F.3d

164, 170-171 (1st Cir. 2009)]  The Federal Circuit defers to the regional circuits only on matters

of procedural law that do not implicate issues of patent law.  *Midwest Indus., Inc. v. Karavan*

*Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) (*en banc* in relevant part).  Where, as here,

the issue "pertains uniquely to patent law," including the issue of JMOL sufficiency, the Federal

Circuit reviews district court determinations under its own law.  *See, e.g., Duro-Last, Inc. v.*

---

[12] Uniloc also argues, without citation to any law, that Microsoft waived its direct infringement argument by not presenting it in its pretrial memorandum – wholly ignoring of course the gaping deficiencies in its own pretrial memorandum.  [Opp. at 29].  In its pretrial memorandum, Uniloc stated that it intended to prove both direct and indirect infringement.  [D.I. No 292, Uniloc Pretrial Memorandum at 7-8].  The plaintiff always bears the burden of proving direct infringement, even when pursuing a theory of indirect infringement.  *DSU Medical Corp. v. JMS Co.*, Ltd., 471 F.3d 1293, 1303 (Fed. Cir. 2006) ("[T]he patentee always has the burden to show direct infringement for each instance of indirect infringement.").  At the pretrial stage, Microsoft had no reason to challenge Uniloc's assertion of direct infringement by Microsoft alone when it appeared that Uniloc intended to make its case by indirect infringement.

*Custom Seal, Inc.*, 321 F.3d 1098, 1106 (Fed. Cir. 2003) (applying Federal Circuit law to the

issue of "whether a pre-verdict JMOL motion directed to inequitable conduct and the on-sale bar

is sufficient to preserve the right to a post-verdict JMOL motion directed to obviousness"); *Texas*

*Instruments Incorporated v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566 n.6 (Fed. Cir.

1996) (applying Federal Circuit law to the issue of whether a general Rule 50(a) motion of non-

infringement supported a Rule 50(b) motion of non-infringement by equivalents); *Malta v.*

*Schulmerich Carillons Inc.*, 952 F.2d 1320, 1324-25 (Fed. Cir. 1991) (same); *Orthokinetics, Inc.*

*v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed.Cir.1986) (applying Federal Circuit law

to the issue of whether a motion for directed verdict of non-infringement encompassed willful

infringement).

 Although by no means clear that the issue would be resolved any differently under First

Circuit authority, the Federal Circuit has definitively and repeatedly held that even terse pre-

verdict motions for JMOL of non-infringement are sufficient to support more detailed post-

verdict motions presenting specific arguments in support of that relief.  *Read Corp.*, 44 Fed.

Appx. at 504 (a pre-verdict motion "broadly" asserting "that the evidence did not support a

finding" of infringement supported subsequent JMOL of no infringement by equivalents); *Malta*

*v. Schulmerich Carillons Inc.*, 952 F.2d 1320, 1324-25 (Fed. Cir. 1991) (pre-verdict motion

stating "we move for a directed verdict on the issue of noninfringement [of the asserted claims]

on the grounds that the evidence is insufficient" supported subsequent JMOL of no infringement

by equivalents); *Texas Instruments Incorporated v. Cypress Semiconductor Corp.*, 90 F.3d 1558,

1566 n.6 (Fed. Cir. 1996); *cf. Yee v. City of Escondido*, 503 U.S. 519, 534-535 (1992) (in

discussing waiver of arguments presented to the Supreme Court, noting the principle that "[o]nce

a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").

Uniloc stated before trial that it intended to pursue theories of both direct and indirect infringement. [D.I. No 292, Uniloc Pretrial Memorandum at 6-8]  At the close of Microsoft's case, and while those theories of infringement were still pending, Microsoft made its Rule 50(a) motion for Judgment as a Matter of Law of non-infringement.  [Opp. at 29-30; Trial Tr. Day 9 at 100:06-102:05]  Just hours before the case was sent to the jury, Uniloc voluntarily gave up its indirect infringement theory, leaving itself the burden of establishing direct infringement of the claimed apparatus *by Microsoft alone*, notwithstanding the undisputed fact that Microsoft does not operate or install half of the accused system.  [D.I. No. 365, Stipulation Regarding Plaintiffs' Claims For Infringement Of Claim 12 And For Indirect Infringement; Jury charge, Trial Tr. Day 10 at 127:04-127:23 ("In this case, you must decide whether Microsoft has made, used, sold, offered for sale or imported within the United States products covered by Claim 19 of the '216 patent.")]

