UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNILOC U.S.A. INC., and
UNILOC SINGAPORE PRIVATE LIMITED,

Plaintiff,

v.                                                        Case No. 03-CV-0440-WGY

MICROSOFT CORPORATION,

Defendant.

## PLAINTIFFS' MOTION FOR LEAVE TO FILE
## MODIFIED EXPERT REPORT

Plaintiffs Uniloc U.S.A. Inc. and Uniloc Singapore Private Limited ("Uniloc"),

hereby request that the Court grant leave for Uniloc to file a six-page modified expert report

on the issue of damages in order to conform to the Court's Order dated October 14, 2011.

For the reasons set forth below, Uniloc requests that this motion be granted.

## BACKGROUND

Pursuant to the original schedule regarding the upcoming damages trial, Uniloc's

expert reports were due to be served on September 7, 2011, and Microsoft's responsive

expert reports were due to be served on October 21, 2011.  By agreement, these due dates

were extended to September 9, 2011 and October 24, 2011, respectively.  Uniloc duly served

its expert reports of Philip Green and David Klausner on September 9, 2011.

On September 26, 2011, Microsoft filed an emergency motion to strike

Mr. Klausner's report. *See* Dkt. No. 460.  The motion requested four measures of relief:

(1) that Mr. Klausner's report be stricken; (2) that Uniloc's damages model based on

06005780

Mr. Green's original report was served on September 9, 2011. Thus, Microsoft has already had six weeks to prepare its response, and now has another six weeks to prepare its response to Mr. Green's six-page modified report. Accordingly, Microsoft's preparation of its response to Mr. Green's original and modified reports will not be prejudiced.

## CONCLUSION

For the reasons set above, Uniloc requests that this motion be granted.

Respectfully submitted,

Dated: October 28, 2011

**UNILOC USA, INC. and
UNILOC SINGAPORE PRIVATE
LIMITED**

By:  /s/ Paul J. Hayes

Sheri L. Pizzi (R.I. Bar No. 5720)
(spizzi@taylorduane.com)
TAYLOR DUANE BARTON
& GILMAN, LLP
10 Dorrance Street, Suite 700
Providence, Rhode Island 02903
(401) 273-7171 (Telephone)
(401) 273-2904 (Facsimile)

Paul J. Hayes, Esq.
(phayes@hbcllc.com)
Dean G. Bostock, Esq.
(dbostock@hbcllc.com)
Paul J. Cronin, Esq.
(pcronin@hbcllc.com)
HAYES BOSTOCK & CRONIN LLC
300 Brickstone Square, 9th Floor
Andover, MA 01810
(978) 809-3850 (Telephone)
(978) 809-3869 (Facsimile)

*Attorneys for Plaintiffs Uniloc U.S.A., Inc. and
Uniloc Singapore Private Limited*

3

## Rule 7.1(A)(2) AND 37.1(B) CERTIFICATION

I hereby certify counsel for Plaintiffs conducted a meet–and–confer with counsel for Defendant and that Defendant did not assent to the relief requested in this Motion.

/s/   Paul J. Hayes

## CERTIFICATE OF SERVICE

I hereby certify that this document field through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic File ("NEF"), and paper copies will be sent to those indicated as non-registered participants on October 28, 2011.

/s/  Paul J. Hayes

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC USA, INC., and<br>UNILOC SINGAPORE PRIVATE LIMITED<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION<br><br>Defendants. | C.A. No. 03-cv-0440 |

RULE 26(a) REPORT REGARDING DAMAGES
PREPARED BY PHILIP GREEN

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................................. 1

II.    PROFESSIONAL QUALIFICATIONS AND COMPENSATION ........................................ 1

III.   SUMMARY OF OPINIONS ................................................................................... 1

OPINION I – ANALYTICAL APPROACHES RESULT IN MINIMUM ROYALTY RATES FOR
THE USE OF THE '216 PATENT BY MICROSOFT OF BETWEEN $2.21 AND $12.70 PER
ACCUSED ACTIVATION. ........................................................................................ 2

OPINION II – A HYPOTHETICAL NEGOTIATION BETWEEN UNILOC AND MICROSOFT
FOR THE USE OF THE '216 PATENT WOULD HAVE OCCURRED IN EARLY 2001.  THIS
NEGOTIATION WOULD HAVE RESULTED IN A REASONABLE ROYALTY RATE OF $4.00
PER ACTIVATION.  APPLYING THIS RATE TO MICROSOFT'S INFRINGING
ACTIVATIONS RESULTS IN TOTAL REASONABLE ROYALTY DAMAGES OF $1.1
BILLION THROUGH DECEMBER 2011, EXCLUDING PREJUDGMENT INTEREST. ............. 2

