IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNILOC USA, INC. and
UNILOC SINGAPORE PRIVATE LTD.,

      Plaintiffs,

      v.

MICROSOFT CORPORATION,

      Defendant.

Civil Action No. 03 440 (WGY)

**MICROSOFT CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID KLAUSNER**

# Table of Contents

I.   INTRODUCTION ...................................................................................................... 1

II.  GENERAL BACKGROUND ..................................................................................... 3

III. LEGAL AUTHORITY .............................................................................................. 5

   A.  Expert Testimony Must Be Both Technical And Reliable ............................................ 5

IV.  ARGUMENT ............................................................................................................. 7

   A.  Mr. Klausner's Opinion That Locating The Clearinghouse In Ireland Was Not An Acceptable Alternative In 2001 Should Be Excluded As Unfounded, Beyond His Expertise, And Improper Attorney Argument ................................................................ 7

      1.  Mr. Klausner's Opinion That Locating The Clearinghouse In Ireland Was Impossible In 2001 Is Fundamentally Unreliable, Given That Microsoft In Fact Located The Clearinghouse In Ireland In 2011 ........................................................ 8

      2.  Mr. Klausner Has No Basis To Opine That Microsoft Was Prevented By Security Considerations From Locating The Clearinghouse In Ireland In 2001 ...................... 9

      3.  Mr. Klausner Has No Basis To Opine That Microsoft Was Prevented By Privacy Considerations From Locating The Clearinghouse In Ireland In 2001 ..................... 11

      4.  Mr. Klausner's Opinion That Microsoft Could Not Have Located The Clearinghouse In Ireland In 2001 Due To An Alleged "Large Installed Base" Is Both Unsupported And Nonsensical ............................................................................ 14

      5.  Mr. Klausner's Opinion That Microsoft Could Not Have Located The Clearinghouse In Ireland In 2001 Due To "Capacity" And "Failover" Considerations Is Unsupported And Fails To Address The Relevant Issue, Which Is Microsoft's Capability In 2001 To Locate Its Primary Clearinghouse In Dublin ......................................................... 15

      6.  Mr. Klausner's Observations That (1) Microsoft Did Not Relocate The Clearinghouse For Legacy Products To Dublin Until 2011, And (2) Microsoft Has Not Relocated The Clearinghouse For Non-Accused Products Are Argumentative Rhetoric, As Well As Irrelevant And Unfairly Prejudicial, Given That (1) The Clearinghouse For Legacy Products Was Not Determined To Infringe Until 2011, And (2) Uniloc Has Not Accused The More Recent Products Of Infringement ......................................... 17

   B.  Mr. Klausner's Opinion That Microsoft's Technical Alternatives Presented Unacceptable Software Security Risks Should Be Excluded As Conclusory *Ipse Dixit* 19

V.   CONCLUSION .......................................................................................................... 24

# Table of Authorities

**CASES**

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)................................................................................................23

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)............................................................................................6, 23

*General Electric v. Joiner*,
   522 U.S. 136 (1997)................................................................................................23

*Hochen v. Bobst Group, Inc.*,
   290 F.3d 446 (1st Cir. 2002)....................................................................................6

*Johns Hopkins University v. Datascope Corp.*,
   543 F.3d 1342 (Fed. Cir. 2008)..............................................................................17

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011).............................................................3, 4, 19, 20

*United States v. Fraizer*,
   387 F.3d 1248 (11th Cir. 2004) ...............................................................................6

**RULES**

Rule 402 of the Federal Rules of Evidence ...................................................................2

Rule 403 of the Federal Rules of Evidence ...............................................................2, 7

Rule 602 of the Federal Rules of Evidence ...................................................................5

Rule 702 of the Federal Rules of Evidence ....................................................... passim

## I.  INTRODUCTION

In the upcoming damages trial, Microsoft will show the jury that the reasonable royalty resulting from a hypothetical negotiation for a license to claim 19 of the '216 patent in 2001 would have been orders of magnitude less than what Uniloc's damages expert Mr. Green opines, including because Microsoft had a number of low-cost acceptable non-infringing alternatives available to it at the time of the hypothetical negotiation.  Those alternatives included simply locating the Clearinghouse outside the United States and changing the code that implements the Clearinghouse.  Knowing this, the patent owner—as a matter of simple business logic—would never have demanded a royalty that would have greatly exceeded the costs of Microsoft's alternatives.

In rebuttal, Uniloc has submitted the Supplemental and Rebuttal Expert Report of David Klausner ("Klausner Supplemental Report").[1]  Mr. Klausner is Uniloc's technical expert, ostensibly in the field of electrical engineering.  However, he offers numerous opinions on subjects that fall well outside his area of expertise, and thus should be excluded.  He also offers opinions that, while technical in nature, are pure *ipse dixit*, and so should also be excluded.

There are at least two subjects on which Mr. Klausner should be barred from offering testimony:

1.  <u>Whether locating the Clearinghouse in Ireland was an acceptable alternative at the time of the hypothetical negotiation in 2001</u>.  Mr. Klausner offers a number of arguments—ranging from the suggestion that an Irish facility was less physically secure than one in the United States to the assertion that Microsoft's privacy policies required it to locate the

---

[1] The Supplemental Report of Mr. Klausner is attached as Exhibit A to the January 30, 2012 Declaration of Kurt L. Glitzenstein In Support Of Microsoft's Motion To Exclude Expert Testimony Of David Klausner (hereinafter "Glitzenstein Declaration II").

Clearinghouse in the United States[2]—as purported bases for his opinion that an Irish

Clearinghouse was not an acceptable alternative to a United States Clearinghouse.  But Mr.

Klausner is Uniloc's *technical* expert, not an expert in either the security of physical facilities or

privacy law.  He does not offer a single *technical* explanation as to why a facility in Ireland

would have been any less physically secure than one in the United States.  Nor does he offer a

single *technical* explanation as to why an Irish Clearinghouse would have run afoul of any

privacy considerations or breached any privacy laws.  Indeed, Mr. Klausner does not identify any

technical impediment whatsoever that would have prevented Microsoft from locating the

Clearinghouse in Ireland in 2001.

