UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC USA, INC. and<br>UNILOC SINGAPORE PRIVATE LTD., | |
| Plaintiffs, | Civil Action No. 03 440 (WGY) |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

**<u>MICROSOFT CORPORATION'S MEMORANDUM IN SUPPORT OF ITS OMNIBUS
MOTIONS IN LIMINE</u>**

# LIST OF MICROSOFT'S MOTIONS IN LIMINE

1.    Microsoft's Motion To Preclude Evidence Or Argument Regarding Microsoft's Privacy Policies, Including As An Impediment To Locating The Clearinghouse In Ireland In 2001 ......... 1

2.    Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Suggesting That Locating The Infringing Product Outside The United States Is Unpatriotic, Anti-American, Or Costing American Jobs ...................................................................................................... 8

3.    Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument That Anything Other Than The Clearinghouse Infringes ..................................................... 9

4.    Microsoft's Motion To Preclude Evidence Or Argument Regarding Non-Accused Products .................................................................................................................................. 12

5.    Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Concerning Alternate Theories Of Infringement ......................................................................................... 15

6.    Microsoft Corporation's Motion in Limine to Exclude Reference to Microsoft Revenues or Profits Outside Entire Market Value Rule .................................................................................. 18

7.    Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Of Litigation Costs ...................................................................................................................... 24

8.    Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Concerning Hearsay Research Reports ....................................................................................................... 28

9.    Microsoft Corporation's Motion In Limine That All Orders And Rulings Excluding Evidence Made In The 2009 Trial Shall Remain In Effect ......................................................... 31

10.    Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Concerning Whether Juries In Other Cases Have Accepted Or Rejected An Expert's Opinions 32

11.    Microsoft Corporation's Motion In Limine To Limit Uniloc Experts To The Opinions Expressed In Their Respective Reports ........................................................................................ 34

12.    Microsoft Corporation's Motion In Limine To Preclude Improper Testimony On The Law .......................................................................................................................... 34

13.    Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Regarding Non-Comparable Licenses .......................................................................................... 37

14.    Microsoft Corporation's Motion in Limine To Preclude Any Suggestion That Microsoft Copied or that Microsoft's Infringement Was Willful Or That Microsoft Lacked An Objectively Reasonable Basis To Believe Claim 19 Was Not Infringed And/Or Invalid ............................... 41

15.     Microsoft Corporation's Motion in Limine To Preclude Any Suggestion That a Study of The '216 Patent Is Necessary To Evaluate the Damages Issues.................................................... 44

16.     Microsoft Corporation's Motion in Limine To Preclude Trial Preparation Communications Protected Under F.R.Civ.P. 26(b)(4)................................................................ 46

# TABLE OF AUTHORITIES

**CASES**

*Ariba, Inc. v. Emptoris, Inc.*,
   567 F.Supp.2d 914 (E.D. Tex. 2008) ...................................................................27

*Bandag, Inc. v. Gerrard Tire Co., Inc.*,
   704 F.2d 1578 (Fed. Cir. 1983)...........................................................................23

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................27

*Cohen v. Brown Univ.*,
   101 F.3d 155 (1st Cir. 1996) ..............................................................................33

*Czarnecki v. Home Depot USA, Inc.*,
   2009 WL 1706582 (E.D. Pa. June 15, 2009) ................................................33, 34

*Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*,
   235 U.S. 641 (1915) ...........................................................................................23

*Ellis v. United States*,
   313 F.3d 636 (1st Cir.2002)................................................................................32

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F.Supp. 1116 (S.D.N.Y. 1970) ............................................................ passim

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   2001 WL 1795665 (D.D.C. July 17, 2001)........................................................28

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009).............................................................22, 26, 36

*Minco Inc. v. Combustion Eng'g, Inc.*,
   95 F.3d 1109 (Fed. Cir. 1996)............................................................................36

*Negron-Almeda v. Santiago*,
   579 F.3d 45 (1st Cir. 2009) ...........................................................................31, 43

*Nieves-Villanueva v. Soto-Rivera*,
   133 F.3d 92 (1st Cir. 1997) ................................................................................36

*Pappas v. Middle Earth Condominium Assoc.*,
   963 F.2d 534 (2d Cir.1992).............................................................................9, 10

*Pelletier v. Main St. Textiles*,
   LP, 470 F.3d 48 (1st Cir.2006) ..........................................................................36

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) .................................................................... passim

*Sara Lee Corp. v. Kraft Foods Inc.*,
    273 F.R.D. 416 (N.D.Ill. 2011) ...............................................................49

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F.2d 1573 (Fed. Cir. 1989) ...............................................................36

*Transclean Corp. v. Bridgewood Servs.*,
    290 F.3d 1364 (Fed. Cir. 2002) ...............................................................36

*U.S. v. Clark*,
    2010 WL 1936174 (W.D. Mo., May 13, 2010) ........................................9

*Uniloc, USA Inc. et al. v. Microsoft Corp.*,
    640 F.Supp.2d 150 (D. RI. 2009) ..............................................16, 42, 43

*Uniloc USA, INC. v. Microsoft Corp.*,
    290 Fed. Appx. 337 (Fed. Cir. 2008) .......................................................4

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) .................................................... passim

*United States v. Moran*,
    393 F.3d 1 (1st Cir. 2004) .......................................................................32

*Zygo Corp. v. Wyko Corp.*,
    79 F.3d 1563 (Fed. Cir. 1996) .................................................................37

**RULES**

F.R.Civ.P. 26(b)(4) .................................................................................46, 49

Fed. R. Evid. 403 ....................................................................................9, 30

Fed. R. Evid. 801 .........................................................................................30

Federal Rule of Evidence 802.......................................................................30

Rule 26 ................................................................................................46, 49

Rule 26(a) ............................................................................................ passim

Rule 26(a)(2)(B).........................................................................................49

Rule 26(b)(4)(C)(i-iii).................................................................................47

Rule 30(b)(6)...............................................................................................38

Rules 402 and 403 .......................................................................................................8, 9, 18, 49

Rule 702 ...............................................................................................................................20, 36

1.    **Microsoft's Motion To Preclude Evidence Or Argument Regarding Microsoft's Privacy Policies, Including As An Impediment To Locating The Clearinghouse In Ireland In 2001**

A.    **Summary of Issue and Argument**

As this Court has recognized, claim 19 of the '216 patent, the sole claim found to be infringed, "only covers Microsoft's Clearinghouse" and, moreover, "the Clearinghouse must be located in the United States in order to infringe."  (Dkt. 467 at 1.)

Microsoft will show the jury that the upper bound of damages should be the cost to Microsoft in 2001 of locating the infringing Clearinghouse[1] out of the country (and specifically in Ireland)—which would have simply and categorically avoided any use of claim 19.  At the hypothetical negotiation in March of 2001, both parties would have recognized that if the patent holder demanded a royalty that in the aggregate would have cost Microsoft more than the cost of locating the Clearinghouse in Ireland, Microsoft could (and would) have relocated the Clearinghouse there, leaving the patent holder with nothing.  Knowing this, the patent holder would never have demanded a royalty that in the aggregate would have exceeded this cost.

Recognizing the simple and compelling logic of Microsoft's position, which flows from the very narrow scope of protection of claim 19, Uniloc has ginned up the responsive argument that Microsoft would have been prevented by a "privacy policy" from locating the Clearinghouse outside of the United States.  However, the "privacy policy" on which Uniloc relies in support of this theory concerns the handling of personally identifiable information, and not the activation data at issue here.  Uniloc cannot now seriously contend that there is any personal information

_____

[1] Locating the Clearinghouse in Ireland would not have involved physically moving the server computers and other hardware that ran the Clearinghouse software. Rather, new computers would have been installed in Ireland and the Clearinghouse Product Activation software would then have been loaded onto the new servers in Ireland.

used in Product Activation, given that it vehemently insisted in closing at trial in 2009:  "**This case has got nothing to do with personal information**." (Ex. 1, Trial Tr. 2009-04-07, Day 10, at 114:14-15.)[2]  Since the case "has got nothing to do with personal information," it likewise has nothing to do with "privacy policies."

### B.    Relief Requested

Uniloc should be precluded from adducing evidence or otherwise suggesting that any Microsoft "privacy policy," or any issue or concern regarding privacy, would in any way have influenced or impeded the ability to locate the Clearinghouse outside the United States at any time, including at the time of the hypothetical negotiation in this case in March 2001.

### C.    Background

The infringing apparatus is Microsoft's Clearinghouse used to activate its Office XP, Windows XP, Office 2003, and Windows Server 2003 products, and if the Clearinghouse were located outside the United States, it would not infringe. (Dkt 467.)  Uniloc has identified no technical impediment to moving the Clearinghouse to Ireland. (Ex. 2, Deposition of David Klausner at 433-435.)  Uniloc instead contends that Microsoft has a "privacy policy" that would have prevented the move.  For example, Mr. Klausner intends to testify that "moving the Clearinghouse overseas [would have been] in violation of [Microsoft's] own privacy policy." (Ex. 3, Supplemental and Rebuttal Expert Report of David Klausner, at 33.)  Likewise, Mr. Green states "locating the infringing clearinghouse outside of the United States could have been against Microsoft's policies."  (Ex. 4, Supplemental Expert Report of Philip Green at 8.)[3]  Uniloc

---

[2] All exhibits are attached to the Declaration of Kurt L. Glitzenstein in support of Microsoft's Motions in Limine.

[3] Apart from the irrelevant and misleading nature of Uniloc's "privacy policy" argument, there is a separate issue as to whether Uniloc's technical and damages experts should be speaking to this

has also previewed that it intends to feature this alleged "privacy policy" impediment to locating

the Clearinghouse in Ireland in the cross-examination of Microsoft's witnesses—rhetorically

equating at a recent deposition locating mundane Product Activation data in Ireland with locating

sensitive banking information in Iraq:

> Q. Have you ever received an opinion -- are aware of any opinion that the privacy
> -- that the privacy laws in Ireland are the same or stricter than the privacy laws in
> the United States?
>
> A. No.
>
> Q. All right. And do you have a bank account?
>
> A. Yes.
>
> Q. And is your bank account located in Iraq?
>
> A. I don't know.
>
> Q. Would you put your money in [an] Iraq bank?

(Ex. 5, Deposition of Aaron McCreery, 68:12-22.)

### 1)   Activation Data Is Not Personally Identifiable Information

Uniloc's technical expert, Mr. Klausner, admits that the activation data sent to the

Clearinghouse contains two relevant pieces of information:  A Hardware ID ("HWID") which is

generated from information about the user's computer and a Product ID ("PID") that is formed

from the product key on the purchased Microsoft software, information from the software CD,

and a random number.  (Ex. 6, Modified Expert Report of David Klausner at 8.)

The HWID is specifically designed so that it does not contain personally identifiable

information about a user's computer, and the PID contains no user information. (Ex. 2,

---

topic at all, since it is well outside of their respective areas of expertise.  That issue is being
addressed in Microsoft's separately filed *Daubert* motions.

