# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| UNILOC USA, INC., and <br> UNILOC SINGAPORE PRIVATE LIMITED <br><br> Plaintiff, <br><br> v. <br><br> MICROSOFT CORPORATION <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     C.A. No. 03-cv-0440 <br> ) <br> ) <br> ) <br> ) <br> ) |

## SUPPLEMENTAL EXPERT REPORT OF PHILIP GREEN

Privileged & Confidential – For Attorneys' Eyes Only

## **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ..................................................................................................1

II. PROFESSIONAL QUALIFICATIONS AND COMPENSATION .........................................1

III. SUMMARY OF SUPPLEMENTAL OPINIONS.....................................................................1

**SUPPLEMENTAL OPINION I – A HYPOTHETICAL NEGOTIATION BETWEEN UNILOC AND MICROSOFT FOR THE USE OF THE '216 PATENT WOULD HAVE OCCURRED IN EARLY 2001. THIS NEGOTIATION WOULD HAVE RESULTED IN A REASONABLE ROYALTY RATE OF $4.00 PER ACTIVATION.** .....................................................................................................................1

**SUPPLEMENTAL OPINION II –THE CONCLUSIONS REGARDING DAMAGES PRESENTED IN THE REPORT OF MR. ROBERT MNOOKIN DO NOT FOLLOW ESTABLISHED METHODOLOGIES, ARE UNSUPPORTED, AND ARE NOT CONSISTENT WITH THE FACTS OF THIS MATTER.** ..........................2

**SUPPLEMENTAL OPINION III – PORTIONS OF THE VELLTURO REPORT ARE INCORRECT AND FAIL TO ANALYZE THE UNDERLYING FACTS OF THIS MATTER PROPERLY.** ....................................2

IV. SUPPLEMENTAL OPINIONS AND RELATED SUPPORT ................................................2

**SUPPLEMENTAL OPINION I – A HYPOTHETICAL NEGOTIATION BETWEEN UNILOC AND MICROSOFT FOR THE USE OF THE '216 PATENT WOULD HAVE OCCURRED IN EARLY 2001. THIS NEGOTIATION WOULD HAVE RESULTED IN A REASONABLE ROYALTY RATE OF $4.00 PER ACTIVATION.** .....................................................................................................................2

    A.   MICROSOFT'S ASSERTED NON-INFRINGING ALTERNATIVES................................................3
        1.   Using the "Old" LVP System, Removing the Hash and Using A Hash-less Telephone Activation Are Not Available Acceptable Non-Infringing Alternatives. ................................................................3
        2.   The Cost of Eliminating Internet Activation and Expand the Existing Use of Telephone Activations Results Is Consistent With a $4 per Activation Royalty ................................................................4
        3.   Relocating the Clearinghouse To Ireland Has Not Been Demonstrated to be an Acceptable Non-infringing Alternative ................................................................5
    B.   CONCLUSIONS REGARDING THE IMPACT OF MICROSOFT'S ASSERTED NON-INFRINGING ALTERNATIVES ON UNILOC'S REASONABLE ROYALTY DAMAGES................................................9

**SUPPLEMENTAL OPINION II –THE CONCLUSIONS REGARDING DAMAGES PRESENTED IN THE REPORT OF MR. ROBERT MNOOKIN DO NOT FOLLOW ESTABLISHED METHODOLOGIES, ARE UNSUPPORTED, AND ARE NOT CONSISTENT WITH THE FACTS OF THIS MATTER.** ..........................9

    A.   THE MNOOKIN REPORT DOES NOT FOLLOW ESTABLISHED METHODOLOGY TO DETERMINE REASONABLE ROYALTY DAMAGES IN A PATENT INFRINGEMENT ACTION................................................9
    B.   THE HYPOTHETICAL NEGOTIATION DIFFERS FROM THE APPROACH FOLLOWED IN THE MNOOKIN REPORT ..10
    C.   UNILOC'S "RESERVATION PRICE" IS NOT MEASURED OR ADEQUATELY CONSIDERED .................11
    D.   THE ANALYSIS DOES NOT CONSIDER THAT MICROSOFT HAD ALREADY EVALUATED ITS NEXT BEST ALTERNATIVE................................................11
    E.   THE OPINION IS NOT BASED ON RIGOROUS FINANCIAL ANALYSIS THAT EVALUATES THE BENEFIT OF THE USE OF THE TECHNOLOGY................................................12
    F.   VALUATIONS OF UNILOC DO NOT ESTABLISH ITS "RESERVATION PRICE"................................................12
    G.   THE MNOOKIN REPORT DOES NOT INCLUDE A COMPLETE ANALYSIS OF UNILOC'S LICENSES................13
    H.   THE ANALYSIS ASSUMES THAT MICROSOFT AND UNILOC WOULD HAVE NEGOTIATED A LUMP SUM ROYALTY WITHOUT PROVIDING ADEQUATE SUPPORT................................................13
    I.   THE MNOOKIN REPORT ACCEPTS MICROSOFT'S ASSERTED NON-INFRINGING ALTERNATIVES WITHOUT INDEPENDENT ANALYSIS................................................14
    J.   THE MNOOKIN REPORT DOES NOT MEASURE A DAMAGE ................................................14

