IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNILOC USA, INC. and<br>UNILOC SINGAPORE PRIVATE LTD.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br>    Defendant. | Civil Action No. 03 440 (WGY) |

## MICROSOFT CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY OF PHILIP GREEN

## I.     INTRODUCTION

In the upcoming trial, Uniloc, through its damages expert, Philip Green, plans to ask the jury for an award of ***$3.6 billion*** in damages, nearly ten times higher than the $388 million award previously rejected by the Federal Circuit.  Uniloc is able to get to this number only by having Mr. Green apply flawed methodologies and reach unreliable conclusions that are improper for presentation to the jury at trial.

The Court is entrusted with a special obligation under Federal Rule of Evidence 702 to scrutinize purported "expert testimony" to ensure that a party does not offer, in the guise of expertise, opinions that are "irrelevant or do not result from the application of reliable methodologies or theories to the facts of the case."  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The Court's gatekeeping function under Rule 702 is crucial to preventing parties from

misleading juries with so-called "expert" opinion that is methodologically unsound or inconsistent with the facts of record in the case.

Mr. Green calculates damages on the basis of so-called "incremental" revenue he contends Microsoft would not have made had it not used its infringing clearinghouse. His estimates of incremental revenue are based on pilot studies Microsoft conducted before implementing the clearinghouse the Court has found to infringe in this case. Using those incremental revenues, he derives his damages estimates using two approaches. First, he applies an alleged "analytical method" to calculate damages based on Microsoft's purported benefits from the use of claim 19 of the '216 patent. This calculation yields damages ranging from $626 million to $3.6 billion. Second, he undertakes an alleged *Georgia-Pacific* analysis based on the same estimates of incremental revenue, which results in a supposed reasonable royalty (according to him) of $4 per activation, or approximately $1.1 billion.

Mr. Green's opinions fail the *Daubert* test on multiple independent grounds. First, his entire analysis improperly assumes that the damages in this case should be based on hundreds of millions of individual activations of Microsoft software products that do not infringe the '216 patent, rather than based on the clearinghouse actually found to infringe. In fact, at deposition he testified that the Court's October 14, 2011, order did not affect his calculations because he believes the clearinghouse to be the "heart of Microsoft's product activation system." (Green Dep., at 10-15.) As a result, his methodology is flawed at the most basic level, in attempting to compensate Uniloc for Microsoft's sales of non-infringing products.

Second, even disregarding this overarching defect in his analysis, Mr. Green arrives at his astronomical and speculative damages numbers in this case by extrapolating from Microsoft's historical estimates of incremental sales due to Microsoft's ***non-infringing*** pilot studies (called

"LVP," for "License Verification Program"), on which Mr. Green bases all of his estimates of incremental revenue allegedly resulting from the clearinghouse's infringement of claim 19 of the '216 patent, and, by extension, his final damages conclusions. Mr. Green concedes in his reports that Microsoft introduced LVP in 1998, years before any infringement of claim 19 of the '216 patent. Nevertheless, he extrapolates from these studies to conclude that Microsoft would have recognized incremental revenues of as high as 35% by using the patented technology instead. He never attempts to calculate the extent to which the infringing clearinghouse prompted incremental revenue gains over and above those that Microsoft would have recognized by using the non-infringing LVP. Rather, he purported to calculate only the extent to which the infringing clearinghouse resulted in revenue gains compared to *no product activation at all*. This analysis is fundamentally divorced from the facts of the case. This point is driven home by the tremendous variation in his estimates of incremental revenues, which directly result in his ultimate conclusion that the damages in this case vary across a range of *$3 billion*. To the extent Mr. Green purports to conduct a reliable expert analysis of the damages in this case, he must do far more than give the jury a virtually unlimited range and hope that the jury picks a number in that range. Because he provides no guidance as to which number is the appropriate one, his conclusions are unduly speculative and unreliable.

Third, in calculating his damages alternatively under both an "analytical method" and a *Georgia-Pacific* analysis, Mr. Green uses an inapposite financial concept to apportion his speculative incremental profits between Microsoft and Uniloc. This concept, the weighted average cost of capital (or "WACC") has no relationship whatsoever to Microsoft's normal returns on sales of its software in the absence of the infringing technology (as the governing case law requires), and is instead a purely arbitrary number calculated to maximize Uniloc's damages.

Its use is nowhere endorsed (or even discussed) in the law of patent damages, and it is an inappropriate measure to use in calculating damages in this case.

Fourth, Mr. Green engages in repeated violations of the Entire Market Value Rule, even though the Federal Circuit overturned the earlier damages award in this case in part on that very basis. Nevertheless, Mr. Green (and, by extension, Uniloc) cannot avoid the temptation of characterizing Uniloc's damages supposedly from use of the patented feature in the clearinghouse – which Mr. Green expressly recognizes plays no part in driving customer demand for the software, much less being the driving force behind demand – against the backdrop of the entire market value of Microsoft's non-infringing Windows operating system and Office desktop productivity software. This approach is methodologically and factually improper, and this Court should prevent Mr. Green's use of it just as the Federal Circuit prevented a similar use by Uniloc's previous damages expert.

Fifth, Mr. Green's *Georgia-Pacific* analysis (which incorporates all of the deficiencies described above) is based on his consideration and reliance upon license agreements that are substantially different (and broader) than the hypothetical license to claim 19 of the '216 patent, which would be the subject of the parties' negotiations in a proper *Georgia-Pacific* construct. Under recent, prevailing Federal Circuit cases, these deficiencies render his entire *Georgia-Pacific* analysis objectionable and inadmissible.

Sixth, Mr. Green repeatedly attempts to opine well outside his area of expertise as a damages expert in this case. For example, he draws technical conclusions with respect to the availability and acceptability of non-infringing alternatives identified by Microsoft's technical personnel and expert witness. He also criticizes Microsoft's experts' conclusions using the language of evidentiary admissibility, and in doing so attempts to act as a mouthpiece for

Uniloc's attorneys. He is not qualified to opine on the admissibility of expert opinion in this case, and the Court should exclude his attempts to do so in the guise of "expert damages testimony."

For these reasons, discussed in greater detail below, Microsoft requests that the Court exclude the testimony of Philip Green in this case.

## II.   STATEMENT OF FACTS

Mr. Green calculates multiple damages outcomes in this case, ranging from a "low" figure of $626 million to a high of over $3.6 billion. (Sept. 9, 2011 Rep. of P. Green, at 58 ("Sept. 2011 Rep.").) He reaches these conclusions by purporting to apply two approaches to calculating patent damages recognized in the case law. First, he purports to use the so-called "analytical method" initially described in *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895 (Fed. Cir. 1986), to reach his higher damages estimates in the case, including two theories of damages exceeding $3 billion. Second, he purports to follow an analysis under *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), to conclude that Microsoft should pay Uniloc a "per-activation" royalty of $4, resulting in overall damages of approximately $1.2 billion. As applied by Mr. Green, both of these approaches suffer from the flaws discussed in this memorandum, and both are therefore improper under R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as explained below.

In calculating damages under both methods, Mr. Green first purports to estimate the additional revenues (and then profit) that Microsoft obtained by infringing claim 19. (*E.g.*, *id.*, at 13.) To do this, he relies on **pilot studies** that Microsoft carried out in 1999 and 2000 in several specific countries, including the United States, which Uniloc contends showed (according to Mr. Green's understanding of Microsoft documents) that the technology underlying the **pilot studies**

caused end-user software product (specifically, Microsoft Office) sales revenue to increase by figures ranging from 4% to 73%.  He ultimately decides to consider two scenarios of incremental revenue growth "resulting" from the infringement: at the high end, 35%, and at the low end, 4% in some market segments, and 8% in others.  (*Id.*, at 27-28.)  He then uses those percentages drawn from the non-infringing pilot studies of a single version of Office 2000 in a few countries as a universal proxy for all versions of all Microsoft products in all countries using the infringing clearinghouse to conclude that Microsoft received incremental revenues from the infringing clearinghouse in the time frame from July 2001 through June 2006 of $7 billion (assuming 35% growth) or $1.5 billion (assuming 4% and 8% growth), i.e., over and above what Microsoft would have realized in the absence of the infringing technology (*id.*), as depicted in the figure below.  What Mr. Green fails to acknowledge is that Microsoft's estimates of increased sales from the non-infringing LVP pilot studies *are the sales Microsoft would have realized in the absence of the infringing clearinghouse*, and therefore, since he assumes the infringing clearinghouse would achieve the same increased sales as the LVP pilot studies, his own analysis shows the infringing clearinghouse *did not increase sales over Microsoft's non-infringing pre-existing alternative*.