In its oral Rule 50(a) motion for JMOL of non-infringement, Microsoft provided detailed supporting bases, including on indirect infringement, that went well beyond the obligations imposed under Federal Circuit law.  *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1561 n.6 (Fed. Cir. 1995) ("The court [in *Malta*] concluded that the earlier general motion of noninfringement embraced all the particular arguments in support of the post verdict motion").  Microsoft is not in any way confined to those specific arguments, or otherwise barred from asserting additional substantive arguments in support of that JMOL.[13]

---

[13] Even were First Circuit law to apply, a Rule 50(a) motion on a particular claim is sufficient to preserve Rule 50(b) motions on grounds that are "inextricably intertwined," "closely related," or an "essential factor" of the claim on which the Rule 50(a) motion was made.  *Chrabaszcz v. Johnston School Committee*, 474 F.Supp.2d 298, 307 (D.R.I.

Policy and equity also favor Microsoft.  Uniloc did not drop its indirect infringement claims until after Microsoft made its oral JMOL motions.  Where, as here, the relevant facts are undisputed, Rule 50 is not implicated.  *See* 11 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2818 (only "sufficiency of the evidence" challenges must be preserved through JMOL); *Fuesting v. Zimmer*, 448 F.3d 936, 938-42 (7th Cir. 2006) (same).  There is no dispute here on the facts relevant to the "direct" infringement argument (*i.e.*, that Microsoft does not make, use, import, sell, or offer to sell the user's computer).  What the parties are disputing are the legal conclusions that follow from those facts.  There was thus no evidentiary gap for Uniloc to close or cure, and the purpose of Rule 50 has been accomplished.

## IV.     CLAIM 19 IS INVALID, AS A MATTER OF LAW

### A.     Based on Uniloc's Infringement Contentions and Uncontradicted and Unimpeached Trial Evidence, Hellman Anticipates Claim 19

Microsoft has consistently asserted the anticipation of claim 19 by Hellman in the alternative, based on Uniloc's own infringement contentions.  [Wallach testimony, Trial Tr. Day 7, at 172:25-173:2 ("So if the terms in Claim 19 mean that Product Activation infringes, then, in that same meaning, it's also the case that Hellman anticipates the claim."); Microsoft closing argument, Trial Tr. Day 10, at 87:6-7 ("*If you find we don't infringe*, we believe the patent is not anticipated.")]  Uniloc's infringement contentions are fundamentally inconsistent with its positions on invalidity, an inconsistency that Uniloc ignored throughout trial, and that it perpetuates in its opposition.  Those infringement contentions, together with the uncontradicted and unimpeached evidence at trial, establish as a matter of law that Hellman anticipates claim 19. *See Evans Cooling Systems Inc. v. General Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997) (holding that infringement allegations are a proper basis for finding anticipation).

---

2007).  Here, the issue of direct infringement, being a necessary predicate to a finding of infringement generally, would meet all of those standards.

Hellman discloses every element of claim 19 when read in light of Uniloc's infringement

contentions.  In its opposition, Uniloc does not dispute this as to any element, except one.  In

particular, Uniloc does not dispute that Hellman's cryptographic hash functions are licensee

unique ID generating means if the hash functions used in Product Activation are such means.

Uniloc also does not dispute that the outputs of Hellman's cryptographic hash functions are

unique.

The only substantive distinction that Uniloc attempts to draw between claim 19 and

Hellman is that Hellman fails to disclose a unique identifier "associated with a licensee" because

the unique inputs to the hash function in Hellman are "associated with the hardware, not the

user." [Opp. at 37]  In this regard, though, Prof. Hellman never testified that the random number

R is associated with the hardware.  Nor does any of his testimony or anything in his patent

support such a conclusion.  Rather, as is apparent in the passage Uniloc quotes, Prof. Hellman

testified merely that "R is generated by – only by the base unit."  [Trial Tr. Day 7 at 46:2]  As

Microsoft explained in its opening brief, neither this Court nor the Federal Circuit held that all

identifiers generated by a piece of hardware are associated with that hardware, not a user.  If that

were the case, then it would be yet another basis for non-infringement, given that the PID used in

Product Activation is likewise indisputably generated by the user's computer.  Uniloc's only

substantive distinction over Hellman is therefore both contrary to its infringement contentions

and unsupported by the Court's claim construction, and cannot sustain the jury's verdict.

There is also no merit to Uniloc's challenges to the legal sufficiency of Microsoft's

evidence on anticipation.  The case cited by Uniloc that purportedly "mandates" element-by-

element expert testimony on anticipation in fact only calls such testimony "typical[]."

*Schumer Laboratory Computer Systems, Inc.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002).[14]

Indeed, the Federal Circuit subsequently highlighted *Schumer's* use of the word "typically" in

noting that there is no *per se* rule requiring that expert testimony on the related issue of

infringement take any particular form.  *See Centricut*, 390 F.3d at 1369-70 ("We do not state a

per se rule that expert testimony is required to prove infringement when the art is complex.").[15]

Through the expert testimony of Prof. Wallach and the factual technical testimony of Prof.

Hellman, Microsoft has more than met any requirement to explain all of the technological issues

in this case that might be "beyond the grasp of an ordinary layperson."[16]  *See Proveris Scientific*

*Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008).