IV.    ADDITIONAL INFORMATION CONSIDERED ......................................................... 2

   A.   RELATIONSHIP BETWEEN MICROSOFT'S INFRINGING CLEARINGHOUSE, PRODUCT ACTIVATION,
        AND UNILOC'S REASONABLE ROYALTY DAMAGES ................................................. 2
        1.  Modified Klausner Report ........................................................................ 2
        2.  Relationship Between the Infringing Clearinghouse, Product Activation, and Uniloc's
            Reasonable Royalty Damages .................................................................. 4
   B.   LOCATION OF THE CLEARINGHOUSE IN THE UNITED STATES ..................................... 5

V.     POST-JUDGMENT ROYALTIES ............................................................................ 5

VI.    PREJUDGMENT INTEREST ................................................................................. 6

VII.   EXHIBITS ...................................................................................................... 6

### I.   Preliminary Statement

I have been retained by Hayes Bostock & Cronin LLC, counsel for Uniloc USA, Inc. and Uniloc Singapore Private Limited ("Uniloc"), to provide an independent and objective opinion of the damages suffered by Uniloc as a result of Microsoft Corporation's ("Microsoft") infringement of United States Patent No. 5,490,216 ("the '216 patent").[1]  I also have been asked to respond, if necessary, to any reports on damages submitted on behalf of Microsoft in this matter.

My initial report in this matter was submitted on September 9, 2011 ("Initial Report").  My Initial Report provides my understanding of the '216 patent and Microsoft's infringement through its Product Activation system as it relates to the evaluation of damages.  This understanding was based upon the description of the '216 patent by the Court of Appeals for the Federal Circuit, the jury verdict, and the trial testimony and Expert Report of Mr. David Klausner, Uniloc's technical expert.

On October 14, 2011, Judge Young issued an order stating that claim 19 of the '216 patent is limited to Microsoft's Product Activation "Clearinghouse."  Judge Young also ordered that in order for infringement to occur, the infringing "Clearinghouse" must be located in the United States.

As a result of the Court's order, Mr. Klausner has issued a modified report regarding the '216 patent and the operation of Product Activation.  This report updates my analysis of Uniloc's damages to consider Judge Young's order and Mr. Klausner's modified report.

This report incorporates, by reference, my Initial Report, including the assumptions, documents considered, and analyses discussed therein.  Should any additional documents or information become available to me that affect any of the conclusions or opinions in this report or in my Initial Report, I may supplement or amend my analyses as appropriate.

### II.   Professional Qualifications and Compensation

My resume and a list of cases in which I have given testimony either in deposition or at trial over the past four years were attached to my Initial Report.  My firm, Hoffman Alvary & Company LLC, is being compensated at the rate of $425 per hour for my work on this engagement.  My firm's compensation is not affected by the outcome of this matter.

### III.   Summary of Opinions

As discussed in my Initial Report, based on my background, training and experience as well as the documents and other information I have reviewed to date in this matter, I have formed the following opinions:

---

[1] Throughout this report, the '216 patent may be referred to as the "patent-in-suit."

**Opinion I – Analytical approaches result in minimum royalty rates for the use of the '216 patent by Microsoft of between $2.21 and $12.70 per accused activation.**

**Opinion II – A hypothetical negotiation between Uniloc and Microsoft for the use of the '216 patent would have occurred in early 2001. This negotiation would have resulted in a reasonable royalty rate of $4.00 per activation. Applying this rate to Microsoft's infringing activations results in total reasonable royalty damages of $1.1 billion through December 2011, excluding prejudgment interest.**

## IV. Additional Information Considered

### A. Relationship Between Microsoft's Infringing Clearinghouse, Product Activation, and Uniloc's Reasonable Royalty Damages

#### 1. Modified Klausner Report

Mr. Klausner's modified report describes Microsoft's infringing Clearinghouse and Product Activation system as follows:

> Microsoft's Clearinghouse is the remote registration station of Microsoft that controls the licensing and Internet activation of Microsoft's products via Product Activation. It is the critical software and hardware specifically deployed by Microsoft to interact with its products over the Internet to implement and control Product Activation to prevent casual copying of Microsoft's key software products.