Instead, Mr. Klausner's expert report makes abundantly clear that Uniloc's true purpose

is to have him recite from the witness stand Uniloc's anticipated closing *argument*, with

assertions such as:

> The most telling evidence confirming that moving the Clearinghouse overseas was not an
> acceptable alternative for Product Activation in 2001 is the fact that Microsoft did not
> move the Clearinghouse until this year [2011], well after the accused products were no
> longer offered by Microsoft.

(Klausner Supplemental Report at 35.)  This is not technical opinion.  It is rhetoric.  It is rhetoric

that is plainly answerable by the fact that Microsoft's Clearinghouse was not finally determined

to infringe the '216 patent until 2011, after which Microsoft promptly relocated the

Clearinghouse in Ireland.  If anything is "telling," it is Mr. Klausner's omission of this key fact.

Apart from his lack of any objectivity, more pertinent to this motion is the fact that Mr. Klausner

has offered no technical bases to underpin his assertion that locating the Clearinghouse in Ireland

---

[2] Microsoft is separately filing a Motion in Limine to preclude Uniloc from offering any testimony or argument regarding Microsoft's privacy policies, on FRE 402 and 403 grounds.  Even if that motion were denied, Mr. Klausner should not be permitted to offer testimony on that subject, for the additional reason that he does not have "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" with regard to Microsoft's privacy policies, as required by FRE 702.

was not an acceptable alternative to Microsoft in 2001, and he therefore should not be permitted to offer any testimony on that issue.

    2.    <u>The level of software security offered by Microsoft's technical alternatives for implementing the Clearinghouse, regardless of the physical location of the Clearinghouse.</u> Microsoft's technical expert, Dr. Alan Sherman, opines that Microsoft also had numerous technical options for implementing the Clearinghouse in ways that would remove the hashing function, one of the software features that led to the finding of infringement. Dr. Sherman explained in detail why these alternatives were both technically feasible and would have offered an acceptable level of security without infringing the '216 patent. Mr. Klausner does not dispute that these alternatives were technically feasible and would have avoided infringement. While he does disagree with Dr. Sherman that they would have offered an acceptable level of software security, he provides no explanation of why. He simply gainsays the conclusions of Dr. Sherman. Since Mr. Klausner's opinions on this issue are wholly conclusory, they too should be excluded.

## II.    GENERAL BACKGROUND

As this Court has recognized, claim 19 of the '216 patent, the sole claim found to be infringed, "only covers Microsoft's Clearinghouse." [Dkt. 467, at 1.] Moreover, "the Clearinghouse must be located in the United States in order to infringe." [*Id.*] The infringing "Clearinghouse" receives requests for activation from Microsoft Office XP, Windows XP, and Office 2003 products, and in response provides "digital licenses" to those products. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1297-99 (Fed. Cir. 2011). The "digital license" is used by these Microsoft products to permit full use of the software. *Id.*

One central aspect of the upcoming damages trial will be the options that Microsoft would have had at the time of the hypothetical negotiation—which in this case would have occurred in March 2001—to deliver digital licenses without infringing the '216 patent.

Microsoft's first option was simply to locate the Clearinghouse outside the United States. The other options involve changes that Microsoft could have made to the software implementing the Clearinghouse to eliminate one of the features required for infringement —specifically the hashing function used to create a shortened form (or digest) of the "digital license." *Id*. at 1298 ("The functionality of the MD5 and SHA-1 [hashing] algorithms is at the heart of this case."). Microsoft contends that at the hypothetical negotiation, the patent owner would not have demanded a license that would have cost Microsoft more than the estimated cost of implementing any of these alternatives—if the patent owner had made a far higher demand, Microsoft would simply have picked one of its non-infringing alternatives, and the patent owner would have gotten nothing.

In rebuttal, Uniloc provided a report from Mr. Klausner.  Mr. Klausner does not identify any technical impediment to implementing any of Microsoft's alternatives.  He nonetheless opines that Microsoft would not have adopted any of these non-infringing alternatives, regardless of the unreasonableness of the demands made at the hypothetical negotiation.  Mr. Klausner has a Bachelor's degree in Mathematics and a Master of Science degree in Electrical Engineering, and purports to have extensive experience in the computer and software industry.  In the first trial, Mr. Klausner was qualified as a technical expert on, and opined on the structure and operation of, Microsoft's Clearinghouse for purposes of infringement.

However, Mr. Klausner's technical expertise is not equally applicable to the damages issues on which Uniloc seeks to proffer him at the next trial.  In order to avoid unnecessary

repetition, the details of Mr. Klausner's opinions, and the bases he identifies in support of those opinions, are discussed below in conjunction with Microsoft's arguments as to why they should be excluded.  However, in general, Uniloc intends to offer him as a witness on issues ranging from Microsoft's privacy policies, to the physical security of Microsoft's various datacenters, to factual and non-technical statements made in Microsoft's documents.  These issues are clearly well outside of Mr. Klausner's expertise, and he has no basis to testify on them.  Uniloc also intends to have Mr. Klausner offer opinions that are wholly conclusory, with no reasoned or technical bases whatsoever.

## III.   LEGAL AUTHORITY

### A.     Expert Testimony Must Be Both Technical And Reliable

Expert testimony is the limited exception to the general rule that testimony may only be offered by witnesses with personal knowledge of the facts at issue.  *See* FRE 602.

First, such testimony is only permitted if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  *See* FRE 702.  If the jury is able to understand the evidence on its own, then the proffered testimony does not fall within Rule 702 and must be excluded.  Rule 702 does not permit an "expert" to summarize the non-technical facts of the case of which he or she has no personal knowledge and then advise the jury how it should decide the disputed issues.  Such testimony is prohibited under FRE 602.