Deposition of David Klausner at 439-441) and (Ex. 7, Expert Report of Alan Sherman at ¶¶22, 27.)  Mr. Klausner even relies on a Microsoft document confirming that "Microsoft Product Activation is completely anonymous, and no personally identifiable information is collected." (Ex. 3, Supplemental and Rebuttal Expert Report of David Klausner, at 30) (citing to MS-U946148-160 at 152; Ex. 8, MS-U946148-160 at 152.)

The fact that Product Activation uses no personal information was also reiterated during the first appeal.  The Federal Circuit reversed summary judgment of no infringing holding that the "licensee unique ID" did not have to contain personal user information.  In dissent, Judge Michel stated he would have construed the claim to require personal information, and because Microsoft's license digest was generated from information about the hardware and the purchased software, "**and not from information that personally identifies the user**"— a fact that was not in dispute—he would have affirmed summary judgment of no infringement.  *Uniloc USA, INC. v. Microsoft Corp.*, 290 Fed. Appx. 337, 344-345 (Fed. Cir. 2008).

Finally, Uniloc in its closing argument in the first trial embraced the fact that product activation does not use personal information, plainly belying its contention today that "privacy policies" would have impeded Microsoft's ability to locate the Clearinghouse in Ireland in 2001:

> He puts up all this stuff about credit cards and whatever, trying to say this case is all about credit cards.  They lost that in the District Court, in the Court of Appeals.  You have the Court of Appeals decision.  ***This case has got nothing to do with personal information.***

(Ex. 1, Trial Tr. 2009-04-07, Day 10, at 114:14-15.)

       2)    <u>Activation Data Is Distinct From Registration Information</u>

Microsoft gives users the option of "registering" their products for marketing purposes and to provide a mailing address for product updates.  As part of the "registration" process, users

are asked to provide personal information, such as name and address.  None of this optionally collected information is used for product activation.

Mr. Klausner relies on Microsoft documents that clearly distinguish activation data from optional registration information: "If they wish, customers may voluntarily register their product by providing their name and contact information."  (Ex. 3, Supplemental and Rebuttal Expert Report of David Klausner, at 30 (citing to MS-U946148-160 at 152); Ex. 8, MS-U946148-160 at 152.)  This information is obtained for purposes completely independent of product activation, and plays no role in product activation.  (*Id*. at 29.)[4]

       3)    <u>Microsoft's Privacy Policy Only Concerns Personally Identifiable Information Optionally Provided By the User If They Elect To Register The Software</u>

Mr. Klausner also cites to a screen shot from Microsoft's "privacy policy" from Microsoft Office XP.  (Ex. 3, Supplemental and Rebuttal Report of David Klausner, at 29.)  Far from supporting Uniloc's theory, the screen shot confirms that registration information is distinct from activation data.

> Your personal contact information (e.g., name and address) is *not* required to activate this product, but you have the option to register your product by including this information. If you choose to register your product, the information you provide will be used by Microsoft and its subsidiaries to provide you with information about new products and services, and to mail product updates if you are eligible.

(*Id.* (emphasis added))

The screen also states that the personally identifiable registration information provided by the user will be stored either in the United States or in the user's country of residence.  In this

---

[4] Prior, non-infringing versions of product activation were called "forced registration." Microsoft subsequently took pains to delineate activation from registration.

screen shot, and in every other document cited by Mr. Klausner or Mr. Green, Microsoft is

clearly talking about the **user's personal information** collected during product registration—

and not about the anonymous and mundane activation data.  Uniloc cannot identify a single

document suggesting a "policy" to store the HWID, PID, or other activation data in the United

States.

      4)     The Privacy Policy States A Fact—The Location Where Microsoft
                  Decided To Store Optional Registration Information—Which Is Subject
                  To Change

The "privacy policy" statements on which Mr. Klausner and Mr. Green rely merely state

the simple fact as to where Microsoft intends to store the user's personal information.  Nothing

in the statements suggests that data **must** be stored anywhere in particular or that it would always

be stored at a particular location.  Rather, Microsoft merely states that personal information "will

be stored in the United States [or] possibly in your country of residence." (*E.g.*, Ex. 3,

Supplemental and Rebuttal Expert Report of David Klausner, at 29.)  Uniloc's theory critically,

and improperly, conflates "will" with "must."  There is no evidence suggesting that Microsoft

"must" store information in the United States because of any "privacy policy."

      5)     The Clearinghouse Was Moved To Ireland In 2011

Uniloc's theory that a "privacy policy" would have prohibited locating the Clearinghouse

in Dublin, Ireland, in 2001 is also belied by the fact that Microsoft in fact relocated the

Clearinghouse in Ireland in 2011. (Ex. 5, Deposition of Aaron McCreery, p. 37.)

    **D.**    **Argument**

Microsoft has no "privacy policy" that impedes or constrains where it may store

activation data.  There is no evidence whatsoever supporting Uniloc's argument that a "privacy

policy" or amorphous "privacy concerns" would have prevented Microsoft from relocating the

Clearinghouse to Ireland in 2001 had unreasonable demands been made during the hypothetical negotiation at that time.

The documents discussed extensively by Mr. Klausner and Mr. Green all concern personal information provided by the user (such as name and address) for product registration—information that is not used for product activation.  Product activation is anonymous.  Product activation sends to the Clearinghouse the PID and HWID and other data that cannot be used to personally identify the user.  Such activation data can be stored in Ireland, and there is no evidence to the contrary.  Accordingly, Microsoft could have avoided infringement by locating the Clearinghouse and the activation data in Ireland in 2001.

All the evidence establishes that the "privacy policy" is irrelevant to product activation. Microsoft would be unduly prejudiced by having to defend against this "privacy policy" sideshow, which lacks any evidentiary support.  Today, the Clearinghouse is in Ireland.  That should be the end of the matter, and direct or cross-examination concerning Microsoft's irrelevant privacy policy will serve only to confuse the jury and distract it from the task at hand, especially when coupled with Uniloc's unfairly prejudicial insinuations that locating mundane and anonymous product activation data in Ireland is tantamount to locating highly sensitive and personal banking information in Iraq.

The undisputed record establishes that the "privacy policy" relates to a user's personal information (used for marketing purposes), not anonymous activation data.  As Uniloc told the jury in closing at the liability trial, "This case has got nothing to do with personal information." (Ex. 1; Trial Tr. 2009-04-07, Day 10, at 114:14-15.)  It cannot take the contrary position now. All questioning, evidence, and argument suggesting that a "privacy policy" or privacy concerns

would prevent relocation of the Clearinghouse to Ireland should be excluded under Rules 402 and 403.

**2.      Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Suggesting That Locating The Infringing Product Outside The United States Is Unpatriotic, Anti-American, Or Costing American Jobs**

### A.      Summary of Issue and Argument

Microsoft has relocated the Clearinghouse to Ireland, and therefore it is no longer infringing.  (Dkt. 467.)  Microsoft will also inform the jury that it could have moved the Clearinghouse to Ireland in 2001 at the time of the hypothetical negotiation and therefore any royalty agreed to by the parties would necessarily have been capped by the cost of such a move.

Microsoft is concerned that Uniloc may argue that moving the Clearinghouse to Ireland is unpatriotic, un-American, costing American jobs or arguments to the same effect.  Such irrelevant arguments—which plainly seek to play to juror emotions—have no place in a patent damages trial.

### B.      Relief Requested

Uniloc should be precluded from introducing evidence or otherwise suggesting that moving the Clearinghouse to Ireland is unpatriotic, anti-American, costing American jobs or arguments to the same effect.

### C.      Background

At the time of the hypothetical negotiation, the parties to the negotiation would have negotiated a royalty based on the patent holder's desire to monetize the right to exclude embodied in the '216 patent and Microsoft's desire to provide product activation while minimizing any payment.  At the hypothetical negotiation, the parties to the negotiation would have discussed the fact that if Microsoft moves the Clearinghouse to Ireland, the patent holder

takes nothing.  Microsoft will show the jury that this would not be an idle threat, but rather that Microsoft had a data center in Ireland that could have hosted the Clearinghouse in 2001, that the move could have been accomplished for a few million dollars, and that Microsoft did in fact move the Clearinghouse to Ireland after the Federal Circuit's mandate in 2011.

> ### D.    Argument

The jury should decide the appropriate royalty based on the evidence.  Specifically, it should consider what royalty rate would have been negotiated given that the patent holder would get nothing if Microsoft had simply moved the Clearinghouse to Ireland.

Suggestions that such a move would have been (or is today) unpatriotic, anti-American, costing American jobs or the like simply does not prove or disprove any issues in this case and has no bearing on the proper measure of damages for Microsoft's infringement. Thus, any such argument or testimony is irrelevant, unduly prejudicial, and inadmissible under Rule 402, 403. *See, e.g., U.S. v. Clark*, 2010 WL 1936174 at *5 (W.D. Mo., May 13, 2010) (excluding evidence of the "impact on the neighborhood" of mortgage fraud under Fed. R. Evid. 403 where it "would be offered for no purpose other than to inflame the jury"); *Pappas v. Middle Earth Condominium Assoc.*, 963 F.2d 534, 539 (2d Cir.1992) ("There is no doubt whatever that appeals to the regional bias of a jury are completely out of place in a federal courtroom".)


> ### 3.    Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument That Anything Other Than The Clearinghouse Infringes

> ### A.    Summary of Issue and Argument

As this Court has recognized, claim 19 of the '216 patent, the sole claim found to be infringed, "only covers Microsoft's Clearinghouse."  (Dkt. 467 at 1.)  The Clearinghouse is not a product that Microsoft sells.  Rather it is a set of server computers and other hardware that run

the Clearinghouse software to process activation requests from **non-infringing** Microsoft products, such as Microsoft Office XP and Windows XP.  The Clearinghouse is only a part of product activation.  Accordingly, Uniloc should not be suggesting to the jury that "product activation" infringes, or that Microsoft Office or Windows infringes.  It is only the "Clearinghouse" that infringes, and only when located in the United States.  (*Id*.)

### B.    Relief Requested

Uniloc should be precluded from adducing evidence, arguing, or otherwise suggesting that any Microsoft product infringes the '216 patent, and that anything other than the Clearinghouse infringes the '216 patent.

### C.    Background

Claim 19 of the '216 patent was the only claim at issue in the liability trial, and the only claim addressed on appeal.  Claim 19 is an apparatus claim and covers a "remote registration station."  The remote registration station is used to process activation requests from user software, but it is distinct from the user software.  On appeal, Microsoft argued that there could be no infringement because "product activation" involved multiple parties (the user running Office XP, for example, and Microsoft running the Clearinghouse).  The Federal Circuit rejected this argument holding that claim 19 "**focuses exclusively on the 'remote registration station,'** and defines the environment in which that registration station must function." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011) (emphasis added).