**SUPPLEMENTAL OPINION III – PORTIONS OF THE VELLTURO REPORT ARE INCORRECT AND FAIL TO ANALYZE THE UNDERLYING FACTS OF THIS MATTER PROPERLY.** ....................................15

A.   MICROSOFT'S ESTIMATES OF THE BENEFITS OF PRODUCT ACTIVATION PROVIDE A REASONABLE BASIS TO MEASURE THE BENEFITS OF THE USE OF THE PATENTED TECHNOLOGY ..................................................................15
   1.   *The Measurements of the Benefit of Product Activation in the Pilot Studies Apply to the Infringing Technology* ..................................................................15
   2.   *The Date of the Hypothetical Negotiation Was Agreed to By the Parties* ..............................15
   3.   *Microsoft's Management Used the Results of the Pilot Studies to Operate its Business* ........15
   4.   *The Vellturo Report's Criticisms of Microsoft's Pilot Studies are Unsupported* ...................16
B.   THE VELLTURO REPORT DOES NOT PROPERLY MEASURE RETURNS FROM USE OF THE PATENTED TECHNOLOGY ..................................................................17
   1.   *The Appropriate Measure of Benefit is the Value of the Incremental Profits Earned From its Use* ......17
   2.   *Microsoft Effectively Earned Incremental Operating Profits from the Use of the Patented Technology of at least 3.25% of Sales* ..................................................................19
C.   THE WEIGHTED AVERAGE COST OF CAPITAL ("WACC") IS THE RELEVANT AND APPROPRIATE MEASURE OF MICROSOFT'S NORMAL RATE OF RETURN ..................................................................20
   1.   *Microsoft's WACC is the Appropriate Measure to Apply to Determine Microsoft's Excess Returns* ....21
   2.   *My Discounted Cash Flow Calculations Properly Value the Range of Potential Royalties That Microsoft Could Pay Uniloc* ..................................................................22
D.   THE VELLTURO REPORT'S CONCLUSIONS RELATED TO UNILOC'S LICENSES ARE INCORRECT. ..................24
   1.   *The Vellturo Report's Treatment of Uniloc's Ordinary Course Licenses is Logically Inconsistent* ......24
   2.   *The Analysis of Uniloc's Ordinary Course License Agreements is Not Consistent with the Facts of This Matter.* ..................................................................25
   3.   *Uniloc's Settlement Agreements* ..................................................................27
E.   THE VELLTURO REPORT'S CONCLUSIONS REGARDING MICROSOFT'S LICENSES ARE INCORRECT ..................28
   1.   *Microsoft's Licenses for Anti-Piracy Technologies are Relevant to the Hypothetical Negotiation.* ......29
   2.   *The Analysis of Microsoft's Licenses for Anti-Piracy Technologies are Unsupported and Not Consistent with the Facts* ..................................................................30
F.   VALUATIONS OF UNILOC DO NOT INCLUDE THE VALUE OF DAMAGES FROM POTENTIAL INFRINGERS OR OTHER GAIN CONTINGENCIES ..................................................................32
G.   THE VELLTURO REPORT'S CRITICISMS REGARDING THE BARGAINING RANGE ARE UNSUPPORTED ..............34
H.   A ROYALTY RATE OF $4.00 PER INFRINGING ACTIVATION IS REASONABLE ..................................................34
   1.   *The Rate is Reasonable Compared to Microsoft's Incremental Revenues from Use of the Invention* ...34
   2.   *The Rate is Reasonable Compared to Microsoft's Incremental Profits from the Use of the Invention*..35
   3.   *The Rate is Reasonable Compared to Microsoft's Incremental Operating Profits from the Use of the Invention* ..................................................................35
   4.   *The Rate is Reasonable Compared to Uniloc's Licenses for its Patented Technology* ..................35
   5.   *The Rate is Reasonable Compared to Value of the Patented Technology to Microsoft's Business* ......36

V.   **POST-JUDGMENT ROYALTIES** ..................................................................36

VI.  **PREJUDGMENT INTEREST** ..................................................................36

VII. **EXHIBITS** ..................................................................37

Privileged & Confidential – For Attorneys' Eyes Only

I. **Preliminary Statement**

I have been retained by Hayes Bostock & Cronin LLC, counsel for Uniloc USA, Inc. and Uniloc Singapore Private Limited ("Uniloc") to provide an independent and objective opinion of the damages suffered by Uniloc as a result of Microsoft Corporation's ("Microsoft") infringement of United States Patent No. 5,490,216 ("the '216 patent").[1] I also have been asked to respond, if necessary, to any reports on damages submitted on behalf of Microsoft in this matter.