Nevertheless, insisting on comparing the estimated increased sales resulting from using the infringing clearinghouse *as compared to having no product activation at all* (rather than comparing it to the non-infringing LVP studies), Mr. Green then applies this overly simplistic and conclusory extrapolation to his "analytical method" approach to reach his first range of damages.  In that analytical approach, Mr. Green attempts to calculate Microsoft's profit from these alleged incremental revenues, and then he attempts to apportion those purported incremental profits between Uniloc and Microsoft.  He concludes that Microsoft's contribution to these profits should be its weighted average cost of capital ("WACC"), which is 14% (and which he analogizes to the "normal returns" described in *TWM*).[1]  He also subtracts Microsoft's costs associated with implementing product activation, which he determines to range from $6 million to $42 million (depending on the calculation he uses), but which are negligible in light of the ultimate damages conclusions he reaches in the many hundreds of millions or billions of

---

[1] Mr. Green describes WACC as "reflect[ing] the rate of return required by Microsoft's debt and equity holders on an investment in Microsoft[.]"  Dec. 29, 2011 Rep. of P. Green ("Dec. 2011 Rep."), at 21.

dollars.  (*E.g.*, *id.*, at Exs. I, I-1.)  Left with a resulting "profit amount," he divides that profit by the number of activations in the period from July 2001 through June 2006 to arrive at a "per-activation" royalty, which he then multiplies by the total number of activations Microsoft has reported since 2001 (approximately 283 million), to arrive at a final damages number.  These "per activation" royalties range from a low of $2.21 to a high of $12.70, resulting in a range of damages, under the analytical approach, of $626 million to $3.6 billion.  (*Id.*, at 58.)

He then presents an analysis under *Georgia-Pacific* as an alternative approach. Extrapolating further from his analysis above, he purports to estimate Microsoft's future estimated revenues and profits derived from use of product activation, starting with a baseline royalty of $7.22 per activation, which he concludes represents the midpoint of a starting range of negotiating positions the parties would have advanced.  (*Id.*, at 55.)  Applying an analysis of the fifteen *Georgia-Pacific* factors, he ultimately concludes a reasonable royalty is $4 per activation. (*Id.*)  This figure results in damages of $1.1 billion.  (*Id.*, at 58.)[2]

All of these damages figures are the result of methodologically incorrect and unreliable approaches to valuing Uniloc's damages (if any) in this case, and they do not fit the facts of the case as contained in the record.  Under *Daubert* and Rule 702, they should be excluded.

## III.   LEGAL STANDARDS

### A.   <u>Rule 702 and the Court's Gatekeeping Responsibility</u>

Under Rule 702, as interpreted by the Supreme Court in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), an expert may offer opinion testimony only where (1) the opinion is based on sufficient facts or data, (2) the opinion is the product of reliable principles

---

[2] He also concludes that, at a minimum, the *Georgia-Pacific* analysis demands a royalty of Microsoft's hypothetical "starting point," or the minimum royalty of $2.21 per activation he derived from the analytical method.  This number results in a total damages figure of $626 million (equivalent to the low number in the analytical method). Sept. 2011 Rep., at 57.

and methods, and (3) the witness has applied those principles and methods reliably to the facts of the case. *See, e.g.*, *Micro Chem.*, 317 F.3d at 1391-92. *Daubert* established four illustrative "reliability-related factors," including "a theory's testability, whether 'it has been a subject of peer review or publication,' the 'known or potential rate of error,' and the 'degree of acceptance . . . within the relevant scientific community.'" *Kumho Tire*, 526 U.S. at 145, n. 151 (citing *Daubert*, 509 U.S. at 589-95). In applying these principles, the court must act as a "gatekeeper" to exclude expert testimony that "is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case." *Micro Chem.*, 317 F.3d at 1391. The court's gatekeeper role is "vital to ensure accurate and unbiased decision-making by the trier of fact" and that "'junk science' plays no part in the [jury's] decision." *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063 (9th Cir. 2002).

In *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), the Supreme Court clarified that this gatekeeper role extends to a review of the strength of the connection between an expert's conclusion and the facts on which that conclusion is based. The Court observed that "[t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." 522 U.S. at 146; *see also Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2002) ("[E]ven the most supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."). As a result, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," and in such cases the expert's testimony is unreliable and should be excluded. *Joiner*, 522 U.S. at 146.

The courts' gatekeeper role extends into the province of economic theories espoused by damages experts in patent infringement cases, and the courts have provided increasingly greater scrutiny to damages experts' opinions, often finding they fall short of the requirements of *Daubert* and *Joiner.  See, e.g., MicroStrategy, Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1355 (Fed. Cir. 2005) (excluding damages expert's opinion for unreliable conclusions); *Imonex Svcs., Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005) (excluding opinion because of violation of entire market value rule); *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1307-08 (Fed. Cir. 1999) (excluding damages expert's testimony proposing a novel, unrecognized theory of damages resulting from infringement); *ePlus, Inc. v. Lawson Software, Inc.*, 774 F. Supp. 2d 807, 816 (E.D. Va. 2011) (declining to "abdicate the gatekeeping duty imposed by *Daubert* and its progeny" by accepting damages expert's *ipse dixit* in support of expert conclusions); *IP Innovation LLC v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 691 (E.D. Tex. 2010) (excluding damages expert's testimony for relying on "irrelevant or unreliable evidence"); *Fenner Investments, Ltd. v. Hewlett-Packard Co.*, 2010 WL 3911372 (E.D. Tex. Apr. 16, 2010) (excluding damages expert's testimony for violation of entire market value rule and relying on noncomparable license agreements).

### B.     Damages Approaches in Patent Cases

As discussed in the Statement of Facts above, Mr. Green purports to estimate damages using both the so-called analytical method described in *TWM*, which is seldom used in hypothesizing damages, and a *Georgia-Pacific* analysis.

In *TWM*, the Federal Circuit rejected the argument that a damages expert must always utilize *Georgia-Pacific* to calculate a reasonable royalty; instead, the district court may allow an expert to apply an analytical methodology based on the defendant's anticipated profits from sales

of infringing devices. *See TWM*, 789 F.2d at 899 ("Dura has cited nothing which would limit the district court's discretion in choosing the analytical approach to determine a reasonable royalty. Section 284 does not mandate how the district court must compute that figure, only that the figure compensate for the infringement."). The court proceeded to find that the district court properly considered evidence of a hypothetical reasonable royalty based on "subtract[ion of] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices." *Id.* Importantly, the analytical methodology the Federal Circuit endorsed in *TWM* was a measurement of the defendant's "usual or acceptable net profit" subtracted from the "anticipated net profit realized from sales of infringing devices." *Id.* (emphasis added).