Uniloc's heavy reliance on the presumption of validity and the resulting clear and

convincing burden to prove invalidity is misplaced.  [*See* at 38]  As Microsoft explained, that

presumption is "eroded" when the prior art at issue, as Hellman here, was not before the PTO,

and the burden is accordingly reduced to a preponderance of the evidence.  [*See* Microsoft Mem.

56 n.15]  Uniloc has no response to this argument.  It does not even address it.

In any event, Microsoft has proved invalidity by clear and convincing evidence.  The

evidence on which Microsoft relies was both "uncontradicted and unimpeached."  *See Marrero*

*v. Goya of P.R., Inc.*, 304 F.3d 7, 22 (1st Cir. 2002) (quoting *Service Auto Supply Co. v. Harte &*

---

[14] Nor does *Schumer* suggest that there is any per se rule requiring that expert testimony be couched in terms of a person of ordinary skill in the art at the time of the invention.

[15] On the other hand, as explained above, the Federal Circuit in *Centricut* went on to say that "in a case involving complex technology, where the accused infringer offers expert testimony negating infringement, the patentee cannot satisfy its burden of proof by relying only on testimony from those who are admittedly not expert in the field."  390 F.3d at 1370.  This is a problem for Uniloc's infringement case, but not for Microsoft's proof of invalidity, given that Microsoft's witnesses fully explained the prior art to the jury, and Uniloc offered no rebuttal testimony, and given that Microsoft is relying on Uniloc's own infringement contentions to prove invalidity.

[16] Uniloc  misrepresents the record in stating that Prof. Hellman "admitted that [his] sketches are not in the prior art Hellman patent *or disclosed in the specification thereof.*"  [Opp. at 34]  Prof. Hellman testified, quite clearly and without contradiction, that although the sketches did not appear as a figure in the patent (Trial Tr. Day 6, 205:15-17 ("Q. I'm not talking about the text now.  I'm talking, is that drawing in your patent, yes or no?  A. Absolutely not."), everything he described to the jury about how his patented invention works could be "found in [the] patent itself." [Trial Tr. Day 7 at 63:12-15]

*Co.*, 533 F.2d 23, 25 (1st Cir. 1976)).  In its opposition, Uniloc has not pointed to any fact necessary to Microsoft's theory of anticipation that was itself either contradicted or impeached at trial.  Rather, Uniloc points to other purported discrepancies or general allegations of bias, for example, based on the fact that Prof. Hellman was compensated for his time spent on the case. Such general allegations are not sufficient to withstand judgment as a matter of law.  *See Service Auto Supply*, 533 F.2d at 26-27.[17]

For example, in *Service Auto Supply*, the First Circuit upheld a directed verdict of contract liability in favor of the plaintiff, despite noting that "much of plaintiff's evidence was in the form of testimony given by witnesses who were sympathetic to [the plaintiff]."  533 F.2d at 27.  The Court also noted that the testimony of two of plaintiff's witnesses "varied in detail about what was said" at a particular meeting, although they agreed on the crucial point.  *Id.* at 26. Indeed, this case presents an even stronger one for judgment as a matter of law than *Service Auto Supply*.  While the plaintiff's case there rested almost entirely on the witnesses' accounts of the relevant events, the testimony here of Microsoft's witnesses about the prior art is corroborated by the prior art documents themselves.  *See Layne v. Vinzant*, 657 F.2d 468, 472 (1st Cir. 1981) (noting the principle that uncontradicted evidence of the moving party is properly considered in a motion for judgment as a matter of law and that "[t]his principle is particularly applicable to documentary evidence").  That testimony and prior art, together with Uniloc's infringement contentions, establish by clear and convincing evidence that Hellman anticipates claim 19.

---

[17] In fact, no reasonable jury could have found any material difference in testimony in some of the supposed instances of "impeachment."  [*Compare, e.g.*, Hellman testimony, Trial Tr. Day 7, 49:11-13 ("And so, while usually a computer is a piece of hardware, it can also be simulated in software on another computer.") (live testimony) *with* 52:14-16 ("Usually the base unit will be in the hardware. It's possible that a base unit could be simulated in software.") (purported impeachment)]

**B.    Claim 19 Is Also Obvious in Light of Hellman, Alone or in Combination With Wolfe**

Particularly in view of Uniloc's overbroad application of the Court's construction of licensee unique ID, the uncontradicted and unimpeached evidence at trial established that Hellman is "within a hairsbreadth of anticipation" of claim 19.  *See SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1359 (Fed. Cir. 2000).  The only difference is in Hellman's use of a cryptographic hash function where the claimed invention uses summation.[18] In its opposition, Uniloc does not dispute that a summation algorithm would have been within the knowledge of one of ordinary skill in the art at the time of the invention, that such algorithms are disclosed in Wolfe, and that such an algorithm would have been an obvious substitution for the cryptographic hash functions disclosed in Hellman.