> The Clearinghouse is the heart of Product Activation, as it is Microsoft's central "clearinghouse" for all activations (worldwide) of Microsoft's products over the Internet via Product Activation. See, e.g., MSI105526-61 (PX248, PX415) at MSI105543 ("The Clearinghouse is…central to the WPA [Windows Product Activation] feature."); MS-U 00366473-95 at MS-U 00366491 ("The activation server is the central clearinghouse…"); MS-U 018152-173 (PX-434) at MS-U 018157 ("These servers automatically manage the internet activations…"). Without the Clearinghouse, there is no registration, no Product Activation and no prevention of casual copying. As such, the Clearinghouse (1) controls the activation (and re-activation) over the Internet (worldwide) of all legitimate instances of Microsoft's products requiring activation, (2) receives and processes all license requests for activation from all instances of Microsoft's products requesting activation over the Internet, (3) issues all licenses from Microsoft for all legitimate instances of Microsoft's products activated over the Internet, (4), registers and securely stores the user and hardware information received by Microsoft through Product Activation to process, activate and re-activate all legitimate instances of its products over the Internet, and to screen illegitimate activation requests to prevent casual copying, (5) generates license digests/licensee unique ID's for all legitimate instances of Microsoft's products requesting activation over the Internet, and (6) sends issued license

2

data, such as license digests/licensee unique ID's, to all legitimate instance of Microsoft's products requesting activation over the Internet, allowing them to complete activation. The software and hardware of the Clearinghouse also (7) screens all license requests over the Internet for attempts to activate illegitimate copies of Microsoft's software obtained by casual copying or other illicit means, and (8) rejects such illegitimate activation requests from such illegal copies by refusing to issue licenses to them in the appropriate circumstances, thereby preventing activation and deterring casual copying of Microsoft's key software products. Thus, the Clearinghouse is an essential and key part of Product Activation and drives Microsoft's use of Product Activation.[2]

Mr. Klausner's modified report further describes the role and importance of the infringing Clearinghouse in preventing the casual copying of Microsoft's software. For example:

In the case where the same copy of the program is then installed on a different or new computer, such as when casually copied by a new user, the following is a representative example of what occurs. During installation of the copy on the new computer, the new user must enter the same 25-character alphanumeric product key contained within the packaging of the product. After the new user agrees to the End User License Agreement ("EULA"), the Product Activation code on the program creates the Product ID ("PID"). It also creates a Hardware ID ("HWID"), but this time based on information from the new user's computer. As with the original copy prior to activation, the new user may use the copy of the software without initiating Product Activation, but such use is temporally limited (50 start-ups of Microsoft Office and 30 days use of Microsoft Windows until basic functions like saving and printing are deactivated) and functionally limited (no updates can be downloaded and installed). When the new user initiates Product Activation, the software, cooperating with the corresponding software in the Clearinghouse, sends from the new computer a digital license request to the Clearinghouse over the Internet. This digital license request includes: the PID, the new HWID, and additional activation information. The Clearinghouse then checks its database to determine whether that PID has ever been registered before in its database. In this example, because the PID is already in the Clearinghouse's database (from the original installation), the Clearinghouse checks the HWID that is stored with the PID in its database against the HWID that was sent with the PID from the new user's computer. If the HWID's do not match and are sufficiently out of "tolerance," the Clearinghouse will not issue a license if the number of allowed installations on separate computers is exceeded, and will deny the activation request. If the Clearinghouse does not issue a license, the installation on the new user's computer cannot be activated. In this way, the Clearinghouse deters casual copying. See, e.g., Swami Declaration, especially at ¶¶ 3, 6.

Thus, the Clearinghouse is a significant and essential part of the functionality of Product Activation because without being able to register the PID, the

---

[2] Modified Expert Report of David Klausner, October 25, 2011, pp. 4 – 6.

unique information from the user, and the HWID, the products that users bought could not be activated and would not be fully enabled. If the Clearinghouse were removed from the system, there would be no way for anyone to activate their products. They would not be fully enabled. They would degrade at the end of their grace periods, effectively rendering them useless for their intended purpose. Further, without the Clearinghouse, there can be no prevention of casual copying. Thus, the Clearinghouse is an essential and substantial part of the overall Product Activation system, and drives the use of Product Activation. Moreover, the Clearinghouse registration station provides the control in Product Activation authorizing use of the product. It generates the digital licenses and controls the use of Product Activation. Further, the Product Activation system as a whole is put into service by the Clearinghouse, and the beneficial use of the system is obtained by Microsoft in the United States via the Clearinghouse.[3]