Second, if the Court concludes that the proffered testimony is of a scientific or technical nature beyond the grasp of juror understanding, then the Court must determine if the testimony is based on sufficient facts or data, the testimony is the product of reliable principles and methods, and the expert has reliably applied the principles and methods to the facts of the case.  FRE 702.

As the proponent of Mr. Klausner's testimony, Uniloc has the burden of persuading this Court that the proffered testimony complies with Rule 702, and specifically that the testimony relates to technical, scientific, or specialized matters beyond jury comprehension, and if so, that the opinions have a solid technical foundation. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). "Rule 702 of the Federal Rules of Evidence assigns to the trial judge the responsibility for ensuring that an expert's testimony as to scientific, technical, or other specialized knowledge 'both rests on a reliable foundation and is relevant to the task at hand.'" *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 452 (1st Cir. 2002) (quoting *Daubert*, 509 U.S. at 597).

The Court thus has the duty to act as a gatekeeper and exclude from the trial all attorney argument masquerading as "expert" testimony. If the issue is non-technical in nature, expert testimony is not appropriate, and should be precluded under Rule 702. "The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue." *Hochen*, 290 F.3d at 452 (quoting *Cipollone v. Yale Indus. Prods.*, 202 F.3d 376, 380 (1st Cir. 2000)). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue from the evidence in closing arguments. *See* 4 Weinstein's Federal Evidence § 702.03[2] [a]. Moreover, allowing experts to testify on subjects within the realm of the jury's understanding is also unfairly prejudicial because of the talismanic significance jurors often accord to expert testimony. *E.g., United States v. Fraizer*, 387 F.3d 1248, 1263 (11th Cir. 2004).

## IV.    ARGUMENT

### A.    Mr. Klausner's Opinion That Locating The Clearinghouse In Ireland Was Not An Acceptable Alternative In 2001 Should Be Excluded As Unfounded, Beyond His Expertise, And Improper Attorney Argument

The testimony that Mr. Klausner intends to offer on the issue of whether Microsoft could have located the Clearinghouse in Ireland in 2001 (Klausner Supplemental Report Section D, at 25-36) is not rooted in mathematics, electrical engineering, or computer science.  Nor is the testimony based on any other scientific or engineering principles or analysis by Mr. Klausner.  In short, Mr. Klausner has no qualifications to offer "expert" opinions on this issue, and he has no "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue" with regard to Microsoft's ability to locate the Clearinghouse in Dublin, Ireland, in 2001.  FRE 702.

Mr. Klausner's testimony is instead nothing more than Uniloc's attorney argument. Under FRE 403, it would also be unfairly and unduly prejudicial for Mr. Klausner to present, as expert testimony, Uniloc's argument as to how the jury should decide the non-technical facts. Given the complexity of the case and the magnitude of Uniloc's damages claim, there is a serious risk that the jury will ascribe inappropriate weight to Mr. Klausner's "conclusions"— given the imprimatur of his status as an "expert"—even though he is no more qualified than they are to evaluate the evidence on which he bases his views.

1.    *Mr. Klausner's Opinion That Locating The Clearinghouse In Ireland Was Impossible In 2001 Is Fundamentally Unreliable, Given That Microsoft In Fact Located The Clearinghouse In Ireland In 2011*

Mr. Klausner intends to tell the jury that, in his opinion, it "would it have been impossible for Microsoft to locate the clearinghouse in Dublin, Ireland, in 2001." (Klausner Tr. 401:25-402:3.)[3]

Despite this categorical view of the "impossibility" of such a task, Mr. Klausner cannot identify any technical impediments whatsoever that would have prevented the largest computer software company in the world from locating the Clearinghouse in Microsoft's data center in Ireland in 2001. The Clearinghouse runs at a "data center." (*Id.* at 399:25-400:15.) At his deposition, Mr. Klausner admitted that not only was he unaware of any limitation on locating a data center in Dublin, Ireland, in 2001, but that he had never even considered that issue (*id.* at 417:6-9):

> Q    Are you aware of any limitation of a company to locate a data center in Dublin, Ireland, in 2001?
> A    I haven't considered it.  I don't know.

Nor could Mr. Klausner explain how it could possibly be the case that Microsoft could not have located the Clearinghouse in Ireland in 2001 when it was in fact able to do precisely that in 2011. While Mr. Klausner repeatedly attempted to evade and restate the question, he ultimately conceded that he had not even tried to address that fundamental issue in any of the three expert reports he has prepared in this case since the remand (*id.* at 433:23-435:14):

> Q    Mr. Klausner, that wasn't my question.  Please listen to my.  Question was sir is it is it true is it not that nowhere in the expert reports that you have provided in this case do you explain why it is that Microsoft was able to locate the clearinghouse in Dublin, Ireland, in 2011, whereas, in your opinion, it would have been impossible for Microsoft to have located the clearinghouse in Dublin, Ireland in 2001, true?

---

[3] The relevant portions of the deposition of David Klausner are attached as Exhibit B to Glitzenstein Declaration II.

8

> * * * [refusing repeatedly to answer the question]
>
> THE WITNESS:  Your question -- the answer to your question is true except to the extent that, had I had Microsoft's material provided to me that shows how they carried out the method of movement from Tukwila, Washington to Dublin, Ireland, in the past several months, I would have been able to analyze that method and answer your question  with greater specificity.  Having not had access to the information that would form the basis of such an analysis, I don't see how I can answer your question with greater specificity.

Mr. Klausner's effort in his reluctant response to heavily caveat his admission is not well-taken.  He cannot seriously contend that Microsoft has failed to produce any information material to this issue.  Indeed, Uniloc's lawyers have taken six depositions that have bordered on the obsessive on the issue of Microsoft's ability in 2001 to locate the Clearinghouse in Dublin, Ireland, and the fact that it did precisely that in 2011.