On remand, however, Uniloc served the Expert Report of David Klausner that was directly contrary to Uniloc's prevailing argument at the Federal Circuit:  "The Microsoft registration system that has been found to infringe includes Clearinghouse software and hardware in conjunction with the accused Microsoft software products executing on the Customer's computer (all henceforth, the Microsoft Product Activation Registration System')."

(See discussion in Dkt 460 and exhibits cited therein.)  Microsoft moved to strike and the Court granted that motion in part, clarifying that the sole infringing instrumentality was the Clearinghouse.  (Dkt. 467.)

In response, Uniloc served a Modified Expert Report of David Klausner that removed the incorrect statements concerning infringement.  However, Mr. Klausner then served a Supplemental and Rebuttal Report that again included statements that improperly and incorrectly suggest that products sold by Microsoft infringe claim 19. (Ex. 3, Supplemental and Rebuttal Report of David Klausner.) For example, Mr. Klausner states:

- "[T]he accused product is Microsoft Product Activation."  (p. 4.)
- "Microsoft did not move the Clearinghouse until this year, well after the accused products were no longer offered by Microsoft." (p. 35)
- Only this year, well after Office XP, Windows XP and the other accused products became so-called 'legacy' products no longer offered by Microsoft, did Microsoft move the Clearinghouse for just those legacy products to Ireland." (p. 36)
- "Now that the accused products are not the crown jewels, but legacy products, Microsoft moves the Clearinghouse for just them to Ireland." (p. 36)

Likewise Uniloc's damages expert, Mr. Green, also incorrectly and improperly suggests that products sold by Microsoft (such as Office and Windows XP) infringe claim 19. (Ex. 4, Supplemental Expert Report of Philip Green at 11):

- "profitability of the products incorporating the patented technology" (p. 10.)
- "Total Accused Product Revenues" (Ex. O.)

### D.    Argument

Uniloc prevailed on appeal by arguing that **<u>only</u>** the Clearinghouse infringed claim 19. Otherwise, Uniloc would have had a "joint infringement" problem where no one actor practiced all the limitations of the claim.  After Uniloc served its opening expert reports backtracking on their winning argument on appeal, Microsoft moved to strike Mr. Klausner's report opining that things other than the Clearinghouse infringed, and the Court granted that motion.  (Dkt. 467.)

The Court specifically granted parts (3) and (4) of Microsoft's Motion To Strike which stated: "claim 19 of Uniloc's 5,490,216 patent only covers Microsoft's Clearinghouse" and "the Clearinghouse must be located in the United States in order to infringe." (*Id*.)

Despite this, Uniloc served rebuttal expert reports that both explicitly stated and implied that "product activation" infringes or that Microsoft Office or Microsoft Windows infringes. These statements are false, and will mislead the jury to believe that products sold by Microsoft were adjudged to infringe, when in fact they were not.

Uniloc should not be permitted to suggest that anything other than the Clearinghouse infringes. Any such suggestion that "product activation," Microsoft Windows, or Office infringes (or anything other than the Clearinghouse infringes) would violate this Court's order on Microsoft's motion to strike, be inconsistent with the Federal Circuit's mandate, and is likely to cause jury confusion on the fundamental question of the proper base for calculating damages.

**4.      Microsoft's Motion To Preclude Evidence Or Argument Regarding Non-Accused Products**

      **A.      Summary of Issue and Argument**

The only thing found to infringe the '216 patent is Microsoft's Clearinghouse used to activate the Office XP, Windows XP, Office 2003, and Windows Server 2003 products. Uniloc has never accused, let alone proven, that any Clearinghouse used to activate later versions of Windows and Office (including Vista and Windows 7) infringe any claim of the '216 patent. There is thus no legitimate basis for Uniloc to refer in any way at trial to any other product than Office XP, Windows XP, Office 2003, and Windows Server 2003, or the Clearinghouse for them. It is not only irrelevant, but unfairly prejudicial given that Uniloc apparently intends to suggest to the jury that products or Clearinghouses other than those infringe, and the fact that

these other Clearinghouses were not relocated outside the United States undercuts Microsoft's assertion that it would have located the Clearinghouse for Office XP, Windows XP, Office 2003, and Windows Server 2003 outside the United States had the patent owner demanded a royalty substantially more than the cost of doing so.

Microsoft's actions with regard to non-accused Clearinghouses are thus of no probative value. Not only would any mention of them be unfairly prejudicial to Microsoft, but would also require a liability trial to address whether these non-accused Clearinghouses infringe.

### B.      Relief Requested

Uniloc should be precluded from adducing evidence or making reference to any later versions of Office XP, Windows XP, Office 2003, and Windows Server 2003 (including Windows Vista or Windows 7), and the Clearinghouses for such later versions, and the locations of such Clearinghouses, and from suggesting in any way that any such later version or Clearinghouse infringes any claim of the '216 patent.

### C.      Background

The liability trial concerned only Office XP, Office 2003, Windows XP, Windows Server 2003, and the Clearinghouse for activating those products. Uniloc has never accused the Clearinghouses for later versions of Office and Windows of infringement. On the contrary, Uniloc moved *in limine* prior to the liability trial to preclude any mention of later versions, which at the time included Windows Vista. Microsoft responded to Uniloc's motion, agreeing that it would not refer to Windows Vista at trial. (Dkt. 266, Def.'s Resp. to Pltfs.' Motion In Limine Regarding the 'VISTA' Version of Windows, at 1.) Based on Microsoft's response, Uniloc's counsel represented to the Court that the motion was "resolved." (Ex. 20, March 3, 2009, Hearing Tr. at 70.) The Court therefore denied Uniloc's motion as moot. (*Id.*)

Despite all of this, Uniloc now wants to make an issue of non-accused later versions such as Windows Vista and Windows 7, and their respective Clearinghouses, in the upcoming damages trial.  Not only does Uniloc intend to imply that the later versions infringe the '216 patent, but also that the location of the Clearinghouses for these products (and whether they have been relocated) somehow undercuts Microsoft's contention that it would have located the Clearinghouse for the other products to Ireland in 2001 if it had been confronted with an unreasonable royalty demand.

Specifically, Uniloc intends to suggest to the jury that Microsoft has not moved, or expressed any intention of moving, the Windows Vista and Windows 7 Clearinghouses to Ireland along with the Clearinghouse found to infringe claim 19.  Uniloc will then argue that this somehow shows that, at the time of the hypothetical negotiation in March 2001, Microsoft would not have moved the Clearinghouse because relocation to Ireland was not an "available" or "acceptable" alternative to Microsoft.  The implicit assumption behind this argument is that the Windows Vista and Windows 7 Clearinghouses infringe—a charge Uniloc has never made and an issue it specifically avoided at the liability trial.

The written reports of Mr. Klausner, one of Uniloc's experts, show Uniloc's intention to make these arguments at trial.  In his Supplemental Report, he opines that "the Clearinghouse for activation of Microsoft's current 'crown jewel' products, i.e., Windows 7 and Vista, is still located in the United States.  Apparently, while certain products are the crown jewels, Microsoft is not willing to risk moving the Clearinghouse for them to a location overseas." (Ex. 3, Supplemental and Rebuttal Expert Report of David Klausner, at 36).[5]

---

[5] *See also* Ex. 3, Supplemental and Rebuttal Expert Report of David Klausner ("Only this year, well after Office XP, Windows XP and other accused products became so-called 'legacy'

**5.      Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Concerning Alternate Theories Of Infringement**

### A.      Summary of Issue and Argument

Microsoft will tell the jury that it had a number of technical options to avoid infringement at the time of the hypothetical negotiation that were completely independent of moving the Clearinghouse to Ireland.  Those options were (a) using the non-infringing product activation technology from Office 2000, (b) using the non-infringing product activation technology used for telephone activation, (c) removing the hash that was central to the Federal Circuit's infringement decision in the last appeal.

Uniloc has not suggested that any of these technical alternatives infringe, and would be barred from doing so now since it has litigated and lost two of these technical alternatives. Nonetheless, Microsoft is concerned that Uniloc may try to suggest to the jury that these alternatives "might" infringe or otherwise suggest that infringement may be an open question.

The first two options were originally accused by Uniloc, and Uniloc failed to pursue either theory of infringement.  The third option removes the hash, which is the only thing that Uniloc showed to be the claimed "licensee unique ID" at trial.

### B.      Relief Requested

Uniloc should be prohibited from adducing evidence of, arguing, or otherwise suggesting in any way that Microsoft's technical alternatives infringe the '216 patent.

---

products no longer offered by Microsoft, did Microsoft move the Clearinghouse for just those legacy products to Ireland. . . .  Now that the accused products [sic] are not the crown jewels, but legacy products, Microsoft moves the Clearinghouse for just them to Ireland.").  Mr. Klausner's emphasis on Microsoft's movement of the clearinghouse for activating so-called "legacy" products indicates Uniloc's intention to make an issue of this point at trial.

### C.      Background

Uniloc prevailed on a narrow theory of infringement.  The adjudged infringing apparatus is **only** the Clearinghouse that handles activations for Microsoft Office XP, Office 2003, Windows XP, and Windows Server 2003, and **only** when the activation uses the hash that is part of internet activation.  Uniloc lost on, and failed to pursue on appeal, its theories that (1) product activation in Office 2000 infringes and (2) that telephone activation infringes.

In his first expert report on infringement in this case, in 2005, Mr. Klausner identified Office 2000 as an infringing product.  (Ex. 9, Expert Report of David Klausner at 5.)  However, after the district court granted summary judgment of no infringement as to all accused products (including Office 2000), Uniloc in the first appeal appealed only with respect to the XP and 2003 products.  Accordingly, the liability trial after remand was limited to the XP and 2003 products.

Similarly, "Uniloc dropped its theory regarding telephone activation." *Uniloc, USA Inc. et al. v. Microsoft Corp.*, 640 F.Supp.2d 150, 157 fn. 5 (D. RI. 2009).

For the products that Uniloc did pursue, the central dispute was whether the hash used in internet activation corresponded to the "licensee unique ID."  As the Federal Circuit stated in the second appeal, "[t]he functionality of the MD5 and SHA−1 [hash] algorithms is at the heart of this case." 632 F.3d at 1298.  The Federal Circuit upheld the infringement verdict based upon its conclusion that the hash algorithm used in internet activation corresponded to the "licensee unique ID generating means." 632 F.3d at 1306-07.

Moreover, after Microsoft's experts identified the removal of the hash as a non-infringing alternative, Uniloc took no contrary position.  Nowhere in the Supplemental and Rebuttal Expert Report of David Klausner does Mr. Klausner suggest that any hashless algorithm would infringe.

### D.     Argument

Uniloc originally accused Office 2000 of infringing, but did not pursue that accusation on appeal after the district court granted summary judgment of non-infringement across the board. At trial, Uniloc's expert conceded that Uniloc did not consider Office 2000 to be infringing:

> Q.   Okay.  Well, can we agree that you have not assumed in your analysis that Office 2000 infringes, correct?

> A.   I believe that's true.