My initial report in this matter was submitted on September 9, 2011 ("Initial Report"). I submitted a second report on October 28, 2011 (collectively, the "Initial Reports"). Microsoft's reports on damages are presented in the reports of Mr. Robert Mnookin, dated December 9, 2011 ("the Mnookin Report"), Dr. Christopher Vellturo, dated December 9, 2011 ("the Vellturo Report") and Dr. Alan T. Sherman, dated December 8, 2011 ("the Sherman Report").[2]

Since issuing my Initial Reports, in addition to the Mnookin, Vellturo and Sherman reports, I have received additional documents. Supplemental Exhibit A is a list of the documents and other information that I have received since issuing my Initial Reports.

This analysis incorporates, by reference, my Initial Reports, including the assumptions, documents considered, and analyses discussed therein. Should any additional documents or information become available to me that affect any of the conclusions or opinions in this, or my Initial Reports, I may supplement or amend my analyses as appropriate.

II. **Professional Qualifications and Compensation**

My resume and a list of cases in which I have given testimony either in deposition or at trial over the past four years were attached to my Initial Report. My firm, Hoffman Alvary & Company LLC, is being compensated at the rate of $425 per hour for my work on this engagement. My firm's compensation is not affected by the outcome of this matter.

III. **Summary of Supplemental Opinions**

Based on my background, training and experience, as well as the documents and other information I have reviewed to date in this matter, I have formed the following supplemental opinions:

> **Supplemental Opinion I – A hypothetical negotiation between Uniloc and Microsoft for the use of the '216 patent would have occurred in early 2001. This negotiation would have resulted in a reasonable royalty rate of $4.00 per activation.**

---

[1] Throughout this report, the '216 patent may be referred to as the "patent-in-suit."
[2] Collectively, these reports may be referred to as "Microsoft's damages reports," "Microsoft's damages analysis," "Defendant's damages reports," or "Defendant's damages analyses."

"Activation servers [are] in [a] secure facility in [the] US" and that the "data [is] secure per privacy/consumer protection laws."[27]

Moreover, internal Microsoft correspondence from January 2004 confirms that Microsoft would not have found it acceptable to locate the clearinghouse outside of the United States. In this internal correspondence, Mr. Greg Peiker, the Manager of the Product Activation Group at Microsoft, was asked to confirm whether certain statements were accurate prior to their inclusion in a presentation to other Microsoft personnel. Among the facts "checked" by Mr. Peiker were statements describing how locating the infringing clearinghouse in the United States was in compliance with Microsoft's policies. Specifically, next to the statement "Activation servers in secure facility in US," Mr. Peiker wrote: "Yes, complies with all MSFT policy." (emphasis added) In addition, in response to the statement "data secure per privacy/consumer protection laws," Mr. Peiker responded: "Yes, we are in compliance with all MSFT security, privacy, and accessibility guidelines." This internal Microsoft document shows that locating the infringing clearinghouse outside of the United States could have been against Microsoft's policies, and therefore may not have been an acceptable alternative to locating the clearinghouse in the United States.[28]

Lastly, other internal Microsoft documents show the emphasis that Microsoft placed on both safeguarding the information stored in the infringing clearinghouse and the details of how the clearinghouse functioned. For example, internal correspondence in June 2002 from Mr. Allen Nieman, Microsoft's Technical Product Manager of Windows Product Activation, states that "right now one of the biggest leverages we have against the pirates is that they do not know anything about our back end. To the extent that we partner with a 3rd party in China to maintain an activation clearinghouse center, we will have to disclose our back end to them. I am extremely hesitant to do this."[29] The strategic importance of both the data stored in the infringing clearinghouse and the specifics of how it operates indicates that Microsoft placed a high value on keeping the infringing clearinghouse in a safe, secure environment that it could easily control and manage. Throughout the past decade, Microsoft has repeatedly decided that the data center in Tukwila, Washington, which is only miles from its corporate headquarters in Redmond, is the location that best serves this need.