While there are relatively few decisions applying the analytical method to calculating patent damages, courts following *TWM* have echoed this comparison of "usual" or "normal" profit versus the defendant's profit recognized from sales of articles incorporating the infringing technology. Thus, in *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009), the Federal Circuit described the analytical method as "subtracting the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices." In *Oleksy v. General Electric Co.*, 2011 WL 4626015, at *4 n. 4 (N.D. Ill. Oct. 3, 2011), the court recognized that the analytical method "focuses on the infringer's profit projections for the infringing product." Other courts have followed suit. *See Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 2011 WL 3240452, at *1 (E.D. Wis. July 27, 2011) ("It is true, as First Quality points out, that in *TMW Mfg.* [sic] the lower court subtracted the industry standard net profit, as opposed to the defendant's profits on its other products, from the anticipated net profit on the infringing product to determine what the reasonable royalty would be."); *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 606 (D. Del. 2007)

11

("According to that [analytical] method, the parties would compare the expected profit margin of the infringing product to the typical profit margin for the relevant business."); *see also Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) (observing that, in calculating a reasonable royalty, "[a]mong the factors to be considered in determining that amount is the infringer's anticipated profit from use of the patented invention").  Mr. Green himself recognizes this point at page 32 of his September report: "For example, in *TWM v. Dura*, a reasonable royalty was determined by comparing the profits that the infringer anticipated it would earn from sales of its infringing devices with it[s] usual or acceptable profits."  (Sept. 2011 Rep., at 32.)

*TWM* and its progeny thus explain that the analytical method involves a comparison of the defendant's anticipated profit from sales of infringing products to the "usual" or "normal" profit that the defendant earns from sales of products that do not incorporate the patented technology.

## IV.   ARGUMENT

### A.   Multiple  Errors and Omissions Render Mr. Green's Opinions Inadmissible

#### 1.   Mr. Green Improperly Bases His Damages Calculations on Activations of Microsoft's Software Products Instead of "Use" of the Infringing Clearinghouse

Mr. Green's damages opinions are predicated fundamentally on Microsoft's revenue from sales of products that do not infringe the '216 patent.  In his September report, Mr. Green states, "I understand that these elements of claim 19 of the '216 patent comprise the entirety of the functionality of Microsoft's Product Activation system including the 'clearinghouse software and hardware in conjunction with the accused Microsoft software products.'"  (Sept. 2011 Rep.,

at 30.)  Continuing, he identifies as his first key data input "Microsoft revenues from Microsoft's Word XP, Word 2003, and other products that include Product Activation."  (*Id.*, at 35.)

All of that is of course factually incorrect.  As this Court subsequently confirmed, claim 19 "only covers Microsoft's Clearinghouse."  (Dkt. 467, at 1.)  Mr. Green was given an opportunity to fix this glaring error after the Court's order, but instead, he filed only a six-page supplement in which his bottom line damages numbers remained unchanged.  (Oct. 28, 2011 Rep. of P. Green ("Oct. 2011 Rep."), at 4, 5.)  In fact, in both his October 2011 and December 2011 rebuttal reports, Mr. Green expressly incorporated by reference the "assumptions, documents considered, and analyses discussed" in this initial report.  (*Id.*, at 1; Dec. 2011 Rep. at 1.)  In Mr. Green's opinion, the damages are identical whether only the Clearinghouse infringes, or whether the infringing subject matter includes Microsoft's Windows XP operating system software and Office XP and 2003 productivity suites.

That Mr. Green's damages opinions are unchanged despite the enormous reduction in the scope of subject matter covered by claim 19 on its face exposes the arbitrariness of his analysis, and its consequent inherent unreliability.

Moreover, Mr. Green in cavalierly asserting that his opinions remain unchanged despite this critical shift simply assumes, with no analysis whatsoever, that the prior damages model is just as appropriate in both cases.  It is not.  In his first analysis, Mr. Green thought— incorrectly—that Microsoft infringes claim 19 when it sells (or, more accurately, derives revenue from licensing) Office XP, Windows XP, and Office 2003.  That tracks the traditional patent damages model: the infringer sells infringing products, and the damages can in some instances be based on the revenue from those infringing sales.

That is not the case here.  Microsoft does not sell the Clearinghouse.  Microsoft only *uses* the Clearinghouse.  The unstated premise of Mr. Green's "revised" analysis is that Microsoft should pay a royalty to Uniloc based on each instance in which Microsoft uses its Clearinghouse to activate a new license for end-user software products already sold.

Not only does Mr. Green fail even to acknowledge that he has shifted from a "sales based" damages model to a "use based" damages model—while remarkably winding up with exactly the same bottom line opinions on the amounts of damages owed—but he does not identify any instance in which a user of computer software pays on a *per-use* basis.  To the contrary, the standard model in the software industry is that the software vendor – in this case, Uniloc -  receives a single (i.e., lump sum) payment from the software user for a license to that software that allows for unlimited use.  Mr. Green himself acknowledges this commonplace reality in his first report:

> When consumers "purchase" software, they are actually purchasing a license to use that software. The consumer does not "own" the underlying code or software; rather, they purchase the right to use the software under the terms of the license agreement provided by the manufacturer.

(Sept. 2011 Rep., at 7.)

Mr. Green simply offers no explanation, let alone analysis or justification, for departing from this standard "lump sum payment" scenario in this case.  Nor does he attempt to come up with an appropriate damages figure on the basis of the use of the Clearinghouse by Microsoft.

While a patent damages theory could be based on the use of an infringing article in an appropriate case, that is the rare exception, not the rule, and such a theory must be supported by evidence showing that use-based royalties are the norm in the applicable industry:

> Since there is no evidence that users in the food industry upon purchase of food processing equipment also expect to pay a use royalty (whether based on a separate method patent or on the right to control use of patented machines), a

14

willing licensor could not have reasonably expected to secure a use royalty from either the maker or user.

*Stickle v. Hublein, Inc.*, 716 F.2d 1550, 1562 (Fed. Cir. 1983) (rejecting damages model where damages calculated on the basis of sales of non-infringing tacos produced by the infringing taco-making machine).

Likewise here, Mr. Green identifies no evidence that a licensee of claim 19 of the '216 patent would pay a royalty each and every time a computer embodying that technology (e.g., a clearinghouse) was used.  To the contrary, Mr. Green acknowledges that the inventor of the '216 patent, Mr. Richardson, specifically contemplated licensing his technology on a lump-sum basis (*see* Dec. 2001 Rep., at 13); Mr. Green discounts that evidence because he contends that "[r]eviewing Mr. Richardson's notes does not constitute a license analysis." (*Id.*)  Mr. Green's failure to acknowledge, let alone grapple with, this core foundational issue renders his damages opinions unreliable, and thus inadmissible.

> 2.     *Mr. Green Fails to Evaluate the Extent, If Any, To Which the Infringing Clearinghouse Increased Revenues Relative to the Non-Infringing Predecessor Technology Used in the Pilot Studies*

Mr. Green opines that Microsoft's infringement resulted in additional incremental sales (and thus revenues and profit) of its non-infringing software beyond sales it would have made had it not infringed.  He then recognizes that the resulting incremental profit must be apportioned in some way between Uniloc (to account for the contribution of the patented technology) and Microsoft (to account for all the features in the non-infringing end-product software).  Once he makes that apportionment, he subtracts the amount of profit he "attributes" to Microsoft, and he divides the resulting number by the total number of activations over the time period of July 2001 through June 2006 to reach a "per-activation" royalty that he contends represents the additional profit per activation Microsoft earned from use of claim 19 of the '216 patent.

The fundamental starting point of this analysis, were it properly done and to the extent legally permissible, would be to determine Microsoft's incremental sales resulting from its use of the *infringing clearinghouse* in product activation.  But Mr. Green does not even attempt to answer that basic question.  Instead, he undertakes the very different task of calculating Microsoft's incremental revenues and profit resulting from its use of a *non-infringing technology*, LVP, used by Microsoft in a series of pilot studies it carried out in 1999 and 2000.  Critically, LVP has *never* been held to infringe the '216 patent in this case.  While Uniloc accused LVP of infringement early in the case (for example, in 2005, Uniloc's technical expert, Mr. Klausner, named Office 2000 SR-1 as an accused product in his first expert report on infringement in this case prior to the trial in 2009), Uniloc abandoned that contention and did not attempt to prove infringement by this technology during trial in 2009.  Therefore, Uniloc is precluded under res judicata and law of the case principles from now suggesting otherwise.[3]  Thus, since they are based on the pilots, Mr. Green's estimates of incremental revenue and profit are based on Microsoft's use of a technology that does *not* infringe claim 19 of the '216 patent.