As with anticipation, Microsoft offered more than sufficient testimony and evidence compelling the conclusion that claim 19 is obvious.  Because the ultimate determination of obviousness is a legal question for the Court, the Federal Circuit has even *discouraged* the giving of expert opinions on that ultimate issue.  *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1574 n.17 (Fed. Cir. 1993).

Nor does the submission of the issue of obviousness to the jury change the fact that the ultimate determination of obviousness remains a question of law, subject to de novo review on a motion for judgment as a matter of law.  *See SIBIA Neurosciences*, 225 F.3d at 1354-55; *see also Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 992 (Fed. Cir. 2009) ("[Courts] are free to override the jury's legal conclusion on the ultimate question of obviousness *without deference*.") (emphasis added).  Where the factual findings implicit in a general jury verdict of non-obviousness are unsupported by substantial evidence, the court can invalidate a claim as

---

[18] As explained, Uniloc's argument that Hellman fails to disclose inputs associated with the user is inconsistent with its infringement contentions.

obvious.  *See SIBIA Neurosciences*, 225 F.3d at 1359 (reversing the district court's denial of

judgment as a matter of law of obviousness); *see also, e.g.*, *Richardson-Vicks Inc. v. Upjohn Co.*,

122 F.3d 1476, 1477 (Fed. Cir. 1997) (affirming the district court's grant of judgment as a matter

of law of obviousness).  Other than the issue of whether the inputs in Hellman are associated

with the user, already addressed above, Uniloc in its opposition does not dispute any other

primary factual consideration, let alone point out how substantial evidence would support some

hypothetical factual finding favoring non-obviousness.  Conversely, the unrebutted testimony of

Microsoft's witnesses compels the factual basis for holding that claim 19 is obvious.  *See SIBIA*

*Neurosciences*, 225 F.3d at 1356-57 (relying on the "unrebutted testimony" of the accused

infringer's expert, as well as other "undisputed evidence" to hold that the "key factual finding"

underlying the jury's determination of non-obviousness was "not supported by substantial

evidence").

　　　　Finally, with respect to secondary considerations of non-obviousness, Uniloc remains

unable to point to any evidence of a nexus between the alleged secondary considerations and the

claimed invention, even though it was Uniloc's burden to do so.  *See Demaco Corp. v. F. Von*

*Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).  Moreover, this is not a

situation in which the primary considerations are equivocal, but rather one in which Microsoft

has made "a strong prima facie obviousness showing" that would "stand even in the face of

considerable evidence of secondary considerations."  *Rothman v. Target Corp.*, 556 F.3d 1310,

1322 (Fed. Cir. 2009); *see also Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed.

Cir. 2008) ("Even when we presume the jury found that [secondary considerations] favored

Agrizap, this evidence is insufficient to overcome the overwhelming strength of Woodstream's

prima facie case of obviousness."); *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d

1157, 1162 (Fed. Cir. 2007) (finding obviousness despite significant evidence of secondary

considerations).  In response to a *prima facie* showing of obviousness, it is the patentee's burden

to introduce evidence of secondary considerations, showing a nexus to the patented invention, to

which the party asserting obviousness can then respond.  *See Optivus Tech. v. Ion Beam

Applications S.A.*, 469 F.3d 978, 991 (Fed. Cir. 2006) (upholding grant of summary judgment of

invalidity where patentee unable to meet burden of production to show secondary consideration

overcame prima facie case of obviousness); *Ecolochem, Inc. v. Southern California Edison Co.*,

227 F.3d 1361, 1381 (Fed. Cir. 2000) (holding burden to rebut a prima facie showing of

obviousness with secondary considerations fell on the patentee).  Uniloc has failed to meet this

burden.

### C.    Microsoft Has Consistently Argued That Claim 19 Is Indefinite as Construed

In its pretrial filings, Microsoft has repeatedly and consistently raised the issue of the

indefiniteness of the term "unique," and there is no basis for Uniloc's allegations of waiver.  On

pages 1-2 of Microsoft's pretrial memorandum, Microsoft requested that this Court affirmatively

construe the term "unique," and stated that in the absence of an affirmative construction, the term

would not be "sufficiently definite."[19]  [D.I. 291]  In this context, Microsoft quoted the same

case, *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008), on

which it continues to rely today in support of judgment as a matter of law of invalidity for

indefiniteness.  This Court subsequently declined to further construe the term "unique."  *See* Jury

Instructions, Trial Tr. Day 10, 137:5-6 ("[The Court] did not define the term 'unique' during

---

[19] Indeed, going all the way back to its claim construction brief, Microsoft pointed out that Uniloc's proposed construction was indefinite under § 112, ¶ 2 and "if adopted would . . . render all claims that use the term invalid under this statute."  [D.I. 139 at 34]  The indefiniteness of the term "unique" was also one of the bases on which Microsoft sought leave to file a further motion for summary judgment.  [D.I. 209-2 at 8 n.4]

claim construction.")]  Microsoft's argument now is the very argument it said it would make in the absence of further construction of the term.