2.   *Relationship Between the Infringing Clearinghouse, Product Activation, and Uniloc's Reasonable Royalty Damages*

As described above, Microsoft's infringing Clearinghouse is "essential" to Microsoft's Product Activation system and is responsible for inhibiting casual copying. This is consistent with my Initial Report's description of the benefits to Microsoft from the infringing Clearinghouse and its analysis of a reasonable royalty for the use of the '216 patent. For example, in describing the functionality and value of Product Activation to Microsoft, my Initial Report stated that:

> By contacting Microsoft's "clearinghouse," Microsoft can create an association between the customer-specific Product ID of the original software and that customer's computer. This allows Microsoft to track, and enforce a "one-product-key-per-unique-installation" policy.[4]

Accordingly, my Initial Report is consistent with Mr. Klausner's modified report that describes the infringing Clearinghouse as essential to, and responsible for, Product Activation's ability to inhibit casual copying. As discussed at length in my Initial Report, Microsoft implemented the Product Activation system to prevent the casual copying of its software products. Since the infringing Clearinghouse is essential to Product Activation and is responsible for the ability of the system to prevent casual copying, it is the basis for Microsoft's demand for and use of the accused Product Activation system.

The analytical methods I have used to compute royalty rates in this matter isolate the incremental profits generated from Product Activation's ability to deter casual copying through the infringing Clearinghouse. As a result, my analysis and conclusions regarding a reasonable royalty in this matter remain unchanged from those expressed in my Initial Report.

---

[3] Modified Expert Report of David Klausner, October 25, 2011, pp. 12 – 14.
[4] Expert Report of Philip Green, September 9, 2011, p. 13, citing MSI105531.

4

B.  Location of the Clearinghouse in the United States

I understand that the Court has found that the infringing Clearinghouse must be located in the United States in order to infringe.  I have been informed by counsel for Uniloc that Microsoft has represented that it is in the process of moving the infringing Clearinghouse to a location outside of the United States.  However, no documents or other evidence relating to the costs of moving the Clearinghouse outside the United States, the impact of such a move on Microsoft and its operations, or whether such a move has occurred have been provided.

Notwithstanding Microsoft's representations regarding the potential move of the Clearinghouse outside of the United States, I note the following:

- The Clearinghouse has been located in the United States for at least the past ten years;
- Microsoft has continued to operate the Clearinghouse in the United States subsequent to the January 2011 decision from the United States Court of Appeals for the Federal Circuit concluding that the '216 patent was valid and infringed;
- All infringing activations (283,404,811) occurred at the Clearinghouse located in Washington State in the United States;[5]
- There appear to be significant business reasons for locating the Clearinghouse in the United Sates.  For example, the Privacy Policy disclosed to Microsoft's customers when Product Activation was first launched states that "Microsoft will process and store this information in the United States and, if you do not live in the United States, possibly in your country of residence;"[6] and
- No documents or evidence have been provided to date showing that locating the Clearinghouse outside of the United States is an acceptable alternative to Microsoft or its customers.

My conclusions regarding the impact of Georgia-Pacific Factors 9 and 10 on the royalty that would be negotiated between Uniloc and Microsoft remain unchanged from my Initial Report.  To the extent that additional information regarding the location of the Clearinghouse is provided to me, I may supplement or amend my analysis of Uniloc's damages.

V.      **Post-Judgment Royalties**

I understand that as an alternative to imposing an injunction, the Court may impose post-judgment royalties.  This report does not specifically analyze the amount or terms of such royalties.  To the extent the Court or the parties seek a separate determination of the appropriate amount and terms of a post-judgment royalty, I may supplement or amend my analysis.

---

[5] Expert Report of Philip Green, September 9, 2011, p. 58.
[6] See, for example, MSI063528, MS-U 008578.

## VI.    Prejudgment Interest

The damages I have computed do not include any amounts for prejudgment interest.  I will provide calculations of the prejudgment interest due Uniloc on the damages awarded in accordance with the schedule provided by the Court.


## VII.    Exhibits

I expect to use this report, my Initial Report, and the reports prepared by Microsoft's damages experts in support of any testimony that may be offered at trial.  However, a final determination of the documents and exhibits that may be used at trial has not been made.  Additional demonstrative exhibits to be used at trial will be provided in accordance with the schedule provided by the Court.


_____
Philip Green

_10/28/2011_____
Date

6