> 2.       *Mr. Klausner Has No Basis To Opine That Microsoft Was Prevented By Security Considerations From Locating The Clearinghouse In Ireland In 2001*

Bereft of any technical argument, Mr. Klausner's principal argument is that "security concerns" would have made it impossible for Microsoft to have located the Clearinghouse in Ireland in 2001.  Specifically, Mr. Klausner contends that an Irish facility not only would have been less physically secure than one in the United States, but less secure to such a degree that Microsoft would have declined to locate the Clearinghouse there even if confronted with a multi-billion dollar royalty demand from Uniloc:  "Microsoft placed a high value on keeping the Clearinghouse in the safe, secure environment of its Tukwila Washington data center, only miles from its corporate headquarters in Redmond, that Microsoft could control and manage." (Klausner Supplemental Report at 33.)

Mr. Klausner's conclusion on this score was not based on any technical assessment of the security of a facility located in Dublin, Ireland, vis-à-vis one located in Tukwila, Washington. Indeed, he conceded at deposition—again trying to lay the blame on Microsoft—that he has no idea whether a Clearinghouse located in Dublin would have been insecure in any respect (Klausner Tr. 438:9-15):

> Q   Now, you mentioned security previously.  Is it your opinion that a clearinghouse located in Dublin, Ireland in 2001 would have been insecure?
> A   Security is a matter of many different aspects, and I don't know -- I don't have enough information because Microsoft hasn't provided me with that information.

Mr. Klausner does not explain what the security measures were at the Tukwila, Washington, facility, or why they could not have been duplicated in a facility in Dublin, Ireland. He does not identify even a single reason why an Irish facility would be less secure in any respect.  Mr. Klausner also does not attempt to reconcile his conclusory assertion that locating the Clearinghouse in Ireland would have been an unacceptable security risk in 2001, with the irrefutable and basic fact that Microsoft in fact relocated the Clearinghouse to Ireland in 2011.

He instead bases this opinion on his reading of Microsoft's documents, from which he purports to divine the degree of Microsoft's subjective interest in the security of whatever facility would house the Clearinghouse:  "the security of Product Activation was very important to Microsoft."  (Klausner Supplemental Report, at 25.)  Mr. Klausner has no special expertise in divining subjective intent from reading Microsoft's documents.  Nor is he better equipped than the jurors to do so.  Uniloc is simply trying to use Mr. Klausner to present its attorney argument based on inferences it hopes to draw from these documents, to the extent they are even admissible.

Moreover, even accepting *arguendo* Mr. Klausner's premise that "the security of Product Activation was very important to Microsoft," he fails to identify even one reason why locating the Clearinghouse in Dublin, Ireland, would not have satisfied Microsoft's security interests. That is the heart of the issue as framed by Uniloc, and Mr. Klausner simply fails to address it.

> 3. *Mr. Klausner Has No Basis To Opine That Microsoft Was Prevented By Privacy Considerations From Locating The Clearinghouse In Ireland In 2001*

Mr. Klausner also opines that "moving the Clearinghouse overseas [would have been] in violation of [Microsoft's] own privacy policy." (*Id.* at 33.) Mr. Klausner's opinions on Microsoft's privacy policies are also, and obviously, not technical opinions. They do not reflect any technical analysis or application of any peer-reviewed scientific or mathematical analysis. This opinion is instead based on Mr. Klausner's reading of non-technical Microsoft documents discussing its privacy policies, which the jury is equally capable of doing.[4]

Mr. Klausner has no specialized training or knowledge in evaluating privacy issues, or in evaluating what decisions Microsoft might or might not have made in view of its own privacy policies. As he admitted as his deposition, he would "leave that up to the attorneys" because he is an "amateur" on that issue (Klausner Tr. 444:2-19):

> Q   In what way or ways would locating the clearinghouse in Dublin, Ireland in 2001 raised any privacy concerns greater than or different than any privacy concerns from locating the clearinghouse in Washington state?
> A   I think I would leave that up to the attorneys.
> Q   No opinion on that?
> A   Correct. Well, let's put it this way: I don't have an opinion outside of the documents that I have read that were produced by Microsoft that will lead to this issue.
> Q   You're not an expert on privacy issues, sir?
> A   No.

---

[4] As noted above, apart from Mr. Klausner's lack of relevant expertise on this subject, Microsoft has also filed a motion in limine to preclude Uniloc from contending, through any other witness or through argument, that any "privacy policy" considerations precluded Microsoft from locating the Clearinghouse in Dublin, Ireland, in 2001.

> Q   You're not an expert on privacy law, I assume, sir; is that correct?
> A   No.  I'm a amateur.

Moreover, as the above-quoted passage makes clear, Mr. Klausner cannot explain why

locating the Clearinghouse in Ireland would have been an affront to Microsoft's privacy policies

in 2001, when Microsoft in fact relocated the Clearinghouse to Ireland in 2011.

In fact, the issue of privacy is irrelevant to Product Activation.  When presented with his

own demonstrative showing the operation of Product Activation, which he had used to explain

the technology to the jury in the first trial, Mr. Klausner admitted that there was no "information

in this diagram that, in [his] opinion, constitutes personal information of the user."  (Klausner Tr.

439:18-23.)  In particular, he testified at deposition that he was not aware that anyone, himself

included, considers the "Product ID" (or "PID") to be personal information of the user (*id*. at

440:8-9), and that he "personally do[es] not consider the hardware ID to be personal

information."  (*Id*. at 441:2-7.)  Thus, again putting his lack of relevant expertise to one side,

there is no factual basis for Mr. Klausner (or any other witness) to testify that a process devoid of

personal information—as Product Activation is—even implicates Microsoft's privacy policies,

let alone violates them.