(Ex.  10, Day 5 Trial Tr., testimony of Uniloc's damages expert Gemini at 89:1-4.)

Moreover, Uniloc has set the date of the hypothetical negotiation as the release of Office XP, thereby taking the position that infringement began with Office XP—and not the earlier Office 2000 products.  (Ex. 4, Supplemental Expert Report of Philip Green, at 1.)  Uniloc lost on its accusation that product activation in Office 2000 infringes, and it is now res judicata that the product activation in Office 2000 is a **non-infringing** alternative.

Likewise, Uniloc lost on its allegations that the technology in telephone activation infringes, and so it is also res judicata that the technology in telephone activation is a **non-infringing** alternative as well.[6]

Uniloc's technical expert, Mr. Klausner, has not opined that any of the three technical alternatives offered by Microsoft infringes the '216 patent.  However, it is unclear whether Uniloc intends to imply that there "might" be infringement.  The time to prove infringement has passed. The liability phase is over.  It was Uniloc's burden to prove infringement, and Uniloc

---

[6] The telephone technology is substantially different from the internet technology, and addresses the problem that people do not want to send or receive a long number over the telephone.  There is no question that the technology would work equally well using the internet as the connection instead of a telephone line.

only established infringement for internet activation with a hash for Office XP and 2003 and Windows XP and Windows Server 2003.  After losing on summary judgment, Uniloc failed to pursue its claims to infringement based on telephone activation, activation in Office 2000, and activation with anything other than the hash.

**6.**    **Microsoft Corporation's Motion in Limine to Exclude Reference to Microsoft Revenues or Profits Outside Entire Market Value Rule**

**A.**    **Summary of Issue and Argument**

Uniloc and its damages expert intend at trial to refer to Microsoft's considerable total revenue and profit resulting from sales of Windows XP, Office XP, Office 2003, and Windows Server 2003 over the past 11 years in its attempt to persuade the jury that Uniloc's claimed damages—in excess of $3 billion—constitute a "reasonable" royalty for infringement of claim 19 of the '216 patent.  This was precisely the argument and evidence that the Federal Circuit found to be in violation of the Entire Market Value Rule—which is what led to Microsoft's award of this new trial on damages—and is plainly impermissible in light of Rules 402 and 403. Uniloc concedes as it must that the patented technology does *not* drive demand for the sales of software it uses to derive its damages.  Indeed, as explained above in connection with Microsoft's *motion in limine* #3, the activated software products do not infringe at all – only the Clearinghouse infringes.  Uniloc  must not be allowed to repeat exactly the same tactics that led to this new trial by presenting its damages demands in the context of the entire market value of that software.

**B.**    **Relief Requested**

Uniloc, including its fact and expert witnesses and its counsel, should be prohibited from adducing evidence of or otherwise making reference to any of the following:

a.  Microsoft's total revenues and/or total profit on a company-wide basis, at any time in its history;

b.  Microsoft's total revenues and/or total profit derived from business units that develop, make, market, or sell Windows XP, Office XP, Windows Server 2003, or Office 2003, including the Desktop and Enterprise Software & Services; Client; Server & Tools; Information Worker; Windows & Windows Live; or Microsoft Business Division segments, at any time in Microsoft's history;

c.  Microsoft's total revenues and/or total profit derived from its sales of Windows XP, Office XP, Windows Server 2003, or Office 2003 at any time in Microsoft's history; and

d.  Microsoft's total "incremental" (as called by Mr. Green) revenues and/or total profit on those incremental revenues resulting from its sales of Windows XP, Office XP, or Windows Server 2003, or Office 2003 at any time in Microsoft's history.

## C.  Background

Uniloc, through both its damages expert's report and its counsels' examination of Microsoft's witnesses at deposition, has made clear that Uniloc plans to rely on these considerable sums in an attempt to make Uniloc's grossly inflated damages claim seem "reasonable" by comparison.  For example, Mr. Green opines in his written reports that, in fiscal 2001 alone, Microsoft recognized revenues of $9.5 billion from sales of desktop applications (including Office) and $8 billion from sales of desktop platforms, including Windows.  (Ex. 11, Rule 26(a) Report Regarding Damages Prepared by Philip Green, at 5.)  Mr. Green also opines that Microsoft earned total revenues of "nearly $455.5 billion" from July 2002 through June 2011, and operating profits in this time frame of $161.9 billion.  (*Id.*, at 7.)  Elsewhere he refers to revenues "from segments containing products related to Product Activation" to be $380.7 billion in that same time period, and profits of $221.8 billion.  (*Id.*)

Extrapolating from these figures (*id.*, at 36),[7] Mr. Green concludes that Microsoft recognized "total incremental revenues from July 2001 through June 2006" of $7 billion as a result of its use of the infringing Clearinghouse, and incremental profits of $5.6 billion.  (*Id.*, at 28.)  He then concludes that an ultimate "reasonable" royalty would range from $626 million to $3.6 billion.  (*Id.*, at 58.)

Uniloc's counsel has also deposed Microsoft's experts on these figures, previewing a cross-examination and closing argument strategy that is a replay of the tactics that the Federal Circuit rejected in the very appeal that led to this new trial on damages.  For example, at Uniloc's deposition of Christopher Vellturo, one of Microsoft's damages experts, counsel for Uniloc walked Dr. Vellturo through a series of "assumptions" in which Microsoft earns $23 billion in total sales on (non-infringing) products activated via the Clearinghouse, resulting in $13.8 billion in profit, of which $5.4 billion are "a result of infringement money that [Microsoft] would not have made but for the infringement[.]"  (Ex. 12, Christopher Vellturo Dep.Tr. at 105-07.)  He also inquired whether, in a "hypothetical" case where Microsoft recognizes $8.5 billion in revenue as a result of the patented technology, a $3 billion number would be a reasonable royalty for Microsoft to pay.  (*See id.* at 94-96 ("A royalty paid to Uniloc of $3 billion as compensation for putting eight and a half billion into Microsoft's pocket would be reasonable, correct?").)[8]

---

[7] The extrapolation is also deeply flawed.  As discussed in greater detail in Microsoft's motion to exclude Mr. Green's opinions under Rule 702, he calculates these incremental revenues and profits on the basis of certain pilot studies Microsoft carried out in 1999 and 2000.  (*See generally* Ex. 11, Rule 26(a) Report Regarding Damages Prepared by Philip GreenSept at 14-21.)

[8] There were numerous instances of such questions in Dr. Vellturo's deposition.  *See, e.g.*, Ex. 12, Christopher Vellturo Dep. Tr. at 101-02 ("Let's assume as a result of Microsoft's infringement it put into its pocket $9 billion in additional revenue that it would not have made but for the infringement. . . .  If we are to apportion in a damage world the damages between

### D.      Argument

We have seen this movie before, and know how it comes out.  At the first trial in 2009, Uniloc's counsel cross-examined Microsoft's damages expert by, in substance, dismissing his opinion on the appropriate level damages as unreasonable when measured against Microsoft's total sales of products activated using the Clearinghouse.  *See Uniloc*, 632 F.3d at 1320 (quoting from Uniloc's cross-examination of Microsoft's damages expert).  He then argued in close that it was "nuts" for Microsoft to argue for a reasonable royalty that amounts to only ".00003%" of "22 billion in infringing sales and 5 billion in additional revenue[.]"  (Ex. 1, Trial Tr. 2009-04-07, Day 10, at 112.)  Microsoft won a new trial on damages precisely because of those arguments.  *See Uniloc*, 632 F.3d at 1320.  The Federal Circuit observed that "[t]his case provides a good example of the danger of admitting consideration of the entire market value of the accused where the patented component does not create the basis for customer demand."  *Id.*  "The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue."  *Id.*

The argument that Uniloc hopes to make now is just as specious, and just as inadmissible, as the one it made then.  There continues to be no dispute on the fundamental point that the patented technology in no way forms the basis for customer demand.  (*See id.* at 1319; Ex. 11,

---

Microsoft, the infringer, and Uniloc, the inventor, it would be reasonable under those circumstances to give to Uniloc at least 30 percent of that $9 billion dollars?"); *see also id.* at 145 ("You think it's fair then – you think it's reasonable that Microsoft puts $9 billion dollars in its pocket and gets to keep $8 billion nine hundred ninety-nine point nine nine percent of the profit, and Uniloc who invents the invention gets .0001 percent?").

Expert Report of Philip Green at 33.[9])  Indeed, the revenues, profits, etc., on which Uniloc relies are on the software products sold by Microsoft – products that do not infringe the '216 patent. Not only do customers not want the patented technology, it is an anathema to them.  It is therefore wholly improper for Uniloc to interject evidence of total revenue and profit derived from the entire market value of the non-infringing software that Uniloc contends "incorporates" the patented technology.  Not only is it wrong and irrelevant, but it is unfairly prejudicial and confusing as well, and will again "skew the damages horizon for the jury" if Uniloc is allowed to do so.  *Uniloc*, 632 F.3d at 1320.

Uniloc will likely contend that "this time it's different" because its expert now attempts to isolate damages flowing only from incremental sales "due to" Microsoft's use of product activation.  This is just the same old wine, in a new bottle.  Uniloc and its damages expert persist in basing an excessive damages claim on the entire value of these alleged "incremental" sales. The Federal Circuit has been very clear that in order to derive damages based on consideration of the entire market value of a product, "the patentee *must* prove that the patent-related feature is the basis for customer demand[.]"  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009), *quoted in Uniloc*, 632 F.3d at 1320 (emphasis included).  This requirement exists for *each individual sale* of the product on which damages are claimed.  It is plainly improper for Uniloc to offer evidence or to argue that it is entitled to damages derived from the entire market value of Microsoft's sales of non-infringing software products, when Uniloc concedes that its technology in no way forms the basis for customer demand for those products.

---

[9] "I am not aware of any specific benefits to consumers or end users of Microsoft's software applications due to the presence of the patented technology."  (Ex. 11, Expert Report of Philip Green at 33.)

Customers buy Microsoft's Office and Windows products for the features and benefits that those products offer, not because Microsoft had a Clearinghouse tucked away at a data center in Tukwila, Washington (now in Dublin, Ireland).  The infringing Clearinghouse is of zero interest to any Microsoft customer.

In short, even basing damages only on the alleged increase in sales that Uniloc (wrongly) contends Microsoft experienced as a consequence of Product Activation, Uniloc's theory disregards the simple and undisputed fact that consumers purchase Microsoft's software because of the innovative features that software contain.  A car manufacturer cannot legally sell a car that lacks seatbelts, but that does not mean that the entire value of the automobile should be attributed to the seatbelt.  By the same token, Uniloc cannot base its claim for damages on the entire market value of the "additional" sales that it claims Microsoft made though its use of the infringing Clearinghouse.  Instead, it must calculate its damages by showing the estimated value the patented feature brings to the end product, above and beyond the other technology that comprises the product and drives each individual sale.[10]  Uniloc has not done this.  Uniloc should not be permitted to once again skew the jury's view of damages by offering evidence of or argument concerning sums that reflect the entire market value of Microsoft's software.