> iv. *There is No Evidence that Locating the Infringing Clearinghouse in Ireland Would Have Been Acceptable to Microsoft's Customers*

When Product Activation was introduced in early 2001, many of Microsoft's customers expressed significant concerns over providing Microsoft with personal information regarding their computer. In fact, the articles cited in the Vellturo Report show that concerns over privacy were the first factor cited by customers that were critical of Product Activation.[30] There is no evidence that these customers would have found it acceptable to have the data collected during Product Activation stored outside of the United States.

---

[27] MS-U 175944. Similar statements are made in a presentation dated January 30, 2011. See MS-U 00905453.
[28] MS-U000391084
[29] MS-U 284321.
[30] Vellturo Report, p. 68, citing *PC Magazine*, August 1, 2001, "Readers to Microsoft: Copy Controls? No Way!"

It is worth noting that Mr. Mnookin does not consider any of the other purportedly acceptable non-infringing alternatives to be Microsoft's best alternative (BATNA).  These alternatives are dismissed by Mr. Mnookin even though they are asserted to be less costly.

The Mnookin Report does not meaningfully consider the *Georgia-Pacific* factors, which provide insights into the parties' commercial relationship, licensing histories, the profitability of the products incorporating the patented technology, or the extent to which Microsoft incorporated the patented technology throughout the period of infringement.  The analysis presented offers no conclusions regarding how these factors would impact the parties' relative bargaining strengths, or how they would influence the outcome of the hypothetical negotiation.

      B.  <u>The Hypothetical Negotiation Differs from the Approach Followed in the Mnookin Report</u>

In a hypothetical negotiation for a patent license it is understood that:

    a) The parties must reach agreement;
    b) Infringement and validity of the patent(s)-in-suit are already determined; and
    c) The purpose of the negotiation is to determine a royalty that compensates for infringement of a patent, i.e. it measures a damage.

The approach followed in the Mnookin Report suggests that the parties do not have to reach agreement.  For example, the Mnookin Report indicates that: "The maximum you will pay in a negotiation always requires an assessment of your alternatives away from the negotiating table."[33]  In the hypothetical negotiation construct, there is no option to walk away from the negotiating table.  Accordingly, the results are logically different than those that would result from an analysis of BATNA.

The Mnookin Report further explains that the BATNA analysis hinges on the possibility of not reaching an agreement: "At what dollar price would I be indifferent between making a deal at the negotiating table or instead pursuing my BATNA? This amount is known as the 'reservation price.' Computing it requires that one analyze how well the BATNA serves one's interests in comparison to how well one's interest would be served if the negotiation succeeds."[34]  Again, the hypothetical negotiation construct requires that the negotiation succeed.  The infringer's potential "indifference" to making a deal is irrelevant.

The BATNA analysis also does not consider that validity and infringement have already been determined.  The infringer is therefore paying a royalty that measures a damage which is intended to compensate the patent holder for the use of the technology made by the infringer.  The BATNA analysis as presented in the Mnookin Report only evaluates Microsoft's indifference point: it does not consider that Microsoft has been found to infringe a valid United States patent.

Assume, for example, that the potential infringer had two options:

---

[33] Mnookin Report, p. 16.
[34] Mnookin Report, p. 13.

Privileged & Confidential – For Attorneys' Eyes Only          10

## Microsoft's Incremental Revenues and Profits From Infringing Activations
*Fiscal Years Ended June 30, Unless As Noted*

*BASED ON "LATER" MICROSOFT ESTIMATES*

| Period | Total Accused Product Revenues [1] | Infringing Activations [2] | Incremental Revenues Per Activation [4] | Incremental Operating Profits Per Activation [4] | Incremental Revenues from Infringing Activations | Incremental Operating Profits from Infringing Activations |
|---|---|---|---|---|---|---|
| March - June 2001 | **REDACTED** | | | | **REDACTED** | |
| 2002 | | | | | | |
| 2003 | | | | | | |
| 2004 | | | | | | |
| 2005 | | | | | | |
| 2006 | | | | | | |
| 2007 | | | | | | |
| 2008 | | | | | | |
| 2009 | | | | | | |
| 2010 | | | | | | |
| 2011 | | | | | | |
| July - Dec. 2011 | | | | | | |

**Damages Period:**
**Oct. 2003 - Dec. 2011**

| Royalty of $4.00 Per Infringing Activation | **REDACTED** | |
|---|---|---|
| *As a % of Incremental Revenues from Infringing Activations* | | **REDACTED** |

*Confidential - Attorney's Eyes Only*