This renders Mr. Green's approach methodologically improper.  Even if one were to accept the premise of Uniloc's theory, it was incumbent upon him to estimate Microsoft's incremental revenues from use of the actual, patented technology, over and above what it anticipated it would earn from using the pre-existing non-infringing LVP.  *See TWM*, 789 F.2d at 899.  He never did this.  Instead, he *equates* the estimated incremental revenue resulting from the pilot studies of LVP to incremental revenue resulting from Microsoft's use of the patented

---

[3] Two other points are worth noting in this connection.  First, Uniloc's technical expert, Mr. Klausner, has offered no opinion in any of his post-remand reports that Microsoft's clearinghouse as used in the pilots infringes.  Second, Mr. Green has set the date of the hypothetical negotiation as March of 2001.  *Id.*, at 42 ("The following analyzes the royalty rates that would have resulted from a hypothetical negotiation between Uniloc and Microsoft in March 2001, the date of the first commercial use of the infringing Product Activation system.).  Because the date of the hypothetical negotiation is always set at the date of the defendant's first infringement of the patent, *Powell*, 2011 WL 5519820, at *12, Mr. Green's damages analysis impliedly concedes that the LVP technology underlying the pilot studies did not infringe.

technology in the clearinghouse.  In doing so, Mr. Green overlooks that, based on his own analysis, Microsoft received *no incremental revenue* from using the infringing clearinghouse as compared to the non-infringing LVP.  Accordingly, Mr. Green's approach is methodologically unsound and results in ultimate conclusions that do not fit the facts of the case. There is simply no foundation for his conclusions.

After Microsoft's expert Christopher Vellturo pointed out this error in his report, Mr. Green attempted in his December report to defend his continued reliance on the pilot data. Specifically, in two paragraphs on page 15 of that report, he argues that Dr. Vellturo's criticism "misses the obvious point" that "Microsoft concluded that use of the infringing technology provided greater profits and/or technical benefits than relying on the purported alternatives." (Dec. 2011 Rep., at 15.)  This statement, though, is entirely made up – there is no evidence that Microsoft thought that product activation would provide incrementally more profits than it saw when using LVP in the pilot and, if so, what that increment was.  The statement is also a non sequitur in view of what Mr. Green actually did.  The purpose of the exercise is to calculate a reasonable royalty the patent-holder deserves for the defendant's use of his patented invention. Mr. Green makes no attempt to do this, instead implying that patented and non-patented technologies are equivalent, such that the actual results of the non-infringing pilot studies are equally applicable to Microsoft's later use of the patented technology.

This argument is also internally inconsistent with his observation, elsewhere in his report, that LVP was not an acceptable non-infringing substitute to the patented technology.  (*Id.*, at 3 ("I understand that Mr. David Klausner will testify that none of these 'alternatives' provides the

17

same functionality and benefit as the patented technology.")[4]  Mr. Green has no place to go: either his reliance on the pilot studies was justified insofar as LVP imparts the same benefits as claim 19 of the '216 patent—in which case his methodology is flawed because LVP does not infringe—or LVP does *not* "provide[] the same functionality and benefit as the patented technology" (which is only claim 19), in which case his reliance on LVP to predict incremental revenues resulting from use of claim 19 is divorced from the facts of record.  Under both scenarios, his conclusions are flawed, and the Court should exclude them.

### 3.    Mr. Green's Use of WACC in His Analyses is Unreliable and Methodologically Improper

The analytical method under *TWM* requires that a person calculating damages apportion the additional profit earned by the defendant as a result of the patented technology.  Mr. Green recognizes that some kind of apportionment is necessary.  (*Id.*, at 32 (recognizing that he must "compar[e] the profits that the infringer anticipated it would earn from sales of its infringing devices with it[s] usual or acceptable profits").)[5]  However, he uses an arbitrary and improper financial measure, WACC, to make that apportionment, which has the direct effect of attributing astronomical damages to Uniloc.

According to Mr. Green, WACC "reflects the rate of return required by Microsoft's debt and equity holders on an investment in Microsoft and applies to cash flow, not income."  (Dec. 2011 Rep., at 21.)  He takes Microsoft's anticipated profits on sales of non-infringing end-user software products (actually based on a non-infringing alternative, as explained above), and then uses a WACC of 14% to "discount" that number to account for Microsoft's "normal" returns on

---

[4] As noted above, Mr. Klausner in fact has not opined on remand that the pilot study activation technology infringes and, given res judicata and law of the case, he could not.  He instead argues the pilot technology is not as good and therefore is not "acceptable."  (Klausner Dec. 2011 Rep., at 17.)

[5] His analysis, here, again fails in light of the fact that the sales of so-called "infringing devices" on which he bases his damages are not "infringing" at all – they are Microsoft's sales of non-infringing, end-user software products. *See* Part III.A.1, *supra.*

the sale of its software products.  (Sept. 2011 Rep., at 36.)[6]  Based on this calculation, he

concludes that a reasonable royalty should lie between $2.21 and $12.70 on each new license

activation, resulting in damages to Uniloc ranging from $626 million to $3.6 billion.  (*Id.*, at 58.)

Mr. Green's use of WACC to apportion Microsoft's "'normal' returns on the sale of its

software products" (*id.*, at 36), is nonsensical.  WACC measures what an investor in Microsoft

anticipates earning on his investment in the company's equity (or debt).  It has *nothing* to do with

the profit rates or profitability that the company recognizes on sales of its best-selling products.[7]

It has *nothing* to do with the value of the patented technology at issue in this case, the infringing

clearinghouse, or even the non-infringing software on which Mr. Green bases his damages.

Indeed, by using WACC, Mr. Green would use the *same number* (14%) to estimate Microsoft's

"normal" returns, regardless of the type of technology at issue in the analysis, whether it be the

core feature driving all customer demand for the product or, as in this case, a feature that Mr.

Green himself acknowledges has nothing whatsoever to do with customer demand.  (*See* Sept.

2011 Rep., at 33.)  *Cf. Lucent*, 580 F.3d at 1337 ("[T]he only reasonable conclusion supported by

the evidence is that the infringing use of the date-picker tool in Outlook is but a very small

component of a much larger software program.").

At his deposition, Mr. Green conceded these points, recognizing that WACC has nothing

to do with the subject matter of the patent in dispute, and that WACC is instead a function of

"Microsoft's products and operation overall, that's true."  (Green Dep., 141; *see also id.*, at 144-

---

[6] "By making this deduction, I am ensuring that Microsoft is credited with its normal rate of return from additional sales due to Product Activation."  *Id.*

[7] *See* Dec. 2011 Rep., at 12 ("[WACC] is essentially the amount of return that Microsoft must earn in order to repay its owners and lenders on any given project or product."); *see also Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1326 n. 3 (Fed. Cir. 2011) ("The WACC is the expected return on a portfolio of all of an entity's securities. Those securities consist of both debt and equity.  The WACC is a weighted average of the return that security holders expect on their investments. . . . The calculation of WACC can be very complex[.]").  Even on its face, the WACC principle is inapposite to a consideration of "normal returns" or profit a defendant ordinarily earns on specified noninfringing products.

45.)  He further conceded that, because WACC is a function of a company's overall credit risk, the WACC of a large, successful company like Microsoft will be less than the WACC of an unsuccessful, untested company, and so under his WACC analysis the less successful and more risky company pays a *lower* royalty than a more successful company, regardless of the technology, or even industry, in dispute.  (*Id.*, at 138-40.)  The concept is completely divorced from any reasoned analysis of the technology in dispute.   The use of WACC in this case results "simply [in] too great an analytical gap between the data and the opinion offered."  *Joiner*, 522 U.S. at 146.