On the substance, Uniloc does not suggest any way that one of ordinary skill in the art would be able to determine whether a number is "unique," consistent with the claim construction.  Uniloc instead raises only two legal arguments, neither of which is correct.  First, contrary to Uniloc's suggestion, there is no requirement that an expert testify that a claim term is indefinite.  Indefiniteness is an issue of law for the Court.  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).  Like expert testimony on the ultimate issue of obviousness, expert testimony on the ultimate issue of indefiniteness would not have been helpful.  *See Nutrition 21 v. Thorne Research, Inc.*, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991) ("An expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all.").  Just as expert testimony is not required for claim construction, so too is it unnecessary to show indefiniteness.

Second, there is nothing inappropriate in Microsoft having argued for a particular construction of the term "unique," while also arguing in the alternative that the different construction adopted by the Court is indefinite.  To begin with, Microsoft is not arguing that *its* construction would have been indefinite.  Microsoft's proposed construction was clear and precise:  "one of a kind."  Moreover, a claim term can be indefinite even after construction by the Court.  *See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008) ("The parties do not dispute the claim constructions reached by the district court, and the district court did construe all terms relevant to this appeal. In and of itself, a reduction of the meaning of a claim term into words is not dispositive of whether the term is definite."); *Halliburton*, 514 F.3d at 1251 ("Even if a claim term's definition can be reduced to words, the

-38-

claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope.").

The Court should thus find that the term "unique" is indefinite, and that claim 19 is therefore invalid as indefinite.

## V.   UNILOC HAS NOT SHOWN EVIDENCE SUFFICIENT TO SUPPORT THE JURY'S DAMAGES AWARD

### A.   Neither of Mr. Gemini's Alternative Royalty Theories Supports the Award

At trial Uniloc presented two alternative justifications in support of its proposed damages figure.  The first was a $2.50 per-activation royalty, and the second was a "comparison" of that royalty to a calculation based on the total revenue generated by Microsoft's products.  Because neither theory finds sufficient support in the evidence presented at trial, Microsoft is entitled to judgment as a matter of law that Uniloc may not recover damages on the basis of either of Mr. Gemini's theories. Alternatively, Microsoft is entitled to a new trial.

Uniloc argues that Microsoft's arguments regarding the jury's damages award are a repetition of arguments previously raised in its *Daubert* motion.  [Opp. at 44]  Not so.  At issue in Microsoft's Daubert motion was the *admissibility* of Mr. Gemini's analysis and opinion.  *See* Fed. R. Evid. 702; *Daubert v. Merrel Dow Pharms.*, 509 U.S. 579, 589 (1993).  The questions now before the court are whether Microsoft is entitled to judgment as a matter of law because Uniloc failed to present a legally sufficient evidentiary basis at trial from which a reasonable jury could have concluded $388 million in damages were warranted, *see Tang v. Rhode Island Dept. of Elderly Affairs*, 163 F.3d 7, 11 (1st Cir., 1998), or whether a new trial is warranted because the jury's verdict "is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice," *see Coffman v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir. 1982).

Uniloc argues that because it asserted at trial that a damages award of $564 million was appropriate, any damages figure that falls between that amount and the $4-7 million amount presented by Microsoft must be accepted.  [Opp. at 51-52]  This is legally incorrect, and is not even supported by the cases cited by Uniloc.  A verdict cannot stand if it is not based on "sound economic and factual predicates."  *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).  Here, Uniloc articulates *no* basis for the jury's $388 million award.

Moreover, it is not enough for an expert to simply state a theory of recovery at trial.  *See Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512 (Fed. Cir., 1995) (reversing district court's failure to grant remittitur, and ordering remittitur of reasonable royalty to 10% notwithstanding expert's testimony based on irrelevant evidence that reasonable royalty could reach  12%).  A jury's damages amount must have adequate evidentiary support in the record.  Uniloc's $564 million figure is not adequately supported by the record because it is based on Mr. Gemini's unsupported $2.50 per activation royalty, and on his improper use of the Entire Market Value Rule.  The maximum damages figure that is supported by the evidence at trial is Mr. Napper's $3-$7 million range.

### 1.    Uniloc Failed to Support Mr. Gemini's $2.50 Per Activation Figure and 25% Rule of Thumb

Mr. Gemini's reliance on the Product Support Services memo as the factual predicate for his $10 base is untenable given the testimony of Veronica Richards.  Ms. Richards was the only trial witness knowledgeable about the contents of the document, and she explained the true relationship of the document to the Product Activation technology at issue in this case.  Ms. Richards testified that the $10-$10,000 figure on which Mr. Gemini relied represented the values of all products sold by Microsoft at the time PID 3.0 was introduced.  [Trial Tr. Day 9 at 52:25-53:10]  Mr. Gemini testified that he relied upon Ms. Richard's interpretation of the document.