Finally, when taken to one of his key pieces of alleged evidence in support of his

contention that privacy issues would have made it impossible for Microsoft to have located the

Clearinghouse in Ireland in 2001, Mr. Klausner ultimately backtracked, and disclaimed any

ability to opine on the document.  In particular, in his report, Mr. Klausner relies heavily on the

attached "screen shot" from Office XP (Klausner Supplemental Report, at 27):



When asked to interpret this document, Mr. Klausner disclaimed any ability to do so, protesting that "You know, I'm not an attorney. I can't interpret this for you legally, and so I just have to pass. I don't know how to interpret this as an attorney." (Klausner Tr. 466:5-9.)

As to the statement in the document that "[t]he only customer information needed to activate this product is the country/region where the product will be used"— the rest of the customer information being provided only in the event the user optionally elects to *register* the product, with registration admittedly being different than activation and entirely unrelated to the '216 patent—Mr. Klausner then admitted that the user's country/region is in fact not even used in Product Activation. (*Id.* at 466:17-24.) He then—after considerable prodding—further conceded that he had not even thought about whether a user's country/region constitutes the user's personal information, let alone formed an opinion on that issue. (*Id.* at 469:16-21.)

Finally, even though nearly the entirety of Mr. Klausner's report consists of him quoting from Microsoft non-technical production documents and offering "opinions" as to what Microsoft "must" have meant or thought, Mr. Klausner ultimately conceded the obvious: he is no

expert in divining Microsoft's subjective views and intentions by reading Microsoft's production

documents (*id.* at 468:6-18):

> Q   Certainly.  On page 29 of your third report from 2011 in the
> screenshot at the top of the page where Microsoft says in the first
> sentence, quote, the only customer information needed to activate this
> product is the country/region where the product will be used, closed
> quote.  Do you disagree with that statement?
>
> A   I don't know what was in Microsoft's mind or whoever it was who
> wrote that statement.  So I don't know.  I know the perception of that,
> and that's what I write about, the public perception as a result.

Mr. Klausner is no more of an "expert" on reading Microsoft's mind by reading

Microsoft's document than he is an "expert" on reading Microsoft's customers' minds.  As a

technical expert, he has nothing to offer on this issue pursuant to FRE 702.

> **4.     *Mr. Klausner's Opinion That Microsoft Could Not Have Located The
> Clearinghouse In Ireland In 2001 Due To An Alleged "Large Installed
> Base" Is Both Unsupported And Nonsensical***

While physical security and privacy are the primary bases for Mr. Klausner's opinion that

locating the Clearinghouse in Ireland would not have been an acceptable alternative, he offers

three secondary bases as well, all of which are equally specious.  First, he contends that, because

the products first activated with the Clearinghouse (Windows XP and Office XP) were sold in

large quantities soon after launch, that in view of the "large installed base" of those programs

"Microsoft could not have risked moving the Clearinghouse out of the United States at that

sensitive time and risked disruptions in activations and customer dissatisfaction and backlash

over privacy concerns."  (*Id.* at 34.)  This makes no logical sense.  The operative question is what

Microsoft could have done *before* it began using the infringing Clearinghouse in March 2001.  If

Microsoft had located the Clearinghouse in Ireland at that time, there would of course be no

"installed base."  Mr. Klausner also offers no technical reason why locating the Clearinghouse in

2001 in Ireland would have risked such "disruptions," "dissatisfaction," and "backlash."  Nor does he attempt to square this conclusory assertion with the reality that Microsoft did in fact relocate the Clearinghouse to Ireland in 2011—when the "installed base" was far larger— without experiencing any of those dire consequences.

> 5.  *Mr. Klausner's Opinion That Microsoft Could Not Have Located The Clearinghouse In Ireland In 2001 Due To "Capacity" And "Failover" Considerations Is Unsupported And Fails To Address The Relevant Issue, Which Is Microsoft's Capability In 2001 To Locate Its Primary Clearinghouse In Dublin*

As an additional secondary consideration, Mr. Klausner asserts that "according to Microsoft personnel, locating the Clearinghouse in Ireland may not have been possible in 2001," citing as support one portion of a deposition transcript and one Microsoft internal email from 2002.  (*Id*. at 34-35.)  Here too Mr. Klausner is not offering any *technical* opinion.  He is just providing his subjective gloss on non-technical testimony and documents, reiterating Uniloc's attorney argument from the witness box.  The jury is equally capable of reviewing the evidence and drawing its own inferences, without the imprimatur of Mr. Klausner's alleged expertise.

Moreover, the inference that Mr. Klausner draws from these two sources is unsupportable.  The deposition testimony merely states that Microsoft's then-existing data center in Ireland did not have computer capacity at that time to locate the Clearinghouse there.  (*Id*. at 34.)  The issue is clearly *not* whether Microsoft already had capacity in Ireland.  As Mr. Klausner well knows, Microsoft's experts and fact witnesses have stated that Microsoft would have invested $2 million to provide Ireland with precisely that capacity.  That was the cost of that alternative, and would have provided an approximate upper bound to the patent owner's royalty demands.

The 2002 email that Mr. Klausner selectively relies upon is similarly a red herring. That email merely discusses some of the technical challenges in making Ireland (or any other site, for that matter) a "failover" site. (*Id*. at 35.) At his deposition, Mr. Klausner could not even explain what a "failover" site is for the Clearinghouse without reviewing the email. (Klausner Tr. 449:17-450:6.) When provided with the document, he conceded that what this document is discussing is the potential use of Microsoft's data center in Ireland as a secondary site that would come on-line in the event the primary Clearinghouse in Washington State failed. (*Id*. at 450:20-451:22.) "[I]t's a different Clearinghouse that sits there and is ready to go in the event the primary Clearinghouse is unavailable." (*Id*. at 451:19-22.) That is not the issue on the table. The issue is Microsoft's option to relocate the primary Clearinghouse to Dublin, Ireland, not to use it as a backup site. The technical issues discussed in the 2002 email—which Mr. Klausner merely quotes from in his Report without providing any technical explanation or opinion of his own—concern "log shipping," which is a procedure used to transfer data from the primary site to the "failover" site so that they both have the same information. (*Id*. at 458:10-19.) In short, the issue was with keeping the data synchronized when switching between sites, not an issue with activation itself, let alone an issue with performing activation using an Irish Clearinghouse. Plainly there is no need to worry about "log shipping" to Dublin, Ireland, if that had been used as the primary site, which is what Microsoft would have done if confronted with an unreasonable royalty demand in the hypothetical negotiation.