---

[10] *See Uniloc*, 632 F.3d at 1318 ("This rule is derived from Supreme Court precedent requiring that 'the patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative[.]'") (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *see also Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 646 (1915) ("In so far as the profits from the infringing sales were attributable to the patented improvements they belonged to the plaintiff, and in so far as they were due to other parts or features they belonged to the defendants."); *Bandag, Inc. v. Gerrard Tire Co., Inc.*, 704 F.2d 1578, 1582 (Fed. Cir. 1983) ("[T]he true measure of a patentee's general damages must be the value of what was taken.").

**7.     Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Of Litigation Costs**

      **A.     Summary of Issue and Argument**

Microsoft has identified a number of non-infringing alternatives that would have been in play at the hypothetical negotiation in March 2001.  Microsoft could have avoided all liability by (a) moving the Clearinghouse outside the United States, for example to Ireland, (b) continuing to use the non-infringing product activation technology in Office 2000, (c) using the non-infringing product activation technology for telephone activation for both internet and telephone activation, and (d) removing the hash of the digital license from the digital signature.  Microsoft has estimated that the costs associated with implementing any of these alternatives would have been, at most, a few million dollars.

Uniloc responds that Microsoft's proposed alternatives are not credible because Microsoft has incurred costs in defending this case that exceed the costs of implementing the alternatives.  According to Uniloc, the fact that Microsoft spent more to defend itself in this case than it would have incurred in implementing these non-infringing alternatives means that the alternatives were not *bona fide*.

Setting aside that the true objective of this argument is to wow the jury with the high costs of defending patent litigation (and to showcase Microsoft's wealth, generally), it is also deeply flawed in its peculiar and cynical illogic.  Microsoft is certainly entitled to defend itself against what it considers baseless allegations of infringement.  Indeed, the district court twice ruled that Uniloc had no case of infringement, and the Chief Judge of the Federal Circuit concurred in the first appeal.  Uniloc seriously and unfairly distorts the principle of sticking up for what you believe in when actually confronted with a suit when they contend that that philosophy is somehow inconsistent with the business reality that, had the patent owner actually

approached Microsoft to negotiate a license in a non-adversarial setting in March of 2001,

Microsoft would have looked to its available options.

The specific facts are not in dispute:  Microsoft has been litigating this case since 2003

and was only held by a Court to be an infringer on May 26, 2011, when the Federal Circuit

overruled the district court's judgment of non-infringement and issued its mandate.  It would be

improper to allow the jury to draw any adverse inferences from the fact that Microsoft

vigorously defended this action or from the amount Microsoft spent in its defense.

### B.      Relief Requested

Uniloc should be precluded from adducing evidence or otherwise referring to Uniloc's or

Microsoft's legal costs, including any suggestion that litigation costs (or the vigorous defense of

the litigation) should be considered in assessing damages, or that the fact that Microsoft spent

more to defend itself in this case than it would have cost to implement the available alternatives

is in any way relevant to the viability of those alternatives.

### C.      Background

At the hypothetical negotiation, the parties would have negotiated a reasonable royalty

while keeping in mind that Microsoft had options for providing product activation without using

the infringing Clearinghouse.  Of course, Microsoft took none of these actions in 2001 because

Uniloc never approached Microsoft with a licensing offer.  Instead, Uniloc sued Microsoft in

2003 and Microsoft defended what it believed to be a meritless lawsuit.  Up until January 4,

2011 when the Federal Circuit issued its opinion reinstating the jury's infringement verdict,

Microsoft was right.  Microsoft had first prevailed on summary judgment.  That decision went on

appeal and was reversed—in a 2:1 decision, with Chief Judge Michel agreeing with Microsoft.

The case went to trial, and after an adverse jury verdict, Microsoft prevailed again in post-trial

motions.  The district court held that Microsoft did not infringe.  One reason Microsoft was held

not to infringe was because Microsoft's hash algorithm was fundamentally different than the "licensee unique ID generating means" disclosed in the patent.

As of January 3, 2011, Microsoft still believed it had prevailed and that the Federal Circuit would affirm the judgment of the district court. Thus, up to that time, there would have been no reason to implement one of the design changes Microsoft will be explaining to the jury. Indeed, even then claim 19 of the patent was under rejection as invalid in a reexamination of the patent by the U.S. Patent and Trademark Office. Microsoft defended this case since 2003 because it believed it was not infringing and the patent was invalid. Microsoft certainly had every right to defend itself.

Nonetheless, Uniloc intends to argue to the jury that Microsoft's defense of this litigation is "evidence" that the alternatives identified by Microsoft were not *bona fide*—essentially that Microsoft litigated out of necessity (having no other options) and not out of a conviction that it was not infringing. The preview from recent depositions is telling:

> Q: Now, if, as you say, you could have theoretically, and would have, moved the clearinghouse from Tukwila to Ireland in 2001, could you explain for me why, after Microsoft has been sued, they have fought this case for over eight years, expending millions upon millions of dollars in legal fees, to avoid moving the clearinghouse?

(Ex. 13, McNerney Deposition at 70:7-13.)

Of course, there is no evidence that Microsoft litigated to "avoid moving the clearinghouse." On the contrary, Microsoft litigated because it believed it was not infringing and the patent was invalid. There should not be a mini-trial on why Microsoft invoked its Constitutional right to defend itself in this lawsuit.

### D.     Argument

A reasonable royalty "derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860,

868 (Fed. Cir. 2010).  At all times, the damages inquiry must concentrate on compensation for

the economic harm caused by infringement of the claimed invention." *Id*. at 869.  As such,

"[a]ny evidence unrelated to the claimed invention does not support compensation for

infringement but punishes beyond the reach of the statute." Id. at 870.

At the hypothetical negotiation, the negotiating parties would have naturally considered

any and all alternatives the defendant has to avoid infringement.  It goes without saying that none

of the alternatives was actually implemented because the negotiation was hypothetical—

Microsoft was not approached with a licensing offer in 2001 and Microsoft did not even know it

was infringing until, at the earliest, the Federal Circuit issued its opinion on January 4, 2011.

Uniloc's theory that Microsoft would have implemented a design change if one was

available that was less than the cost of defense is baseless and highly prejudicial.  The Supreme

Court has recently commented on the disconnect between litigation costs and the value of a case.

"It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless,

be weeded out early in the discovery process … the threat of discovery expense will push cost-

conscious defendants to settle even anemic cases before reaching those proceedings." *Bell

Atlantic Corp. v. Twombly*, 550 U.S. 544, 559-560 (2007).

There is also no *Georgia-Pacific* factor that considers the expected costs of litigation

when evaluating the appropriate reasonable royalty.  *See Georgia-Pacific Corp. v. U.S. Plywood

Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970); *Ariba, Inc. v. Emptoris, Inc.*, 567 F.Supp.2d

914, 917 Fn.2 (E.D. Tex. 2008) ("It has been suggested that the jury be informed that, at the

hypothetical negotiation, … that an inventor could demand a large 'cost of defense' settlement.

This kind of expansion of the *Georgia-Pacific* factors will have to be authorized by a higher

court.")  Accordingly, Microsoft's good faith (and largely successful) defense of this litigation

from 2003 to January 4, 2011 should not—and cannot—lead to an inference that design changes less costly than litigation were not available, or otherwise cast a shadow over the credibility of the design alternatives.  This is particularly true in this case where, as noted above, Uniloc' own technical expert has provided no technical reason why any of Microsoft's alternatives would have been unacceptable.  Lacking any substantive argument whatsoever, the adverse inference Uniloc would have the jury draw based on the fact that Microsoft defended itself is particularly inappropriate.

To support this invalid theory, Uniloc has sought both documents and 30(b)(6) testimony regarding Microsoft's litigation costs, and filed an emergency motion to obtain that information. (Dkt. 493.)  Microsoft has provided this information to Uniloc, but reserved its rights to challenge its admissibility (which it is doing here). This information should not be paraded in front of the jury.

Other Courts have found litigation costs to be wholly irrelevant.  *See, e.g., In re Lorazepam & Clorazepate Antitrust Litig.*, 2001 WL 1795665, at *4 (D.D.C. July 17, 2001). Delving into litigation costs would result in sideshow litigation into all the reasons the parties decided to litigate and all the reasons the litigation costs were what they were. Such an exercise is a waste of the Court's time and unfairly prejudicial to Microsoft.


8.    **Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Concerning Hearsay Research Reports**

A.    **Summary of Issue and Argument**

Uniloc intends to rely on third party research reports that speculate as to the future movement of Microsoft's stock and the expected success of product activation.  These statements are classic hearsay by third party declarants, which Uniloc seeks to offer for the truth of the

matter asserted.  Uniloc has not sought to depose the declarants, who have not been cross-examined, to ascertain the basis for the forward-looking speculation contained in the reports. From the context of the reports, it is clear that the declarants had no personal knowledge on which to base their speculation and certainly possessed no crystal ball that could reveal the future on which they were commenting.  All such statements must be excluded and Uniloc's experts should not be permitted to rely on them.

### B.   Relief Requested

Uniloc should be precluded from adducing evidence or otherwise referring to third party research reports with unsubstantiated hearsay speculation as to future events.

### C.   Background

Plaintiffs' damages expert, Mr. Green, cites numerous third party research reports as "Evidence Regarding Product Activation and the Impact of Software Piracy and Casual Copying on Microsoft's Business."  (Ex. 11, Rule 26(a) Report Regarding Damages Prepared by Philip Green at 22-24.)  These include research reports from Prudential Financial, Buckingham Research, Morgan Stanley, Credit Suisse, and Wachovia Securities.  (*Id*. at 23-24.)  None of these companies was deposed in this case about the statements made in the cited research reports.

Mr. Green relies on these future-looking statements for the following statements:

- "online activation will likely sufficiently reduce the number of pirated copies of Microsoft Office over time" and a "large reduction in piracy could have a significant impact on the revenue growth of Office."  (p. 23.)

- "Microsoft's recent development of Product Activation would help to 'dramatically lower piracy levels' and force a 'meaningful number' of consumers to purchase legal copies." (p. 24.)

- "in discussing the 'stock catalysts' that were impacting Microsoft's share price, Morgan Stanley described how 'success in stamping out piracy is a positive.'"  (p. 24.)

- "[t]o the extent that it can crack down on piracy, the company can generate significant incremental revenue.  It has taken some steps such as product activation, which limits the number of installations of a piece of software (primarily retail/shrink wrap) to the number licensed."  (p. 24)

- "Software Piracy is Costing Billions In Lost Revenue" and "if the product activation technology is successful, it could help to reduce the illegal copying of its core desktop platform."  (p. 24)

### D.    Argument

The third party research reports are hearsay and must be excluded, and in addition, Uniloc's damages expert should not be permitted to rely on the unsubstantiated forward-looking statements in the research reports.