This criticism of Mr. Green's use of WACC is consistent with the fact that there appear to be no reported decisions applying WACC to calculate patent damages, much less to apportion the "normal returns" to the defendant under the analytical approach.[8]  Mr. Green's reliance on WACC to calculate Uniloc's damages is based only on his *ipse dixit*, and it is an arbitrary number.  The analytical approach calls for a calculation of the defendant's anticipated profits from use of the infringing technology, and then a deduction of the "normal" profits the defendant earns on non-infringing sales in that market.  Here, Mr. Green has not compared Microsoft's anticipated profits on any sales of Microsoft's non-infringing end-user software to the "normal" profits Microsoft would earn in the absence of the patented technology.  However, the data to do so is in his reports: one can compare Microsoft's overall profit from the timeframe when it used the noninfringing LVP technology, to Microsoft's overall profit from the timeframe when it used claim 19 of the '216 patent.  (*See, e.g.*, Sept. 2011 Rep., at Ex. D.)  Not surprisingly, there is no meaningful difference.  Instead of comparing the actual numbers that might be relevant, he uses an inapposite financial concept, WACC, that reflects (according to his own report) the rate of

---

[8] There are, however, cases criticizing an expert's use of WACC, although not in the patent context.  *See Baldwin v. Bader*, 539 F. Supp. 2d 443, 447-48 (D. Me. 2008) (excluding expert's testimony for improper use of WACC, among other things).

return a company's investors expect to receive on an investment in Microsoft's debt or equity. *Cf. Johns-Manville Corp. v. Guardian Indus. Corp.*, 718 F. Supp. 1310, 1313 (E.D. Mich. 1989) (rejecting use of analytical approach that involved improper mixing of cost accounting and financial accounting "to obtain allegedly comparative figures"); *Hughes Tool Co. v. Dresser Indus., Inc.*, 816 F.2d 1549, 1557 (Fed. Cir. 1987) (reversing damages award for improper comparison of return on investment and actual profits). The Court should not permit him to offer these expert opinions at trial.

5.     *Mr. Green's Opinions Violate the Entire Market Value Rule*

"The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand." *Uniloc*, 632 F.3d at 1320 (quoting *TWM*, 789 F.2d at 901); *see also Lucent*, 580 F.3d at 1336 ("In one sense, our law on the entire market value rule is quite clear. For the entire market value rule to apply, the patentee must prove that 'the patent-related feature is the 'basis for customer demand.'"). In the 2009 jury trial, Uniloc improperly compared its claimed damages to the entire market value of Microsoft's product offerings, when the patented feature (which was in the clearinghouse only) plainly did not drive customer demand for those offerings. As a result, the Federal Circuit reversed the damages award and remanded. Notwithstanding this clear guidance from the Federal Circuit on the proper application of the Entire Market Value Rule, Uniloc (through Mr. Green) again attempts to offer damages calculations based on the entire market value of Microsoft's best-selling products. This approach is methodologically improper, and the Court should prohibit Mr. Green's opinions accordingly. *See Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 290 (N.D.N.Y. 2009) ("It is the duty of this court to

ensure that the estimates are tied to *demand for the claimed invention* and proper economic methodologies, not just numbers in an accounting format.") (emphasis added).

Uniloc has never argued that the patented technology drives customer demand for the Microsoft software incorporating the technology. Indeed, Mr. Green himself has affirmatively stated that the patented technology does *not* drive customer demand. (Sept. 2011 Rep., at 33 ("I am not aware of any specific benefits to consumers or end users of Microsoft's software applications due to the presence of the patented technology.")) Despite the clear precedent on this point, and his own admission that the patented technology has no effect on customer demand, he still relies on the entire market value of Microsoft's software products to reach his conclusions, asserting repeatedly that Uniloc is entitled to the entirety of Microsoft's earnings on sales of its software, minus a 14% discount that he claims constitutes adequate compensation for the value of Microsoft's contribution to sales of these products. He never attempts to value the contribution of claim 19 of the '216 patent in relation to Microsoft's contributions to the non-infringing end-user software.

Mr. Green's references to the entire market value of Microsoft's best-selling, non-infringing end-user software products permeate his reports. In his September report, he commences his analysis by summarily observing that "I have calculated the incremental revenues earned by Microsoft *due to Product Activation* assuming the rates summarized in the above table." (Sept. 2011 Green Rep., at 27.)[9] He therefore begins his calculations with an assumption that *all* of Microsoft's incremental revenues based on estimated increased sales of the non-infringing software are attributable, and attributable alone, to Microsoft's use of claim 19 of the '216 patent, and he relies on this flawed assumption throughout his analysis. This

---

[9] In his report, Mr. Green equates "Product Activation" with the technology claimed in claim 19 of the '216 patent.

summary presumption is emblematic of his overall attempt to assert that Uniloc is entitled to all Microsoft's incremental earnings on non-infringing software which Mr. Green claims was sold due to the patented technology, on the flawed premise that the technology covered by claim 19 of the '216 patent is the only "but for" factor driving those sales.[10]

Additional examples of Mr. Green ascribing all earnings received by Microsoft from incremental sales (based on his flawed estimates of those anticipated increased sales) to claim 19 of the '216 patent include:

- "I have assumed that Microsoft would earn incremental profits of 80% on the incremental revenues from Product Activation." Sept. 2011 Green Rep., at 28.

- "Exhibit G-1 shows . . . incremental revenues due to Product Activation of $1.73 billion and $2.2 billion, respectively." *Id.*

  "In addition, applying a revenue growth rate of 35% to Microsoft's Open License revenues results in additional revenues of $3.1 billion due to the use of Product Activation." *Id.*

- "The additional profits earned by Microsoft on these incremental sales represent the economic contribution of the patented technology." (*Id.*, at 33.)

- "As shown on Exhibit G and Exhibit G-1, Microsoft has earned incremental profits of approximately $5.50 to $26.76 per activation as a result of Product Activation." (*Id.*, at 35.)

- "I have applied revenue growth rates of 4% to 35% to estimate the growth in Microsoft's System Builder segment revenues due to Product Activation. . . . Accordingly, Microsoft's total incremental revenues from Product Activation amount to between $1.5 billion to $7.0 billion." (*Id.*, at 35-36.)

- "Because these net profits are calculated solely on Microsoft's incremental sales due to Product Activation, these net profits are *entirely attributable to the use of the infringing Product Activation system*." (*Id.*, at 36 (emphasis added).)

- "Accordingly, absent any evidence from Microsoft that it has licensed technologies from others and incorporated this technology into the infringing

---

[10] *See also* Sept. 2011 Green Rep., at 27 (referring serially to his assumption that Microsoft experienced various revenue growth rates "due to Product Activation" and "due to the use of Product Activation," resulting in additional sales of $1.5 billion).

Product Activation system, the *entirety* of this amount is attributable to the '216 patented technology." (*Id.*, at 37 (emphasis added).)

In an attempt to evade criticism based on the Entire Market Value Rule, Mr. Green pays lip-service to the Federal Circuit's decisions in this case and in *ResQNet* regarding the rule (see *id.*, at 31-32). He asserts that his methodologies "are not based on the entire value of all profits or revenues that Microsoft has earned from sales of the accused end products, i.e., Windows and Office" (*id.*, at 56), because he "deriv[es] royalty rates from the incremental portion of the revenues and profits that are attributable to the accused Product Activation system, and not Microsoft's overall Windows and Office sales[.]" (*Id.*) This misses the mark. With respect to what he calls "incremental sales," he makes no attempt beyond his arbitrary WACC theory to quantify the value of those parts of the clearinghouse or software applications that Microsoft, as opposed to Uniloc, contributed, and which enabled Microsoft to make those incremental sales, i.e., the things that caused customers to be interested in acquiring the software in the first place. Stated otherwise, Mr. Green would have the jury (and the Court) believe that he has adhered to the Entire Market Value Rule by calculating Uniloc's damages based only on incremental sales of Microsoft's non-infringing software resulting from his analysis of Microsoft's pilot studies.[11]

For example, Mr. Green takes no account whatsoever of the fact that, *in addition to* the presence of the few features found to be covered by claim 19, the clearinghouse uses substantial technology created by Microsoft and technology licensed by Microsoft from third parties such as RSA.[12] He ignores that those customers who otherwise would have copied the software were interested in the software solely because of the features of the products innovated by Microsoft,

---

[11] "Microsoft's 'normal' revenues and profits have already been accounted for in my analysis. The Excess Earnings and Discounted Cash Flow calculations are based solely on the incremental revenues and profits that are attributable to Product Activation." Dec. 2011 Green Rep., at 21.