[Trial Tr. Day 5 at 103:15-104:7]  Uniloc points to the absence at trial of Manisha Chainani, who authored the document, and suggests that Microsoft should be penalized for Ms. Chainani's absence.  [Opp at. 48-49]  That is absurd.  It is Uniloc's burden to show a proper evidentiary foundation for its expert's opinion.  Uniloc's expert chose to rely on Ms. Richards' testimony about the document.  Uniloc cannot now question Ms. Richards' expertise on the document, or suggest that Microsoft should have called a different witness than the one Uniloc itself dragged into the fray.  Indeed, even now Uniloc does not argue that Ms. Richards was unqualified to speak about the contents of the document.

Relying on *Beatrice Foods Co. v. New England Printing & Lith. Co.*, 899 F.2d 1171, 1176 (Fed. Cir. 1990), Uniloc argues that the absence of an "appraisal" document at trial precludes Microsoft from objecting in any way to Mr. Gemini's opinion regarding the Product Support Services memo.  [Opp. at 48]  In *Beatrice Foods*, the defendant was found to have deliberately destroyed – during the litigation – manufacturing records that would have detailed the extent of its infringement.  *Beatrice Foods*, 899 F.2d at 1174-75.  As a result, the plaintiff was forced to reconstruct certain figures from the documents that remained, and in that context was entitled to certain adverse inferences regarding damages.  *Id.* at 1175-76.  There is absolutely no factual parallel to this case.  Uniloc has not even alleged, let alone established, that the "appraisal" was ever written down, let alone that Microsoft deliberately destroyed it, let alone that Microsoft deliberately destroyed it during the litigation.  Uniloc never even moved to compel production of such a document.

Uniloc also objects that Microsoft's motion asks the court to weigh the record evidence regarding the Product Support Services memo.  [Opp. at 49]  That is perfectly appropriate in the context of a new trial request.  When evaluating such a request, a judge is free to "judge the

credibility of those witnesses having testified," as well as to "consider the weight of the evidence" presented. *MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 132 (1989). The overwhelming weight of the evidence presented at trial concerning the Product Support Services memo confirms Microsoft's position that the $10-$10,000 figure relied on by Mr. Gemini does not represent the isolated value of Product Activation, but is instead the range of values of the products as a whole.

As to the 25% "rule of thumb," there was no factual testimony at trial to support Mr. Gemini's contention that the 25% "rule" was generally accepted. Mr. Gemini testified that he was unaware of any case in which the rule was adopted as the method of calculating a royalty, and Mr. Napper testified that he had never used the rule in any patent license negotiation. [Trial Tr. Day 5 at 114:15-23 (Mr. Gemini's testimony); Trial Tr. Day 8 at 140:13-21 (Mr. Napper's testimony)]

Furthermore, regardless of the soundness of the "rule of thumb" as a theoretical starting point, the law requires that a reasonable royalty be connected to the actual facts and circumstances of the case. *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120-1121 (S.D.N.Y. 1970), *modified and aff'd* 446 F.2d 295 (2d Cir. 1971) ("Where a willing licensor and a willing licensee are negotiating for a royalty, the hypothetical negotiations would not occur in a vacuum of pure logic."). The question before the Court on this motion is whether Uniloc provided sufficient evidence to link the theoretical application of the 25% rule of thumb with the actual facts and circumstances present in this case. *Bowling v. Hasbro, Inc.*, No. C.A. 05-229S, 2008 WL 717741, at *6 (D.R.I. March 17, 2008) ("The fundamental defect in Lapidus' report … is [his] failure to connect the Georgia-Pacific factors to his ultimate conclusion as to the reasonable royalty rate that would have resulted from a

hypothetical negotiation between these parties"). Uniloc and Mr. Gemini failed to do so, and as such Mr. Gemini's 25% rate, and therefore his $2.50 per activation royalty, is factually unsupported.

### 2.    Mr. Gemini's Entire Market Value "Check" Was Impermissible as a Matter of Law

Uniloc does not dispute that it cannot rely on the Entire Market Value Rule. It instead asserts that it did not invoke the Entire Market Value Rule at trial. [Opp. at 45-47] Mr. Gemini's statement that he did not base his $2.50 per activation calculation on the $19.27 billion entire market value of Microsoft's accused products is entirely form over substance. [*Id.* at 46] Mr. Gemini admitted that he used the $19.27 billion figure as a "check" to produce an alternative royalty of 2.9% [Trial Tr. Day 5 at 74:5-11]; he admitted that the $19.27 billion figure represented the entire market value of the accused products [Trial Tr. Day 5 at 165:24-166:4]; and he admitted that Product Activation is not the basis for customer demand of the accused products [Trial Tr. Day 5 at 166:5-11]. Not surprisingly, Uniloc does not cite any authority for the proposition that an expert can buttress one legally unsupportable and contrived damages theory with another. Indeed, as discussed more fully above, a new trial is at minimum required where one of the several theories asserted by a party was insufficient to support the verdict, and the verdict form makes it impossible to determine if that was the theory on which the jury had based its verdict. *Gillespie,* 386 F.3d 29-30. Here, we simply do not know whether the jury accepted the unsupportable 25% theory, or rejected it and relied on the entire market value theory. "[A]s the verdict may have rested solely on the [defective market value] theory, a new trial is required." *Id*.