In addition, Mr. Klausner fundamentally contradicts himself on even what this document means. In his report, he categorically states, with reference to this document, that "Microsoft internal correspondence in July 2002 indicates that Microsoft had considered building a 'failover' site for the Clearinghouse [in Dublin, Ireland]". (Klausner Supplemental Report at

35.)  But when that interpretation proved inconvenient at his deposition, he ran away from it

(Klausner Tr. 594:25-595:4):

> Q   And what this is talking about is a different consideration, namely, the use of
>     Dublin, Ireland as a potential failover site in 2002, correct?
> A   That's not how I read it.

Mr. Klausner's opinions are so result-oriented that he cannot keep even his most basic

facts straight as the abundant flaws in his logic are, time after time, exposed.  *Johns Hopkins*

*University v. Datascope Corp.*, 543 F.3d 1342, 1349 (Fed. Cir. 2008) (when a liability expert's

opinion testimony is contradicted by his own factual testimony, that opinion should not be

accepted).

> 6.      *Mr. Klausner's Observations That (1) Microsoft Did Not Relocate The*
> *Clearinghouse For Legacy Products To Dublin Until 2011, And (2) Microsoft*
> *Has Not Relocated The Clearinghouse For Non-Accused Products Are*
> *Argumentative Rhetoric, As Well As Irrelevant And Unfairly Prejudicial, Given*
> *That (1) The Clearinghouse For Legacy Products Was Not Determined To*
> *Infringe Until 2011, And (2) Uniloc Has Not Accused The More Recent Products*
> *Of Infringement*

Mr. Klausner's third and final secondary argument is that "[t]he most telling evidence

confirming that moving the Clearinghouse overseas was not an acceptable alternative for Product

Activation in 2001 is the fact that Microsoft did not move the Clearinghouse until this year

[2011], well after the accused products were no longer offered by Microsoft."  (Klausner

Supplemental Report at 35.)  From the perspective of any *technical* opinion, this is content-free

rhetoric.  As far as rhetoric goes, it also fails to address the fact that Microsoft's Clearinghouse

was not determined to infringe the '216 patent until 2011, months before Microsoft relocated the

Clearinghouse in Ireland.  It again shows that Uniloc's true intent is to offer Mr. Klausner to

present Uniloc's closing argument, rather than to assist the jury's understanding of the technical

issues in this case.  Mr. Klausner's Report continues:

17

> Only this year, well after Office XP, Windows XP and the other accused products became so-called "legacy" products no longer offered by Microsoft, did Microsoft move the Clearinghouse *for just those legacy products* to Ireland. McCreery 12/13/11 Deposition Tr. at 8:22-33:12.6.  Apparently, while those products were the "crown jewels" of Microsoft, Microsoft was not willing to risk moving the Clearinghouse to Ireland. Now that the accused products are not the crown jewels, but legacy products, Microsoft moves the Clearinghouse *for just them* to Ireland. I note that the Clearinghouse for activation of Microsoft's current "crown jewel" products, i.e., Windows 7 and Vista, is still located in the United States.

(*Id*. at 36, both emphases in original.)  This is not reasoned, well-founded, or principled expert testimony.  It is singing from Uniloc's hymnal.  As Mr. Klausner knows, Microsoft's Windows 7 and Vista products, and the Clearinghouse that activates them, have not even been accused of infringing the '216 patent, in this case or any other (Klausner Tr. 383:13-23):

> Q    Well, you began to qualify or tried to qualify your answer with the words, "to the extent that."  Let me -- let me break it down this way, Mr. Klausner.  The office -- there has been no office product accused of infringement in this case after the Office 2003 product, true?
>
> A    I think that's true for this case.
>
> Q    And, Mr. Klausner, there's been no Windows product accused of infringement in this case after the Windows XP product, true?
>
> A    I think that's true.

Nor has Mr. Klausner ever offered an opinion that any product after Office 2003, or any product after Windows XP, or the Clearinghouse that activates them, infringe the '216 patent. In any event, Uniloc should not be permitted to turn this case into one about infringement issues concerning products that Uniloc has not even accused of infringement.

As to Mr. Klausner's "most telling evidence"—namely, that Microsoft did not locate the Clearinghouse in Dublin, Ireland until 2011—even Mr. Klausner grudgingly concedes that Microsoft had no reason to do so at any earlier time (*id*. at 567:8-15):

> Q    No, okay.  So -- but the most significant thing to you is that Microsoft did not move the Clearinghouse until 2011, right?
>
> A    Right.
>
> Q    And you cannot identify any reason why Microsoft would have moved the Clearinghouse at any point prior to 2011, true?

A   True.

**B.      Mr. Klausner's Opinion That Microsoft's Technical Alternatives Presented Unacceptable Software Security Risks Should Be Excluded As Conclusory *Ipse Dixit***

In addition to relocating the Clearinghouse outside the United States, Microsoft also in 2001 could have reprogrammed the software for implementing the Clearinghouse to remove one of the features required for infringement.  In the context of a hypothetical licensing negotiation between Microsoft and Uniloc in March 2001, the patent owner's royalty demand would have been constrained by the cost to Microsoft of implementing any one of these alternatives, because if Microsoft availed itself of any one of these options, the patent owner would have wound up with nothing.

Specifically, Microsoft had several options for removing the hash function that creates a "digest" of the digital license that is sent to the user's computer to activate the software.  Uniloc relied exclusively on this hash function, which is present in both Microsoft's Clearinghouse software and the software on the user's computer, to satisfy the requirement in claim 19 that the same algorithm be present on both the local and remote computers, and that the results of that algorithm be matched.  *Uniloc USA,* 632 F.3d at 1298 ("The functionality of the MD5 and SHA-1 algorithms is at the heart of this case.")