Hearsay is an out of court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801.  The third party research reports are offered for the truth of the matter asserted; indeed, they are cited as "Evidence Regarding Product Activation and the Impact of Software Piracy and Casual Copying on Microsoft's Business."  (Ex.11, Rule 26(a) Report Regarding Damages Prepared by Philip Green at 22-24.)  None of the authors of the research reports was deposed and the jury will never hear testimony from them in court.

There is no way for Microsoft to question the declarants about their views, which are facially not based on personal knowledge.  The third party research reports are classic hearsay and any discussion of them should be excluded under Federal Rule of Evidence 802.  Any discussion of the reports should also excluded from trial under Rule 403 because the probative value of forward-looking statements is substantially outweighed by the danger of unfair prejudice and confusion of the issues. Fed. R. Evid. 403.

Cross examination is not a sufficient safeguard to defend against Mr. Green's reliance on these forward-looking statements.  Once the jury hears these forward-looking statements, the jury will likely give them undue weight, even though they have no probative value whatsoever.

These forward-looking statements are not the sort of data that an expert reasonably relies on as they are facially nothing more than speculation lacking in any scientific rigor.

9. **Microsoft Corporation's Motion In Limine That All Orders And Rulings Excluding Evidence Made In The 2009 Trial Shall Remain In Effect**

   A. **Summary of Issue and Argument**

   Uniloc may attempt to introduce evidence or make arguments that were excluded in the last trial. This case was remanded so that the damages case could be retried, and all evidentiary rulings from the prior trial should apply. Uniloc should not get a "do over" on evidentiary rulings made the first time around or use the remand as an excuse to admit evidence that has already been excluded in this case.

   B. **Relief Requested**

   Uniloc should be precluded from violating any evidentiary ruling from the first trial unless and until this Court expressly changes such ruling.

   C. **Background**

   In the first trial, Judge Smith ruled on the parties' motions *in limine* and made numerous evidentiary rulings during trial. Those rulings remain in force until such time as they are modified by a subsequent court order.

   D. **Argument**

   The upcoming damages trial is a continuation of the first trial and therefore all evidentiary rulings made to date are law of the case. *See Negron-Almeda v. Santiago*, 579 F.3d 45, 51 (1st Cir. 2009) ("Under the law of the case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same

case.") (internal quotation marks and citation omitted); *see also United States v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004); *Ellis v. United States*, 313 F.3d 636, 646 (1st Cir.2002).

**10.    Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Concerning Whether Juries In Other Cases Have Accepted Or Rejected An Expert's Opinions**

### A.    Summary of Issue and Argument

In the 2009 trial, Uniloc asked Microsoft's damages expert whether any other jury had accepted his damages theory.  (Ex. 14, 2009-04-01 Day 8 Trial Tr. at 198:22-25.)  Microsoft objected to that line of questioning.  (*Id*. at 198:22-199:2.)  The Court sustained Microsoft's objection but not before Uniloc was wrongly able to leave an impression that a jury's decision in another case somehow impacts whether Microsoft's expert was correct in this case.  (*See id.*.)

### B.    Relief Requested

Uniloc should be precluded from adducing evidence or otherwise making any reference to whether juries in other cases have accepted or rejected an expert's opinions.

### C.    Background

Uniloc questioned Microsoft's damages experts on whether Microsoft's experts' opinions had been accepted by other juries.  Such questioning is improper and is irrelevant to whether the opinions being expressed at this trial are correct.  For example:

> Q.   Well, you reviewed Napper's.  That was a lump sum theory of three to five million, right? Approximately.
>
> A.   That's my recollection.
>
> Q.   **And the jury didn't buy that one, did they?**

(Ex. 12, 2012-01-23 Deposition of Christopher Vellturo, 53:16-20) (emphasis added.)

> Q. Right. And you told the jury, though, the lump sum would be $2 million, right? $5 million, right?

A. That's correct.

Q. **And the jury didn't buy it.**

MR. DENNING: Objection.

Q. **They gave Lucent 70 million bucks. Rejected your testimony flat out, right?**

(Ex. 15, 2012-01-25 Deposition of Robert Mnookin, 94:7-17) (emphasis added.)

### D.    Argument

Judge Smith's ruling that experts cannot be questioned about whether juries have accepted their opinions in other cases is law of the case in this one, and should be followed in the upcoming trial on damages. *Cohen v. Brown Univ.,* 101 F.3d 155, 167 (1st Cir. 1996) ("The law of the case doctrine precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided.")

Whether a jury has accepted or rejected an expert's opinion in another case does not prove or disprove any issues in this case, and is thus irrelevant. *See Czarnecki v. Home Depot USA, Inc.,* 2009 WL 1706582, *3 (E.D. Pa. June 15, 2009) (holding "another factfinder's acceptance or rejection of an expert's opinion in another case is not relevant to this case.")

Each jury is to independently weigh the testimony of the expert based on the evidence in each respective trial.  This jury did not sit at the prior unrelated trial, and thus has no basis to process or analyze the fact that an expert's opinions were or were not accepted.  For example, the prior jury may have rejected Mr. Napper's lump sum analysis because they were unduly swayed Uniloc's entire market value rule analysis, which the Federal Circuit held was improper and prejudicial:

> This case provides a good example of the danger of admitting consideration of the entire market value of the accused where the patented component does not create the basis for customer demand. As the district court aptly noted, "[t]he $19 billion

cat was never put back into the bag even by Microsoft's cross-examination of Mr. Gemini and re-direct of Mr. Napper, and in spite of a final instruction that the jury may not award damages based on Microsoft's entire revenue from all the accused products in the case."

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011).

If admitted, such evidence would likely cause the jury to find facts based not on the evidence before it, but instead improperly reach a conclusion based on a fragment of information from an unrelated case.  *See Czarnecki* (holding "another fact finder's acceptance or rejection of an expert's opinion in another case … is likely to confuse or mislead the jury.").

## 11.   Microsoft Corporation's Motion In Limine To Limit Uniloc Experts To The Opinions Expressed In Their Respective Reports

### A.   Summary of Issue and Argument

Microsoft understands that it is the practice of this Court to limit expert witnesses to the contents of their reports, and in fact will require page and line numbers to be ready in real time during direct examinations, and thus this Motion may be moot.

However, at the prior trial, Uniloc's technical expert repeatedly attempted to offer opinions that were not contained in his expert report.  The district court therefore limited Mr. Klausner to the opinions expressed in his report, and this Court should do likewise in this remand.  (Ex. 16, 2009-03-25 Day 3 Tr. at 3:3-22:2.)

### B.   Relief Requested

Uniloc's experts should be precluded from offering testimony that is not contained within their respective reports.

## 12.   Microsoft Corporation's Motion In Limine To Preclude Improper Testimony On The Law

### A.   Summary of Issue and Argument

Microsoft's damages expert, Mr. Mnookin, will testify that at the hypothetical negotiation, the negotiating parties would have considered alternatives available to Microsoft to provide product activation, but without infringing the'216 patent.  Uniloc has included in the rebuttal report of Mr. Green an attack on the legal sufficiency of Mr. Mnookin's analysis.  Such an attack should not be aired in front of the jury.  Uniloc may file a Daubert motion challenging the sufficiency of Mr. Mnookin's testimony, but once admitted, that should be the end of it.  Mr. Green should not be making Uniloc's legal challenge to the jury.

### B.    Relief Requested

Uniloc should be precluded from adducing testimony or otherwise making reference to the law of damages that is inconsistent with or beyond what is found in the jury instructions, and from suggesting to the jury that the opinions of Microsoft's experts do not comply with the law of patent damages.

### C.    Background

Mr. Mnookin, who is a world-respected expert in negotiation, will testify that at the hypothetical negotiation, each side would consider the other side's BATNA—the other side's "best alternative to a negotiated agreement."  Mr. Mnookin will explain that both sides would have considered Microsoft's alternatives to reaching a deal, and would have compromised accordingly.  For example, both negotiating parties would have recognized that in 2001, Microsoft could have moved the Clearinghouse to Ireland if faced with an unreasonable royalty demand.

Mr. Green intends to testify that Mr. Mnookin's analysis is **legally** flawed, criticizing Mr. Mnookin for failing to address the *Georgia-Pacific* factors and asserting that a party cannot threaten to leave the table at the hypothetical negotiation. (*See e.g.,* Ex. 4, Supplemental Expert Report of Philip Green at table of contents.)

### D.      Argument

Since "it is the judge's role, not a witness's, to instruct the jury on the law," a district court "has broad discretion to exclude expert opinion evidence about the law that would impinge on the roles of the judge and the jury" or would cause "jury confusion." *Pelletier v. Main St. Textiles*, LP, 470 F.3d 48, 54–55 (1st Cir.2006).  "[P]urely legal questions and instructions to the jury on the law to be applied to the resolution of the dispute before them is exclusively the domain of the judge" and "expert testimony on such purely legal issues is rarely admissible." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997).  The danger in such testimony is that "the jury may think that the 'expert' in the particular branch of the law knows more than the judge—surely an impermissible inference in our system of law."  *Id.* (citation omitted.) Moreover, testimony by experts on purely legal questions "is not helpful to the jury and so does not fall within the literal terms of Fed. R. Evid. 702, which allows expert testimony '[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue … .'"  Id. at 100.

On the merits, Mr. Green's criticisms of Mr. Mnookin's "negotiation theory" are baseless.  The Federal Circuit has repeatedly stated that there is no single, correct test for assessing patent damages.  *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). ("Litigants routinely adopt several approaches for calculating a reasonable royalty."); *Minco Inc. v. Combustion Eng'g, Inc.,* 95 F.3d 1109, 1118 (Fed. Cir. 1996) (fashioning an appropriate damages award depends on the unique economic circumstances of each case); *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576-77 (Fed. Cir. 1989) (same); *Transclean Corp. v. Bridgewood Servs.,* 290 F.3d 1364, 1370 (Fed. Cir. 2002) (same). Microsoft's damages expert, Mr. Mnookin, follows one such approach, negotiation theory, a field he has worked in for decades.

Moreover, the negotiation theory is applicable to *Georgia-Pacific* factor 15, for example, which contemplates both parties "reasonably" and "voluntarily" approaching the negotiation and the ultimate royalty being one that a "prudent licensee" would be willing to pay. *See Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571-72 (Fed. Cir. 1996) ("In contrast, the fact that [accused infringer] COULD have continued marketing the [non-infringing alternative] is a factor relevant to the determination of a proper royalty during hypothetical negotiations. [The accused infringer] would have been in a stronger position to negotiate for a lower royalty rate knowing it had a competitive noninfringing device 'in the wings.'").

*Georgia-Pacific* itself explained that the hypothetical negotiation should be "a marketplace confrontation of the parties" that relies on "any … economic factor that normally prudent businessmen would, under similar circumstances, take into consideration in negotiating a hypothetical license." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970). "In applying the formulation, the Court must take into account the realities of the bargaining table and subject the proofs to a dissective scrutiny." *Id.* at 1122. This negotiation must not take place "in a vacuum of pure logic" – it must instead take into account what any normally prudent businessman would have considered under like circumstances. *Id.* at 1121.