[12] Microsoft licensed encryption technology from RSA which lies at the heart of product activation's ability to deter casual copying. *See id.*, at 31-32.

such as the ability to use Microsoft Word to draft documents, or Excel to keep track of numerical records, or PowerPoint to create slide presentations. If any of these features was stripped from the hypothetical software sales Mr. Green analyzes, those sales would necessarily have decreased because of the diminished consumer demand for the end product, and yet Mr. Green never attempts to evaluate the contribution of those features.[13] Instead, he simply subtracts 14% of the earnings based on his use of WACC, and otherwise characterizes and interprets Uniloc's damages as flowing from the entire market value of Microsoft's non-infringing software offerings, in contravention of the decisions in *Lucent* and *Uniloc*.[14] This methodology is unsound and unreliable, and the Court should exclude Mr. Green's opinions on this basis. Mr. Gemini, Uniloc's damages expert in the first trial, violated the Entire Market Value Rule merely by using it as a so-called "check" to his other calculations. In contrast, Mr. Green's violations of the rule lie at the very heart of his damages analysis, because he consistently attributes the entire value of the additional sales of the Microsoft products to the patented technology.

Finally, Mr. Green engages in a particularly egregious violation of the rule near the end of his December report, when he expressly attempts to compare the total amount of his reasonable royalty analysis under *Georgia-Pacific* (equaling $1,133,619,244) to an appraisal of "Microsoft's cash and cash equivalents, including short-term investments[.]" (Dec. 2011 Green

---

[13] For example, in his December 2011 report, Mr. Green argues that "[t]hese incremental returns are directly attributable to Product Activation and the patented technology, as they would not have occurred *but for* the presence of the infringing clearinghouse." (Dec. 2011 Green Rep., at 20.) Here Mr. Green makes the basic logical error of assuming that a factor *necessary* to prompt an outcome must be the *only* such factor. Obviously, if Microsoft stripped every one of its own features from its software applications, leaving only a program that a customer could activate through product activation (and nothing else), there would be no sales at all.

[14] Mr. Green does attempt to account for "Microsoft's investments in Product Activation, including call center costs and upfront development costs," see Sept. 2011 Green Rep. at 35, but he ultimately concludes that those investments were minimal, amounting to approximately $42 million. *See id.*, at 37 (finding that the "entirety" of incremental revenues are "attributable to the '216 patented technology" because Microsoft has provided no evidence of licensing technology from others that it used in product activation). Of course, the more important point is that he does not consider, again, the value of Word, of Excel, of PowerPoint, or of the other myriad features contained in the software; he considers only a portion of Microsoft's specific contribution to the product activation piece of the clearinghouse.

Rep., at 34 n. 85.)  There, he declares that his "computed damages are approximately 2% of this balance" of "more than $52 billion."  (*Id.*)  This is a flagrant attempt to encourage the jury to award damages as a "small fraction" of Microsoft's purported overall corporate wealth, and is emblematic of a wholesale disregard of the Entire Market Value Rule.  *See Uniloc*, 632 F.3d at 1318 (criticizing Uniloc's first damages expert for opining that Uniloc's alleged damages were only 2.9% of Microsoft's overall revenue of $19 billion).  For the foregoing reasons, the Court should exclude Mr. Green's opinions as fundamentally based on violations of the Entire Market Value Rule, rendering them methodologically unsound, unreliable, and misleading.

### 4.   *Mr. Green Improperly Relies on Non-Comparable Uniloc Licenses to Justify His Royalty Rate, in Contravention of Clear Federal Circuit Precedent.*

In his discussion of the first factor of the *Georgia-Pacific* analysis, which considers royalties received by the patentee for licensing the patent in suit, Mr. Green relies upon three agreements that he contends "favor Uniloc during the hypothetical negotiation." (*Id.*, at 43-44.) The first agreement, between Uniloc and Xtreamlock, resulted in a royalty of 1% of Xtreamlock's net sales of licensed products under the '216 patent.  Mr. Green contends the second, between Uniloc and Curious Software, resulted in royalties in excess of 3% to 5%, and in the third, between Uniloc and MidNet, he contends that Uniloc received royalties "between 12.5% and 37.5% of the incremental revenues received by MidNet per authentication." (*Id.*)  He concludes that these licenses favor a higher royalty rate in the hypothetical negotiation under *Georgia-Pacific* (which he ultimately determines to be $4 per activation, or approximately $1,134,000,000).[15]

---

[15] *See* Sept. 2011 Green Rep., at 56 n. 214 (arguing that the MidNet license royalty rates of between 12.5% and 37.5% are consistent with his proposed royalty rate of $4.00 per activation, which he extrapolates to "approximately 20%" of Microsoft's incremental revenues resulting from product activation).

His reliance on each of these agreements is improper, because they are not comparable to the license that is the subject of the hypothetical negotiation in this case. *See ResQNet*, 594 F.3d at 869-70. Of these three agreements, only one (between Uniloc and Xtreamlok) is actually for a license to the patent at issue in this case. However, that license grants Xtreamlok the right to practice all 20 claims of the '216 patent. (Xtreamlok Agreement, at 1 (describing "The Property" licensed as "the invention(s) described in U.S. Patent No. 5,490,216"). The license in this case, however, would be limited to claim 19 of the '216 patent, which is the only claim Uniloc has shown Microsoft to infringe. *See ResQNet*, 594 F.3d at 869. Despite this important distinction, however, Mr. Green makes no adjustment in his reliance on the Xtreamlok agreement, and he considers it to be a comparable license for purposes of determining a reasonable royalty in this case. This is improper. Furthermore, Xtreamlok was selling a product that embodied the '216 patent, namely, a product for locking and unlocking software. Microsoft sells no such product; instead, it merely uses the clearinghouse to activate non-infringing software. These applications of the '216 patent are starkly different from one another.

Mr. Green then impermissibly relies on other non-comparable license agreements (between Uniloc and Curious Software and MidNet, respectively) of the exact type the Federal Circuit criticized in *ResQNet.com*. In that case, the plaintiff's damages expert attempted to extrapolate a royalty rate from license agreements that were *not* for the patent in suit, but rather for software agreements that purportedly included the patent in suit (although the court noted that the agreements failed even to mention the patents in suit). *See ResQNet*, 594 F.3d at 869-70. The Federal Circuit rejected this testimony, and it emphasized that licenses are appropriate for comparison under the first factor of *Georgia-Pacific* only where they are "past and present licenses to the *actual patent*" in litigation. *Id.* at 869.

27

The licenses in *ResQNet* were not comparable because they were not licenses to the patent in suit, but to "finished software products and source code." *Id.* at 870. The court expressly pointed out that the plaintiff's expert's conclusions that the licensed software was "based on the technology described in the patents in suit" were "a far cry from a conclusion that ResQNet's products are coextensive with the claimed invention," and that it was impossible to tell whether the licensed software practiced prior art, the claimed invention, or some combination of both. *Id.* at 871 n. 1; *cf. Lucent*, 580 F.3d at 1327-28 (criticizing reliance on license agreements that were different from the hypothetical agreement under consideration, or where the evidence was insufficient to show how the agreements were relevant). The court also observed that the software licenses were "absolutely silent on any relation to the patents in suit." *ResQNet,* 594 F.3d at 871. As a result of these deficiencies, the court found the damages award to be unduly speculative and inconsistent with the facts of record in the case, and it remanded for further proceedings. *Id.* at 873; *see also id.* at 869 ("[T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the marketplace. . . . Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute.").