Additionally, Uniloc repeatedly invoked the entire market value of the accused products in its cross-examination of Brian Napper and its closing argument. [*See* Trial Tr. Day 8 at 179:8-

21 (cross-examination of Mr. Napper); Trial Tr. Day 9 at 22:2-14 (same); Trial Tr. Day 10at

112:14-19 (closing argument)]  This was an end-run around the Entire Market Value rule.  It was

grossly improper, and it worked.  The jury's damages award cannot stand.

**B.      Uniloc's Total Damages Are Grossly Excessive**

Uniloc does not deny any of the undisputed facts cited in Microsoft's opening brief – that

Microsoft had demonstrated to Uniloc that its allegedly patented copy protection product was

utterly ineffective back in 1993-94; that Uniloc had failed in its efforts to market or license its

technology and was struggling financially; and that the entire value of Uniloc (including its

patent) had been calculated at just $5 million.  There is no justification for an award of $388

million on this undisputed record.  At a minimum, the Court should serve as a gatekeeper and

order a new trial.

**C.      The Evidence Does Not Warrant Damages for Foreign Activations**

Microsoft's reliance on *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007), in support

its argument regarding foreign activations is entirely appropriate.  [Opp. at 52-53]  Uniloc in

arguing to the contrary misreads both Microsoft's motion and the holding of *AT&T*.  *AT&T*

stands for the general proposition that there is a "presumption that United States law governs

domestically but does not rule the world," and that that presumption against extraterritorial

application of United States law "applies with particular force in patent law."  *Microsoft Corp.

v. AT&T Corp.*, 550 U.S. at 454-55.  This presumption applies to all extraterritorial applications

of patent law, including the situation presented in this case.

Furthermore, and contrary to Uniloc's assertion, Microsoft does not rely solely on *AT&T*

to support its position, but rather invokes the Supreme Court's analysis in *AT&T* in conjunction

with other cases with factual circumstances similar to those presented in this case, such as *NTP,

Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005), and *Deepsouth Packing Co. v.*

*Laitram Corp.*, 406 U.S. 518 (1972).  For example, in *NTP*, the Federal Circuit concluded that a communication system was put to use *where the customers of the system were located*, not where the defendant's controlling relay was located and where the defendant was headquartered.  *NTP, Inc.*, 418 F.3d at 1317; *see also Decca Ltd. v. United States*,544 F.2d 1070 (Ct. Cl. 1976).  So too is the system accused here put to use abroad, *where the foreign customers are located*, not in the United States, where Microsoft and the Clearinghouse are located.  *Deepsouth*'s holding that there could be no infringement of a patent involving a combination of parts unless *all parts* are assembled within the United States (406 U.S. at 528-29) also compels the conclusion that a system like Product Activation cannot be infringed where, as here, *not all parts* of the system are made, used, sold, or assembled within the United States.

Uniloc is also incorrect that Mr. Klausner's testimony that the control and benefit of Product Activation occurs within the United States was "unrebutted."  [Opp. at 53]  The overall undisputed operation of Product Activation was described by Aidan Hughes.  [*See generally* Trial Ex. N-9a]  Mr. Hughes established that the bulk of the process, including the starting and ending points of Activation, occur on the user's computer, where the alleged "mode switching means" resides, and therefore the control of Product Activation occurs on that computer, which, in the cases of foreign activations, is located outside of the United States.  Uniloc fails to refute that when Product Activation is viewed as a whole, most of the relevant components are on the user's machine, with the Clearinghouse components performing only a rote database and checking functionality.  [Trial Ex. N-9a at DDX-69][20]

---

[20] It is undisputed that the process begins with installation of the accused software on the user's computer.  During installation, users must enter a number known as the Product Key, which has to be valid in order for installation to continue.  [Trial Tr. Day 4 at 75:03-76:03, 155:01-156:07; Trial Ex. N-9a at 1-2]  Next, a user must agree to an End-User Licensing Agreement (EULA).  [Trial Tr. Day 4 at 78:25-80:01, 80:05-81:01; Trial Ex. N-9a at 3]  After installation, the software begins in the "grace period."  [Trial Tr. Day 4 at 80:02-80:04, 82:05-83:06; Trial Ex. N-9a at 4]  The Product ID (PID), a value derived from the Product Key, a code on the software media, and a random number, is generated on the user's machine prior to activation.  [Trial Tr. Day 4 at 81:08-81:25, 83:16-87:21; Trial