That hashing function, while critical to Uniloc's infringement case, is entirely optional in Microsoft's product activation system.  To explain to the Court and the jury why the hash can be removed without compromising security, Microsoft retained Dr. Alan T. Sherman, a cryptology expert from the University of Maryland.  Dr. Sherman earned his Ph.D. from the Massachusetts Institute of Technology in 1987, and since then has been working, conducting research, and publishing in the field of cryptology.  Dr. Sherman conducted an analysis based on techniques accepted in the field, and concluded that the hash could be removed without compromising the

security of Microsoft's product activation.  There is no genuine dispute that if the hash is removed, there is no infringement.

In his expert report,[5] Dr. Sherman explains that the Clearinghouse generates a digital license and sends it to the user's computer to activate their software.  (Sherman Report at 8-9.)  The digital license is processed using a hash function to compress it, and then the output of that function is encrypted.  (*Id.* at 9-10, 21-22.)  The encrypted value is sent to the user along with the digital license.  The user's computer (1) processes the digital license using the same hash function, and (2) decrypts the encrypted value.  If those two numbers match, then the user's computer concludes that the digital license is a *bona fide* digital license from Microsoft.  (*Id.*)

However, as Dr. Sherman explains, the hash is unnecessary because the digital license need not be compressed.  Given the small size of the digital license, it may be encrypted directly.  (*Id.*, at 22.)   Dr. Sherman further explains that this approach is highly secure if the license is "padded" (meaning that additional bits such as a long string of zeros are added to the license data). (*Id.*, at 25-27, 31.)  Dr. Sherman explains in detail why padding provides an alternative, highly secure, approach to the hashing approach found to infringe.  (*Id.*, at 25-37.)  Dr. Sherman's analysis is supported by an accepted analytical framework, mathematics, and references to well-known treatises and peer-reviewed articles. (*See, e.g.*, Sherman Report at Exhibit B, including references to Arb97, Bel94, Bel00a, Bel00b, Dai09, Dif76, Kat00, PKCS, Riv78, RSAbench, Sch96.)   Dr. Sherman also discusses other options that Microsoft had for communicating the digital license to the user in a secure manner. (*Id.*, at 37-38.)

In his rebuttal report, Mr. Klausner does not opine that there was any technical impediment to implementing any of Microsoft's proposed designs for eliminating the hashing function.  Nor does Mr. Klausner identify any technical flaw in Dr. Sherman's technical analysis.

---

[5] The Expert Report of Alan T. Sherman ("Sherman Report") is attached as Exhibit C to Glitzenstein Declaration II.

Mr. Klausner does not question any of the mathematics on which Dr. Sherman's analysis is based. Nor does Mr. Klausner offer any technical analysis of his own in rebuttal to Dr. Sherman.

Mr. Klausner instead merely gainsays Dr. Sherman, stating that, contrary to everything Dr. Sherman has said, removing the hash would compromise security. Throughout Section III.A. of his Supplemental Report, Mr. Klausner repeatedly states that he "disagrees" with Dr. Sherman, but fails to explain why:

- "[T]he hash is an extremely important part of product activation, as it provides, in conjunction with RSA 1024 digital signature encryption, a high level of security." (Klausner Supplemental Report at 6.) Mr. Klausner provides no explanation of why hashing provides a higher level of security than the alternatives discussed in Dr. Sherman's report.

- "Without the high level of security provided by the hash (including generation of the remote license digest/licensee unique ID), the license data or digest could be compromised when it is sent to the user for completion of activation." (*Id.*) This is non-responsive. Mr. Klausner fails to address the particular approaches identified by Dr. Sherman, including the use of padding instead of a hash, let alone provide any basis to conclude that hashing is superior to padding.

- "Also, without the hash, counterfeit license data or digests could be generated by a hacker or other third party and used to activate illegitimate copies of Microsoft software." (*Id.*). The suggestion that the approaches discussed by Dr. Sherman are more vulnerable to hackers is wholly conclusory.

- "The hash, in conjunction with the RSA 1024 digital signature, provides this required high level of security." (*Id.* at 8.) Not only is this unsupported, but it misses the point, as it fails to respond to Dr. Sherman's opinion that using padding instead of a hash would provide an acceptable level of security.

- "Therefore, the hash provides a layer of security not provided by the RSA 1024 'digital signature' encryption technology alone." (*Id.* at 9-10.) Mr. Klausner does not explain what this alleged "layer of security" is, and to the extent that he is disagreeing with Dr. Sherman, he provides no analysis of how this alleged "layer of security" works, and why it is not equally provided by using padding instead of a hash. Mr. Klausner also plainly mischaracterizes the testimony that he relies on in support of this assertion.

- "Removal of the hash in 2001 when Product Activation was introduced, or at any time thereafter, would remove this additional hash layer of security, necessarily compromising the safety and security of Product Activation." (*Id.* at 10.) Mr.

Klausner provides no technical analysis to support his statement that removal of the hash "necessarily compromise[es]" the safety and security of Product Activation.

- "Based on my knowledge and experience, and for the reasons set forth above and below, the hash is not unnecessary or superfluous" and "[w]ithout the hash, Product Activation would not work." (*Id.* at 11.)  Mr. Klausner offers no technical analysis to support the conclusion that  "Product Activation would not work" without the hash.  Nor does he critique Dr. Sherman's well-developed and fully supported opinions to the contrary.

Indeed, Mr. Klausner all but ignores the padding issue, which is central to Dr. Sherman's analysis and opinion that the hashing function can be removed and replaced with padding, or simply removed if there is sufficient padding already.  The only mention of padding is in footnote 4 of Mr. Klausner's Supplemental Report, and it too is merely a conclusory statement of disagreement with Dr. Sherman, without any technical analysis (Klausner Supplemental Report at 10) (emphasis added):

> Dr. Sherman opines that the added security of the hash, if removed, could be replaced by "padding" the license data before it is encrypted by the RSA 1024 digital signature. **<u>I disagree that such padding would be an effective substitute for the security provided by the hash</u>**. As Dr. Sherman acknowledges in his Report at 25 (¶71), in Product Activation the Clearinghouse already pads the license data before it is entered into the hash.