In any event, the legal sufficiency of Mr. Mnookin's testimony is a question for the Court to decide, not the jury, and certainly not Mr. Green.

## 13.   Microsoft Corporation's Motion In Limine To Preclude Evidence Or Argument Regarding Non-Comparable Licenses

### A.   Summary of Issue and Argument

Uniloc intends to introduce, and have its damages expert rely on, three licenses that Uniloc contends evince an established royalty for the '216 patent: the Curious Software license, the MidNet license, and the Xtreamlok license.

However, the licenses between Uniloc and Curious Software and between Uniloc and MidNet are not patent licenses, but software licenses. On this basis alone, they are non-comparable and should be excluded. In addition, no royalties were ever paid under the licenses. The licenses therefore do not evidence an established royalty and thus have little to no probative value. The Curious Software and Midnet licenses should be excluded.

The license between Uniloc and Xtreamlok, which has a royalty of 1%, is not comparable because it is a license to the entire '216 patent, which includes claims with much broader coverage than just claim 19. Because this suit is now limited to claim 19, the Xtreamlok license is not comparable in scope. The Xtreamlok license should be excluded as well.

### B.     Relief Requested

Uniloc should be prohibited from adducing evidence or making reference to non-comparable licenses including those from Curious Software, MidNet, and Xtreamlok.

### C.     Background

In this case, Uniloc intends to introduce and rely upon agreements between it and Curious Software and MidNet that purportedly "favor Uniloc during the hypothetical negotiation." (Ex. 11, Rule 26(a) Report Regarding Damages Prepared by Philip Green at 43-44.) Uniloc asserts that these agreements demonstrate royalties equal to 3 to 5%, and 12.5 to 37.5% respectively.

However, these agreements are not patent licenses. They are software agreements. The subject matter of the Curious Software agreement is "certain proprietary software." The '216 patent is not mentioned. Uniloc's Rule 30(b)(6) witness, Brad Davis, testified that he did not know what software this license referred to. (Ex. 17, Deposition of Bradley Davis at 180:14-

81:22.) There is no basis to conclude that this license was connected to the '216 patent.  The subject matter of the MidNet agreement was "Uniloc software" including "netAnchor."  The '216 patent is not mentioned.

Moreover, Uniloc testified (via Mr. Davis) that Uniloc received no ongoing royalties from either of these two agreements. (Ex. 17, Deposition of Bradley David at 171-172, 178-179.)[11]  Microsoft attempted to subpoena these two companies to find out more about the basis for the royalty, but could obtain no information.  MidNet no longer exists and Curious Software exists in name only—it is a non-operating subsidiary of another company.  (Ex. 18, Letter in response to Curious Software subpoena.)  The parent of Curious Software reported that Curious Software never used any Uniloc technology, which is consistent with Uniloc's own testimony. (Ex. 17, Deposition of Bradley Davis at 178-179 .)

Uniloc also entered into an agreement with Xtreamlok which provided a 1% royalty for a patent license to all 20 claims of the '216 patent.  There is no evidence as to what royalty would have been paid for just claim 19, the sole claim at issue in this case.

**D.    Argument**

1)    <u>The Curious Software and MidNet licenses should be excluded</u>

Both the Curious Software and MidNet licenses should be excluded for two independent reasons.  First, the licenses are not patent licenses.  They are software licenses.  Agreements for software are not comparable and should not be considered when deciding the appropriate reasonable royalty.  A software agreement is not comparable to a patent license even if patent rights are included with the software license.  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 860, 872 (Fed. Cir. 2010).  In reversing and remanding, one issue the Federal Circuit found

---

[11] Uniloc received a one-time development fee from MidNet, but no royalties.

"particularly troubling" was "the extremely high rates in the re-bundling licenses compared with the license on the claimed technology" which the plaintiff's expert used to "inflate his royalty recommendation." *Id*. at 870-71.  A software license is fundamentally different than a naked patent license, and is non-comparable.  A software license provides the licensee with an actual product for which royalties are paid, thus saving considerable design effort by the licensee.  A patent license, on the other hand, would naturally demand much lower royalties because no actual product or turn-key technology is being transferred.  (Ex. 17, Deposition of Bradley Davis at 167:12-169:1, 178-182).  Mr. Green, Uniloc's damages expert, makes no adjustments to his analysis to account for the non-comparability of the licenses.  He simply, and incorrectly, assumes that these are comparable patent licenses rather than software licenses.

Second, the first *Georgia-Pacific* factor "requires considering past and present royalties received" by the patentee for the licensing of the patent in suit.  *ResQNet.com*, 594 F.3d at 868 (emphasis added).  Here, Uniloc received **no** royalties from Curious Software or MidNet.  An agreement with a small company that did not actually use the invention, and that resulted in no royalty payments, is not relevant to the question of whether Microsoft would have paid in excess of a billion dollars for anything, let alone for only claim 19 of the '216 patent, as Uniloc contends.

For example, it is possible that when Curious Software and MidNet did the math, they realized that the royalties were unreasonable and scrapped the projects, if there were any, that used any '216 invention.  Or perhaps both companies entered into the Agreements knowing full well that they were not going to exploit the '216 patent and therefore the precise rates in the agreement were of little consequence.  Unfortunately, both Midnet and Curious Software were small companies that no longer exist and therefore the reasons why an agreement was signed, but

never used, will never be known for sure.  The Midnet and Curious Software agreements have no probative value and their admission would be unduly prejudicial given the undue weight the jury would give the naked royalty rates.

2)   The Xtreamlok License Is Not Comparable

Unlike the Curious Software and MidNet licenses, the Xtreamlok license is directed to the '216 patent.  However, the license, which has a 1% royalty rate applied to product sales, provides rights to all 20 claims of the '216 patent.  Here, the only claim that Microsoft was found to infringe is claim 19.  This is a single claim drawn to a "remote registration station" which is not even a product Microsoft sells.  More fundamentally, the royalty obligation under the Xtreamlok license is triggered only when a product embodying a claim of the patent is sold.  There is no royalty obligation at all if Xtreamlok merely uses the claimed invention.  (Ex. 17, Deposition of Bradley Davis, 159-161.)  Uniloc's damages theory here is entirely use-based:  per Uniloc, Microsoft must pay a royalty every time it uses the infringing Clearinghouse in the United States.  There is absolutely nothing comparable in the Xtreamlok license.  There is thus no basis for Mr. Green to use the 1% royalty rate on product sales as an appropriate baseline for a reasonable royalty for only claim 19 that applies here only to something (the Clearinghouse) not sold.  "The first *Georgia-Pacific* factor … must consider licenses that are commensurate with what the defendant has appropriated.  If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question."  *ResQNet,* 594 F.3d at 871-72 (emphasis added).

**14.   Microsoft Corporation's Motion in Limine To Preclude Any Suggestion That Microsoft Copied or that Microsoft's Infringement Was Willful Or That Microsoft Lacked An Objectively Reasonable Basis To Believe Claim 19 Was Not Infringed And/Or Invalid**

### A.     Summary of Issue and Argument

In the liability phase of this case, the District Court already ruled that Microsoft did not copy claim 19, and that Microsoft's infringement was not willful.  The District Court found that Uniloc failed to prove both prongs of willful infringement; it did not show that Microsoft lacked an objectively reasonable basis to believe that claim 19 was not infringed and/or was invalid, and it also failed to show that Microsoft knew or should have known about a risk of infringement. Accordingly, the District Court granted judgment as a matter of law that Microsoft did not willfully infringe.  *Uniloc USA, Inc. v. Microsoft Corp.*, 640 F.Supp.2d 150, 176-79 (D.R.I. 2009).  In so doing, the Court held that no reasonable jury could find that Microsoft knew about and copied Uniloc's invention.  *Id.* at 177-79.  The Federal Circuit affirmed the judgment of no willful infringement.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d at 1311.  Uniloc should not suggest otherwise in this damages trial.

### B.     Relief Requested

Uniloc should be precluded from adducing evidence or otherwise making reference to any alleged "copying" of the invention by Microsoft or to any alleged willfulness.  Indeed, Uniloc should be precluded from making any suggestion that Microsoft lacked an objectively reasonable basis to believe claim 19 was not infringed and/or invalid.

### C.     Background

Uniloc's attempts to prove that Microsoft willfully infringed claim 19 failed on all fronts. The District Court found that Uniloc presented a "dearth of clear and convincing evidentiary support" on the objective prong of the willfulness inquiry.  640 F.Supp.2d at 176-77.  The Court rejected Uniloc's argument that Microsoft's litigation conduct showed an objectively high likelihood of infringement and found that "the entire course of this litigation" showed that no such objectively high likelihood existed.  *Id.*  The district court flatly rejected Uniloc's purported

evidence as insufficient to support finding a knowing risk of infringement.  *Id.* at 177-78.  The Court likewise rejected Uniloc's theory that the jury could have found Microsoft knew of the '216 patent because the patent was cited in the 1999 prosecution history of a Microsoft patent unrelated to product activation.  The district court called this theory "a non-starter."  *Id.* at 178.

As to the subjective prong of the willfulness inquiry, the District Court likewise flatly rejected as insufficient to support the verdict Uniloc's alleged evidence that Microsoft knew about and copied claim 19.  *Id.* at 177-79.   The Court found Uniloc's purported evidence that it had presented a concept to Microsoft for evaluation in 1993 insufficient to support a finding of a knowing risk of infringement.  *Id.* The Court likewise rejected Uniloc's theory that the jury could have found Microsoft knew of the '216 patent for the purposes of a willfulness finding because the patent was cited in the 1999 prosecution history of a Microsoft patent unrelated to product activation.  *Id.*, 178.

The district court likewise rejected each piece of evidence Uniloc offered in support of its copying theory.  *Id.* at 178-79.  Nothing in the testimony of the inventor of the '216 patent, Mr. Ric Richardson, showed that Microsoft had copied anything from Uniloc.  *Id.* at 179.  The testimony of Microsoft's employee on which Uniloc relied was likewise "a far cry from proving Mr. Pearce located, much less copied, some idea or design in claim 19 from a software company halfway around the world in Australia."  *Id.*  "In sum," the District Court concluded, "vast and overlapping evidentiary gaps doomed Uniloc's disjointed willfulness presentation from the start."  *Id.*  The Federal Circuit affirmed the judgment of no willfulness.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310-11 (Fed. Cir. 2011).

### D.    Argument

Under the law of the case, the Court's willfulness findings remain in effect.  *See Negron-Almeda v. Santiago*, 579 F.3d 45, 51 (1st Cir. 2009) ("Under the law of the case doctrine, when a

court decides upon a rule of law, that decision should continue to govern the same issues in

subsequent stages in the same case.") (internal quotation marks and citation omitted).