Mr. Green's reliance upon noncomparable licenses in this case is improper under *ResQNet.* The Curious Software and MidNet licenses are for software products (not patents), which are not coextensive with claim 19 of the '216 patent. (*See* Glitzenstein Decl., at Exs. G and H (comprising those licenses).) Indeed, at deposition, Brad Davis, Uniloc's CEO, testified that NetAnchor (the subject of the MidNet license) does *not* practice the '216 patent. (*See* Davis Dep., at 12, 41.) And, as in *ResQNet*, neither of these agreements even makes reference to the '216 patent. Instead, the Court is left only with Mr. Green's *ipse dixit* that these agreements are

somehow reflective of a reasonable royalty for Microsoft's use of the patented technology in this case.[16]  Mr. Green's reliance on these agreements is improper under *ResQNet*, and the Court should exclude his opinions under *Georgia-Pacific* on that basis.

###### B.    Mr. Green Renders Numerous Opinions Outside of His Competence as an Expert

######## 1.    *Mr. Green is Not Qualified to Opine on the Availability or Acceptability of Microsoft's Non-Infringing Alternatives*

Microsoft's damages experts Professor Mnookin and Dr. Vellturo, and Microsoft's technical expert Dr. Alan Sherman,[17] in opining on behalf of Microsoft, identify or rely on a number of non-infringing alternatives to the patented technology that Mr. Green categorically failed to consider in his opening reports.  (*See, e.g.*, Sept. 2011 Rep., at 51 ("Moreover, I am unaware of any acceptable non-infringing alternatives available to Microsoft at the time of the hypothetical negotiation.")).[18]  The discussion of those alternatives in the Mnookin and Vellturo reports is based on factual declarations from, and conversations with, the Microsoft employees who would have been negotiating a license with Uniloc in 2001 and who would have determined whether moving the clearinghouse to Ireland would have been acceptable and at what cost.  In his December supplemental report, Mr. Green spends several pages purporting to opine on why the various non-infringing alternatives that Microsoft's experts identified are not, in fact, acceptable alternatives that should affect the calculation of damages in this case.  Critically,

---

[16] *See, e.g.*, Dec. 2011 Green Rep., at 26 (defending his reliance on the MidNet agreement by arguing that "[t]he Vellturo Report wholly ignores that this software embodied the patent-in-suit").  Of course, he provides no support for this statement – a classic case of *ipse dixit*.

[17] Dr. Sherman is an associate professor of computer science at the University of Maryland, Baltimore County.  He submitted an expert report in this case on December 8, 2011 with respect to various technical non-infringing alternatives to Uniloc's patented technology that were available to Microsoft at the time of the hypothetical negotiation.

[18] This statement evidences the fact that Mr. Green completely overlooked (or misunderstood) the fact that the product activation technology underlying Microsoft's pilot studies was never held to infringe the '216 patent, which constitutes a fundamental flaw (as explained above) in his own methodology.

however, Mr. Green's expertise does *not* extend into the realm of technical alternatives to the

patented technology in dispute (nor does he or Uniloc ever claim that it does), rendering all of

these opinions without the foundation necessary to permit their introduction under Rule 702.

The Court should therefore strike all of Mr. Green's proposed opinions criticizing or otherwise

characterizing Microsoft's alternatives as not acceptable, not infringing, or both.

Specifically, in his "Supplemental Opinion I" of his December 29, 2011 report, Mr.

Green defends his conclusion that the parties would have negotiated a royalty of $4 per

activation by engaging in a lengthy criticism of the technical non-infringing alternatives

available to Microsoft instead of Uniloc's patented technology.  Mr. Green identifies these

alternatives as consisting of

> 1) Using the "hash-less" License Verification system;
> 2) Removing the hash from the existing Product Activation system;
> 3) Using the hash-less telephone activation protocol for Internet activations;
> 4) Eliminating Internet activation and expanding the use of telephone activation; and
> 5) Relocating the infringing clearinghouse outside the United States.

(Dec. 2011 Green Rep., at 2.)  He immediately discounts them all by arguing that, were they

truly acceptable alternatives, Microsoft would have used one or more instead of continuing to

use claim 19 of the '216 patent.  This is speculation and attorney argument, not proper expert

analysis. He does not stop there, but engages in an extended discussion of each, purporting to

explain why, in his "expert" opinion, none is a true alternative.  He treats *each* of the five

alternatives listed above in this way.

For example, with respect to the alternative of locating the clearinghouse in Ireland, he

directly criticizes Microsoft's employee witnesses (including Bobby Kishore and Aaron

McCreery), who have substantial experience with Microsoft's product activation, by challenging

their credibility.  (*Id.*, at 5-6.)  Mr. Green obviously has no expert foundation on which to challenge any of this information, as he is not an expert in product activation, the technology underlying claim 19 of the '216 patent, or witness credibility.  He also identifies emails in Microsoft's production that he contends show that the alternatives were not acceptable or available, although those documents describe product activation in highly technical terminology and jargon that is well outside of Mr. Green's technical expertise in this case.[19]  He even purports to characterize and interpret Microsoft's internal corporate policies with respect to customer privacy, another area in which he has no background or expertise.  (*See id.*, at 7-8.)

In rendering his opinions on these topics outside of his expertise, he does state that he has "considered information regarding the technical alternatives provided by Mr. David Klausner [Uniloc's technical expert] and Dr. Sherman," *id.* at 3, but saying so does not transform him into a technical expert competent to opine on the subject of non-infringing alternatives.  Nor should the Court permit Mr. Green to suggest that the jury accord more weight to Mr. Klausner's expert opinions (which Microsoft also challenges on *Daubert* grounds) with respect to technical matters, by purporting to "corroborate" Mr. Klausner's opinions.  *See Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346. 364 (D. Del. 2006) (prohibiting damages expert from opining "on whether there are acceptable non-infringing alternatives," as opposed to technical expert); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 444 (2d Cir. 1995) (affirming exclusion of damages expert testimony outside scope of expertise); *Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, 2011 WL 4055376, at *1 n. 3 (S.D. Fla. Sept. 13,

---

[19] *See, e.g.*, Dec. 2011 Green Rep., at 6 (characterizing email that refers to, among other technical matters, "log shipping to a remote SQL server running in warm backup mode").  As a direct result of his lack of expertise in this technical area, he misinterprets this document in an attempt to use it to defend his conclusions.  This is exactly the sort of thing that *Daubert* and its progeny were meant to curtail.

2011) (same).  For these reasons, the Court should exclude Mr. Green's unfounded opinions on

the availability and acceptability of technical non-infringing alternatives to Microsoft.

At his deposition, Mr. Green also expressed his opinion that a consideration of non-

infringing alternatives was irrelevant to his analysis of damages under the "analytical" approach

based on *TWM*.  (Green Dep., at 121-22, 128-29.)  In doing so, Mr. Green misunderstands the

analytical approach not to involve a hypothetical negotiation, when this is decidedly not the case.

As the Federal Circuit made clear in *TWM*, damages are still estimated in the context of a

hypothetical negotiation construct; however, different considerations (including the profitability

of the defendant resulting from the infringement) are the most important factors dictating the

"reasonable royalty" to which the parties would have negotiated in the hypothetical negotiation.

*See TWM*, 789 F.2d at 898 ("For the years TWM could not establish its lost profits, TWM and

Dura agreed that the district court should determine a reasonable royalty based on a 'hypothetical

royalty resulting from the arm's length negotiations between a willing licensor and a willing

licensee.'") (citation omitted); *id.* at 900 (referring to "what a willing licensor and licensee would

have agreed to in 1967, based on the present record").  In any hypothetical negotiation construct,

the presence or absence of acceptable, available non-infringing alternatives is a fundamental

consideration that would affect the parties' negotiating positions.  Mr. Green has categorically

failed to consider this issues in his analytical approach, and opinions based on that approach

should be excluded for that reason.  In any event, Mr. Green should not be permitted to testify at

trial that non-infringing alternatives are not relevant to an estimation of damages under the

analytical approach.