Therefore, this Court need not, and should not, defer to the jury's conclusion on these issues, as Uniloc suggests (at 52-53). All the facts pertinent to the analysis – that the Clearinghouse is located in Redmond, that foreign activations are initiated by foreign licensees on platforms that are located outside that United States, and the fundamental way in which Product Activation operates – are undisputed. Whether a system comprised of those components and having those characteristics is "within the United States" for purposes of Section 271(a) is therefore a question of law for the Court to decide. *See, e.g., NTP*, 418 F.3d at 1318 (awarding judgment as a matter of law appropriate where, on undisputed facts, patented method was not performed "within the United States"). The law is clear that control occurs where the customers are located (*NTP, Decca*), that infringement can occur only when *all parts* of a patented system are made, used, or sold in the United States (*Deepsouth*), and that if there were *any doubt* about the former issues, then the balance must tilt against the extraterritorial application of U.S. law (*AT&T*). This law compels adoption of Microsoft's construction of Section 271(a).

---

Ex. N-9a at DDX-47 and DDX-48] The Hardware ID (HWID), a value derived from information describing components of the local machine, is also generated on the local machine prior to activation. [Trial Tr. Day 4 at 87:22-91:10; Trial Ex. N-9a at DDX-66] The PID and HWID, both of which are generated on the user's machine, are the "building blocks" of Product Activation. [Trial Tr. Day 4 at 136:07-138:09, 160:17-161:03] When a user chooses to activate, the PID and HWID are sent to remote Clearinghouse servers located in Washington, which check the PID and HWID and, if the PID and HWID are valid and the PID has not previously been activated, send back to the client a digital license and a digital signature, created from a license digest. [Trial Tr. Day 4 at 91:11-96:02; Trial Ex. N-9a at DDX-67] The user's computer then verifies the digital signature of the digital license, and performs other validity checks before the local software enters an activated state. [Trial Tr. Day 4 at 96:14-97:2, 153:06-154:11, and 157:03-160:16; Trial Ex. N-9a at DDX-68]

## VI. CONCLUSION

For the reasons stated above and in Microsoft's moving papers, the Court should enter judgment as a matter of law in favor of Microsoft. In the alternative, it should order a new trial or grant remittitur of damages.

**Dated**: June 5, 2009                          **By**:      /s/ Kurt L. Glitzenstein_____
                                                                          Frank E. Scherkenbach, Esq.
                                                                          Kurt L. Glitzenstein, Esq.
                                                                          **FISH & RICHARDSON, P.C.**
                                                                          225 Franklin Street
                                                                          Boston, MA 02110-2804
                                                                          (617) 542-5070 (Telephone)
                                                                          (617) 542-8906 (Facsimile)

                                                                          /s/ Joseph V. Cavanagh_____
                                                                          Joseph V. Cavanagh, Jr. #1139
                                                                          **BLISH & CAVANAGH**
                                                                          Commerce Center
                                                                          30 Exchange Terrace
                                                                          Providence, Rhode Island 02903
                                                                          (401) 831-8900 (Telephone)
                                                                          (401) 751-7542 (Facsimile)

                                                                          Isabella Fu, Esq.
                                                                          **MICROSOFT CORPORATION**
                                                                          One Microsoft Way
                                                                          Redmond, WA 98052-6399
                                                                          (425) 882-8080 (Telephone)
                                                                          (425) 936-7329 (Facsimile)

                                                                          *Attorneys for Defendant*
                                                                          *Microsoft Corporation*

## <u>CERTIFICATE OF SERVICE</u>

On June 5, 2009, I caused a true and correct copy of **REPLY IN SUPPORT OF MICROSOFT CORPORATION'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR REMITTITUR** thereof to be served via ECF on the following counsel of record:

| | |
|---|---|
| Francis A. Connor, III | Attorneys for Plaintiffs |
| Sheri L. Pizzi | UNILOC USA, INC. and UNILOC |
| TAYLOR DUANE BARTON & GILMAN, LLP | SINGAPORE PRIVATE LIMITED |
| 10 Dorrance Street, Suite 700 | |
| Providence, RI 02903 | |
| | |
| Paul J. Hayes | Counsel for Plaintiffs |
| Dean G. Bostock | UNILOC USA, INC. and UNILOC |
| Eugene A. Feher | SINGAPORE PRIVATE LIMITED |
| Paul J. Cronin | |
| MINTZ, LEVIN, COHN, FERRIS, GLOVSKY | |
|    AND POPEO, P.C. | |
| One Financial Center | |
| Boston, MA 02111 | |

/s/ Kurt L. Glitzenstein_____
                Kurt L. Glitzenstein