On what basis does Mr. Klausner disagree with Dr. Sherman?  Where is the alleged flaw in Dr. Sherman's analysis?  Mr. Klausner never says.[6]  Mr. Klausner's *ipse dixit* cannot be evaluated, and thus must be excluded as unreliable: proposed testimony must be supported by appropriate validation— i.e., "good grounds," based on what is known.  "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot

---

[6] Dr. Sherman explains why the presence of padding renders hashing unnecessary.  Dr. Sherman also explains that Microsoft includes both hashing and padding, but that, from a technical standpoint, both are not required.  To the extent that Mr. Klausner is suggesting that hashing and padding are both required in the Microsoft product, no analysis is provided to back up this conclusion.   Accordingly the last sentence of the footnote does not support his "disagreement" with Dr. Sherman.

support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S.

209, 242 (1993).  In short, "the requirement that an expert's testimony pertain to 'scientific

knowledge' establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590; *see also*

*General Electric v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate

from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a

district court to admit opinion evidence which is connected to existing data only by the *ipse dixit*

of the expert.  A court may conclude that there is simply too great an analytical gap between the

data and the opinion proffered.").  Indeed, the facts here are even more compelling in terms of

exclusion than *Joiner.*  There, the expert's analysis of the data was inadmissible because his

conclusion was supported only by *ipse dixit*. *Id*. at 146-47.  But at least the expert there had data.

Here, Mr. Klausner does not even identify data.  He just asserts.

Thus, this is not the typical scenario where competing experts disagree on the application

of accepted technical principals, or disagree on the appropriate methodologies to be applied in

the particular circumstance.  We instead have, on the one hand, the expert opinions of Dr.

Sherman which are thoroughly supported, and on the other hand, Mr. Klausner's "disagreement"

with those opinions without any analysis as to why.

Just as with the issue of locating the Clearinghouse in Ireland, Mr. Klausner concludes

his section on the viability of doing without the hashing function with Uniloc's counsel's

anticipated closing argument: "The most telling evidence confirming that removal of the hash

was never an acceptable alternative for Product Activation is the fact that Microsoft never

removed it."  (Klausner Supplemental Report at 15.)  Mr. Klausner does not even address the

fact that twice during this litigation, and, for a considerable time after each of those rulings,

Microsoft's existing hash-based technology was found not to infringe the '216 patent.  There is

no technical analysis in his assessment of what constitutes "the most telling evidence."  It is pure

rhetoric, sponsored by Uniloc's counsel, not based in principles of science.

## V.     CONCLUSION

Wherefore, for the foregoing reasons, Microsoft respectfully requests that Uniloc's

technical expert, Mr. David Klausner, be barred from offering testimony (1) on the issue of

whether locating the Clearinghouse outside of the United States was an acceptable non-

infringing alternative (including offering opinions on whether any of the following

considerations would have impeded or constrained Microsoft's ability to locate the

Clearinghouse in Dublin, Ireland, in 2001: (1a) security considerations; (1b) privacy

considerations; (1c) "installed base" considerations; (1d) capacity considerations; and (1e)

failover considerations); (2) stating or suggesting that anything other than the Clearinghouse for

activating Office XP, Office 2003, and Windows XP infringes any claim of the '216 patent; (3)

stating or suggesting that Microsoft had any reason to relocate the Clearinghouse for Office XP,

Office 2003, and Windows XP prior to 2011; and (4) on the issue of the level of software

security offered by Microsoft's technical alternatives for implementing the Clearinghouse,

regardless of the physical location of the Clearinghouse.

Dated:  January 30, 2012                          FISH & RICHARDSON P.C.

By:  */s/ Kurt L. Glitzenstein* _____
    Mary C. Dunn #6712
    (mcd@blishcavlaw.com)
    Joseph V. Cavanagh, Jr. #1139
    (jvc@blishcavlaw.com)
    **BLISH & CAVANAGH LLP**
    Commerce Center, 30 Exchange Terrace
    Providence, RI 02903
    Telephone:  (401) 831-8900
    Facsimile:  (401) 751-7542

    Frank E. Scherkenbach
    (scherkenbach@fr.com)
    Kurt L. Glitzenstein (glitzenstein@fr.com)
    **FISH & RICHARDSON P.C.**
    One Marina Park Dr.
    Boston, MA 02210
    Telephone:  (617) 542-5070
    Facsimile:  (617) 542-8906

    Laura R. Braden
    (braden@fr.com)
    **FISH & RICHARDSON P.C**.
    1425 K St., N.W. 11th Floor
    Washington, DC 20005-3500
    Telephone:  (202) 783-5070
    Facsimile:  (202) 783-2331

    John W. Thornburgh
    (thornburgh@fr.com)
    **FISH & RICHARDSON P.C.**
    12390 El Camino Real P.C.
    San Diego, CA 92130
    Telephone:  (858) 678-5070
    Facsimile:   (858) 678-5099

    Matthew D. McGill
    (mmcgill@gibsondunn.com)
    **GIBSON, DUNN & CRUTCHER LLP**
    1050 Connecticut Ave., NW
    Washington, DC 20036
    Telephone:  202-955-8500

    **ATTORNEYS FOR DEFENDANT
    MICROSOFT CORPORATION**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that MICROSOFT CORPORATION'S MEMORANDUM OF LAW IN

SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID

KLAUSNER filed through the ECF system will be sent electronically to the registered

participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent

to those indicated as non-registered participants on this 30th day of January, 2012.

*/s/ Kurt L. Glitzenstein*
Kurt L. Glitzenstein