Here, the district court expressly found that Microsoft did not willfully infringe the '216

Patent.  It considered Uniloc's copying allegations and rejected them, holding no reasonable jury

could have found that Microsoft copied the invention.  The Federal Circuit affirmed the district

court's willfulness ruling.  Accordingly, the decision on willful infringement and copying made

at the judgment as a matter of law stage remains the law of the case.

Thus, any discussion, questioning, or argument suggesting (1) that Uniloc presented a

"concept" related to its patent application to Microsoft in 1993; (2) that the '216 patent was cited

in the prosecution history of a 1999 Microsoft patent application; and/or (3) that Microsoft

copied anything from the '216 patent; and/or (4) that Microsoft lacked an objectively reasonable

basis for its belief that claim 19 was not infringed and/or invalid should be wholly excluded from

the damages trial because the district court in the liability phase has already determined that there

is insubstantial evidence to support such allegations.  Moreover, any such discussion of copying

and willfulness is irrelevant to any issue remaining to be litigated and unduly prejudicial to

Microsoft.[12]


**15.    Microsoft Corporation's Motion in Limine To Preclude Any Suggestion That A Study of The '216 Patent Is Necessary To Evaluate the Damages Issues**

      **A.    Summary of Issue and Argument**

---

[12] In light of the affirmed judgment of no willfulness, Microsoft will also seek a jury instruction that Microsoft at all times had an objectively reasonable basis for believing the '216 patent was not infringed and/or invalid.

Microsoft asserts that at the hypothetical negotiation, the parties would have considered various non-infringing alternatives to the Clearinghouse found to infringe.  The discussion of these alternatives does not require an in-depth knowledge of the '216 patent, other than what appears in the rulings from this Court and the Federal Circuit.  Nonetheless, Uniloc questioned Microsoft's technical expert as to the amount of time spent reviewing the '216 patent, and implying that the review was insufficient to support his opinions.  Because an in-depth review of the '216 patent was not required, all such questions should be precluded.

### B.    Relief Requested

Uniloc should be precluded from questioning Microsoft witnesses about the amount of time spent reviewing or studying the '216 patent or suggesting that a study of the '216 patent is necessary to evaluate the damages issues.

### C.    Background

The liability phase is concluded, and the Clearinghouse (and only the Clearinghouse) was held to infringe claim 19.  Therefore, the question at the upcoming damages trial is the proper reasonable royalty due for that infringement.  Questions of claim construction and the scope of claim 19 are no longer at issue and therefore the details from the specification of the '216 patent are largely irrelevant.

For example, Microsoft has retained Dr. Sherman, a cryptology expert, who has concluded that certain technical design changes would not compromise the security of Product Activation and would thus be acceptable to Microsoft.  His opinions do not depend on the details of the '216 patent (other than claim 19 itself).  Nonetheless, Uniloc questioned Microsoft's technical expert on the amount of time he spent reviewing the '216 patent, and implied that his

review (about 8 hours) was not sufficient to support his opinions.  (Ex. 19, Deposition of Alan Sherman at 50-51, 191.)[13]

### D.   Argument

Having little else to impugn the credibility of Dr. Sherman, Uniloc would like to suggest to the jury that Dr. Sherman's opinions regarding the security of design alternatives is suspect because he has not spent days studying the '216 patent.  However, the details of the '216 patent are not relevant to Dr. Sherman's analysis (other than the text of claim 19 itself).  Dr. Sherman will not be discussing the scope of the '216 patent other than to note that it is established in this case that the hash used with the RSA digital license corresponds to the term "licensee unique ID" in the claim and that its removal would result in non-infringement (a point that is not disputed). This conclusion flows from the ruling of the Federal Circuit in the last appeal, and not from a "study" of the patent.

Thus, the time spent "studying" the '216 patent is not relevant.  Uniloc may wish to ask other Microsoft witnesses how long they have studied the patent in an attempt to create the specter that such a study is necessary.  Because a "study" of the '216 patent is not required to address the issues in the damages trial, Uniloc should not be asking Microsoft witnesses how long they have spent reviewing the '216 patent.

### 16.   Microsoft Corporation's Motion in Limine To Preclude Trial Preparation Communications Protected Under F.R.Civ.P. 26(b)(4)

### A.   Summary of Issue and Argument

---

[13] Uniloc asked similar questions of Mr. Vellturo, another Microsoft expert.

An expert report cannot be written in a vacuum and therefore it is typically, if not always, the case that an expert must work in conjunction with counsel to prepare an expert report. The 2010 amendments to the Federal Rules recognize this fact and also recognize the mischief that opposing counsel may make of this routine fact. Therefore, Rule 26 was amended in 2010 to extend protections to (1) drafts of expert reports, and (2) communications with counsel concerning the preparation of the expert report (subject to three explicit exemptions).

Nonetheless, Uniloc spent a considerable part of its deposition of Dr. Sherman asking—over Microsoft's repeated objections—about communications with counsel and the preparation of the expert report.

All such questioning, with respect to any of Microsoft's witnesses, should be excluded from trial. The bases for Dr. Sherman's opinions are stated in his report, and the manner in which the report was prepared and the number of times counsel for Microsoft spoke to Dr. Sherman are irrelevant.

### B.     Relief Requested

Uniloc should be precluded from questioning Microsoft's experts about preparation of drafts of their expert reports or their communications with Microsoft counsel on topics outside the specific exclusions of Rule 26(b)(4)(C)(i-iii).

### C.    Background

At the deposition of Microsoft's experts, Uniloc inquired into the preparation of draft

expert reports and the communications between Microsoft's counsel and its experts.  For

example, at the deposition of Dr. Sherman, Uniloc asked how many times he had met with

counsel for Microsoft in person and how many telephone conversations he had had with counsel

for Microsoft.  (Ex. 19, Deposition of Alan Sherman at 29-38.)  Uniloc also inquired as to "who

wrote" various paragraphs and sentences in the report

> Q.  Okay.  And then you said "The Appeals Court found that Microsoft's
>     Clearinghouse infringed Claim 19."
>
> A.  Yes, I wrote that.
>
> Q.  You wrote that?
>
> A.  Yes, I wrote that.  I'm aware of Claim 19.
>
> Q.  I'm not asking you where. You wrote that the Court, the Federal Circuit, held
>     that the Clearinghouse infringed 19?
>
> A.  Yes.  I wrote a sentence like that, and it was edited by [an attorney with Fish
>     & Richardson] or somebody else from the lawyers.

 (Ex. 19, Deposition of Alan Sherman at186:5 to 186:16.)  Another example:

> Q.  Now, Paragraph 13, who wrote that one about what the Court.  The district
>     court I assume you're talking about.  Who wrote that one?
>
> A.  The initial draft of that paragraph was initially written by [an attorney with
>     Fish & Richardson].
>
> Q.  Okay.  Did you even read the October 14th order by Judge Young before you
>     started this thing?
>
> A.  That's the District Court ruling?
>
> Q.  Yes.
>
> A.  I've seen that, yes.
>
> Q.  Before you signed this document?

A.   Yes.

(*Id.* at 191:16-192:3.)  Uniloc posed similar questions for a number of other paragraphs in the

Report delving into the lawyers' involvement in drafting the report.  In fact, large portions of the

deposition dealt with the preparation of the report and communications with counsel.

Counsel for Uniloc's purpose was clear—Uniloc will ask the jury to draw an

impermissible adverse inference from the existence of protected counsel-expert communications:

I'm simply asking for a number [of attorney-expert conferences].  **We'll let the jury decide what you guys are talking about, all right**?"

(*Id.* at 35:24-36:2) (emphasis added).

## D.   Argument

"In December 2010, Rule 26 was amended to address the undesirable effects of routine

discovery into attorney-expert communications."  *Sara Lee Corp. v. Kraft Foods Inc.*, 273

F.R.D. 416, 418-21 (N.D.Ill. 2011) (denying expert discovery into attorney-expert

communications).  The new Rule 26(b)(4) states that protected materials now include the report

drafting process and communications between attorneys and retained experts:

(1)   "[D]rafts of any report or disclosure required under Rule 26(a)(2)(B), regardless of the form in which the draft is recorded."

(2)   "[C]ommunications between the party's attorney and any witness required to provide a report under Rules 26(a)(2)(B), regardless of the form of the communications , except to the extent that the communications" relate to (i) compensation, (ii) data provided by the attorney and considered by the expert, and (iii) assumptions provided by the attorney and relied upon by the expert.

The rule was amended to allow attorneys to interact with retained experts "without fear of

exposing those communications to searching discovery." (Advisory committee notes to the 2010

amendments to Rule 26.)  Uniloc delved into forbidden territory over the objection of

Microsoft's counsel concerning the report drafting process.  Whether a lawyer initially drafted a

paragraph after consulting with an expert or whether a lawyer provided edits after a paragraph was written by an expert is now off limits under the new rules.  Such questions necessarily seek information about draft reports and the communications between counsel and expert.  They should not have been asked in the first place.  Who drafted what paragraphs is not relevant to the substance of the opinions expressed in the report.  Nor is there any obligation for an expert to type his own report.  Dr. Sherman clearly testified that "the report reflects my ideas." (Ex. 19, Deposition of Alan Sherman at 78:22-23).  Questioning about the report drafting process should be excluded under Fed. R. Civ. P. 26(b)(4) and FRE 402 and 403.

.

Dated:  January 30, 2012                     FISH & RICHARDSON P.C.

                                    By:  */s/ Kurt L. Glitzenstein*_____

Mary C. Dunn #6712
(mcd@blishcavlaw.com)
Joseph V. Cavanagh, Jr. #1139
(jvc@blishcavlaw.com)
**BLISH & CAVANAGH LLP**
Commerce Center, 30 Exchange Terrace
Providence, RI 02903
Telephone:  (401) 831-8900
Facsimile:  (401) 751-7542

Frank E. Scherkenbach
(scherkenbach@fr.com)
Kurt L. Glitzenstein (glitzenstein@fr.com)
**FISH & RICHARDSON P.C.**
One Marina Park Dr.
Boston, MA 02210
Telephone:  (617) 542-5070
Facsimile:  (617) 542-8906

Laura R. Braden
(braden@fr.com)
**FISH & RICHARDSON P.C**.
1425 K St., N.W. 11th Floor
Washington, DC 20005-3500
Telephone:  (202) 783-5070
Facsimile:  (202) 783-2331

John W. Thornburgh
(thornburgh@fr.com)
**FISH & RICHARDSON P.C.**
12390 El Camino Real P.C.
San Diego, CA 92130
Telephone:  (858) 678-5070
Facsimile:   (858) 678-5099

Matthew D. McGill
(mmcgill@gibsondunn.com)
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave., NW
Washington, DC 20036
Telephone:  202-955-8500

**ATTORNEYS FOR DEFENDANT
MICROSOFT CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that MICROSOFT CORPORATION'S MEMORANDUM IN SUPPORT OF ITS OMNIBUS MOTIONS IN LIMINE filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 30th day of January, 2012.

*/s/ Kurt L. Glitzenstein*
Kurt L. Glitzenstein