Nor should the Court permit Mr. Green to opine that Microsoft's expenses (including

legal fees and support costs) in litigating this dispute purportedly "show" that the non-infringing

alternatives were not acceptable or available to Microsoft.  At deposition, this argument was a key basis for his conclusions that, from the standpoint of a "rational economic actor," the various non-infringing alternatives Microsoft has identified were unavailable, unacceptable, or both.  As the Court is well aware, Microsoft and Uniloc have litigated this case for over eight years, during the majority of which time Microsoft was *not* found to have infringed claim 19 of the '216 patent.  Mr. Green may not casually opine that alternatives were not available or acceptable to Microsoft because it opted to defend itself from Uniloc's claims (of which most, in fact, were decided against Uniloc, with the exception of claim 19).  This opinion is not the result of reasoned or defensible scientific analysis, and it does not fit the facts of the procedural history of the case.  At best, it is not outside the ken of the average juror, and thus is not appropriate testimony for Uniloc's expert to espouse.  Finally, for the reasons set forth in Microsoft's motion in limine on the issue of admitting evidence of Microsoft's legal fees at trial, any such reference by Mr. Green to those expenses would be irrelevant and unduly prejudicial to Microsoft.  The Court should therefore limit Mr. Green from making any reference to his theory that alternatives were not acceptable or available based on Microsoft's accumulation of legal fees in this case, or because of Microsoft's good-faith decision to defend itself from Uniloc's infringement claims.

Mr. Green also at deposition expressed his opinion that merely because Microsoft "opted" to infringe, any non-infringing alternatives must necessarily have been unavailable or unacceptable because Microsoft purportedly deemed the infringed technology to be technically superior or more profitable.  First, it is grossly improper for Mr. Green to opine or express any conclusion that Microsoft "opted" to infringe, as the Court has definitively found that Microsoft's infringement in this case was not willful.  The Court should prohibit him from making any such reference.  Further, this theory is illogical at the most basic level.  If a damages

expert like Mr. Green could simply disregard a non-infringing alternative because the defendant ultimately used the patented technology, there would *never* be a case in which a non-infringing alternative could be available or acceptable for purposes of evaluating damages.  In other words, Mr. Green's explanation, while cloaked in the guise of his "expertise," makes no logical sense whatsoever, and effectively eliminates the case law holding that a consideration of non-infringing alternatives *is* germane to a calculation of damages.  As this theory cannot be the product of a reliable scientific methodology, the Court should not permit Mr. Green to express these opinions at trial.

2.      *Mr. Green is Not Qualified to Opine on the Admissibility of Professor Mnookin's Opinions*

Mr. Green's December report contains a "Supplemental Opinion II" in which he critiques in legal terms the expert opinions offered by Professor Mnookin in his December 9, 2011 report, as though he himself (and not Uniloc's counsel) were attempting to argue that Professor Mnookin's opinions are improper under Rule 702 and *Daubert*.  (*See* Dec. 2011 Green Rep., at 9.)  For example, he writes that Professor Mnookin's "conclusion does not follow established methodologies.  It is unsupported, and is inconsistent with the facts of this matter[.]"  (*Id.*) Additionally, Mr. Green criticizes Professor Mnookin for failing to "meaningfully consider the *Georgia-Pacific* factors," incorrectly valuing the reservation price Professor Mnookin refers to in his opinions, relying on valuations of Uniloc (by Uniloc's own business decision-makers), and disregarding 35 U.S.C. § 284 ("The Mnookin Report Does Not Measure a Damage").  (*See generally id.*, at 9-14.)  These are legal arguments; it is not proper for Mr. Green to act as a mouthpiece for Uniloc's counsel on these issues.

As a threshold matter, Mr. Green's critique of Professor Mnookin on these points is ironic, in that Mr. Green himself has offered expert opinions that do not rely on the *Georgia-*

*Pacific* factors in this case (that is, his opinions based on his attempted application of *TWM*'s analytical method), and, in doing so, has crafted an entirely novel "analytical method" that disregards the governing precedent in *TWM* and its progeny as noted above.  He has then imported these flawed conclusions into a *Georgia-Pacific* analysis, in an attempt to cloak his unorthodox methodology in the generally-accepted language of *Georgia-Pacific*.  As explained in detail earlier in this memorandum, Mr. Green's opinions fall outside of the strictures on expert testimony imposed by Rule 702 and *Daubert*, because they misapply and mischaracterize the relevant facts of the case and the governing legal precedent.  In contrast, Professor Mnookin's opinions are proper, and Microsoft will defend his ability to offer those conclusions at trial, if Uniloc asks the Court to exclude them.  It is inappropriate, however, for Mr. Green to argue for the exclusion of Professor Mnookin's opinions in the guise of "expert testimony."

The First Circuit has definitively held that "[i]t is black-letter law that '[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge."  *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997).  Legal questions are "exclusively the domain of the judge," and expert testimony on such issues "is not helpful to the jury and so does not fall within the literal terms of Fed. R. Evid. 702 . . . .  'Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect[.]'"  *Id.* (citations omitted); *cf. Rodriguez v. Clark Equip. Co.*, 147 F. Supp. 2d 81, 85 (D.P.R. 2001) (excluding expert's opinions that "do not properly assist the trier of fact because they pretend to draw ultimate legal conclusions, thereby invading the province of the jury").  Nor is this a case where the legal principles Mr. Green attempts to explain and apply to Professor Mnookin's opinions are sufficiently "highly complex and technical" that the Court should make an exception to the general rule.  Instead, Mr. Green's criticisms of the admissibility of Professor Mnookin's

opinions "are routinely before the courts[.]" *Nieves-Villanueva*, 133 F.3d at 101.  Thus, if Mr.

Green is allowed to testify with respect to these matters, "the use of such testimony [will be]

egregious," as it was in *Nieves-Villanueva. Id.*; *see also Wilson v. Bradlees of New England,*

*Inc.*, 1999 WL 816817, at *4 (D.N.H. Feb. 3, 1999) (striking expert's opinions where "[t]here

[was] no basis for Canter's expertise on . . . the applicable legal standard"); *Celebrity Cruises*

*Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 191 (S.D.N.Y. 2006) (striking expert damages

testimony that was, "in effect, an opinion about Celebrity's legal standing, and as such is beyond

the province of a financial expert").  The Court should therefore exclude Mr. Green's

supplemental opinions critiquing the admissibility of Professor Mnookin's opinions.

## IV.    CONCLUSION

For the reasons explained above, and to ensure that trial in this matter constitutes a fair

inquiry into the true damages Uniloc has suffered as a result of infringement of claim 19 of the

'216 patent, Microsoft respectfully asks the Court to exclude the objectionable testimony of Mr.

Green.

Dated:  February 6, 2012

FISH & RICHARDSON P.C.

By: /s/ Kurt L. Glitzenstein
    Mary C. Dunn #6712
    (mcd@blishcavlaw.com)
    Joseph V. Cavanagh, Jr. #1139
    (jvc@blishcavlaw.com )
    **BLISH & CAVANAGH LLP**
    Commerce Center
    30 Exchange Terrace
    Providence, RI 02903
    Telephone:  (401) 831-8900
    Facsimile:  (401) 751-7542

    Frank E. Scherkenbach
    (scherkenbach@fr.com)
    Kurt L. Glitzenstein
    (glitzenstein@fr.com)
    Steven R. Katz
    (katz@fr.com)
    **FISH & RICHARDSON P.C.**
    One Marina Park Drive
    Boston, MA  02110
    Telephone:  (617) 542-5070
    Facsimile:  (617) 542-8906

    Laura R. Braden
    (braden@fr.com)
    **FISH & RICHARDSON P.C**.
    1425 K Street, N.W.
    11th Floor
    Washington, DC  20005-3500
    Telephone:  (202) 783-5070
    Facsimile:  (202) 783-2331

    Roger A. Denning
    (denning@fr.com)
    **FISH & RICHARDSON P.C.**
    12390 El Camino Real
    San Diego, CA  92130
    Telephone:  (858) 678-5070
    Facsimile:  (858) 678-5099

    **ATTORNEYS FOR DEFENDANT**
    **MICROSOFT CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that MICROSOFT CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY OF PHILIP GREEN filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 6th day of February, 2012.

*/s/ Kurt L. Glitzenstein*
Kurt L. Glitzenstein